Case 2:23-cr-00047-JLS Document 1 Filed 01/31/23 Page 1 of 18 Page ID #:1

FILED
CLERK, U.S. DISTRICT COURT
1/31/2023
CENTRAL DISTRICT OF CALIFORNIA
BY: ___vav___ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

March 2022 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>THOMAS VINCENT GIRARDI and CHRISTOPHER KAZUO KAMON,<br><br>    Defendants. | CR No. 2:23-cr-00047-JFW<br><br>I N D I C T M E N T<br><br>[18 U.S.C. § 1343: Wire Fraud; 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c): Criminal Forfeiture] |

The Grand Jury charges:

COUNTS ONE THROUGH FIVE

[18 U.S.C. §§ 1343, 2(a)]

A. INTRODUCTORY ALLEGATIONS

1. At times relevant to this Indictment:

    a. Defendant THOMAS VINCENT GIRARDI was a resident of Pasadena, California.

    b. Defendant GIRARDI was an attorney licensed to practice law in the State of California.

    c. Defendant GIRARDI was the 100 percent owner and managing partner of Girardi Keese, a law firm located in Los Angeles, California, that primarily represented plaintiffs in personal injury

cases. On or about December 18, 2020, after a series of civil lawsuits publicly alleged that Girardi Keese had misappropriated client funds, certain creditors of Girardi Keese commenced an involuntary petition for relief under Chapter 7 of Title 11 of the United States Code against Girardi Keese. On or about January 13, 2021, the Bankruptcy Court entered an Order for Relief Under Chapter 7 and ordered the appointment of a Chapter 7 Trustee.

    d. Defendant GIRARDI was a signatory on and exercised control over the following bank accounts, which were opened and maintained in Los Angeles, California:

        i. A Girardi Keese attorney-client trust account, also called an "Interest on Lawyer's Trust Account" or "IOLTA" account, at Torrey Pines Bank, bearing an account number ending in 5859 (the "Torrey Pines IOLTA Account"); and

        ii. A Girardi Keese IOLTA account, at Nano Banc, bearing an account number ending in 0567 (the "Nano Banc IOLTA Account").

    e. Defendant GIRARDI became a member of the State Bar of California in 1965 and was obligated to comply with the California Rules of Professional Conduct. Defendant GIRARDI knew that the California Rules of Professional Conduct required him to, among other things, promptly notify a client of the receipt of any funds the client was entitled to receive, and promptly pay or deliver to the client or such payees as designated by the client any such funds that defendant GIRARDI and Girardi Keese held in trust for the client upon the client's request.

    f. Defendant CHRISTOPHER KAZUO KAMON was a resident of Palos Verdes and Encino, California. From in or about 2004 until in

or about December 2020, defendant KAMON was the Controller and Chief Financial Officer ("CFO") of Girardi Keese, from which position he oversaw the law firm's financial affairs, supervised its accounting department, and was in charge of paying the firm's expenses. As Girardi Keese's Controller and CFO, defendant KAMON had a duty to maintain books and records that accurately reflected the firm's finances, including the disposition of monies held in its attorney-client trust accounts.

   g. "Client 1" was an individual who resided in San Bruno, California. Beginning on or about October 1, 2010, defendant GIRARDI and Girardi Keese had a formal attorney-client relationship with Client 1. Specifically, defendant GIRARDI and Girardi Keese agreed to represent Client 1 in connection with a lawsuit against a public utility related to significant injuries Client 1 sustained as a result of an explosion that caused severe burns all over his body.

   h. "Client 2" was an individual who resided in Lake Havasu City, Arizona. Beginning as early as in or around May 2019, defendant GIRARDI and Girardi Keese had a formal attorney-client relationship with Client 2. Specifically, defendant GIRARDI and Girardi Keese agreed to represent Client 2 in connection with potential litigation related to a boating accident where the boat unexpectedly sped up to 120 miles per hour, flipped, and ejected all three occupants, and as a result of which Client 2's husband died.

   i. "Client 3" was an individual who resided in Castaic, California. Beginning as early as 2012, defendant GIRARDI and Girardi Keese had a formal attorney-client relationship with Client 3. Specifically, defendant GIRARDI and Girardi Keese agreed to represent Client 3 in connection with a lawsuit against a medical

device provider related to severe injuries, including organ damage, Client 3 sustained as a result of a defective medical device.

j. "Client 4" and "Client 5" were individuals who resided in Los Angeles, California. Beginning as early as in or around December 2019, defendant GIRARDI and Girardi Keese had a formal attorney-client relationship with Client 4 and Client 5. Specifically, defendant GIRARDI and Girardi Keese agreed to represent Client 4 and Client 5 in connection with a lawsuit related to injuries Client 4, Client 5, and their minor son, who was paralyzed from the neck down, sustained in an automobile collision.

B. THE SCHEME TO DEFRAUD

2. Beginning at least as early as in or around 2010 and continuing through at least in or around December 2020, in Los Angeles County, within the Central District of California, and elsewhere, defendants GIRARDI and KAMON, together with others known and unknown to the Grand Jury, knowingly and with intent to defraud, devised, participated in, and executed a scheme to defraud victim clients to whom defendant GIRARDI and Girardi Keese had agreed to provide legal services including, but not limited to, Client 1, Client 2, Client 3, Client 4, and Client 5, as to material matters, and to obtain money and property from such victim clients by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts, including material facts that defendant GIRARDI had a duty to disclose.

3. The fraudulent scheme operated, in substance, in the following manner:

a. Defendant GIRARDI would negotiate a settlement on behalf of a client that would require the payment of funds to the client.

b. Defendant GIRARDI would misrepresent, conceal, and falsely describe to the client the true terms of the settlement and/or the disposition of the settlement proceeds.

c. Defendants GIRARDI and KAMON would cause the settlement proceeds to be deposited in or transferred to attorney trust accounts, including the Torrey Pines IOLTA Account and the Nano Banc IOLTA Account, that defendants GIRARDI and KAMON controlled.

d. Defendants GIRARDI and KAMON would thereafter embezzle and misappropriate settlement funds from the Torrey Pines IOLTA Account and the Nano Banc IOLTA Account belonging to Girardi Keese clients for improper purposes. The improper purposes included, among other things, paying other Girardi Keese clients whose own settlement funds previously had been misappropriated, paying Girardi Keese's payroll, and paying other Girardi Keese's expenses, including its American Express Card bills encompassing charges for defendant GIRARDI's and defendant KAMON's personal expenses.

e. As part of their scheme and to conceal the embezzlements and misappropriations from the victim clients, defendants GIRARDI and KAMON would send and cause to be sent lulling communications to the clients that, among other things, falsely denied that the settlement proceeds had been paid and falsely claimed that Girardi Keese could not pay the settlement proceeds to clients until certain purported requirements had been met, such as addressing supposed tax obligations, obtaining supposedly necessary

authorizations from judges, and satisfying medical liens and other

authorizations from judges, and satisfying medical liens and other debts.

        f.  As further part of their scheme and to conceal the embezzlements and misappropriations from the victim clients, defendants GIRARDI and KAMON would also send and cause to be sent lulling payments to the clients, falsely representing and maintain the false pretense that such payments were "advances" on the purportedly yet-to-be received settlement proceeds, or "interest payments" on the settlement proceeds that purportedly could not be paid to the clients until the fabricated requirements were satisfied.

### **Embezzlement of Client 1's Funds**

4. In or about January 2013, defendant GIRARDI negotiated a settlement of the lawsuit related to Client 1's injuries without obtaining prior approval of the settlement terms from Client 1. The terms of the settlement provided that Client 1 would be paid $53,000,000 to release all of Client 1's claims. Pursuant to Client 1's retainer agreement with Girardi Keese, Girardi Keese's attorneys' fees, in the amount of 25% of the settlement amount, costs, and expenses were to be deducted from the settlement proceeds and paid to Girardi Keese.

5. On or about January 10, 2013, defendant GIRARDI told Client 1 that the case had settled. Defendant GIRARDI had not previously informed Client 1 of the settlement or obtained Client 1's consent to the terms of the settlement and concealed the true terms of the settlement from Client 1. Defendant GIRARDI falsely represented to Client 1 that the total settlement amount was approximately $7,250,000, and concealed from Client 1 that the true amount of the settlement was $53,000,000. Defendant GIRARDI further falsely

6

represented that the settlement would be structured as an annuity to be paid to Client 1 for the rest of Client 1's life when, as defendant GIRARDI then knew, the settlement terms did not require the creation of an annuity or any other structured settlement, and defendant GIRARDI had not obtained Client 1's consent to so structure the settlement.

6. On or about January 24, 2013, over half of Client 1's settlement, namely, $28,000,000, was wire transferred to the Torrey Pines IOLTA Account. Defendants GIRARDI and KAMON were provided notice of the incoming wire that same day. Defendants GIRARDI and KAMON then misappropriated and embezzled a portion of Client 1's settlement funds and caused those funds to be used to pay other expenses and liabilities of Girardi Keese unrelated to Client 1, including payments to other Girardi Keese clients whose own settlement funds had previously been misappropriated by defendants GIRARDI and KAMON, and others.

7. In order to lull Client 1 and prevent Client 1 from discovering that defendants GIRARDI and KAMON had embezzled Client 1's settlement funds, defendant GIRARDI and KAMON, aiding and abetting each other, committed and caused to be committed the following acts, among others:

    a. Falsely informing Client 1 that Client 1's settlement "should be tax free," and that delays in payment of settlement funds to Client 1 were due to defendant GIRARDI's efforts to remove any tax liability for Client 1 when, as defendant GIRARDI then knew, Client 1's settlement was not taxable;

    b. Falsely informing Client 1 that Client 1's settlement funds had been transferred into a separate interest-bearing account

7

when, in fact, no such transfers had been made and no such separate interest-bearing account containing Client 1's settlement funds existed;

  c. Falsely informing Client 1 that Client 1's settlement funds were "locked up" for a six-month period due to their deposit into the separate interest-bearing account, when no such separate interest-bearing account existed;

  d. Sending and causing to be sent lulling payments to Client 1 as purported "interest payments" deriving from the supposed separate interest-bearing account;

  e. Sending and causing to be sent letters to Client 1 falsely claiming that "we worked magic so far in getting these huge interest rates and getting the first two years tax free";

  f. Sending and causing to be sent letters to Client 1 falsely attributing delays in the payment of settlement funds to Client 1 to supposed court oversight of the distribution of settlement funds when, in fact, no such court oversight was required or existed; and

  g. Sending and causing to be sent, on July 1, 2019, a check for $2,500,000 to Client 1 purportedly as a disbursement of Client 1's settlement funds, which funds were, as defendant GIRARDI then knew, settlement proceeds belonging to Client 4 and Client 5 (as described below), and not Client 1's settlement proceeds, which defendants GIRARDI and KAMON had already spent and caused to be spent through disbursements unrelated to Client 1.

**Embezzlement of Client 2's Funds**

8. In or about April 2020, defendant GIRARDI negotiated a settlement of legal claims related to the death of Client 2's spouse.

8

On or about June 24, 2020, defendants GIRARDI and KAMON received a settlement check for $504,400 as payment on Client 2's claims. Pursuant to Client 2's retainer agreement with Girardi Keese, Girardi Keese's attorneys' fees, in the amount of 33.3% of the settlement amount, costs, and expenses were to be deducted from the settlement proceeds and paid to Girardi Keese.

9. On or about June 25, 2020, defendant GIRARDI caused Client 2's settlement funds to be deposited into the Torrey Pines IOLTA Account. Prior to that deposit, and in violation of the California Rules of Professional Conduct governing the management of attorney-client trust accounts, defendants GIRARDI and KAMON transferred and caused the transfer of approximately $183,605.45 from the Torrey Pines IOLTA account to a Girardi Keese operating account, as "fees" owed to Girardi Keese from Client 2's settlement, when defendants GIRARDI and KAMON then knew that the funds in fact came from settlement funds belonging to other Girardi Keese clients. Defendants GIRARDI and KAMON used the transferred funds to pay Girardi Keese payroll expenses and fund a $50,000 check written on the operating account to defendant GIRARDI, which defendant GIRARDI then used to make payments to two exclusive country clubs.

10. In order to lull Client 2 and prevent Client 2 from discovering that defendant GIRARDI had embezzled Client 2's settlement funds, defendants GIRARDI and KAMON committed and caused to be committed the following acts, among others:

    a. In response to Client 2's repeated efforts to obtain the settlement funds, defendant GIRARDI falsely told Client 2 that he was working on the "last signature from a judge" and that defendant GIRARDI would send Client 2 a "personal check" for $50,000 as an

1 "advance" on Client 2's settlement, when, as defendant GIRARDI then
2 knew, there was no need for any "signature from a judge" before
3 Client 2's settlement proceeds could be disbursed, and there was no
4 need for an "advance" because Girardi Keese had already received
5 Client 2's settlement payment;

6     b. On July 24, 2020, approximately one month after
7 receiving Client 2's settlement check and after being informed that
8 Client 2 still had not received her settlement payment and was
9 contemplating filing a complaint with the State Bar of California,
10 defendants GIRARDI and KAMON sent and caused to be sent, for the
11 purpose of lulling Client 2, a $50,000 check drawn on the Torrey
12 Pines IOLTA Account;

13     c. In order to further lull Client 2, and to falsely
14 assure Client 2 that Client 2 did not need to take any further steps
15 to obtain full payment of her settlement, defendants GIRARDI and
16 KAMON caused a $100,000 payment to be made to Client 2 in the form of
17 a check drawn on the Nano Banc IOLTA Account;

18     d. In order to further lull Client 2, defendant GIRARDI
19 falsely told Client 2 and an attorney Client 2 had hired to help
20 Client 2 obtain the settlement funds from Girardi Keese that
21 defendant GIRARDI was working to mitigate the taxes purportedly owed
22 by Client 2 on the settlement funds and, separately, that Girardi
23 Keese had only received a portion of Client 2's settlement when, in
24 fact, as defendant GIRARDI then knew, no taxes were owed on the
25 settlement funds and Girardi Keese had received Client 2's full
26 settlement amount approximately five months earlier; and

27     e. In order to further lull Client 2, defendant GIRARDI
28 falsely claimed to have arranged for a check for the balance of the

settlement to be available for Client 2 to pick up.  In fact, when the messenger sent to get the check arrived, defendant GIRARDI caused the messenger to be falsely told, among other things, that defendant GIRARDI was not available and that Client 2's check was inaccessible because it was purportedly locked in the Girardi Keese accounting office.

### Embezzlement of Client 3's Funds

11.   In or about October 2018, defendant GIRARDI negotiated a settlement of Client 3's lawsuit related to injuries caused by a defective medical device.  Pursuant to Client 3's retainer agreement with Girardi Keese, Girardi Keese's attorneys' fees, in the amount of 40% of the settlement amount, costs, and expenses were to be deducted from the settlement proceeds and paid to Girardi Keese.  Disbursement of Client 3's settlement funds required approval by the bankruptcy trustee and bankruptcy court, which was obtained in March 2020.

12.   On or about May 22, 2020, defendants GIRARDI and KAMON received a wire for $128,250 into the Torrey Pines IOLTA Account as settlement payment on Client 3's claims.  Defendants GIRARDI and KAMON then misappropriated and caused to be misappropriated Client 3's settlement funds, including by using amounts in excess of any money due to Girardi Keese to pay for leases of luxury cars.

13.   In order to lull Client 3 and prevent Client 3 from discovering that defendants GIRARDI and KAMON had embezzled Client 3's settlement funds, defendant GIRARDI committed and caused to be committed the following acts, among others:

   a.   Causing a letter to be sent to Client 3, on or about July 31, 2020, falsely stating, in part, "We are trying desperately to get everything figured out.  Since there is a Bankruptcy Trustee,

we have to get an understanding of how much goes to the Trustee and how much goes to you . . . I am not getting much of a response from the Trustee." In truth, as defendant GIRARDI then knew, defendant GIRARDI and the bankruptcy trustee had already negotiated the apportionment of Client 3's settlement funds, which the bankruptcy court had approved approximately four months earlier, in or around March 2020; and

   b. Falsely stating in voicemail messages to Client 3 that the settlement funds could not be disbursed until "certain orders" were signed, when, as defendant GIRARDI then knew, no further court orders were necessary, and falsely stating that "we'd like our money just like you'd like yours," despite the fact that defendants GIRARDI and KAMON had already received (and misappropriated) all of Client 3's settlement proceeds.

### Embezzlement of Client 4's and Client 5's Funds

14. In or about July 2019, defendant GIRARDI negotiated a settlement of the lawsuit related to the injuries sustained by Client 4, Client 5, and their minor child in an automobile accident. The terms of the settlement provided for a total payment of $17,500,000, a portion of which would be paid to the paralyzed minor child with the remaining funds due to Client 4 and Client 5. Pursuant to Client 4's and Client 5's retainer agreement with Girardi Keese, Girardi Keese's attorneys' fees, in the amount of 25% of the settlement amount for the minor and 40% of the settlement amount for Client 4 and Client 5, costs, and expenses were to be deducted from the settlement proceeds and paid to Girardi Keese.

15. The settlement agreement specified that the minor's portion of the settlement proceeds would be placed in a trust and an annuity

12

to be controlled and administered by a third party, neither of which could be accessed by defendants GIRARDI and KAMON. The remaining settlement funds were to be paid directly to Girardi Keese for the benefit of Client 4 and Client 5.

16. On or about June 17, 2019, the first installment of the settlement payment, namely, $4,000,000, was wired transferred to the Nano Banc IOLTA Account. Prior to that deposit, and in violation of rules governing the management of funds in attorney client-trust accounts, defendants GIRARDI and KAMON transferred and caused the transfer of approximately $1,450,000 purportedly as an "advance" from Client 4's and Client 5's settlement funds, which amount was deposited into Girardi Keese operating accounts, when defendants GIRARDI and KAMON then knew that the funds in fact came from settlement funds belonging to other Girardi Keese clients. Defendants GIRARDI and KAMON used the transferred funds to pay Girardi Keese operating expenses unrelated to the representation of Client 4 and Client 5.

17. On or about July 1, 2019, defendants GIRARDI and KAMON caused a $2,500,000 check drawn on the Nano Banc IOLTA Account and comprised in large part of Client 4's and Client 5's settlement funds, to be issued to Client 1 as a partial payment of Client 1's settlement funds owed to Client 1 but which had been misappropriated by defendants GIRARDI and KAMON.

18. On or about August 2, 2019, a further payment of Client 4's and Client 5's settlement, namely, a check for $5,119,449.61, was deposited into the Nano Banc IOLTA Account.

19. In order to lull Client 4 and Client 5 and prevent them from discovering that defendants GIRARDI and KAMON had embezzled

their settlement funds, defendants GIRARDI and KAMON committed and caused to be committed the following acts, among others:

    a. Providing incremental lulling payments to Client 4 and Client 5, which comprised only a fraction of the total settlement due to Client 4 and Client 5;

    b. Falsely informing Client 4 and Client 5 that the remaining settlement funds could only be paid after medical liens had been satisfied when, as defendant GIRARDI then knew, all medical expenses related to Client 4's and Client 5's claims had already been paid;

    c. Falsely informing Client 4 and Client 5 that disbursement of their settlement proceeds was delayed due to court proceedings related to their minor child when, as defendant GIRARDI then knew, payment of settlement funds to Client 4 and Client 5 was not dependent on any court proceedings;

    d. Falsely informing Client 4 and Client 5 that delays in payment of their settlement funds were due to defendant GIRARDI's purported efforts to remove any tax liability for Client 4 and Client 5, including defendant GIRARDI's travel to Washington, D.C., to meet with government officials to remove tax liability for the settlement when, as defendant GIRARDI then knew, Client 4's and Client 5's settlement funds were not taxable; and

    e. Falsely informing Client 4 and Client 5 that their settlement funds could not be disbursed until additional court approvals were received when, as defendant GIRARDI then knew, no further court orders were necessary.

20. Between at least in or about 2010 and in or about December 2020, as a result of this scheme to defraud, defendants GIRARDI and

KAMON obtained money and property belonging to victim Clients 1-5 in excess of $15,000,000.

C. USE OF THE WIRES

21. On or about the following dates, within the Central District of California, and elsewhere, defendants GIRARDI and KAMON, aiding and abetting each other, for the purpose of executing the above-described scheme to defraud, transmitted and caused to be transmitted by means of wire communication in interstate commerce the following items:

| COUNT | DATE | WIRE |
|---|---|---|
| ONE | 6/17/19 | Wire Transfer of approximately $4,000,000 from City National Bank, in Los Angeles, California, through the Fedwire system to the Nano Banc IOLTA Account, in Los Angeles, California, from the settlement related to Client 4 and Client 5, which defendants GIRARDI and KAMON caused to be spent, in part, for costs and expenses unrelated to Client 4 and Client 5. |
| TWO | 7/1/19 | Wire clearing an approximately $2,500,000 check drawn on the Nano Banc IOLTA Account, in Los Angeles, California and deposited into First Century Bank, in Los Angeles, California, which wire traveled via a server located in Oklahoma City, Oklahoma, for the benefit of Client 1, the source of which funds was, in part, the settlement proceeds belonging to Client 4 and Client 5. |
| THREE | 5/22/20 | Wire Transfer of approximately $128,250 from Bank of America, in New York, New York, through the Fedwire system to the Torrey Pines IOLTA Account, in Los Angeles, California, from the settlement related to Client 3, which defendants GIRARDI and KAMON spent, in part, for costs and expenses unrelated to Client 3. |
| FOUR | 6/25/20 | Wire clearing a check of approximately $504,400 by drawing upon a JPMorgan Chase Bank account in Fort Washington, New York, and crediting funds to the Torrey Pines IOLTA Account in Los Angeles, California, representing Client 2's settlement proceeds, spent, in part, for costs and expenses unrelated to Client 2. |

| COUNT | DATE | WIRE |
|-------|------|------|
| FIVE | 7/9/20 | Wire transfer of approximately $15,000 from a Girardi Keese operating account in Los Angeles, California, to American Express via a server located in Phoenix, Arizona, as payment for charges incurred on the Girardi Keese Corporate American Express Card issued to defendant KAMON, the source of which funds was, in part, the settlement proceeds belonging to Client 2 |

//

//

//

FORFEITURE ALLEGATION

[18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)]

1. Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), in the event of defendant THOMAS VINCENT GIRARDI's and/or defendant CHRISTOPHER KAZUO KAMON's conviction of and of the offenses set forth in any of Counts One through Five of this Indictment.

2. Any defendant so convicted shall forfeit to the United States of America the following:

(a) All right, title, and interest in any and all property, real or personal, constituting, or derived from, any proceeds traceable to the offense; and

(b) To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3. Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), any defendant so convicted shall forfeit substitute property, up to the value of the property described in the preceding paragraph if, as the result of any act or omission of said defendant, the property described in the preceding paragraph or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been

substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

                                        A TRUE BILL

                                            /s/
                                        _____
                                        Foreperson

E. MARTIN ESTRADA
United States Attorney

*/signature/*

MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division

RANEE A. KATZENSTEIN
Assistant United States Attorney
Chief, Major Frauds Section

SCOTT PAETTY
Assistant United States Attorney
Deputy Chief, Major Frauds Section

ALI MOGHADDAS
Assistant United States Attorney
Major Frauds Section