# Exhibit A

The Journal of Psychiatry & Law 32/Summer 2004                          169

# The independent lawyer consultation: a practicum of ethics for the forensic mental health expert

BY S. JAN BRAKEL, J.D., DIANE S. GOLDSTEIN, PH.D., AND RODGERS M. WILSON, M.D.

---

*The opportunity to obtain an independent legal consultation on a case protects the forensic mental health expert against being manipulated by the retaining lawyer. Such manipulation—also articulated as attorney seduction/intimidation—presents a serious threat to the integrity of the forensic process. A case study is presented to show how the independent legal consultation can save the forensic expert from being misled. The case comes from a workplace in which the availability of a legal consultant is built in. Some speculations are offered regarding the extension of this concept to settings not so endowed.*

---

AUTHORS' NOTE: *Please address all correspondence to S. Jan Brakel, J.D., Isaac Ray Forensic Group, LLC, 200 S. Michigan Ave., Suite 710, Chicago, IL 60604; e-mail: sjbrakel@IRFG.org.*

© 2004 by Federal Legal Publications, Inc.

In 1997, Paul Appelbaum, past president of the American Psychiatric Association and one of the country's leading forensic psychiatrists, published an article titled "A Theory of Ethics for Forensic Psychiatry."[1] In it, he argued that the physician's "medical ethics" are inapplicable outside the clinical realm. The forensic role, he wrote, dictates its own set of moral principles. Since the primary role of the forensic expert is to apply his or her particular professional skills "to legal issues for legal ends," the expert's primary ethical duty, like that of any other witness in a legal proceeding, is to tell the truth. Secondarily, there is for the forensic expert a moral obligation to show respect for persons. This principle describes the limits of conduct of officials operating in any administrative or service context; for the psychiatrist in a forensic role vis-à-vis an evaluee, it mandates particular emphasis on clarifying the distinction between this role and the traditional therapeutic role, so as to minimize the likelihood of disclosures-against-interest stemming from confusion or even deception regarding the evaluator's agency.

Many within the psychiatric profession, and even in the larger medical profession, believe Appelbaum has gone too far in rejecting the relevance of medical ethics to forensic practice (the American Medical Association's Council on Judicial and Ethical Affairs has ruled that forensic psychiatry constitutes the practice of medicine). We do not necessarily agree, but that is not the point we wish to make in this paper. Our primary purpose rather is to demonstrate that the Appelbaum principles *do not go far enough*; that they fail to address an overriding ethical dilemma facing the mental health expert every time he or she elects to participate in a legal case. Robert Sadoff has called this the problem of attorney seduction or intimidation.[2] It is a threat to the integrity of the forensic expert that is greatly exacerbated by the adversarial nature of our legal system and the attorney dominance that is one of its consequent features. The imperative of truth-telling does not come to grips with this threat, in part because much of the lure is subsurface and the response is subconscious.

We present a case study to demonstrate the problem of undue attorney influence.[3] In this case, clinical experts were pressed to give a competency conclusion that was not sustainable under the controlling law. That is, they were, in effect, urged by the attorney to provide an erroneous, if not "illegal," forensic opinion. The case ultimately came to a proper ending because the clinicians were able to consult with an independent legal expert (the lawyer writer of this article). While not offering an intellectual theory on the order of that provided by Appelbaum, we would submit that the opportunity to garner an independent legal consultation is one—and a very effective—safeguard against the moral hazard posed to forensic experts by the potentially overwhelming presence of the adversarial attorney in the case.

## Matching law and mental health: problems, solutions and misgivings

That law and psychiatry are uneasy partners is a distinctly unnovel point, articulated in numerous writings and speeches on the issue of what they are doing together in the first place. One of the more philosophically oriented articulations is Willard Gaylin's 1965 piece on psychiatric participation in criminal cases,[4] in which he stated that "fundamental to the psychiatric view of man are principles antagonistic to the social view of man upon which the criminal law is founded." Gaylin was referring to the essentially deterministic conceptualization of human behavior that animates psychiatry and other mental health disciplines in contrast to the law's driving precepts of free will and individual accountability. There are more mundane differences between the two professions, many of which can be identified as functions of training, orientation, or even "culture," but we think that ultimately they all derive from the yawning philosophical chasm Gaylin described. It is this chasm that also underlies, or at least accentuates, the dominant ethical problems whenever and wherever law and professional mental health do meet, and it is what makes these problems especially hard to resolve.

Our proposal, then—that we ought to throw another, an extra, lawyer into the hopper to help deal with the worst of our ethical dilemmas—may strike some as curious, to say the least. Is this a serious idea? Or are the proponents just playing? Or worse, is this yet another full-employment bill for lawyers masquerading as the answer to a problem that may itself be largely overstated?

We have had and continue to have our own misgivings about various facets of the proposal. But at bottom, yes, we *are* serious (though hopefully not self-serious or pedantic).

One misgiving concerns our sense—we don't want to say experience—that no formal ethical theory or construct is likely to address the "real" ethical problems that arise in a given field. Take *legal ethics*—the term itself is an oxymoron, as the law's critics like to say—which are notoriously beside the point, mistargeted. Daily experience reveals how little they do to address, much less curb, lawyerly excesses of, say, avarice (tobacco litigation is currently turning more than a few legal servants into billionaires;[5] suits for damages continue to be filed against utility companies and the like, generating thousands if not millions of dollars for lawyers, but pennies, if that, for consumers, etc.).[6] Nor do the profession's ethical precepts seem to do much to inhibit the no-holds-barred, damn-the-social-consequences partisanship that drives too many practitioners (on the theory of deterring bad medical practice, non-negligent doctors are sued and occasionally found liable, while the resultant defensive tactics drive up the costs of, or drive off the market, medically safe but *legally* risky practices;[7] sociopathic murderers are asked to be sprung from prisons in the name of our due process rights, while the death penalty is sought for distraught and disturbed mothers who have killed their children but pose little if any further risk to any animate object).[8] Nor do they stop the mutilations of truth that take place in our courtrooms and backrooms every day, as facts are not merely bent but *made up* to suit the law ("If the glove

173

don't fit, you must acquit"; but if it does, then planted by a rogue cop, it was).[9] One suspects that ethical strictures designed for medical or mental health practice tend to suffer from a similar, if not equal, relevancy deficiency.

Another misgiving is this: Even if it is true, as we suggest, that the Appelbaum theory misses the primary ethical mark, what hope is there that this independent-lawyer proposal comes anywhere near to hitting it? As a psychiatric colleague (other than the contributing writer) with some, but limited, forensic experience put it: "Where's the problem? I just furnish clinical opinions. What the lawyers do with them is not my concern." Our hope, via the case study coming up, is to convincingly dispel that fanciful notion. The forensic expert's "clinical" opinions are inevitably permeated by law, like it or not. To give one quick example from a clinician's case report done at our place of business a few years ago, involving murder charges against Mrs. X, who had shot and killed her battering husband: "On the afternoon of [date] Mrs. X suffered from Battered Woman Syndrome and acted in self-defense when she shot Mr. X." That is decidedly *not* a clinical conclusion.

Finally, there is the misgiving about whether the proposal is at all realistic, even if we assume it to be relevant and cogent. Who will pay for independent legal consultations? Who will accept the idea? Will the forensic novice be willing to seek the help and bear the costs? Can we expect the more seasoned practitioner to acknowledge the need? And what about the client/attorney? Unless a specialist in mental health law, the attorney may have a knowledge gap as well. But even if that is recognized, he or she may resist the independent consultation on the grounds that it would challenge—if not threaten—his or her ultimate control over the case. And what about the courts? Will they be willing to approve the fees if assessed against their budget? We touch on these issues some more at the end, but first the case study.

174          THE INDEPENDENT LAWYER CONSULTATION

### The Babbling Counterfeiter

The case that we might call The Babbling Counterfeiter involved a criminal defendant faced with both federal and state (of Illinois) charges. That is not so unusual. The mix of charges, however—possession of counterfeit currency, weapons tampering (removal of the serial numbers from a firearm), and unlawful possession of a firearm on the federal ledger; operating a motor vehicle without valid registration or insurance, failure to wear a seat belt and speeding, as well as possession of cannabis and possession of child pornography on the state's side—is less typical. Though some of these charges were ultimately dropped, this does not alter the fact that the behaviors at the bottom of these charges do not usually go together. The child pornography charge would seem to be particularly out of place in the company of the other misdeeds. But the story will tell.

We first got the case from a federal defender, who, in the absence of any viable substantive defense, asked our clinicians to look into the possible "procedural" (lay rather than legal meaning of the word) escapes of his client's (un)fitness to stand trial, his (in)competency to waive his *Miranda* rights, and the legal (in)validity of the confession he ultimately gave at the police station. The (state) public defender's office came to us shortly after. The theory of its attorney was that challenging his client's competency to consent to a search of his car and home—the latter leading to the pornography charges[10]—was the best shot at avoiding conviction.

### The federal case

Our clinical team—a neuropsychologist and a psychiatrist—did the required interviews with, and ran the relevant tests on, the accused in order to arrive at their opinion(s). (There is no need, for this readership, to go into the methodological details.) What emerged was the portrait of a relatively small-

175

time offender with some serious emotional and control problems, including a full-fledged Axis I anxiety disorder (panic disorder with agoraphobia). In particular, he appeared to be hyper-verbal and "circumstantial," as clinicians say, or, in lay terms, unable to shut up (to a point where he almost drove the clinical interviewers crazy).

As is the pattern in cases we do for one side or the other—as opposed to being court-appointed—our clinicians communicated the gist of their findings to the federal defender and further discussed such things as when the evaluation report would be ready, what the likelihood was that in-court testimony would be required, etc. This is more than just "scheduling" talk, as it can happen that the initial clinical findings or impressions are sufficiently adverse to the client's interests to prompt a request that no report be written at all. From the attorney's point of view, this is not merely a matter of saving time and money on unhelpful things; because the report is potentially discoverable, squelching its production serves the purpose of keeping disadvantageous information out of the other side's hands. One could raise an ethical question about this avoidance tactic, but the adversarial role of the expert in our adversarial legal culture—even of the scientific and therefore presumably objective expert—would seem to be well enough established to lay that one to rest. The lawyer who "hired" the expert is in control here, a reality from which one may deduce as well how much legal influence and control will be exerted when the preliminary indications are that the clinical findings *are* usable.

The utility to the defense of the *clinical* finding that the accused suffered from anxiety-driven control problems was that it suggested his waiver of *Miranda* was *legally* involuntary (and his confession therefore legally invalid)—a conclusion that was all but agreed to in preliminary telephone conversations between our clinicians and the federal defender. The "but" was that one of our clinical people recalled that the landmark U.S. Supreme Court case *Colorado*

*v. Connelly*[11] had something of relevance to say on the issue, which she decided to check into further by consulting the independent lawyer.[12] This legal "checkup"—neither mandated nor sought as a matter of routine at the time—resulted in a significant reformulation of the legal question to be addressed, of the legal test to be applied, and ultimately of how the clinical data gathered by our clinicians could (and could not) be used.

The primary holding of *Colorado v. Connelly* is that for purposes of a federal voluntariness challenge—i.e., to persuade the district (trial) court to grant a motion to suppress the contents of a confession, so that these contents can then not be used at the accused's trial—proof must be provided that there was state (police) misconduct. Involuntariness turns on evidence of *outside* coercion, not on any asserted or proven facts of *inner* psychological compulsion. An accused's mental handicaps are not relevant per se; they come into play only—as the court's majority opinion, written by Chief Justice Rehnquist, conceded as an afterthought—if the police exploited the accused's handicap, his special vulnerability/susceptibility, thus rendering coercive interrogation tactics that might "normally" be unobjectionable.

Because the facts of the *Connelly* case did not require that it be addressed, a neglected aspect in the majority's opinion concerns the principle that for an accused to validly waive a constitutional right such as his Fifth Amendment *Miranda* rights, it must be done not only voluntarily, but *knowingly* and *intelligently* (i.e., competently).[13] Justice Stevens's part-concurrence/part-dissent, which would divide the case up into pre-custodial and post-custodial components (and suppress as invalidly waived all post-custodial parts of the confession), brings this aspect into focus. While the Stevens analysis has no direct precedential value, federal defenders may wish to use it in factually pertinent cases, particularly since pre-*Connelly* precedents certainly do endorse the analysis.

177

Where did all this go, how did it fit, in our case example?

To begin with the latter, the invalid-because-*unknowing* argument, it could be and was dismissed readily in the case at hand. Whatever our Babbling Counterfeiter's impairments, they were not primarily cognitive. He understood very well what his legal predicament was at the time of his arrest, and he had ample *intellectual* equipment to comprehend the *Miranda* warnings and the implications of either asserting his rights or giving them up. This was a non-starter, as our clinicians and subsequently the defender recognized.

What then with the voluntariness? This issue engendered some spirited discussion within our group. One of our clinicians felt we should stick with the conclusion we had more or less "promised" to the federal defender: "We are providing an opinion on clinical competency, clinical voluntariness; it's not for us to decide the legal issue" is how he put it. "That's the attorney's job." This view did not prevail, as we came to agree that we were not being asked just to assess clinical competency (whatever that may be) but were expected to respond to the forensic (legal) question of whether the accused had "voluntarily" confessed, under *Colorado v. Connelly*'s interpretation of that term. Not only that; there being no "ultimate issue" bar in this context (typically reserved for in-court testimony in any event), we were asked to respond to the question with finality. The consensus we arrived at was that, given the holding of *Connelly*, we could not conclude based on the facts we had (i.e., an accused with primarily volitional impairments, but no record of explicit, unvarnished police coercion) that our confessant's statements to the police were involuntary. Sticking to our guns and concluding the opposite, as we originally intimated, would put us in the position of delivering a legally questionable, if not erroneous, forensic opinion. If called upon to testify, we (our clinicians) would be blown out of the water by the prosecution. We would have to call the federal defender with the bad news.

A teleconference was arranged between our clinicians and the federal defender; it excluded the consulting attorney for reasons of professional delicacy, if not ethics. The conference went well. To the extent she didn't know already, the defender was persuaded that our reading of the *Connelly* case, and its applicability to the case at hand, was correct. She stated so explicitly in a memorandum she later drafted summarizing the phone conversation and her suggestions for new defense approaches. Its second sentence read: "I would agree with the conclusion you [two] expressed . . . that the legal standard does not allow a finding of a violation of *Miranda* based on mental illness alone." She then sketched out her new strategy.

That strategy, as expected, was to get our clinicians to focus on what the defender characterized as the law's interest in the "interplay" between a defendant's mental impairment(s) and allegations of coercive police tactics. Secondarily, she sought to take a crack at our clinicians' earlier finding that the defendant was fit to stand trial, with medication. Because their clinical opinion was also that the defendant was currently not being properly medicated, the defender wondered (in her memorandum) whether perhaps her client was "technically not fit because his medications are wrong."

The bit of legal ingenuity about the medications did not sway our clinicians, and they restated their conclusion that the defendant was fit for trial. They jumped, however, at the mental-illness/police-coercion interplay suggestion (whether from a desire to be helpful to the hiring attorney or a conviction that the defendant's mental make-up made him deserving of *some* legal break). Now they began to talk "vulnerability" and "susceptibility" as distinct from voluntariness or competency. Whereas our counterfeiter was previously characterized primarily as a blabbermouth, the new emphasis was on his medication-worthy panic disorder. And the police's conduct, which previously did not get much play (if for no other reason than that the accused was an "unreliable historian"), suddenly became the object of intense scrutiny.

179

The new focus provided renewed enthusiasm to our clinicians. But rather than let it run away with them, they harnessed this enthusiasm to produce several carefully crafted, legally defensible forensic opinions in their report to the federal defender. Contained in the report's section titled "Conclusions and Recommendations," they are, verbatim, that:

Mr. B demonstrates an understanding of the purpose of one's Miranda rights, is capable of correctly naming them, and is able to articulate an individual's choices at the time he is faced with making a decision regarding how to proceed in a criminal investigation during questioning by police or other law enforcement agents. Mr. B has been arrested before and is familiar with the legal system. Despite Mr. B's *knowledge* of the concept and details of Miranda rights and a related waiver, it is my opinion that Mr. B has volitional/control problems that may have rendered him especially vulnerable to police pressure. This opinion is based on the following:

a)   Mr. B suffers from a psychiatric illness (Panic Disorder) and personality disorder (Narcissistic with Obsessive-Compulsive features). These conditions render him vulnerable to react with extreme anxiety in stressful situations. These conditions may or may not have been visible to detectives at the police department.

b)   Cognitive examination reveals that despite having average intelligence, Mr. B manifests considerable attentional, memory, and executive dysfunction. These deficits render him vulnerable to having difficulty maintaining concentration over an extended period of time (his time at the police station was not brief), to interference and difficulty learning and maintaining new information, and to being able to access and utilize previously learned information. He additionally demonstrates organizational difficulties in novel situations, and his behavior throughout four days of evaluation demonstrates significantly poor judgment, poor frustration tolerance, lack of impulse control (in particular disinhibited speech), and lack of insight into his own behavior. Extreme anxiety is likely to contribute to further cognitive disorganization.

c)   Mr. B reported that while he was held and interrogated at the police department, he was denied requests for his medication (Valium), which he takes to control his panic attacks and anxiety. He reported that he was denied use of a bathroom, and he ultimately urinated on himself. He reported that he was denied access to an attorney. Mr. B reported that he was repeatedly told if he simply cooperated, the process of interrogation would be over soon, and he

would be free to leave. Notably, at no time did he report that he was directly told that *if* he provided a confession *then* he could have his medication or leave.

*If* one accepts as true Mr. B's description of events at the police department, and his *perception* of being pressured and/or intimidated into cooperation vis-à-vis a confession, then Mr. B's mental illness becomes critical; based on his history of mental illness, coupled with his demonstrated cognitive impairment, it is indeed possible that his mental state at the time he made a confession rendered him vulnerable to cooperate with the police against his best (legal) interests.

### The state's case

Based as it was on the same facts as the federal case, albeit focusing on a different set of criminal charges, it could be expected that the state case would cover much of the same ground. And, in fact, the federal defender sent a copy of our clinicians' reports to the state defender with the implication that they would in many respects be highly relevant. The state defender, however, took this acknowledgment of parallelism one step too far. He thought (and articulated) that he should get a gift-wrapped blanket forensic conclusion that if the circumstantial facts were as his client described them, the consent to the search would inevitably be considered coerced and therefore invalid. Our clinicians, however, alerted by the independent legal consultant that there were new facts (and new law)[14] to be considered, found that they could not comply.

The reason is that, unlike with the *Miranda* waiver and the confession, which occurred pretty much simultaneously after a substantial period of detention at the police station, the consent to the police *searches* took place at two disparate moments in time, under disparate conditions. The police

asked to search the accused's car immediately after they stopped him for speeding. Though clearly agitated, the accused was not then-and-there pressured—and the time frame and circumstances were such that there was no question of a developing coercive atmosphere or a deliberate exploitation of the accused's mental state—so that his consent was voluntary in every sense, psychological as well as legal (it was, of course, also knowing, given his relatively clean cognitive slate). As the neuropsychological member of our team put it: "It is my opinion that [with respect to the car search] there do not appear to be circumstances present that suggest that Mr. B's affective state rendered him particularly vulnerable to police pressure and subsequently to cooperate with a search against his best (legal) interests."

The consent to the house search, however, was a different matter. It occurred some seven hours after the initial traffic stop. The timing of related events—alleged or proved—was also critical. They rendered at least plausible the defense theory of a mentally vulnerable accused whose will to consent was overborne by circumstances and police actions that in their totality were coercive. This is how our clinician summed it up in her opinion:

These same *perceptions* of police pressure on Mr. B's part, which, coupled with his affective and cognitive state, adversely affected the voluntariness of his Miranda waiver, were also influential and adversely affected the voluntariness of Mr. B's consent to a search of his home on [date]. This is further supported by the fact that paramedics were called to the holding area of the Police Department at midnight on [date], in order to treat Mr. B for a panic attack with the Diazepam (Valium) he was requesting earlier in the day. The relevant time frame involves the following events: a) he was initially stopped for speeding at 1:14 p.m., b) he waived his Miranda warning at an unknown time thereafter, but prior to consenting to a search of his home, c) he provided consent to search his home at 8:00 p.m., and d) he was treated by paramedics at midnight. Thus, it is my opinion that *if* one accepts as true Mr. B's description of events at the police department, and his *perception* of being pressured and/or intimidated into cooperation vis-à-vis a search waiver (and Miranda waiver earlier in the day), then based

on his history of mental illness, coupled with his demonstrated cognitive impairment, it is indeed possible that his mental state at the time he consented to a search of his home on [date] rendered him vulnerable to cooperate with the police against his best (legal) interests.[15]

So we now had carefully calibrated, legally supportable forensic opinions in both the federal and the state components of the case. On the stand, if it came to that, our clinicians would now be able to proceed with confidence, assured that their findings and conclusions were properly focused and within the bounds of the law, which, though always flexible, does have its breaking points. We had been in danger of stretching beyond this point.

### The tape

Every expectation was that the case would go to trial, in both its federal and its state configurations, and that our clinicians would be asked to provide their expert input. Then the videotape surfaced. Nine months into the case (after the arrest), the defense suddenly learned that a video had been made of the accused's entire "ordeal" at the police station. Copies were requested and obtained (once such evidence comes to light it cannot be (re)buried). The current word—we have not received our own copy yet—is that the tape's contents support the accused's version of how he was treated in several critical respects. It apparently shows that the medication the accused requested was withheld for several hours; that he was told his questions would be answered *after* he signed his *Miranda* waiver; and that he was denied access to a lawyer despite multiple requests. As a result, the prosecution's case is disintegrating. They may have the "goods" on him, but it appears more and more that the law's "technicalities" will prevent them from being used to obtain a conviction. Just the other day, we were told that the state had dropped all pornography[16] and drug charges, leaving only the

183

speeding and related traffic parts of the case. There would be no need for psychiatric or psychological testimony to combat that threat! Whether the Feds can or will still proceed with their charges is, for the moment, unknown.

## Conclusion

The retaining attorneys in this case were conscientious and, one would have to assume given an absence of evidence to the contrary, operating in good faith. They represented the interests of their client in a way that caused them to bend the law a little bit, and there was at least subtle pressure for our forensic experts to fit their findings to those bent ("crooked" would be too strong a word) legal contours. This was not a case of overt attorney coercion and behavior skirting the edge of fraud, as in the case originally intended to be used as a second example. There, both the law and the facts were presented to our experts in a manner so seriously defective as to constitute an ethical violation in its own right. Nevertheless, the utility of an independent legal consultation was evident in the first case, reasonably appropriate conduct by the lawyers notwithstanding. Without the consultation, our clinicians would have rendered opinions that would have left them highly vulnerable to legal attack by the opposing side. With the consultation, they were on safe legal ground.

Perhaps presenting all the foregoing as a problem in ethics strikes some as off the mark. They may feel it is essentially a lack-of-knowledge problem. As such, they may see little here to challenge the aptness of the Appelbaum analysis. Yet lack of knowledge, legal ignorance, is what leads to ethical problems or exacerbates them. It leaves forensic clinicians all too vulnerable. Unsure of their footing, not knowing whether or where they are being led, they run an increasing risk of being *mis*led. Giving misleading testimony *is* an ethical problem. It may even be unethical to leave oneself in the position of being misled and misleading, if there is an alternative.

Is the alternative realistic, this incorporation of the independent legal consultation into forensic psychiatry and psychology? Our experience with it to date is too limited to say. And we don't know enough about this experience elsewhere—other than that it *is* done in a few other practices—to make plausible predictions. What we can say is that, so far, the experience has been positive. The clinicians at our place of business accept the concept. Some request it frequently, if not routinely, and they are grateful for the service. Others may be somewhat less enthusiastic, judging from their lesser use of it. The attorneys have been the best surprise so far. In the cases to date, all have been open to it, and some have reacted with praise for the added(?) legal sophistication of the clinicians and even gratitude for the help in honing their own case presentations. No one has seen this as harmful or threatening. From the courts we do not have any data at this point, except that there have been no questions about the addition of the legal consultations to the menu of our services and no rejections of the (very modest) charges.

We intend to keep the concept going at our workplace. We may even proselytize a bit—in conversation or writing—as here. In the end, we feel, the independent legal consultation will help shield the forensicist from partisan bias, from attorney seduction or intimidation, as we put it earlier. And—here is where our concept converges with Paul Appelbaum's ethical priority—in the end, they, the forensicists, will be better at telling the truth.

### Postscript: the child abuse reporting angle

Virtually every state in the United States has enacted legislation requiring caregivers to report instances of child abuse that come to their notice.[17] Typically, the reports must be filed with the state's child protection agency [the Department of Children and Family Services (DCFS) in Illinois], but the laws vary from state to state when it comes

185

to the precise circumstances that mandate a report. Even within one state, including Illinois, the duty to report may be unclear due to ambiguities in the statute or potentially competing, if not conflicting, language found in other statutes, such as a Patients' Records and Communications Confidentiality Act or the like.[18]

Our clinicians then were in a difficult situation when they learned of Mr. B's deviant sexual interests and the fact that he had an accessible target in the 13-year-old daughter of his sister, who lived nearby. He admitted to obsessively fantasizing about this niece and that his "next step" would be to arrange an encounter either at his own home or at his sister's residence. Though pretrial, he was out on bond and able to move around at will. What would normally be a no-brainer—you report a situation so fraught with potential harm as this one—was complicated by our clinicians' forensic, as opposed to caregiving, role in the case. The formal (role) obstacle could probably be overcome by virtue of the fact that one of the relevant reporting statutes spoke in terms of the duties of caregivers "in their professional or official capacity"[19]—a phrase that could be stretched to go beyond the therapeutic role and include the forensic one. But this still left a looming practical problem: How does one go about reporting details learned in the course of a legal dispute and still *in* dispute without wrecking the case and the relationship with the retaining attorney? If our clinicians reported, the attorney (the state public defender in this case, who was contesting the pornography charges) would feel betrayed and might even sue for what from his and his client's perspective was a very damaging breach of confidentiality.

After considerable agonizing, our clinicians decided that their ethical duties as caregivers should override concerns about legal fallout. They would initially take the least drastic option available by calling the DCFS's anonymous hotline for a consultation. If they were then told to report and identify themselves, they hoped for at least some protection from the

fact that they were acting on an official mandate. Despite the urgency of the matter, it took the child protection agency officials more than a week to come back with a response: The agency would not take the report formally, as the accused himself was not living with or in a caregiving role to the potential victim—a dubious interpretation of the statute.[20] There was still the option of directly warning the accused's sister (and mother of the niece),[21] a way out that became especially appealing when the state's pornography charges against the accused were dropped, eliminating the direct conflict with the defense of his criminal case. But this proved unnecessary when, within a few days of the DCFS's response, it was learned that the sister/mother—perhaps having got wind of something unsavory or else simply fed up with her wayward brother—had decided on her own to cut off contact with him. Thus another ethical dilemma was solved, another threat averted. This one, by any proper measure, was more serious than the threat of being made to look inept on the witness stand.

**Notes**

1. Appelbaum PS: A theory of ethics for forensic psychiatry. J Am Acad Psychiatry Law 25:233-47, 1997.

2. Sadoff RL: Practical ethical problems of the forensic psychiatrist in dealing with attorneys. Bull Am Acad Psychiatry Law 12:243-52, 1984.

3. The original intention was to present two cases, but space (in this journal) does not permit it. This is regrettable, because the second case was also nicely instructive; our experts were put on a Battered Woman Syndrome fishing expedition, with faulty legal guidance from the retaining attorney and materially (and deliberately) incomplete facts.

4. Gaylin W: Psychiatry and the law: Partners in crime. Colum U Forum 8:23-9, 1965.

5. There are some agencies in the U.S. today that track what they see as lawsuit abuse, in the hope of generating momentum for legal reforms. A favorite example from the list provided by one of these agencies—worth mentioning here because of its connection to big-time tobacco litigation—is the lawsuit recently filed by a small-timer named Raymond Leopold. Mr. Leopold is suing R.J. Reynolds

Tobacco for $65 million in damages for the "remorse and guilt" he feels over having appeared for two years in advertisements for Winston cigarettes. The Heartland Institute: Lawsuit Abuse Fortnightly 1: No. 2, May 2002. That he appeared willingly (and that he profited from it) apparently stops neither the client nor the lawyer intent on abusing the law. There is now also a new McDonald's lawsuit that threatens to be much bigger than the original: This one is not merely for putting customers at risk with "dangerously" hot coffee, but for McDonald's and three other fast-food chains jeopardizing the very health of all Americans via their dangerously fatty fare. Given the number of overweight Americans, this "burger 'n' fries" litigation could quickly rival the legal assault on Big Tobacco.

6. Along the same lines, the result of a recent lawsuit against Blockbuster yielded an agreement whereby the company would provide free movie rental coupons to customers charged allegedly unfair late-return fees. The coupons are worth three or four dollars to the "injured" customer, and only 10% have been collected and used since the settlement. The trial lawyers bringing this class action, however, netted a cool $9.2 million in legal fees. The Heartland Institute: Lawsuit Abuse Fortnightly 1: No. 6, July 2002.

7. See, generally, Brakel SJ: Using what we know about our civil litigation system: A critique of "base-rate" analysis and other apologist diversions. Ga L Rev 31:77-200, 1996.

8. In the Marilyn Lemak case here in Illinois (of a mother who killed by suffocation her three children, ages seven, six and three), the prosecutor held out the threat of capital punishment until after conviction, when, sensitive to the political winds (not to mention his own political ambitions; he was running for governor), he decided not to ask for death. Another possibility is that the prosecutor never intended to seek the death penalty, but intimated that he might so as to get a so-called death-qualified jury, which studies show to be more prone to convict than a jury from which those opposed to capital punishment have not been weeded out.

9. O.J. Simpson. For an opposing view of the case, see Dershowitz, AM: Reasonable Doubts: The O.J. Simpson Case and the Criminal Justice System: Simon & Schuster, 1996. Dershowitz, a Harvard law professor and occasional high-profile-case practitioner, was part of the Simpson defense "dream team" of celebrity lawyers.

10. At the accused's home, the police found hundreds of child pornographic photos cut out of magazines; home-altered photos in which the faces of minor children had been collated onto bodies of naked adult females engaged in sexual acts; similarly altered photos in which the accused had placed a picture of himself as a young man on the body of an adult male engaged in sexual acts with the

188       THE INDEPENDENT LAWYER CONSULTATION

    foregoing female adult body/child's face composites, etc. Of greatest concern was that a significant number of these composites, including those featuring the accused, portrayed the face of his 13-year-old niece, to whom he had easy access via his sister.

11.    *Colorado v. Connelly*, 479 U.S. 157 (1986).

12.    This attorney is an academic (non-practicing) mental health law specialist. His role at our place of business, the Isaac Ray Forensic Group, LLC, is to train forensic interns and occasional non-forensic residents to research and write on law-and-psychiatry topics and generally to investigate and answer questions on a range of legal issues for clinical staff who ask. The preparation and review of forensic reports and, more sporadically, preparation for trial testimony have always been an informal part of the job. Only recently did we formalize it.

13.    *Johnson v. Zerbst*, 304 U.S. 458 (1938).

14.    In fact, state law, including Illinois law, is different from the federal law on confessions as articulated in *Connelly*. Not only did Justice Rehnquist in *Connelly* explicitly leave open the possibility that the confession might be excluded under state evidentiary law (based on reliability concerns), but many state courts generally fudge *Connelly*'s clear distinction between the voluntariness and the knowingness of a confession/waiver. Illinois courts have gone so far as to rule that "the confession of an insane person is involuntary *per se*." *People v. Bernasco*, N.E. 2d 958 (Ill 1990), citing *People v. Lambersky*, 102 N.E. 2d 326 (Ill 1951). Arguably, these wrinkles in the law on confessions are equally applicable to consent to a police search. But whatever Mr. B's problems in our case, he was not "insane" under any plausible definition of that term.

15.    Or, as the psychiatrist member, the sprinter, on our team concluded, less long-windedly: "Mr. B's volitional decompensation progressed over a period of time. At the time of the initial vehicular search he demonstrated appropriate capacity but [that] had deteriorated by the time he consented to the search of his home."

16.    The public defender suggested that the state's chances of obtaining a conviction against Mr. B had dwindled in any event, following the recent U.S. Supreme Court's decision in *Ashcroft v. Free Speech Coalition*, 122 S. Ct. 1389 (2002). But this appears to be an overreading of the case, whose holding invalidates those portions of the Child Pornography Prevention Act prohibiting so-called virtual porn (typically computer generated). The case presented no challenge to, and did not affect, the act's ban on "pseudo porn"—the prurient alteration of innocent images of children (e.g., by grafting a child's school picture onto a naked adult body), the kind of thing Mr. B liked to be engaged in.

189

17. In Illinois this law is called the Abused and Neglected Child Reporting Act, P.A. 79-65, eff. July 1, 1975, 325 ILCS 5/1 et seq.

18. See the Illinois Mental Health and Developmental Disabilities Confidentiality Act, P.A. 80-1508, eff. Jan. 9, 1979, 740 ILCS 110/1 et seq.

19. 325 ILCS 5/4.

20. *Id*. The Illinois law requires reporting when the physician or other provider has "reasonable cause to believe a child known to them in their professional or official capacity may be an abused child or a neglected child." It says nothing about the relationship between the (potential) victim and the victimizer.

21. Illinois law permits, but (unlike *Tarasoff*) does not require, warning or protecting a potential, identifiable victim. The Confidentiality Act leaves it to the therapist's "sole discretion," 740 ILCS 110/11.