# EXHIBIT 1

Morgan Stanley

```
P.O. Box 507
New York, NY 10013-0507
```

```
THOMAS GIRARDI
1126 WILSHIRE BLVD
LOS ANGELES CA 90017
```

| | |
|---|---|
| Account No | ███████ |
| Investment Representative | ████████████████ |
| Statement Period | 2019-10-01 to 2019-10-31 |

For questions please contact

MORGAN STANLEY & CO. LLC
1585 Broadway
New York, NY  10036-8293
(212) 761-4000

Morgan Stanley

*This page is intentionally left blank*

# Morgan Stanley

THOMAS GIRARDI

| ACCOUNT NO | | | REPORTED IN |
|---|---|---|---|
| STATEMENT PERIOD | 2019-10-01 to 2019-10-31 | | **US DOLLARS** |

## ACCOUNT SUMMARY

| | TRADE DATE | SETTLEMENT DATE |
|---|---|---|
| Net Closing Cash Balance | 0.00 | 0.00 |
| Long Market Value | 0.00 | 0.00 |
| Short Market Value | 0.00 | 0.00 |
| **Equity in Your Account** | **0.00** | **0.00** |

*Reported mutual funds and unpriced securities are not included in market value and equity calculations.*

## OPENING BALANCE SUMMARY

| ACCOUNT TYPE | TRADE DATE | SETTLEMENT DATE |
|---|---|---|
| **Net Opening Cash Balance** | **0.00** | **0.00** |

## CLOSING BALANCE SUMMARY

| ACCOUNT TYPE | TRADE DATE | SETTLEMENT DATE |
|---|---|---|
| **Net Closing Cash Balance** | **0.00** | **0.00** |

## CASH ACTIVITY SUMMARY

| | This Period | | Year to Date | |
|---|---|---|---|---|
| | TRADE DATE | SETTLEMENT DATE | TRADE DATE | SETTLEMENT DATE |
| **Opening Balance** | **0.00** | **0.00** | **0.00** | **0.00** |
| Miscellaneous Journals | (15,787,293.19) | (15,787,293.19) | (15,787,293.19) | (15,787,293.19) |
| Securities Sell | 15,787,293.19 | 15,787,293.19 | 15,787,293.19 | 15,787,293.19 |
| **Closing Balance** | **0.00** | **0.00** | **0.00** | **0.00** |

## TRADE ACTIVITY

| TRADE DATE | SETTLEMENT DATE | ACCOUNT TYPE | ACTIVITY | QUANTITY | PRICE | INTEREST | INFLOWS/(OUTFLOWS) |
|---|---|---|---|---|---|---|---|
| REPLIGEN CORP COM STK TRADE ENTRY-TRADE DATE POSTING NONRECON ACCTS - *(RGEN / 2731654 / RGEN.O / US7599161095 / 759916109)* | | | | | | | |
| 2019-10-24 | | DVP/RVP | Sell Cancel | 200,000 | | | (15,781,293.19) |
| 2019-10-24 | | DVP/RVP | Sell Correction | (200,000) | | | 15,787,293.19 |
| 2019-10-24 | | DVP/RVP | Sell | (200,000) | | | 15,787,293.19 |
| | 2019-10-28 | DVP/RVP | Sell | (200,000) | 78.9381 | | 15,787,293.19 |
| | | **Net Trade Date Activity** | | | | | **15,787,293.19** |
| | | **Net Settlement Date Activity** | | | | | **15,787,293.19** |

## OTHER ACTIVITY FOR THIS PERIOD

| TRADE DATE | SETTLEMENT DATE | ACCOUNT TYPE | QUANTITY | DESCRIPTION | INFLOWS/(OUTFLOWS) |
|---|---|---|---|---|---|
| Miscellaneous Journals | | | | | |
| 2019-10-28 | 2019-10-28 | DVP/RVP | | 95HKB; Adjust Collateral Position | (15,787,293.19) |
| 2019-10-28 | 2019-10-28 | DVP/RVP | | 200,000 REPLIGEN CORP COM STK 95HKB; Adjust Collateral Position - *(RGEN / 2731654 / RGEN.O / US7599161095 / 759916109)* | 0.00 |

# Morgan Stanley

THOMAS GIRARDI

| **ACCOUNT NO** | | | | |
|---|---|---|---|---|
| **STATEMENT PERIOD** | **2019-10-01 to 2019-10-31** | | REPORTED IN **US DOLLARS** | |

**OTHER ACTIVITY FOR THIS PERIOD** *(Continued)*

| TRADE DATE | SETTLEMENT DATE | ACCOUNT TYPE | QUANTITY  DESCRIPTION | INFLOWS/(OUTFLOWS) |
|---|---|---|---|---|
| | | **Net Activity for This Period** | | **(15,787,293.19)** |

# Morgan Stanley

THOMAS GIRARDI

**ACCOUNT NO**

**STATEMENT PERIOD**     2019-10-01 to 2019-10-31

IF YOU HAVE A MARGIN ACCOUNT WITH US, AS PERMITTED BY LAW WE MAY USE CERTAIN SECURITIES IN YOUR ACCOUNT FOR, AMONG OTHER THINGS, SETTLING SHORT SALES AND LENDING THE SECURITIES FOR SHORT SALES, AND AS A RESULT MAY RECEIVE COMPENSATION IN CONNECTION THEREWITH.

Callable Securities - If a Security is subject to a partial redemption by the issuer, the issuer notifies Morgan Stanley & Co. LLC (MS&Co.), via a central industry depository, of the number of units for the specific security to be redeemed. MS&Co. determines the favorability of the redemption as required under FINRA 4340 - "Callable Securities". A link to the Firm's allocation procedures for callable securities is located at http://www.morganstanley.com/about/ir/regulated_information.html. Additionally, a hard copy of the allocation procedures will be provided to customers upon request.

INVESTMENTS AND SERVICES ARE OFFERED THROUGH MORGAN STANLEY AND CO. LLC, MEMBER SIPC.

# Morgan Stanley

*Please advise your investments representative immediately of any discrepancies in securities transactions or investment activity in your account, and in order to protect your rights, including those provided under the Securities Investor Protection Act (SIPA), confirm any such oral communications in writing.*

## TERMS AND CONDITIONS

We provide both trade date and settlement date activity on your statements. Confirmations of transactions have been made to you pursuant to SEC Rule 10b-10 and of futures transactions pursuant to CFTC Rule 1 33. Immediately notify the Compliance Director at address indicated below, if you have not received a confirmation.

All transactions are subject to the constitutions, rules, regulations, customs, usages, rulings and interpretation of the pertinent exchanges, markets self-regulatory organizations, and clearing houses.

We trade for our own account as an odd lot dealer, a block positioner or arbitrageur. At the time of any transaction in your account, we may have a long or short position in the same security and our position may be completely or partially hedged.

If your statement contains a transaction or position in a mutual fund, we may receive compensation from the fund or its advisor as described in the fund's prospectus. Any information on this statement relating to a mutual fund has been provided to us by the fund.

Please note that all money entries and balances that are identified under the summary section are credits to your account unless specified as a debit by an amount in parenthesis.

Please promptly advise your Investments Representative of any material changes in your investment objectives or financial situation.

*PORTFOLIO SUMMARY*: The month-end valuations of your portfolios are computed using prices from pricing services and other sources we consider to be generally reliable in approximating the value of securities held in your account. These valuations, however, are sometimes outdated as of the date your monthly statement is prepared and, accordingly, may not actually be can be realized. We do not warrant the accuracy

of these sources and are not responsible for any inaccuracies. In instances where prices of securities are not readily available from such sources, "NA" (Not Available) will appear in the price column, the market value for the security is not computed, and the total equity in your account does not reflect the long or short market value (if any) of those securities.

*YTD VALUES*: YTD figures are based on transactions that post in the current calendar year.

*ESTIMATED ANNUAL DIVIDEND RATE AND INCOME*: Estimated annual dividend, bond interest rate and annual income are derived from standard statistical sources. We do not guarantee the accuracy of such information. As the figures are subject to change at any time, they should not be relied upon for investment or trading decisions.

*SECURITIES MATURING OR EXPIRING NEXT TWO MONTHS*: Securities which mature (e.g., bonds) or expire (e.g., options) may appear on the monthly statement prior to the maturity or expiration month. The actual maturity or expiration date, quantity, description and current market price may be reflected on the statement.

*MULTIPLE CURRENCY REPORTING*: Foreign exchange rates are from sources we consider to be reliable but they may not reflect realizable rates. We do not warrant the accuracy of these sources and are not responsible for any inaccuracies.

*LISTED OPTIONS*: Further information with respect to commissions and other charges related to the execution of listed option transactions has been previously furnished to you in confirmations of such transactions. A summary of such information will be made available to you promptly upon request.

*TRANSACTIONS PENDING SETTLEMENT*: are reflected in the Trade Date sections but do not imply a guarantee of settlement.

*WHEN ISSUED TRANSACTIONS*: Any transaction involving an unissued security may be reflected in this statement under the trades pending settlement section. When, as, and if the security is issued, the transaction may then appear in the regular activity section of the statement.

*FUTURES TRANSACTIONS*: Further information regarding the futures transactions confirmed herein will be furnished upon request. Futures transactions are subject to the terms and conditions of your Commodity Futures Customer agreement, and other applicable documentation. Our financial statement is available for your inspection at our offices or a copy of it will be mailed to you upon your written request.

This statement, its enforcement, and any dispute between us shall be governed by the laws of the state of New York, excluding its conflict of laws provisions.

This statement shall be conclusive and binding if not objected to in writing within ten days after transmittal to you by mail or otherwise. A shorter notice period for objection to confirmed term of futures transactions may apply, please consult your Commodity Futures Customer Agreement.

*DIRECT PARTICIPATION PROGRAMS ("DPP") AND REAL ESTATE INVESTMENT TRUSTS ("REIT")*: If your statement contains month-end valuations for DPPs or REITs, such values may be estimated and obtained from pricing services or from the issuer in its annual report. If your statement does not contain month-end valuations for such instruments, it may be because accurate valuation information is not available. In any event, such securities are often illiquid and any estimated value may not be realized upon sale. The actual value of such instruments will most likely be different than the original purchase price.

## FOR CUSTOMERS OF THE UNITED STATES SUBSIDIARIES AND AFFILIATES OF MORGAN STANLEY

Any issues concerning your account should be addressed to the Institutional Client Services Division at (443) 627-6551 or at Morgan Stanley & Co. LLC, Institutional Client Services Division, 1585 Broadway, New York, N.Y. 10036 U.S.A.

This statement should be preserved, as it may be necessary for the preparation and subsequent examination of your income tax returns and verify interest charges that may appear on your next statement. We are required by law to report to the Internal Revenue Service certain dividends, registered bond interest and the net proceeds of certain transactions.

Morgan Stanley & Co. LLC is a member of the Securities Investor Production Corporation (SIPC). Therefore, subject to certain SIPC restrictions, securities and cash held by us in your account are protected up to $500,000 per client (including up to $250,000 for cash). Morgan Stanley & Co. LLC has obtained coverage in addition to the existing SIPC protection from a major insurance underwriter to cover each client's total net equity value of cash and securities held in the client's Morgan Stanley & Co. LLC account. SIPC coverage does not protect against changes in market value.

Among the investments that are ineligible for SIPC protections are commodity futures contracts (unless in portfolio margining accounts and defined as customer property under the Securities Investor Protection Act), fixed annuity contracts, and currency as well as investment contracts (such as limited partnerships) that are not registered with

the U.S. Securities and Exchange Commission under the Securities Act of 1933. Your pledged or transferred assets may not be protected by SIPC or additional coverage.

Clients may obtain information about the Securities Investor Protection Corporation (SIPC), including the S PC brochure, by contacting S PC at 1-202-371-8300 or by visiting www.sipc.org.

We can use your closing credit balance in our business, subject to the limitations of 17 CFR Section 240.15c3-3 promulgated under the Securities Exchange Act of 1934. You have the absolute right to receive, in the normal course of business, any free credit balance and any fully paid for securities subject to any open commitments in any of your accounts. You are entitled to receive securities purchased on margin upon full payment of any indebtedness to us If this is a margin account, this is a combined statement of your general account and the special memorandum account maintained for you under Regulation T issued by the Board of Governors of the Federal Reserve System. The permanent balanced records of the special account, as required by federal regulations, are available for your inspection upon request.

In accordance with SEC Rule 606, upon written request, Morgan Stanley & Co. LLC will disclose the identity of the venue to which your orders were routed for execution, whether the orders were directed or non directed, and the time of the executions, if any, that resulted from such orders.

FINRA has established the public disclosure program, known as BrokerCheck, to provide certain information regarding the disciplinary history of FINRA members and their associated persons. The BrokerCheck Hotline Number is 1-800-289-9999. The FINRA web site address is www.finra.org. An investor brochure that includes information describing FINRA BrokerCheck may be obtained from FINRA.

Municipal Advisor Rule; Disclosures for Municipal Entities and Obligated Persons:

Morgan Stanley Wealth Management is not acting as a municipal advisor to any municipal entity or obligated person within the meaning of Section 15B of the Securities Exchange Act (the "Municipal Advisor Rule"). If you have a Brokerage Account, please note that: 1) Morgan Stanley Wealth Management does not owe you a fiduciary duty pursuant to the Municipal Advisor Rule when Morgan Stanley Wealth Management makes statements or provides you with information regarding your Brokerage Account; 2) Morgan Stanley Wealth Management may be acting for its own interests and 3) before acting on any statements made or information provided by Morgan Stanley Wealth Management, you should consult any and all advisors as you deem appropriate.

## FOR CUSTOMERS OF THE NON-UNITED STATES SUBSIDIARIES AND AFFILIATES OF MORGAN STANLEY

Any complaints concerning your account should be addressed to the Compliance Director at the Morgan Stanley entity of which you are a customer.

CUSTOMERS OF MORGAN STANLEY & CO. INTERNATIONAL PLC

Charges and taxes deducted in respect of transactions have been set out in previous contract notes, confirmations or statements.

12042B-R (R12-04)

Morgan Stanley

```
P.O. Box 507
New York, NY 10013-0507
```

```
THOMAS GIRARDI
1126 WILSHIRE BLVD
LOS ANGELES CA 90017
```

| | |
|---|---|
| Account No | ██████████ |
| Investment Representative | ██████████████████ |
| Statement Period | 2020-03-01 to 2020-03-31 |
| Last Statement Date | 2019-10-31 |

For questions please contact

MORGAN STANLEY & CO. LLC
1585 Broadway
New York, NY  10036-8293
(212) 761-4000

Morgan Stanley

*This page is intentionally left blank*

# Morgan Stanley

**THOMAS GIRARDI**

| **ACCOUNT NO** | | REPORTED IN |
|---|---|---|
| **STATEMENT PERIOD** | 2020-03-01 to 2020-03-31 | **US DOLLARS** |

## ACCOUNT SUMMARY

| | TRADE DATE | SETTLEMENT DATE |
|---|---|---|
| Net Closing Cash Balance | 0.00 | 0.00 |
| Long Market Value | 0.00 | 0.00 |
| Short Market Value | 0.00 | 0.00 |
| **Equity in Your Account** | **0.00** | **0.00** |

*Reported mutual funds and unpriced securities are not included in market value and equity calculations.*

## OPENING BALANCE SUMMARY

| ACCOUNT TYPE | TRADE DATE | SETTLEMENT DATE |
|---|---|---|
| **Net Opening Cash Balance** | **0.00** | **0.00** |

## CLOSING BALANCE SUMMARY

| ACCOUNT TYPE | TRADE DATE | SETTLEMENT DATE |
|---|---|---|
| **Net Closing Cash Balance** | **0.00** | **0.00** |

## CASH ACTIVITY SUMMARY

| | This Period | | Year to Date | |
|---|---|---|---|---|
| | TRADE DATE | SETTLEMENT DATE | TRADE DATE | SETTLEMENT DATE |
| **Opening Balance** | **0.00** | **0.00** | **0.00** | **0.00** |
| Wires | (33,636,264.50) | (33,636,264.50) | (33,636,264.50) | (33,636,264.50) |
| Securities Sell | 33,636,264.50 | 33,636,264.50 | 33,636,264.50 | 33,636,264.50 |
| **Closing Balance** | **0.00** | **0.00** | **0.00** | **0.00** |

## TRADE ACTIVITY

| TRADE DATE | SETTLEMENT DATE | ACCOUNT TYPE | ACTIVITY | QUANTITY | PRICE | INTEREST | INFLOWS/(OUTFLOWS) |
|---|---|---|---|---|---|---|---|
| REPLIGEN CORP COM STK - *(RGEN / 2731654 / RGEN.O / US7599161095 / 759916109)* | | | | | | | |
| 2020-03-05 | 2020-03-09 | DVP/RVP | Sell | (210,000) | 93.5973 | | 19,654,998.61 |
| 2020-03-24 | 2020-03-26 | DVP/RVP | Sell | (19,500) | 93.2405 | | 1,817,564.56 |
| 2020-03-24 | 2020-03-26 | DVP/RVP | Sell | (130,500) | 93.2405 | | 12,163,701.33 |
| | | **Net Trade Activity** | | | | | **33,636,264.50** |

## OTHER ACTIVITY FOR THIS PERIOD

| TRADE DATE | SETTLEMENT DATE | ACCOUNT TYPE | QUANTITY DESCRIPTION | INFLOWS/(OUTFLOWS) |
|---|---|---|---|---|
| Miscellaneous Journals | | | | |
| 2020-03-26 | 2020-03-26 | DVP/RVP | 150,000 REPLIGEN CORP COM STK Adjust Collateral Position - *(RGEN / 2731654 / RGEN.O / US7599161095 / 759916109)* | 0.00 |
| Wires | | | | |
| 2020-03-09 | 2020-03-09 | DVP/RVP | 210,000 REPLIGEN CORP COM STK clearing corp updown - *(RGEN / 2731654 / RGEN.O / US7599161095 / 759916109)* | 0.00 |

# Morgan Stanley

THOMAS GIRARDI

| ACCOUNT NO | | | | REPORTED IN |
|---|---|---|---|---|
| **STATEMENT PERIOD** | **2020-03-01 to 2020-03-31** | | | **US DOLLARS** |

**OTHER ACTIVITY FOR THIS PERIOD** *(Continued)*

| TRADE DATE | SETTLEMENT DATE | ACCOUNT TYPE | QUANTITY DESCRIPTION | INFLOWS/(OUTFLOWS) |
|---|---|---|---|---|
| **Wires** | | | | |
| 2020-03-09 | 2020-03-09 | DVP/RVP | Exotic Option Risk Reversal rgen.q 22-Apr-2020 clearing corp updown - *(rgen/20d/0vkaj / otcc000185625.otc / 99VLJMV42)* | (19,654,998.61) |
| 2020-03-26 | 2020-03-26 | DVP/RVP | Exotic Option Risk Reversal rgen.q 04-Jun-2020 Girardi Settlement - *(rgen/20f/0te6w / otcc000169046.otc / 99VJ90W11)* | (13,981,265.89) |
| | | **Net Wires Activity** | | **(33,636,264.50)** |
| | | **Net Activity for This Period** | | **(33,636,264.50)** |

# Morgan Stanley

**THOMAS GIRARDI**

| | |
|---|---|
| **ACCOUNT NO** | ▮▮▮▮▮ |
| **STATEMENT PERIOD** | **2020-03-01 to 2020-03-31** |

Consolidated Statement of Financial Condition (in millions of dollars):

At December 31, 2019 Morgan Stanley & Co. LLC had net capital of $13,708 which exceeded the greater of the Securities and Exchange Commission or the U.S. Commodity Futures Trading Commission's minimum requirement by $10,686. A copy of the Morgan Stanley & Co. LLC Consolidated Statement of Financial Condition at December 31, 2019 can be viewed online at: http://www.morganstanley.com/about-us-ir/shareholder/morganstanley_co_llc.pdf, or may be mailed to you at no cost by calling 1 (866) 825-1675, after March 15, 2020.

Callable Securities - If a Security is subject to a partial redemption by the issuer, the issuer notifies Morgan Stanley & Co. LLC (MS&Co.), via a central industry depository, of the number of units for the specific security to be redeemed. MS&Co. determines the favorability of the redemption as required under FINRA 4340 - "Callable Securities". A link to the Firm's allocation procedures for callable securities is located at http://www.morganstanley.com/about/ir/regulated_information.html. Additionally, a hard copy of the allocation procedures will be provided to customers upon request.

INVESTMENTS AND SERVICES ARE OFFERED THROUGH MORGAN STANLEY AND CO. LLC, MEMBER SIPC.

IF YOU HAVE A MARGIN ACCOUNT WITH US, AS PERMITTED BY LAW WE MAY USE CERTAIN SECURITIES IN YOUR ACCOUNT FOR, AMONG OTHER THINGS, SETTLING SHORT SALES AND LENDING THE SECURITIES FOR SHORT SALES, AND AS A RESULT MAY RECEIVE COMPENSATION IN CONNECTION THEREWITH.

# Morgan Stanley

*Please advise your investments representative immediately of any discrepancies in securities transactions or investment activity in your account, and in order to protect your rights, including those provided under the Securities Investor Protection Act (SIPA), confirm any such oral communications in writing.*

## TERMS AND CONDITIONS

We provide both trade date and settlement date activity on your statements. Confirmations of transactions have been made to you pursuant to SEC Rule 10b-10 and of futures transactions pursuant to CFTC Rule I 33. Immediately notify the Compliance Director at address indicated below, if you have not received a confirmation.

All transactions are subject to the constitutions, rules, regulations, customs, usages, rulings and interpretation of the pertinent exchanges, markets self-regulatory organizations, and clearing houses.

We trade for our own account as an odd lot dealer, a block positioner or arbitrageur. At the time of any transaction in your account, we may have a long or short position in the same security and our position may be completely or partially hedged.

If your statement contains a transaction or position in a mutual fund, we may receive compensation from the fund or its advisor as described in the fund's prospectus. Any information on this statement relating to a mutual fund has been provided to us by the fund.

Please note that all money entries and balances that are identified under the summary section are credits to your account unless specified as a debit by an amount in parenthesis.

Please promptly advise your Investments Representative of any material changes in your investment objectives or financial situation.

*PORTFOLIO SUMMARY*: The month-end valuations of your portfolios are computed using prices from pricing services and other sources we consider to be generally reliable in approximating the value of securities held in your account. These valuations, however, are sometimes outdated as of the date your monthly statement is prepared and, accordingly, may not actually be can be realized. We do not warrant the accuracy

of these sources and are not responsible for any inaccuracies. In instances where prices of securities are not readily available from such sources, "NA" (Not Available) will appear in the price column, the market value for the security is not computed, and the total equity in your account does not reflect the long or short market value (if any) of those securities.

*YTD VALUES*: YTD figures are based on transactions that post in the current calendar year.

*ESTIMATED ANNUAL DIVIDEND RATE AND INCOME*: Estimated annual dividend, bond interest rate and annual income are derived from standard statistical sources. We do not guarantee the accuracy of such information. As the figures are subject to change at any time, they should not be relied upon for investment or trading decisions.

*SECURITIES MATURING OR EXPIRING NEXT TWO MONTHS*: Securities which mature (e.g., bonds) or expire (e.g., options) may appear on the monthly statement prior to the maturity or expiration month. The actual maturity or expiration date, quantity, description and current market price may be reflected on the statement.

*MULTIPLE CURRENCY REPORTING*: Foreign exchange rates are from sources we consider to be reliable but they may not reflect realizable rates. We do not warrant the accuracy of these sources and are not responsible for any inaccuracies.

*LISTED OPTIONS*: Further information with respect to commissions and other charges related to the execution of listed option transactions has been previously furnished to you in confirmations of such transactions. A summary of such information will be made available to you promptly upon request.

*TRANSACTIONS PENDING SETTLEMENT*: are reflected in the Trade Date sections but do not imply a guarantee of settlement.

*WHEN ISSUED TRANSACTIONS*: Any transaction involving an unissued security may be reflected in this statement under the trading pending settlement section. When, as, and if the security is issued, the transaction may then appear in the regular activity section of the statement.

*FUTURES TRANSACTIONS*: Further information regarding the futures transactions confirmed herein will be furnished upon request. Futures transactions are subject to the terms and conditions of your Commodity Futures Customer agreement, and other applicable documentation. Our financial statement is available for your inspection at our offices or a copy of it will be mailed to you upon your written request.

This statement, its enforcement, and any dispute between us shall be governed by the laws of the state of New York, excluding its conflict of laws provisions.

This statement shall be conclusive and binding if not objected to in writing within ten days after transmittal to you by mail or otherwise. A shorter notice period for objection to confirmed term of futures transactions may apply, please consult your Commodity Futures Customer Agreement.

*DIRECT PARTICIPATION PROGRAMS ("DPP") AND REAL ESTATE INVESTMENT TRUSTS ("REIT")*: If your statement contains month-end valuations for DPPs or REITs, such values may be estimated and obtained from pricing services or from the issuer in its annual report. If your statement does not contain month-end valuations for such instruments, it may be because accurate valuation information is not available. In any event, such securities are often illiquid and any estimated value may not be realized upon sale. The actual value of such instruments will most likely be different than the original purchase price.

## FOR CUSTOMERS OF THE UNITED STATES SUBSIDIARIES AND AFFILIATES OF MORGAN STANLEY

Any issues concerning your account should be addressed to the Institutional Client Services Division at (443) 627-6551 or at Morgan Stanley & Co. LLC, Institutional Client Services Division, 1585 Broadway, New York, N.Y. 10036 U.S.A.

This statement should be preserved, as it may be necessary for the preparation and subsequent examination of your income tax returns and verify interest charges that may appear on your next statement. We are required by law to report to the Internal Revenue Service certain dividends, registered bond interest and the net proceeds of certain transactions.

Morgan Stanley & Co. LLC is a member of the Securities Investor Production Corporation (SIPC). Through, subject to certain SIPC restrictions, securities and cash held by us in your account are protected up to $500,000 per client (including up to $250,000 for cash). Morgan Stanley & Co. LLC has obtained coverage in addition to the existing SIPC protection from a major insurance underwriter to cover each client's total net equity value of cash and securities held in the client's Morgan Stanley & Co. LLC account. SIPC coverage does not protect against changes in market value.

Among the investments that are ineligible for SIPC protections are commodity futures contracts (unless in portfolio margining accounts and defined as customer property under the Securities Investor Protection Act), fixed annuity contracts, and currency as well as investment contracts (such as limited partnerships) that are not registered under

the U.S. Securities and Exchange Commission under the Securities Act of 1933. Your pledged or transferred assets may not be protected by SIPC or additional coverage.

Clients may obtain information about the Securities Investor Protection Corporation (SIPC), including the S PC brochure, by contacting S PC at 1-202-371-8300 or by visiting www.sipc.org.

We can use your closing credit balance in our business, subject to the limitations of 17 CFR Section 240.15c3-3 promulgated under the Securities Exchange Act of 1934. You have the absolute right to receive, in the normal course of business, any free credit balance and any fully paid for securities subject to any open commitments in any of your accounts. You are entitled to receive securities purchased on margin upon full payment of any indebtedness to us If this is a margin account, this is a combined statement of your general account and the special memorandum account maintained for you under Regulation T issued by the Board of Governors of the Federal Reserve System. The permanent balanced records of the special account, as required by federal regulations, are available for your inspection upon request.

In accordance with SEC Rule 606, upon written request, Morgan Stanley & Co. LLC will disclose the identity of the venue to which your orders were routed for execution, whether the orders were directed or non directed, and the time of the executions, if any, that resulted from such orders.

FINRA has established the public disclosure program, known as BrokerCheck, to provide certain information regarding the disciplinary history of FINRA members and their associated persons. The BrokerCheck Hotline Number is 1-800-289-9999. The FINRA web site address is www.finra.org. An investor brochure that includes information describing FINRA BrokerCheck may be obtained from FINRA.

Municipal Advisor Rule; Disclosures for Municipal Entities and Obligated Persons:

Morgan Stanley Wealth Management is not acting as a municipal advisor to any municipal entity or obligated person within the meaning of Section 15B of the Securities Exchange Act (the "Municipal Advisor Rule"). If you have a Brokerage Account, please note that: 1) Morgan Stanley Wealth Management does not owe you a fiduciary duty pursuant to the Municipal Advisor Rule when Morgan Stanley Wealth Management makes statements or provides you with information regarding your Brokerage Account; 2) Morgan Stanley Wealth Management may be acting for its own interests and 3) before acting on any statements made or information provided by Morgan Stanley Wealth Management, you should consult any and all advisors as you deem appropriate.

## FOR CUSTOMERS OF THE NON-UNITED STATES SUBSIDIARIES AND AFFILIATES OF MORGAN STANLEY

Any complaints concerning your account should be addressed to the Compliance Director at the Morgan Stanley entity of which you are a customer.

CUSTOMERS OF MORGAN STANLEY & CO. INTERNATIONAL PLC

Charges and taxes deducted in respect of transactions have been set out in previous contract notes, confirmations or statements.

12042B-R (R12-04)

Morgan Stanley

```
P.O. Box 507
New York, NY 10013-0507
```

```
THOMAS GIRARDI
1126 WILSHIRE BLVD
LOS ANGELES CA 90017
```

Account No                          ████████
Investment Representative           ─████████████████████
Statement Period                    2019-10-01 to 2019-10-31

For questions please contact
MORGAN STANLEY & CO. LLC
1585 Broadway
New York, NY  10036-8293
(212) 761-4000

Morgan Stanley

*This page is intentionally left blank*

# Morgan Stanley

THOMAS GIRARDI

| ACCOUNT NO | | | REPORTED IN |
|---|---|---|---|
| STATEMENT PERIOD | 2019-10-01 to 2019-10-31 | | **US DOLLARS** |

## ACCOUNT SUMMARY

| | TRADE DATE | SETTLEMENT DATE |
|---|---|---|
| Net Closing Cash Balance | 0.00 | 0.00 |
| Long Market Value | 0.00 | 0.00 |
| Short Market Value | 0.00 | 0.00 |
| **Equity in Your Account** | **0.00** | **0.00** |

*Reported mutual funds and unpriced securities are not included in market value and equity calculations.*

## OPENING BALANCE SUMMARY

| ACCOUNT TYPE | TRADE DATE | SETTLEMENT DATE |
|---|---|---|
| **Net Opening Cash Balance** | **0.00** | **0.00** |

## CLOSING BALANCE SUMMARY

| ACCOUNT TYPE | TRADE DATE | SETTLEMENT DATE |
|---|---|---|
| **Net Closing Cash Balance** | **0.00** | **0.00** |

## CASH ACTIVITY SUMMARY

| | This Period | | Year to Date | |
|---|---|---|---|---|
| | TRADE DATE | SETTLEMENT DATE | TRADE DATE | SETTLEMENT DATE |
| **Opening Balance** | **0.00** | **0.00** | **0.00** | **0.00** |
| Miscellaneous Journals | (15,787,293.19) | (15,787,293.19) | (15,787,293.19) | (15,787,293.19) |
| Securities Sell | 15,787,293.19 | 15,787,293.19 | 15,787,293.19 | 15,787,293.19 |
| **Closing Balance** | **0.00** | **0.00** | **0.00** | **0.00** |

## TRADE ACTIVITY

| TRADE DATE | SETTLEMENT DATE | ACCOUNT TYPE | ACTIVITY | QUANTITY | PRICE | INTEREST | INFLOWS/(OUTFLOWS) |
|---|---|---|---|---|---|---|---|
| REPLIGEN CORP COM STK TRADE ENTRY-TRADE DATE POSTING NONRECON ACCTS - *(RGEN / 2731654 / RGEN.O / US7599161095 / 759916109)* | | | | | | | |
| 2019-10-24 | | DVP/RVP | Sell Cancel | 200,000 | | | (15,781,293.19) |
| 2019-10-24 | | DVP/RVP | Sell Correction | (200,000) | | | 15,787,293.19 |
| 2019-10-24 | | DVP/RVP | Sell | (200,000) | | | 15,787,293.19 |
| | 2019-10-28 | DVP/RVP | Sell | (200,000) | 78.9381 | | 15,787,293.19 |
| | | **Net Trade Date Activity** | | | | | **15,787,293.19** |
| | | **Net Settlement Date Activity** | | | | | **15,787,293.19** |

## OTHER ACTIVITY FOR THIS PERIOD

| TRADE DATE | SETTLEMENT DATE | ACCOUNT TYPE | QUANTITY DESCRIPTION | INFLOWS/(OUTFLOWS) |
|---|---|---|---|---|
| Miscellaneous Journals | | | | |
| 2019-10-28 | 2019-10-28 | DVP/RVP | 95HKB; Adjust Collateral Position | (15,787,293.19) |
| 2019-10-28 | 2019-10-28 | DVP/RVP | 200,000 REPLIGEN CORP COM STK 95HKB; Adjust Collateral Position - *(RGEN / 2731654 / RGEN.O / US7599161095 / 759916109)* | 0.00 |

# Morgan Stanley

THOMAS GIRARDI

| ACCOUNT NO | | | | | REPORTED IN |
|---|---|---|---|---|---|
| **STATEMENT PERIOD** | **2019-10-01 to 2019-10-31** | | | | **US DOLLARS** |

| OTHER ACTIVITY FOR THIS PERIOD | | | *(Continued)* | |
|---|---|---|---|---|
| **TRADE DATE** | **SETTLEMENT DATE** | **ACCOUNT TYPE** | **QUANTITY  DESCRIPTION** | **INFLOWS/(OUTFLOWS)** |
| | | **Net Activity for This Period** | | **(15,787,293.19)** |

# Morgan Stanley

THOMAS GIRARDI

**ACCOUNT NO**

**STATEMENT PERIOD**    2019-10-01 to 2019-10-31

IF YOU HAVE A MARGIN ACCOUNT WITH US, AS PERMITTED BY LAW WE MAY USE CERTAIN SECURITIES IN YOUR ACCOUNT FOR, AMONG OTHER THINGS, SETTLING SHORT SALES AND LENDING THE SECURITIES FOR SHORT SALES, AND AS A RESULT MAY RECEIVE COMPENSATION IN CONNECTION THEREWITH.

Callable Securities - If a Security is subject to a partial redemption by the issuer, the issuer notifies Morgan Stanley & Co. LLC (MS&Co.), via a central industry depository, of the number of units for the specific security to be redeemed. MS&Co. determines the favorability of the redemption as required under FINRA 4340 - "Callable Securities". A link to the Firm's allocation procedures for callable securities is located at http://www.morganstanley.com/about/ir/regulated_information.html. Additionally, a hard copy of the allocation procedures will be provided to customers upon request.

INVESTMENTS AND SERVICES ARE OFFERED THROUGH MORGAN STANLEY AND CO. LLC, MEMBER SIPC.

# Morgan Stanley

*Please advise your investments representative immediately of any discrepancies in securities transactions or investment activity in your account, and in order to protect your rights, including those provided under the Securities Investor Protection Act (SIPA), confirm any such oral communications in writing.*

## TERMS AND CONDITIONS

We provide both trade date and settlement date activity on your statements. Confirmations of transactions have been made to you pursuant to SEC Rule 10b-10 and of futures transactions pursuant to CFTC Rule 1 33. Immediately notify the Compliance Director at address indicated below, if you have not received a confirmation.

All transactions are subject to the constitutions, rules, regulations, customs, usages, rulings and interpretation of the pertinent exchanges, markets self-regulatory organizations, and clearing houses.

We trade for our own account as an odd lot dealer, a block positioner or arbitrageur. At the time of any transaction in your account, we may have a long or short position in the same security and our position may be completely or partially hedged.

If your statement contains a transaction or position in a mutual fund, we may receive compensation from the fund or its advisor as described in the fund's prospectus. Any information on this statement relating to a mutual fund has been provided to us by the fund.

Please note that all money entries and balances that are identified under the summary section are credits to your account unless specified as a debit by an amount in parenthesis.

Please promptly advise your Investments Representative of any material changes in your investment objectives or financial situation.

*PORTFOLIO SUMMARY*: The month-end valuations of your portfolios are computed using prices from pricing services and other sources we consider to be generally reliable in approximating the value of securities held in your account. These valuations, however, are sometimes outdated as of the date your monthly statement is prepared and, accordingly, may not actually be can be realized. We do not warrant the accuracy

of these sources and are not responsible for any inaccuracies. In instances where prices of securities are not readily available from such sources, "NA" (Not Available) will appear in the price column, the market value for the security is not computed, and the total equity in your account does not reflect the long or short market value (if any) of those securities.

*YTD VALUES*: YTD figures are based on transactions that post in the current calendar year.

*ESTIMATED ANNUAL DIVIDEND RATE AND INCOME*: Estimated annual dividend, bond interest rate and annual income are derived from standard statistical sources. We do not guarantee the accuracy of such information. As the figures are subject to change at any time, they should not be relied upon for investment or trading decisions.

*SECURITIES MATURING OR EXPIRING NEXT TWO MONTHS*: Securities which mature (e.g., bonds) or expire (e.g., options) may appear on the monthly statement prior to the maturity or expiration month. The actual maturity or expiration date, quantity, description and current market price may be reflected on the statement.

*MULTIPLE CURRENCY REPORTING*: Foreign exchange rates are from sources we consider to be reliable but they may not reflect realizable rates. We do not warrant the accuracy of these sources and are not responsible for any inaccuracies.

*LISTED OPTIONS*: Further information with respect to commissions and other charges related to the execution of listed option transactions has been previously furnished to you in confirmations of such transactions. A summary of such information will be made available to you promptly upon request.

*TRANSACTIONS PENDING SETTLEMENT*: are reflected in the Trade Date sections but do not imply a guarantee of settlement.

*WHEN ISSUED TRANSACTIONS*: Any transaction involving an unissued security may be reflected in this statement under the trades pending settlement section. When, as, and if the security is issued, the transaction may then appear in the regular activity section of the statement.

*FUTURES TRANSACTIONS*: Further information regarding the futures transactions confirmed herein will be furnished upon request. Futures transactions are subject to the terms and conditions of your Commodity Futures Customer agreement, and other applicable documentation. Our financial statement is available for your inspection at our offices or a copy of it will be mailed to you upon your written request.

This statement, its enforcement, and any dispute between us shall be governed by the laws of the state of New York, excluding its conflict of laws provisions.

This statement shall be conclusive and binding if not objected to in writing within ten days after transmittal to you by mail or otherwise. A shorter notice period for objection to confirmed term of futures transactions may apply, please consult your Commodity Futures Customer Agreement.

*DIRECT PARTICIPATION PROGRAMS ("DPP") AND REAL ESTATE INVESTMENT TRUSTS ("REIT")*: If your statement contains month-end valuations for DPPs or REITs, such values may be estimated and obtained from pricing services or from the issuer in its annual report. If your statement does not contain month-end valuations for such instruments, it may be because accurate valuation information is not available. In any event, such securities are often illiquid and any estimated value may not be realized upon sale. The actual value of such instruments will most likely be different than the original purchase price.

## FOR CUSTOMERS OF THE UNITED STATES SUBSIDIARIES AND AFFILIATES OF MORGAN STANLEY

Any issues concerning your account should be addressed to the Institutional Client Services Division at (443) 627-6551 or at Morgan Stanley & Co. LLC, Institutional Client Services Division, 1585 Broadway, New York, N.Y. 10036 U.S.A.

This statement should be preserved, as it may be necessary for the preparation and subsequent examination of your income tax returns and verify interest charges that may appear on your next statement. We are required by law to report to the Internal Revenue Service certain dividends, registered bond interest and the net proceeds of certain transactions.

Morgan Stanley & Co. LLC is a member of the Securities Investor Production Corporation (SIPC). Therefore, subject to certain SIPC restrictions, securities and cash held by us in your account are protected up to $500,000 per client (including up to $250,000 for cash). Morgan Stanley & Co. LLC has obtained coverage in addition to the existing SIPC protection from a major insurance underwriter to cover each client's total net equity value of cash and securities held in the client's Morgan Stanley & Co. LLC account. SIPC coverage does not protect against changes in market value.

Among the investments that are ineligible for SIPC protections are commodity futures contracts (unless in portfolio margining accounts and defined as customer property under the Securities Investor Protection Act), fixed annuity contracts, and currency as well as investment contracts (such as limited partnerships) that are not registered under

the U.S. Securities and Exchange Commission under the Securities Act of 1933. Your pledged or transferred assets may not be protected by SIPC or additional coverage.

Clients may obtain information about the Securities Investor Protection Corporation (SIPC), including the S PC brochure, by contacting S PC at 1-202-371-8300 or by visiting www.sipc.org.

We can use your closing credit balance in our business, subject to the limitations of 17 CFR Section 240.15c3-3 promulgated under the Securities Exchange Act of 1934. You have the absolute right to receive, in the normal course of business, any free credit balance and any fully paid for securities subject to any open commitments in any of your accounts. You are entitled to receive securities purchased on margin upon full payment of any indebtedness to us If this is a margin account, this is a combined statement of your general account and the special memorandum account maintained for you under Regulation T issued by the Board of Governors of the Federal Reserve System. The permanent balanced records of the special account, as required by federal regulations, are available for your inspection upon request.

In accordance with SEC Rule 606, upon written request, Morgan Stanley & Co. LLC will disclose the identity of the venue to which your orders were routed for execution, whether the orders were directed or non directed, and the time of the executions, if any, that resulted from such orders.

FINRA has established the public disclosure program, known as BrokerCheck, to provide certain information regarding the disciplinary history of FINRA members and their associated persons. The BrokerCheck Hotline Number is 1-800-289-9999. The FINRA web site address is www.finra.org. An investor brochure that includes information describing FINRA BrokerCheck may be obtained from FINRA.

Municipal Advisor Rule; Disclosures for Municipal Entities and Obligated Persons:

Morgan Stanley Wealth Management is not acting as a municipal advisor to any municipal entity or obligated person within the meaning of Section 15B of the Securities Exchange Act (the "Municipal Advisor Rule"). If you have a Brokerage Account, please note that: 1) Morgan Stanley Wealth Management does not owe you a fiduciary duty pursuant to the Municipal Advisor Rule when Morgan Stanley Wealth Management makes statements or provides you with information regarding your Brokerage Account; 2) Morgan Stanley Wealth Management may be acting for its own interests and 3) before acting on any statements made or information provided by Morgan Stanley Wealth Management, you should consult any and all advisors as you deem appropriate.

## FOR CUSTOMERS OF THE NON-UNITED STATES SUBSIDIARIES AND AFFILIATES OF MORGAN STANLEY

Any complaints concerning your account should be addressed to the Compliance Director at the Morgan Stanley entity of which you are a customer.

CUSTOMERS OF MORGAN STANLEY & CO. INTERNATIONAL PLC

Charges and taxes deducted in respect of transactions have been set out in previous contract notes, confirmations or statements.

12042B-R (R12-04)

*End of Statement*

# EXHIBIT 2



March 20, 2019

Mr. Thomas V. Girardi
Mrs. Erika Girardi
███████████████████

Re:  Letter of Intent to Purchase Partnership Interests

Dear Mr. and Mrs. Girardi:

On behalf of The Bicycle Hotel & Casino (the "Casino") we are pleased to present this Letter of Intent to purchase the Option to acquire partnership interests in The Bicycle Hotel & Casino.  This letter is intended to evidence a legally binding agreement between the parties, enforceable in accordance with its terms as set forth below.

## GENERAL TERMS

*Interest to Be Purchased.* Casino will purchase Girardi's Option to acquire a be 13.11819% partnership interest (the "Interest") in the Casino as more fully detailed in the Option and Purchase Agreement between Thomas V. Girardi and Erika Girardi (collectively "Girardi") and The Bicycle Casino, L.P. ("TBC") and executed on September 8, 2013 and October 7, 2013 respectively.  The purchase will be on the terms and subject to the conditions set forth in a legally binding written agreement to be entered into by Girardi and Casino.

*Purchase Price.* Casino will purchase Girardi's Option for a total price of Ten Million Dollars ($10,000,000.00).  At the time this letter is executed, Casino will pay Girardi half of the purchase price, Five Million Dollars ($5,000,000.00) with the remaining Five Million Dollars due upon Closing.

*Representations, Warranties, Covenants, and Conditions.* The definitive agreement will contain the representations, warranties, covenants, conditions and other terms and provisions that are customary for transactions of this nature and are commercially reasonable between similarly situated parties. If the parties do not enter into a complete, definitive agreement, they agree that any provisions necessary to construe and enforce this agreement will reflect such commercially reasonable and customary provisions.

*Closing.* The closing shall be subject to the usual and customary conditions and requirements, including but not limited to all required governmental approvals as necessary.

*Exclusive Dealing.* Girardi shall not directly or indirectly, through an owner, employee, or agent, offer to sell the Interest to anyone other than Casino.  Girardi acknowledges that section 3.2 of the Option and Purchase Agreement provides that the right of the Girardis to acquire the Interest is personal to them and may not be assigned, transferred or conveyed to any other person or entity.

Thomas V. Girardi
Erika Girardi
March 20, 2019
Page 2 _____

*Expenses.* Casino and Girardi each shall be solely responsible for expenses that it incurs in connection with the sale of Girardi's Interest and the consummation of the sale and other transactions contemplated by their agreement.

*Tax Liabilities*. Girardi will consult his tax advisors prior to the close of the sale and will be responsible for all personal tax liabilities as a result of the agreement to sell the Interest.

*No Conflicting Agreement.* Other than section 3.2 of the Option and Purchase Agreement which the parties agree to amend to be in accordance with this Letter of Intent, each party hereto represents and warrants that such party is not a party to any contract, agreement or understanding with any other party which would prevent such party from entering into this letter of intent.

*Counterparts.* This letter may be executed in counterparts, each of which shall be enforceable against the parties actually executing such counterparts, and all of which together shall constitute one instrument.

*Definitive Agreements.* Upon execution of this letter of intent, the parties shall negotiate and execute a binding agreement. However, in the event that the parties cannot agree upon the terms of the definitive agreements, this letter of intent shall be the agreement between the parties.

As indicated above, this letter is intended to be a legally binding agreement, enforceable in accordance with its terms as set forth in this letter.   Please sign and date this Letter of Intent and return a copy to us to confirm our mutual understandings and binding agreements by March 22, 2019 so that we can move forward with the necessary steps to conclude this purchase.

Very truly yours,
The Bicycle Hotel & Casino

By: Hashem Minaiy, President of
    Thousand Palms Enterprises, Inc.
    A General Partner

By: Leo Chu
    A General Partner

Agreed to and Accepted:

_____
Thomas V. Girardi

March 21, 2019

_____
Erika Girardi

March 21, 2019

# EXHIBIT 3



**MEMORANDUM**

TO:      Attorneys
FROM: Thomas V. Girardi
DATE:  September 28, 2020
RE:      Getting back to the office
_____

My dear and wonderful friends:

Unfortunately, the "working at home" is not working. Our income has been reduced by 90%. Therefore, you have to come back to work in the office. I talked to the Mayor and he said he had already issued a document which permitted law firms to be open. I explained how we only occupy 40% of the office space. He indicated masks must be warned while walking around the office, the distance must be maintained, temperature must be taken in the morning and when you leave in the afternoon. Any large meetings or conferences (in person) cannot take place. If you have any cough or any flu symptoms, you must immediately leave to be tested.

We have to come back to the office and start settling all of the smaller cases (up to $200,000.00). The larger cases will have to wait for the courts to reopen.

TOM
/kc

2

# EXHIBIT 4

GIRARDI | KEESE
LAWYERS

## MEMORANDUM

TO:        Lawyers

FROM:   Thomas V. Girardi

DATE:   October 30, 2020

**RE:**       **"Working from Home"**

---

To show you how devastating it is to the law firm.

For the past eight years, excluding 2020, the firm has had income of $45 million to $55 million. We were, therefore, able to pay the nice wages to the wonderful people who work here. Unfortunately, this year we are going to be lucky if we bring in $3.5 million. Obviously, this has been a massively difficult time for me if you are going to continue to work from home.

I am attaching a time sheet for you to describe in detail exactly what you are doing on various cases.

Tom

Attachment

## TIME SHEET FOR ATTORNEYS
### (WORK FROM HOME)

| Date | Case Name | Work Product | Time Spent |
|------|-----------|--------------|------------|
|      |           |              |            |
|      |           |              |            |

# EXHIBIT 5



Via E-Mail: ███████████████

May 14, 2020

Dian Daniaty

**Re:    *Lion Air distribution of settlement***

Dear Dian:

We made an agreement with Boeing that all of the cases would be resolved.  They gave us special authorization to distribute 50%.  I feel fairly confident the balance will be done within 30 days.

Thank you for your nice note.

With kind regards,

THOMAS V. GIRARDI
TVG:kc

# EXHIBIT 6



Via E-Mail: ███████████████

June 19, 2020

Septi

*Re:    LionAir Case*

Dear Septi:

There are some serious issues.  I have been back east four times to get everything resolved.  I think I need two more weeks.  I will insist that, at least, we get the interest in two weeks, if I cannot resolve it.

Your friend,


TOM
\kc

# EXHIBIT 7
## Digital Recording

# EXHIBIT 8

Digital Recording

# EXHIBIT 9



Via E-Mail: ███████████████

July 31, 2020

Josefina Hernandez

*Re:*   *TVTS*

Dear Josie:

We are trying desperately to get everything figured out.  Since there's a Bankruptcy Trustee, we have to get an understanding of how much goes to the Trustee and how much goes to you.

We would like to get this over with.  If you could have the person who represented you in the bankruptcy give me a call, it would be very helpful.

I am not getting much of a response from the Trustee.

With kind regards,


THOMAS V. GIRARDI
TVG:kc

29129

# EXHIBIT 10

1   LINDSEY L. SMITH (State Bar No. 265401)
    LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
2   10250 Constellation Boulevard, Suite 1700
    Los Angeles, CA 90067
3   Telephone: (310) 229-1234
    Facsimile: (310) 229-1244
4   Email: lls@lnbyb.com

5   Proposed Attorneys for Timothy J. Yoo,
    Chapter 7 Trustee

6

7

8                    **UNITED STATES BANKRUPTCY COURT**

9                    **CENTRAL DISTRICT OF CALIFORNIA**

10                        **LOS ANGELES DIVISION**

11

12   | | |
     |---|---|
     | In re | Case No. 2:11-bk-54999-WB |
     | A████████ M█████ H███████ and J█████ C███████ H█████, | Chapter 7 |
     | Debtors. | **MOTION FOR ENTRY OF ORDER APPROVING SETTLEMENT OF CLAIM AND PAYMENT OF COUNSEL EMPLOYED BY DEBTORS; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF TIMOTHY J. YOO IN SUPPORT THEREOF** |
     | | [No Hearing Required Pursuant to Local Bankruptcy Rule 9013-1(o)] |

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

1    Pursuant to Federal Rule of Bankruptcy Procedure 9019 and Local Bankruptcy Rule

2    9013-1(o), Timothy J. Yoo, the duly appointed Chapter 7 Trustee (the "Trustee") for the

3    bankruptcy estate (the "Estate") of A████ M████ H██████ ("A██████") and J████

4    C████ H██████ ("J██████" together with A████ the "Debtors"), hereby submits this

5    motion (the "Motion") for the entry of an order, *inter alia*: (A) approving a settlement (the

6    "Settlement") reached concerning a claim asserted by J██████ in a case pending in the United

7    States District Court for the Southern District of West Virginia (the "Claim"); and (B)

8    approving the payment of the attorneys that J██████ engaged to represent her in connection

9    with the Claim. The terms of the Settlement are detailed in the settlement agreement (the

10   "Settlement Agreement"), which is attached as Exhibit 1 to the Declaration of Timothy J. Yoo

11   annexed hereto (the "Yoo Declaration") and is incorporated herein by reference. The complete

12   bases of the Motion are set forth in the Memorandum of Points and Authorities annexed hereto.

13   In summary, the Settlement resolves the Claim asserted by J██████ in the United States

14   District Court for the Southern District of West Virginia arising out of the implantation of

15   transvaginal mesh against the manufacturer of the mesh (the "Defendant"). The Debtors

16   inadvertently did not list the Claim as an asset of the Debtors' bankruptcy estate and the

17   Debtors' bankruptcy case was closed as a no asset case on February 10, 2012. After the closing

18   of the Debtors' bankruptcy case, J██████ retained Girardi and Keese (the "Firm") to prosecute

19   the Claim. In connection with the prosecution of the Claim, J██████ entered into an

20   Authorization to Settle (the "Authorization to Settle"), purporting to authorize settlement of the

21   Claim for the gross amount of $135,000(the "Total Settlement Amount") pursuant to a Master

22   Settlement Agreement entered into between the Firm and the Defendant regarding the potential

23   settlement of lawsuits against the Defendant by multiple plaintiffs. On April 1, 2019, the Firm

24   reached out to the Trustee to determine whether the estate asserted an interest in the settlement

25   funds.

26   Under the Settlement, the Total Settlement Amount shall be paid in conformity with the

27   requirements of the Master Settlement Agreement, which includes payments by the Settlement

28   Administrator of 5% of the Total Settlement Amount ($6,750.00) to the MDL 2325 common

2

1  benefit fund and of medical liens totaling $6,792.98 (a Medicare lien in the amount of $201.32

2  and an Anthem Inc. lien in the amount of $6,491.66). After payment of the foregoing, the

3  Settlement Administrator shall pay the remaining Total Settlement Amount to the Firm. The

4  Firm is entitled to a contingency fee of the Total Settlement Amount in the amount of $27,000

5  plus $2,888.00 in expenses incurred in connection with their representation of J████ and a

6  $625.00 lien resolution fee. After payment of the Firm's fees and costs, the Firm shall pay

7  $35,000 to the Trustee on behalf of the estate and any remaining funds shall be paid to J████

8  (which remaining funds are estimated to be $55,944.02).  This last part was negotiated chiefly

9  between the Trustee and the Debtors with the Firm agreeing to the mechanics of the Settlement

10  Agreement.

11        Pursuant to this Motion, the Trustee seeks approval of the Settlement of the Claim and

12  the payment of the fees, costs and expenses set forth in the Settlement Agreement and described

13  herein.

14        Additionally, pursuant to this Motion, the Trustee, on behalf of himself and the

15  bankruptcy estate, seeks approval authorizing himself and J████ to enter into, execute and

16  deliver any and all release documentation required by Defendant and any other documents or

17  instruments, if any, necessary or appropriate in order to effectuate a release of claims (the

18  "Release"), and that upon the Release becoming effective in accordance with its terms, all

19  persons and entities, including, without limitation, the Trustee, the bankruptcy estate, J████,

20  and any person or entity claiming, or who could claim, by, through or on behalf of the Trustee,

21  the bankruptcy estate and/ or J████, shall be and hereby are deemed to have released all

22  claims and are permanently enjoined from asserting or prosecuting any claims related to arising

23  from the Claim.

24        The Trustee believes that approval of the Settlement is in the best interests of the

25  Debtors' estate because the Settlement will allow the amount of $35,000 to come into the estate

26  for the benefit of the Debtors' creditors. It is the Trustee's belief that as a result of the receipt of

27  these settlement proceeds, the Trustee will be able to make a substantial (if not full) distribution

28  to unsecured creditors.

1    This Motion is based upon Rule 9019 of the Federal Rules of Bankruptcy Procedure and

2   Local Bankruptcy Rule 9013-1, the Notice of Motion filed concurrently herewith, this Motion

3   and the attached Memorandum of Points and Authorities and Yoo Declaration, the entire record

4   in the Debtors' bankruptcy case, and any other evidence properly presented to the Court.

5    **WHEREFORE**, the Trustee respectfully requests that the Court enter an Order:

6    1.    granting the Motion in its entirety;

7    2.    approving the terms and conditions of the Settlement as set forth herein and in

8   Exhibit 1 hereto;

9    3.    authorizing the payment by the Settlement Administrator of the liens, fees, costs

10  and expenses under the terms of the Settlement, including, without limitation, J███████'s

11  attorneys fees and costs, medical lien of Anthem BCBS, and MDL 2325 common benefit fund

12  fees from the Total Settlement Amount;

13   4.    authorizing the release and waiver of any interest in or any claims or rights

14  J██████, the Trustee and/or the bankruptcy estate may or could have regarding, arising from or

15  related to the J██████'s Claim; and to authorize the Trustee and J█████ to execute and deliver

16  any and all release documentation required by defendants and any other documents or

17  instruments, if any, necessary or appropriate in order to effectuate the release of claims;

18   5.    granting such other and further relief as may be necessary or appropriate under

19  the circumstances.

20  Dated: February 12, 2020        TIMOTHY J. YOO, CHAPTER 7 TRUSTEE

21

22              By:___/s/ Lindsey L. Smith_____
                    LINDSEY L. SMITH
23                  LEVENE, NEALE, BENDER, YOO
                        & BRILL L.L.P.
24                  Proposed Attorneys for Timothy J. Yoo,
                    Chapter 7 Trustee
25

26

27

28

4

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## STATEMENT OF FACTS

1.      On October 28, 2011, A███ M███ H███ ("A███") and J███ C███ H███ ("J███" together with A███ the "Debtors") filed a Voluntary Petition under Chapter 7 of 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"). Thereafter, Timothy J. Yoo (the "Trustee") was appointed as the chapter 7 trustee of the Debtors' bankruptcy estate.

2.      On December 8, 2011, the Trustee filed a Chapter 7 Trustee's Report of No Distribution and the Debtors' case was closed on February 10, 2012.

3.      After the Debtors' case was closed, the Trustee received information that J███ had a pre-petition claim (the "Claim") against the manufacturer of a medical device, causing J███ personal injury. It appeared that the Debtors inadvertently did not fully disclose the foregoing Claim in their Schedules and/or Statement of Financial Affairs. The Trustee received further information that a settlement concerning the Claim had already been proposed (the "Settlement").

4.      Based on the foregoing, the Office of the United States Trustee filed a motion to reopen the Debtors' bankruptcy case on April 10, 2019, which was granted by the Court order reopening the Debtors' case entered on April 18, 2019.

5.      The Debtors' case was reopened so that the Trustee could resolve the Claim, and upon the terms of the Settlement being satisfied, receive proceeds of the Settlement as detailed in the Settlement.

6.      As a result of the foregoing, the Trustee is seeking pursuant to this motion (the "Motion") an order, *inter alia,*: (A) approving the Settlement of the Claim; and (B) approving the payment by the Settlement Administrator of the fees and costs under the terms of the Settlement, including, payment of the attorneys that J███ engaged to represent her in connection with the Claim. The terms of the Settlement are detailed in the Settlement Agreement, which is attached as Exhibit 1 to the Declaration of Timothy J. Yoo annexed hereto (the "Yoo Declaration") and is incorporated herein by reference.

1    7.    The Settlement resolves the Claim asserted by J███ in the United States

2  District Court for the Southern District of West Virginia arising out of the implantation of

3  transvaginal mesh against the manufacturer of the mesh (the "<u>Defendant</u>"). After the closing of

4  the Debtors' bankruptcy case, J████ retained Girardi and Keese (the "<u>Firm</u>") to prosecute the

5  Claim. In connection with the prosecution of the Claim, J████ entered into an Authorization

6  to Settle the "<u>Authorization to Settle</u>"), purporting to authorize settlement of the Claim for the

7  gross amount of $135,000 (the "<u>Total Settlement Amount</u>") pursuant to a Master Settlement

8  Agreement entered into between the Firm and the Defendant regarding the potential settlement

9  of lawsuits against the Defendant by multiple plaintiffs.

10    8.    Under the Settlement, the Total Settlement Amount shall be paid in conformity

11  with the requirements of the Master Settlement Agreement, which includes payments by the

12  Settlement Administrator of 5% of the Total Settlement Amount ($6,750.00) to the MDL 2325

13  common benefit fund and of medical liens totaling $6,792.98 (a Medicare lien in the amount of

14  $201.32 and an Anthem Inc. lien in the amount of $6,491.66). After payment of the foregoing,

15  the Settlement Administrator shall pay the remaining Total Settlement Amount to the Firm. The

16  Firm is entitled to a contingency fee of the Total Settlement Amount in the amount of $27,000

17  plus $2,888.00 in expenses incurred in connection with their representation of J████ and a

18  $625.00 lien resolution fee. After payment of the Firm's fees and costs, the Firm shall pay

19  $35,000 to the Trustee on behalf of the estate and any remaining funds shall be paid to J████

20  (which remaining funds are estimated to be $55,944.02).  This last part was negotiated chiefly

21  between the Trustee and the Debtors with the Firm agreeing to the mechanics of the Settlement

22  Agreement.

23    9.    Pursuant to this Motion, the Trustee seeks approval of the Settlement of the

24  Claim and the payment of the fees, costs and expenses set forth in the Settlement Agreement

25  and described herein.

26    10.    Additionally, pursuant to this Motion, the Trustee, on behalf of himself and the

27  bankruptcy estate, seeks approval authorizing himself and J████ to enter into, execute and

28  deliver any and all release documentation required by Defendant and any other documents or

6

1  instruments, if any, necessary or appropriate in order to effectuate a release of claims (the

2  "Release"), and that upon the Release becoming effective in accordance with its terms, all

3  persons and entities, including, without limitation, the Trustee, the bankruptcy estate, ▮▮▮,

4  and any person or entity claiming, or who could claim, by, through or on behalf of the Trustee,

5  the bankruptcy estate and/ or ▮▮▮, shall be and hereby are deemed to have released all

6  claims and are permanently enjoined from asserting or prosecuting any claims related to arising

7  from the Claim.

8      11.    The Trustee believes that approval of the Settlement is in the best interests of the

9  Debtors' estate because the Settlement will allow the amount of $35,000 to come into the estate

10  for the benefit of the Debtors' creditors. The deadline for creditors to file pre-petition claims

11  against the Debtor's estate passed on October 4, 2019 and only $18,087 of unsecured claims

12  were filed. The Trustee's fee under Section 326 is $4,250. The Trustee anticipates that a tax

13  preparer will charge the estate about $1,000 to file the final tax returns for the estate. Since the

14  Trustee negotiated the settlement directly, the Trustee anticipates that his counsel's fees should

15  be quite low. Based on the foregoing, the Trustee believes that as a result of the receipt of these

16  settlement proceeds, the estate will be able to make a substantial (if not full) distribution to

17  unsecured creditors.

18                                      **II.**

19                                 **DISCUSSION**

20      The authority granting a trustee the ability to compromise a controversy or agree to a

21  settlement is set forth in the Federal Rules of Bankruptcy Procedure 9019(a), which provides in

22  pertinent part that "[o]n motion by the trustee and after hearing on notice to creditors . . ., the

23  court may approve a compromise or settlement." The decision of whether a compromise should

24  be accepted or rejected lies within the sound discretion of the court. *In re Carson*, 82 B.R. 847,

25  852 (Bankr. S.D. Ohio 1987); *In re Hydronic Enterprise, Inc.*, 58 B.R. 363, 365 (Bankr. D.R.I.

26  1986); *In re Mobile Air Drilling Co., Inc.*, 53 B.R. 605, 607 (Bankr. N.D. Ohio 1985); *Knowles*

27  *v. Putterbaugh (In re Hallet)*, 33 B.R. 564, 565 (Bankr. D.Me. 1983).

28      The Ninth Circuit Court of Appeals has determined that, in considering a proposed

1   compromise, the court must evaluate (i) the probability of success in the litigation; (ii) the

2   difficulties, if any, to be encountered in the matter of collection; (iii) the complexity of the

3   litigation involved, and the expense, inconvenience and delay necessarily attendant to it; and

4   (iv) the paramount interests of creditors and a deference to their views. *In re A & C Properties*,

5   764 F.2d 1377, 1381 (9th Cir. 1986). *See also In re Lion Capital Group*, 49 B.R. 163 (Bankr.

6   S.D. N.Y. 1985); *Matter of Marshall*, 33 B.R. 42 (Bankr. D. Conn. 1983).

7           A court should not substitute its own judgment for the judgment of the trustee or the

8   debtor in possession. *Matter of Carla Leather, Inc.*, 44 B.R. 457, 465 (Bankr. S.D. N.Y. 1984).

9   "It is sufficient that, after apprising itself of all facts necessary for an intelligent and objective

10  opinion concerning the claim's validity, the court determines that either (1) the claim has a

11  'substantial foundation' and is not 'clearly invalid as a matter of law,' or (2) the outcome of the

12  claim's litigation is 'doubtful'." *Matter of Walsh Const., Inc.*, 669 F.2d 1325, 1328 (9th Cir.

13  1982). A court, in reviewing a proposed settlement, "is not to decide the numerous questions of

14  law and fact but rather to canvass the issues and see whether the settlement 'fall[s] below the

15  lowest point in the range of reasonableness.'" *In re W.T. Grant & Co.*, 699 F.2d 599, 608 (2nd

16  Cir. 1983), *accord, Newman v. Stein*, 464 F.2d 689, 693 (2nd Cir. 1972). The court should not

17  conduct a "mini-trial" on the merits of the underlying cause of action. *Matter of Walsh Const.,

18  Inc.*, 669 F.2d at 1328; *In re Blairu*, 538 F.2d 849 (9th Cir. 1976).

19          The Trustee submits that the Settlement comports with the *A & C Properties* standards

20  set forth above and is in the best interests of the estate and the Debtors' creditors. The four

21  factors, pursuant to *A & C Properties*, to be considered in reaching the aforementioned

22  conclusion, are as follows:

23          1.      The probability of success in the litigation.

24          The Trustee seeks approval of 2 settlements: (1) the underlying Settlement reached in

25  the class action and (2) the Settlement Agreement that was negotiated between the Trustee and

26  the Debtors to provide for a distribution to the unsecured creditors of the estate.

27          The analysis of the probability of success in litigation is moot given that the Settlement

28  was reached prior to the reopening of the Debtors' bankruptcy case. Additionally, the

8

1 │ Settlement was part of a settlement accepted by numerous other plaintiffs, not just J████.

2 │ Therefore, this factor weighs heavily in favor of approving the Settlement.

3 │      As for the Settlement Agreement, the parties recognized the difficult issues related to the

4 │ Debtors' ability to claim an exemption on an undisclosed asset and wisely decided to avoid

5 │ litigation by compromising an amount to be paid to the creditors.

6 │      2.    <u>The difficulties in collection.</u>

7 │      The Settlement Amount has been set aside and placed in the control of the Settlement

8 │ Administrator. Therefore, collection of the Settlement Amount does not pose any difficultly.

9 │ However, under the terms of the Settlement, among other things, Bankruptcy Court approval of

10 │ the Settlement is required before any of the proceeds of the Settlement Amount are distributed.

11 │ Therefore, if the Settlement is not approved and the other terms and conditions are not met, the

12 │ Settlement Administrator will not turn over any of the remaining proceeds of the Settlement to

13 │ the Firm and will have no obligation to do so. Additionally, if the Settlement is not approved,

14 │ the estate will likely have no ability to litigate the Claim and collect on any judgment received

15 │ therefrom given that it was a part of a global settlement reached with several plaintiffs. Based

16 │ on the foregoing, the Trustee respectfully submits that the "difficulties in collection" factor

17 │ weighs in favor of approving the Settlement.

18 │      3.    <u>The complexity of the litigation involved and the expense, inconvenience and</u>

19 │ <u>delay attendant to it.</u>

20 │      As noted above, the Claim was part of a global settlement reached with several

21 │ plaintiffs. Therefore, any attempt at litigating the Claim by itself will be very complex and

22 │ likely result in no receipt of funds to the estate. Given that the proceeds of the settlement

23 │ received by the estate will allow for a substantial distribution to creditors, by re-litigating the

24 │ Claim or attempting to do so, the estate would be put at substantial risk of no longer being able

25 │ to make any distribution to creditors.

26 │      Based on the foregoing, the Trustee respectfully submits that this factor weighs strongly

27 │ in favor of approving the Settlement.

28 │ ///

1    4.    The interests of creditors.

2    The Trustee believes that the interests of creditors are best served by the approval of the

3    Settlement. As discussed above, as a result of the Settlement, the Trustee believes that he will

4    be able to make a substantial distribution to creditors. Without the Settlement, it is likely that

5    the Debtor's creditors will not receive any distribution on account of their claims.

6    Based on all of the foregoing, the Trustee respectfully submits that the Settlement and

7    the compromise contemplated thereby should be approved by the Court.

8    **III.**

9    **CONCLUSION**

10    **WHEREFORE**, the Trustee respectfully requests that the Court enter an Order:

11    1.    granting the Motion in its entirety;

12    2.    approving the terms and conditions of the Settlement as set forth herein and in

13    Exhibit 1 hereto;

14    3.    authorizing the payment by the Settlement Fund Trustee of the fees, costs and

15    expenses authorizing the payment by the Settlement Administrator of the liens, fees, costs and

16    expenses under the terms of the Settlement, including, without limitation, J██████'s attorneys'

17    fees and costs, medical lien of Anthem BCBS, and MDL 2325 common benefit fund fees from

18    the Total Settlement Amount;

19    4.    authorizing the release and waiver of any interest in or any claims or rights

20    J██████, the Trustee and/or the bankruptcy estate may or could have regarding, arising from or

21    related to the J██████'s Claim; and to authorize the Trustee and J██████ to execute and deliver

22    any and all release documentation required by defendants and any other documents or

23    instruments, if any, necessary or appropriate in order to effectuate the release of claims;

24    ///

25    ///

26    ///

27    ///

28    ///

1        5.    granting such other and further relief as may be necessary or appropriate under

2    the circumstances.

3    Dated: February 12, 2020            TIMOTHY J. YOO, CHAPTER 7 TRUSTEE

4

5                      By:    */s/ Lindsey L. Smith*

6                            LINDSEY L. SMITH
                        LEVENE, NEALE, BENDER, YOO

7                              &amp; BRILL L.L.P.
                        Proposed Attorneys for Timothy J. Yoo,

8                            Chapter 7 Trustee

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1 **DECLARATION OF TIMOTHY J. YOO**

2    I, Timothy J. Yoo, hereby declare as follows:

3    1.    I am the duly appointed Chapter 7 Trustee (the "<u>Trustee</u>") for the bankruptcy

4 estate of A████ M████ H████████ ("A████████") and J████ C████ H████████ ("J████████"

5 together with A████████ the "<u>Debtors</u>"), the debtors herein. I have personal knowledge of the

6 facts set forth below and, if called to testify, I would and could competently testify thereto.

7    2.    I make this declaration in support the foregoing motion (the "<u>Motion</u>"). All

8 capitalized terms not specifically defined herein shall have the meanings ascribed to them in the

9 Motion.

10    3.    On October 28, 2011, the Debtors filed a Voluntary Petition under Chapter 7 of

11 11 U.S.C. §§ 101 *et seq.* (the "<u>Bankruptcy Code</u>"). Thereafter, I was appointed as the chapter 7

12 trustee of the Debtors' bankruptcy estate.

13    4.    On December 8, 2011, I filed a Chapter 7 Trustee's Report of No Distribution

14 and the Debtors' case was closed on February 10, 2012.

15    5.    After the Debtors' case was closed, I received information that J████████ had a

16 pre-petition claim (the "<u>Claim</u>") against the manufacturer of a medical device, causing J████████

17 personal injury. It appeared that the Debtors inadvertently did not fully disclose the foregoing

18 Claim in their Schedules and/or Statement of Financial Affairs. I received further information

19 that a settlement concerning the Claim had already been proposed (the "<u>Settlement</u>").

20    6.    Based on the foregoing, the Office of the United States Trustee filed a motion to

21 reopen the Debtors' bankruptcy case on April 10, 2019, which was granted by the Court order

22 reopening the Debtors' case entered on April 18, 2019.

23    7.    The Debtors' case was reopened so that I could resolve the Claim, and upon the

24 terms of the Settlement being satisfied, receive proceeds of the Settlement as detailed in the

25 Settlement.

26    8.    As a result of the foregoing, I am seeking pursuant to the Motion an order, *inter*

27 *alia:* (A) approving the Settlement of the Claim; and (B) approving the payment by the

28 Settlement Administrator of the fees and costs under the terms of the Settlement, including,

1 payment of the attorneys that J█████ engaged to represent her in connection with the Claim.

2 The terms of the Settlement are detailed in the Settlement Agreement, which is attached hereto

3 as Exhibit 1 and is incorporated herein by reference.

4     9.    The Settlement resolves the Claim asserted by J█████ in the United States

5 District Court for the Southern District of West Virginia arising out of the implantation of

6 transvaginal mesh against the manufacturer of the mesh (the "Defendant"). After the closing of

7 the Debtors' bankruptcy case, J█████ retained Giradi and Keese (the "Firm") to prosecute the

8 Claim. In connection with the prosecution of the Claim, J█████ entered into an Authorization

9 to Settle (the "Authorization to Settle"), purporting to authorize settlement of the Claim for the

10 gross amount of $135,000 (the "Total Settlement Amount") pursuant to a Master Settlement

11 Agreement entered into between the Firm and the Defendant regarding the potential settlement

12 of lawsuits against the Defendant by multiple plaintiffs.

13     10.    I believe that approval of the Settlement is in the best interests of the Debtors'

14 estate because the Settlement will allow the amount of $35,000 to come into the estate for the

15 benefit of the Debtors' creditors. The deadline for creditors to file pre-petition claims against the

16 Debtors' estate passed on October 4, 2019, and only $18,087 of unsecured claims were filed.

17 My fees under Section 326 is $4,250. I anticipate that a tax preparer will charge the estate about

18 $1,000 to file the final tax returns for the estate. Since I negotiated the settlement directly, I

19 anticipate my counsel's fees should be quite low. Based on the foregoing, I believe that as a

20 result of the receipt of these settlement proceeds, the estate will be able to make a substantial (if

21 not full) distribution to unsecured creditors.

22     I declare under penalty of perjury under the laws of the United States of America that

23 the foregoing is true and correct.

24     Executed this 11th day of February 2020, at Los Angeles, California.

25

26     Timothy J. Yoo, Declarant

27

28

12

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **EXHIBIT "1"**



## SETTLEMENT AGREEMENT

This Settlement Agreement (the "Agreement") is made by and among M████ A████ H████ and J████ C████ H████ (the "Debtors"), Timothy J. Yoo, the Chapter 7 trustee for the Debtors' bankruptcy estate (the "Trustee") and Girardi and Keese (the "Firm").

1. <u>RECITALS</u>: This Agreement is made with reference to the following facts:

   a. On October 28, 2011 (the "Petition Date"), the Debtors filed a Voluntary Petition under Chapter 7 of the Bankruptcy Code. The case was pending before the United States Bankruptcy Court for the Central District of California ("Court") as Case No. 2:11-bk-54999-WB (the "Case").

   b. J████ C████ H████ ("J████") had certain claims arising out of the implantation of transvaginal mesh prior to the Petition Date (the "Claim") against the manufacturer of the mesh (the "Defendant").

   c. The Debtors inadvertently did not list the Claim as an asset of the estate, and the Case was closed on February 10, 2012.

   d. After the Case closed, J████ retained the Firm to prosecute the Claim and filed on September 25, 2012, a complaint in the United States District Court for the Southern District of West Virginia (the "District Court") against the Defendant (Civil Action No. 2:11-cv-05831) (the "Lawsuit").

   e. J████ executed that certain Authorization to Settle ("Authorization to Settle"), purporting to authorize settlement of the Lawsuit for the gross amount of $135,000.00 (the "Total Settlement Amount") pursuant to a Master Settlement Agreement entered into between her counsel and the Defendant regarding the potential settlement of lawsuits against the Defendant by multiple plaintiffs. On April 1, 2019, the Firm reached out to the Trustee to determine whether the estate asserted an interest in the Funds.

   f. The Case was reopened on April 18, 2019, at the request of the United States Trustee to allow the Trustee to obtain Court approval of the foregoing settlement and to administer the Funds.

2. <u>SETTLEMENT OF LAWSUIT</u>: The Debtors and the Trustee agree to be bound by the Authorization to Settle.

3. <u>PAYMENT</u>: The Total Settlement Amount shall be paid in conformity with the requirements of the Master Settlement Agreement and as set forth below:

   a. The Settlement Administrator pursuant to the Master Settlement Agreement shall pay 5% of the Total Settlement Amount, or $6,750.00, to the MDL 2325

common benefit fund as required by orders previously entered by the District Court;

b.  The Settlement Administrator shall next pay directly medical liens totaling $6,792.98 (*i.e.*, Medicare lien amount of $301.32 and Anthem Inc. lien amount of $6,491.66);

c.  After payment of the foregoing, the Settlement Administrator shall pay the balance (the "Remaining Amount") to the Firm;

d.  From the Remaining Amount, the Firm shall retain funds sufficient to pay the lien resolution fees of $625.00 and other costs not included in the MDL fee to reimburse its out-of-pocket costs of $2,888.00 and to pay its contingency fee in the amount of $27,000.00;

e.  The Firm shall pay $35,000 of the Remaining Amount (the "Trustee Payment") to the Trustee;

f.  The balance of the Remaining Amount shall be paid to the Debtors.

g.  The Trustee Payment due to the Trustee shall be free and clear of any claim of exemption by the Debtors and shall be made payable to "Timothy J. Yoo, Chapter 7 Trustee" and delivered to the following address within 10 days of receipt by the Firm:

Timothy J. Yoo
Levene, Neale, Bender, Yoo & Brill, L.L.P.
800 South Figueroa Street, Suite 1260
Los Angeles, California 90017

h.  Any funds remaining after payment in full of all claims in the Case, including the administrative expenses of the estate, will be paid to the Debtors;

i.  Payment of any part of the Total Settlement Amount shall be conditioned on the execution by the Debtors and the Trustee of the Release as required under the Master Settlement Agreement, and the Court's order approving the settlement shall authorize the Debtors and the Trustee to execute any and all release documentation required to effectuate the settlement between the Debtors and the Defendant.

4.  APPROVAL BY THE COURT: The effectiveness of this Agreement is subject to the Court's approval by entry of an order authorizing this Agreement according to its terms. The Trustee shall file a motion for an order approving this Agreement with the Court.

2

5.    REPRESENTATIONS AND WARRANTIES: Each of the parties to this Agreement
represents, warrants, and agrees as to itself as follows:

    a.    No party (nor any officer, agent, employee, representative, or attorney of or
for any party) has made any statement or representation to any other party
regarding any fact relied upon in entering into this Agreement, and each party
does not rely upon any statement, representation or promise of any other party
(or of any officer, agent, employee, representative, or attorney for the other
party), in executing this Agreement, or in making the settlement provided for
herein, except as expressly stated in this Agreement.

    b.    Each party to this Agreement has made such investigation of facts pertaining
to this settlement and this Agreement and of all the matters pertaining thereto
as it deems necessary.

    c.    Each party has read this Agreement and understands the contents hereof.

    d.    Each party has not heretofore assigned, transferred, or granted, or purported to
assign, transfer, or grant, any of the claims, demands, and cause or causes of
action disposed of by this Agreement.

    e.    The parties will execute all such further and additional documents as shall be
reasonable, convenient, necessary or desirable to carry out the provisions of
this Agreement.

6.    SETTLEMENT: This Agreement affects the settlement of claims which are denied
and contested and nothing contained herein shall be construed as an admission by any
party hereto of any liability of any kind to any other party. Each of the parties hereto
denies any liability in connection with any claim and intends merely to avoid
litigation and buy its peace.

7.    MISCELLANEOUS

    a.    This Agreement shall be deemed to have been executed and delivered within
the State of California, and the rights and obligations of the parties hereunder
shall be construed and enforced in accordance with, and governed by, the laws
of the State of California.

    b.    This Agreement is the entire Agreement between the parties with respect to
the subject matter hereof and supersedes all prior and contemporaneous oral
and written agreements and discussions. This Agreement may be amended
only by an agreement in writing.

    c.    Each party has cooperated in the drafting and preparation of this Agreement.
Hence, in any construction to be made of this Agreement, the same shall not
be construed against any party.

      d.      Each party shall be responsible for, and may not seek reimbursement from its adverse party for, the costs, expenses, and attorneys' fees that it incurred in connection with the settlement and negotiation of this Agreement.

      e.      The parties hereto agree that the United States Bankruptcy Court for the Central District of California shall have sole and exclusive jurisdiction, sitting without a jury, to hear and determine any disputes that arise under or on account of this Agreement.

      f.      If any of the provisions of this Agreement are held by the court of competent jurisdiction to be invalid, void or otherwise unenforceable, the remaining provisions shall nonetheless continue in full force and effect without being impaired or invalidated in any way.

      g.      In the event of litigation relating to this Agreement, the prevailing party shall be entitled to attorneys' fees.

This Agreement may be executed in counterparts, and when each party has signed and delivered at least one such counterpart, each counterpart (including facsimile signatures) shall be deemed an original, and when taken together with other signed counterparts, shall constitute one Agreement, which shall be binding upon and effective as to all parties.

      This Agreement, consisting of 4 pages, is made and entered into on and as of the____of December, 2019.

                           TIMOTHY J. YOO
                           Chapter 7 Trustee

                           MICHAEL A██████ H████
                           Debtor

                           JOSEFINA C██████ H████
                           Debtor

                           GIRARDI AND KEESE
                           By Thomas V. Girardi
                           The Firm

d.  Each party shall be responsible for, and may not seek reimbursement from its adverse party for, the costs, expenses, and attorneys' fees that it incurred in connection with the settlement and negotiation of this Agreement.

e.  The parties hereto agree that the United States Bankruptcy Court for the Central District of California shall have sole and exclusive jurisdiction, sitting without a jury, to hear and determine any disputes that arise under or on account of this Agreement.

f.  If any of the provisions of this Agreement are held by the court of competent jurisdiction to be invalid, void or otherwise unenforceable, the remaining provisions shall nonetheless continue in full force and effect without being impaired or invalidated in any way.

g.  In the event of litigation relating to this Agreement, the prevailing party shall be entitled to attorneys' fees.

This Agreement may be executed in counterparts, and when each party has signed and delivered at least one such counterpart, each counterpart (including facsimile signatures) shall be deemed an original, and when taken together with other signed counterparts, shall constitute one Agreement, which shall be binding upon and effective as to all parties.

This Agreement, consisting of 4 pages, is made and entered into on and as of the 12ᵗʰ of December, 2019.

TIMOTHY J. YOO
Chapter 7 Trustee

M⬛⬛ A⬛⬛ H⬛⬛
Debtor

J⬛⬛ C⬛⬛ H⬛⬛
Debtor

GIRARDI AND KEESE
By Thomas V. Girardi
The Firm

4

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is 10250 Constellation Boulevard, Suite 1700, Los Angeles, CA 90017.

A true and correct copy of the foregoing document entitled **Motion For Entry of Order Approving Settlement of Claim and Payment of Counsel Employed By Debtors; Memorandum of Points and Authorities; Declaration of Timothy J. Yoo In Support Thereof** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner stated below:

**1.    TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **February 12, 2020**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

Alvin Mar on behalf of U.S. Trustee United States Trustee (LA)
alvin.mar@usdoj.gov

Ramesh Singh on behalf of Interested Party Courtesy NEF
claims@recoverycorp.com

United States Trustee (LA)
ustpregion16.la.ecf@usdoj.gov

Emmanuel S Vargas on behalf of Debtor M█████ A███████ O H████████
bknotices@rjb-lawoffices.com, bknotices@evargaslegal.com

Emmanuel S Vargas on behalf of Joint Debtor J██████ C████ H████████
bknotices@rjb-lawoffices.com, bknotices@evargaslegal.com

Timothy Yoo (TR)
tjytrustee@lnbyb.com, tjy@trustesolutions.net

☐ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**: On **February 12, 2020**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

| Joint Debtors<br>M█████ A███████ O H████████<br>J██████ C████ H████████ | Courtesy Copy<br>Hon. Julia W. Brand<br>United States Bankruptcy Court<br>Central District of California<br>255 E. Temple Street, Suite 1382<br>Los Angeles, CA 90012 |
|---|---|

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **February 12, 2020,** I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

_June 2012_                                                                    **F 9013-3.1.PROOF.SERVICE**

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| February 12, 2020 | John Berwick | /s/ John Berwick |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                **F 9013-3.1.PROOF.SERVICE**

# EXHIBIT 11

1 | LINDSEY L. SMITH (SBN 265401)
LEVENE, NEALE, BENDER, YOO &
2 | BRILL L.L.P.
10250 Constellation Boulevard, Ste 1700
3 | Los Angeles, CA 90067
Telephone: (310) 229-1234
4 | Facsimile:  (310) 229-1244
Email:  lls@lnbyb.com
5 |
Attorneys for Timothy J. Yoo,
6 | Chapter 7 Trustee

FILED & ENTERED

MAR 05 2020

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY tatum      DEPUTY CLERK

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**LOS ANGELES DIVISION**

In re

A▮▮▮▮▮ M▮▮▮▮ H▮▮▮▮▮ and
J▮▮▮▮ C▮▮▮▮ H▮▮▮▮,

    Debtors.

Case No. 2:11-bk-54999-WB

Chapter 7

**ORDER GRANTING MOTION FOR
ENTRY OF ORDER APPROVING
SETTLEMENT OF CLAIM AND
PAYMENT OF COUNSEL
EMPLOYED BY DEBTORS**

[No Hearing Required Pursuant to Local
Bankruptcy Rule 9013-1(o)]

1

1    The Court having read and considered the *Motion For Entry Of Order Approving*

2    *Settlement Claim And Payment Of Counsel Employed By Debtors* (the "<u>Motion</u>") filed by

3    Timothy J. Yoo, the duly appointed Chapter 7 Trustee (the "<u>Trustee</u>") for the bankruptcy estate

4    of A███ M███ H███ ("<u>A███</u>") and J███ C███ H███ ("<u>J███</u>"

5    together with A███ the "<u>Debtors</u>") and the declaration of the Trustee's counsel certifying

6    that no response to and request for on the Motion was timely filed and good cause appearing

7    therefor,

8    IT IS HEREBY ORDERED AS FOLLOWS:

9    1.    The Motion is granted in its entirety.

10   2.    The terms and conditions of the settlement (the "<u>Settlement</u>") reached

11   concerning a claim asserted by J███ in a case pending in the United States District Court for

12   the Southern District of West Virginia (the "<u>Claim</u>"), which are detailed in the settlement

13   agreement, which is attached as <u>Exhibit 1</u> to the Declaration of Timothy J. Yoo annexed to the

14   Motion are approved.

15   3.    The Settlement Administrator is authorized to pay the liens, fees, costs and

16   expenses under the terms of the Settlement, including, without limitation, J███'s attorneys

17   fees and costs, medical lien of Anthem BCBS, and MDL 2325 common benefit fund fees from

18   the total settlement amount of $135,000.

19   ///

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28

2

1      4.       The Trustee, on behalf of the Trustee and the bankruptcy estate, and J██████, are

2  hereby authorized to enter into, execute and deliver any and all release documentation required

3  by defendants and any other documents or instruments, if any, necessary or appropriate in order

4  to effectuate the release of claims (the "<u>Release</u>"). Upon the Release becoming effective in

5  accordance with its terms, the Trustee, the bankruptcy estate, J██████ and anyone making

6  claims by, thorough or on behalf the Trustee, the bankruptcy estate and/or J██████, shall be and

7  hereby are deemed to have released all claims or causes of action relating to or arising from

8  J██████'s Claim.

9      **IT IS SO ORDERED.**

10                   # # #

11

12

13

14

15

16

17

18

19

20

21

22

23

24  Date: March 5, 2020

25                             Julia W. Brand
                              United States Bankruptcy Judge

26

27

28

# EXHIBIT 12

Electronically FILED by Superior Court of California, County of Los Angeles 1/19/2021 6:39 PM Sherri R. Carter, Executive Officer/Clerk, By T. Young, Deputy Clerk

Case 2:23-cr-00047-JLS Document 123 Filed 08/31/23 Page 62 of 184 Page ID #:2108

**GC-111**

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*<br>Nicholas J. Van Brunt, SBN: 233876 Ryan D. Schiedermayer, SBN: 308168<br>Sheppard Mullin Richter & Hampton LLP<br>1901 Avenue of the Stars, Suite 1600<br>Los Angeles, California 90067<br>TELEPHONE NO.: 310.228.3700 FAX NO. *(Optional):* 310.228.3701<br>E-MAIL ADDRESS *(Optional):* nvanbrunt@sheppardmullin.com<br>ATTORNEY FOR *(Name):* Robert J. Girardi | FOR COURT USE ONLY |
|---|---|

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF Los Angeles<br>STREET ADDRESS: 111 N. Hill St.<br>MAILING ADDRESS: 111 N. Hill St.<br>CITY AND ZIP CODE: Los Angeles, California 90012<br>BRANCH NAME: Central District | |
|---|---|

| TEMPORARY CONSERVATORSHIP OF<br>*(Name):* Thomas V. Girardi<br>                                      CONSERVATEE | CASE NUMBER:<br>21STPB00413 |
|---|---|

| PETITION FOR APPOINTMENT OF TEMPORARY CONSERVATOR<br>☐ Person  ☐ Estate  ☒ Person and Estate | HEARING DATE: **02/01/2021** |
|---|---|
| | DEPT.: **67**    TIME: **1:30PM** |

1. **Petitioner** *(name each):* Robert J. Girardi                           **requests that**

   a. *(Name):* Robert J. Girardi
      *(Address and*
      *telephone number):*
      be appointed temporary conservator of the PERSON of the proposed conservatee and Letters issue upon qualification.

   b. *(Name):* Robert J. Girardi
      *(Address and*
      *telephone number):*

      be appointed temporary conservator of the ESTATE of the proposed conservatee and Letters issue upon qualification,

   c. (1) ☐ bond not be *required* because petition is for a temporary conservatorship of the person only.
      (2) ☐ bond not be required for the reasons stated in attachment 1c.
      (3) ☒ $ TBD          bond be fixed. It will be furnished by an admitted surety insurer or as otherwise provided by
      law.

         *(Specify reasons in attachment 1c if the amount is different from maximum required by Probate Code section 2320*
         *and Cal. Rules of Court, rule 7.207(c).)*

      (4) ☐ $          in deposits in a blocked account be allowed. Receipts will be filed.
         *(Specify institution and location):*

   d. ☐ a request for an *exception* to notice of the hearing on this petition for good cause is filed with this petition,
   e. ☐ the powers specified in Attachment 1e be granted in addition to the powers provided by law.
   f. ☐ other orders be granted *(specify in attachment 1f).*

2. **The proposed conservatee is** *(name):* Thomas V. Girardi

   Current address: 100 Los Altos, Pasadena, CA 91105          Current telephone no.:626-▓▓▓▓

3. **The proposed conservatee requires a temporary conservator** to  ☒ provide for temporary care, maintenance, and support
   ☒ protect property from loss or injury  because *(facts are*  ☒ *specified in attachment 3*  ☐ *as follows):*

| TEMPORARY CONSERVATORSHIP OF<br>*(Name):* Thomas V. Girardi | CASE NUMBER: |
|---|---|
| CONSERVATEE | |

4. **Temporary conservatorship is required**

   a. ☒   pending the hearing on the petition for appointment of a general conservator,

   b. ☐   pending the appeal under Probate Code section 1301.

   c. ☐   during the suspension of powers of the conservator.

5. ☒ **Character and estimated value of the property of the estate** *(complete if a temporary conservatorship of the estate or the person and estate is requested):*

   a. Personal property:                                     $       See Attachment 5

   b. Annual gross income from all sources, including real and

      personal property, wages, pensions, and public benefits:    $

   c. Additional amount for cost of recovery on the bond, calculated as

      required under Cal. Rules of Court, rule 7.207(c):       $ _____

   d. Total:                                            $       See Attachment 5

6. ☐ **Petitioner requests authority to change the proposed conservatee's residence during the temporary conservatorship**

   a. ☐   Petitioner proposes to change the residence of the proposed conservatee to *(address):*

       The proposed conservatee will suffer irreparable harm if his or her residence is not changed as requested and no means less restrictive of the proposed conservatee's liberty will suffice to prevent the harm because *(reasons are*

       ☐   *specified in attachment 6a*   ☐   *as follows):*

   b. ☐   The proposed conservatee must be removed from the State of California to permit the performance of the following nonpsychiatric medical treatment essential to the proposed conservatee's physical survival. The proposed conservatee consents to this medical treatment. *(Facts and* place *of treatment are*  ☐  *specified in attachment 6b*  ☐  *as follows):*

7. ☐ **Petitioner is a professional fiduciary**

   a.   Petitioner holds license no. *(specify):*           from the Professional Fiduciaries Bureau of the Department of Consumer Affairs issued or last renewed on *(specify later date of initial issuance or renewal):*   .

   b.   Petitioner was requested to file this petition by *(name):*

   c.   The circumstances leading to petitioner's engagement to file this petition are described in attachment 7c.

   d.   Petitioner had: (1)  ☐  No relationship to the proposed conservatee, his or her family, or his or her friends before engagement to file this petition.

                    (2)  ☐  A relationship to the proposed conservatee, his or her family, or his or her friends before engagement to file this petition. That relationship is described in ☐ attachment 7d. ☐ the *Petition for Appointment of Probate Conservator (form GC-310)* filed with this petition or an attachment to that petition *(specify attachment to general petition):*

GC-111

| TEMPORARY CONSERVATORSHIP OF<br>*(Name):* Thomas V. Girardi | CASE NUMBER: |
|---|---|
| CONSERVATEE | |

8. **Petitioner's contact with persons named in *Petition for Appointment of Probate Conservator***

   a. ☐   Petitioner is the proposed conservatee. *(If this item is selected, go to item 9.)*

   b. ☒   Petitioner is not the proposed conservatee. All persons other than the proposed conservatee named in the *Petition for Appointment of Probate Conservator* filed with this petition:

      (1) ☒   Have been found and contacted. All will be given notice of the hearing on this petition.

      (2) ☐   Have not been found or have not been contacted. Efforts to find the persons who have not been found and the reasons why any person cannot be contacted are described in one or more declarations under penalty of perjury attached to this petition as attachment 8b. *(Attachment 8b is not a request for a good cause exception to notice. See Prob. Code, § 2250(e) and rule 7.1062 of the Cal. Rules of Court.)*

   c. ☒   Petitioner is not the proposed conservatee. Facts showing the preferences of the proposed conservatee concerning the appointment of any temporary conservator, and the appointment of the temporary conservator proposed in this petition, or why it was not feasible to ascertain those preferences, are specified in one or more declarations attached to this petition as attachment 8c.

9. **Petitioner is informed and believes that the proposed conservatee**

   a. ☒   will attend the hearing.

   b. ☐   is able but unwilling to attend the hearing, does not wish to contest the establishment of a conservatorship, does not object to the proposed conservator, and does not prefer that another person act as conservator.

   c. ☐   is unable to attend the hearing because of medical inability. An affidavit or certificate of a licensed medical practitioner or an accredited religious practitioner is affixed as attachment 9c.

   d. ☐   is not the petitioner, is out of state, and will not attend the hearing.

10. ☒   Filed with this petition is a proposed *Order Appointing Court Investigator* (form GC-330).

11. All attachments to this form are incorporated by this reference as though placed here in this form. There are 2 pages attached to this form.

Date: January 19, 2021

▶ _____

(SIGNATURE OF ATTORNEY*)

Nicholas J. Van Brunt

**\* (Signature of all petitioners also required (Prob. Code, § 1020).)**

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: January 19, 2021

Robert J. Girardi

_____
(TYPE OR PRINT NAME)

▶ _____
(SIGNATURE OF PETITIONER)

_____
(TYPE OR PRINT NAME)

▶ _____
(SIGNATURE OF PETITIONER)

Conservatorship of Thomas V. Girardi

**ATTACHMENT** *(Number):* 8c

*(This Attachment may be used with any Judicial Council form.)*

Given the potential conservatee's current mental condition and challenges with memory, it is reasonably certain that Tom will be unable to maintain a position for or against a conservatorship. However, Petitioner believes that if a conservator were to be appointed, that his brother would not object to Petitioner's appointment, given that he and his brother have a trusting and healthy relationship.

*(If the item that this Attachment concerns is made under penalty of perjury, all statements in this Attachment are made under penalty of perjury.)*

Page 1 of 1

*(Add pages as required)*

| SHORT TITLE:                              | CASE NUMBER: |
| Conservatorship of Thomas V. Girardi      |              |

**ATTACHMENT** *(Number):* 5 _____

*(This Attachment may be used with any Judicial Council form.)*

The proposed conservatee is subject to an involuntary bankruptcy proceeding (U.S. Bankruptcy Court Case Nos. 20-bkk-21020-BR and 20-bk-21022-BR (C.D. Cal)) and marriage dissolution proceeding (Los Angeles Superior Court Case No. 20STFL11050), which leaves the proposed conservatee without any control over his assets. It is anticipated that assets and liabilities of the bankruptcy estate will be filed in the involuntary bankruptcy proceeding prior to the hearing on this petition and petitioner anticipates filing a supplement at that time.

*(If the item that this Attachment concerns is made under penalty of perjury, all statements in this Attachment are made under penalty of perjury.)*

**Page** 1 **of** 1

*(Add pages as required)*

| SHORT TITLE: | CASE NUMBER: |

| SHORT TITLE: | CASE NUMBER: |
| --- | --- |
| Conservatorship of Thomas V. Girardi | |

**ATTACHMENT** *(Number):* 3 _____

*(This Attachment may be used with any Judicial Council form.)*

Thomas V. Girardi ("Tom") is a renowned trial lawyer, responsible for some of the most notable mass tort verdicts in California. However, at age 81, Tom's current condition has sadly deteriorated to the point where he cannot care for himself without assistance. His short-term memory is severely compromised and, on information and belief, he is often not oriented as to date, time or place.

Petitioner Robert Girardi ("Petitioner") is Tom's brother. Petitioner has first-hand knowledge that Tom lives alone and cannot care for himself. As a baseline, for at least 25 years, Tom has employed help to assist him with day-to-day functions. For instance, Petitioner believes he has not purchased his own groceries in years. However, Tom's longtime housekeeper of 25 years is set to quit due to Tom's financial situation: he cannot pay them any longer. While Tom does have family members, such as Petitioner, and certain friends looking out for him to make sure he has sufficient food and that he makes it to a given appointment on time, left to his own devices, it is highly doubtful that Tom could manage most of the activities of daily living for any significant period of time without assistance.

Tom cannot protect his property from loss or resist undue influence. As noted above, Petitioner believes Tom does not remember anything except the distant past and is delusional, believing he has access to funds which have been frozen per court order. As such, he is unable to handle his financial affairs and protect his property at present, despite serious financial and legal problems. Tom is currently subject to multiple lawsuits and legal proceedings. Tom was accused of embezzlement by his former law partner in one lawsuit. He is currently subject to an involuntary bankruptcy proceeding. And a judge in Chicago, U.S. District Judge Thomas Durkin, held Tom in civil contempt.

But Tom does not retain and undertanding of the dire nature of his present situation. Instead, he claims intermittently that his financial problems are temporary or expresses disbelief that he does not have access to funds and has to be continually reminded of this fact. It is obvious to Petitioner (and, on information and belief, anyone else who knows him) that Tom cannot make the decisions needed to handle the important issues relating to his property and financial matters.

Among other reasons, a temporary conservatorship is necessary because the proposed conservatee is, as referenced above, subject to an involuntary bankruptcy proceeding (U.S. Bankruptcy Court Case Nos. 20-bkk-21020-BR and 20-bk-21022-BR (C.D. Cal)) and a marriage dissolution proceeding (Los Angeles Superior Court Case No. 20STFL11050). Tom needs a representative to interface on his behalf to be able to direct counsel in those and other proceedings and waiting until the initial hearing on the general petition for conservatorship may cause deadlines to lapse in the interim without someone who can meaningfully direct counsel.

*(If the item that this Attachment concerns is made under penalty of perjury, all statements in this Attachment are made under penalty of perjury.)*

**Page** 1 **of** 1

*(Add pages as required)*

# EXHIBIT 13

# LAW OFFICES OF EVAN A. JENNESS

**777 SOUTH FIGUEROA STREET, STE. 3800**
**LOS ANGELES, CA 90017**
**TEL. (213) 630-5088 FAX (213) 683-1225**
**EVAN@JENNESSLAW.COM**

April 8, 2021

John C. Kocoras, First Asst. U.S. Attorney
Christopher Catizone, Asst. U.S. Attorney
Office of the U.S. Attorney
Dirksen Federal Bldg.
219 S. Dearborn St.
Chicago, IL 60604

*Via Email*

Re:    Thomas Girardi Investigation

Dear Counsel:

I am writing to provide information bearing on the mental status of my client,
Thomas Girardi.   Specifically: (1) a March 3, 2021 Comprehensive
Neuropsychiatric Evaluation of Mr. Girardi prepared by Nathan E. Lavid, M.D.; (2)
a February 1, 2021 Neuropsychological Evaluation of Mr. Girardi prepared by
Deborah Budding, PhD ; and (3) a capacity declaration of Dr. Lavid submitted in
conservatorship proceedings in which Mr. Girardi's brother, Robert Girardi, DDS,
has been designated his temporary conservator.   The experts' credentials
accompany their reports.   I am in the process of marshaling medical records, and
will provide copies of those.

Mr. Girardi's conservator is just beginning to assemble an appropriate medical
team, and exploring management options regarding Mr. Girardi's degenerative
condition.   Accordingly, it is likely we will have further information bearing on his
mental health, as the process continues and Mr. Girardi is evaluated further.

As reflected in the enclosed, Mr. Girardi suffers from dementia which causes him to
have an insufficient present ability to consult with defense counsel with a
reasonable degree of rational understanding.   Because of his impairment, he has

neither a rational nor factual understanding of the events underlying the contempt judgment entered by Judge Durkin, nor any of the many pending proceedings, lawsuits and claims made against him and the (former) Girardi Keese firm.

Dr. Lavid concludes that "Mr. Girardi suffers from dementia," finding that "Mr. Girardi has almost no short-term memory. Thus, he is incapable of understanding his current legal situation, cannot retain essential information, cannot use such information to intelligently weigh the advantages and disadvantages of legal options, and cannot make knowing and intelligent decisions." He states that "With reasonable medical certainty, Mr. Girardi's dementia renders him incapable of understanding the nature and consequences of his current legal proceedings and assisting properly with his defense." This impairment "is incurable, progressive and not recoverable."

Dr. Budding, too, identifies Mr. Girardi's substantial mental deficits. Based on the tests that she conducted, she concluded that Mr. Girardi "presents with impairments in multiple areas of function," which include "encoding new information." His "basic orientation to place and time is impaired," and his "learning and memory functions are impaired for both verbal and nonverbal material and information can get mixed up." His "executive function skills are marked by difficulty following complex instructions, shifting his thinking, withholding impulses, contemplating consequences, and engaging in multi-step processing." She concludes, that "he appears unable to effectively aid his counsel due to these multiple deficits."

I am providing this information to show why I believe Mr. Girardi would not meet the standard for competency to stand trial, specifically, whether the defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding - and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402 (1960) (*per curiam*), *cited with approval in Indiana v. Edwards*, 128 S. Ct. 2379, 2383 (2008). It is being provided pursuant to Rule 408 of the Federal Rules of Evidence, and is within the privacy rules established by HIPAA, Pub. L. 104-191. Please limit any disclosure to others accordingly.

As you may recall, indicia of Mr. Girardi's serious mental impairment were sufficiently clear to me that I disclosed the issue to the Court during the contempt proceedings in the *Lion Air* matter, although Mr. Girardi had not yet been evaluated. As I informed the Court during December 14, 2020 proceedings, upon my initial engagement, it was apparent that Mr. Girardi was unable to assist me in preparing for the proceedings, or even to understand the nature of them, notwithstanding what appeared to be his good faith efforts to do so. Since then, the experts' evaluations, information continually related by others, and my experiences with Mr. Girardi, all validate his mental incompetence.

Today, Mr. Girardi he does not even recall the *Lion Air* contempt proceedings. When reminded (as he periodically is), he expresses shock and dismay, asks questions reflecting his lack of comprehension, and then completely forgets the conversation such that the cycle begins afresh when he's next told about what occurred.   The same repetitive fact pattern occurs regarding all of the other recent and ongoing adverse legal, and personal, circumstances surrounding Mr. Girardi.

Mr. Girardi is at a stage in his mental decline where he does not acknowledge his serious mental impairment.   Dr. Lavid notes that "Mr. Girardi does not think he suffers from dementia," and acknowledged that he "diagnosed with some memory problems," but was "emphatic that he's 'more than competent'."   When Dr. Budding asked him about his current cognitive function, he insisted he is functioning well, stating "I'm maybe 80% of what I was before," and acknowledging only "a little difficulty" at times with his train of thought.   However, Mr. Girardi's impairment was evident to both experts.

Mr. Girardi's lack of awareness regarding his own mental impairment makes it all the more apparent to those around him.   He repetitively calls current and former counsel, never remembering he has done so multiple times on the same day, and each time with the same questions or agenda.   He has repetitively called adversaries with fantastical offers to resolve problems he has just read about in the paper or been told about by a reporter.   He repetitively calls former Girardi Keese employees - all of whom are long gone from the shuttered firm - with directives to perform various tasks incident to the jobs he mistakenly believes they still have at Girardi Keese.   Even last week, Mr. Girardi was asking to be taken "to the office." Following one recent occasion where he was (again) told that Girardi Keese is closed, he began enthusiastically planning a "new law firm," clearly with no recollection that his State Bar license is suspended and he is facing disbarment. When reminded of recent adverse events, he repetitively expresses surprise and upset, and formulates an implausible plan to solve the problem, then does not retain the information once he has changed his focus to a different matter.

As you will see in Dr. Lavid's report, Mr. Girardi continues to think he is running a successful litigation firm that is having a great year.   When Mr. Girardi met with Dr. Lavid on February 26, 2021, he described his typical day as working from 9-6 and going to a professional function in the evening.   However, most employees had quit working for Girardi Keese over two months earlier, and there had been *no* professional functions in Los Angeles for 11 months because of the pandemic.   He also reported that he was running the firm, and it was doing extremely well and had 40-50 employees, including 15 attorneys.   This was after Judge Durkin's December 14, 2020 contempt ruling and order freezing all of the assets of Girardi Keese (and Mr. Girardi), and over a month after a bankruptcy trustee had taken control of Girardi Keese, and changed the locks on the firm doors.   He had no

recollection of Judge Durkin's referral to your office, expressed confusion about what my role is, and denied having any legal problems.

Anecdotal reports from Mr. Girardi's family, colleagues, friends and former staff vividly illustrate the extent of his impairment.   For example, as reflected in Dr. Lavid's report, Rick Kraemer, a friend and colleague of Mr. Girardi, describes how Mr. Girardi continues to think Girardi Keese remains open and he is going to work, does not recognize people he has known for a long time, believes that a favorite restaurant (which has been closed throughout the pandemic) is open, and confabulates by filling in his memory gaps with stories that are inconsistent with reality.   Mr. Kraemer relates a recent incident in which Mr. Girardi left a medical appointment and tried to walk home (an impossibility given the great distance alone), evidently not remembering that his longtime housekeeper was waiting to take him home.

A long-time friend of Mr. Girardi, prominent attorney Richard Marmaro, describes running into Mr. Girardi in federal court in Downtown Los Angeles in March, 2020. Mr. Girardi mistakenly believed they were in the nearby State courthouse, in which Mr. Girardi has appeared "hundreds if not thousands of times over the last 30 years."   A friend of 45 years, and business partner, Dennis Fitzpatrick, describes repetitive calls with Mr. Girardi about a potential business venture where Mr. Girardi would not recall from one call to the next that they had already covered a matter – "he doesn't have the faintest idea about any of the basic facts – information he used to know very well."

Former Girardi Keese employee Kim Cory describes Mr. Girardi's decline over the past few years, marked by events such as an incident in which Mr. Girardi asked her who the woman was in a photo with him (answer: "Erika," *his own wife since 2000*), and how he would repetitively dictate the same letters or declarations, or ask for the same files, never recalling he had just completed the task.

Mr. Girardi's adult daughter Jennifer, who has not spent much time with him over the past 12 years, recently read media reports and initially thought "the whole memory loss issue was a horrible lame excuse for all of his shortcomings."   After that, she met with her father, and saw "first hand how far 'gone' my dad was."   She describes how Mr. Girardi expressed surprise when she told him that her brother is a lawyer, although her brother has practiced for 20 years and *used to work for Girardi Keese*.   [Note that Mr. Girardi told Dr. Budding that his son is "studying to be an attorney."]   Jennifer also describes a recent incident where she arrived at Mr. Girardi's home and he tried to introduce her to two guests sitting with him, but could not recall her name.   *His own daughter's name.*

Mr. Girardi's longtime housekeeper, Isabelle Mancilla, like Mr. Kraemer, dates Mr. Girardi's obvious decline to a 2017 car accident in which he was unconscious for several house and suffered a concussion.   Since then, he began engaging in odd behavior like collecting foam cups.   Over the past year, Mr. Girardi's memory has become much worse.   He keeps on asking her the same questions, and gets confused about simple events like forgetting that he just had dinner with his daughter the evening before.

The preceding are just a thumbnail of the many events indicating the extent of Mr. Girardi's mental decline.

On April 3, 2021, I met with Mr. Girardi for a few hours to confirm my impressions of his impairment from our earlier meetings, and in subsequent phone calls.   He was gracious and articulate, but has virtually no recollection of recent events or his current circumstances.   He did not recall previously meeting with me (at some length) on two prior occasions, insofar as he greeted me by stating, "It's nice to meet you."   He had no recollection of the multiple times we have spoken since then.

When we began to discuss Girardi Keese, it was clear he had no present knowledge of recent events, and indeed is largely living in a made-up world.   He believes Girardi Keese is still operating and is "having a very good year," has 101 active cases and "20 in the pipeline," and has 43 employees on its payroll, including eighteen lawyers.   He himself works 5-6 days a week.

Mr. Girardi could not accurately identify anyone among the figures in various recent legal matters.   For example, even though they have met in person and spoken by phone, Mr. Girardi believes attorney Leonard Pena (who represents his conservator in pending bankruptcy proceedings against Tom Girardi) is "an attorney with my firm."   He did not recognize the name of Elise Miller, the trustee for Girardi Keese in the pending bankruptcy proceedings.   He thinks he once had a "casual meeting" with Dr. Budding, but does not recall what it was about, or where they met (they met twice, for three hours each time, while she administered psychological tests, at her offices, for purposes of the enclosed report).   He could not identify who Dr. Lavid is, but eventually said he thinks that he was referred to Dr. Lavid by his doctor (incorrect) for "memory issues."   The appointment was "sort and just a general work up" (they met for over three hours while Dr. Lavid evaluated his mental status for purposes of the enclosed report).

He could not describe *at all* what happened during the telephonic contempt proceedings in the N.D. Illinois ("Was I there?"), including even the case to which they pertained, nor the Court's ruling.   He could not identify the judge.   When I asked who "Jay Edelson" is, all he knew was that Edelson is "someone who refers cases."   I told him that I was going to be preparing a presentation for your office arising from the criminal referral to your Office that the Court made after its

contempt finding in the *Lion Air* matter.   It was impossible to have any meaningful dialog with him.   He did not recall there had been a criminal referral, even though he was on the telephonic hearing call, and we have discussed the issue many times. He appeared shocked and confused to hear that all of Girardi Keese's clients in the *Lion Air* matter were not paid the full amounts owed – as if he were hearing it for the very first time.   He had no recollection of previously being told this - *many* times – or having read it – virtually daily - in the media.   All I need to do is get the firm's accounting records, which will show "everyone was paid."   He had no recollection of the accounting provided to the Court in the contempt proceedings.

In sum, my impressions from the meeting more than validated the experts' conclusions.   It was readily apparent Mr. Girardi would be unable to assist me in any material way in preparing to defend any criminal charges, or at trial.   He has only a fleeting understanding of any new information (even information repeatedly provided to him), and cannot retain the information long enough to have a rational or factual understanding of recent or ongoing events and issues.   Even when he thinks he recalls or understands a matter, he is an unreliable narrator because he often relates inaccurate information.   He clearly cannot help me understand what transpired with Girardi Keese's finances such that the firm failed to pay all former *Lion Air* clients because he does not even realize that the former clients were not fully paid, and that the firm is in bankruptcy and was shuttered months ago.   He would have no ability to make rational decisions (like whether to testify, or enter a plea) because he cannot retain information long enough to evaluate it in any meaningful way.   Nor could he honor any oath to tell the truth because he is unable to form a rational understanding of recent events, and at times relates imaginary information in place of his memory deficits.

I will forward medical records shortly, and it is likely that further information about Mr. Girardi's mental status will be available over time as his condition is evaluated more fully.   Meanwhile, please let me know if there is additional information that would be useful.

Finally, Mr. Girardi's conservator has been unable to locate his passport, but will keep trying.   Mr. Girardi himself believes his "assistant has it," and it is "at the office."   One option could be having Mr. Girardi's conservator submit a lost passport statement (DS-64), although the form does not appear to contemplate submission by someone other than the actual passport holder.   Meanwhile, any risk of flight appears minimal.   Mr. Girardi does not recognize the adverse circumstances he faces, is 81 years old and now heavily dependent on family members for daily care, has no access to funds, does not drive, and has now developed what I understand is a serious eye condition that requires continual treatment.

Page 7 of 7

Thank you for considering this information.   I look forward to speaking further.

Best regards,

LAW OFFICES OF EVAN A. JENNESS

*Evan A. Jenness*

Evan A. Jenness

Cc:  Michael Monaco, Esq.
     Ryan Mitsos, Esq.
     (w/ encls.)

EXHIBIT 14

Electronically FILED by Superior Court of California, County of Los Angeles 9/24/2021 8:27 AM Sherri R. Carter, Executive Officer/Clerk, By Thu Nguyen, Deputy Clerk

Case 2:23-cr-00047-JLS   Document 123   Filed 08/31/23   Page 77 of 184   Page ID #:2123

| NAME, ADDRESS, AND TELEPHONE NUMBER OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER 233876/307072 | Reserved for Clerk's File Stamp |
|---|---|---|

Nicholas J. Van Brunt
Meghan K. McCormick
Sheppard Mullin Richter & Hampton LLP
1901 Avenue of the Stars, Suite 1600
Los Angeles, California 90067

ATTORNEY FOR (Name): Robert J. Girardi

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

Name of Court:   Superior Court of California, County of Los Angeles
Branch Name:   Central District
Street Address:   111 N. Hill St.
City and Zip Code:   Los Angeles, CA 90012

In the Matter of:
Conservatorship of Thomas V. Girardi

| **CONSERVATORSHIP CARE PLAN** | CASE NUMBER 21STPB00413 |
|---|---|

Robert J. Girardi _____, the conservator of the person/estate of Thomas V. Girardi _____ hereby submits the conservator's General Plan in compliance with local court rules.

1. **Conservatee's current residence address:***
   a. Type of facility (i.e. home, skilled nursing, hospital, etc.) Skilled Nursing Facility _____
   b. How long has the conservatee been in the present residence? August 9, 2021- present
   c. Do you anticipate making any changes in the conservatee's residence in the next year?  __X__ No   _____ Yes (explain) _____
   d. _____ What is the plan to return the conservatee to his/her personal residence if not now living at home?  ("**Tom**") to his home. There is no plan to return conservatee Thomas V. Girardi _____
   e. If there are no plans to return the conservatee to his/her personal residence in the foreseeable future, explain the limitations or restrictions for not doing so? Tom's health and finances require that he be at a skilled nursing facility. _____

2. **Current level of care (mark all that apply):**

| _____ requires total care | _____ has feeding tube |
|---|---|
| __X__ requires assistance with care | _____ has a catheter |
| _____ able to do own care | _____ uses wheelchair/walker |
| __X__ ambulatory | _____ urinary/bowel incontinence |

Other relevant information _____
**If residing in a facility or group home, attach copy of the facility's care plan:** The Conservator was not provided with a care plan.
**If client of a regional center, identify regional center and social worker and telephone number:** _____

***Please note that the Probate Investigator's Office must be notified of any change of address by using the Notification to Court of Address form number PRO 003.**

American LegalNet, Inc.
www.FormsWorkflow.com

| CONSERVATORSHIP OF *(Name):*<br>Thomas V. Girardi | CASE NUMBER:<br>21STPB00413 |
|---|---|
| CONSERVATEE | |

3. **Conservatee's physical and medical condition:** _____

    a.  Please list health problems: Alzheimer's disease, early onset dementia, blindness

in right eye, glaucoma in right eye, hearing issues.

    b.  Are any other health providers involved? _____ No   __X__ Yes

| __X__ | visiting nurse | _____ | social worker |
|---|---|---|---|
| __X__ | podiatrist | __X__ | dentist |
| __X__ | counselor | __X__ | physical therapist |
| _____ | speech therapist | | other (specify) |

    c.  Medications: ████████████

    d.  Activities conservatee is involved in? Work out classes

4. **How often do you expect to visit the conservatee?** Monthly. **Does the family visit?** Yes.

5. **Are there plans to give the conservator a rest?**

    _____ respite care     _____ adult day care     _____ other care takers

    _____ In Home Supportive Services (IHSS)

  **Names & relationships of relief caregivers:** _____

6. **Conservatee's Estimated Monthly Income (complete even if a conservatorship of the**
         The Conservator is informed and believes that Tom is entitled to
         approximately $3,000 per month in social security, but the Conservator has
  **person only):** not obtained authority to marshal those funds yet.

7. **Conservatee's Estimated Monthly Expenses (complete even if a conservatorship of the**
  **person only):** _____

    a.  **LIVING EXPENSES**

| | | | | |
|---|---|---|---|---|
| Rent/Mortgage | $ | | Utilities | $ |
| Nursing/Care Home | $ | 8,000 | In-Home Care | $ |
| Food | $ | | Clothing | $ |
| Medical/Dental | $ | TBD | Medications | $ TBD |
| Transportation | $ | | Entertainment | $ |
| | | | Other (specify) | $ |

           Total Estimated Monthly Expenses:  $     $8,000

American LegalNet, Inc.
www.Forms*Workflow*.com

| CONSERVATORSHIP OF *(Name):* | CASE NUMBER: |
|---|---|
| Thomas V. Girardi | 21STPB00413 |
| CONSERVATEE | |

b. **OTHER EXPENSES**

| **TAXES** | **Current** | **Estimated Amount** |
|---|---|---|
| Income Tax | $ 0 | 0 |
| Property | $ 0 | 0 |
| Payroll | $ 0 | 0 |

c. **INSURANCE**

| | **Coverage Amount** | **Estimated Premiums** |
|---|---|---|
| Homeowner | $ See Attachment 7(c) | |
| Renters | $ See Attachment 7(c) | |
| Automobile | $ See Attachment 7(c) | |
| Worker's Comp | $ See Attachment 7(c) | |
| Health | $ See Attachment 7(c) | |
| Life | $ See Attachment 7(c) | |

**8. What are the contents of any safety deposit boxes?** The Conservator is informed and believes that Tom does not have any safety deposit boxes.

**9. Does the conservatee receive Medi-Cal benefits?**
    __X__ No          _____ Yes          $ _____ share of cost

**10. Do you expect to sell any of the conservatee's real or personal property in the next year?** _____ No      __X__ Yes

If yes, what will be sold and explain reasons: Tom is the subject of an involuntary bankruptcy proceeding (U.S. Bankruptcy Court Case Nos. 20-bk-21020-BR and 20-bk-21022-BR (C.D. Cal) and a marriage dissolution proceeding (LASC Case No. 20STFL11050). As such, he does not have any control over his assets, but to the extent they exist, they will likely be liquidated.

**11. Does the conservatee own a home in which s/he does not live?**
    **If so, is it rented?** _____      **Amount of rent:** $ _____
    **If not rented, explain why:** Tom's home is currently for sale as a part of the ongoing bankruptcy proceedings.

**12. If the Conservatee's monthly expenses are greater than his/her income explain how the shortfall will be met:** The Conservator is paying Tom's expenses.

**13. Does the conservatee have a trust or is s/he a beneficiary of a trust and entitled to receive income from the trust? If so, please provide an attachment with the name of the trust, the name(s) of the trustee(s) and their contact information, and if applicable court case number for the trust:** No.

American LegalNet, Inc.
www.FormsWorkflow.com

| CONSERVATORSHIP OF *(Name):*<br>Thomas V. Girardi | CASE NUMBER<br>21STPB00413 |
| --- | --- |
| CONSERVATEE | |

**14. Do you anticipate any unusual activities related to the management of the conservatee's estate during the next year?**

_____ No     __X__ Yes (explain) See Attachment 14 _____

**15. Are there any special problems or needs raised by the Court Investigation, the Court, or others interested? If yes, how have you addressed them?** No. _____

**The undersigned conservator will:**

   a. Inventory all assets in which the conservatee has any interest.

   b. Submit accurate, complete, and timely accountings.

   c. Carry out all mandatory usual and general duties of a conservator.

   d. Maintain periodic contact with the conservatee's physician and other health care providers, if appointed conservator of the person.

   e. Maintain periodic contact with the conservatee's family and friends, if applicable.

   f. Be available to the conservatee on a 24 hour basis for emergencies, or arrange for such coverage by a qualified agent.

   g. Maintain accurate records related to the estate.

   h. Maintain all estate assets in a separate identifiable manner.

   i. Maintain estate cash assets in interest-bearing accounts, except as necessary for every day administration.

   j. Maintain an adequate surety bond as required by law.

   k. Update care plan as needed.

   l. Refer to the "Conservator's Handbook."

> **File stamp the original Conservatorship Care Plan with the court and mail a copy to the Probate Investigations Office at: 111 N. Hill Street, Room 208, Los Angeles, CA 90012.**

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that I have retained a copy of this case plan for my record.

Dated: September ____, 2021     9/15/2021

DocuSigned by:

*Robert Girardi*

D864087D30F54F2...

Signature of Conservator

Robert J. Girardi

Type or Print Name

American LegalNet, Inc.<br>www.Forms*Workflow*.com

## Attachment 7(c):

[*7(c): INSURANCE*]

The conservator is informed and believes that Tom does not have any insurance of any kind, with the exception of the Medicare coverage in which the Conservator recently enrolled Tom.

## Attachment 14

[*14.  Do you anticipate any unusual activities related to the management of the conservatee's estate during the next year?*]

Tom is subject to an involuntary bankruptcy proceeding (U.S. Bankruptcy Court Case Nos. 20-bk-21020-BR and 20-bk-21022-BR (C.D. Cal.) and a marriage dissolution proceeding (LASC Case No. 20STFL11050).  These proceedings could impact the management of Tom's estate.

American LegalNet, Inc.
www.Forms*Workflow*.com

# EXHIBIT 15

- 1 of 3 -

FD-302 (Rev. 5-8-10)



UNCLASSIFIED//FOUO

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry          08/02/2023

    KIM CORY (CORY), date of birth ▮▮▮▮▮▮▮▮, was interviewed at the WILSHIRE LAW FIRM, PLC (WLF) office located at 3055 Wilshire Boulevard, 12th Floor, Los Angeles, California 90010, by, Assistant United States Attorney (AUSA) Ali Moghaddas, Federal Bureau of Investigation Special Agent (SA) Elias Guerrero and SA Ryan Nicolos, and Internal Revenue Service Criminal Investigation (IRS-CI) SA Ryan Roberson. Participating in the interview was CORY's attorney THIAGO COELHO (COELHO). After being advised of the identity of the interviewing SAs and AUSA, as well as the nature of the interview, CORY provided the following information:

    CORY was a secretary for THOMAS "TOM" GIRARDI (GIRARDI) at the GIRARDI & KEESE (GK) law firm. CORY started working at GK in 1987 and started out as a relief receptionist. CORY then transitioned to completing discovery tasks, then working on attorney calendars, and eventually landed a job as one of GIRARDI's secretaries. CORY's job duties included dictating letters for GIRARDI. Letters dictated by CORY would be marked with a "/KC" at the end of the letter.

    GIRARDI was a very busy person. GIRARDI dictated letters to CORY from the start of the morning until the end of the day. GIRARDI was personally handling around 15-20 cases at a time and oversaw all of the GK cases which were in the hundreds. Some of the cases GIRARDI personally handled had hundreds of clients.

    CORY recalled that GIRARDI used a flip phone. GIRARDI did not have a book of phone numbers but knew people's phone numbers based on his memory.

    During the COVID-19 pandemic, GIRARDI was going into the office every day. Due to restaurants being closed during the pandemic, CORY would cook breakfast and lunch for GIRARDI in the office. Before the pandemic, GIRARDI would not cook for himself but would typically eat out at restaurants like the Jonathan Club or Morton's Steakhouse.

    In 2019 and 2020, CORY recalled that GK was under financial pressure. GIRARDI was very stressed and CORY took dictation from GIRARDI for various

UNCLASSIFIED//FOUO

| | | | |
|---|---|---|---|
| Investigation on | 07/27/2023 | at | Los Angeles, California, United States (In Person) |

File # ▮▮▮▮▮▮▮▮                                                              Date drafted  07/28/2023

by  NICOLOS RYAN MATTHEW, GUERRERO ELIAS

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

UNCLASSIFIED//FOUO

FD-302a (Rev. 5-8-10)

Continuation of FD-302 of  (U) Interview of Kim Cory                    , On  07/27/2023  , Page   2 of 3

litigation lenders asking for more time to pay loans or requesting
additional funding for the firm. Securing additional lending for the firm
was something GIRARDI was handling during that time. Also during the COVID-
19 pandemic, GIRARDI was upset with his employees because they were not
coming into the office and GIRARDI would send memos to his staff to return
to the office.

**AGENT NOTE: At this point in the interview, CORY was shown a memo which will
be maintained in a digital 1A folder attached to this document.**

**2020.09.28 TVG Memo**

    CORY's last day with GK was in December of 2020. Sometime later, CORY was
approached by JACK GIRARDI (JACK) who was attempting to put GIRARDI's assets
in a conservatorship. JACK asked CORY to write a letter highlighting certain
issues with GIRARDI's cognitive abilities. CORY understood that JACK wanted
a persuasive letter to establish the conservatorship. JACK asked CORY to
speak with the other secretaries to see if they would write persuasive
letters as well. When asked about her claims in the letter regarding
GIRARDI's memory issues, CORY stated that during this time period, GIRARDI
had a lot going on, including many cases and many phone calls. When asked
about GIRARDI's ability to remember people's names, CORY stated that since
she has known GIRARDI, GIRARDI often struggled with people's names,
including staff and attorneys that he did not regularly work with.

    After CORY left GK, she and other GK staff visited GIRARDI on at least
two occasions. The first visit occurred on April 3, 2021. CORY brought her
daughter and went to the house with GK employee SHAWNA MILLS. GIRARDI gave
them a tour of the house and told them that someone had broken into his
residence a few months before. GIRARDI showed CORY where the intruder had
smashed a window. When the incident occurred, GIRARDI saw the person in his
house and told CORY he was thin and had blonde hair. GIRARDI told CORY that
he initially thought the person was CHRIS AUMAIS (AUMAIS) due to that
individual having the same build and hair color as AUMAIS. GIRARDI also told
CORY that his safe had been opened. A few months later, CORY and a few other
secretaries visited GIRARDI at his home in Pasadena. During the visit, the
group had lunch and GIRARDI served CORY and the other secretaries bottles of
wine. GIRARDI retrieved the bottles of wine and opened them for the group.

    When asked if CORY ever saw GIRARDI wearing a burgundy sweater, CORY
stated that she had never seen GIRARDI wearing a Burgundy sweater. GIRARDI
had sometimes worn a blue sweater. Also, when CORY was asked about GIRARDI
not recognizing a photo of his wife ERIKA JAYNE (JAYNE), CORY recalled that

UNCLASSIFIED//FOUO

UNCLASSIFIED//FOUO

FD-302a (Rev. 5-8-10)

Continuation of FD-302 of  (U)  Interview of Kim Cory _____ , On  07/27/2023  , Page  3 of 3

the photograph was taken approximately 20 to 25 years ago and showed JAYNE
without make up and before having plastic surgery.

   At no time did CORY ever tell GIRARDI's doctors, family members, or the
senior attorneys at GK that GIRARDI was mentally unfit to be a lawyer,
manage client monies, or run the law firm.

Attached to this document are interview notes and the memo shown to CORY,
which will be maintained in a digital 1A folder.

# EXHIBIT 16

## Digital Recording

# EXHIBIT 17
## Digital Recording

# EXHIBIT 18



Via E-Mail: ██████████████

October 20, 2020

██ S█████
████████████████████

*Re:*      *J███ S█████ v. O'Donoghue, et al.*

Dear J████:

Maybe you do not know but this settlement is fully taxable by the IRS. These rules came into play a year and a half ago. I am working desperately to get a waiver or to get the other side to pay something for the settlement. I remain doing everything I can to help you.

With kind regards,

THOMAS V. GIRARDI
TVG:kc

# EXHIBIT 19

## Digital Recording

# EXHIBIT 20



GIRARDI | KEESE
LAWYERS

January 9, 2017

*Personal & Confidential*



Dear J█:

It is massively important that you and I understand everything.  Unfortunately, I'm out of the country for about ten days.  I would like for you to call Shirleen on Wednesday, January 18th, to set an appointment for us to go over everything.

I want you to know that the only way we were able to settle this case was a commitment by me that I would make sure that the funds were used properly.  The judge indicated that he knew many young men who got a large amount of money and it ended up in a total disaster.  The judge indicated that buying a home, buying a car, buying insurance and paying tuition to better the young person's life was all acceptable.

I want to go over everything and make sure you are very happy with our law firm.

With kind regards,

THOMAS V. GIRARDI

TVG:sf

# EXHIBIT 21



# DEPARTMENT OF THE TREASURY
## Internal Revenue Service
## Criminal Investigation

# Memorandum of Interview

---

**Investigation #:** ▮▮▮▮▮▮▮          Location:     Via WebEx
**Investigation Name:** THOMAS GIRARDI
**Date:** July 25, 2023
**Time:** Approximately 10:00 AM – 11:30 AM
**Participant(s):** Alan Zimmerman, Witness
Chris Frost, Counsel
John Madden, Counsel
Stephanie Boone, Counsel
Ali Moghaddas, AUSA
Ryan Roberson, Special Agent

On the above date and approximate time, Special Agent Ryan Roberson (SA Roberson) with IRS Criminal Investigation (IRS-CI) along with Assistant United States Attorney Ali Moghaddas (AUSA Moghaddas) met with Alan Zimmerman (Zimmerman) and counsel Chris Frost (Frost), John Madden, and Stephanie Boone via WebEx. Zimmerman voluntarily provided the following information:

1. Zimmerman was the Chief Executive Officer at Law Finance Group (LFG), a litigation lender that loaned funds to the Girardi Keese (GK) law firm. Zimmerman is an attorney himself who specialized in business law, before transitioning to litigation lending.

2. Zimmerman met Tom Girardi (Girardi) through Skip Keesal (Keesal), a fellow attorney and business associate of Zimmerman's. Keesal thought Zimmerman and Girardi may be able to do some business together and introduced them in approximately 2015. Girardi and Zimmerman had lunch together at Morton's, where they Discussed LFG and their backgrounds. Girardi eventually called and asked if LFG wanted to do some business with GK. After doing its due diligence, LFG eventually loaned approximately $12,000,000.00 to GK. LFG used GK's future cases as collateral. One case used as collateral was the Carson Shell case. LFG was supposed to be paid from the attorney's fees earned by GK, after the Shell case settlement funds were received by GK.

3. Over the years, Zimmerman met with Girardi several times at GK's office and for lunches. Zimmerman eventually got to know GK attorney's Bob Finnerty (Finnerty) and Chris Aumais (Aumais). Zimmerman went to lunch with them, and saw them around at various functions.

4. At one function, Zimmerman ran into Finnerty. Over the course of conversation,

Zimmerman asked when the funds from the Shell case were going to come in. Finnerty seemed surprised by Zimmerman's question and implied that GK had already received funds from the Shell settlement. Zimmerman recalled Finnerty saying something to effect of, "Oh you haven't gotten paid, you should talk to Tom." This conversation took place in early 2018, or possible early 2019. Zimmerman elaborated that the emails in the production provided by LFG should provide an accurate timeline.

5. Zimmerman's general impression was that Finnerty and Aumais did not want to get involved in the business operations of GK.

6. After his interaction with Finnerty regarding the Shell settlement funds being received by GK, Zimmerman reached out to Girardi to inquire about the status of GK paying back LFG. Girardi told Zimmerman that he had made a mistake and didn't realize GK needed to pay LFG back right away. Subsequently, Zimmerman went to Los Angeles on several occasions to see Girardi regarding LFG being paid by GK. Girardi made excuses and gave Zimmerman a "load of garbage" as to why GK was not paying LFG.

7. During one of Zimmerman's meetings with Girardi, Shirleen Fujimoto (Fujimoto), Girardi's assistant, ran all the GK outstanding case costs at the request of Girardi. The outstanding case costs paid by GK added up to approximately $85 - $90 Million. Zimmerman was surprised by such a large figure. As time went on, LFG was still not paid by GK. Sometime in the summer of 2018 LFG and GK eventually reached a Forbearance Agreement, which was signed by Girardi. Despite signing the Forbearance Agreement, GK still failed to make any payments. In November or December of 2018, Zimmerman reached out to an attorney to start the legal process of LFG obtaining the payments due from GK.

8. In Spring of 2019, mediation was held between GK and LFG, and a settlement was reached: GK was to pay approximately $16 Million to LFG. GK paid $10 Million in June of 2019, but failed to pay the remaining $6 Million therefore LFG obtained a judgement against GK and began levying GK's bank accounts. Shortly after this, LFG received $6 Million from Girardi's personal Morgan Stanley account in the Fall of 2019.

9. Frost was retained by LFG to assist LFG in recovering the funds due from GK. Aumais was Frost's main point of contact at GK. In the Summer of 2019, Aumais helped provide GK's bank records to Frost. Aumais told Frost that he had provided all the information for all GK bank accounts, and that none of those accounts had enough money in them to pay the full $6 Million due to LFG. The only GK account with significant funds to pay LFG, was GK's payroll account. Aumais explained if GK paid LFG from the payroll account, then GK could not make payroll. Despite this understanding, LFG and Frost began the process of levying GK's bank accounts, which were ultimately levied in October of 2019.

10. Shortly after levying GK's bank accounts, LFG was paid the $6 Million due to them, from Girardi personal Morgan Stanley account in the Fall of 2019. Aumais helped to facilitate this payment from Girardi's personal Morgan Stanley account. Aumais was aware that Girardi, on behalf of GK, could access Girardi's personal funds at Morgan Stanley. Morgan Stanley had liens on Girardi's funds, but LFG was able to work with Morgan Stanley to ensure LFG was paid.

11. Aumais never discussed the GK's client trust bank accounts with Zimmerman or Frost. Each time Frost brought up the topic of GK's client trust bank accounts, Aumais would change the topic. Frost speculated that Aumais changed the topic away from GK's client trust bank accounts on purpose.

12. Originally, when LFG began pursuing the collection of the additional $6 Million in the Summer of 2019, Chris Good (Good) was the attorney who represented Girardi and GK in their objection to lawsuit filed by LFG. Frost believes Good is a former GK associate. Good and Aumais ended up forming their own law firm with a third attorney sometime after GK went into bankruptcy in December of 2020.

13. After Good stopped representing Girardi and GK, Aumais became Frost's GK point of contact. Frost believes Aumais was acting on behalf of Girardi. Aumais told Frost that all final decisions regarding the payment to LFG needed to be made by Girardi.

14. Frost and Zimmerman were under the impression Aumais was not happy at GK. Aumais told them he was not going to be paid the amount due to him for the cases he worked because GK did not have the funds to pay him. Zimmerman found it unusual that Aumais worked cases at GK and was also the primary point of contact for GK in the LFG and GK negotiations. At one point, Aumais said he was thinking about leaving GK.

**Exhibit 1, SA Roberson referenced the email dated December 17, 2017 from Ajit Singh to Finnerty with Girardi and Aumais CCed. Zimmerman provided the following information:**

15. Zimmerman recalled interacting with Finnerty and Aumais from time to time. Ajit Singh (Singh) was LFG's sales and marketing guy. Singh and Aumais developed a business relationship with each other. They may have been talking about other GK cases GK may want financed.

**Exhibit 2, SA Roberson referenced the email dated June 25, 2018 from Zimmerman to Girardi re GK key lawyers. Zimmerman provided the following information:**

16. Zimmerman knew that Girardi owned the law firm and thought maybe Girardi should have a succession plan. Zimmerman suggested the senior attorney's at GK get involved in the succession plan. This was extent of Zimmerman's input. Girardi never brought up Zimmerman's suggestion after this email.

**Exhibit 3, SA Roberson referenced the email dated July 3, 2019, from Zimmerman to Girardi with Aumais and David Lira (Lira) CCed. Zimmerman provided the following information:**

17. Aumais was trying to resolve the judgement LFG had against GK. Zimmerman is not sure why Lira was CCed. Zimmerman met Lira once at a football party but did not interact with him. Frost did not interact with Lira.

**Girardi's Mental State**

18. Zimmerman last spoke with Girardi in the late Summer of 2019. Over the course of their relationship, Zimmerman never had any odd interactions or suspicions, where he thought that Girardi was operating at less than 100% mentally. Instead, Zimmerman found Girardi to always be very sharp and cunning. Zimmerman has some friends who are getting early dementia, and Zimmerman never saw any similarities between his friends getting early dementia and Girardi.

19. Zimmerman did not recognize any difference in Girardi's mental state from 2015 through 2019. Zimmerman had many interactions with Girardi before and after, Girardi's car accident in 2017. Zimmerman recalled having lunch at Morton's with Girardi right after Girardi's car accident in 2017. Girardi reserved a back room at Morton's for lunch, and came into the room in a wheelchair. They talked and had lunch while Girardi was in his wheelchair. Girardi told Zimmerman about the accident, and Zimmerman never saw any suggestion at all that Girardi had any mental impairments. Girardi told Zimmerman he was in the wheelchair because he injured his leg in the car accident. Girardi's car slid down a hill and was stopped a tree. After being stopped by a tree, Girardi was dragged back up the hill. When Zimmerman saw Girardi again, he was out of the wheelchair and had recovered from his leg injury. Zimmerman had several subsequent meetings after Girardi's accident, and Girardi never showed signs of mental impairment.

20. Frost dealt directly with Girardi on several occasions. Frost never recalled Girardi showing any signs of mental impairment whatsoever. In one instance, Girardi showed up to a court proceeding in front of Judge Becklaw who said the matter between GK and LFG seemed "cut and dry." GK was given seven days to mediate the matter with LFG. In the mediation, Frost observed some real strategy by Girardi during the party's interactions. LFG and GK were close to a deal, but then Girardi said, "F off and walked out." Frost believed this to be a deliberate strategic decision that would not have been made by someone with a mental impairment. This mediation took place sometime in second half of 2019.

21. When Frost first heard about Girardi being incompetent, Frost thought to himself "that's convenient."

22. Regarding the $6 Million payoff from Girardi's Morgan Stanley account, Girardi

was aware his personal funds were being used. Aumais helped to facilitate the transaction, but Girardi had the ultimate say in what took place.

23. At one point, Joe DiNardo (DiNardo) of Counsel Financial AKA California Attorney Lender, reached out to Zimmerman and said DiNardo's company was attempting to provide funding to GK. DiNardo then asked Zimmerman to hold off on collecting from GK. Zimmerman said no. LFG would not want to "get in bed" with DiNardo.

The interview was concluded at approximately 11:30 AM.


Ryan Roberson
Special Agent

# EXHIBIT 22

## Digital Recording

# EXHIBIT 23

Digital Recording

EXHIBIT 24

```
 1              SUPERIOR COURT OF THE STATE OF CALIFORNIA
 2                   FOR THE COUNTY OF LOS ANGELES
 3
 4
 5       J███ R███████,                       )
                                              )
 6                        Plaintiff,          )
                                              )
 7                   V.                       ) No. 19STCV22296
                                              )
 8       THOMAS V. GIRARDI,                   )
         ET AL.,                              )
 9                                            )
                          Defendants.         )
10       _____)
11
12
13
14
15
              EXAMINATION OF THOMAS V. GIRARDI, VOLUME 2
16
                 TUESDAY, OCTOBER 13, 2020, 1:00 P.M.
17
18
19
20
21
22
23
24       Reported By:  Alexander T. Joko
                        CSR No. 12272, CCRR No. 160
25       Job No.        4298274

                                               Page 1
```

ACTS001220

```
 1              SUPERIOR COURT OF THE STATE OF CALIFORNIA.
 2                 FOR THE COUNTY OF LOS ANGELES
 3
 4    J███   R███████,                    )
                                          )
 5                   Plaintiff,           )
                                          )
 6              V.                        ) No. 19STCV22296
                                          )
 7    THOMAS V. GIRARDI,                  )
      ET AL.,                             )
 8                                        )
                     Defendants.          )
 9    _____)
10
11
12
13
14              Examination of Thomas V. Girardi, taken
15    on behalf of Plaintiff via Zoom Video Conference,
16    commencing at 1:000 p.m., on Tuesday, October 13, 2020,
17    before Alexander T. Joko, CSR No. 12272.
18
19
20
21
22
23
24
25
```

                                                          Page 2

ACTS001221

```
1    APPEARANCES:

2

3    FOR THE PLAINTIFF:        ABIR COHEN TREYZON SALO, LLP
                               BY:  BORIS TREYZON
4                                   DANNY ABIR
                               16001 VENTURA BLVD
5                              SUITE 200
                               ENCINO, CA 91436

6

7

     FOR THE DEFENDANTS:    BAKER KEENER & NAHRA LLP
8                           BY:  PHILLIP A. BAKER
                            633 WEST FIFTH STREET
9                           55TH FLOOR
                            LOS ANGELES, CA 90071

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 3

ACTS001222

1                              I N D E X

2

3    THOMAS V. GIRARDI                                    PAGE

4    BY MR. TREYZON...................................5

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                              Page 4

ACTS001223

```
 1    Los Angeles, California; Tuesday, October 13, 2020

 2
                          1:00 P.M.

 3
                          - - - - -

 4

 5

 6               THOMAS V. GIRARDI,

 7               having been previously sworn

 8               by the Clerk of Department 56 was

 9               examined and testified as follows:

10

11                    EXAMINATION

12   BY MR. TREYZON:

13   Q    Mr. Girardi, this is the second session of the

14   debtor's exam we had previously conducted.

15        In the last debtor examination, we discussed

16   about you providing documents that were listed in the

17   subpoena.

18        Have you prepared any such documents?

19   A    What?  I didn't hear you.

20   Q    Sure.  Let me repeat myself.

21        At the last session of our examination that

22   was about two weeks ago, you were requested to produce

23   documents that were necessary for us in order to

24   continue to enforce judgment.

25        You said you needed additional time.  You said
```

Page 5

ACTS001224

```
 1    a few days in order to obtain such documents.
 2              Have you prepared any documents for me today?
 3    A    No.
 4    Q    Sir, do you understand that, without having those
 5    documents, I'm unable or it makes it very difficult for
 6    me to continue to enforce my judgment?
 7    A    Well, maybe so.
 8              I made an offer this morning.  That's
 9    rejected, I take it.
10              And you want to do this stuff instead; right?
11    Q    Well, sir --
12    A    Right?
13    Q    Sir, the offer that you have presented is not
14    acceptable.
15    A    Okay.  Good.
16    Q    So we can proceed.
17    A    Good luck.
18    Q    Okay.  Sir, is there a document that lists the
19    cases that Girardi and Keese presently has?
20    A    Oh, I'm sure of it; but I can't give that to
21    anybody.  And I won't give it.  Clearly, I won't give
22    it to you.
23    Q    And why wouldn't you give it to me?
24    A    Because you're -- you have no more trust, no more
25    integrity.
```

Page 6

ACTS001225

1    Q    Other than your belief of a lack of integrity, will

2    you agree with me that the proceeds from such cases may

3    be used to satisfy your obligation to my clients?

4    A    Not necessarily because I can't let you be involved

5    with my cases.

6    Q    I see.

7         Sir, are you familiar with a case of Gabriel

8    Abikzer under the case number BC706830?

9    A    I know the name.

10   Q    Are you aware that that case, which is against the

11   City of Los Angeles, was recently settled?

12   A    Yes.

13   Q    And are you aware that the settlement is in the

14   amount of $23 million?

15   A    I don't know, but it was fairly large.

16   Q    What amount is Girardi and Keese entitled to

17   receive from that case?

18   A    I don't know.  I don't think we got anything, did

19   we?  Maybe we did.

20   Q    I see.

21        Do you know if Girardi and Keese received or

22   is entitled to receive any amount of money from the

23   Abikzer case as attorney's fees?

24   A    I don't know.

25   Q    Who would know at Girardi and Keese about that?

Page 7

ACTS001226

```
1    A    Well, I suppose we could pull the file and see if
2    there's an agreement and see if they sent us a check.
3    Q    Do you -- is George Abikzer a client of Girardi and
4    Keese?
5    A    No.  We got brought in by his counsel.
6    Q    And who is his counsel?
7    A    I don't know.
8    Q    Do you owe that counsel any referral fees?
9    A    I don't know.
10   Q    Do you know if you owe a referral fee on the
11   Abikzer case?
12   A    I don't know.
13   Q    Do you know how much your costs are in the Abikzer
14   case?
15   A    No.
16   Q    Is there any reason why you have not produced the
17   retainer agreement for your examination today?
18   A    I don't know that there is one.
19   Q    Do you ever represent clients without a retainer
20   agreement?
21   A    No.
22        Here, I was brought in by the lawyers to help.
23   Q    Sir, you're listed as attorney of record on the
24   docket for the Abikzer case, which is in Chatsworth
25   courthouse; do you understand that?
```

Page 8

ACTS001227

```
1    A      No.

2    Q      Have you ever appeared in the Abikzer case?

3    A      Just for the settlement conference.

4    Q      Okay.  And when did the settlement conference take

5    place?

6    A      I don't know.  Within the past six months.

7    Q      And was a settlement reached?

8    A      Eventually, I think it was.

9    Q      And is it your intention that any portion of the

10   money owed to Girardi and Keese or to you individually

11   is being placed in a QSF?

12   A      That was placed where?

13   Q      To a qualified settlement fund.

14   A      You know, maybe so.

15          You know more about this than I do.

16   Q      And when -- well, who at your firm would know more

17   about this than me or you, for that matter?

18   A      You know, nobody.

19   Q      Okay.

20   A      This was a matter we were just brought in to help

21   with the settlement.  And we did some help, and that

22   was it.

23   Q      And how long have you been part of that case?

24   A      A couple of months.

25   Q      Okay.  Hold on one second.
```

                                                      Page 9

ACTS001228

```
 1              Sir, do you know an attorney by the name of --
 2    actually, I apologize.  You're listed as the only
 3    attorney for the plaintiff.
 4              Did you know that?
 5    A    No.
 6    Q    Do you know an attorney by the name of Keith
 7    Griffin?
 8    A    Yes.  Sure.
 9    Q    And is he part of Girardi and Keese?
10    A    Yeah.
11    Q    I'll represent to you that Mr. Griffin has filed a
12    declaration saying he represented Mr. Abikzer for the
13    entirety of that representation.
14              Do you believe that your attorney is wrong?
15    A    No.  If he said it, it's true.
16              I was just telling you about my involvement,
17    which was late in the game.
18    Q    And what about the involvement of Girardi and
19    Keese, how long has Girardi and Keese been involved in
20    this case?
21    A    I have no clue.
22    Q    And do you know if Girardi and Keese has a retainer
23    agreement with this particular client?
24    A    I don't know.
25    Q    Has Girardi and Keese borrowed any money from any
```

ACTS001229

```
 1   lender to fund this litigation?
 2   A    I don't think so.
 3   Q    So am I correct that the entirety of the attorney's
 4   fees are payable exclusively to Girardi and Keese?
 5   A    Well, they had other lawyers that -- the fees that
 6   we got, I think there were maybe some liens by
 7   borrowers -- by lenders.
 8   Q    When did you receive fees on the Abikzer case?
 9   A    When did I what?
10   Q    When did you receive fees on the Abikzer case?
11   A    I have no idea.
12   Q    Do you know if you have received fees on the
13   Abikzer case?
14   A    I'm not positive we even got liens.
15   Q    I'm talking about attorney's fees.
16         Do you know if you received any attorney's
17   fees on the Abikzer case?
18   A    I don't know that.  I assume we did.
19   Q    Do you know if you are entitled to additional
20   attorney's fees on the Abikzer case?
21   A    I have no idea.  I didn't handle it.
22   Q    I see.
23         Sir, do you own a house at 175 Sonoma lane in
24   Carmel?
25   A    I think so.
```

Page 11

ACTS001230

```
 1   Q    Do you still own it presently?

 2   A    I don't know.

 3   Q    Do you know if the house on 175 Sonoma Lane in

 4   Carmel is in your name?

 5   A    I don't know.  I haven't been up there in five

 6   years.  I don't know.

 7   Q    Do you know who Richard Crane is?

 8   A    What?

 9   Q    Do you know who Richard Crane is?

10   A    Yeah.  He's a lawyer.

11   Q    And do you know why he is listed as owner of record

12   on that house?

13   A    Yeah.  He was with me, I think, when we bought the

14   house.

15   Q    Is the house actually yours?

16   A    Is it actually what?

17   Q    Yours.

18   A    I don't know.

19   Q    Well, did you buy the house?

20   A    I don't know.  I owned a part of it.  I don't know.

21   Q    Did Mr. Crane ever quitclaim the house back to you?

22   A    I don't know.

23   Q    Do you believe you presently own that house?

24        MR. BAKER:  I think he answered that.

25        THE WITNESS:  Yeah, I don't know.
```

Page 12

ACTS001231

```
1    BY MR. TREYZON:

2    Q    In February of 2020, did you sell that house?

3    A    You know, maybe so.

4    Q    How much money did you get for it?

5    A    I have no idea.

6    Q    What did you do with the money, if you got it?

7    A    When did I what?

8    Q    What did you do with the money, if you received it?

9    A    I have no recollection of receiving the money.  If

10   I did receive it, I'm sure I spent it on expenses.

11   Q    I see.

12        Sir, have you contributed any of your personal

13   money to Girardi and Keese in 2020?

14   A    Oh, sure.

15   Q    How much?

16   A    I don't -- I don't take a salary or I get any

17   payment for Girardi Keese.  And I think I put in

18   several million.

19   Q    Was that this year?

20   A    Beg your pardon?

21   Q    Was that in 2020?

22   A    I don't know.  I've been putting in money for costs

23   for a long time.  So I think I've put in close to a

24   hundred million.

25   Q    I'm just asking in 2020.
```

Page 13

ACTS001232

```
 1            Can you give your best estimate of how much
 2    money you put into Girardi and Keese of your personal
 3    money in 2020?
 4    A    I have no clue.
 5    Q    Who would know that?
 6    A    I suppose I could ask accounting.
 7    Q    Is there any reason you haven't prior to today?
 8    A    I didn't think this was a big-time question.  I
 9    didn't know I was going to be harassed this way.
10            I told you that I would settle the case, laid
11    it all out.  And, instead, you want to take my depo,
12    take my time, ask a bunch of stupid questions.
13    Q    Other than --
14    A    You're right.  I had no clue it was going to be
15    this way.
16    Q    I see.
17            Other than then, as you stated, the stupidity
18    of my questions, is there any other reason you do not
19    have your documents prepared today?
20    A    Well, you have no right to them.
21    Q    I see.
22            Would you agree with me that the documents I'm
23    requesting are readily available to you?
24    A    No.  I don't know.
25    Q    Well, did you ask the accounting department to
```

Page 14

ACTS001233

1   prepare any documents?

2   A    No.

3   Q    Did you ask the accounting department to see if

4   they are able to prepare documents?

5   A    No.

6   Q    Sir, are there secured lenders that lend money to

7   Girardi and Keese?

8   A    I don't know how that's your business.

9           MR. TREYZON:  Phil, do you want to help me?

10          MR. BAKER:  What are you looking for here?

11          MR. TREYZON:  I'm asking who are the lenders

12   of Girardi and Keese.

13          MR. BAKER:  If you can identify a few, Tom,

14   please, if you can.

15          THE WITNESS:  I don't know.  There are a

16   couple of lenders that have helped with costs.

17   BY MR. TREYZON:

18   Q    Do you know their names?

19   A    Not really.

20   Q    Do you own stock in a company called Repligen?

21   A    I certainly used to.  I don't know if I own

22   anymore.

23   Q    Who would know about that?

24   A    Well, the stockbroker would.

25   Q    Who is your stockbroker?

Page 15

ACTS001234

```
 1    A    He was with Wells Fargo, and he just left there.
 2    He started his own company.
 3    Q    Do you know what his name is?
 4    A    I don't know if he took my account or not.  So I
 5    can't answer that.
 6    Q    So am I correct that you don't know how many shares
 7    of Repligen you presently own?
 8    A    If any, yeah, correct.
 9    Q    You don't know?
10    A    I don't know.
11    Q    And do you know if there are any restrictions upon
12    you selling those shares in Repligen, if you do own?
13    A    I don't know.
14    Q    Have you ever seen the stock certificate for
15    Repligen?
16    A    Not that I recall.
17    Q    Do you know if it's electronic or paper?
18    A    I don't recall.
19    Q    Am I correct that you have accounting records --
20    general accounting records that are available to you?
21         Am I correct?
22    A    Well, our accounting records are all private.
23    Q    I understand.
24         But if you were to --
25    A    They involve clients.  They involve attorney/client
```

Page 16

ACTS001235

```
 1    privilege.  So they're not open to you.
 2    Q    I understand.
 3         Would I be correct that, if you were to ask,
 4    your accounting department can prepare a profit and
 5    loss statement for you?
 6    A    Maybe not.  It depends what -- I'm not going to
 7    show -- obviously, there's no trust in you.  So to give
 8    up anything private to you would be insanity.
 9    Q    Sir, my question is a little bit different.
10         My question is, would you agree with me that,
11    if you were to ask, your accounting department can
12    prepare for you a profit and loss statement?
13    A    I don't know.
14    Q    Do you know, if you were to ask, your accounting
15    department can prepare for you a balance sheet?
16    A    No.  I don't know.
17    Q    Do you know, if you were to ask, your accounting
18    department can prepare for you a statement of cash
19    flows?
20    A    No.
21    Q    If you were tasked, could your accounting
22    department give you your current bank statements?
23    A    Did I ask them to?
24    Q    Well, number one, did you ask them to?
25    A    No.
```

                                           Page 17

ACTS001236

1    Q    Do you know, if you were to ask them, would they be

2    able to give you current bank statements?

3    A    Oh, I think so.  But, certainly, it wouldn't go to

4    anybody else.

5    Q    Other than yourself?

6         So it's your position that you refuse to

7    produce financial records to me?

8    A    Well, I'm not going to produce any of my personal

9    records.  I'm not going to produce any records that in

10   any way, shape or form affects a client.  I'm not going

11   to produce any records that are being used for helping

12   clients in the litigation.  I'm going to protect my

13   clients.

14   Q    I see.

15        Do you have personal financial records such as

16   your personal bank statements and balance sheet?

17   A    I don't know.

18   Q    Do you maintain separate trust accounts for your

19   clients?

20   A    We have two trusts.

21   Q    When you say, "we have two trusts," you mean trust

22   accounts -- you have two trust accounts at banks?

23   A    There are two trust accounts.

24   Q    And in those trust accounts, do you have an

25   accounting systems which maintains a separate ledger

Page 18

ACTS001237

1    for each of your clients?

2    A    I'm not going to tell you anything about my trust

3    accounts.

4    Q    I'm not asking anything specific.

5         I'm asking whether you have a separate ledger

6    for each one of your clients within your system?

7    A    Yeah.  We have -- we know who is entitled to funds

8    and stuff, yeah.

9    Q    And who is in charge of maintaining that system?

10   A    Our accounting department.

11   Q    And who is in charge of your accounting department?

12   A    On that particular issue, Chris Kamon, I suppose.

13   Q    Can you tell me, approximately, how much money you

14   owe to various lenders?

15   A    I owe to who?

16   Q    To various -- all of your lenders.

17   A    No, I'm not going to talk to you.

18        Can you imagine?  You are showing nothing but

19   disparity.  You are showing nothing but rudeness.  Your

20   whole attack here is absurd.

21        I tried to tell you that we'll try and cut a

22   deal and rid you of the problem.  And, instead, I get

23   this.

24        No.  So I'm not -- the last person in the

25   world I would give anything to that is in any way

                                              Page 19

ACTS001238

1   confidential is you.

2   Q    I see.

3        MR. TREYZON:  Phil, do you want to help me?

4        THE WITNESS:  What?

5        MR. TREYZON:  I'm asking if Mr. Baker wants to

6   jump in on this.

7           Phil?

8        MR. BAKER:  Tom, you don't know what amounts

9   are owed to various lenders, do you?

10        THE WITNESS:  No.

11  BY MR. TREYZON:

12  Q    Can you give me your best estimate?

13  A    No.

14  Q    And do you know if those lenders are secured?

15  A    I don't know.

16        MR. TREYZON:  Let's go off the record for a

17  second.  I may be done.

18

19           (Break in the Proceedings)

20

21  BY MR. TREYZON:

22  Q    Mr. Girardi, in our last session, you said you

23  would produce financial records for me; but you're

24  taking back that representation?

25  A    Who said?

                                        Page 20

ACTS001239

```
1    Q    You did.

2    A    When did I say that?

3    Q    I believe the date was the 13th -- I'm sorry, now

4    is the 13th.

5              It was approximately two weeks ago.

6    A    I certainly don't recall that.

7              And, believe me, I would never give you

8    financial records that harm our law firm or clients

9    cause that's what you're out to do.

10   Q    I see.

11             Sir, do you understand you're under court

12   orders to provide those records; right?

13   A    If the court has ordered something, I'm going to

14   follow the court's order or appeal it, one or the

15   other.

16   Q    I see.

17             And you understand that, together with your

18   examination, we served a civil subpoena for you to

19   produce records; correct?

20   A    I don't believe that anybody in your law firm would

21   do anything civil.

22   Q    I'm sorry, I didn't hear you.

23             Mr. Girardi, I didn't hear you.

24   A    That's okay.  Read it.

25   Q    Okay.  So the subpoena for document production
```

Page 21

ACTS001240

```
 1   called for you to produce 34 categories of records.
 2   A     Right.  My used cars, you want that.  The insurance
 3   that used to be on cars I don't own, the cars that I
 4   leased, the -- can you imagine the harassment that you
 5   are trying to do?
 6   Q     Do you know if you served an objection to any of
 7   these?
 8            Mr. Girardi, do you know if you served an
 9   objection to any of these?
10   A     Yeah, I object.
11   Q     Other than you objecting presently, any other
12   objections?
13   A     No.  To the fraud, I do.
14   Q     I see.
15            Sir, you understand that my client has an $11
16   million judgment against you; correct?
17   A     No.
18   Q     You don't understand that?
19   A     No.
20            That's a lot of money because they were
21   gouging on interest.  They just gouge the hell out of
22   you.
23            I'm going to get it out to the trial bar
24   exactly their integrity, the way they behave, people
25   like you, et cetera.
```

Page 22

ACTS001241

1    Q    Nevertheless, sir, do you intend to pay my clients

2    the $11 million judgment?

3    A    No.

4         I'm going to -- as I told you, I don't think

5    so.

6    Q    I see.

7         And is it your intention to do everything in

8    your power to make sure my clients aren't going to get

9    paid?

10   A    Well, anything ethical and honest, is something

11   that you wouldn't understand.

12        Anything ethical and honest, yes.

13   Q    Sir, do you presently possess assets that would be

14   sufficient to satisfy the judgment my clients hold

15   against you?

16   A    I'm not talking about my assets to you.

17   Q    I see.

18        MR. TREYZON:  I believe this will conclude --

19   will suspend today's ORAP, and we will go back to court

20   to seek the court's intervention.

21             Right?

22             Phil, do you want to do a stip or by

23   code?

24        MR. BAKER:  Did you do a stip on the last one?

25             Bob, says you did.  So why don't we use

Page 23

ACTS001242

```
 1    the --
 2           MR. TREYZON:  Let me do this, I propose the
 3    following stipulation:
 4               The court reporter will be relieved of
 5    his custodial duty under the Code of Civil Procedure to
 6    maintain custody and control of the original transcript
 7    of today's examination.  That whatever convenience
 8    Mr. Girardi or Mr. Baker needs in order to review the
 9    transcript, sign it under penalty of perjury may be
10    afforded to them.  That should the original transcript
11    of today's examination will -- should the original
12    transcript of today's examination be unavailable for
13    any purpose, an unsigned certified copy may be used as
14    if it's the original.
15           MR. BAKER:  That's agreed to.
16           MR. TREYZON:  Thank you very much.
17           MR. BAKER:  Thank you.
18
19               (End of Deposition at 1:37 p.m.)
20
21
22
23
24
25
```

Page 24

ACTS001243

```
 1   STATE OF CALIFORNIA     )
                             )          )  ss.
 2   COUNTY OF LOS ANGELES   )

 3

 4

 5

 6

 7

 8

 9        I, the undersigned, say that I have read the

10   foregoing deposition, and I declare, under penalty of

11   perjury under the laws of the State of California,

12   that the foregoing is a true and correct transcript of

13   my testimony contained therein.

14

          EXECUTED this_____day of_____,

15
     2020, at_____.

16

17

18

19

                      _____

20                               THOMAS GIRARDI

21

22

23

24

25

                                              Page 25
```

ACTS001244

```
 1   STATE OF CALIFORNIA    )
                            )
 2   COUNTY OF LOS ANGELES  )

 3

 4           I, Alexander T. Joko, CSR No. 12272,
 5   Certified Shorthand Reporter, do hereby certify that:
 6           That prior to being examined, the witness
 7   named in foregoing deposition was by me duly sworn;
 8           That said deposition was taken down by me
 9   in shorthand at the time and place therein named and
10   thereafter transcribed under my direction;
11           I further certify that I am neither
12   counsel for, nor related to, any party to said
13   proceedings, not in anyway interested in the outcome
14   thereof.
15           I declare under penalty of perjury under
16   the law of the State of California that the foregoing
     is

17
     true and correct.
18

19

20

     Dated:  OCTOBER 14, 2020
21

22

23

24

     Alexander T. Joko
25   CSR No. 12272, CCRR 160
```

Page 26

ACTS001245

[& - charge]

**&**

**&** 3:7

**1**

**11** 22:15 23:2
**12272** 1:24 2:17 26:4,25
**13** 1:16 2:16 5:1
**13th** 21:3,4
**14** 26:20
**160** 1:24 26:25
**16001** 3:4
**175** 11:23 12:3
**19stcv22296** 1:7 2:6
**1:00** 1:16 5:2
**1:000** 2:16
**1:37** 24:19

**2**

**2** 1:15
**200** 3:5
**2020** 1:16 2:16 5:1 13:2,13,21,25 14:3 25:15 26:20
**21628** 26:23
**23** 7:14

**3**

**34** 22:1

**4**

**4298274** 1:25

**5**

**5** 4:4
**55th** 3:9
**56** 5:8

**6**

**633** 3:8

**9**

**90071** 3:9
**91436** 3:5

**a**

**abikzer** 7:8,23 8:3 8:11,13,24 9:2 10:12 11:8,10,13 11:17,20
**abir** 3:3,4
**able** 15:4 18:2
**absurd** 19:20
**acceptable** 6:14
**account** 16:4
**accounting** 14:6 14:25 15:3 16:19 16:20,22 17:4,11 17:14,17,21 18:25 19:10,11
**accounts** 18:18,22 18:22,23,24 19:3
**additional** 5:25 11:19
**afforded** 24:10
**ago** 5:22 21:5
**agree** 7:2 14:22 17:10
**agreed** 24:15
**agreement** 8:2,17 8:20 10:23
**al** 1:8 2:7
**alexander** 1:24 2:17 26:4,24
**amount** 7:14,16,22
**amounts** 20:8
**angeles** 1:2 2:2 3:9 5:1 7:11 25:2 26:2
**answer** 16:5
**answered** 12:24
**anybody** 6:21 18:4 21:20

**anymore** 15:22
**anyway** 26:13
**apologize** 10:2
**appeal** 21:14
**appearances** 3:1
**appeared** 9:2
**approximately** 19:13 21:5
**asking** 13:25 15:11 19:4,5 20:5
**assets** 23:13,16
**assume** 11:18
**attack** 19:20
**attorney** 8:23 10:1 10:3,6,14 16:25
**attorney's** 7:23 11:3,15,16,20
**available** 14:23 16:20
**aware** 7:10,13

**b**

**back** 12:21 20:24 23:19
**baker** 3:7,8 12:24 15:10,13 20:5,8 23:24 24:8,15,17
**balance** 17:15 18:16
**bank** 17:22 18:2 18:16
**banks** 18:22
**bar** 22:23
**bc706830** 7:8
**beg** 13:20
**behalf** 2:15
**behave** 22:24
**belief** 7:1
**believe** 10:14 12:23 21:3,7,20 23:18

**best** 14:1 20:12
**big** 14:8
**bit** 17:9
**blvd** 3:4
**bob** 23:25
**boris** 3:3
**borrowed** 10:25
**borrowers** 11:7
**bought** 12:13
**break** 20:19
**brought** 8:5,22 9:20
**bunch** 14:12
**business** 15:8
**buy** 12:19

**c**

**ca** 3:5,9
**california** 1:1 2:1 5:1 25:1,11 26:1 26:16
**called** 15:20 22:1
**carmel** 11:24 12:4
**cars** 22:2,3,3
**case** 7:7,8,10,17,23 8:11,14,24 9:2,23 10:20 11:8,10,13 11:17,20 14:10
**cases** 6:19 7:2,5
**cash** 17:18
**categories** 22:1
**cause** 21:9
**ccrr** 1:24 26:25
**certainly** 15:21 18:3 21:6
**certificate** 16:14
**certified** 24:13 26:5
**certify** 26:5,11
**cetera** 22:25
**charge** 19:9,11

ACTS001246

[chatsworth - give]

chatsworth 8:24
check 8:2
chris 19:12
city 7:11
civil 21:18,21 24:5
clearly 6:21
clerk 5:8
client 8:3 10:23
  16:25 18:10 22:15
clients 7:3 8:19
  16:25 18:12,13,19
  19:1,6 21:8 23:1,8
  23:14
close 13:23
clue 10:21 14:4,14
code 23:23 24:5
cohen 3:3
commencing 2:16
company 15:20
  16:2
conclude 23:18
conducted 5:14
conference 2:15
  9:3,4
confidential 20:1
contained 25:13
continue 5:24 6:6
contributed 13:12
control 24:6
convenience 24:7
copy 24:13
correct 11:3 16:6
  16:8,19,21 17:3
  21:19 22:16 25:12
  26:17
costs 8:13 13:22
  15:16
counsel 8:5,6,8
  26:12
county 1:2 2:2
  25:2 26:2

couple 9:24 15:16
court 1:1 2:1
  21:11,13 23:19
  24:4
court's 21:14
  23:20
courthouse 8:25
crane 12:7,9,21
csr 1:24 2:17 26:4
  26:25
current 17:22 18:2
custodial 24:5
custody 24:6
cut 19:21

**d**

d 4:1
danny 3:4
date 21:3
dated 26:20
day 25:14
days 6:1
deal 19:22
debtor 5:15
debtor's 5:14
declaration 10:12
declare 25:10
  26:15
defendants 1:9 2:8
  3:7
department 5:8
  14:25 15:17 17:4
  17:11,15,18,22
  19:10,11
depends 17:6
depo 14:11
deposition 24:19
  25:10 26:7,8
different 17:9
difficult 6:5
direction 26:10

discussed 5:15
disparity 19:19
docket 8:24
document 6:18
  21:25
documents 5:16
  5:18,23 6:1,2,5
  14:19,22 15:1,4
duly 26:7
duty 24:5

**e**

e 4:1
electronic 16:17
encino 3:5
enforce 5:24 6:6
entirety 10:13
  11:3
entitled 7:16,22
  11:19 19:7
estimate 14:1
  20:12
et 1:8 2:7 22:25
ethical 23:10,12
eventually 9:8
exactly 22:24
exam 5:14
examination 1:15
  2:14 5:11,15,21
  8:17 21:18 24:7
  24:11,12
examined 5:9 26:6
exclusively 11:4
executed 25:14
expenses 13:10

**f**

fairly 7:15
familiar 7:7
fargo 16:1
february 13:2

fee 8:10
fees 7:23 8:8 11:4
  11:5,8,10,12,15,17
  11:20
fifth 3:8
file 8:1
filed 10:11
financial 18:7,15
  20:23 21:8
firm 9:16 21:8,20
five 12:5
floor 3:9
flows 17:19
follow 21:14
following 24:3
follows 5:9
foregoing 25:10
  25:12 26:7,16
form 18:10
fraud 22:13
fund 9:13 11:1
funds 19:7
further 26:11

**g**

gabriel 7:7
game 10:17
general 16:20
george 8:3
girardi 1:8,15 2:7
  2:14 4:3 5:6,13
  6:19 7:16,21,25
  8:3 9:10 10:9,18
  10:19,22,25 11:4
  13:13,17 14:2
  15:7,12 20:22
  21:23 22:8 24:8
  25:20
give 6:20,21,21,23
  14:1 17:7,22 18:2
  19:25 20:12 21:7

ACTS001247

**[go - okay]**

go  18:3 20:16
   23:19
going  14:9,14 17:6
   18:8,9,10,12 19:2
   19:17 21:13 22:23
   23:4,8
good  6:15,17
gouge  22:21
gouging  22:21
griffin  10:7,11

**h**

handle  11:21
harassed  14:9
harassment  24:4
harm  21:8
hear  5:19 21:22,23
hell  22:21
help  8:22 9:20,21
   15:9 20:3
helped  15:16
helping  18:11
hold  9:25 23:14
honest  23:10,12
house  11:23 12:3
   12:12,14,15,19,21
   12:23 13:2
hundred  13:24

**i**

idea  11:11,21 13:5
identify  15:13
imagine  19:18
   22:4
individually  9:10
insanity  17:8
insurance  22:2
integrity  6:25 7:1
   22:24
intend  23:1
intention  9:9 23:7

interest  22:21
interested  26:13
intervention  23:20
involve  16:25,25
involved  7:4 10:19
involvement  10:16
   10:18
issue  19:12

**j**

job  1:25
joko  1:24 2:17
   26:4,24
j█████  1:5 2:4
judgment  5:24 6:6
   22:16 23:2,14
jump  20:6

**k**

kamon  19:12
keener  3:7
keese  6:19 7:16,21
   7:25 8:4 9:10 10:9
   10:19,19,22,25
   11:4 13:13,17
   14:2 15:7,12
keith  10:6
know  7:9,15,18,21
   7:24,25 8:7,9,10
   8:12,13,18 9:6,14
   9:15,16,18 10:1,4
   10:6,22,24 11:12
   11:16,18,19 12:2,3
   12:5,6,7,9,11,18
   12:20,20,22,25
   13:3,22 14:5,9,24
   15:8,15,18,21,23
   16:3,4,6,9,10,11
   16:13,17 17:13,14
   17:16,17 18:1,17
   19:7 20:8,14,15
   22:6,8

**l**

lack  7:1
laid  14:10
lane  11:23 12:3
large  7:15
late  10:17
law  21:8,20 26:16
laws  25:11
lawyer  12:10
lawyers  8:22 11:5
leased  22:4
ledger  18:25 19:5
left  16:1
lend  15:6
lender  11:1
lenders  11:7 15:6
   15:11,16 19:14,16
   20:9,14
liens  11:6,14
listed  5:16 8:23
   10:2 12:11
lists  6:18
litigation  11:1
   18:12
little  17:9
llp  3:3,7
long  9:23 10:19
   13:23
looking  15:10
los  1:2 2:2 3:9 5:1
   7:11 25:2 26:2
loss  17:5,12
lot  22:20
luck  6:17

**m**

maintain  18:18
   24:6
maintaining  19:9
maintains  18:25

matter  9:17,20
mean  18:21
million  7:14 13:18
   13:24 22:16 23:2
money  7:22 9:10
   10:25 13:4,6,8,9
   13:13,22 14:2,3
   15:6 19:13 22:20
months  9:6,24
morning  6:8

**n**

n  4:1
nahra  3:7
name  7:9 10:1,6
   12:4 16:3
named  26:7,9
names  15:18
necessarily  7:4
necessary  5:23
needed  5:25
needs  24:8
neither  26:11
never  21:7
nevertheless  23:1
number  7:8 17:24

**o**

object  22:10
objecting  22:11
objection  22:6,9
objections  22:12
obligation  7:3
obtain  6:1
obviously  17:7
october  1:16 2:16
   5:1 26:20
offer  6:8,13
oh  6:20 13:14 18:3
okay  6:15,18 9:4
   9:19,25 21:24,25

Page 3

ACTS001248

[open - separate]

open   17:1
orap   23:19
order   5:23 6:1
   21:14 24:8
ordered   21:13
orders   21:12
original   24:6,10
   24:11,14
outcome   26:13
owe   8:8,10 19:14
   19:15
owed   9:10 20:9
owned   12:20
owner   12:11

**p**

p.m.   1:16 2:16 5:2
   24:19
page   4:3
paid   23:9
paper   16:17
pardon   13:20
part   9:23 10:9
   12:20
particular   10:23
   19:12
party   26:12
pay   23:1
payable   11:4
payment   13:17
penalty   24:9 25:10
   26:15
people   22:24
perjury   24:9
   25:11 26:15
person   19:24
personal   13:12
   14:2 18:8,15,16
phil   15:9 20:3,7
   23:22
phillip   3:8

place   9:5 26:9
placed   9:11,12
plaintiff   1:6 2:5,15
   3:3 10:3
please   15:14
portion   9:9
position   18:6
positive   11:14
possess   23:13
power   23:8
prepare   15:1,4
   17:4,12,15,18
prepared   5:18 6:2
   14:19
presented   6:13
presently   6:19
   12:1,23 16:7
   22:11 23:13
previously   5:7,14
prior   14:7 26:6
private   16:22 17:8
privilege   17:1
problem   19:22
procedure   24:5
proceed   6:16
proceedings   20:19
   26:13
proceeds   7:2
produce   5:22 18:7
   18:8,9,11 20:23
   21:19 22:1
produced   8:16
production   21:25
profit   17:4,12
propose   24:2
protect   18:12
provide   21:12
providing   5:16
pull   8:1
purpose   24:13

put   13:17,23 14:2
putting   13:22

**q**

qsf   9:11
qualified   9:13
question   14:8 17:9
   17:10
questions   14:12,18
quitclaim   12:21

**r**

reached   9:7
read   21:24 25:9
readily   14:23
really   15:19
reason   8:16 14:7
   14:18
recall   16:16,18
   21:6
receive   7:17,22
   11:8,10 13:10
received   7:21
   11:12,16 13:8
receiving   13:9
recollection   13:9
record   8:23 12:11
   20:16
records   16:19,20
   16:22 18:7,9,9,11
   18:15 20:23 21:8
   21:12,19 22:1
referral   8:8,10
refuse   18:6
rejected   6:9
related   26:12
relieved   24:4
repeat   5:20
repligen   15:20
   16:7,12,15
reported   1:24

reporter   24:4 26:5
represent   8:19
   10:11
representation
   10:13 20:24
represented   10:12
requested   5:22
requesting   14:23
restrictions   16:11
retainer   8:17,19
   10:22
review   24:8
richard   12:7,9
rid   19:22
right   6:10,12
   14:14,20 21:12
   22:2 23:21
rudeness   19:19
r█████   1:5 2:4

**s**

salary   13:16
salo   3:3
satisfy   7:3 23:14
saying   10:12
says   23:25
second   5:13 9:25
   20:17
secured   15:6
   20:14
see   7:6,20 8:1,2
   11:22 13:11 14:16
   14:21 15:3 18:14
   20:2 21:10,16
   22:14 23:6,17
seek   23:20
seen   16:14
sell   13:2
selling   16:12
sent   8:2
separate   18:18,25
   19:5

Page 4

ACTS001249

[served - zoom]

served  21:18 22:6
   22:8
session  5:13,21
   20:22
settle  14:10
settled  7:11
settlement  7:13
   9:3,4,7,13,21
shape  18:10
shares  16:6,12
sheet  17:15 18:16
shorthand  26:5,9
show  17:7
showing  19:18,19
sign  24:9
signature  26:23
sir  6:4,11,13,18
   7:7 8:23 10:1
   11:23 13:12 15:6
   17:9 21:11 22:15
   23:1,13
six  9:6
sonoma  11:23
   12:3
sorry  21:3,22
specific  19:4
spent  13:10
ss  25:1
started  16:2
state  1:1 2:1 25:1
   25:11 26:1,16
stated  14:17
statement  17:5,12
   17:18
statements  17:22
   18:2,16
stip  23:22,24
stipulation  24:3
stock  15:20 16:14
stockbroker  15:24
   15:25

street  3:8
stuff  6:10 19:8
stupid  14:12
stupidity  14:17
subpoena  5:17
   21:18,25
sufficient  23:14
suite  3:5
superior  1:1 2:1
suppose  8:1 14:6
   19:12
sure  5:20 6:20
   10:8 13:10,14
   23:8
suspend  23:19
sworn  5:7 26:7
system  19:6,9
systems  18:25

**t**

t  1:24 2:17 26:4,24
take  6:9 9:4 13:16
   14:11,12
taken  2:14 26:8
talk  19:17
talking  11:15
   23:16
tasked  17:21
tell  19:2,13,21
telling  10:16
testified  5:9
testimony  25:13
thank  24:16,17
thereof  26:14
think  7:18 9:8
   11:2,6,25 12:13,24
   13:17,23 14:8
   18:3 23:4
thomas  1:8,15 2:7
   2:14 4:3 5:6 25:20
time  5:25 13:23
   14:8,12 26:9

today  6:2 8:17
   14:7,19
today's  23:19 24:7
   24:11,12
told  14:10 23:4
tom  15:13 20:8
transcribed  26:10
transcript  24:6,9
   24:10,12 25:12
treyzon  3:3,3 4:4
   5:12 13:1 15:9,11
   15:17 20:3,5,11,16
   20:21 23:18 24:2
   24:16
trial  22:23
tried  19:21
true  10:15 25:12
   26:17
trust  6:24 17:7
   18:18,21,22,23,24
   19:2
trusts  18:20,21
try  19:21
trying  22:5
tuesday  1:16 2:16
   5:1
two  5:22 18:20,21
   18:22,23 21:5

**u**

unable  6:5
unavailable  24:12
undersigned  25:9
understand  6:4
   8:25 16:23 17:2
   21:11,17 22:15,18
   23:11
unsigned  24:13
use  23:25

**v**

v  1:7,8,15 2:6,7,14
   4:3 5:6
various  19:14,16
   20:9
ventura  3:4
video  2:15
volume  1:15

**w**

want  6:10 14:11
   15:9 20:3 22:2
   23:22
wants  20:5
way  14:9,15 18:10
   19:25 22:24
weeks  5:22 21:5
wells  16:1
west  3:8
witness  12:25
   15:15 20:4,10
   26:6
world  19:25
wrong  10:14

**x**

x  4:1

**y**

yeah  10:10 12:10
   12:13,25 16:8
   19:7,8 22:10
year  13:19
years  12:6

**z**

zoom  2:15

# EXHIBIT 25
## Digital Recording

# EXHIBIT 26

Digital Recording

EXHIBIT 27





**The Clinical Neuropsychologist**

ISSN: 1385-4046 (Print) 1744-4144 (Online) Journal homepage: https://www.tandfonline.com/loi/ntcn20

# A systematic review and meta-analysis of the Test of Memory Malingering  in adults: Two decades of deception detection

Phillip K. Martin, Ryan W. Schroeder, Daniel H. Olsen, Halley Maloy, Anneliese Boettcher, Nathan Ernst & Hayrettin Okut

**To cite this article:** Phillip K. Martin, Ryan W. Schroeder, Daniel H. Olsen, Halley Maloy, Anneliese Boettcher, Nathan Ernst & Hayrettin Okut (2020) A systematic review and meta-analysis of the Test of Memory Malingering  in adults: Two decades of deception detection, The Clinical Neuropsychologist, 34:1, 88-119, DOI: 10.1080/13854046.2019.1637027

**To link to this article:** https://doi.org/10.1080/13854046.2019.1637027

🗓 Published online: 30 Jul 2019.

✎ Submit your article to this journal 🗗

📊 Article views: 548

🔍 View related articles 🗗

◉ View Crossmark data 🗗

⧉ Citing articles: 6 View citing articles 🗗

Full Terms & Conditions of access and use can be found at
https://www.tandfonline.com/action/journalInformation?journalCode=ntcn20

THE CLINICAL NEUROPSYCHOLOGIST
2020, VOL. 34, NO. 1, 88–119
https://doi.org/10.1080/13854046.2019.1637027





# A systematic review and meta-analysis of the Test of Memory Malingering in adults: Two decades of deception detection

Phillip K. Martin[a], Ryan W. Schroeder[a], Daniel H. Olsen[b], Halley Maloy[b], Anneliese Boettcher[c], Nathan Ernst[d] and Hayrettin Okut[b]

[a]Department of Psychiatry and Behavioral Sciences, University of Kansas School of Medicine –Wichita, Wichita, KS, USA; [b]University of Kansas School of Medicine – Wichita, Wichita, KS, USA; [c]Ochsner Health System, New Orleans, LA, USA; [d]University of Pittsburgh Medical Center, Pittsburgh, PA, USA

**ABSTRACT**

**Objective:** The present study, adhering to Preferred Reporting Items for Systematic review and Meta-Analyses (PRISMA) guidelines, is the first systematic review and meta-analysis of the Test of Memory Malingering (TOMM) to examine traditional and alternative cutoffs across Trial 1, Trial 2, and Retention.

**Method:** Search criteria identified 539 articles published from 1997 to 2017. After application of selection criteria, 60 articles were retained for meta-analysis. Classification accuracy statistics were calculated using fixed- and random-effects models.

**Results:** For Trial 1, a cutoff of $<42$ was found to result in the highest sensitivity value (0.59–0.70) when maintaining specificity at $\geq 0.90$. Traditional cutoffs for Trial 2 and Retention were highly specific (0.96–0.98) and moderately sensitive (0.46–0.56) when considering all available studies and only neurocognitive/psychiatric samples classified by known-groups design. For both trials, a modified cutoff of $<49$ allowed for improved sensitivity (0.59–0.70) while maintaining adequate specificity (0.91–0.97). A supplementary review revealed that traditional TOMM cutoffs produced $>0.90$ specificity across most samples of examinees for whom English is not the primary language, but well-below acceptable levels in individuals with dementia.

**Conclusions:** The TOMM is highly specific when interpreted per traditional cutoffs. In individuals not suspected of significant impairment, findings indicate that a less conservative TOMM Trial 2 or Retention cutoff of $<49$ can be interpreted as invalid, especially in settings associated with higher base rates of invalidity and, thus, higher positive predictive power. A cutoff of $<42$ on Trial 1 can also be interpreted as invalid in most settings.

**ARTICLE HISTORY**
Received 11 February 2019
Accepted 21 June 2019
Published online 30 July 2019

**KEYWORDS**
Test of Memory Malingering; TOMM; systematic review; meta-analysis

CONTACT Phillip K. Martin ✉ pmartin4@kumc.edu 🖂 Department of Psychiatry and Behavioral Sciences, University of Kansas School of Medicine – Wichita, Wichita, KS 67214-3199, USA

© 2019 Informa UK Limited, trading as Taylor & Francis Group

## Introduction

Performance validity test (PVT) research has rapidly and substantially developed over the past two and a half decades (Martin, Schroeder, & Odland, 2015). As a result, it is now well recognized that PVTs are essential to neuropsychological evaluations (Bush et al., 2005; Heilbronner et al., 2009; Institute of Medicine, 2015; Martin et al., 2015; Schroeder, Martin, & Odland, 2016). The Test of Memory Malingering (TOMM), a stand-alone PVT published in 1996, has become the most commonly utilized test of its kind, with nearly 80% of surveyed neuropsychologists purporting to use it frequently (Martin et al., 2015).

An appealing aspect of the TOMM is its large and diverse research base, which contains studies spanning a range of populations, settings, and research methods, as well as investigations of both traditional and newly devised TOMM indices. While these studies have been essential in validating the utility of the TOMM, the vast majority of the TOMM literature base is comprised of single-sample primary studies. Given that primary studies often involve small sample sizes, utilize varying methodologies, and can be influenced by sample-specific factors, primary studies cannot represent the total body of evidence on a topic (Guyatt, Rennie, Meade, & Cook, 2015). Consequently, evidence-based medicine (EBM) guidelines often afford greater levels of confidence to articles combining data from multiple studies, especially when such studies are systematically collected (i.e. systematic review) and/or when the data are statistically aggregated (i.e. meta-analysis; Chelune, 2017; Guyatt et al., 2015; Miller, 2017).

A small proportion of the primary studies on the TOMM have been previously subjected to a meta-analysis within the context of a broad study on performance validity testing (Sollman & Berry, 2011). In the meta-analysis, Sollman and Berry included 21 articles related to the TOMM, which were published either in professional journals or as student theses/dissertations. The samples included participants subjected to control simulator designs as well as participants whose validity status was determined according to known-groups designs. Study effect sizes were noted to vary significantly as a factor of research design, and simulator studies involving patients yielded significantly higher effect sizes than known-groups studies involving patients. Nonetheless, all studies were aggregated, and it was found that a TOMM Trial 2 score of <45 resulted in sensitivity of 0.65 and specificity of 0.94.

Sollman and Berry (2011) provided valuable data on PVT accuracy, overall, and TOMM Trial 2 performance, specifically. At the same time, the study did not document Trial 2 classification accuracy data when solely utilized within the context of clinical patients, and the authors refrained from examining classification accuracy of the Retention trial. Additionally, the study did not provide data on previously proposed alternative TOMM cutoffs (e.g. Greve et al., 2006a) or findings for several alternative TOMM indicators that have since been subject to empirical research. Alternative indicators include Trial 1 performance, the Albany Inconsistency Index (ACI; Gunner, Miele, Lynch, & McCaffrey, 2012), the Invalid Forgetting Frequency Index (IFFI; Buddin et al., 2014), and errors on the first 10 items of Trial 1 (TOMMe10; Denning, 2012). While the literature concerning ACI, IFFI, and TOMMe10 is still accumulating, a number of primary studies have investigated the classification accuracy of TOMM Trial 1.

Regarding Trial 1 performance, Denning (2012) reviewed 18 studies, comprised of 24 samples. Given the lack of an established recommended interpretive cutoff, Trial 1 classification accuracy data were reported according to a wide range of possible cutoffs (i.e. 34 to 44), which prohibited the aggregation of data at any specific cutoff individually. To reconcile this issue, Denning averaged both the cutoff points and accuracy statistics, reporting weighted mean sensitivity and specificity values of 0.77 and 0.92, respectively, at an averaged cutoff value of $<41$. While the study contributed notably to the literature by demonstrating the utility of Trial 1 as a PVT, determination of an "optimal" cutoff and its resultant classification accuracy is limited given that the data were averaged across multiple and widely ranging cutoff values.

The purpose of the current study was to systematically review the published TOMM literature for classification accuracy data on Trial 1, Trial 2, Retention, and combined Trial 2 and Retention to provide examiners administrating the TOMM guidance in its interpretation. In line with this objective, the current study was conducted with several goals in mind. First, given that previous efforts to aggregate Trial 1 data (Denning, 2012) were conducted using averaged scores across various cutoff points, the current study sought to examine classification accuracy data individually at each Trial 1 cutoff to best determine a clinically appropriate cutoff. Second, the study sought to update Trial 2 aggregated classification accuracy data reported by Sollman and Berry (2011) by analyzing a literature base that has since expanded considerably. Third, the study sought to aggregate classification accuracy data from studies examining the Retention trial, individually, and Trial 2 and Retention, collectively; as such data have not yet been subject to meta-analysis. Fourth, in addition to examining Trial 2 and Retention classification accuracy at traditionally recommended cutoff points, the current study sought to examine specificity and sensitivity at alternative cutoffs to determine whether less conservative cutoffs might be appropriately applied in clinical practice. Fifth, given the potential that classification accuracy might differ according to study design (e.g. simulator/control versus known groups design) and/or diagnostic population, the current study sought to examine TOMM performance across discrete subgroups of examinees. Finally, given that prior literature has recommended caution in interpreting TOMM performance in individuals evaluated for dementia and for whom English is not the primary language (Teichner & Wagner, 2004; Nijdam-Jones, Rivera, Rosenfeld, & Arango-Lasprilla, 2017), a review of test accuracy in these populations is also reported.

## Method

Study methodology was designed and executed to adhere to Preferred Reporting Items for Systematic review and Meta-Analyses (PRISMA) guidelines. This study was not registered and is not an update to a prior systematic review or meta-analysis of the TOMM. Eligibility criteria were established a priori. Studies allowing for the examination of classification accuracy of the TOMM, either in the form of sensitivity/specificity data or frequencies of individuals failing or passing the TOMM, were initially included. Studies were then excluded if they 1) were not published in a peer-reviewed journal, 2) examined only pediatric samples, 3) classified the validity status of clinical or

forensic examinees solely based on the presence or absence of external incentive, or 4) examined clinical or forensic patients and did not provide criteria for determining valid performance external to the TOMM (e.g. Slick, Sherman, and Iverson's (1999) criteria, additional PVTs, known groups, expert consensus).

Studies were excluded for lack of validity status criterion external to the TOMM given that such studies do not provide an accurate means for calculating sensitivity or specificity. Studies falling into this category include those utilizing differential prevalence designs, which seek to examine the prevalence of a phenomenon (e.g. failing the TOMM) without interpreting the meaning of the phenomenon (e.g. true invalid performance) by comparing its occurrence to that of an external indicator. Without comparing TOMM performance to an external criterion, it would be unknown if failing or passing the TOMM occurred in the context of valid or invalid performance given the likely mixed validity status of the sample. Such an approach would be expected to increase false positive and negative rates, diluting the reported sensitivity and specificity values below their true levels.

To eliminate redundancy within included studies, samples were excluded if they overlapped with other included samples, as indicated by the respective study authors. Samples comprised of individuals with dementia were excluded from primary analyses, given that PVT specificity and cutoff values identified in non-dementia samples typically do not generalize to individuals with dementia (Boone, 2018; Dean, Victor, Boone, Philpott, & Hess, 2009; McGuire, Crawford, & Evans, 2019; Schroeder, Twumasi-Ankrah, Baade, & Marshall, 2012). Additionally, samples comprised of individuals for whom English is not the primary language were excluded from primary analyses, as some authors have expressed concern regarding application of traditional TOMM cutoffs across languages and cultures (Nijdam-Jones et al., 2017). Given that both samples of individuals with dementia and samples of individuals for whom English is not the primary language might be expected to vary from samples that are English speaking and absent of dementia, and given that significant heterogeneity can obscure interpretation of aggregated findings, these samples were excluded from meta-analysis. As findings in individuals with dementia and across language and culture are of both interest and importance, however, they were included in a supplementary review. Of note, unlike studies retained for meta-analysis, studies involving participants with dementia and for whom English is the second language were not excluded on the basis of absence of an external criterion, given that the vast majority of these studies lacked such methods for classifying participants.

Sample population was not used as an original selection criterion; Clinical, forensic, and research samples of both adults and children were included in the initial search. A search of both PsycINFO (EBSCO) and PubMED was conducted in January 2018, limited by including only peer-reviewed journal articles published from 1997 (corresponding to the first peer-reviewed journal article pertaining to the TOMM) through 2017 (final year prior to the search). Of note, in using these restrictions, some articles published in 2018 were also identified due to an ahead of print, online publication year of 2017 (only one such article met all other selection criteria and was therefore included in the study results). PsychINFO search criteria were: [(Title) "test of memory malingering" OR (Abstract) "test of memory malingering" OR (Keyword) "test of memory malingering" OR (Title) "TOMM" OR (Abstract) "TOMM" OR (Keyword) "TOMM"].

The titles and abstracts of studies identified by the initial search were screened by current authors PM and HM, and articles not related to the TOMM (e.g. articles addressing the gene, TOMM40) and articles not written in English were excluded. Full-text copies of the articles were then distributed across the following dyads within the authorship group: HM/PM, AB/PM, DO/PM, and NE/RS. Both members of the dyad reviewed articles, and those articles not meeting eligibility criteria were excluded from further analyses. Classification accuracy data (i.e. sensitivity, specificity, false positives, false negatives, true positives, and true negatives), sample characteristics, and comparison methods used as external criterion (e.g. simulator vs. control) were extracted by one member of the dyad and confirmed by the other member. Additional verification of data extraction accuracy was then completed: RS re-examined the data extracted by dyads including PM, and PM re-examined the data extracted by dyads including RS. In the event of a discrepancy, the data were coded separately and the discrepancy rectified via discussion of the authors.

Risk of bias in individual studies was analyzed independently by PM and RS by examining the methodological practices and outcomes of individual studies. Studies with unclear criteria for classifying validity status were excluded, as were three simulator/control samples in which uncharacteristic manipulations to the study design appeared to substantially influence results. Specifically, Barhon, Batchelor, Meares, Chekaluk, and Shores (2015) and Etherton, Bianchini, Greve, and Ciota (2005) both exposed controls to distractors to suppress performance and Schenk and Sullivan (2010) threatened real-world consequences to simulators if their invalid performances were detected.

Data synthesis was completed using both fixed- and random-effects models derived from TOMM pass/fail frequency counts. For some articles, only sensitivity and specificity values were provided. In these cases, true positives were calculated by multiplying sensitivity by the number of individuals in the invalid group and true negatives were calculated by multiplying specificity by the number of individuals in the valid group. False negatives were then calculated by subtracting true positives from the invalid sample size, and false positives were calculated by subtracting true negatives from the valid sample size. Any non-integers were rounded to the nearest whole number, with 0.5 being rounded up.

Fixed-effects model analyses were conducted by summing frequency counts across samples for a given trial to calculate weighted mean values for specificity ((total true negatives/(total true negatives + total false positives)) and sensitivity ((total true positives/(total true positives + total false negatives)). Random-effects meta-analyses using a restricted maximum-likelihood method were conducted to include within-studies and between-studies sources of variation for point and interval estimates (Takwoingi et al., 2017; Lee, Kim, Choi, Huh, & Park, 2015). As specificity and sensitivity values are proportions, they were subjected to meta-analysis after a logit transformation. In comparison with the fixed-effects model, the random-effects model estimates the mean of a distribution of true effects. Large studies may yield more precise estimates than small studies, but each study estimates a different effect size, and each of these effect sizes serves as a sample from the population whose mean is being estimated. Therefore, as compared with the fixed-effects model, the weights assigned under a

random-effects model are more balanced, allowing the overall result to be less biased by the sample size of an individual study (Lee et al., 2015). Despite the benefits of random-effects models, there were several instances where too few samples were available to appropriately run such analyses (i.e. $k < 5$; Jackson & Turner, 2017). Therefore, fixed-effects models were conducted in addition to random-effects models to allow for a wider variety of analyses. Inclusion of such data also allows for more direct comparison to studies within this paradigm that reported data from fixed-effects models (e.g. Denning, 2012).

TOMM data were grouped according to TOMM trial. Meta-analyses were conducted for Trial 1, Trial 2, and Retention, across both standard and alternative cutoffs, as well as for the TOMM when considering performance on Trial 2 ($<45$) and Retention ($<45$) collectively (i.e. failure on either trial constitutes an invalid performance). For each cutoff, meta-analyses were conducted using both fixed-effects and random-effects models by compiling all eligible samples. Cochran's Q statistic was used as a measure of heterogeneity, which is calculated as the weighted sum-of-squared differences between individual study effects and the pooled effect across studies. Given the number of analyses, results were considered significant at $p < .01$.

Given the possibility of heterogeneity, subgroup analyses were also conducted. Fixed-effects and random-effects meta-analyses were conducted for those samples comprised only of actual examinees evaluated for neurocognitive or psychiatric disorders, thus excluding simulator/control studies and samples of patients evaluated for chronic pain. Simulator/control and chronic pain groups were analyzed by fixed-effects models only, as there was an insufficient number of samples to conduct random-effects model analyses in many cases. Positive predictive power (PPP) and negative predictive power (NPP) were calculated across invalidity base rates ranging from 10% to 50% for both standard and alternative cutoffs. Finally, data from studies examining TOMM performance in patients with dementia and English as a second language were described.

## Results

### Study selection

Figure 1 details results from study selection and screening, including the number of studies excluded at each step of the screening process. Five-hundred and thirty-nine studies were initially identified. After applying selection criteria, 60 studies were eventually retained for meta-analysis. Eleven additional studies, comprised of individuals with dementia or individuals for whom English was not the primary language, were excluded from meta-analysis but retained for the systematic review. Of note, multiple samples were often reported within the individual studies. For some studies, all individual samples met inclusion/exclusion criteria; yet, for other studies, some samples met selection criteria and were included, while other samples did not meet criteria and were excluded. Specifically, samples that were excluded were done so because they reported participants utilized in other included samples, were absent of validity status criterion external to the TOMM, or were comprised of participants with dementia.



**Figure 1.** Article selection.

### *Trial 1*

Twenty articles meeting inclusion criteria provided data regarding specificity of Trial 1, with data reported across 24 samples. Specificity and sensitivity data were reported across multiple cutoff values for all but five samples and are noted in Tables 1 and 2. As noted in Table 1, Trial 1 produced a weighted mean specificity value of $\geq 0.90$ at $<44$, largely due to the high specificity (i.e. 0.98) of healthy controls at this cutoff. Weighted mean specificity of $\geq 0.90$ was first achieved across the neurocognitive and psychiatric group at a cutoff of $<43$, although five of nine samples with data at this cutoff yielded specificity values $<0.90$. Similarly, random-effects model estimates of Trial 1 specificity fell below 0.90 at this cutoff. By contrast, using a cutoff of $<42$ resulted in specificity of 0.91 in the neurocognitive and psychiatric group whether

Table 1. TOMM Trial 1 specificity at multiple cutoffs.

| Study | Validity Classification | Sample | n | <46 | <45 | <44 | <43 | <42 | <41 |
|---|---|---|---|---|---|---|---|---|---|
| Tombaugh (1997) | Controls | Community Dwelling Volunteers | 70 | 0.87 | 0.92 | – | – | – | – |
| Ashendorf, Constantinou, and McCaffrey (2004) | Research volunteers | Depressed Older Adults | 31 | 0.97 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 |
| Ashendorf et al. (2004) | Controls | Community Dwelling Older Adults | 166 | 0.95 | 0.97 | 0.98 | 0.99 | 0.99 | 0.99 |
| Yanez et al. (2006) | Research volunteers | Severe Depression | 20 | 0.60 | 0.70 | – | – | – | – |
| Yanez et al. (2006) | Controls | Community Research Volunteers | 20 | 0.80 | 0.85 | – | – | – | – |
| Greve et al. (2006a) | Slick Criteria | Toxic Exposure | 17 | 0.88 | 0.88 | 0.88 | 0.94 | 0.94 | 0.94 |
| Greve et al. (2006b) | Slick Criteria | TBI – Moderate/Severe | 30 | 0.79 | 0.82 | 0.85 | 0.88 | 0.88 | 0.88 |
| Greve et al. (2006b) | Slick Criteria | TBI – Mild | 46 | 0.85 | 0.87 | 0.91 | 0.93 | 0.93 | 0.93 |
| O'Bryant, Engel, Kleiner, Vasterling, and Black (2007) | Slick Criteria | Mixed Clinical and Forensic | 186 | 0.83 | 0.86 | 0.88 | 0.88 | 0.90 | 0.91 |
| O'Bryant et al. (2008) | Controls | Community Older Adult Volunteers | 306 | – | 0.96 | 0.98 | 0.99 | 0.99 | 0.99 |
| Greve, Etherton, Ord, Bianchini, and Curtis (2009) | Slick Criteria | Chronic Pain Patients | 118 | 0.81 | 0.87 | 0.91 | 0.95 | 0.96 | 0.99 |
| Sollman, Ranseen, and Berry (2010) | Research volunteers | ADHD | 29 | – | 0.83 | – | – | – | – |
| Ryan, Glass, Hinds, and Brown (2010) | Controls | Undergraduate Students | 36 | – | – | 1.00 | 1.00 | 1.00 | 1.00 |
| Ryan et al. (2010) | Controls | Students – BNT before TOMM | 36 | – | – | – | – | – | 1.00 |
| Deming (2012) | Single PVT | Mixed Veterans | 331 | 0.77 | 0.82 | 0.85 | 0.88 | 0.91 | 0.94 |
| Schroeder et al. (2013) | Slick Criteria | Mixed Clinical | 36 | 0.75 | 0.78 | 0.86 | 0.89 | 0.89 | 0.89 |
| Jones (2013) | Slick Criteria | Mixed Military | 45 | – | 0.93 | 0.96 | 0.98 | 0.98 | 1.00 |
| Kulas, Axelrod, and Rinaldi (2014) | Multiple PVTs | Mixed Clinical | 52 | 0.87 | 0.89 | 0.89 | 0.89 | 0.92 | 0.92 |
| Deming (2014) | Single PVT | Mixed Veterans | 100 | – | – | – | – | – | 0.92 |
| Smith et al. (2014) | Slick Criteria | IQ Score ≤ 75 | 55 | – | – | – | – | – | 0.92 |
| Fazio, Denning, and Denney (2017) | Multiple PVTs | Criminal Forensic | 34 | – | – | – | – | – | – |
| Bain and Soble (2017) | Single PVT | Mixed Veterans | 58 | 0.94 | – | 0.88 | – | 0.91 | 0.94 |
| An, Kaploun, Erdodi, and Abeare (2017) | Controls | Undergraduate Students | 120 | – | 0.95 | – | – | – | – |
| Bailey, Soble, and O'Rourke (2018) | Single PVT | Mixed Veterans | 44 | – | 0.98 | – | – | – | – |

Table 1. Cont. TOMM Trial 1 specificity at multiple cutoffs

| Study | Validity Classification | Sample | Sample Size | <46 | <45 | <44 | <43 | <42 | <41 |
|---|---|---|---|---|---|---|---|---|---|
| All Samples | | Patient Sample | – | 0.83 | 0.89 | 0.92 | 0.93 | 0.95 | 0.96 |
| Neuro/Psychiatric | | – | – | 0.81 | 0.85 | 0.88 | 0.90 | 0.91 | 0.93 |
| Pain Conditions | | – | – | 0.81 | 0.87 | 0.91 | 0.95 | 0.96 | 0.99 |
| Healthy Control Studies | | – | – | 0.92 | 0.95 | 0.98 | 0.99 | 0.99 | 0.99 |

Note: Slick Criteria = Slick et al. (1999) criteria for malingering; BNT = Boston Naming Test; PVT = performance validity test; TBI = traumatic brain injury; Neuro/Psychiatric = samples comprised of actual examinees evaluated for a neurocognitive or psychiatric disorder; All aggregated specificity rates are calculated based on weighted average specificity values.

**Table 2.** TOMM Trial 1 sensitivity at multiple cutoffs.

| Study | Validity Classification | Sample | n | <46 | <45 | <44 | <43 | <42 | <41 |
|---|---|---|---|---|---|---|---|---|---|
| Etherton et al. (2005) | Simulator Pain | Undergraduate Students | 20 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 |
| Heinze and Purisch (2001) | Expert opinion | Criminal Forensic | 57 | – | 0.76 | – | – | – | – |
| Greve et al. (2006a) | Slick Criteria | Toxic Exposure | 33 | 0.76 | 0.70 | 0.64 | 0.64 | 0.55 | 0.52 |
| Greve et al. (2006b) | Slick Criteria | TBI – Mild | 30 | 0.83 | 0.73 | 0.73 | 0.73 | 0.67 | 0.60 |
| Greve et al. (2006b) | Slick Criteria | TBI – Moderate/Severe | 11 | 0.82 | 0.73 | 0.73 | 0.46 | 0.46 | 0.46 |
| O'Bryant et al. (2007) | Slick Criteria | Mixed Clinical/Forensic | 53 | 0.89 | 0.87 | 0.85 | 0.81 | 0.79 | 0.76 |
| Greve et al. (2009) | Slick Criteria | Chronic Pain | 216 | 0.82 | 0.56 | 0.56 | 0.53 | 0.51 | 0.49 |
| Sollman, Ranseen, and Berry (2010) | Simulators | ADHD Simulation | 30 | – | 0.87 | – | – | – | – |
| Denming (2012) | Single PVT | Mixed Veterans | 166 | 0.88 | 0.85 | 0.84 | 0.79 | 0.76 | 0.72 |
| Schroeder et al. (2013) | Slick Criteria | Mixed Forensic | 26 | 0.85 | 0.73 | 0.73 | 0.65 | 0.54 | 0.54 |
| Jones (2013) | Slick Criteria | Mixed Military | 132 | – | 0.71 | 0.69 | 0.66 | 0.63 | 0.58 |
| Kulas et al. (2014) | Multiple PVTs | Mixed Clinical | 12 | 0.67 | 0.67 | 0.67 | 0.67 | 0.67 | 0.67 |
| Denming (2014) | Single PVT | Mixed Veterans | 51 | – | – | – | – | – | 0.77 |
| Bain and Soble (2017) | Single PVT | Mixed Veterans | 32 | – | 0.85 | – | 0.81 | – | – |
| Fazio et al. (2017) | Multiple PVTs | Criminal Forensic | 62 | – | – | – | – | – | – |
| Bailey et al. (2018) | Single PVT | Mixed Veterans | 18 | – | 0.50 | – | – | 0.73 | 0.71 |
| All Samples | – | – | | 0.85 | 0.73 | 0.71 | 0.68 | 0.65 | 0.62 |
| Neuro/Psychiatric | – | – | | 0.85 | 0.77 | 0.76 | 0.73 | 0.69 | 0.66 |
| Pain Conditions | – | – | | 0.82 | 0.56 | 0.56 | 0.53 | 0.51 | 0.49 |
| Simulator Studies | – | – | | 1.00 | 0.92 | 1.00 | 1.00 | 1.00 | 1.00 |

Note: Slick Criteria = Slick et al. (1999) criteria for malingering; PVT = performance validity test; TBI = traumatic brain injury; Clinical/Forensic = clinical and forensic patients; Neuro/Psychiatric = samples comprised of actual examinees evaluated for a neurocognitive or psychiatric disorder; all aggregated sensitivity rates are calculated based on weighted average sensitivity values.

**Table 3.** TOMM specificity by weighted mean and random-effects model.

| | | | | Specificity | Heterogeneity |
|---|---|---|---|---|---|
| | | Samples (k) | *n* | WM | REM (95% CI) | Cochrane's Q |
| T1 < 41 | | | | | | |
| | All samples | 17 | 1625 | 0.96 | 0.95 (0.92–0.97) | 33.1* |
| | Neuro/Psychiatric | 12 | 963 | 0.93 | 0.93 (0.91–0.94) | 7.4 |
| T1 < 42 | | | | | | |
| | All samples | 15 | 1470 | 0.95 | 0.95 (0.92–0.97) | 33.4* |
| | Neuro/Psychiatric | 10 | 808 | 0.91 | 0.91 (0.89–0.93) | 5.6 |
| T2 < 45 | | | | | | |
| | All samples | 53 | 3179 | 0.98 | 0.97 (0.96–0.98) | 74.7 |
| | Neuro/Psychiatric | 29 | 1745 | 0.97 | 0.96 (0.94–0.97) | 46.5 |
| T2 < 49 | | | | | | |
| | All samples | 21 | 1010 | 0.97 | 0.96 (0.93–0.98) | 43.9* |
| | Neuro/Psychiatric | 13 | 450 | 0.95 | 0.94 (0.89–0.97) | 25.4 |
| Retention < 45 | | | | | | |
| | All samples | 33 | 1195 | 0.99 | 0.97 (0.96–0.98) | 14.2 |
| | Neuro/Psychiatric | 16 | 504 | 0.98 | 0.96 (0.94–0.98) | 5.3 |
| Retention < 49 | | | | | | |
| | All samples | 13 | 586 | 0.95 | 0.93 (0.93–0.96) | 18.3 |
| | Neuro/Psychiatric | 9 | 308 | 0.93 | 0.91 (0.87–0.94) | 7.4 |
| T2 & Retention | | | | | | |
| | All samples | 14 | 939 | 0.98 | 0.96 (0.93–0.98) | 31.8* |
| | Neuro/Psychiatric | 7 | 596 | 0.97 | 0.96 (0.91–0.98) | 15.1 |

*Note:* T2 = Trial 2; T1 = Trial 1; WM = weighted mean; REM = random-effect model; Neuro/Psychiatric = samples comprised of actual examinees evaluated for a neurocognitive or psychiatric disorder. *Heterogeneity is significant at $p < .01$.

utilizing fixed or random-effects model approaches (Table 3), with only two samples falling below acceptable thresholds for specificity. This cutoff also resulted in specificity values above 0.90 when utilized in samples of healthy controls and pain patients (Table 1). The more conservative and previously recommended Trial 1 cutoff (i.e. <41; Denning, 2012) resulted in 93% specificity in the neurocognitive and psychiatric group regardless of statistical approach.

Sensitivity for Trial 1 increased as a function of increasing cutoff values (Table 2). At a cutoff of <41, weighted mean and random-effects model-derived sensitivity values (Table 4) were 0.62 and 0.64, respectively, when examining all eligible studies, and 0.66 and 0.65, respectively, when including only neurocognitive and psychiatric samples. At a cutoff of <42, sensitivity was 0.65 (regardless of statistical approach) when all eligible studies were included, and 0.69 and 0.67 when including only neurocognitive and psychiatric samples. Significant heterogeneity was evident across both cutoffs regarding sensitivity and specificity analyses when all studies were analyzed together. Conversely, statistically significant heterogeneity between Trial 1 samples was not evident when examining the neurocognitive/psychiatric samples separately.

### Trial 2 and retention standard cutoffs

Standard cutoffs for invalidity, as recommended by the TOMM publication manual (Tombaugh, 1997), are scores of <45 on Trial 2 or Retention. Forty-one articles reported specificity data across 53 samples for Trial 2 (Table 5), and 31 articles reported sensitivity data across 39 samples for Trial 2 at a cutoff of <45 (Table 6). Weighted mean and random-effects model-derived specificity values were 0.98 and

**Table 4.** TOMM sensitivity by weighted mean and random-effects model.

| | | Samples (k) | n | Sensitivity | | Heterogeneity Cochrane's Q |
|---|---|---|---|---|---|---|
| | | | | WM | REM (95% CI) | |
| T1 < 41 | | | | | | |
| | All samples | 12 | 812 | 0.62 | 0.64 (0.56–0.70) | 41.94* |
| | Neuro/Psychiatric | 10 | 576 | 0.66 | 0.65 (0.58–0.71) | 19.3 |
| T1 < 42 | | | | | | |
| | All samples | 11 | 761 | 0.65 | 0.63 (0.57–0.72) | 41.3* |
| | Neuro/Psychiatric | 9 | 525 | 0.69 | 0.67 (0.60–0.73) | 17.3 |
| T2 < 45 | | | | | | |
| | All samples | 39 | 1590 | 0.50 | 0.56 (0.48–0.64) | 177.5* |
| | Neuro/Psychiatric | 17 | 691 | 0.45 | 0.46 (0.39–0.52) | 39.4* |
| T2 < 49 | | | | | | |
| | All samples | 16 | 724 | 0.59 | 0.64 (0.55–0.71) | 54.7* |
| | Neuro/Psychiatric | 11 | 384 | 0.63 | 0.62 (0.55–0.68) | 15.4 |
| Retention < 45 | | | | | | |
| | All samples | 25 | 989 | 0.50 | 0.56 (0.47–0.64) | 98.0* |
| | Neuro/Psychiatric | 9 | 286 | 0.55 | 0.55 (0.49–0.68) | 5.1 |
| Retention < 49 | | | | | | |
| | All samples | 10 | 585 | 0.61 | 0.65 (0.56–0.73) | 35.9* |
| | Neuro/Psychiatric | 7 | 291 | 0.70 | 0.69 (0.63–0.74) | 3.4 |
| T2 & Retention | | | | | | |
| | All samples | 16 | 603 | 0.61 | 0.66 (0.55–0.75) | 70.1* |
| | Neuro/Psychiatric | 4 | 167 | 0.56 | 0.56 (0.41–0.69) | 8.6 |

Note: T2 = Trial 2; T1 = Trial 1; T2 & Retention = Trial 2 and Retention combined; WM = weighted mean; REM = random-effects model; Neuro/Psychiatric = samples comprised of actual examinees evaluated for a neurocognitive or psychiatric disorder. *Heterogeneity is significant at $p < .01$.

0.97, respectively, when examining all eligible samples, and 0.97 and 0.96 when including only neurocognitive and psychiatric samples (Table 3). Further subgrouping of the neurocognitive/psychiatric samples revealed weighted mean specificities of 0.99 for mild traumatic brain injury (TBI; $k = 4$, $n = 183$), 0.91 for moderate/severe TBI ($k = 3$, $n = 109$), 0.96 for mild intellectual disability (ID; $k = 3$, $n = 100$), and 0.94 for only psychiatric samples ($k = 5$, $n = 382$). Additionally, specificity was 1.00 in healthy controls samples (Table 7) and 1.00 across chronic pain samples ($k = 3$, $n = 214$).

Weighted mean and random-effects model-derived sensitivity values (Table 4) were 0.50 and 0.56, respectively, when examining all eligible studies, and 0.45 and 0.46, respectively, when including only neurocognitive and psychiatric samples. Significant heterogeneity was seen in both the overall group and the neurocognitive/psychiatric subgroup. Weighted mean sensitivity was 0.66 when including only simulator studies in which participants were asked to feign a neurocognitive disorder, excluding attention deficit hyperactivity disorder (ADHD), learning disability (LD), or ID. (Table 7). Sensitivity was 0.41 in simulator studies identifying participants instructed to feign ADHD, LD, or ID ($k = 4$, $n = 118$).

Twenty-four articles reported specificity data across 33 samples for the Retention trial (Table 8) and 20 articles reported sensitivity data across 25 samples for the Retention trial at a cutoff of <45 (Table 9). Weighted mean and random-effects model-derived specificities were 0.99 and 0.97, respectively, when examining all eligible samples, and 0.98 and 0.97 when including only neurocognitive and psychiatric samples (Table 3). Further subgrouping of the neurocognitive/psychiatric sample revealed weighted mean specificities of 0.98 for mild TBI ($k = 3$, $n = 94$) and 0.96 for mild ID ($k = 2$, $n = 45$). Additionally, specificity was 1.00 in healthy control samples (Table 3) and 1.00 across chronic pain samples ($k = 3$, $n = 214$).

**Table 5.** TOMM Trial 2 specificity at $<45$.

| Study | Validity Classification | Sample | n | Specificity |
|---|---|---|---|---|
| Tombaugh (1997) | Controls | Undergraduate Students | 21 | 1.00 |
| Tombaugh (1997) | Controls | Community Volunteers | 70 | 1.00 |
| Rees, Tombaugh, Gansler, and Moczynski (1998) | Controls | Undergraduate Students | 19 | 1.00 |
| Rees et al. (1998) | Research volunteers | TBI | 10 | 0.96 |
| Rees et al. (1998) | Controls | Community Volunteers | 20 | 1.00 |
| Bolan, Foster, Schmand, and Bolan (2002) | Controls | Community Volunteers | 16 | 1.00 |
| Ashendorf, O'Bryant, and McCaffrey (2003) | Controls | Community Volunteers Older Adult | 197 | 1.00 |
| Ashendorf et al. (2004) | Research volunteers | Depression – Older Adults | 31 | 1.00 |
| Powell, Gfeller, Hendricks, and Sharland (2004) | Controls | Undergraduate Students | 28 | 1.00 |
| Etherton et al. (2005) | Controls | Undergraduate Students | 20 | 1.00 |
| Yanez et al. (2006) | Research volunteers | Depression | 20 | 0.90 |
| Yanez et al. (2006) | Controls | Community Volunteers | 20 | 1.00 |
| Greve et al. (2006a) | Slick Criteria | Toxic Exposure | 17 | 1.00 |
| Greve et al. (2006b) | Slick Criteria | TBI – Moderate/Severe | 33 | 0.94 |
| Greve et al. (2006b) | Slick Criteria | TBI – Mild | 46 | 0.98 |
| Iverson, Page, Koehler, Shojania, and Badii (2007) | Research volunteers | Fibromyalgia | 54 | 1.00 |
| Greve, Ord, Curtis, Bianchini, and Brennan (2008) | Pass multiple PVTs | Chronic Pain | 42 | 0.98 |
| Greve et al. (2008) | Pass multiple PVTs | TBI – 63% Mild | 43 | 0.98 |
| Greiffenstein, Greve, Bianchini, and Baker (2008) | Single PVT | Disability | 59 | 0.95 |
| Greiffenstein et al. (2008) | Single PVT | Disability | 184 | 1.00 |
| Batt, Shores, and Chekaluk (2008) | Research volunteers | TBI – Severe | 25 | 0.84 |
| O'Bryant et al. (2008) | Controls | Community Volunteers Older Adult | 306 | 1.00 |
| Greve et al. (2009) | Slick Criteria | Chronic Pain | 118 | 1.00 |
| Rosenfeld, Green, Pivovarova, Dole, and Zapf (2010) | Research volunteers | Mixed Psych | 87 | 0.94 |
| Shandera et al. (2010) | Research volunteers | ID – Mild | 24 | 0.88 |
| Sollman et al. (2010) | Controls | Undergraduate Students | 14 | 1.00 |
| Sollman et al. (2010) | Research Volunteers | ADHD – College | 29 | 0.97 |
| Schenk and Sullivan (2010) | Controls | Undergraduate Students | 18 | 1.00 |
| Ryan et al. (2010) | Controls | Undergraduate Students | 72 | 1.00 |
| Shandera et al. (2010) | Controls | Community Volunteers | 10 | 1.00 |
| Price et al. (2011) | Research volunteers | Methamphetamine Abuse | 71 | 1.00 |
| Armistead-Jehle and Gervais (2011) | Single PVT | Forensic Disability | 271 | 0.98 |
| Green (2011) | Single PVT | Mixed Forensic | 204 | 0.99 |
| Vanderslice-Barr, Miele, Jardin, and McCaffrey (2011) | Controls | Undergraduate Students | 48 | 1.00 |
| Jasinski et al. (2011) | Controls | Undergraduate Students | 48 | 1.00 |
| Green, Rosenfeld, Belfi, Rohlehr, and Pierson (2012) | Expert opinion | Forensic Psych | 73 | 0.88 |
| An, Zakzanis, and Joordens (2012) | Controls | Undergraduate Students | 63 | 1.00 |
| Davis, Wall, and Whitney (2012) | Controls | Undergraduate Students | 73 | 1.00 |
| Davis et al. (2012) | Single PVT | Mixed Veterans | 63 | 0.95 |
| Sullivan and Elliott (2012) | Controls | Community Volunteers | 41 | 1.00 |
| Jones (2013) | Slick Criteria | Mixed Military | 45 | 1.00 |

(*continued*)

**Table 5.** Continued.

| Study | Validity Classification | Sample | n | Specificity |
|---|---|---|---|---|
| Schroeder et al. (2013) | Slick Criteria | Mixed Forensic | 36 | 1.00 |
| Love, Glassmire, Zanolini, and Wolf (2014) | Expert opinion | ID – Mild (Forensic) | 21 | 0.95 |
| Kulas et al. (2014) | Pass multiple PVTs | Mixed Veterans | 52 | 0.98 |
| Williamson et al. (2014) | Research volunteers | ADHD | 22 | 1.00 |
| Williamson et al. (2014) | Research Volunteers | ADHD + Psychiatric | 22 | 1.00 |
| Bashem et al. (2014) | Research volunteers | TBI – Moderate/Severe | 51 | 0.92 |
| Buddin et al. (2014) | Slick Criteria | Mixed Forensic | 34 | 0.97 |
| Smith et al. (2014) | Slick Criteria | IQ Score ≤ 75 | 55 | 1.00 |
| Barhon et al. (2015) | Controls | Undergraduate Students | 23 | 1.00 |
| Erdodi and Rai (2017) | Single PVT | Mixed Psychiatric | 50 | 1.00 |
| Erdodi and Rai (2017) | Single PVT | TBI – 70% Mild | 47 | 1.00 |
| An et al. (2017) | Controls | Undergraduate Students | 120 | 1.00 |

Note: Slick Criteria = Slick et al. (1999) criteria for malingering; TBI = traumatic brain injury; PVT = performance validity test; ADHD = attention deficit hyperactivity disorder; ID = intellectual disability.

**Table 6.** TOMM Trial 2 sensitivity at <45.

| Author | Validity Classification | Diagnosis | n | Sensitivity |
|---|---|---|---|---|
| Tombaugh (1997) | Simulators (UC) | Undergraduate Students | 20 | 1.00 |
| Rees et al. (1998) | Simulators | Undergraduate Students | 25 | 0.84 |
| Rees et al. (1998) | Simulators (UC) | TBI Simulators | 8 | 1.00 |
| Heinze and Purisch (2001) | Expert opinion | Forensic Criminal | 57 | 0.66 |
| Bolan et al. (2002) | Simulators (UC) | Community Volunteers | 16 | 1.00 |
| Powell et al. (2004) | Simulators (C) | Undergraduate Students | 27 | 0.93 |
| Powell et al. (2004) | Simulators (C) | Undergraduate Students | 25 | 0.96 |
| Etherton et al. (2005) | Simulator Pain (UC) | Undergraduate Students | 20 | 0.85 |
| Greve et al. (2006a) | Slick Criteria | Toxic Exposure | 33 | 0.55 |
| Greve et al. (2006b) | Slick Criteria | TBI - Moderate/Severe | 11 | 0.46 |
| Greve et al. (2006b) | Slick Criteria | TBI – Mild | 30 | 0.40 |
| Haber and Fichtenberg (2006) | Single PVT | Forensic – Worker's Comp | 17 | 0.76 |
| Batt et al. (2008) | Simulator (UC) | TBI – Asked to Feign | 11 | 1.00 |
| Greiffenstein et al. (2008) | Single PVT | Disability – Mostly PCS | 77 | 0.57 |
| Greiffenstein et al. (2008) | Single PVT | Disability Mixed | 153 | 0.37 |
| Greve et al. (2008) | Multiple PVTs | TBI – 63% Mild | 27 | 0.48 |
| Greve et al. (2008) | Multiple PVTs | Chronic Pain | 58 | 0.40 |
| Greve et al. (2009) | Slick Criteria | Chronic Pain | 216 | 0.35 |
| Schenk and Sullivan (2010) | Simulators (UC) | Undergraduate Students | 24 | 0.50 |
| Rosenfeld et al. (2010) | Simulators (UC) | Community Volunteers | 29 | 0.62 |
| Sollman et al. (2010) | Simulators (ADHD) | Undergraduate Students | 30 | 0.47 |
| Shandera et al. (2010) | Simulators (ID) | Community Volunteers | 25 | 0.40 |
| Armistead-Jehle and Gervais (2011) | Single PVT | Forensic Disability | 74 | 0.32 |
| Green (2011) | Single PVT | Mixed Forensic | 40 | 0.38 |
| Jasinski et al. (2011) | Simulators (ADHD) | Undergraduate Students | 40 | 0.38 |
| Davis et al. (2012) | Single PVT | Mixed Veterans | 29 | 0.59 |
| Davis et al. (2012) | Simulators (C) | Undergraduate Students | 73 | 0.25 |
| Davis et al. (2012) | Simulators (UC) | Undergraduate Students | 73 | 0.42 |
| Green et al. (2012) | Expert opinion | Forensic Psych | 25 | 0.41 |
| Sullivan and Elliott (2012) | Simulators (UC) | Community Volunteer | 40 | 0.80 |
| Schroeder et al. (2013) | Slick Criteria | Mixed Forensic | 26 | 0.46 |
| Buddin et al. (2014) | Slick Criteria | Mixed Clinical | 25 | 0.44 |
| Kulas et al. (2014) | Multiple PVTs | Mixed Clinical | 12 | 0.42 |
| Bashem et al. (2014) | Simulators (UC) | Community Volunteer | 58 | 0.50 |
| Williamson et al. (2014) | Simulators (ADHD) | Undergraduate Students | 23 | 0.39 |
| Barhon et al. (2015) | Simulators (C) | Undergraduate Students | 24 | 0.88 |
| Barhon et al. (2015) | Simulators (UC) | Undergraduate Students | 22 | 0.91 |
| Erdodi and Rai (2017) | Single PVT | TBI - 70% Mild | 37 | 0.32 |
| Erdodi and Rai (2017) | Single PVT | Psychiatric | 18 | 0.22 |

Note: Slick Criteria = Slick et al. (1999) criteria for malingering; TBI = traumatic brain injury; PVT = performance validity test; ADHD = attention deficit hyperactivity disorder; ID = intellectual disability; PCS = post-concussive syndrome; C = coached simulator; UC = uncoached simulator.

**Table 7.** Weighted mean sensitivity and specificity in simulator and control studies.

| Trial | Healthy controls | | | Simulated neurocognitive disorder | | |
|---|---|---|---|---|---|---|
| | Samples (k) | N | Specificity | Samples (k) | n | Sensitivity |
| T1 < 41 | 4 | 544 | 0.99 | 1 | 20 | 1.00 |
| T1 < 42 | 4 | 544 | 0.99 | 1 | 20 | 1.00 |
| T2 < 45 | 21 | 1220 | 1.00 | 16 | 507 | 0.66 |
| T2 < 49 | 6 | 400 | 0.99 | 2 | 46 | 0.91 |
| Retention < 45 | 14 | 477 | 1.00 | 10 | 311 | 0.63 |
| Retention < 49 | 2 | 118 | 0.99 | – | – | – |
| T2 & Retention | 7 | 343 | 1.00 | 10 | 388 | 0.63 |

Note: T2 = Trial 2; T1 = Trial 1.

**Table 8.** TOMM Retention specificity at <45.

| Study | Validity Classification | Sample | n | Specificity |
|---|---|---|---|---|
| Tombaugh (1997) | Controls | Undergraduate Students | 21 | 1.00 |
| Tombaugh (1997) | Controls | Community Volunteers | 70 | 1.00 |
| Rees et al. (1998) | Controls | Undergraduate Students | 19 | 1.00 |
| Rees et al. (1998) | Research Volunteer | TBI | 10 | 1.00 |
| Bolan et al. (2002) | Controls | Community Volunteers | 16 | 1.00 |
| Powell et al. (2004) | Controls | Undergraduate Students | 28 | 1.00 |
| Etherton et al. (2005) | Controls | Undergraduate Students | 20 | 1.00 |
| Yanez et al. (2006) | Research Volunteer | Depression | 20 | 0.95 |
| Yanez et al. (2006) | Controls | Community Volunteers | 20 | 1.00 |
| Greve et al. (2006a) | Slick Criteria | Toxic exposure | 12 | 1.00 |
| Greve et al. (2006b) | Slick Criteria | TBI - Mild | 41 | 1.00 |
| Greve et al. (2006b) | Slick Criteria | TBI Moderate/Severe | 30 | 0.94 |
| Iverson et al. (2007) | Research Volunteer | Fibromyalgia | 54 | 1.00 |
| Greve et al. (2008) | Pass multiple PVTs | Chronic Pain | 42 | 0.98 |
| Greve et al. (2008) | Pass multiple PVTs | TBI - 63% Mild | 43 | 0.95 |
| Greve et al. (2009) | Slick Criteria | Chronic Pain | 118 | 1.00 |
| Ryan et al. (2010) | Controls | Undergraduate Students | 72 | 1.00 |
| Shandera et al. (2010) | Research Volunteers | ID – Mild | 24 | 0.92 |
| Shandera et al. (2010) | Controls | Community Volunteers | 10 | 1.00 |
| Sollman et al. (2010) | Research Volunteer | ADHD – College | 29 | 0.97 |
| Sollman et al. (2010) | Controls | Undergraduate Students | 14 | 1.00 |
| Schenk and Sullivan (2010) | Controls | Undergraduate Students | 18 | 1.00 |
| Vanderslice-Barr et al. (2011) | Controls | Undergraduate Students | 48 | 1.00 |
| Jasinski et al. (2011) | Controls | Undergraduate Students | 48 | 1.00 |
| Davis et al. (2012) | Controls | Undergraduate Students | 73 | 1.00 |
| Davis et al. (2012) | Single PVT | Mixed Veteran | 63 | 0.95 |
| Schroeder et al. (2013) | Slick Criteria | Mixed Forensic | 36 | 1.00 |
| Jones (2013) | Slick Criteria | Mixed Military | 45 | 1.00 |
| Love et al. (2014) | Expert Opinion | ID - Mild (Forensic) | 21 | 1.00 |
| Kulas et al. (2014) | Pass multiple PVTs | Mixed Veterans | 52 | 0.98 |
| Williamson et al. (2014) | Research Volunteer | ADHD | 22 | 1.00 |
| Williamson et al. (2014) | Research Volunteer | ADHD + Psychiatric | 22 | 1.00 |
| Buddin et al. (2014) | Slick Criteria | Mixed Forensic | 34 | 0.97 |

Note: Slick Criteria = Slick et al. (1999) criteria for malingering; TBI = traumatic brain injury; PVT = performance validity test; ADHD = attention deficit hyperactivity disorder; ID = intellectual disability.

Weighted mean and random-effects model-derived sensitivities (Table 4) were 0.50 and 0.56, respectively, when examining all eligible studies, and 0.55 when including only neurocognitive and psychiatric samples. Significant heterogeneity was seen when examining all samples together, but not when examining the subgroup of neurocognitive/psychiatric samples. Weighted mean sensitivity improved to 0.63 when including only simulator studies in which participants were asked to feign a neurocognitive disorder (Table 7) but fell to 0.41 in simulator samples where examines were instructed to feign ADHD, LD, or ID ($k = 4$, $n = 118$).

**Table 9.** TOMM Retention sensitivity at <45.

| Study | Validity Classification | Sample | n | Sensitivity |
|---|---|---|---|---|
| Tombaugh (1997) | Simulator (UC) | Undergraduate Students | 20 | 1.00 |
| Rees et al. (1998) | Simulator (UC) | Undergraduate Students | 25 | 0.88 |
| Rees et al. (1998) | Simulator (UC) | TBI - Asked to Feign | 8 | 1.00 |
| Heinze and Purisch (2001) | Expert Opinion | Forensic Criminal | 57 | 0.65 |
| Bolan et al. (2002) | Simulator (UC) | Community Volunteers | 16 | 1.00 |
| Powell et al. (2004) | Simulator (C) | Undergraduate Students | 27 | 0.93 |
| Powell et al. (2004) | Simulator (C) | Undergraduate Students | 25 | 0.96 |
| Etherton et al. (2005) | Simulator Pain (UC) | Undergraduate Students | 20 | 0.75 |
| Greve et al. (2006a) | Slick Criteria | Toxic Exposure | 31 | 0.52 |
| Greve et al. (2006b) | Slick Criteria | TBI – Mild | 46 | 0.57 |
| Greve et al. (2006b) | Slick Criteria | TBI – Moderate/Severe | 33 | 0.46 |
| Greve et al. (2008) | Multiple PVTs | TBI – 63% Mild | 27 | 0.56 |
| Greve et al. (2008) | Multiple PVTs | Chronic Pain | 58 | 0.35 |
| Greve et al. (2009) | Slick Criteria | Chronic Pain | 216 | 0.34 |
| Schenk and Sullivan (2010) | Simulator (UC) | Undergraduate Students | 24 | 0.42 |
| Sollman et al. (2010) | Simulator – ADHD | Undergraduate Students | 30 | 0.47 |
| Shandera et al. (2010) | Simulator – ID | Community Volunteers | 25 | 0.44 |
| Jasinski et al. (2011) | Simulator (ADHD) | Undergraduate Students | 40 | 0.35 |
| Davis et al. (2012) | Single PVT | Mixed Veterans | 29 | 0.62 |
| Davis et al. (2012) | Simulator (C) | Undergraduate Students | 73 | 0.33 |
| Davis et al. (2012) | Simulator (UC) | Undergraduate Students | 73 | 0.44 |
| Schroeder et al. (2013) | Slick Criteria | Mixed Forensic | 26 | 0.50 |
| Buddin et al. (2014) | Slick Criteria | Mixed Clinical | 25 | 0.48 |
| Kulas et al. (2014) | Multiple PVTs | Mixed Clinical | 12 | 0.50 |
| Williamson et al. (2014) | Simulator (ADHD) | Undergraduate Students | 23 | 0.39 |

Note: Slick Criteria = Slick et al. (1999) criteria for malingering; TBI = traumatic brain injury; PVT = performance validity test; ADHD = attention deficit hyperactivity disorder; ID = intellectual disability; PCS = post-concussive syndrome; C = coached simulator; UC = uncoached simulator.

Tables 10 and 11 present specificity and sensitivity data for the TOMM when considering performance on Trial 2 and Retention collectively (i.e. failure on either trial constitutes an invalid performance). Using this approach, overall sensitivity values using the weighted mean and random-effects models were 0.61 and 0.66, respectively, and 0.56 when examining only neurocognitive and psychiatric samples (Table 4). Specificity remains high, ranging from 0.96 to 0.98 across groupings (Table 3). For both sensitivity and specificity, statistically significant heterogeneity was seen when examining all samples together but not when examining the subgroup of neurocognitive/psychiatric samples.

### Trial 2 and retention alternative cutoffs

A subgroup of included TOMM studies provided classification accuracy data when utilizing alternative cutoff values. Tables 12–15 depict Trial 2 and Retention specificity and sensitivity values at selected alternative cutoffs. A Trial 2 cutoff of <49 was the first cutoff to maintain specificity values of 0.90 or above in both fixed- and random-effects models when all studies were combined and when the neurocognitive/psychiatric group was separately analyzed. When using this cutoff, weighted mean and random-effects model-derived specificity values were 0.97 and 0.96, respectively, when examining all eligible samples, and 0.95 and 0.94 when including only neurocognitive and psychiatric samples (Table 3). On Retention, a cutoff of <49 was also the first cutoff to maintain specificity values of 0.90 or above across the group that contained all studies and the group that contained

**Table 10.** TOMM Trial 2 and Retention combined specificity at <45.

| Study | Validity Classification | Sample | n | Specificity |
|---|---|---|---|---|
| Rees et al. (1998) | Controls | Undergraduate Students | 20 | 1.00 |
| Tan, Slick, Strauss, and Hultsch (2002) | Controls | Undergraduate Students | 27 | 0.96 |
| Gervais, Rohling, Green, and Ford (2004) | Multiple PVTs | Forensic/Workers Comp | 341 | 1.00 |
| DenBoer and Hall (2007) | Controls | Undergraduate Students | 146 | 1.00 |
| Lindstrom, Lindstrom, Coleman, Nelson, and Gregg (2009) | Controls | Undergraduate Students | 25 | 1.00 |
| Pivovarova, Rosenfeld, Dole, Green, and Zapf (2009) | Research Volunteer | Psychiatric Outpatients | 86 | 0.94 |
| Davis et al. (2012) | Single PVT | Mixed Veterans | 63 | 0.95 |
| Gunner et al. (2012) | Single PVT | Mixed Forensic | 24 | 0.96 |
| Weinborn, Woods, Nulsen, and Leighton (2012) | Controls | Undergraduate Students | 26 | 1.00 |
| Davis et al. (2012) | Controls | Undergraduate Students | 73 | 1.00 |
| Weinborn et al. (2012) | Controls | Undergraduate Students | 26 | 1.00 |
| Williamson et al. (2014) | Research Volunteer | ADHD | 22 | 1.00 |
| Williamson et al. (2014) | Research Volunteer | ADHD + Psychiatric | 22 | 1.00 |
| Fazio, Sanders, and Denney (2015) | Multiple PVTs | Forensic (Criminal) | 38 | 0.87 |

Note: PVT = Performance validity test; ADHD = attention deficit hyperactivity disorder.

**Table 11.** TOMM Trial 2 and Retention combined sensitivity at <45.

| Study | Validity Classification | Sample | n | Sensitivity |
|---|---|---|---|---|
| Davis et al. (2012) | Simulators (C) | Undergraduate Students | 73 | 0.33 |
| Rees et al. (1998) | Simulators | Undergraduate Students | 20 | 0.95 |
| Tan et al. (2002) | Simulators | Undergraduate Students | 25 | 0.80 |
| GerGervais, Rohling, Green, and Ford (2004) | Multiple PVTs | Forensic/Workers Comp | 73 | 0.52 |
| DenBoer and Hall (2007) | Simulators (C) | Undergraduate Students | 56 | 0.60 |
| DenBoer and Hall (2007) | Simulators (UC) | Undergraduate Students | 35 | 0.80 |
| Lindstrom et al. (2009) | Simulator LD | Undergraduate Students | 25 | 0.68 |
| Pivovarova et al. (2009) | Simulators | Community Volunteers | 29 | 0.62 |
| Weinborn et al. (2012) | Simulators | Undergraduate Students | 27 | 1.00 |
| Weinborn et al. (2012) | Simulators | Undergraduate Students | 26 | 0.89 |
| Weinborn et al. (2012) | Simulators | Undergraduate Students | 24 | 0.83 |
| Davis et al. (2012) | Simulators (UC) | Undergraduate Students | 73 | 0.45 |
| Davis et al. (2012) | Single PVT | Mixed Veterans | 29 | 0.66 |
| Gunner et al. (2012) | Single PVT | Forensic – most mTBI | 24 | 0.33 |
| Williamson et al. (2014) | Simulator ADHD | Undergraduate Students | 23 | 0.52 |
| Fazio et al. (2015) | Multiple PVTs | Forensic (Criminal) | 41 | 0.68 |

Note: TBI = traumatic brain injury; PVT = performance validity test; ADHD = attention deficit hyperactivity disorder; LD = learning disability; C = coached simulator; UC = uncoached simulator.

only neurocognitive/psychiatric studies. This cutoff resulted in overall specificity values of 0.95 and 0.93 when utilizing weighted mean and random-effects model approaches, respectively. When examining only neurocognitive and psychiatric samples, specificity values were 0.93 and 0.91.

For both Trial 2 and Retention, TOMM specificity in a sample of moderate/severe TBI patients (Greve et al., 2006a) and a sample of patient with severe depression (Yanez, Fremouw, Tennant, Strunk, & Coker, 2006) fell below 90% when utilizing a cutoff of <49. Specificity was ≥90% across all other individual neurocognitive/ psychiatric samples that were examined, which were mostly of patients with mixed etiologies or mTBI (Table 12). Weighted mean specificity was 0.99 for both Trial 2 and Retention across healthy controls and chronic pain examinees.

At a Trial 2 cutoff of <49, weighted mean and random-effects model-derived sensitivity values (Table 4) were 0.59 and 0.64, respectively, when examining all eligible studies, and 0.63 and 0.62, respectively, when including only neurocognitive

**Table 12.** TOMM Trial 2 specificity at alternative cutoffs.

| Study | Validity Classification | Sample | n | <50 | <49 | <48 | <47 | <46 |
|---|---|---|---|---|---|---|---|---|
| Tombaugh (1997) | Controls | Research Volunteers OA | 70 | 0.96 | 0.97 | 0.99 | 1.00 | 1.00 |
| Tombaugh (1997) | Controls | Undergraduate Students | 21 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 |
| Ashendorf et al. (2003) | Controls | Research Volunteers OA | 197 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 |
| Ashendorf et al. (2004) | Research Volunteers | Research Volunteers Dep | 31 | 0.94 | 1.00 | 1.00 | 1.00 | 1.00 |
| Greve et al. (2006a) | Slick Criteria | Toxic Exposure | 17 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 |
| Greve et al. (2006b) | Slick Criteria | TBI – Mild | 46 | 0.85 | 0.93 | 0.96 | 0.98 | 0.98 |
| Greve et al. (2006b) | Slick Criteria | TBI – Moderate/Severe | 33 | 0.70 | 0.76 | 0.85 | 0.91 | 0.94 |
| Yanez et al. (2006) | Research Volunteers | Severe Depression | 20 | – | 0.8 | – | 0.90 | – |
| Iverson et al. (2007) | Research Volunteers | Fibromyalgia | 54 | – | – | 1.00 | – | – |
| Greve et al. (2008) | Multiple PVTs | TBI – 63% Mild | 43 | – | 0.93 | – | – | – |
| Greve et al. (2008) | Multiple PVTs | Chronic Pain | 42 | – | 0.98 | – | – | – |
| Greve et al. (2009) | Slick Criteria | Chronic Pain | 118 | 0.88 | 1.00 | 1.00 | 1.00 | 1.00 |
| Vanderslice-Barr et al. (2011) | Controls | Undergraduate Students | 48 | – | 1.00 | 1.00 | 1.00 | 1.00 |
| Sullivan and Elliott (2012) | Controls | Undergraduate Students | 41 | – | 1.00 | 1.00 | 1.00 | 1.00 |
| Schroeder et al. (2013) | Slick Criteria | Mixed Forensic | 36 | 0.94 | 0.97 | 0.97 | 0.97 | 0.97 |
| Jones (2013) | Slick Criteria | Mixed Military | 45 | 0.96 | 1.00 | 1.00 | 1.00 | 1.00 |
| Kulas et al. (2014) | Multiple PVTs | Mixed Clinical | 52 | 0.98 | 0.98 | 0.98 | 0.98 | 0.98 |
| Smith et al. (2014) | Expert Opinion | Low IQ | 9 | – | 1.00 | 1.00 | 1.00 | 1.00 |
| Love et al. (2014) | Expert Opinion | ID – Mild | 21 | 0.67 | 0.92 | 0.92 | 0.92 | 0.95 |
| Barhon et al. (2015) | Controls | Undergraduate Students | 23 | 0.91 | 0.96 | 0.96 | 0.96 | 0.96 |
| Erdodi and Rai (2017) | Single PVT | TBI – 70% Mild | 50 | 0.91 | 0.98 | 0.98 | 1.00 | 1.00 |
| Erdodi and Rai (2017) | Single PVT | Psychiatric | 47 | 0.96 | 0.98 | 1.00 | 1.00 | 1.00 |
| All studies | – | – | – | 0.93 | 0.97 | 0.99 | 0.99 | 0.99 |
| Neuro/Psychiatric | – | – | – | 0.90 | 0.95 | 0.97 | 0.98 | 0.98 |
| Healthy Controls | – | – | – | 0.98 | 0.99 | 0.99 | 1.00 | 1.00 |
| Chronic Pain | – | – | – | 0.88 | 0.99 | 1.00 | 1.00 | 1.00 |

Note: Slick Criteria = Slick et al. (1999) criteria for malingering; OA = older adult, Dep = depression, ID = intellectual disability; T2 = Trial 2; Neuro/Psychiatric = samples comprised of actual examinees evaluated for a neurocognitive or psychiatric disorder; all aggregated specificity values are derived from weighted means.

**Table 13.** TOMM Trial 2 sensitivity at alternative cutoffs.

| Study | Validity Classification | Sample | n | <50 | <49 | <48 | <47 | <46 |
|---|---|---|---|---|---|---|---|---|
| Etherton et al. (2005) | Simulator Pain | Undergraduate Students | 20 | 0.95 | 0.95 | 0.95 | 0.95 | 0.95 |
| Greve et al. (2006a) | Slick Criteria | Toxic Exposure | 33 | 0.61 | 0.61 | 0.58 | 0.55 | 0.55 |
| Greve et al. (2006b) | Multiple PVTs | TBI – Mild | 30 | 0.77 | 0.7 | 0.53 | 0.47 | 0.4 |
| Greve et al. (2006b) | Slick Criteria | TBI – Moderate/Severe | 11 | 0.73 | 0.55 | 0.55 | 0.55 | 0.55 |
| Haber and Fichtenberg (2006) | Single PVT | TBI – Moderate/Severe | 17 | 0.88 | 0.82 | 0.82 | 0.76 | 0.76 |
| Greve et al. (2008) | Multiple PVTs | TBI – 63% Mild | 27 | – | 0.70 | – | – | – |
| Greve et al. (2008) | Multiple PVTs | Chronic Pain | 58 | – | 0.50 | – | – | – |
| Greve et al. (2009) | Slick Criteria | Chronic Pain | 216 | 0.56 | 0.45 | 0.43 | 0.39 | 0.37 |
| Schroeder et al. (2013) | Slick Criteria | Mixed Forensic | 26 | 0.77 | 0.65 | 0.62 | 0.50 | 0.50 |
| Jones (2013) | Slick Criteria | Mixed Military | 132 | 0.71 | 0.64 | – | – | – |
| Kulas et al. (2014) | Multiple PVTs | Mixed Clinical | 12 | 0.67 | 0.50 | 0.50 | 0.42 | 0.42 |
| Smith et al. (2014) | Slick Criteria | Non-credible Low IQ | 41 | – | 0.73 | – | – | – |
| Barhon et al. (2015) | Simulator | Undergraduate Students | 22 | 0.96 | 0.96 | 0.96 | 0.96 | 0.91 |
| Barhon et al. (2015) | Simulator | Undergraduate Students | 24 | 0.88 | 0.88 | 0.88 | 0.88 | 0.88 |
| Erdodi and Rai (2017) | Single PVT | TBI – 70% Mild | 37 | 0.55 | 0.47 | 0.45 | 0.39 | 0.39 |
| Erdodi and Rai (2017) | Single PVT | Psychiatric | 18 | 0.39 | 0.39 | 0.33 | 0.33 | 0.33 |
| All studies | – | – | – | 0.66 | 0.59 | 0.54 | 0.50 | 0.49 |
| Neuro/Psychiatric | – | – | – | 0.72 | 0.63 | 0.60 | 0.54 | 0.52 |
| Simulators | – | – | – | 0.91 | 0.91 | 0.91 | 0.91 | 0.89 |
| Chronic Pain | – | – | – | 0.59 | 0.49 | 0.47 | 0.44 | 0.42 |

Note: Slick Criteria = Slick et al. (1999) criteria for malingering; PVT = performance validity testing; TBI = traumatic brain injury; Neuro/Psychiatric = samples comprised of actual examinees evaluated for a neurocognitive or psychiatric disorder; all aggregated sensitivity values are derived from weighted means.

Table 14. TOMM Retention specificity at alternative cutoffs.

| Study | Validity Classification | Sample | n | <50 | <49 | <48 | <47 | <46 |
|---|---|---|---|---|---|---|---|---|
| Tombaugh (1997) | Controls | Undergraduate Students | 70 | 0.93 | 0.99 | 0.99 | 0.99 | 0.99 |
| Greve et al. (2006a) | Slick Criteria | Toxic exposure | 12 | 0.83 | 0.92 | 1.00 | 1.00 | 1.00 |
| Greve et al. (2006b) | Slick Criteria | TBI – Mild | 46 | 0.80 | 0.91 | 0.98 | 0.98 | 1.00 |
| Greve et al. (2006b) | Slick Criteria | TBI – Moderate/Severe | 33 | 0.70 | 0.85 | 0.85 | 0.91 | 0.91 |
| Iverson et al. (2007) | Research Volunteers | Fibromyalgia | 54 | – | – | – | 0.97 | – |
| Yanez et al. (2006) | Research Volunteers | Severe Depression | 20 | – | 0.85 | – | 0.95 | – |
| Greve et al. (2008) | Multiple PVTs | TBI – 63% mild | 43 | – | 0.91 | – | – | – |
| Greve et al. (2008) | Multiple PVTs | Chronic Pain | 42 | – | 0.93 | – | – | – |
| Greve et al. (2009) | Slick Criteria | Chronic Pain | 118 | 0.86 | 0.99 | 0.99 | 1.00 | 1.00 |
| Vanderslice-Barr et al. (2011) | Controls | Undergraduate Students | 48 | – | 1.00 | 1.00 | 1.00 | 1.00 |
| Schroeder et al. (2013) | Slick Criteria | Mixed Forensic | 36 | 0.86 | 0.92 | 0.97 | 0.97 | 0.97 |
| Jones (2013) | Slick Criteria | Mixed military | 45 | 0.98 | 1.00 | 1.00 | 1.00 | 1.00 |
| Kulas et al. (2014) | Multiple PVTs | Mixed clinical | 52 | 0.96 | 0.96 | 0.96 | 0.96 | 0.98 |
| Love et al. (2014) | Expert Opinion | ID – Mild | 21 | 0.81 | 1.00 | 1.00 | 1.00 | 1.00 |
| All studies | – | – | – | 0.87 | 0.95 | 0.98 | 0.98 | 0.99 |
| Neuro/Psychiatric | – | – | – | 0.87 | 0.93 | 0.97 | 0.97 | 0.98 |
| Healthy Controls | – | – | – | 0.93 | 0.99 | 0.99 | 0.99 | 0.99 |
| Chronic Pain | – | – | – | 0.86 | 0.99 | 0.99 | 1.00 | 1.00 |

Note: Slick Criteria = Slick et al. (1999) criteria for malingering; PVT = performance validity test; TBI = traumatic brain injury; ID = intellectual disability; Neuro/Psychiatric = samples comprised of actual examinees evaluated for a neuro-cognitive or psychiatric disorder; all aggregated specificity values are derived from weighted means.

Table 15. TOMM Retention sensitivity at alternative cutoffs.

| Study | Validity Classification | Sample | n | <50 | <49 | <48 | <47 | <46 |
|---|---|---|---|---|---|---|---|---|
| Etherton et al. (2005) | Simulator Pain | Undergraduate Students | 20 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 |
| Greve et al. (2006a) | Slick Criteria | Toxic Exposure | 31 | 0.74 | 0.68 | 0.68 | 0.58 | 0.58 |
| Greve et al. (2006b) | Slick Criteria | TBI – Mild | 30 | 0.83 | 0.60 | 0.60 | 0.60 | 0.60 |
| Greve et al. (2006b) | Slick Criteria | TBI – Moderate/Severe | 33 | 0.82 | 0.82 | 0.64 | 0.64 | 0.64 |
| Greve et al. (2008) | Multiple PVTs | TBI – 63% Mild | 27 | – | 0.70 | – | – | – |
| Greve et al. (2008) | Multiple PVTs | Chronic Pain | 58 | – | 0.50 | – | – | – |
| Greve et al. (2009) | Slick Criteria | Chronic Pain | 216 | 0.61 | 0.48 | 0.43 | 0.39 | 0.37 |
| Schroeder et al. (2013) | Slick Criteria | Mixed Forensic | 26 | 0.81 | 0.77 | 0.73 | 0.58 | 0.58 |
| Jones (2013) | Slick Criteria | Mixed Military | 132 | 0.75 | 0.70 | – | – | – |
| Kulas et al. (2014) | Multiple PVTs | Mixed Clinical | 12 | 0.67 | 0.58 | 0.58 | 0.58 | 0.50 |
| All studies | – | – | – | 0.71 | 0.61 | 0.54 | 0.50 | 0.48 |
| Neuro/Psychiatric | – | – | – | 0.77 | 0.70 | 0.65 | 0.60 | 0.59 |
| Chronic Pain | – | – | – | 0.64 | 0.52 | 0.48 | 0.44 | 0.42 |

Note: Slick Criteria = Slick et al. (1999) criteria for malingering; TBI = traumatic brain injury; Neuro/Psychiatric = samples comprised of actual examinees evaluated for a neurocognitive or psychiatric disorder; all aggregated sensitivity values are derived from weighted means.

and psychiatric samples. Retention sensitivity at the <49 cutoff was 0.61 and 0.65 when examining all studies, improving to 0.70 and 0.69 when examining only neuro-cognitive and psychiatric samples. Significant heterogeneity was seen when examining sensitivity of Trial 2 and specificity of both Trial 2 and Retention when all studies were analyzed together at this alternative cutoff. Conversely, significant heterogeneity was not evident when examining the neurocognitive/psychiatric samples separately.

## Positive and negative predictive power

Tables 16 and 17 provide the posterior probabilities, according to various pretest probabilities (base rates) of invalidity, that a TOMM failure is a true positive and that a TOMM pass is a true negative. Such likelihood statistics, also referred to as positive

**Table 16.** PPP for TOMM trials by base rates of invalidity.

| | | | PPP | | | | |
|---|---|---|---|---|---|---|---|
| | Sensitivity | Specificity | 10% BR | 20% BR | 30% BR | 40% BR | 50% BR |
| Trial 1 | | | | | | | |
| <41 | 0.66 | 0.93 | 0.51 | 0.70 | 0.80 | 0.86 | 0.90 |
| <42 | 0.69 | 0.91 | 0.46 | 0.66 | 0.77 | 0.84 | 0.88 |
| Trial 2 | | | | | | | |
| <45 | 0.45 | 0.97 | 0.63 | 0.79 | 0.87 | 0.91 | 0.94 |
| <49 | 0.63 | 0.95 | 0.58 | 0.76 | 0.84 | 0.89 | 0.93 |
| Retention | | | | | | | |
| <45 | 0.55 | 0.98 | 0.75 | 0.87 | 0.92 | 0.95 | 0.97 |
| <49 | 0.70 | 0.93 | 0.53 | 0.71 | 0.81 | 0.87 | 0.91 |

Note: Sensitivity and specificity values are based on weighted mean values of neurocognitive and psychiatric samples; PPP = Positive Predictive Power; BR = Base Rate.

**Table 17.** NPP for TOMM trials by base rates of invalidity.

| | | | NPP | | | | |
|---|---|---|---|---|---|---|---|
| | Sensitivity | Specificity | 10% BR | 20% BR | 30% BR | 40% BR | 50% BR |
| Trial 1 | | | | | | | |
| <41 | 0.66 | 0.93 | 0.96 | 0.92 | 0.87 | 0.80 | 0.73 |
| <42 | 0.69 | 0.91 | 0.96 | 0.92 | 0.87 | 0.81 | 0.75 |
| Trial 2 | | | | | | | |
| <45 | 0.45 | 0.97 | 0.94 | 0.88 | 0.81 | 0.73 | 0.64 |
| <49 | 0.63 | 0.95 | 0.96 | 0.91 | 0.86 | 0.79 | 0.72 |
| Retention | | | | | | | |
| <45 | 0.55 | 0.98 | 0.95 | 0.90 | 0.87 | 0.77 | 0.69 |
| <49 | 0.70 | 0.93 | 0.97 | 0.93 | 0.88 | 0.82 | 0.76 |

Note: Sensitivity and specificity values are based on weighted mean values of neurocognitive and psychiatric samples. NPP = Negative Predictive Power; BR = Base Rate.

predictive power (PPP) and negative predictive power (NPP), respectively, are influenced by sensitivity, specificity, and base rates of invalid performance. Regardless of the condition assessed (in this particular case, the condition would be test invalidity), PPP increases and NPP decreases as the condition becomes more prevalent. PPP and NPP are provided at both traditional and proposed alternative cutoffs for each of the TOMM trials with base rates ranging from 10% to 50%. As noted in Table 16, PPP (likelihood that a positive/failure is a true positive) is generally relatively low in settings where base rates of invalidity are low (e.g. clinical patients with no external incentive; Kemp et al., 2008). By contrast, PPP approaches 0.90, even with use of the more liberal alternative cutoffs, when invalidity approximates a base rate of 40%, which corresponds to estimates of invalidity base rates in forensic settings (Larrabee, 2003; Mittenberg, Patton, Canyock, & Condit, 2002). NPP (likelihood that a negative/pass is a true negative) generally exceeds 0.95 in low base rate settings, with likelihood for false negatives increasing in settings where invalid test performance is believed to be more prevalent. As would be expected, relatively more liberal alternative cutoff values are associated with a decreased likelihood for false-negative findings.

## Analysis of special groups

### Dementia

In general, the extant neuropsychological literature shows that standard PVTs typically demonstrate unacceptably high false-positive rates in patients with dementia,

**Table 18.** TOMM specificity in dementia samples.

| Study | Sample | n | Specificity | | |
|---|---|---|---|---|---|
| | | | Trial 1 | Trial 2 | Retention |
| Tombaugh (1997) | Dementia | 37 | 0.57 | 0.73 | 0.81 |
| Teichner and Wagner (2004) | Dementia | 21 | 0.33 | 0.29 | 0.29 |
| Greve et al. (2006a) | Memory disorder | 22 | 0.86 | 0.82 | 0.77 |
| Merten et al. (2007) | Alzheimer's diagnosis | 20 | – | 0.70 | 0.50 |
| Dean et al. (2009) | Dementia | 20 | – | 0.45 | – |
| Bortnik, Horner, and Bachman (2013) | Dementia | 113 | – | 0.78 | – |
| Bortnik et al. (2013) | Dementia | 40 | – | – | 0.40 |
| Walter, Morris, Swier-Vosnos, and Pliskin (2014) | Dementia | 31 | – | 0.79 | – |
| Total | | 408 | 0.65 | 0.70 | 0.65 |

Note: Cutoff for Trial 1 $< 40$; Cutoff for Trial 2 $< 45$: Cutoff for Retention $< 45$.

particularly when traditional cutoffs are employed (Boone, 2018; Dean, Victor, Boone, Philpott, & Hess, 2009; McGuire et al., 2019; Olsen, Schroeder, Heinrichs, & Martin, 2018; Schroeder et al., 2012; Schroeder & Marshall, 2010). Because of this, samples comprised of patients with dementia were analyzed separately. TOMM performance in eight dementia samples across seven studies were identified, the results of which are provided in Table 18. Weighted mean specificity values were 0.70 or below across TOMM trials, at a cutoff of $<45$, with no single study finding false-positive rates to be less than 10%.

### Samples of examinees for whom English is not the primary language

The appropriateness of using the TOMM with individuals for whom English is not the primary language has been studied in both patients residing within and outside of the United States. Identified studies are listed in Table 19 and include patient samples administered the TOMM in Spanish, Dutch, German, and English (bilingual patients who requested English instructions). As can be seen, TOMM Trial 2, at a cutoff of $<45$, yielded $\geq 0.90$ specificity across 16 of the 19 validly performing samples. TOMM Retention, at a cutoff of $<45$, produced specificity within acceptable limits across each of the five valid performing samples in which TOMM Retention was administered. TOMM sensitivity ranged from 0.42 to 1.00 across samples.

### Discussion

Evidence-based practice extends beyond the minimum expectation of incorporating research into practice (Bowden, 2017; Guyatt et al., 2015). Rather, it requires that practitioners seek the highest level of evidence to inform their clinical decisions, which often presupposes utilization of systematic reviews and meta-analyses. Similarly, EBM grading systems designed to appraise the quality of evidence behind a given clinical practice generally assign low ratings when evidence is limited to single primary studies, with higher ratings reserved for practices supported by systematic reviews and meta-analyses. While the TOMM has been well researched by a number of primary studies, the current study is the first to systematically review and meta-analyze TOMM traditional and alternative cutoffs while following PRISMA guidelines.

**Table 19.** TOMM accuracy in examinees for whom English is not the primary language.

| Study | Country – Language | Sample | Validity Class | n | Trial | Specificity | Sensitivity |
|---|---|---|---|---|---|---|---|
| Van Hout, Schmand, Wekking, Hageman, and Deelman (2003) | Netherlands – Dutch | TE | Single PVT Pass | 82 | T2/TR | 0.96 | – |
| | | | Single PVT Fail | 63 | T2/TR | – | 0.43 |
| Merten, Bossink, and Schmand (2007) | Germany – German | CI – NCO | No Incentive | 24 | T2 | 0.94 | – |
| | | | No Incentive | 24 | TR | 0.96 | – |
| | Netherlands – Dutch | Elderly Controls | Controls | 14 | T2 | 1.00 | – |
| | | | Controls | 14 | TR | 1.00 | – |
| Vilar-López et al. (2007) | Spain – Spanish | PCS | No Litigation | 12 | T2 | 1.00 | – |
| | | | Litigation | 14 | T2 | – | 0.42 |
| | | | Simulators | 35 | T2 | – | 0.86 |
| Vilar-López et al. (2008) | Spain – Spanish | TBI mild | Slick Criteria - | 14 | T2 | 0.81 | – |
| | | | No Incentive | 30 | T2 | 1.00 | – |
| | | | Slick Criteria + | 10 | T2 | – | 1.00 |
| | | | Simulators | 54 | T2 | – | 0.85 |
| Jelicic, Ceunen, Peters, and Merckelbach (2011) | Netherlands – Dutch | Research Volunteers | Controls | 60 | T2 | 1.00 | – |
| | | | Controls | 60 | TR | 1.00 | – |
| | | | Controls | 60 | T2/TR | 1.00 | – |
| | | | Simulators | 30 | T2 | – | 0.83 |
| | | | Simulators | 30 | TR | – | 0.88 |
| | | | Simulators | 30 | T2/TR | – | 0.92 |
| Burton, Vilar-López, and Puente (2012) | USA – Spanish | Mixed Clinical | No Incentive | 29 | T2 | 0.93 | – |
| Strutt et al. (2012) | USA – Spanish | TBI w/ Primary Edu | Slick Criteria - | 5 | T2 | 0.61 | – |
| | | TBI w/ Secondary Edu | Slick Criteria - | 11 | T2 | 0.91 | – |
| | | TBI | Slick Criteria + | 4 | T2 | – | 1.00 |
| Nijdam-Jones et al. (2017) | Argentina – Spanish | Research Volunteers | No Incentive | 315 | T2 | 1.00 | – |
| | Bolivia – Spanish | | No Incentive | 262 | T2 | 0.90 | – |
| | Chile – Spanish | | No Incentive | 304 | T2 | 0.94 | – |
| | Colombia – Spanish | | No Incentive | 1380 | T2 | 0.94 | – |
| | Mexico – Spanish | | No Incentive | 545 | T2 | 0.96 | – |
| | Paraguay – Spanish | | No Incentive | 263 | T2 | 0.76 | – |
| | Peru – Spanish | | No Incentive | 238 | T2 | 0.98 | – |
| | USA/PR – Spanish | | No Incentive | 283 | T2 | 0.98 | – |
| Gasquoine, Weimer, and Amador (2017) | USA – Bilingual Spanish | | No Incentive | 61 | T2/TR | 0.97 | – |

Notes: TE = Toxic Encephalopathy, CI – NCO = Cognitive impairment, not clinically obvious, TBI = Traumatic brain injury, PCS = Post-concussive syndrome, USA = United States of America, PR = Puerto Rico, T2 = TOMM Trial 2, TR = TOMM retention trial, T2/R = Trial 2 and Retention, PVT = performance validity test, Slick Criteria -=Slick et al. (1999) criteria for malingering not met, Slick Criteria +=Slick et al. (1999) criteria for malingering met.

When results from all primary studies were pooled, findings for many TOMM validity indicators demonstrated significant between-sample heterogeneity. This indicates that the individual studies comprising the meta-analytic findings differed to such a degree that the pooled effect estimate did not accurately represent all included studies. Thus, the authors managed the heterogeneity by conducting subgroup analyses separating neurocognitive/psychiatric examinee samples from simulator/control and chronic pain samples. In doing so, the results were generally absent of statistically significant heterogeneity.

In addition to generally lacking statistically significant heterogeneity, neurocognitive/psychiatric samples consist of real-world neuropsychological examinees representative of those individuals evaluated in actual practice. For both of these reasons, the neurocognitive/psychiatric subgroup results can be viewed as offering more precise and generalizable estimates of actual TOMM sensitivity and specificity than those data derived from all of the studies pooled without consideration of study methodology or population. Examination of sample heterogeneity and subgroup analyses findings thus represent a significant strength of the study, as past studies aggregating TOMM data did not take such steps, thereby limiting external validity of the findings. Regarding results of the neurocognitive/psychiatric subgroup, traditional TOMM Trial 2 and Retention cutoffs demonstrated very strong specificity (i.e. 0.96–0.99), with specificity exceeding thresholds of acceptability across diagnostic subgroups, excepting patients with dementia. TOMM sensitivity was relatively lower, though, ranging from 0.45 to 0.55 when using conventional cutoff values.

Given the disparity between TOMM sensitivity and specificity and the promising results from primary studies that advocate for use of alternative TOMM interpretive methods (e.g. Greve et al., 2006a), the current authors examined the accuracy of Trial 1, as well as less conservative cutoffs for Trial 2 and Retention. The results of these analyses provide the first meta-analytic evidence that TOMM interpretation can be adapted to improve TOMM sensitivity while maintaining adequate specificity. A cutoff of <49 on both Trial 2 and Retention demonstrated ≥90% specificity when examining neurocognitive and psychiatric examinee samples, overall, and improved sensitivity notably for both Trial 2 and Retention (i.e. 0.62–0.70). Similarly, Trial 1 maintained specificity at ≥0.90, both at the previously recommended cutoff of <41 (Denning, 2012), as well as at a less conservative cutoff of <42. The Trial 1 cutoff of <42 demonstrated greater sensitivity than traditional Trial 2 and Retention cutoffs, and it demonstrated comparable sensitivity to the alternative Retention cutoff.

The relatively fewer number of studies reporting data for the alternative interpretive approaches precluded formal analysis of specific diagnostic subgroups outside of the aggregated neurocognitive/psychiatric group. That being said, specificity fell below 90% for Trial 2 and Retention at a cutoff of <49 in samples of patients with moderate/severe TBI and severe depression (Greve et al., 2006a; Yanez et al., 2006) and for Trial 1 at a cutoff of <42 in a sample of patients with moderate/severe TBI (Greve et al., 2006a; of note, individuals with severe depression were not examined at the Trial 1 cutoff of <42). Therefore, future researchers examining individuals with moderate/severe TBI and severe depression, as well as other populations expected to have similar levels of dysfunction, are encouraged to determine the appropriateness of

applying these revised and more stringent cutoffs to individuals with severe cognitive or psychiatric dysfunction.

Overall, these results establish the facts that 1) the TOMM is highly specific when interpreted per originally published traditional cutoffs and 2) TOMM specificity can be safely maintained by interpreting Trial 1 and less conservative Trial 2 or Retention cutoffs in individuals not suspected of significant cognitive or psychiatric impairment. Trial 2 or Retention scores of <45 should be interpreted as invalid across most settings and diagnostic populations, and scores of <49 should be interpreted as invalid in cases where significant impairment is not expected, such as mTBI. Examiners should consider the impact of base rates on PPP and NPP when considering test scores of the individual examinee, realizing that the likelihood for false-positive error decreases in settings with higher rates of invalidity. Juxtaposed, these points illustrate that, particularly in forensic settings where base rates of invalidity approximate 40%–50% (Ardolf, Denney, & Houston, 2007; Larrabee, 2003; Mittenberg et al., 2002), TOMM Trial 2 or Retention performances of <49 in an examinee with a mTBI or injury/illness of equivalent expected cognitive impact should be interpreted as invalid with a high degree of confidence.

The current study is the second meta-analysis of TOMM Trial 2 performance and the first published since that of Sollman and Berry (2011). In comparison with Sollman and Berry's findings, the current study discovered Trial 2 to yield similar specificity. That is, the current study found specificity to be 0.97 and 0.96 in all samples and neurocognitive/psychiatric samples, respectively, and Sollman and Berry found Trial 2 to achieve 0.94 specificity across all samples. However, whereas Sollman and Berry report Trial 2 sensitivity to be 0.65, the current study found sensitivity to be 0.56 when examining known groups and simulator/control studies collectively, but only 0.46 when examining actual neurocognitive/psychiatric groups individually.

Differences in sensitivity values between the current results and those published by Sollman and Berry (2011) might be due to a combination of factors. First, studies included in the current study, while overlapping, differ from those included by Sollman and Berry. Specifically, 22 studies overall were examined in the previous meta-analysis, whereas the current study included data from 43 studies. Broken down further, of the 21 Trial 2 studies aggregated for classification accuracy by Sollman and Berry, 57% (12/21) were included in the present analyses. The nine studies not included in the present study were excluded due to being dissertations not published in a peer-reviewed journal ($n = 6$), not being identified by the current study search criteria ($n = 2$), or not having data reported within the article that would allow for calculation of accuracy statistics ($n = 1$). Two of the 12 Sollman and Berry articles included in the present study were included in the combined Trial 2 and Retention analyses in the current paper as these studies did not report accuracy statistics separately for Trial 2 and Retention. Of the 43 studies included in the analysis of Trial 2 sensitivity and/or specificity in the current study, 77% (33/43) were new to the current analyses. Studies included in the present study that were not included in Sollman and Berry's study seemingly were excluded from the latter due to either 1) articles being published after that author group's search date or 2) articles only presenting sensitivity *or* specificity data (not both), which was exclusionary for the earlier study but not for the present study.

A second factor potentially explaining sensitivity differences between the current results and those of Sollman and Berry (2011) is the difference in aggregation of study designs within the meta-analyses. In the current meta-analysis, the authors used separate analyses of neurocognitive/psychiatric examinees subjected to external criterion (known groups) and simulator/control samples, while Sollman and Berry aggregated both of these study designs together. When examining only simulator/control samples, weighted mean sensitivity of Trial 2 in the current study was 0.66, which is nearly identical to the sensitivity of Trial 2 found by Sollman and Berry (i.e. 0.65). By contrast, sensitivity of Trial 2 in the current study was 0.46 at traditional cutoffs when examining only known groups. While Sollman and Berry found the effect sizes in PVT performance, overall, to not significantly differ between simulator/control studies involving healthy research participants and known-groups designs using real patients, there was a notable difference in TOMM sensitivity according to which of these methodologies was employed (i.e. 0.68 vs. 0.55). This is consistent with previous findings that simulated malingerers perform worse than actual malingerers on the TOMM (Brennan & Gouvier, 2006) as well as findings from the current study demonstrating that studies of simulated neurocognitive disorder find higher sensitivity values than known-groups designs of neurocognitive/psychiatric samples. Therefore, TOMM classification accuracy, especially test sensitivity, appears to vary according to use of simulator/control versus known-groups approaches, which further helps to explain why Trial 2 sensitivity reported by Sollman and Berry was higher than that found in our examination of neurocognitive/psychiatric patients.

Another important aspect of the current study is that it systematically reviewed primary studies examining TOMM performance in special populations: individuals with dementia and individuals for whom English is not the primary language. In patients with dementia, the findings are consistent with the general PVT literature (Boone, 2018; Dean et al., 2009; McGuire et al., 2019; Schroeder et al., 2012) by demonstrating unacceptably high false-positive rates and indicating that traditional TOMM cutoffs should not be interpreted in individuals with suspected or confirmed dementia. Conversely, the reviewed literature indicates that the TOMM is adequately specific across most samples of examinees whose primary language is not English, even when residing outside of the United States. Of note, in the largest study of TOMM performance in non-English-speaking examinees (Nijdam-Jones et al., 2017), specificity was generally at, or, in many cases, well-above 90% across Latin American countries; the only exception was that TOMM Trial 2 yielded a 24% false-positive rate in examinees from Paraguay. Nijdam-Jones and colleagues further found that TOMM performance correlated with age and education, and noted that the magnitude of the correlations varied according to Latin American country, being particularly strong in examinees from Paraguay. Similarly, in a much smaller sample of examinees, Strutt, Scott, Lozano, Tieu, and Peery (2012) found high specificity in Spanish speakers who completed secondary education, but an unacceptably high false-positive rate in those with only a primary level of education. Results from both studies suggest that cohort-specific factors uniquely associated with age or very low education in certain non-English-speaking examinee groups likely account for the findings given that they are not replicated in English-speaking populations. Overall, while these factors require

consideration, the reviewed studies support the use of traditional TOMM cutoffs in the majority of individuals administered the TOMM in a language other than English. At the same time, ongoing research to collect further country- and language-specific normative data and to investigate the influence of potential moderating factors in non-English-speaking examinees would be beneficial.

An important limitation, which can also be viewed as a potential strength of the study, is that the authors excluded non-peer-reviewed studies. Such a practice increases the risk of omitting samples with less positive results, possibly resulting in publication bias (Guyatt et al., 2015). At the same time, unpublished studies were not included in our review for several reasons. First, when examined empirically, including unpublished studies or "grey literature" in meta-analyses generally has a negligible impact regarding study findings (Hartling et al., 2017; Schmucker et al., 2017). Second, publication bias, or "the file drawer problem," might be of particular concern in intervention/therapy studies given that negative or non-significant findings might be less likely published than those demonstrating an intervention to be effective. However, given that studies of the TOMM examine diagnostic accuracy statistics, which cannot yield a non-significant result, such a threat was believed minimal. If anything, studies with TOMM accuracy statistics discrepant from traditional findings might actually be of greater interest to research consumers. Third, as opposed to intervention/therapy studies that are frequently sponsored or written by the producer of the therapy agent, only one of the articles identified by the systematic review included authors personally associated with the TOMM (i.e. Tombaugh, 1997). Thus, the literature base would not seem highly susceptible to promulgating certain findings and suppressing others.

While the authors believed that inclusion of unpublished studies would yield little benefit in reducing bias, they believed that including these studies would potentially be harmful by increasing the possibility of bias by two different processes. First, when including unpublished studies, those that are located may be unrepresentative of the total body of unpublished studies on a topic (Higgins & Green, 2008), resulting in a selection bias. Second, unpublished studies are not subject to peer review and may be of lower methodological quality. For example, Egger, Juni, Bartlett, Holenstein, and Sterne (2003) found that unpublished studies were often of lower quality than published studies. Specifically, the authors found in their review of 60 meta-analyses of clinical trials, allocation concealment and binding of outcome assessor were better in published versus unpublished studies. Given that inclusion of unpublished studies could potentially increase rather than decrease potential bias, the authors determined a priori to include only published studies in this systematic review.

Finally, given that approximately 15 months had elapsed from the initial search to submission of the current article, a second literature search was conducted at the time of peer review using PsychINFO database. Two additional articles were identified after applying study selection criteria (i.e. Kanser, Rapport, Bashem, & Hanks, 2019; Oudman et al., 2019). Kanser et al. found TOMM Trial 2 specificity to be 1.00 in healthy controls ($n = 61$) and 0.98 in TBI patients ($n = 45$), and sensitivity to be 0.73 in simulators ($n = 45$). Oudman et al. found Trial 2 specificity to be 1.00 in a group of healthy controls ($n = 20$). Given the relatively small sizes of the samples used in these two articles and the concordance between the study findings and the results of this meta-analysis,

inclusion of the studies would not be anticipated to have any impactful bearing on the results of the meta-analysis. Therefore, a revision of the data analyses, which would require deviation from a priori established procedures, was not conducted.

## Conclusions

In conclusion, the current study reports several findings that will aide clinicians in the interpretation of the TOMM. First, a cutoff of <42 on Trial 1 appears to be most appropriate as it optimizes test sensitivity while maintaining greater than 0.90 specificity across studies, overall. Second, traditional cutoffs (<45) on Trial 2 and Retention are associated with very high specificity, but at the sacrifice of test sensitivity. Third, TOMM Trial 2 or Retention performances of <49 can be interpreted as invalid with a high degree of confidence when evaluating individuals not suspected of severe impairment in settings with higher base rates of invalidity, and, consequently, higher PPP (e.g. forensic settings).

## Disclosure statement

No potential conflict of interest was reported by the authors.

## References

An, K. Y., Kaploun, K., Erdodi, L. A., & Abeare, C. A. (2017). Performance validity in undergraduate research participants: A comparison of failure rates across tests and cutoffs. *The Clinical Neuropsychologist*, 31(1), 193–206. doi:10.1080/13854046.2016.1217046

An, K. Y., Zakzanis, K. K., & Joordens, S. (2012). Conducting research with non-clinical healthy undergraduates: Does effort play a role in neuropsychological test performance? *Archives of Clinical Neuropsychology*, 27(8), 849–857. doi:10.1093/arclin/acs085

Ardolf, B. R., Denney, R. L., & Houston, C. M. (2007). Base rates of negative response bias and malingered neurocognitive dysfunction among criminal defendants referred for neuropsychological evaluation. *The Clinical Neuropsychologist*, 21(6), 899–916.

Armistead-Jehle, P., & Gervais, R. O. (2011). Sensitivity of the test of memory malingering and the nonverbal medical symptom validity test: A replication study. *Applied Neuropsychology*, 18(4), 284–290. doi:10.1080/09084282.2011.595455

Ashendorf, L., Constantinou, M., & McCaffrey, R. J. (2004). The effect of depression and anxiety on the TOMM in community-dwelling older adults. *Archives of Clinical Neuropsychology*, 19(1), 125–130. doi:10.1093/arclin/19.1.125

Ashendorf, L., O'Bryant, S. E., & McCaffrey, R. J. (2003). Specificity of malingering detection strategies in older adults using the CVLT and WCST. *The Clinical Neuropsychologist*, 17(2), 255–262. doi:10.1076/clin.17.2.255.16502

Bailey, K. C., Soble, J. R., & O'Rourke, J. J. (2018). Clinical utility of the Rey 15-Item Test, recognition trial, and error scores for detecting noncredible neuropsychological performance in a mixed clinical sample of veterans. *The Clinical Neuropsychologist*, 32(1), 119–131. doi:10.1080/13854046.2017.1333151

Bain, K. M., & Soble, J. R. (2017). Validation of the advanced clinical solutions word choice test (WCT) in a mixed clinical sample: Establishing classification accuracy, sensitivity/specificity, and cutoff scores. *Assessment*, doi:10.1177/1073191117725172

Barhon, L. I., Batchelor, J., Meares, S., Chekaluk, E., & Shores, E. A. (2015). A comparison of the degree of effort involved in the TOMM and the ACS Word Choice Test using a dual-task paradigm. *Applied Neuropsychology: Adult*, 22(2), 114–123. doi:10.1080/23279095.2013.863775

Bashem, J. R., Rapport, L. J., Miller, J. B., Hanks, R. A., Axelrod, B. N., & Millis, S. R. (2014). Comparisons of five performance validity indices in bona fide and simulated traumatic brain injury. *The Clinical Neuropsychologist*, 28(5), 851–875. doi:10.1080/13854046.2014.927927

Batt, K., Shores, E. A., & Chekaluk, E. (2008). The effect of distraction on the Word Memory Test and Test of Memory Malingering performance in patients with a severe brain injury. *Journal of the International Neuropsychological Society*, 14(6), 1074–1080. doi:10.1017/S135561770808137X

Bolan, B., Foster, J. K., Schmand, B., & Bolan, S. (2002). A comparison of three tests to detect feigned amnesia: The effects of feedback and the measurement of response latency. *Journal of Clinical and Experimental Neuropsychology*, 24(2), 154–167. doi:10.1076/jcen.24.2.154.1000

Boone, K. B. (2018). Assessment of neurocognitive performance validity. In J. E. Morgan, & J. H. Ricker (Eds.), *Textbook of clinical neuropsychology* (2nd ed., pp. 39–50). New York, NY: Routledge.

Bortnik, K. E., Horner, M. D., & Bachman, D. L. (2013). Performance on standard indexes of effort among patients with dementia. *Applied Neuropsychology: Adult*, 20(4), 233–242. doi:10.1080/09084282.2012.695757

Bowden, S. C. (2017). Why do we need evidence-based neuropsychological practice? *Neuropsychological assessment in the age of evidence-based practice: Diagnostic and treatment evaluations* (pp. 1–11).

Brennan, A. M., & Gouvier, W. M. (2006). Are we honestly studying malingering? A profile and comparison of simulated suspected malingerers. *Applied Neuropsychology*, 13(1), 1–11.

Buddin, W. H., Schroeder, R. W., Hargrave, D. D., Von Dran, E. J., Campbell, E. B., Brockman, C. J., … Baade, L. E. (2014). An examination of the frequency of invalid forgetting on the Test of Memory Malingering. *The Clinical Neuropsychologist*, 28(3), 525–542. doi:10.1080/13854046.2014.906658

Burton, V., Vilar-López, R., & Puente, A. E. (2012). Measuring effort in neuropsychological evaluations of forensic cases of Spanish speakers. *Archives of Clinical Neuropsychology*, 27(3), 262–267. doi:10.1093/arclin/acs026

Bush, S. S., Ruff, R. M., Troster, A. I., Barth, J. T., Koffler, S. P., Pliskin, N. H., … Silver, C. H. (2005). Symptom validity assessment: Practice issues and medical necessity NAN Policy and Planning Committee. *Archives of Clinical Neuropsychology*, 20(4), 419–426. doi:10.1016/j.acn.2005.02.002

Chelune, G. J. (2017). Evidence-based practices in neuropsychology. *Neuropsychological Assessment in the Age of Evidence-Based Practice: Diagnostic and Treatment Evaluations*, 155–181.

Davis, J. J., Wall, J. R., & Whitney, K. A. (2012). Derivation and clinical validation of consistency indices on the Test of Memory Malingering. *Archives of Clinical Neuropsychology*, 27(7), 706–715. doi:10.1093/arclin/acs078

Dean, A. C., Victor, T. L., Boone, K. B., Philpott, L. M., & Hess, R. A. (2009). Dementia and effort test performance. *The Clinical Neuropsychologist*, 23(1), 133–152. doi:10.1080/13854040701819050

DenBoer, J. W., & Hall, S. (2007). Neuropsychological test performance of successful brain injury simulators. *The Clinical Neuropsychologist*, 21(6), 943–955. doi:10.1080/13854040601020783

Denning, J. H. (2012). The efficiency and accuracy of The Test of Memory Malingering trial 1, errors on the first 10 items of The Test of Memory Malingering, and five embedded measures in predicting invalid test performance. *Archives of Clinical Neuropsychology*, 27(4), 417–432. doi:10.1093/arclin/acs044

Denning, J. H. (2014). Combining the Test of Memory Malingering Trial 1 with behavioral responses improves the detection of effort test failure. *Applied Neuropsychology: Adult*, 21(4), 269–277. doi:10.1080/23279095.2013.811076

Egger, M., Juni, P., Bartlett, C., Holenstein, F., & Sterne, J. (2003). How important are comprehensive literature searches and the assessment of trial quality in systematic reviews? Empirical study. *Health Technology Assessment*, 7(1), 1–76.

Erdodi, L. A., & Rai, J. K. (2017). A single error is one too many: Examining alternative cutoffs on Trial 2 of the TOMM. *Brain Injury*, 31(10), 1362–1368. doi:10.1080/02699052.2017.1332386

Etherton, J. L., Bianchini, K. J., Greve, K. W., & Ciota, M. A. (2005). Test of Memory Malingering performance is unaffected by laboratory-induced pain: Implications for clinical use. *Archives of Clinical Neuropsychology*, 20(3), 375–384. doi:10.1016/j.acn.2004.09.007

Fazio, R. L., Denning, J. H., & Denney, R. L. (2017). TOMM Trial 1 as a performance validity indicator in a criminal forensic sample. *The Clinical Neuropsychologist*, 31(1), 251–267. doi:10.1080/13854046.2016.1213316

Fazio, R. L., Sanders, J. F., & Denney, R. L. (2015). Comparison of performance of the Test of Memory Malingering and Word Memory Test in a criminal forensic sample. *Archives of Clinical Neuropsychology*, 30(4), 293–301. doi:10.1093/arclin/acv024

Gasquoine, P. G., Weimer, A. A., & Amador, A. (2017). Specificity rates for non-clinical, bilingual, Mexican Americans on three popular performance validity measures. *The Clinical Neuropsychologist*, 31(3), 587–597. doi:10.1080/13854046.2016.1277786

Gervais, R. O., Rohling, M. L., Green, P., & Ford, W. (2004). A comparison of WMT, CARB, and TOMM failure rates in non-head injury disability claimants. *Archives of Clinical Neuropsychology*, 19(4), 475–487. doi:10.1016/S0887-6177(03)00111-2

Green, P. (2011). Comparison between the Test of Memory Malingering (TOMM) and the Nonverbal Medical Symptom Validity Test (NV-MSVT) in adults with disability claims. *Applied Neuropsychology*, 18(1), 18–26. doi:10.1080/09084282.2010.523365

Green, D., Rosenfeld, B., Belfi, B., Rohlehr, L., & Pierson, A. (2012). Use of measures of cognitive effort and feigned psychiatric symptoms with pretrial forensic psychiatric patients. *International Journal of Forensic Mental Health*, 11(3), 181–190. doi:10.1080/14999013.2012.723665

Greiffenstein, M. F., Greve, K. W., Bianchini, K. J., & Baker, W. J. (2008). Test of Memory Malingering and Word Memory Test: A new comparison of failure concordance rates. *Archives of Clinical Neuropsychology*, 23(7–8), 801–807. doi:10.1016/j.acn.2008.07.005

Greve, K. W., Bianchini, K. J., Black, F. W., Heinly, M. T., Love, J. M., Swift, D. A., & Ciota, M. (2006a). Classification accuracy of the Test of Memory Malingering in persons reporting exposure to environmental and industrial toxins: Results of a known-groups analysis. *Archives of Clinical Neuropsychology*, 21(5), 439–448. doi:10.1016/j.acn.2006.06.004

Greve, K. W., Bianchini, K. J., & Doane, B. M. (2006b). Classification accuracy of the Test of Memory Malingering in traumatic brain injury: Results of a known-groups analysis. *Journal of Clinical and Experimental Neuropsychology*, 28(7), 1176–1190. doi:10.1080/13803390500263550

Greve, K. W., Etherton, J. L., Ord, J., Bianchini, K. J., & Curtis, K. L. (2009). Detecting malingered pain-related disability: Classification accuracy of the Test of Memory Malingering. *The Clinical Neuropsychologist*, 23(7), 1250–1271. doi:10.1080/13854040902828272

Greve, K. W., Ord, J., Curtis, K. L., Bianchini, K. J., & Brennan, A. (2008). Detecting malingering in traumatic brain injury and chronic pain: A comparison of three forced-choice symptoms validity tests. *The Clinical Neuropsychologist*, 22(5), 896–918. doi:10.1080/13854040701565208

Gunner, J. H., Miele, A. D., Lynch, J. K., & McCaffrey, R. J. (2012). The Albany Consistency Index for the Test of Memory Malingering. *Archives of Clinical Neuropsychology*, 27(1), 1–9. doi:10.1093/arclin/acr089

Guyatt, G., Rennie, D., Meade, M., & Cook, D. (Eds.). (2015). *Users' guides to the medical literature: A manual for evidence-based clinical practice* (3rd ed.). Chicago: AMA press.

Haber, A. H., & Fichtenberg, N. L. (2006). Replication of the Test of Memory Malingering (TOMM) in a traumatic brain injury and head trauma sample. *The Clinical Neuropsychologist*, 20(3), 524–532. doi:10.1080/13854040590967595

Hartling, L., Featherstone, R., Nuspl, M., Shave, K., Dryden, D. M., & Vandermeer, B. (2017). Grey literature in systematic reviews: A cross-sectional study of the contribution of non-English reports, unpublished studies and dissertations to the results of meta-analyses in child-relevant reviews. *BMC Medical Research Methodology*, 17(1), 64. doi:10.1186/s12874-017-0347-z

Heilbronner, R. L., Sweet, J. J., Morgan, J. E., Larrabee, G. L., Millis, S. R, & Conference Participants. (2009). American Academy of Clinical Neuropsychology Consensus Conference Statement on the neuropsychological assessment of effort, response bias, and malingering. *The Clinical Neuropsychologist*, 23, 1093–1129.

Heinze, M. C., & Purisch, A. D. (2001). Beneath the mask: Use of psychological tests to detect and subtype malingering in criminal defendants. *Journal of Forensic Psychology Practice*, 1(4), 23–52. doi:10.1300/J158v01n04_02

Higgins, J. P., & Green, S. (Eds.). (2008). *Cochrane handbook for systematic reviews of interventions*. Version 5.0.0. The Cochrane Collaboration. Retrieved from http://www.cochrane-handbook.org.

Institute of Medicine. (2015). *Psychological testing in the service of disability determination: Report brief*. Washington, DC: Institute of Medicine

Iverson, G. L., Page, J. L., Koehler, B. E., Shojania, K., & Badii, M. (2007). Test of Memory Malingering (TOMM) scores are not affected by chronic pain or depression in patients with fibromyalgia. *The Clinical Neuropsychologist*, 21(3), 532–546. doi:10.1080/13854040060611392

Jackson, D., & Turner, R. (2017). Power analysis for random-effects meta-analysis. *Research Synthesis Methods*, 8(3), 290–302. doi:10.1002/jrsm.1240

Jasinski, L. J., Harp, J. P., Berry, D. T., Shandera-Ochsner, A. L., Mason, L. H., & Ranseen, J. D. (2011). Using symptom validity tests to detect malingered ADHD in college students. *The Clinical Neuropsychologist*, 25(8), 1415–1428. doi:10.1080/13854046.2011.630024

Jelicic, M., Ceunen, E., Peters, M. J., & Merckelbach, H. (2011). Detecting coached feigning using the Test of Memory Malingering (TOMM) and the Structured Inventory of Malingered Symptomatology (SIMS). *Journal of Clinical Psychology*, 67(9), 850–855. doi:10.1002/jclp.20805

Jones, A. (2013). Test of memory malingering: Cutoff scores for psychometrically defined malingering groups in a military sample. *The Clinical Neuropsychologist*, 27(6), 1043–1059. doi:10.1080/13854046.2013.804949

Kanser, R. J., Rapport, L. J., Bashem, J. R., & Hanks, R. A. (2019). Detecting malingering in traumatic brain injury: Combining response time with performance validity test accuracy. *The Clinical Neuropsychologist*, 33(1), 90–107. doi:10.1080/13854046.2018.1440006

Kemp, S., Coughlan, A.K., Rowbottom, C., Wilkinson, K., Teggart, V., & Baker, G. (2008). The base rate of effort test failure in patients with medically unexplained symptoms. *Journal of Psychosomatic Research*, 65, 319–325.

Kulas, J. F., Axelrod, B. N., & Rinaldi, A. R. (2014). Cross-validation of supplemental Test of Memory Malingering scores as performance validity measures. *Psychological Injury and Law*, 7(3), 236–244. doi:10.1007/s12207-014-9200-4

Larrabee, G. J. (2003). Detection of malingering using atypical performance patterns on standard neuropsychological tests. *The Clinical Neuropsychology (Neuropsychology, Development and Cognition: Section D)*, 17(3), 410–425. doi:10.1076/clin.17.3.410.18089

Lee, J., Kim, K. W., Choi, S. H., Huh, J., & Park, S. H. (2015). Systematic review and meta-analysis of studies evaluating diagnostic test accuracy: A practical review for clinical researchers-part II. Statistical methods of meta-analysis. *Korean Journal of Radiology*, 16(6), 1188–1196. doi:10.3348/kjr.2015.16.6.1188

Lindstrom, W. A., Jr, Lindstrom, J. H., Coleman, C., Nelson, J., & Gregg, N. (2009). The diagnostic accuracy of symptom validity tests when used with postsecondary students with learning disabilities: A preliminary investigation. *Archives of Clinical Neuropsychology*, 24(7), 659–669. doi:10.1093/arclin/acp071

Love, C. M., Glassmire, D. M., Zanolini, S. J., & Wolf, A. (2014). Specificity and false positive rates of the Test of Memory Malingering, Rey 15-Item Test, and Rey Word Recognition Test among forensic inpatients with intellectual disabilities. *Assessment*, 21(5), 618–627. doi:10.1177/1073191114528028

Martin, P. K., Schroeder, R. W., & Odland, A. P. (2015). Neuropsychologists' validity testing beliefs and practices: A survey of North American professionals. *The Clinical Neuropsychologist*, 29(6), 741–776. doi:10.1080/13854046.2015.1087597

McGuire, C., Crawford, S., & Evans, J. J. (2019). Effort testing in dementia assessment: A systematic review. *Archives of Clinical Neuropsychology*, 34(1), 114–131. doi:10.1093/arclin/acy012

Merten, T., Bossink, L., & Schmand, B. (2007). On the limits of effort testing: Symptom validity tests and severity of neurocognitive symptoms in nonlitigant patients. *Journal of Clinical and Experimental Neuropsychology*, 29(3), 308–318. doi:10.1080/13803390600693607

Miller, J. B. (2017). Critically appraised topics for intervention studies: Practical implementation methods for the clinician-scientist. *Neuropsychological Assessment in the Age of Evidence-Based Practice: Diagnostic and Treatment Evaluations*, 259.

Mittenberg, W., Patton, C., Canyock, E. M., & Condit, D. C. (2002). Base rates of malingering and symptom exaggeration. *Journal of Clinical and Experimental Neuropsychology (Neuropsychology, Development and Cognition: Section A)*, 24(8), 1094–1102. doi:10.1076/jcen.24.8.1094.8379

Nijdam-Jones, A., Rivera, D., Rosenfeld, B., & Arango-Lasprilla, J. C. (2017). A cross-cultural analysis of the Test of Memory Malingering among Latin American Spanish-speaking adults. *Law and Human Behavior*, 41(5), 422. doi:10.1037/lhb0000250

O'Bryant, S. E., Engel, L. R., Kleiner, J. S., Vasterling, J. J., & Black, F. W. (2007). Test of Memory Malingering (TOMM) trial 1 as a screening measure for insufficient effort. *The Clinical Neuropsychologist*, 21, 511–521. doi:10.1080/13854040600611368

O'Bryant, S. E., Gavett, B. E., McCaffrey, R. J., O'Jile, J. R., Huerkamp, J. K., Smitherman, T. A., & Humphreys, J. D. (2008). Clinical utility of Trial 1 of the Test of Memory Malingering (TOMM). *Applied Neuropsychology*, 15(2), 113–116. doi:10.1080/09084280802083921

Olsen, D. H., Schroeder, R. W., Heinrichs, R. J., & Martin, P. K. (2018). Examination of optimal embedded PVTs within the BVMT-R in an outpatient clinical sample. *The Clinical Neuropsychologist*, 33(4), 1–11. doi:10.1080/13854046.2018.1501096

Oudman, E., Krooshof, E., van Oort, R., Lloyd, B., Wijnia, J. W., & Postma, A. (2019). Effects of Korsakoff Amnesia on performance and symptom validity testing. *Applied Neuropsychology: Adult*, 1–9. doi:10.1080/23279095.2019.1576180

Pivovarova, E., Rosenfeld, B., Dole, T., Green, D., & Zapf, P. (2009). Are measures of cognitive effort and motivation useful in differentiating feigned from genuine psychiatric symptoms? *International Journal of Forensic Mental Health*, 8(4), 271–278. doi:10.1080/14999011003635514

Powell, M. R., Gfeller, J. D., Hendricks, B. L., & Sharland, M. (2004). Detecting symptom- and test-coached simulators with the Test of Memory Malingering. *Archives of Clinical Neuropsychology*, 19(5), 693–702. doi:10.1016/j.acn.2004.04.001

Price, K. L., DeSantis, S. M., Simpson, A. N., Tolliver, B. K., McRae-Clark, A. L., Saladin, M. E., … Brady, K. T. (2011). The impact of clinical and demographic variables on cognitive performance in methamphetamine-dependent individuals in Rural South Carolina. *The American Journal on Addictions*, 20(5), 447–455. doi:10.1111/j.1521-0391.2011.00164.x

Rees, L. M., Tombaugh, T. N., Gansler, D. A., & Moczynski, N. P. (1998). Five validation experiments of the Test of Memory Malingering (TOMM). *Psychological Assessment*, 10(1), 10. doi:10.1037//1040-3590.10.1.10

Rosenfeld, B., Green, D., Pivovarova, E., Dole, T., & Zapf, P. (2010). What to do with contradictory data? Approaches to the integration of multiple malingering measures. *International Journal of Forensic Mental Health*, 9(2), 63–73. doi:10.1080/14999013.2010.499559

Ryan, J. J., Glass, L. A., Hinds, R. M., & Brown, C. N. (2010). Administration order effects on the Test of Memory Malingering. *Applied Neuropsychology*, 17(4), 246–250. doi:10.1080/09084282.2010.499802

Schenk, K., & Sullivan, K. A. (2010). Do warnings deter rather than produce more sophisticated malingering? *Journal of Clinical and Experimental Neuropsychology*, 32(7), 752–762. doi:10.1080/13803390903512678

Schroeder, R. W., Buddin, W. H., Hargrave, D. D., VonDran, E. J., Campbell, E. B., Brockman, C. J., … Baade, L. E. (2013). Efficacy of Test of Memory Malingering Trial 1, Trial 1, the Retention Trial, and the Albany Consistency Index in a criterion group forensic neuropsychological sample. *Archives of Clinical Neuropsychology*, 28(1), 21–29. doi:10.1093/arclin/acs094

Schroeder, R. W., & Marshall, P. S. (2010). Validation of the sentence repetition test as a measure of suspect effort. *The Clinical Neuropsychologist*, 24(2), 326–343. doi:10.1080/13854040903369441

Schroeder, R. W., Martin, P. K., & Odland, A. P. (2016). Expert beliefs and practices regarding neuropsychological validity testing. *The Clinical Neuropsychologist*, 30(4), 515–535. doi:10.1080/13854046.2016.1177118

Schroeder, R. W., Twumasi-Ankrah, P., Baade, L. E., & Marshall, P. S. (2012). Reliable Digit Span: A systematic review and cross-validation study. *Assessment*, 19(1), 21–30. doi:10.1177/1073191111428764

Schmucker, C. M., Blümle, A., Schell, L. K., Schwarzer, G., Oeller, P., Cabrera, L., … Meerpohl, J. J. (2017). Systematic review finds that study data not published in full text articles have unclear impact on meta-analyses results in medical research. *PLoS One*, 12(4), e0176210. doi:10.1371/journal.pone.0176210

Shandera, A. L., Berry, D. T., Clark, J. A., Schipper, L. J., Graue, L. O., & Harp, J. P. (2010). Detection of malingered mental retardation. *Psychological Assessment*, 22(1), 50. doi:10.1037/a0016585

Slick, D. J., Sherman, E. M. S., & Iverson, G. L. (1999). Diagnostic criteria for malingered neurocognitive dysfunction: Proposed standards for clinical practice and research. *The Clinical Neuropsychologist*, 13(4), 545–561. doi:10.1076/1385-4046(199911)13:04;1-Y;FT545

Smith, K., Boone, K., Victor, T., Miora, D., Cottingham, M., Ziegler, E., … Wright, M. (2014). Comparison of credible patients of very low intelligence and non-credible patients on neurocognitive performance validity indicators. *The Clinical Neuropsychologist*, 28(6), 1048–1070. doi:10.1080/13854046.2014.931465

Sollman, M. J., & Berry, D. T. R. (2011). Detection of inadequate effort on neuropsychological testing: A meta-analytic update and extension. *Archives of Clinical Neuropsychology*, 26(8), 774–789. doi:10.1093/arclin/acr066

Sollman, M. J., Ranseen, J. D., & Berry, D. T. (2010). Detection of feigned ADHD in college students. *Psychological Assessment*, 22(2), 325. doi:10.1037/a0018857

Strutt, A. M., Scott, B. M., Lozano, V. J., Tieu, P. G., & Peery, S. (2012). Assessing sub-optimal performance with the Test of Memory Malingering in Spanish speaking patients with TBI. *Brain Injury*, 26(6), 853–863. doi:10.3109/02699052.2012.655366

Sullivan, K. A., & Elliott, C. (2012). An investigation of the validity of the MMPI-2 response bias scale using an analog simulation design. *The Clinical Neuropsychologist*, 26(1), 160–176. doi:10.1080/13854046.2011.647084

Takwoingi, Y., Guo, B., Riley, R. D., & Deeks, J. J. (2017). Performance of methods for meta-analysis of diagnostic test accuracy with few studies or sparse data. *Statistical Methods in Medical Research*, 26(4), 1896–1911. doi:10.1177/0962280215592269

Tan, J. E., Slick, D. J., Strauss, E., & Hultsch, D. F. (2002). How'd they do it? Malingering strategies on symptom validity tests. *The Clinical Neuropsychologist*, 16(4), 495–505. doi:10.1076/clin.16.4.495.13909

Teichner, G., & Wagner, M. T. (2004). The Test of Memory Malingering (TOMM): Normative data from cognitively intact, cognitively impaired, and elderly patients with dementia. *Archives of Clinical Neuropsychology*, 19(3), 455–464. doi:10.1016/S0887-6177(03)00078-7

Tombaugh, T. N. (1997). The Test of Memory Malingering (TOMM): Normative data from cognitively intact and cognitively impaired individuals. *Psychological Assessment*, 9(3), 260. doi:10.1037/1040-3590.9.3.260

van Hout, M. S., Schmand, B., Wekking, E. M., Hageman, G., & Deelman, B. G. (2003). Suboptimal performance on neuropsychological tests in patients with suspected chronic toxic encephalopathy. *Neurotoxicology*, 24(4–5), 547–551. doi:10.1016/S0161-813X(03)00054-8

Vanderslice-Barr, J. L., Miele, A. S., Jardin, B., & McCaffrey, R. J. (2011). Comparison of computerized versus booklet versions of the TOMM™. *Applied Neuropsychology*, 18(1), 34–36. doi:10.1080/09084282.2010.523377

Vilar-López, R., Santiago-Ramajo, S., Gómez-Río, M., Verdejo-García, A., Llamas, J. M., & Pérez-García, M. (2007). Detection of malingering in a Spanish population using three specific malingering tests. *Archives of Clinical Neuropsychology*, 22(3), 379–388. doi:10.1016/j.acn.2007.01.012

Vilar-López, R., Gómez-Río, M., Santiago-Ramajo, S., Rodríguez-Fernández, A., Puente, A. E., & Pérez, G., M. (2008). Malingering detection in a Spanish population with a known-groups design. *Archives of Clinical Neuropsychology*, 23(4), 365–377. doi:10.1016/j.acn.2008.01.007

Case 2:23-cr-00047-JLS   Document 123   Filed 08/31/23   Page 168 of 184   Page ID #:2214



Walter, J., Morris, J., Swier-Vosnos, A., & Pliskin, N. (2014). Effects of severity of dementia on a symptom validity measure. *The Clinical Neuropsychologist*, *28*(7), 1197–1208. doi:10.1080/13854046.2014.960454

Weinborn, M., Woods, S. P., Nulsen, C., & Leighton, A. (2012). The effects of coaching on the verbal and nonverbal medical symptom validity tests. *The Clinical Neuropsychologist*, *26*(5), 832–849. doi:10.1080/13854046.2012.686630

Williamson, K. D., Combs, H. L., Berry, D. T., Harp, J. P., Mason, L. H., & Edmundson, M. (2014). Discriminating among ADHD alone, ADHD with a comorbid psychological disorder, and feigned ADHD in a college sample. *The Clinical Neuropsychologist*, *28*(7), 1182–1196. doi:10.1080/13854046.2014.956674

Yanez, Y. T., Fremouw, W., Tennant, J., Strunk, J., & Coker, K. (2006). Effects of severe depression on TOMM performance among disability-seeking outpatients. *Archives of Clinical Neuropsychology*, *21*(2), 161–165. doi:10.1016/j.acn.2005.07.009

EXHIBIT 28



**The Clinical Neuropsychologist**



ISSN: 1385-4046 (Print) 1744-4144 (Online) Journal homepage: http://www.tandfonline.com/loi/ntcn20

# Cross-validation of the Dot Counting Test in a large sample of credible and non-credible patients referred for neuropsychological testing

Courtney McCaul, Kyle B. Boone, Annette Ermshar, Maria Cottingham, Tara L. Victor, Elizabeth Ziegler, Michelle A. Zeller & Matthew Wright

**To cite this article:** Courtney McCaul, Kyle B. Boone, Annette Ermshar, Maria Cottingham, Tara L. Victor, Elizabeth Ziegler, Michelle A. Zeller & Matthew Wright (2018): Cross-validation of the Dot Counting Test in a large sample of credible and non-credible patients referred for neuropsychological testing, The Clinical Neuropsychologist, DOI: 10.1080/13854046.2018.1425481

**To link to this article:** https://doi.org/10.1080/13854046.2018.1425481

Published online: 18 Jan 2018.

Submit your article to this journal 🖉

View related articles 🔍

View Crossmark data

THE CLINICAL NEUROPSYCHOLOGIST, 2018
https://doi.org/10.1080/13854046.2018.1425481





# Cross-validation of the Dot Counting Test in a large sample of credible and non-credible patients referred for neuropsychological testing

Courtney McCaul[a], Kyle B. Boone[a], Annette Ermshar[a], Maria Cottingham[b], Tara L. Victor[c], Elizabeth Ziegler[d], Michelle A. Zeller[e] and Matthew Wright[f]

[a]California School of Forensic Studies, Alliant International University, Los Angeles, CA, USA; [b]Mental Health Care Line, Veterans Administration Tennessee Valley Healthcare System, Nashville, TN, USA; [c]Department of Psychology, California State University, Dominguez Hills, Carson, CA, USA; [d]Spokane Veterans Administration, Spokane, WA, USA; [e]West Los Angeles Veterans Administration Medical Center, Los Angeles, CA, USA; [f]Department of Psychiatry, Harbor-UCLA Medical Center, Torrance, CA, USA

**ABSTRACT**

**Objective:** To cross-validate the Dot Counting Test in a large neuropsychological sample. **Method:** Dot Counting Test scores were compared in credible ($n = 142$) and non-credible ($n = 335$) neuropsychology referrals. **Results:** Non-credible patients scored significantly higher than credible patients on all Dot Counting Test scores. While the original E-score cut-off of ≥17 achieved excellent specificity (96.5%), it was associated with mediocre sensitivity (52.8%). However, the cut-off could be substantially lowered to ≥13.80, while still maintaining adequate specificity (≥90%), and raising sensitivity to 70.0%. Examination of non-credible subgroups revealed that Dot Counting Test sensitivity in feigned mild traumatic brain injury (mTBI) was 55.8%, whereas sensitivity was 90.6% in patients with non-credible cognitive dysfunction in the context of claimed psychosis, and 81.0% in patients with non-credible cognitive performance in depression or severe TBI. Thus, the Dot Counting Test may have a particular role in detection of non-credible cognitive symptoms in claimed psychiatric disorders. Alternative to use of the E-score, failure on ≥1 cut-offs applied to individual Dot Counting Test scores (≥6.0″ for mean grouped dot counting time, ≥10.0″ for mean ungrouped dot counting time, and ≥4 errors), occurred in 11.3% of the credible sample, while nearly two-thirds (63.6%) of the non-credible sample failed one of more of these cut-offs. **Conclusions:** An E-score cut-off of 13.80, or failure on ≥1 individual score cut-offs, resulted in few false positive identifications in credible patients, and achieved high sensitivity (64.0–70.0%), and therefore appear appropriate for use in identifying neurocognitive performance invalidity.

**ARTICLE HISTORY**
Received 8 May 2017
Accepted 3 January 2018

**KEYWORDS**
Dot Counting Test; Performance Validity; non-credible performance; freestanding performance validity test

The Dot Counting Test (Boone, Lu, & Herzberg, 2002) incorporates overlearned rapid counting skills that are preserved in all but the most severe traumatic brain injuries. Boone and colleagues examined effectiveness of the Dot Counting Test in a sample of 100 non-credible individuals (86 from personal injury cases and 14 from a prison population) and 249 credible

**CONTACT** Kyle B. Boone   ✉ kboone@kyleboonephd.com

© 2018 Informa UK Limited, trading as Taylor & Francis Group

participants (who presented with psychosis, learning disabilities, depression, mild dementia, moderate dementia, moderate to severe traumatic brain injury receiving outpatient rehab services, left and right stroke receiving outpatient rehab services, and older age). Using an all-purpose cut-off ≥17, every group showed specificity of over 90% with the exception of the stroke and moderate dementia groups (50–68% specificity), and sensitivity was 71.8% in civil compensation-seekers and 100% in a criminal forensic setting. Examination of individual subgroups suggested that cut-offs can be adjusted for specific differential diagnoses (e.g. a cut-off of ≥14 achieved adequate specificity in credible depressed samples indicating that scores beyond this cut-off could be used to identify non-credible cognitive presentations in the context of claimed depression). These results suggested that the Dot Counting Test is an effective measure of performance validity in criminal forensic and civil compensation-seeking contexts.

Marshall and Happe (2007) investigated the false positive rates on various PVTs in a sample of 100 individuals with mental retardation. Only 21% passed the Dot Counting Test using the E-score cut-off of 17, leading the authors to conclude that the Dot Counting Test is inappropriate for use in a population with intellectual disability. In a subsequent study (Smith et al., 2014) of credible subjects with low intelligence (FSIQ ≤ 75; $n$ = 55), Dot Counting Test specificity using a cut-off of ≥17 was only 55.8%; the cut-off had to be adjusted to ≥30 to maintain at least 90% specificity, but sensitivity was only 18% in a sample of 71 non-credible individuals thought to be feigning low IQ. Thus, these two studies suggest that utility of the Dot Counting Test is limited in the differential of actual versus feigned low IQ.

Dean, Victor, Boone, Philpott, and Hess (2009) examined false positive rates for various PVTs in a dementia population, and reported that using the Dot Counting Test cut-off of 17, specificity was only 50%. When the sample was divided into mild dementia (MMSE > 20), mild to moderate dementia (MMSE = 15–20), and moderate to severe dementia (MMSE < 15), specificity of the E-score cut-off of 17 was 77%, 44%, and 8%, respectively. The cut-off had to be raised to 42 to maintain at least 90% specificity in the sample; sensitivity of this cut-off in feigned dementia was not studied but is likely low. Thus, as with samples with low intelligence described above, the Dot Counting Test may have limited usefulness in discriminating actual versus feigned dementia.

Vilar-Lopez et al. (2008), conducting research in Spain, provided one of the first cross-cultural studies of the effectiveness of the Dot Counting Test. Their Spanish speaking mild traumatic brain injury (TBI) sample included 30 non-compensation seekers, 14 compensation seekers judged not to be malingering, and 10 suspected malingerers, as well as 54 non-TBI control subjects. E-score specificity rates for a cut-off of ≥17 were adequate (≥90%) in the first two groups, but sensitivity was only 40–48%. Burton, Vilar-Lopez, and Puente (2012) further examined Dot Counting Test performance in Spanish-speaking populations in the United States (28 subjects convicted of capital murder, 25 subjects in other forensic populations, and 29 clinical controls). Specificity in controls was adequate (92.9%), with failure rates of 25–40% in the forensic samples using an E-score cut-off of ≥17. Finally, in a sample of 115 Mexican laborers tested in either Mexico or Los Angeles, and with lowered educational levels (0–10 years), no adjustment to the Dot Counting Test E-score cut-off of ≥17 was necessary to maintain specificity of at least 90% (Robles, López, Salazar, Boone, & Glaser, 2015). In fact the cut-off could be lowered to ≥14 in the group with 6–10 years of education, and to ≥16 in those with 0–6 years of education, and still limit false positive rates to <10%. Thus,



the Dot Counting Test, using the recommended E-score cut-off ≥17 or even lower, appears appropriate for use in Spanish-speakers and in test takers with low educational level.

In contrast, Weiss and Rosenfeld (2010) examined the Dot Counting Test in a sample of 105 Sikh Indians engaged in civil lawsuits for claimed post-traumatic stress disorder. The authors were concerned that only a 41% specificity rate was found for the E-score cut-off of 17, and that even with a cut-score of 22, specificity was only 63%. However, they failed to consider that given the compensation-seeking setting, some subjects were in fact not performing to true ability, which would result in lowered specificity rates. That is, if test takers who do not perform to true skill level on the Dot Counting Test are included in 'credible' clinical comparison samples, when standard cut-offs are applied to these groups, false positives rates are elevated, which translates into lower specificity.

Very recently, Soble et al. (2017) reported Dot Counting Test data collected in a mixed clinical veteran sample ($n = 77$). The E-score cut-off of 17 achieved 91% specificity and 55% sensitivity, but the authors suggest that the optimal cut-off was 15 (88% specificity; 70% sensitivity). These data raise the suggestion that Dot Counting Test sensitivity may have declined since the original validation study in 2002, but that higher levels of sensitivity may be achieved if the E-score cut-off is adjusted.

In conclusion, available data suggest that the Dot Counting Test is an effective performance validity instrument with low false positive rates, even in non-English-speakers and in individuals of low educational level, with the exception of individuals of low intelligence and dementia. However, the original validation study was published in 2002 and a recent cross-validation study suggested that sensitivity rates may have declined, but that a lowering of the E-score cut-off maybe a viable option to maintain test sensitivity at high levels. Additional cross-validation studies are required to determine whether the original Dot Counting E-score cut-off of 17 remains valid and recommended, or if the cut-off can and should be adjusted. In the current study, archival data on the Dot Counting Test obtained on neuropsychology patients between 2001 and 2016 were examined to address this issue.

## Methods

### *Participants*

De-identified archival data were accessed from outpatients seen for neuropsychological assessment at the Neuropsychology Service at Harbor-UCLA Medical Center and patients tested in the private forensic practice of the second author. Patients evaluated in the former setting were referred by treating mental health professionals or neurologists or other physicians for diagnostic clarification, case management, and/or determination of appropriateness for disability compensation. Patients tested in the private practice of the second author were either evaluated in the context of litigation or at the request of private disability carriers. All patients were fluent in English. No patient data used in the original 2002 validation study were retained in the current data-set. Use of the archival data was approved by the Institutional Review Board at Alliant International University, and the Institutional Review Board at LABioMed at Harbor-UCLA Medical Center. Patients were assigned to credible and non-credible groups according to procedures described below. All credible patient data were obtained from the Harbor-UCLA database, and non-credible patient data were accessed

4   😊   C. MCCAUL ET AL.

in approximately equal percentages from the Harbor-UCLA database and the private forensic practice.

### Credible patients

The 142 subjects assigned to the credible group met the following criteria: (a) no motive to feign symptoms (not in litigation or attempting to secure disability compensation), (b) failure on one or fewer PVTs out of a total of up to nine administered (listed with cut-offs in Table 1; note: scores from the same test were counted as a single failure), and (c) no FSIQ < 80 or dementia/amnestic disorder diagnoses. A tabulation of diagnoses is reproduced in Table 2.

The nine PVTs used for group assignment were selected to sample a variety of neurocognitive domains, including processing speed, attention, visual perception, verbal memory, visual memory, and motor dexterity, to insure that differing types of neurocognitive symptom feigning were assessed. Our lab has preferred to use the Warrington as the forced choice PVT given that its sensitivity rates are higher than those reported for the Test of Memory Malingering (TOMM) and Word Memory Test (WMT) in a civil compensation-seeking population (see M. S. Kim et al., 2010, for Warrington sensitivity data; see Greve, Ord, Curtis, Bianchini, & Brennan, 2008, for TOMM and WMT sensitivity data). Patients who failed a single PVT were retained in the credible sample given evidence that failure on a single PVT is not unusual in credible populations (Victor, Boone, Serpa, Buehler, & Ziegler, 2009), and that the expected number of PVT failures in credible patients when nine are administered is one (Davis & Millis, 2014). It was judged that exclusion of patients with no motive to feign and

**Table 1.** PVTs used for group assignment, and numbers of patients completing each PVT.

---

*Attention*
   Digit Span (Babikian, Boone, Lu, & Arnold, 2006)
      ACSS ≤ 5 (142 credible; 323 noncredible),
      RDS ≤ 6 (142 credible; 329 noncredible),
      3-digit time > 2″ (118 credible; 306 noncredible), or
      4-digit time > 4″ (98 credible; 272 noncredible)
*Visual memory*
   Rey Osterrieth Effort Equation (Reedy et al., 2013)
      ≤50 (130 credible; 289 noncredible)
   Digit Symbol recognition equation (N. Kim et al., 2010)
      ≤57 (113 credible; 239 noncredible)
*Verbal memory*
   Rey Auditory Verbal Learning Test (Boone et al., 2005; Sherman, Boone, Lu, & Razani, 2002)
      Effort Equation ≤ 12 (123 credible; 298 noncredible), or
      RAVLT/RO discriminant function ≤ −.40 (123 credible; 294 noncredible)
   Warrington Recognition Memory Test – Words (M. S. Kim et al., 2010)
      Total ≤ 42 (115 credible; 286 noncredible)
      Time ≥ 207″ (101 credible; 264 noncredible)
*Visual perception*
   Picture Completion Most Discrepant Index (Solomon et al., 2010)
      ≤2 (102 credible; 275 noncredible)
*Processing speed*
   Comalli Stroop (Arentsen et al., 2013)
      A (Word Reading) ≥ 66″ (139 credible; 113 noncredible)
      B (Color Naming) ≥ 93″ (139 credible; 115 noncredible)
   b Test (Roberson et al., 2013)
      E-score ≥ 82 (94 credible; 289 noncredible)
*Motor dexterity*
   Finger Tapping (dominant) (Arnold et al., 2005)
      Men ≤ 35 (72 credible; 176 noncredible)
      Women ≤ 28 (60 credible; 126 noncredible)

---

Note: Failures on multiple cut-offs from a single test were counted as a single failure.

Table 2. Tabulation of primary presenting diagnoses in credible and non-credible groups.

|  | Credible | Noncredible |
|---|---|---|
|  | ($n = 142$) | ($n = 335$) |
| Anoxia | 5 | 11 |
| Anxiety/panic disorder | 3 | 4 |
| Aspberger's syndrome | 1 | – |
| Attention deficit disorder | 6 | 1 |
| Bipolar disorder | 5 | – |
| Brain infection | – | 3 |
| Brain tumor | 3 | 2 |
| Chronic fatigue | – | 2 |
| Chronic pain | – | 7 |
| Cognitive disorder NOS | 5 | 6 |
| Depressive disorder | 27 | 21 |
| Dementia | – | 6 |
| Electrocution | – | 3 |
| Epilepsy | 11 | 8 |
| HIV/AIDs | 3 | 1 |
| Klinefelter syndrome | 2 | – |
| Learning disability | 17 | 14 |
| Lupus | – | 1 |
| Mental retardation | – | 5 |
| Mild cognitive impairment | 1 | – |
| Multiple sclerosis | 1 | – |
| Neurofibromatosis | – | 1 |
| Obsessive compulsive disorder | 1 | – |
| Psychotic disorder | 12 | 32 |
| PTSD | 1 | 4 |
| Somatoform disorder | 18 | 1 |
| Stroke/aneurysm/hematoma | 3 | 18 |
| Substance Abuse | 9 | 4 |
| Syncopal episodes | – | 1 |
| Toxic exposure | – | 8 |
| Traumatic brain injury |  |  |
| Mild | 1 | 138 |
| Moderate | 2 | 12 |
| Severe | 5 | 21 |

who failed a single PVT might be problematic because they likely have more actual cognitive dysfunction (leading to the PVT failure), and removal of these individuals could result in a spurious raising of Dot Counting Test specificity rates. To more thoroughly evaluate the impact of retention of credible patients with a single PVT failure on study results, those failing versus not failing a single PVT were compared on Dot Counting Test scores (these analyses are discussed in the Results section below).

Individuals with dementia diagnoses, amnestic disorder, and IQ < 80 were excluded given evidence that individuals with these conditions demonstrate a high failure rate on PVTs despite performing to true ability. Dean et al. (2009) found that dementia patients with MMSE scores > 20 failed an average of 36% of PVTs administered, while those with MMSE 15–20 failed an average of 47%, and patients with MMSE scores < 15 failed 83% of administered PVTs. Individuals with IQs within the borderline range (70–79) have been found to exceed cut-offs on 17% of PVTs administered, while individuals with IQs between 60 and 69 have been reported to fail 44% of PVTs; in contrast, in low average to superior IQ groups, ≤8% of PVTs administered are failed (Dean, Victor, Boone, & Arnold, 2008). Much stronger correlations have in fact been documented between low IQ and PVT scores than is found at higher IQ levels (Keary et al., 2013).

### Non-credible patients

The 335 subjects assigned to the non-credible group met the following criteria: (a) motive to feign symptoms (in litigation or attempting to secure disability compensation), (b) failure on at least two independent performance validity tests (PVTs; listed with cut-offs in Table 1), and (c) evidence that low cognitive scores were inconsistent with normal function in activities of daily living. A listing of frequency of claimed diagnoses is shown in Table 2.

It is critical to identify and exclude from non-credible groups any truly low functioning individuals who fail PVTs due to actual neurologic or developmental conditions rather than a failure to perform to true ability (e.g. dementia/amnestic disorder or FSIQ < 80). IQ data and memory scores cannot not be used for this purpose given research showing that non-credible subjects obtain spuriously lowered neurocognitive and IQ scores (e.g. Boone, Lu, & Wen, 2005; Demakis et al., 2001); that is, neurocognitive/intellectual scores are not accurate indicators of function in this population. The approach we used to confirm appropriateness of assignment to the non-credible group was by checking for a mismatch between low cognitive scores and evidence of normal function in ADLs (e.g. dementia-level memory scores but was able to live independently, work, drive, handle his or her own finances). If such a mismatch was present, the participant was retained in the non-credible group. In contrast, if individuals had independently verifiable evidence of low cognitive function that could account for their PVT failure (e.g. not able to live independently, had never held employment or been able to drive, had a guardian or conservator), they were excluded from the non-credible group.

### Procedures

All subjects were administered the Dot Counting Test according to published procedures (Boone et al., 2002) as part of a neuropsychological assessment. The PVTs used in the current study were not administered in a particular order. Given that these were clinical evaluations, for various reasons particular PVTs might not have been administered to specific patients, but most patients completed nearly all of the PVTs; the number of patients in each group completing each PVT is reported in Table 1.

Scores used for analysis included the E-score, as well as the individual scores that comprise the E-score. The E-score was calculated by summing mean grouped dot counting time + mean ungrouped dot counting time + number of errors, without use of the rounding procedure specified in the manual (the rounding procedure provided no benefit and its use resulted in a slightly higher E-score cut-off, thereby reducing test sensitivity to a minor degree).

### Results

Group comparisons on test scores were computed using independent $t$-tests, and confirmed with non-parametric analyses (Mann–Whitney $U$), due to the positive skewness of all test scores in both groups. Comparisons on demographic variables were computed either with independent $t$-tests or chi-square. To control for multiple comparisons, a $p$-value of <.01 was employed for determination of statistical significance on both test scores and demographic variables.

As shown in Table 3, credible and non-credible groups did not significantly differ in age, educational level, gender distribution, or language status, but did somewhat differ in ethnic

**Table 3.** Means, *SD*s, and ranges or distributions, and group comparison data for demographic variables and dot counting scores.

| | Credible | Noncredible | | | |
|---|---|---|---|---|---|
| | (*n* = 142) | (*n* = 335) | *t*/*X*$^2$ | *p* | *d* |
| Age | 42.04 ± 14.03 (17–75) | 45.01 ± 12.22 (17–77) | −2.32 | .021 | .21 |
| Education | 13.33 ± 3.49 (0–20) | 12.82 ± 2.90 (0–21) | 1.66 | .097 | .15 |
| Gender | 73 m/64f (53.3%/46.7%) | 190 m/142f (57.2%/42.8%) | 5.54 | .136 | .11** |
| Ethnicity | | | 17.01* | .002 | .19** |
|   Caucasian | 75 (52.3%) | 138 (41.6%) | | | |
|   Hispanic | 31 (21.8%) | 71 (21.4%) | | | |
|   African American | 15 (10.6%) | 88 (26.5%) | | | |
|   Asian | 10 (7.0%) | 12 (3.6%) | | | |
|   Middle Eastern | 7 (4.9%) | 16 (4.8%) | | | |
|   Native American | 2 (1.4%) | 3 (.9%) | | | |
|   Other | 2 (1.4%) | 2 (.6%) | | | |
| Language | | | 10.68 | .014 | .15** |
|   English as first | 108 (76.6%) | 251 (75.4%) | | | |
|   English as second | 23 (16.3%) | 76 (22.8%) | | | |
|   Both learned together | 10 (7.1%) | 6 (1.8%) | | | |
| Dot counting | | | | | |
|   E-score | 10.91 ± 5.93 | 20.07 ± 11.70 | −8.86 | .0001 | 1.55 |
|     Range | (4.40–69.20) | (5.5–86.0) | | | |
|   Mean grouped time | 2.87 ± 2.81 | 6.98 ± 5.41 | −8.59 | .0001 | 1.46 |
|     Range | (1.00–32.50) | (1.00–39.80) | | | |
|   Mean ungrouped time | 6.88 ± 3.16 | 10.63 ± 5.80 | −7.21 | .0001 | 1.19 |
|     Range | (3.20–34.70) | (3.00–43.20) | | | |
|   Errors | 1.16 ± 1.15 | 2.46 ± 2.47 | −5.98 | .0001 | 1.13 |
|     Range | (0–5) | (0–12) | | | |

Notes: *SD* = standard deviation; m = male; f = female; *d* = effect size.
Missing data: Gender = 5 credible, 3 noncredible; Ethnicity = 3 noncredible; Language = 1 credible, 2 noncredible.
*Native American and 'other' categories were not included in chi-square analyses due to inadequate cell sizes; **Phi; .1 = small effect size; .3 = medium effect size; .5 = large effect size.

distribution, although the effect size was small. In the credible group, men, and women were not significantly different on Dot Counting Test scores (*t*'s ≤ .968. *p* ≥ .335); in the non-credible group, no differences were observed between men and women (*t*'s ≤ .767, *p* ≥ .444) with the exception that men committed significantly more errors (*t* = 2.740, *p* = .006), although the difference was minor (2.03 vs. 2.77).

As reproduced in Table 3, credible and non-credible groups significantly differed on all Dot Counting Test scores, with non-credible subjects scoring higher. As shown in Table 4, when cut-offs were selected to maintain at least 90% specificity in the credible group, the E-score cut-off was ≥13.80. Credible patients who failed one (*n* = 62) versus 0 (*n* = 80) PVTs were compared on Dot Counting Test scores; while the group failing one PVT scored slightly higher than the group with no failures, no differences reached statistical significance (*p* ≥ .300). For example, the mean E-score in the group with zero failures was 10.46 ± 3.61, while the mean E-score in the group with one failure was 11.48 ± 7.98 (*t* = −1.026; *p* = .307). More importantly, inclusion of the patients with one PVT failure did not impact selection of the optimal E-score cut-off. The cut-off associated with ≥90% specificity in the group with one PVT failure was ≥14.00, while the cut-off at ≥90% specificity in the group with zero PVT failures was ≥13.80, as was the cut-off which achieved ≥90% specificity in the credible group as a whole.

8 ⊛ C. MCCAUL ET AL.

Table 4. Specificity and sensitivity values for dot counting e-scores.

| | Specificity | | Sensitivity | | | | |
|---|---|---|---|---|---|---|---|
| | All | Somatoform | All | mTBI | Severe TBI | Depression | Psychosis |
| E-score | ($n = 142$) | ($n = 18$) | ($n = 335$) | ($n = 138$) | ($n = 21$) | ($n = 20$) | ($n = 31$) |
| ≥13.00 | 86.6 | 77.8 | 73.4 | 60.9 | 85.7 | 80.0 | 93.5 |
| ≥13.50 | 88.0 | 77.8 | 70.7 | 58.0 | 81.0 | 80.0 | 90.3 |
| ≥13.70 | 89.4 | 77.8 | 69.9 | 56.5 | 81.0 | 80.0 | 90.3 |
| **≥13.80** | **90.8** | **77.8** | **69.6** | **55.8** | **81.0** | **80.0** | **90.3** |
| ≥13.90 | 91.5 | 77.8 | 68.4 | 54.3 | 76.2 | 80.0 | 90.3 |
| ≥14.00 | 92.3 | 77.8 | 68.1 | 54.3 | 76.2 | 80.0 | 87.1 |
| ≥14.20 | 93.0 | 83.3 | 66.6 | 54.3 | 71.4 | 75.0 | 87.1 |
| ≥14.50 | 93.0 | 83.3 | 64.8 | 51.4 | 71.4 | 75.0 | 87.1 |
| ≥14.70 | 93.0 | 83.3 | 63.3 | 48.6 | 71.4 | 70.0 | 87.1 |
| ≥14.80 | 93.7 | 88.9 | 62.1 | 47.8 | 71.4 | 70.0 | 83.9 |
| ≥15.00 | 94.4 | 94.4 | 60.9 | 46.4 | 66.7 | 70.0 | 80.6 |
| ≥15.50 | 95.8 | 94.4 | 59.4 | 43.5 | 66.7 | 65.0 | 80.6 |
| ≥16.00 | 96.5 | 94.4 | 56.4 | 39.9 | 66.7 | 55.0 | 77.4 |
| ≥16.50 | 96.5 | 94.4 | 53.1 | 37.7 | 57.4 | 45.0 | 74.2 |
| ≥17.00 | 96.5 | 94.4 | 51.6 | 36.2 | 52.4 | 45.0 | 71.0 |
| ≥18.00 | 97.2 | 100.0 | 46.6 | 34.8 | 47.6 | 35.0 | 61.3 |
| ≥19.00 | 97.9 | 100.0 | 43.6 | 31.9 | 42.9 | 30.0 | 54.8 |
| ≥20.00 | 97.9 | 100.0 | 38.2 | 26.1 | 42.9 | 25.0 | 54.8 |
| ≥21.00 | 98.6 | 100.0 | 34.3 | 24.6 | 42.9 | 20.0 | 41.9 |
| ≥22.00 | 98.6 | 100.0 | 28.7 | 18.8 | 33.3 | 15.0 | 38.7 |
| ≥23.00 | 98.6 | 100.0 | 25.4 | 15.9 | 33.3 | 10.0 | 32.3 |
| ≥24.00 | 98.6 | 100.0 | 21.8 | 14.5 | 28.6 | 5.0 | 29.0 |
| ≥25.00 | 98.6 | 100.0 | 19.7 | 13.8 | 28.6 | 5.0 | 29.0 |
| ≥26.00 | 98.6 | 100.0 | 18.2 | 12.3 | 28.6 | 5.0 | 25.8 |
| ≥27.00 | 98.6 | 100.0 | 17.3 | 12.3 | 28.6 | 5.0 | 22.6 |
| ≥30.00 | 98.6 | 100.0 | 14.3 | 10.1 | 28.6 | 5.0 | 22.6 |
| ≥35.00 | 99.3 | 100.0 | 10.1 | 5.8 | 23.8 | 0 | 16.1 |
| ≥40.00 | 99.3 | 100.0 | 5.7 | 4.3 | 4.8 | 0 | 6.5 |
| ≥45.00 | 99.3 | 100.0 | 4.2 | 2.9 | 4.8 | 0 | 3.2 |
| ≥60.00 | 99.3 | 100.0 | 2.4 | 2.2 | 4.8 | 0 | 3.2 |
| ≥78.50 | 100.0 | 100.0 | .6 | .7 | 4.8 | 0 | 0 |
| ≥86.00 | 100.0 | 100.0 | .3 | 0 | 4.8 | 0 | 0 |

Note: mTBI = mild traumatic brain injury; TBI = traumatic brain injury; bolded font = values associated with the recommended cut-off of 13.8.

As shown in Table 4, sensitivity of the cut-off of ≥13.80 in the non-credible group was 69.6%. The Dot Counting Test E-score cut-off was then applied to the largest non-credible subgroups (mild traumatic brain injury, $n = 138$; psychosis, $n = 31$; severe traumatic brain injury, $n = 21$; depression, $n = 20$) to determine cut-off sensitivity in the context of these claimed diagnoses. The E-score cut-off achieved 90.3% sensitivity in claimed psychosis, 80.0% sensitivity in depression, and 81.0% in severe traumatic brain injury, but only 55.8% sensitivity in mild traumatic brain injury.

Sensitivity was also examined for individual Dot Counting Test scores. When cut-offs were selected to maintain at least 90% specificity, the grouped dot counting time cut-off was ≥4.20″, the ungrouped dot counting cut-off was ≥8.85″, and the cut-off for errors was 4. Sensitivity of these cut-offs in the non-credible group was 66.0% for grouped dot counting time, 52.2% for ungrouped dot counting time, and 24.5% for errors. However, failure on one or more of these three individual test score cut-offs occurred in 19% of the credible patients, an unacceptably high false positive rate. By making the cut-offs slightly more stringent, we were able to lower the false positive rate for the three cut-offs in combination to an acceptable level. Specifically, when individual cut-off scores were adjusted to ≥6.0″ for grouped

dot counting time, ≥10.0" for ungrouped dot counting time, and the cut-off for errors was maintained at ≥4, only 11.3% of the credible sample failed one or more of these cut-offs, while sensitivity for failure of at least one of these cut-offs was 63.6%.

The 10% ($n = 14$) of credible patients who met or exceeded the E-score cut-off of 13.80 were examined for characteristics that might predispose to Dot Counting Test failure in credible populations. As shown in Table 5, those scoring beyond the cut-off were fairly equally represented between men and women, the mean age of 42.36 was not different from that of the larger credible sample (42.04), the mean educational level of 13.36 was not different from that of the larger credible sample (13.33), the percentage who were ESL or learned English concurrently with another language (14.29%) was actually lower than the larger credible sample (23.40%), the mean FSIQ of 95.00 was not different from that of the larger credible sample (100.00), and ethnic distribution percentages were comparable to the larger credible sample (e.g. 50% Caucasian in both groups). However, the subsample exceeding the E-score cut-off obtained a mean WAIS-III Arithmetic subtest score lower than that of the larger credible sample (7.43 vs. 8.78). Arithmetic subtest scores were modestly correlated with Dot Counting E-scores in the entire credible sample ($r = -.263$), and in patients who obtained an Arithmetic ACSS ≤ 7, the E-score failure rate was slightly inflated (14.8% false positive rate). In addition, somatoform diagnoses were overrepresented in the subset failing the E-score cut-off; specifically, four of the 14 patients (28.57%) exceeding the cut-off had primary diagnoses of somatoform ($n = 4$) disorder; as shown in Table 4, 22% of the entire credible subsample with diagnoses of somatoform disorder ($n = 18$) failed the E-score cut-off.

## Discussion

In this cross-validation study of effectiveness of the Dot Counting Test as a performance validity indicator in a very large 'real world' sample of 142 credible and 335 non-credible patients referred for neuropsychological assessment, the E-score cut-off of ≥17 recommended in the original validation study (Boone et al., 2002) continued to show excellent specificity (96.5%). However, sensitivity dropped from 71.8% documented in 2002 to 51.6%

**Table 5.** Characteristics of the 14 credible patients scoring beyond the e-score cut-off.

| E-score | Diagnosis | Age | Educ. | Gender | ESL | Ethnicity | FSIQ | Arith. |
|---|---|---|---|---|---|---|---|---|
| 69.2 | Learning disability | 30 | 12 | M | No | Caucasian | 90 | 4 |
| 34.8 | Stroke | 55 | 13 | F | No | Caucasian | 95 | 7 |
| 20.3 | Psychotic disorder | 54 | 18 | M | No | Hispanic | 102 | 10 |
| 18.4 | Psychotic disorder | 46 | 11 | M | No | AA | 91 | 9 |
| 17.5 | Somatoform dis. | 60 | 14 | F | No | Caucasian | 98 | 6 |
| 16.0 | Cognitive dis. NOS | 25 | 12 | M | No | Asian | 83 | 7 |
| 15.2 | Depression | 30 | 11 | F | Yes | Hispanic | 90 | 6 |
| 15.2 | Anoxia | 38 | 14 | F | No | Caucasian | 91 | 6 |
| 15.0 | Somatoform dis. | 40 | 14 | F | Yes | Hispanic | 95 | 4 |
| 14.8 | Somatoform dis. | 45 | 13 | M | No | Hispanic | 91 | 6 |
| 14.2 | Somatoform dis. | 49 | 13 | M | No | Caucasian | 97 | 10 |
| 14.0 | Cognitive dis. NOS | 22 | 14 | F | No | Mid. Eastern | 100 | 12 |
| 13.9 | Learning disability | 49 | 14 | M | No | Caucasian | 102 | 9 |
| 13.8 | Substance abuse | 50 | 14 | M | No | Caucasian | 105 | 8 |
| Mean | | 42.36 | 13.36 | | | | 95.0 | 7.43 |

Notes: Educ. = Educational level; ESL = English as a Second Language status; FSIQ = Full Scale IQ; Arith. = WAIS-III Arithmetic subtest ACSS; Dis. = Disorder; NOS = Not Otherwise Specified; AA = African American; Mid. Eastern = Middle Eastern.

in the current sample. When the cut-off was lowered to ≥13.80, adequate specificity was maintained (≥90%) in the current credible sample, and sensitivity rose to (70.0%). Other recent studies have supported lowering of the E-score cut-off (Robles et al., 2015; Soble et al., 2017). We opted to dispense with the original 'rounding' procedure described on the published test score sheet because it is somewhat cumbersome and provides no advantage; in fact, use of a cut-off of 13.8 as compared to the 'rounded' score of 14.0 slightly raised test sensitivity. We therefore recommend future omission of the rounding procedure in favor of simple calculation of mean ungrouped dot counting time + mean grouped dot counting time + number of errors.

The question arises as to why the E-score cut-off could be lowered from that recommended in the 2002 study and still achieve adequate specificity. The original validation study included credible patients with dementia in residential placement, and no exclusions based on IQ were employed (i.e. patients with IQ < 80 were not excluded). The inclusion of such patients requires an elevated E-score cut-off in order to be adequately protective of these groups. In the current study, no patients with dementia or IQ < 80 were included in the credible group, allowing the cut-off to be lowered, and thereby retaining sensitivity at a higher level. To illustrate, when Dot Counting Test data were analyzed on 13 patients meeting criteria for the credible group with the exception that FSIQ was 70–79, the mean Dot Counting E-score was substantially higher than that of the other credible patients (14.17 ± 3.61), and eight of these patients with borderline IQ exceeded the cut-off of 13.80 (38.5% specificity); the cut-off had to be raised to > 18.50 to achieve at least 90% specificity in this subgroup. When these patients are included in the credible group, the cut-off had to be raised to 14.80 to maintain adequate specificity. Due to evidence that patients with low average, average, high average, and superior IQ fail comparable percentages of PVTs (i.e. ≤8%) as compared to the 17% failure rate in individuals with borderline IQ and 44% failure rate in patients with IQ of 60–69 (Dean et al., 2008) and the ≥36% failure rate in patients with dementia (Dean et al., 2009), we believe it is preferable to develop PVT cut-offs specific for these latter groups. In the differential diagnosis of actual versus feigned dementia, the clinician is referred to the Dean et al. (2009) study for Dot Counting Test cut-offs appropriate for use with dementia, and to the Smith et al. (2014) paper which provides Dot Counting Test cut-offs appropriate in the differential of actual low IQ (≤75) versus feigned low IQ. However, the clinician is cautioned that sensitivity rates are low with these adjusted cut-offs.

The 10% of credible patients who exceeded the E-score cut-off of ≥13.80 were examined for risk factors for failure. The subgroup was of comparable age, educational level, ESL status, Full Scale IQ, and ethnic distribution as the larger credible sample. However, the subsample exceeding the E-score cut-off obtained a mean WAIS-III Arithmetic subtest score lower than that of the larger credible sample, and the E-score false positive rate was mildly elevated in credible patients with Arithmetic ACSS ≤ 7 (15%). This finding suggests that clinicians should exert some caution in using the Dot Counting Test in test takers who might in fact have deficient math skills, particularly when premorbid or historical information documenting deficient math skill is available (e.g. math grades or academic testing in school) separate from concurrent Arithmetic subtest data (which could be subject to deliberate underperformance).

Somatoform diagnoses (based on DSM-IV criteria frequently buttressed with MMPI-2/RF findings) were also overrepresented in the subgroup failing the E-score cut-off; specifically,

nearly 30% of the subgroup exceeding the cut-off carried these diagnoses, while nearly a quarter of all credible patients with these diagnoses scored beyond the cut-off. However, no somatoform patient exceeded an E-score cut-off of 17.5, which suggests that scores beyond this level are likely consistent with deliberate feigning. In contrast, Dot Counting Test E-scores between 13.80 and 17.5, without confirming evidence of non-credible performance based on additional PVT data, may signal somatoform symptom production. Research has shown that it is not unusual for somatoform patients to fail a single PVT, but that it is relatively rare for them to fail more than one (Kemp et al., 2008). The view that more extreme failures on the Dot Counting Test would be consistent with deliberate feigning meshes with interpretation strategies employed on other psychological tests. For example, on the MMPI-2-RF, somatoform patients are described as obtaining intermediate elevations on symptom over-report scales (Sellbom, Wygant, & Bagby, 2012), but extreme elevations in the context of normal VRIN-r/TRIN-r are judged to reflect malingering (Ben-Porath, 2012). Conclusions regarding use of the Dot Counting Test to identify somatoform presentations should be viewed as tentative given the relatively small size of the somatoform subgroup ($n$ = 18).

It is of note that a sizable minority (41%) of patients in the non-credible group were claiming residuals from mTBI, whereas only one credible patient presented with this diagnosis (<1%). In the outpatient hospital-based evaluation setting from which the credible patients were drawn, virtually no patients who were not compensation-seeking were referred for neuropsychological assessment of mTBI because such patients in fact recovered and were not viewed as needing evaluation by treaters, as is the expected outcome with mTBI (see Boone, 2013, for review).

Effectiveness of the Dot Counting Test E-score in detecting subtypes of non-credible presentations was also examined. The E-score cut-off of ≥13.80 achieved 90.6% sensitivity in claimed psychosis, 80/0% sensitivity in claimed depression, and 81.0% sensitivity in severe traumatic brain injury, but only 55.8% sensitivity in mild traumatic brain injury. Thus, the Dot Counting Test appears to be more sensitive to feigned cognitive symptoms associated with psychiatric and severe TBI presentations than to non-credible cognitive performance in mTBI. These findings suggest that the Dot Counting Test may have a particular role in detection of non-credible cognitive performance in claimed psychiatric presentations, a finding similar to that observed for the b Test (Roberson et al., 2013). Both the b Test and the Dot Counting Test assess for non-credible deficits in processing speed and visual scanning, and these appear to be more prominent in claimed psychiatric presentations than in non-credible mild TBI. Other literature has shown that individuals feigning symptoms in the context of mild TBI focus more on producing verbal memory deficits (Nitch, Boone, Wen, Arnold, & Alfano, 2006). Taken together these data suggest that non-credible test takers adopt differing strategies for feigning depending on the condition they are attempting to mimic, and that non-credible test takers feigning in the context of mTBI apparently perceive that reduced memory should be exhibited as a part of this condition, while individuals feigning in the context of psychiatric disorders perceive that cognitive slowing should be displayed in these presentations.

If the Dot Counting Test is used in evaluating performance validity in mTBI patients, it should be recognized that a substantial minority (44%) of this population will not be detected. In fact, the apparent lowering of Dot Counting Test sensitivity  over time  in our publications appears to be an artifact of increasing rates of mTBI patients in our non-credible patient group. We did not gather data on diagnosis in our non-credible patients in the original

2002 validation study, but in the current data-set, 34.8% of the non-credible mTBI patients were tested between the years 2001 and 2008, as opposed to 65.2% tested between 2009 and 2016, a significant difference ($X^2[1, N = 138] = 25.41$, $p < .0001$). Correspondingly, sensitivity of the original E-score cut-off of 17 declined from 60.1% for cases collected between 2001 and 2008, to 40.8% for cases tested between 2009 and 2016. It is of note that in the Soble et al. (2017) investigation, which documented sensitivity of 55% using an E-score cut-off of 17 in a general neuropsychological sample, approximately 40% of the non-credible group was comprised of individuals claiming mTBI. Thus, the Soble et al. (2017) non-credible sample closely matches that of the current study (41% claimed mTBI), and interestingly, overall sensitivity rates of the E-score of 17 are comparable between studies (55% vs. 52%).

The E-score, incorporating both time and error data, achieved higher sensitivity than cut-offs applied to individual Dot Counting Test scores (70% vs. 25–66%). However, there maybe instances in which the clinician may elect to apply cut-offs to individual Dot Counting Test scores (mean grouped dot counting time, mean ungrouped dot counting time, number of errors) rather than use the E-score. For example, a test taker may commit an excessive number of errors, but due to rapid completion time may still pass the E-score cut-off. Only 11.3% of the credible sample were found to fail one or more individual cut-offs (6.0″ for grouped dot counting time, 10.0″ for ungrouped dot counting time, and four errors), while nearly two-thirds (63.6%) of the non-credible sample were detected. This method identified 10% of non-credible patients not detected by the E-score, indicating that it has effectiveness as an alternative interpretation strategy when using the Dot Counting Test.

If at the start of the examination a test taker appears to be adopting a sole or primary feigning strategy of being very slow but accurate, or very fast but inaccurate, the clinician can decide to use individual cut-offs that will better document the specific type of feigning strategy. In contrast, the E-score sets a wider net to detect the largest number of non-credible test takers, but becomes diluted when a test taker is opting for a single feigning approach (e.g. slow but accurate, fast but inaccurate). We anticipate that in the vast majority of cases, clinicians will find use of the E-score adequate and appropriate. If the clinician chooses to employ both the E-score and the three individual scores, the false positive rate is 14.8%.

In terms of study limitations, we obtained non-credible patients from two different settings: a private practice primarily involving civil litigants, and a hospital-based neuropsychology clinic which evaluated disability-seekers. We do not have data on the percentage of non-credible patients obtained from each site although we estimate that it was gathered in approximately equal proportions from each setting. The relative percentage of personal injury litigants versus disability-seekers may have impacted study findings in unknown ways.

In conclusion, cross-validation data show that the original Dot Counting Test cut-off scores can be made more stringent, while still maintaining low false positive rates, and thereby detect 70% of non-credible test takers. Thus, the Dot Counting Test continues to be a valuable technique in the identification of performance invalidity.

## Disclaimer

The views expressed herein do not necessarily represent the views of the Veterans Administration Tennessee Valley Healthcare System or the United States.



## Disclosure statement

Dr. Boone derives royalties from two of the PVTs used in the study (b Test and Dot Counting Test), and Drs. Boone, Ermshar, Victor, and Ziegler are forensic consultants.

## References

Arentsen, T. J., Boone, K. B., Lo, T. T., Goldberg, H. E., Cottingham, M. E., Victor, T. L., … Zeller, M. A. (2013). Effectiveness of the Comalli Stroop Test as a measure of negative response bias. *The Clinical Neuropsychologist, 27*, 1060–1076.

Arnold, G., Boone, K., Lu, P., Dean, A., Wen, J., Nitch, S., & McPherson, S. (2005). Sensitivity and specificity of finger tapping test scores for the detection of suspect effort. *The Clinical Neuropsychologist, 19*, 105–120.

Babikian, T., Boone, K., Lu, P., & Arnold, G. (2006). Sensitivity and specificity of various digit span scores in the detection of suspect effort. *The Clinical Neuropsychologist, 20*, 145–159.

Ben-Porath, Y. S. (2012). *Interpreting the MMPI-2-RF*. Minneapolis: University of Minnesota Press.

Boone, K. B. (2013). *Clinical practice of forensic neuropsychology: An evidence-based approach*. New York, NY: Guilford Press.

Boone, K. B., Lu, P., & Herzberg, D. (2002). *Rey Dot Counting Test*. Los Angeles, CA: Western Psychological Services.

Boone, K. B., Lu, P., & Wen, J. (2005). Comparison of various RAVLT scores in the detection of noncredible memory performance. *Archives of Clinical Neuropsychology, 20*, 301–319.

Burton, V., Vilar-Lopez, R., & Puente, A. E. (2012). Measuring effort in neuropsychological evaluations of forensic cases of Spanish speakers. *Archives of Clinical Neuropsychology, 27*, 262–267.

Davis, J. J., & Millis, S. R. (2014). Reply to commentary by Bilder, Sugar, and Helleman (2014 this issue) on minimizing false positive error with multiple performance validity tests. *The Clinical Neuropsychologist, 28*, 1224–1229.

Dean, A. C., Victor, T. L., Boone, K. B., & Arnold, G. (2008). The relationship of IQ to effort test performance. *The Clinical Neuropsychologist, 22*, 705–722.

Dean, A. C., Victor, T. L., Boone, K. B., Philpott, L. M., & Hess, R. A. (2009). Dementia and effort test performance. *The Clinical Neuropsychologist, 23*, 133–152.

Demakis, G. J., Sweet, J. J., Sawyer, T. P., Moulthrop, M., Nies, K., & Clingerman, S. (2001). Discrepancy between predicted and obtained WAIS–R IQ scores discriminates between traumatic brain injury and insufficient effort. *Psychological Assessment, 13*, 240–248.

Greve, K. W., Ord, J., Curtis, K. L., Bianchini, K. J., & Brennan, A. (2008). Detecting malingering in traumatic brain injury and chronic pain: A comparison of three forced-choice symptom validity tests. *The Clinical Neuropsychologist, 22*, 896–918.

Keary, T. A., Frazier, T. W., Belzile, C. J., Chapin, J. S., Naugle, R. I., Najm, I. M., & Busch, R. M. (2013). Working memory and intelligence are associated with Victoria Symptom Validity Test hard item performance in patients with intractable epilepsy. *Journal of the International Neuropsychological Society, 19*(03), 314–323.

Kemp, S., Coughlan, A. K., Rowbottom, C., Wilkinson, K., Teggart, V., & Baker, G. (2008). The base rate of effort test failure in patients with medically unexplained symptoms. *Journal of Psychosomatic Research, 65*, 319–325.

Kim, M. S., Boone, K. B., Victor, T., Marion, S. D., Amano, S., Cottingham, M. E., … Zeller, M. A. (2010). The Warrington Recognition Memory Test for words as a measure of response bias: Total score and response time cut-offs developed on "real world" credible and noncredible subjects. *Archives of Clinical Neuropsychology, 25*, 60–70.

Kim, N., Boone, K. B., Victor, T., Lu, P., Keatinge, C., & Mitchell, C. (2010). Sensitivity and specificity of a digit symbol recognition trial in the identification of response bias. *Archives of Clinical Neuropsychology, 25*, 420–428.

Marshall, P., & Happe, M. (2007). The performance of individuals with mental retardation on cognitive tests assessing effort and motivation. *The Clinical Neuropsychologist, 21*, 826–840.

Nitch, S., Boone, K. B., Wen, J., Arnold, G., & Alfano, K. (2006). The utility of the Rey Word Recognition Test in the detection of suspect effort. *The Clinical Neuropsychologist, 20*, 873–887.

Reedy, S., Boone, K., Cottingham, M., Glaser, D. F., Lu, P., Victor, T., …, Wright, M. (2013). Cross validation of the Lu and colleagues (2003) Rey-Osterrieth Complex Figure Test effort equation in a large known-group sample. *Archives of Clinical Neuropsychology, 28*, 30–37.

Roberson, C. J., Boone, K. B., Goldberg, H., Miora, D., Cottingham, M., Victor, T., … Wright, M. (2013). Cross validation of the b Test in a large known group sample. *The Clinical Neuropsychologist, 27*, 495–508.

Robles, L., López, E., Salazar, X., Boone, K. B., & Glaser, D. (2015). Specificity data for the b Test, Dot Counting Test, Rey-15 Item Plus Recognition, and Rey Word Recognition Test in monolingual Spanish-speakers. *Journal of Clinical and Experimental Neuropsychology, 37*, 614–621.

Sellbom, M., Wygant, D., & Bagby, M. (2012). Utility of the MMPI-2-RF in detecting non-credible somatic complaints. *Psychiatry Research, 197*, 295–301.

Sherman, D. S., Boone, K. B., Lu, P., & Razani, J. (2002). Re-examination of a Rey Auditory Verbal Learning Test/Rey Complex Figure Discriminant Function to detect suspect effort. *The Clinical Neuropsychologist, 13*, 545–561.

Smith, K., Boone, K., Victor, T., Miora, D., Cottingham, M., Ziegler, E., … Wright, M. (2014). Comparison of credible patients of very low intelligence and non-credible patients on neurocognitive performance validity indicators. *The Clinical Neuropsychologist, 28*, 1048–1070.

Soble, J. R., Santos, O. A., Bain, K. M., Kirton, J. W., Bailey, K. C., Critchfield, E. A., … González, D. A. (2017). The Dot Counting Test adds up: Validation and response pattern analysis in a mixed clinical veteran sample. *Journal of Clinical and Experimental Neuropsychology,* 1–9.

Solomon, R. R., Boone, K. B., Miora, D., Skidmore, S., Cottingham, M., Victor, T., … Zeller, M. (2010). Use of the WAIS-III picture completion subtest as an embedded measure of response bias. *The Clinical Neuropsychologist, 24*, 1243–1256.

Victor, T., Boone, K. B., Serpa, J. G., Buehler, J., & Ziegler, E. A. (2009). Interpreting the meaning of multiple symptom validity test failure. *The Clinical Neuropsychologist, 23*, 297–313.

Vilar-Lopez, R., Gomezrio, M., Santiagoramajo, S., Rodriguezfernandez, A., Puente, A. E., & Perezgarcia, M. (2008). Malingering detection in a Spanish population with a known-groups design. *Archives of Clinical Neuropsychology, 23*, 365–377.

Weiss, R., & Rosenfeld, B. (2010). Cross-cultural validity in malingering assessment: The Dot Counting Test in a rural Indian sample. *International Journal of Forensic Mental Health, 9*, 300–307.