E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
SCOTT PAETTY (Cal. Bar No. 274719)
Assistant United States Attorney
Deputy Chief, Major Frauds Section
ALI MOGHADDAS (Cal. Bar No. 305654)
Assistant United States Attorney
Major Frauds Section
    1100 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-6527/1786
    Facsimile: (213) 894-6269
    E-mail:   scott.paetty/ali.moghaddas@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 23-00047-JLS-1 |
|---|---|
| Plaintiff, | **GOVERNMENT'S POST-HEARING BRIEF FOR ORDER FINDING DEFENDANT THOMAS V. GIRARDI COMPETENT TO STAND TRIAL** |
| v. | |
| THOMAS VINCENT GIRARDI, | |
| Defendant. | |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Scott Paetty and Ali Moghaddas, hereby files its post-hearing brief for order finding defendant Thomas Vincent Girardi competent to stand trial. The government files this brief after having received final transcripts from the competency hearing (Dkt. Nos. 139, 141, 143) in compliance with the Court's order (Dkt. 128).

//

//

This brief is based upon the attached memorandum of points and authorities, the testimony and exhibits introduced during the three-day competency hearing, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: October 27, 2023          Respectfully submitted,

                                      E. MARTIN ESTRADA
                                      United States Attorney

                                      MACK E. JENKINS
                                      Assistant United States Attorney
                                      Chief, Criminal Division

                                              /s/
                                      SCOTT PAETTY
                                      ALI MOGHADDAS
                                      Assistant United States Attorneys

                                      Attorneys for Plaintiff
                                      UNITED STATES OF AMERICA

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.   INTRODUCTION**

Defendant Thomas Vincent Girardi is competent to stand trial. Unrebutted evidence presented during the three-day competency hearing confirmed the information provided in the pre-hearing briefing, both demonstrating that in the months and weeks leading up to his precipitous purported decline, defendant was continuing to practice law, communicate with clients, negotiate with lenders, and manage his law firm, which handled hundreds of active matters that he oversaw. Although the Court heard lay witness testimony about defendant's occasional forgetfulness and disorientation, and the government's own expert diagnosed him with mild cognitive impairment, mere cognitive decline is not the standard in determining whether defendant is presently competent to stand trial.  Rather the Court need only determine, by a preponderance of the evidence, whether he currently has a rational and factual understanding of the proceedings against him and is able to consult with his counsel with a reasonable degree of rational understanding.  The government has met that standard; the testimony at the evidentiary hearing not only failed to undercut the government's showing, it often supported it.

The government presented testimony from two experts, Dr. Diana Goldstein and Dr. Ryan Darby, who each opined that defendant was presently competent.  Their opinions were based, in part, on defendant's medical records, neurocognitive testing, collateral interviews, and, importantly, their own interactions and observations of defendant.  Each opined that defendant was exaggerating the extent of his condition and each identified material inconsistencies in his clinical presentation.  Far from an unawareness of this case or an

inability to form new memories, defendant tracked the allegations against him, offered a variety of excuses for his criminal conduct, and discussed matters that only recently transpired. He further described, rationally and specifically, how he would defend himself against such allegations. Defense counsel, on the other hand, proffered only one expert, Dr. Stacey Wood, who claimed that defendant was incompetent. However, Dr. Wood admitted that she failed to consider contemporaneous evidence of defendant's cognitive functioning leading up to his claimed incompetency -- evidence that directly contradicts the trajectory of his claimed impairment.

Throughout these proceedings, defendant has exhibited an understanding of the criminal charges in this case and the ability to confer meaningfully confer with his counsel, if he so chooses. Accordingly, the Court should find defendant competent.

**II. ARGUMENT**

**A.  Defendant Has Been Malingering Since Late 2020**

The question of defendant's competency in large part hinges on whether he is feigning and/or exaggerating the extent of his condition. Any purposeful effort by defendant to manipulate these proceedings and make himself look more impaired than he truly is would certainly demonstrate his appreciation of this criminal matter and its potential consequences and exceed the low threshold for establishing competency. Accordingly, as defendant's own expert conceded, when tasked with evaluating an individual's competence one must be critical of the claimed symptoms and scrutinize them. (See Dkt. 141 at 69:16-70:6.) This is especially true in criminal cases where defendants are incentivized to feign the extent of their impairment. (Id.) Nevertheless, neither defense expert critically

examined defendant's purported symptoms. As an initial matter, Dr. Chui readily conceded that she was not asked to conduct a competency evaluation, nor does she have any expertise in that field. (Dkt. 139 at 86:14-87:14.) She further admitted that she has never conducted a forensic evaluation before, nor does she have any forensic evaluation training. (Id. at 88:13-17.) And while Dr. Wood purportedly conducted a forensic evaluation, she conceded during cross examination, that she both failed to consider relevant evidence of defendant's malingering and, in some cases, failed to adequately explain or even acknowledge his inconsistent presentation.

Evidence of defendant's intentional malingering from December 2020 -- when he first claimed incompetency in connection with the Lion Air civil matter -- is relevant to an evaluation of defendant's current competence. That is, if defendant were exaggerating his impairments in 2020 by claiming, among other things, that he did not appreciate the allegations against him, then his identical claims in 2023 may likewise be exaggerated. However, when repeatedly asked whether she considered defendant's previous claims of incompetence, Dr. Wood claimed they were not relevant to her evaluation. (Dkt. 141 at 98:10-99:3.) She did not ask for any evidence of defendant's capabilities in 2020, because she believed it was not relevant to her "focus [] on his current cognitive abilities." (See id. at 93:7-21.) But Dr. Wood's failure to review and analyze the timing and context of defendant's initial claims of incompetency undercuts the reliability of her opinion. For example, when presented with defendant's voicemails and letters from 2020, Dr. Wood conceded that defendant's capabilities at that time were inconsistent with his claims of incompetence. (See id. at 74:4-8 re: Ex. 7 ("Q: . . . Is

that significant to you? Does that tend to contradict that claim? A: Um, yes, potentially."), 74:23-75:2 re: Ex. 8 ("Would you agree that that is inconsistent with that claim? A: It does seem to be."), 92:14-93:2 re: Ex. 3 (same); 101:9-17 (same).) Although omitted from her report, Dr. Wood admitted during cross-examination that defendant was probably not incompetent in 2020 and that he was likely suffering from MCI rather than dementia. (See id. at 86:18-88:2 re: Ex. 9.) Dr. Wood's failure to consider this relevant evidence of malingering undercuts the accuracy and reliability of her opinion.

Dr. Wood further failed to acknowledge defendant's inconsistent clinical presentation both in her expert report and during her testimony. When confronted with defendant's purported lack of memory that he had a third wife and his incongruous statements about past United States wars and presidents, Dr. Wood refused to consider that they may represent efforts to intentionally manipulate the proceedings. For example, Dr. Wood blamed such inconsistent presentation on frontal lobe atrophy; however, she acknowledged that defendant's most recent brain scans place him in the 70th percentile for frontal lobe volume -- well above average. (Id. at 119:4-121:23, see also Def. Ex. 54.) Dr. Wood further admitted that despite defendant's incongruous answers regarding historical facts, such as incorrect statements regarding past presidents and wars, these facts are not short-term memories that are typically affected in beginning stages of dementia. (Id. at 125:19-126:20.) She ultimately conceded that his responses were "unusual." (Id. at 123:7-10.)

Furthermore, Dr. Chui admitted that she did not conduct any tests for malingering when she evaluated defendant. (Dkt. 139 at 115:24-116:12.) She likewise did not consider defendant's

4

capabilities in late 2020 (for example, his role as a moderator at a live-streamed, panel discussion regarding the law at which he was a featured guest but admitted that such information would be relevant to a determination of defendant's mental abilities at the time he first raised a claim of incompetence. (Id. at 122:23-123:6.)  Dr. Chui also failed to consider the suspicious timing of defendant's claims of incompetence starting in December 2020.  Indeed, her role as defendant's treating physician presented a conflict with her instant assignment.  As a treating physician, she took an oath to help her patients and act in their best interests, which she readily conceded was different from a forensic evaluation. (Id. at 84:16-85:8.)  Her lack of any effort to determine whether defendant was feigning or exaggerating symptoms of cognitive dysfunction, or indeed to question whether defendant could be exaggerating or feigning impairment, thus casts doubt on the reliability and accuracy of her opinion.  Both Drs. Wood and Chui also put significant weight on collateral interviews rife with incomplete information.  For example, Dr. Chui relied on defendant's daughter, Jennifer Crane, who was estranged from her father for many years prior to his conservatorship in 2021.  (See Dkt. 64, Ex. B.)  Dr. Chui testified that a reliable collateral informant is someone who "knows the patient well, and is familiar with symptoms and the context in which they're occurring." (Dkt. 139 at 40:2-5.)  Despite alleging that defendant's purported memory decline began in 2017, by her own admission Ms. Crane had not seen defendant in over 14 years and only reconnected with him two months prior, at which time defendant's legal troubles had already surfaced.  (Dkt. 64, Ex. B at 3.)  Moreover, in reaching their dementia diagnosis, which requires consideration of defendant's

present abilities to perform certain activities of daily living, or ADLs, Drs. Chui and Wood based their opinion solely on the defense investigator's report of her interview with Margarita Munoz – the program coordinator at Sunrise, defendant's senior living facility. However, as established during Ms. Munoz' testimony, much was omitted from that initial interview.  For example, Ms. Munoz testified that neither she nor her staff spend that much time with defendant.  In fact, Ms. Munoz only sees him occasionally when he stops by her office, and his care manager spends maybe about an hour a day with him.  (Dkt. 141 at 257:25-259:22.)  Moreover, Ms. Munoz testified that staff from defendant's previous senior living facility were confused about why his family was escalating his level of care given his independence.  (Id. at 253:7-254:6.)  Indeed, for the past two years defendant has been at the lowest care level at Sunrise (level one out of five), which reflects near total independence with need for minimal reminders, a fact that Dr. Chui conceded is "significant."  (See id. at 254:7-255:6; Dkt. 139 at 155:9-13.)  As for defendant's recent drastic decline, Ms. Munoz testified this began shortly after his indictment in this matter (Dkt. 141 at 255:7-22) – timing that is both highly suspect and inconsistent with Dr. Chui's opinion that defendant's illness is slowly progressing.

In sum, the evidence presented during the competency hearing demonstrates that defendant has been intentionally exaggerating his impairments since 2020.  His claims of being unaware of his criminal and civil exposure, which have persisted until present day, are demonstrably false and evince his cunningness and, thus, his competency to proceed.

## B. Defendant Understands the Nature of These Proceedings and Can Aid in His Defense

Neither party disputes that defendant, an 84-year old, exhibits some form of cognitive impairment. However, the "mere presence of a mental disease or defect is not sufficient to render a defendant incompetent." United States v. Giraldo, No. 9-85, 2011 WL 7946037, at *2 (M.D. Fla. Oct. 24, 2011) (citations and internal marks omitted), adopted by 2012 WL 1890508, at *1 (M.D. Fla. May 23, 2012). "Incompetency to stand trial is not defined in terms of mental illness" and "a defendant can be competent to stand trial despite being mentally ill and similarly a defendant can be found incompetent to stand trial without being mentally ill." Id.

Each of defendant's clinical interviews in connection with this proceeding demonstrated his understanding of the charges against him. During interviews with government's experts, defendant accurately recalled that he was accused of not paying clients, a fact discussed earlier in the meeting, and then related, at several points over the three-day examination, without prompting that he did nothing wrong, and did not steal from clients. (Goldstein 66.) Likewise, in his interview with Dr. Darby, despite disclaiming knowledge of the indictment, defendant frequently told Dr. Darby that he did not steal anything (echoing his comments to Dr. Goldstein) while acknowledging that Girardi Keese clients may not have received all the funds to which they were entitled. (Darby 22.) Even the defense expert, Dr. Wood, conceded that notwithstanding defendant's claims to the contrary, she believed he actually does have an appreciation of the criminal charges against him. (Dkt. 141 at 94:9-25.)

Defendant also has the capacity to consult meaningfully and rationally with his counsel if he chooses to do so.  (Goldstein at 71.)  Indeed, defendant outlined his defense strategies for the experts -- strategies that Dr. Wood conceded were rational and sound.  (Id. at 135:21-137:12.)  The Court further observed defendant's ability to process information firsthand when he hurled an expletive under his breath at the prosecutor.  (Id. at 78:7-18.)  Such examples highlight defendant's true ability to track and process information in real time and understand the significance of that information.  Other evidence further corroborated this assessment of defendant's cognitive abilities.  For example, Dr. Wood conceded that except for some facets of memory, defendant's remaining cognitive domains were relatively normal and, in some cases, above average.  (See id. at 118:4-22.)  This includes his attention, processing speed, executive functioning, and even working memory, which was a relative strength.  (Id.)  And while defendant's brain scans show abnormal hippocampal atrophy, the defense experts agree his atrophy dates back to at least 2017 and thus, during the time when the atrophy was present, defendant still functioned normally up until late 2020 when allegations of his misappropriation were made public.  (Id. at 73:2-77:4; Dkt. 139 at 127:8-128:19.)  Accordingly, the evidence presented at the competency hearing demonstrated that defendant clearly has a rational and factual understanding of the charges against him, and that he has the capacity to consult meaningfully with his attorneys, if he so chooses.  His insistence on being unaware of his legal situation is willful and deliberate.  He can opt to participate meaningfully in these proceedings at any time.

**III. CONCLUSION**

For the foregoing reasons, the government respectfully requests that this Court find defendant competent and set this matter for trial.