E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
SCOTT PAETTY (Cal. Bar No. 274719)
Assistant United States Attorney
Deputy Chief, Major Frauds Section
ALI MOGHADDAS (Cal. Bar No. 305654)
Assistant United States Attorney
Major Frauds Section
     1100 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-6527/1786
     Facsimile: (213) 894-6269
     E-mail:   scott.paetty/ali.moghaddas@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>           v.<br><br>THOMAS VINCENT GIRARDI,<br><br>        Defendant. | No. CR 23-00047-JLS-1<br><br>GOVERNMENT'S REPLY BRIEF FOR ORDER FINDING DEFENDANT THOMAS V. GIRARDI COMPETENT TO STAND TRIAL |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Scott Paetty and Ali Moghaddas, hereby files its reply brief for order finding defendant Thomas Vincent Girardi competent to stand trial.

//

//

1

This reply is based upon the attached memorandum of points and authorities, the testimony and exhibits introduced during the three-day competency hearing, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: November 30, 2023          Respectfully submitted,

                                  E. MARTIN ESTRADA
                                  United States Attorney

                                  MACK E. JENKINS
                                  Assistant United States Attorney
                                  Chief, Criminal Division


                                          /s/
                                  _____
                                  SCOTT PAETTY
                                  ALI MOGHADDAS
                                  Assistant United States Attorneys

                                  Attorneys for Plaintiff
                                  UNITED STATES OF AMERICA

**Table of Contents**

I.    INTRODUCTION....................................................1

II.   ARGUMENT........................................................2

    A.    Both Government Experts Are Qualified and Experienced.....2

    B.    Defendant's Presentation, Including Compelling
        Inconsistencies During Clinical Evaluations, Support a
        Finding of Competency....................................8

    C.    Defendant is Competent Even if He Has Dementia..........10

III.  CONCLUSION.....................................................12

**Table of Authorities**

United States v. Brockman,

    604 F. Supp. 3d 612 (S.D. Tex. 2022)....................3, 4, 10

United States v. Kasim,

    No. 07-CR-56, 2010 WL 339084 (D. Ind. Jan. 21, 2010)..........11

United States v. Montgomery,

    No. 11-CR-20044, 2014 WL 1516147 (W.D. Tenn. Jan. 28, 2014)....5

United States v. Jones,

    No. 10-CR-03090, 2017 WL 4231511 (W.D. Mo. Sept. 22, 2017).....5

United States v. Benson,

    No. 12-CR-00480, 2015 WL 1869476 (N.D. Cal. Apr. 22, 2015)....11

United States v. Heth,

    338 F. App'x 489 (6th Cir. 2009)...............................9

United States v. Markis,

    535 F.2d 899 (5th Cir. 1976)..................................10

United States v. Patel,

    524 F. Supp. 2d 107 (D. Mass. 2007)...........................11

United States v. Rothman,

    No. 8-20895, 2009 WL 426282 (S.D. Fla. Feb. 19, 2009).........10

United States v. Vallone,

    698 F.3d 416 (7th Cir. 2012)................................2, 11

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Defendant's post-hearing brief seeks to divert the Court from the task at hand -- determining whether defendant meets the low threshold of competency -- in order to focus on defendant's specific diagnosis, the applicability of certain performance validity tests, and meritless attacks on the government's experts.  In doing so, defendant ignores the simple fact that his clinical presentation demonstrates that he is presently competent.  Defendant's efforts to mire these proceedings in the weeds of test scores and statistics merely obscure the true measure of defendant's ability to understand the proceedings against him and assist meaningfully in his defense. Indeed, defendant's brief is devoid of any reasonable explanation for anomalies in his clinical presentation, the timing of his purported decline, incongruous statements made during the experts' evaluations, his selective memories, or even his live, sotto voce comment in court, all of which demonstrate his appreciation of this case and the allegations lodged against him.  Furthermore, his crystallized knowledge of court proceedings and insightful answers to questions about a hypothetical defense evince a meaningful understanding of and ability to assist in a defense to the charges against him.

When considering the totality of the evidence presented, including the thorough opinions of the government's qualified experts, the government has proved, by at least a preponderance of the evidence, that defendant is presently competent to proceed to trial.  Accordingly, the Court should find defendant legally competent and set this matter for trial.

1   **II.   ARGUMENT**

2         **A.   Both Government Experts Are Qualified and Experienced**

3         Defendant claims that Drs. Goldstein and Darby are unqualified

4   to opine on competency, yet this is precisely what they have done for

5   years.  Dr. Goldstein testified that she has conducted close to 200

6   competency evaluations in her career.  (Dkt. 143 at 9:5-6.)  She is a

7   respected professional with decades of experience and has been

8   praised by at least one district court that called her report

9   "comprehensive" and "one of best I have seen in a long time."  See

10  United States v. Vallone, 698 F.3d 416, 509 (7th Cir. 2012).

11  Moreover, far from being "biased for the government," Dr. Goldstein

12  testified that she has actually been retained more by the defense

13  than the government.  (Dkt. 143 at 230:16-20.)  Defendant's

14  suggestion that she is also unqualified because of her limited

15  gerontology experience is similarly misguided.  The government is

16  unaware of any requirement that only geriatric specialists conduct

17  senior defendants' neuropsychological evaluations and, in fact,

18  experts with no such specialty in this district routinely evaluate

19  senior defendants.  And of all the experts, Dr. Goldstein has the

20  most forensic training and experience – both of which Dr. Wood

21  admittedly lacks.  (See generally Dkt. 60 at Exhibit A (Wood CV).)

22        Likewise, Dr. Darby also has had ample experience in conducting

23  competency evaluations, including through being the court's appointed

24  expert in a recent case in this district.  See United States v.

25  Valiente, CR 18-59-DMG (C.D. Cal.).  In Valiente, the court appointed

26  Dr. Darby as its expert to opine on defendant's competency, which was

27  subsequently adopted.  (Dkt. 134 and 156.)  Dr. Darby's opinion was

28  also adopted in United States v. Brockman, another contentious

competency proceeding which dragged out for over a year.  604 F. Supp. 3d 612, 632 (S.D. Tex. 2022) ("The Court finds Dr. Darby's testimony regarding Brockman's "cognitive reserve" clear, credible and reliable").[1]  He has also routinely been retained by the defense as demonstrated in his CV and case list.  (See Exs. 49 and 51.)

Defendant's opposition also heavily focuses on cutoff scores applied to performance validity tests ("PVTs") and argues for cutoffs based on an a priori determination of dementia.  (Dkt. 146 at 7-10.) But defendant's own court filings and the testimony of his own expert contradict this circular approach and instead support Dr. Goldstein's approach, which relies on context in evaluating cognitive test scores in a forensic setting.  "Until the empirical literature and test developers establish better methods for assessing data validity in older adults using quantitative measures, the best approaches at this time will rely on a process approach including qualitative integration of clinical judgment, strong working knowledge of disease characteristics and comparisons with known clinical groups, behavioral observations, and careful scrutiny of the contextual factors surrounding a particular case."  Defense Ex. 47.  "In other words, if clinical judgment raises sufficient suspicion, further investigation and more careful scrutiny of relevant contextual factors may be necessary."  Id.  Even Dr. Wood ascribes to this approach.  (See Dkt. 139 at 254:14-255:5.)

---

[1] Defendant suggests that Dr. Darby and the court's competency determination was wrong given the defendant's subsequent death months later.  (Dkt. 146 at 3.)  Not so.  The court's thorough opinion more than sufficiently outlined defendant's competency to proceed to trial and his intentional efforts to avoid trial.  That the defendant, an 81-year-old, subsequently died of natural causes in no way negates either the court's determination or Dr. Darby's opinions.

1    Setting aside defendant's circular argument that an a priori

2  diagnosis must be made before administering PVTs, Dr. Goldstein

3  ultimately reached the opinion that defendant is not suffering from

4  dementia and, therefore, traditional cut-offs are appropriate.  (Dkt.

5  143 at 211:4.)  As a result, defendant failed a majority of the PVTs

6  she administered, indicating less than optimal effort during testing.

7  But Dr. Goldstein's malingering opinion is based on more than

8  defendant's PVT scores.  She testified, among other things, that

9  defendant's clinical presentation was inconsistent with his claimed

10  symptoms.  For example, defendant's purported amnesia past the

11  Vietnam War is inconsistent with his familiarity with recent events

12  including the pandemic and current president.  (Id. at 218:5-13.)

13  Dr. Goldstein also identified the inconsistency of defendant's claim

14  that he did not have a third wife, yet he took calls from her

15  multiple times during their examination.  (Id.)  Ultimately, Dr.

16  Goldstein found these, and other examples, were illustrative of

17  defendant's malingering and his abilities to make and retain new

18  memories.  (Id. at 219:6-13.)[2]  Given Dr. Goldstein's extensive

19  experience, including through nearly 200 evaluations across the

20  country, her testing and clinical observations should be credited.[3]

21

22

_____

23    [2] Defendant's interactions with police responding to a break-in
at his residence in 2021 is likewise illuminating.  In body camera
24  footage provided to the Court, defendant is observed conversing with
the officers and providing details of the break-in with little to no
25  difficulty.  (See exhibits lodged at Dkt. 129, 130.)  Indeed, this is
the same break-in that defendant recounted for his former secretary,
26  Kim Cory, months later in April 2021, (Dkt. 109 at 9), clearly
evidencing his ability to form and retain memories over a long period
27  of time.

    [3] In any event, as discussed below, the Court can base its
28  determination of defendant's malingering on evidence beyond just
defendant's failing PVT scores.  See infra Section B.

1        In stark contrast to Drs. Darby and Goldstein, defendant's

2   retained experts either completely lacked experience in conducting

3   competency evaluations or conducted an evaluation without real

4   scrutiny of defendant's claims.  Indeed, Dr. Wood's CV completely

5   omits any reference to forensic work or forensic certifications,

6   which has given at least two courts "concern as to Dr. Wood's

7   credibility."  See, e.g., United States v. Montgomery, No. 2:11-CR-

8   20044-JPM-1, 2014 WL 1516147, at *18 (W.D. Tenn. Jan. 28, 2014) ("Dr.

9   Wood is not board certified in clinical neuropsychology or forensic

10  psychology."); United States v. Jones, No. 6:10-CR-03090-DGK, 2017 WL

11  4231511, at *2 (W.D. Mo. Sept. 22, 2017) ("Although a licensed

12  psychologist, she is not board certified in . . . neuropsychology or

13  forensic psychology.").  Given her inexperience in forensic work, it

14  is no surprise that Dr. Wood completely ignored the most important

15  evidence of defendant's malingering, i.e., the fact that defendant

16  led and managed his law firm without any challenge to his mental

17  capacity from anyone in his inner circle (including defendant's

18  collateral witnesses)[4] and his unnatural, precipitous decline at the

19  end of 2020 once the Lion Air allegations were made public.  When

20  confronted with defendant's own voicemails and letters during this

21  time period when he was claiming incompetence, Dr. Wood refused to

---

[4] Contrary to defendant's claim, the government provided ample
information from collateral witnesses regarding defendant's mental
state.  While it could have called witnesses to testify at the
hearing, including former Girardi Keese employees and other legal
professionals with first-hand knowledge of defendant's mental acuity
(see Dkt. 109 at 17), the Court ultimately believed that was not
necessary given their inclusion in the record.  (See Dkt. 141 at
265:22 ("I don't think I need anything further. . . . I have what I
need in terms of evidence").)  Should the Court decide it wants to
hear from them, these collateral witnesses have been and remain
available to testify.

1    acknowledge that such evidence would be relevant -- let alone

2    contradictory to her opinion.  (See Dkt. 141 at 98:10-99:3 ("Q: . . .

3    Is it your testimony, Dr. Wood, that the claims that this defendant

4    [] w[as] making in December 2020 that mirror the claims here in this

5    case, that those are not relevant to your determination? A: I -- I

6    don't think they are.").)  Dr. Wood's conclusion that defendant's

7    "lack of insight" renders him incapable of making rational choices is

8    plainly contradicted by defendant's statements to Dr. Goldstein that

9    outline a reasonable and perceptive defense to hypothetical charges,

10   modeled after the same charges he currently faces (Dkt. 109 at 37)[5],

11   and his telling statement to Dr. Darby that he would consider a

12   guilty plea to negligence (see id. at 14 (citing Dkt. 91 at 29)).

13       Dr. Chui fared no better.  While she is undoubtedly qualified in

14   the field of neurology, she is defendant's treating neurologist

15   (raising questions of bias), has never conducted a competency

16   examination, and previously misdiagnosed defendant with Alzheimer's.

17   (Dkt. 139 at 84:6-85:3, 86:14-87:14, 132:10-18.)  Furthermore, she

18   did not apply any forensic techniques or PVTs to evaluate defendant's

19   effort, nor did she question whether defendant could be exaggerating

20   or feigning his condition.  (Id. at 115:9-116:12, 142:6-143:10.)  And

21   while she spoke of academic research exploring the correlation

22   between hippocampal atrophy and dementia, she also conceded that the

23   link between brain imaging and the severity of dementia is not one to

24   one (id. at 126:2-127:7), a view echoed by Dr. Darby.  (Dkt. 91 at

25

26

27

28       [5] Citations to page numbers of docket entries, including briefs
     and expert reports, refer to the documents themselves rather than the
     pagination in the ECF header.

                                    6

26.)[6]  Thus, defendant's argument that his diminished hippocampal volume necessitates a finding of incompetence should be rejected. Defendant's verified capabilities between 2017 and 2020 demonstrate that he can still independently function notwithstanding his hippocampal atrophy.  Indeed, Dr. Chui admitted that defendant's "severe atrophy of the anterior temporal lobes and the hippocampus" dated all the way back to 2017.  (Dkt. 139 at 48:4-7.)[7]  Given the overwhelming evidence of defendant's normal functioning up to the demise of his law firm, including television footage of defendant entertaining guests at his home in 2019 (Ex. 22 and Dkt. 139 at 127:8-128:19), it is clear that his atrophy has not meaningfully impaired his ability to understand and function.[8]

---

[6] Defendant mischaracterizes Dr. Darby's position regarding the correlation of hippocampal atrophy to cognitive impairment.  (Dkt. 146 at 2.)  Dr. Darby's statement that the relationship is not "one to one" refers merely to the undisputed fact that brain imaging alone cannot determine the extent of cognitive impairment.  A point to which Dr. Chui agreed.  (Dkt. 139 at 44:8-9.)

[7] Furthermore, Dr. Chui's comparison of defendant to other patients she has treated with similar levels of brain atrophy is unreliable because she admitted that her clinical experience is limited to patients who were all cognitively impaired.  (Id. 124:15-125:9.)  Thus, her opinion is skewed because her comparison does not account for persons with similar levels of atrophy who are not experiencing cognitive dysfunction.

[8] Defendant cites late-produced records from Sunrise, defendant's current residence, purportedly showing that defendant's care level has increased from one to two.  (Dkt. 146 at 19 n.53.) Setting aside the late production, which prevented the government's ability to address such materials at the hearing, as well as Margarita Munoz's conflicting testimony that defendant was and remained a level one (Dkt. 141 at 254:14-255:6), defendant ignores that the applicable scale is out of five and, thus, he still remains relatively independent compared to other Sunrise residents.

1

2

**B.   Defendant's Presentation, Including Compelling
      Inconsistencies During Clinical Evaluations, Support a
      Finding of Competency**

3      Throughout defendant's interviews with the experts, he presented

4  contradictory and noncredible behavior consistent with malingering.

5  While each expert -- for both the government and defense -- agreed

6  that historical facts are not typically affected in the early stages

7  of dementia, defendant routinely provided bizarre responses to

8  questions about U.S. and world history.  For example, while defendant

9  was able to name Biden as the current president, he inexplicably

10 claimed that the Vietnam War is ongoing.  (Dkt. 64 at 21.)  Two weeks

11 later, in his interview with Dr. Wood, defendant claimed that George

12 Bush was the current president, notwithstanding his correct answer

13 weeks ago.  (Dkt. 60 at 15; see also Dkt. 109 at 33-35.)  Likewise,

14 when Dr. Darby asked who the president during the Civil War was,

15 defendant responded, "It wasn't Lincoln, it wsn't old man Bush . . .

16 pass."  (Dkt. 91 at 20.)  Dubbed as a "near miss," this answer is

17 telling as it demonstrates that defendant knows the correct answer

18 but intentionally provided an incorrect answer.  (Id. at 28.)

19     As Dr. Darby noted in his report, the foregoing examples of

20 noncredible responses relate to overlearned facts, i.e., basic

21 factual information that patients with genuine memory impairment

22 nonetheless retain.  (See id. ("In patients with genuine memory

23 impairment, confabulation relates to personal memories and not

24 factual information.").)  Accordingly, defendant's responses can only

25 be attributed to malingering rather than genuine memory impairment.

26 Even Dr. Wood conceded that historical facts such as this are

27 examples of crystallized knowledge not typically affected in early

28 stages of dementia.  (Dkt. 141 at 124:19-22, 123:7-10 ("I did find

that to be unusual"; <u>see also</u> Dkt. 139 at 129:8-16 (Dr. Chui likewise admitting crystallized knowledge should stay unimpaired).) "Outside of delirium, coma, intoxication, or end-stage dementia, no neurological disorder should cause an educated patient" to confuse such over-learned historical facts. (Dkt. 91 at 28.)

Defendant's claimed ignorance of his current counsel is also incredible. As Dr. Goldstein testified, if defendant truly was unaware of his counsel's identities, his dementia would be "so profound that he would not be capable of talking about these things that happened in the recent past," such as the pandemic and his co-defendant. (Dkt. 143 at 227:1-13.) Moreover, not once during the three-day competency hearing did defendant ever question where he was, who his counsel was, or what we were doing. To the contrary, defendant was relatively stoic during the proceedings, standing when appropriate, conversing with his counsel at breaks, and never interrupting except for the single expletive directed at the prosecutor during cross-examination, but even that comment was made under his breath such that no one in the courtroom other than his counsel and the prosecutor heard it. Far from demonstrating severe, or even moderate dementia, defendant demonstrated an understanding of the limits of acceptable courtroom etiquette. <u>United States v. Heth</u>, 338 F. App'x 489, 497 (6th Cir. 2009) (finding that although defendant was somewhat difficult, the court did not observe him exhibit any behavior in the courtroom that would suggest he was not capable of being competent "if [he] choose[s] to do so.").

1

   **C.   Defendant is Competent Even if He Has Dementia**

2       There is no agreement amongst the testifying experts regarding

3   the true diagnosis of defendant's mental condition.[9]  In any event, a

4   competency evaluation does not hinge on any such diagnosis.  Although

5   defendant attempts to conflate dementia and competency, the two are

6   not mutually exclusive.  "Although medical professionals properly

7   determine whether a defendant has a disorder or is malingering,

8   competency is a legal concept," and "even if the experts' medical

9   conclusions of impaired ability are credited, the judge must

10  independently decide if the particular defendant was legally capable

11  of reasonable consultation with his attorney and able to rationally

12  and factually comprehend the proceedings."  United States v. Rothman,

13  No. 8-20895, 2009 WL 426282, at *6 (S.D. Fla. Feb. 19, 2009)

14  (internal marks omitted) (quoting United States v. Markis, 535 F.2d

15  899 (5th Cir. 1976)).  Thus, even if defendant has dementia, this

16  Court can and should still find him competent based on the facts

17  before it.  Indeed, numerous courts have found defendants suffering

18  from dementia and other neurocognitive disorders competent to proceed

19  to trial.  See, e.g., United States v. Brockman, No. 21-CR-9, Dkt.

20  263, (S.D. Tex. filed May 23, 2022) (finding an 80-year old defendant

21  with Parkinson's disease and cognitive impairment to be competent due

22  to malingering); United States v. Dreyer, No. 08-41-VAP, Dkt. 279

23  (C.D. Cal. filed Apr. 19, 2014) (finding a defendant with a brain

24  hemorrhage and previous dementia diagnosis competent); United States

25

26       [9] This is not surprising given that defendant's actual medical
    condition cannot be known until post mortem. (Dkt. 139 at 111:15-
27  23.)  The four expert opinions are as follows: Dr. Goldstein (mild
    cognitive impairment, or "MCI"); Dr. Darby (MCI or maybe mild
28  dementia); Dr. Wood (likely mild dementia); Dr. Chui (moderate
    dementia). (Dkt. Nos. 64 at 51; 91 at 26; 60(A) at 33; 60(B) at 10.)

                                   10

1  v. Kight, No. 16-99-AT-LTW, Dkt. 118 (N.D. Ga. filed Feb. 2, 2018)

2  (same); United States v. Bradley, No. 05-CR-59-JRH-CLR, Dkt. 349

3  (S.D. Ga. filed Jan. 24, 2006) (defendant with dementia and memory

4  issues found competent); United States v. Benson, No. 12-CR-00480-

5  YGR-1, 2015 WL 1869476 (N.D. Cal. Apr. 22, 2015) (defendant with

6  alleged dementia and evidence of malingering found competent); United

7  States v. Patel, 524 F. Supp. 2d 107 (D. Mass. 2007) (defendant with

8  memory issues, alleged dementia, and evidence of malingering found

9  competent); United States v. Chun, No. 17-CR-204510-VAR-MKM, Dkt. 87

10  (E.D. Mich. filed Dec. 6, 2019) (finding a malingering defendant with

11  MCI competent); United States v. Kasim, No. 07-CR-56-PPS-APR, 2010 WL

12  339084 (D. Ind. Jan. 21, 2010) (finding a likely malingering

13  defendant competent after previous order found defendant incompetent

14  with dementia); see also United States v. Vallone, 698 F.3d 416, 508-

15  511 (7th Cir. 2012) (finding defendant with Alzheimer's and dementia

16  competent).

17       Even if this Court took defendant's test scores at face value,

18  it still shows relatively average performance in most domains. (Dkt.

19  141 at 118:4-22.)  And while defendant claims to have trouble with

20  forming new memories (despite multiple examples to the contrary),

21  even Dr. Wood testified that an individual with mild to moderate

22  dementia can still retain new information with repetition. (Dkt. 141

23  at 144:10-20.)  Moreover, when questioned about whether such tactics

24  could be used with defendant, again, Dr. Wood testified that it could

25  be helpful to use that strategy. (Id. at 149:15-24.)  Accordingly,

26  even the defense expert agrees that repetition, cueing,[10] and other

27  ────────────

28       [10] Dr. Chui admitted that defendant is at least "partially
     responsive to cueing." (Dkt. 139 at 71:15-19.)

strategies can be used with defendant to assist him in this case. While the government maintains that such assistance is unnecessary given his clear ability to track the proceedings in real-time, it is nonetheless amenable to such aids during further proceedings.

**III. CONCLUSION**

For the foregoing reasons, the government respectfully requests that this Court find defendant competent and set this matter for trial.