

FILED
CLERK, U.S. DISTRICT COURT

1/5/2024

CENTRAL DISTRICT OF CALIFORNIA
BY: ___ gga ___ DEPUTY

**UNSEALED BY ORDER OF THE COURT,
JANUARY 5, 2024.**

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>THOMAS VINCENT GIRARDI,<br><br>Defendant. | Case No. 2:23-CR00047-JLS<br><br><br>**ORDER FINDING DEFENDANT COMPETENT TO STAND TRIAL** |

This matter is before the Court on Defendant's Motion for Order Finding Incompetency. The record on this matter is extensive, and includes a three-day evidentiary hearing, the transcript of which has been filed on the docket;[1] expert reports from Drs. Wood, Chui, Darby, Schroeder, and Goldstein (unredacted version);[2] pre-hearing and post-hearing briefing;[3] and extensive exhibits.[4]

---

[1] (*See* Docs. 139 (Sept. 12, 2023 Tr.), 141 (Sept. 13, 2013 Tr.) & 145 (Aug. 23, 2023 Tr.).)

[2] (*See* Docs. 60 (reports of Def. experts Wood and Chui), 91 (report of Gov. expert Darby) & 115 (report of Gov. expert Schroeder (also designated Def. Ex. 172), Doc. 64 (Goldstein Rpt. (sealed redacted version)); *see also* Doc. 81 (order, issued after Court's *in camera* review of the unredacted Goldstein Report, to provide same to Gov. expert Darby).)

[3] (Docs. 106 (Mot.), 109 (Opp.) & 110 (Reply)) and post-hearing briefs (Docs. 144 (Gov. Post-Hr'g Br.), 146 (Def. Post-Hr'g Br.), 147 (Gov. Post-Hr'g Reply Br.))

[4] Defendant's Exhibits 1-69, Defendant's hearing Exhibits 172, 183-86, 214, 233, 236- 237, 239-241, 248, 257-261 & 263, and Government's Exhibits 1-28.

Having reviewed and considered the entire record, and for the reasons set forth herein, the Court FINDS Defendant is competent to stand trial, and DENIES Defendant's Motion.

## I.      INTRODUCTION

### A.      Current Charges

On January 31, 2023, former attorney Thomas Vincent Girardi ("Defendant") was indicted on five counts of wire fraud in violation of 18 U.S.C. § 1343.  Defendant is accused of defrauding five clients "by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts" that Defendant "had a duty to disclose."  Essentially, the alleged scheme to defraud is that Defendant (and his co-defendant) unlawfully failed to pay to their client-victims certain settlement funds received by Defendant's (now defunct) law firm, Girardi Keese, and that they made misrepresentations and/or offered fictitious excuses as to why the settlement funds could not be distributed to the client-victims sooner.  In addition to the five criminal charges, the Indictment seeks an order of forfeiture in an unspecified amount traceable to the charged offenses.

### B.      Procedural History

On February 6, 2023, Defendant was arraigned, entered a plea of not guilty, and was released on bond.  Shortly thereafter, on March 13, 2023, defense counsel sought an order for a mental competency evaluation of Defendant, which the Court granted.  On August 17, 2023, Defendant filed the present Motion, seeking an order finding him incompetent to stand trial due to limited cognitive functioning as the result of dementia.  The matter was briefed in advance of the first of three days of hearings on the matter.  (*See* Docs. 120, 126 & 128 (minutes of hearing).)  With the filing of the last post-hearing brief on November 30, 2023, the matter was submitted.

### C.      Defendant's Position

Defendant, through counsel, moves the Court for an order determining that he is incompetent to stand trial.  Defendant argues that his cognitive decline became apparent in 2017 when a post-auto accident MRI revealed "moderate brain . . . volume loss" and the presence of white matter lesions.  He asserts that, thereafter (in and around 2019-2020), multiple individuals noticed his continued decline, and that, by early 2021, three neurologists agreed that Defendant was cognitively impaired due to Alzheimer's disease or dementia.  He asserts that it was this cognitive decline that caused his brother to initiate conservatorship proceedings in probate court on January 19, 2021 and that caused his family to later place him in assisted living.  Defendant asserts that he has drastically declined since then and cannot perform basic self-care.  Defendant's expert Dr. Wood diagnosed Defendant with "Major Neurocognitive Disorder—Not Specified."  Defendant argues that he is unable to recall and/or retain case-specific information and is therefore unable to assist counsel in his defense of this case.  Defense counsel believe that Defendant is incompetent to stand trial.

### D.      Government's Position

The Government, which bears the burden of proof as to Defendant's mental competency to stand trial, maintains that Defendant is exaggerating mild cognitive deficits in an attempt to thwart the present prosecution; namely, that he is effectively feigning or exaggerating symptoms suggestive of mental incompetency, which is termed "malingering" by experts in their reports.  The Government contends that Defendant's feigning began when his decades-long scheme of defrauding his clients began to unravel as the 2020 COVID-19 pandemic drastically slowed the incoming cash flow to Girardi Keese.

## II.   LEGAL STANDARDS

### A.      Criminal Defendants Must Be Mentally Competent to be Tried

The Due Process Clause of the Fifth Amendment demands that a mentally incompetent person not be tried in a criminal case.  *See Cooper v. Oklahoma*, 517 U.S. 348,

354 (1996); *Pate v. Robinson*, 383 U.S. 375, 378 (1966).  In *Cooper*, the Supreme Court explained the foundational underpinnings of this requirement:

> Competence to stand trial is rudimentary, for upon it depends the main part of those rights deemed essential to a fair trial, including the right to effective assistance of counsel, the rights to summon, to confront, and to cross-examine witnesses, and the right to testify on one's own behalf or to remain silent without penalty for doing so.

*Cooper*, 517 U.S. at 354 (quotation marks omitted).  This right dates back to at least the American colonial period, where it finds its roots in English common law.  *See Drope v. Missouri*, 420 U.S. 162, 171 (1975) (citing 4 W. Blackstone Commentaries, Chap. 2 at 24 (1769) ("Also, if a man in his sound memory commits a capital offense, and before arraignment for it, he becomes mad, he ought not to be arraigned for it; because he is not able to plead to it with that advice and caution that he ought.  And if, after he has pleaded, the prisoner becomes mad, he shall not be tried; for how can he make his defense?")).

Mental incompetency is now statutorily defined.  An accused may not be tried if he is "presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense."  18 U.S.C. § 4241(d); *see also Drope*, 420 U.S. at 171 ("It has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial.").

A district court cannot find a defendant competent merely because he or she "[is] oriented to time and place and [has] some recollection of events."  *Dusky v. United States*, 362 U.S. 402, 402 (1960).  And competence consists of more than "merely . . . passively observing the proceedings, . . . it requires the mental acuity to see, hear and digest the evidence, and the ability to communicate with counsel in helping prepare an effective

defense." *Odle v. Woodford*, 238 F.3d 1084, 1089 (9th Cir. 2001).  The "test [is] whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky*, 362 U.S. at 403 (quotation marks omitted).  Thus, "[a] simple understanding of the surface facts of the legal proceedings is not adequate to meet the standard of possessing a rational and factual understanding of the proceedings against a defendant." *United States v. Giffen*, 2019 WL 2720216, at *2 (D. Or. May 28, 2019), *report and recommendation adopted*, 2019 WL 2718485 (D. Or. June 28, 2019), *aff'd*, 839 F.App'x 168 (9th Cir. 2021).  Instead, "a defendant must have some ability to draw rational conclusions." *Id.*

Nevertheless, the presence of a mental deficiency does not necessarily render a defendant incompetent to stand trial.  *Hoffman v. Arave*, 455 F.3d 926, 938 (9th Cir. 2006), *vacated in part on other grounds*, 552 U.S. 117 (2008); *see Boyde v. Brown*, 404 F.3d 1159, 1166-67 (9th Cir.), *as amended on reh'g on other grounds*, 421 F.3d 1154 (9th Cir. 2005).  Circuit courts have upheld the competency findings of district courts notwithstanding a defendant's low intelligence, including scores within the range of developmental disability.  *See, e.g., United States v. DeCoteau*, 630 F.3d 1091, 1095-96 (8th Cir. 2011) (finding defendant competent to stand trial notwithstanding low IQ scores of 55 to 57 that placed defendant in the "mild mental retardation range"); *United States v. Oliver*, 626 F.2d 254, 259 (2d Cir. 1980) (finding defendant competent to stand trial notwithstanding IQ score in the bottom one percentile of the population, noting that the defendant could not "express himself as articulately as might be desired" but that he could still "understand the proceedings" and "consult with his counsel").  So too, have defendants with brain injuries resulting in cognitive impairment been found competent to stand trial.  *See, e.g., United States v. Timbana*, 222 F.3d 688, 690-92, 701 (9th Cir. 2000).  And defendants with dementia have likewise been found competent to stand trial.  *See id.* at 711 (noting diagnosis of "dementia due to head trauma").

### B.    Procedure

The procedure for determining mental competency is set forth in 18 U.S.C. § 4241. Subsection (a) provides that on the court's own motion or the motion of either party, the court must order a hearing as to the defendant's competency where "there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." 18 U.S.C. § 4241(a). The Court may order psychiatric or psychological examinations of the defendant to be conducted and order that the resulting reports be filed with the court. 18 U.S.C. § 4241(b).

At the hearing, the defendant must be represented by counsel and must be given the "opportunity to testify, to present evidence, to subpoena witnesses on his behalf, and to confront and cross-examine witnesses who appear at the hearing." 18 U.S.C.A. § 4247; *see also* 18 U.S.C. § 4241(c) ("The hearing shall be conducted in accordance with the provisions of section 4247(d).").

After the hearing, the court applies the preponderance of the evidence standard to determine if "the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." 18 U.S.C. § 4241(d). If the defendant is found to be incompetent, the court must "commit the defendant to the custody of the Attorney General." *Id.*

### C.    Burden of Proof and Evidence Evaluation

The finding that a defendant is competent to stand trial is a question of fact. *United States v. Hoskie*, 950 F.2d 1388, 1392 (9th Cir. 1991); *United States v. Garcia*, 837 F. App'x 489, 491 (9th Cir. 2020). The Government bears the burden of proving this fact by a preponderance of the evidence. *Hoskie*, 950 F.2d at 1392.

The court should consider representations of defense counsel regarding his client's competence, *Drope*, 420 U.S. at 177 n.13, but is nevertheless free to weigh all the evidence and accord greater credibility to certain evidence, including expert reports and testimony, *see Hoskie*, 950 F.2d at 1394.

## III.   EVIDENCE REGARDING DEFENDANT'S COMPETENCY[5]

### A.   2017 Motor Vehicle Accident

On July 30, 2017, Defendant was involved in a motor vehicle accident ("2017 MVA"). Specifically, he was brought to the emergency room by ambulance in the early morning hours after a late-night crash. As a result of the 2017 MVA, Defendant suffered orthopedic injuries and blunt force head trauma. The MRI at that time reflected "no infarct or any other acute findings" but noted "moderate brain parenchymal volume loss, not following a particular pattern." According to the contemporaneous medical records of Dr. Joseph Pachorek, Defendant's long-time primary care physician, Defendant suffered a concussion; within days of the accident Dr. Pachorek also "noted a resolution of . . . memory impairment" other than "amnesia for the accident itself."

### B.   2019 Fall

In February 2019, Defendant fell and struck his head, requiring stitches. The medical records from Dr. Pachorek's physical exam indicate that, neurologically, Defendant had imbalance and mild fine tremors. His exam also reflected that Defendant's memory was "normal," that he was not forgetful and that he had no memory loss. He also had "[n]ormal insight. Normal judgment. Normal attention span and concentration." Dr. Pachorek recommended further consultation with a neurologist, but this did not occur until 2021, in connection with legal proceedings.

---

[5] Many facts are set forth in the parties' experts' reports, which the Court relies on extensively herein. (*See* Doc. 60 at 109-152 (Chui Rpt.); Doc. 60 at 5-107 (Wood Rpt.); Doc. 64 (Goldstein Rpt. (sealed redacted version); Doc. 91 (Darby Rpt.); (Doc. 115 (Schroeder Rpt.).)

C.      **2020 Communications from Defendant to Clients, Co-Counsel, and Employees**

While the Court does not have before it all of the legal work Defendant performed during 2020, it did receive the following exhibits reflecting some of his work and communications.

On May 14, 2020, Defendant wrote a letter to his client regarding "*Lion Air* distribution of settlement," stating that Boeing had given "special authorization to distribute 50%" and offering reassurance that he was "fairly confident the balance would be done within 30 days."

On June 19, 2020, Defendant authored a similar letter to another *Lion Air* client saying "[t]here [were] serious issues," that he had "been back east four times to get everything resolved," that he thought he needed an additional two weeks, and would at a minimum "insist" that interest be paid within two weeks.

On July 31, 2020, Defendant authored a letter to another client, one in bankruptcy proceedings, stating that "[w]e are trying desperately to get everything figured out," referencing working with a bankruptcy trustee to determine how much should go to the estate and how much should be distributed to her.  On February 12, 2020, the bankruptcy court had entered an order specifying the amounts that were to be distributed among the various parties, including the recipient of the letter.

On September 28, 2020, Defendant sent a memorandum to all the attorneys who worked for Girardi Keese, telling them that the "work from home" strategy of the COVID-19 pandemic was not working.  In it, he told the attorneys that Girardi Keese's income had "been reduced by 90%" and he wanted the attorneys to "come back to work in the office." Defendant advised the attorneys that the office space would have only 40% occupancy, that the Mayor of Los Angeles "had already issued a document which permitted law firms to be open," that everyone would be required to wear masks when "walking around" the office, that they must practice social distancing, have their body temperature checked twice daily,

stay home and seek testing if they showed symptoms, and avoid large in-person conferences.

On October 30, 2020, Defendant followed up with a memorandum to all attorneys, again trying to convince them to come back to the office rather than continuing to work from home. Therein, he included a time sheet for attorneys to report the cases they were working on, describe their work product, and indicate the time they spent doing so. In the memo itself, Defendant gave specific information regarding the reduction in cash flow to the firm from $45 to $55 million in 2019 to an estimated $3.5 million in 2020.

On December 4, 2020, Defendant left a voicemail for Jay Edelson of Edelson, PC, in which he noted he had seen the allegations made in the *Edelson v. Girardi* case, which he characterized as "terrible." He stated that he thought he had "gotten clearance to send money out today," and asked Edelson to call him, giving him his phone number.

On December 27, 2020, Defendant left a second voicemail for Jay Edelson, stating that he believed there had been a "miscommunication," and that he thought they were not to distribute funds until all of the settlements were funded so that everyone would get paid at the same time. Defendant said that the money was held in trust. He also said he'd been sick with cancer of the eye, asked Edelson to not "be bad to me," assured Edelson that he was "a nice guy," and suggested that they "work everything out in a nice way." He acknowledged that perhaps there was negligence in this matter and that if so, as the head of the firm, it would be "[his] fault." He again asked Edelson to call him, leaving his phone number.

During the first half of 2021, Defendant continued to contact former Girardi Keese lawyers to attempt to start a new practice.

### D.   Videotaped Presentations from Late September through November 2020

Defendant was videotaped speaking on at least four occasions in October and November 2020. Specifically, two videotaped sessions of a judgment-debtor examination of Defendant, dated September 23, 2020, and October 13, 2020, show Defendant testifying.

On October 6, 2020, Defendant appeared as a guest on a one-hour podcast to discuss trial strategy. On November 21, 2020, on behalf of Consumer Attorneys of California, Defendant moderated a ninety-minute continuing legal education panel discussion about plaintiff trial strategy.

### E.     December 2020 Events Related to the *In Re: Lion Air Flight JT 610 Crash* Case

Throughout 2020, Defendant and other lawyers, including lawyers from Girardi Keese, represented the families of deceased crash victims from Lion Air Flight 610 in the Northern District of Illinois. The underlying case, *In Re: Lion Air Flight JT 610 Crash*, No. 18-cv-07686 (N.D. Ill.) ("*Lion Air*"), consolidates over fifty individual actions against, *inter alia*, The Boeing Company. These cases arise out of the crash of a Boeing 737 Max 8 aircraft on October 29, 2018, resulting in over 75 deaths.

On December 2, 2020, Defendant and Girardi Keese were sued by their *Lion Air* co-counsel, Edelson, PC. (*See Edelson PC v. Girardi et al.*, Case No. 20-CV-7115 (N.D. Ill.) ("*Edelson v. Girardi*").) Edelson alleged that Defendant and Girardi Keese, among others, "wrongfully transferred, misappropriated, and retained settlement funds owed to the victims of Lion Air Flight 610." (*Edelson v. Girardi*, Doc. 1, Compl. ¶ 82.) Edelson also alleged that Defendant, among others, failed to pay to Edelson attorney fees owed to it under a fee-sharing agreement. Edelson asserted claims for breach of contract, tortious interference with contract, and conversion, seeking an accounting and imposition of a constructive trust. (*See id.* ¶¶ 83-120.)

On the same day that lawsuit was filed, Edelson also moved the *Lion Air* court for an order of contempt based on its understanding that "Boeing [had] fully funded . . . the settlements many months [before]," but that the funds had not been distributed to the clients and had instead been misappropriated and diverted elsewhere by the Girardi Keese firm. (*Lion Air*, Doc. 842 ¶ 3.) On Monday, December 14, 2020, the district court held a hearing on the matter, which Defendant attended by telephone along with his own separate

counsel.[6]  During this hearing, counsel for Girardi Keese gave the following answer to the judge's question about "what happened that went off the rails for [the] four cases" that Boeing had funded by wiring settlement funds to Girardi Keese:  "It's very, very difficult to say, Judge.  Mr. Girardi is 81 years of age and has had issues regarding his mental competence."[7]  This representation by Girardi Keese counsel preceded any medical evidence that Defendant had experienced "any memory issues."[8]  His own counsel echoed the statement by counsel for Girardi Keese, stating that Defendant was not able "to understand the nature of the proceedings or to provide [her] with useful information."[9]

The same day, the *Lion Air* court held Defendant in contempt,[10] froze Defendant's and Girardi Keese's assets, and entered judgment against them in the amount of $2 million. (*Lion Air*, Docs. 848 & 869.)  The next day, Los Angeles Superior Court Judge Holly Fujie issued a separate order to show cause why defendant "should not be reported to the California State Bar for misconduct and violation of the Rules of Professional Conduct for withholding settlement funds."  (*See* Opp. at 7-8 (citing *Ruigomez v. Girardi*, LASC Case. No. 19STCV22296).)

---

[6] (*Lion Air*, Doc. 852 at 3-4 (Dec. 14, 2020 transcript of hearing).)

[7] (*Id.* at 16.)

[8] On the final day of Defendant's competency hearing before this Court, September 13, 2023, on cross-examination, defense expert Dr. Wood answered "True" to the prosecutor's inquiry that "there is not a single [medical] record before December of 2020, other than the short three days after the [2017 MVA] noting any memory issues of this defendant?"  (Sept. 13, 2023 Tr. at 116; *see also* Goldstein Rpt. at 59 (detailing facts supporting her opinion that, prior to 2021, Defendant's "capacity to make material decisions" was never "questioned by those close to him").)

[9] (*Lion Air* Dec. 14, 2020 Tr. at 23-24.)

[10] The day after Defendant was indicted in the present case on wire fraud charges, on February 1, 2023, Defendant was also indicted in the Northern District of Illinois, where he faces seven counts of wire fraud, five counts of criminal contempt, and forfeiture exceeding $3 million, all arising out of the *Lion Air* settlement funding.  *See United States v. Girardi, et al.*, Case No. 23-CR-54 (N.D. Ill.) (Doc. 69, Superseding Indictment).

Four days later, on Friday, December 18, 2020, Defendant's and Girardi Keese's creditors forced both into involuntarily bankruptcy proceedings.[11]

### F.   Petition to Appoint Conservator Filed in January 2021

On January 19, 2021, a petition was filed in Los Angeles Superior Court to appoint Defendant's brother Robert as his conservator.  In connection with the conservatorship proceeding, Defendant was examined by various doctors in January through March 2021.

Specifically, Eric S. Frechette, M.D., a neuropsychiatrist, diagnosed Defendant with a cognitive impairment of mild or moderate severity, perhaps as a result of Alzheimer's disease.[12]  Neurologist Aaron M. McMurtray, M.D., concurred, noting that Defendant suffered from dementia, perhaps brought on by Alzheimer's disease.  Dr. Nathan E. Lavid, M.D., a neuropsychiatrist, performed a three-hour neuropsychiatric evaluation after which he concluded Defendant had "almost no short-term memory," stating in his declaration for the conservatorship proceeding that Defendant's "dementia impairs his ability to understand the hearing."  (Def. Exs. 20 & 40 ("Lavid Rpt.").)

Deborah E. Budding, Ph.D., conducted a neuropsychological evaluation that included testing.  (Def. Ex. 41 ("Budding Rpt.").)  Dr. Budding believed that Defendant's "invalid/inconsistent" result on one test may have been the result of a combination of his vision troubles and the proximity of the score sheet "bubbles" on this particular portion of the testing.  Ultimately, Dr. Budding opined that Defendant was not capable of assisting his attorney due to "clearly impaired abilities to encode/absorb information" and "difficulty recalling information provided to him."

The petition to appoint a conservator was granted on July 9, 2021.

---

[11] On February 4, 2021, Edelson filed a Suggestion of Bankruptcy to alert the court that Defendant Thomas Girardi and law firm Girardi Keese were in bankruptcy proceedings as of December 18, 2020, effectively halting the litigation pending bankruptcy adjudication or relief from the automatic stay. (*Edelson v. Girardi*, Doc. 37.)

[12] Eventually, a diagnosis of Alzheimer's disease was excluded based on Defendant's negative amyloid PET scan.

### G.    Break-In at Defendant's Pasadena Residence

Defendant was recorded by police officer body cameras after a break-in at his home on January 23, 2021 and in a follow-up interview about five days later.  In these videos, Defendant shows some trouble in recalling some names and details, but he is able to walk through the home with the officers, recount what he had seen, and convey details regarding the residence itself.  With effort, he was able to provide contact information of family members, attorneys, and his assistant by consulting a paper list.[13]

### H.    July 31, 2021 Fall

On or about July 31, 2021, Defendant again fell.[14]  The hospital report noted that Defendant gave a history indicating that his mother was alive when in fact she had died many years before.  He also believed that someone from his (then defunct) law firm brought him into the hospital when in fact he had been brought in by ambulance.  A CT scan of his brain on July 31, 2021 showed "no acute intracranial findings," and also showed the "generalized brain parenchymal volume loss" that had been reported in earlier scans.  An MRI of Defendant's brain followed on the same day, and the report notes "[n]o acute infarct," notes "[v]olume loss," and "[m]ild changes chronic small vessel ischemic disease."  On August 1, 2021, Defendant is reported as having "poor short-term memory," noted as not remembering the reason for his hospitalization, and of forgetting that he was not ready to be discharged after being told this repeatedly.  This continued for at least the next two days.  Defendant was unhappy with his treatment team's recommendation that he move to an assisted living facility.  This recommendation was apparently implemented, and Defendant moved into assisted living at Belmont Village.

---

[13] Defendant uses a flip phone, not a smart phone.

[14] Three days before, on July 28, 2021, Defendant had a minor surgical procedure.  (Def. Ex. 23.)

13

## I.        Post Hoc Accounts of Defendant's Cognitive Decline

There were no contemporaneous anecdotal reports (i.e., text messages, emails, letters) of Defendant's alleged cognitive decline from 2017 through the end of 2020.  The first of such anecdotal reports were made to Defendant's lawyer and/or experts related to the conservatorship proceeding in 2021.

In a February 25, 2021 letter to the psychiatrist retained by Defendant's family in support of a conservatorship, Richard Kraemer, Defendant's friend of over two decades (who also worked with Defendant "on many trials" and who had "been his photographer") recounted that he noticed Defendant's decline begin after the 2017 MVA.

In an email of the same date to Defendant's counsel, Defendant's legal assistant noted the same decline, providing examples from 2019 and 2020, including Defendant asking the identity of a woman in a picture with him (his wife), forgetting she had given him particular files, forgetting details about cases, repeatedly dictating the same letter to the same person, failing to recognize employees, and calling her in for work after the firm had closed.  (*See* Def. Ex. 10; *but see* Gov. Ex. 15 at 2.)[15]

A consultant who had worked for Girardi Keese for a number of years was interviewed by Dr. Diana Goldstein, a Government expert in this proceeding, about the consultant's interactions with Defendant.  The consultant reported that "approximately six to nine months after the 2017 car accident [Defendant] didn't have the same attention to detail or the same short-term memory."  She "noticed he'd say, 'Hey baby,' to people instead of their names, people he should have known, it's like 'cheating'… but I never saw him . . . not recognize someone."  Nevertheless, she "didn't think he was any less sharp." The consultant stated that Defendant had "stolen her friend's money," and that she

---

[15] During an interview with the FBI, Defendant's legal assistant recounted a social call to Defendant's residence in April 2021 during which Defendant filled her in on a burglary that occurred in his residence in January.  (Gov. Ex. 15 at 2; *see also* Goldstein Rpt. at 61-62 (characterizing the assistant's FBI interview as "describing a much milder cognitive picture" and elaborating).)

confronted him about it when she last met with Defendant in mid-May 2019.  She also noted that she observed him at the arraignment in the current matter, and believed he recognized her.  She reported to Dr. Goldstein that she observed that Defendant appeared fragile in front of the cameras, but did not appear to need assistance once he reached the hallway (presumably out of sight of the media).

Defendant's daughter Jennifer was also interviewed by Dr. Goldstein.  Jennifer had been estranged from Defendant for a number of years, but reconciled with him in early 2021.  When she did see him, she became concerned regarding his ability to live alone: he'd always had people to manage his medication and take care of his home and was unlikely to learn how to do it then; he wasn't driving anymore; he made notes about his practice but Jennifer believed a lot of Defendant's notes were "gibberish"; Defendant could not recall details regarding family members, including thinking his grandson was his nephew; Jennifer occasionally had to remind him to shower, get dressed fully, or change his clothes.

In February, 2021, Defendant's long-time lawyer-friend Richard Marmaro sent a text message to Defendant's brother (which was then forwarded to Defendant's attorney) providing an example of Defendant's earlier loss of orientation as to place in March 2020.  Specifically, Marmaro explained that in March 2020, he ran into Defendant in the lobby of the federal court and quickly ascertained that Defendant was looking for a particular department of the Superior Court and was in the wrong building.  Marmaro became concerned for his friend because he knew Defendant had appeared "hundreds if not thousands of times" in Superior Court over the previous three decades.

A defense expert interviewed Defendant's long-time housekeeper, who, in early 2021, transitioned from being Defendant's housekeeper to his caregiver.  She helped to care for him for about seven months before he moved into Belmont Village.  Defendant's housekeeper reported she first noticed a change after the 2017 MVA, giving examples that

he could not make a sandwich, he would wear the same socks three or four days in a row, and he would bring home dirty, empty Styrofoam cups from the office.

The first medical notation suggesting cognitive decline was around the time the conservatorship proceeding was initiated. In late February 2021, after speaking with a defense expert involved in the conservatorship proceeding, Dr. Pachorek, who had made contemporaneous notes in 2019 stating that Defendant's memory was normal, made an entry in his notes retrospectively noting a cognitive decline:

> Ever since his motor vehicle accident where he went off the cliff in 2017
> fracturing his ankle and having head trauma[,] he has not been the same.
> There has been a marked change in his cognition often repeating stories
> talking about the past and focusing on past accomplishments. Over the last
> two years socially his gait became slightly impaired more shoveling [*sic*,
> shuffling] and he seemed to get occasionally confused when out in public.

(Def. Ex. 9 at 1 (Dr. Pachorek's notes).) Dr. Pachorek saw Defendant the same day he made that note, and he added for the first time in his office notes that Defendant had "impaired memory and poor insight and judgment."

An attorney who worked with Defendant from July 1, 2019 to December 6, 2020, was interviewed by Dr. Goldstein. During this time, she frequently consulted with Defendant regarding her cases and, although she had to help him recall the specific facts, he recalled the cases when given details, and he always assisted her with mediation or settlement conferences. "She viewed him as a very capable mentor." She often lunched with him, particularly during the early part of the COVID-19 pandemic when they were the only lawyers in the office. She did not experience him becoming confused, having trouble tracking conversations, rambling, losing his train of thought, repeating himself, or responding "off-point" to questions. He remembered details of her personal life, such as where she lived and that she was looking into purchasing a home. She reported that during the time she worked with him, she did not ever feel he was incapable of overseeing the firm

or of providing case supervision.  He sometimes made inappropriate comments to her, but she stated that was in keeping with his personality, not a deviation from it.  Other than that, she saw no "odd behavior[,] changes in hygiene[,] changes in normal routine[,] or socializing habits . . . ."  Over this time, she observed some physical problems:  walking slowly, hearing problems, eye problems, decreased appetite, and weight loss.

### J.     Criminal Indictments

The day after Defendant was indicted in the present case on wire fraud charges, on February 1, 2023, Defendant was also indicted in the Northern District of Illinois, where he faces seven counts of wire fraud, five counts of criminal contempt, and forfeiture exceeding $3 million, all arising out of the *Lion Air* settlement funding.  (*See United States v. Girardi, et al.*, Case No. 23-CR-54 (N.D. Ill.) (Doc. 69, Superseding Indictment).)

### K.     Reports from Retained Experts

In 2023, after Defendant was charged in the present case, and in connection with the present Motion, additional experts were consulted regarding Defendant's cognition; much of the contents of their reports are discussed below.

#### 1. Defense Experts

##### a.     Helena Chang Chui, M.D., Neurologist

Dr. Chui treated Defendant, seeing him twice in 2021, and was later retained by the defense as an expert.  Specifically, Dr. Chui was retained by the defense on March 27, 2023, and she authored a report dated May 31, 2023.  Significantly, Dr. Chui was not asked to opine on Defendant's mental competency; rather, she was asked to evaluate the presence and etiology of Defendant's dementia, its progression and severity, and Defendant's prognosis.

Dr. Chui saw Defendant via videoconference as a treating neurologist on April 8, 2021 and November 12, 2021, and she conducted an in-person interview of him on April 13, 2023.  The treatment visits were initiated by Defendant's daughter Jennifer who, having been estranged from her father for approximately fourteen years, had reconciled with him

approximately two months prior to the first visit.  After reconciling with him, Jennifer noticed that her father said a number of things that were no longer true; for instance, he said he went to his office, but his law firm had been closed for months; he said he talked to his secretary, but he didn't; and he said his home mortgage was paid off, but it wasn't.  From a brain MRI dated February 9, 2021, Dr. Chui noted "moderate bilateral temporal, parietal and hippocampal atrophy,"[16] and she formed the initial impression that Defendant suffered from mild to moderate dementia due to late-onset Alzheimer's disease.[17]

On November 12, 2021, Dr. Chui saw Defendant, again by videoconference, after he had moved into an assisted living facility, Belmont Village.  A staff member confirmed that he was independent as to personal care.  Defendant told Dr. Chui he was working as a lawyer 12 hours a day.  Dr. Chui was left with the impression Defendant suffered from mild dementia.

On April 13, 2023, Dr. Chui saw Defendant in person.  He continued to express the belief that he was working as a lawyer (despite having been disbarred) and that he still lived in his house in Pasadena (despite having moved out in mid-2021).  Objective neurological assessments administered to Defendant resulted in scores similar to those two years prior.  Ultimately, Dr. Chui was left with the impression that Defendant suffered from mild to moderate dementia.

Responding to the defense question regarding the "presence and etiology of" dementia, Dr. Chui analyzed three brain MRI scans, one from the day after the 2017 MVA, a second from February 9, 2021, and a final one from April 17, 2023.  The 2017 scan showed "no contusions or intraparenchymal hemorrhages that typically occur with head trauma," but did "show significant atrophy of the temporal poles and hippocampi."  The 2021 and 2023 scans have a quantifiable, comparable measure of atrophy of Defendant's

---

[16] To say a part of the brain has atrophied means that that part of the brain has gotten smaller, which can be caused by aging and by neurodegenerative disorders, traumatic brain injury, infections, or toxins.

[17] As noted previously, this etiology has been excluded based on negative amyloid PET scans.

hippocampi, placing these regions in the first percentile for a person of Defendant's age, meaning the size Defendant's hippocampi was less than 99% of other 81-year-old (and 83-year-old) individuals.  This type of atrophy is "associated with impairments in learning and retaining new information."

Dr. Chui testified at the hearing regarding the significance of hippocampal atrophy. The hippocampi are associated with the encoding of one's short-term memories.  There is a strong correlation between hippocampal volume and memory.

As to Defendant, Dr. Chui testified that because Defendant's hippocampi were first determined to be atrophied in 2017, the atrophy actually began before that time.  She testified both that there was a progression of the atrophy between 2017 to 2023, and that a comparison of the 2017 scan with the 2021 scan revealed that "[a] similar level of significant hippocampal atrophy was present throughout the period from 2017 to [January 2021]"

During the time from 2021 to 2023, Dr. Chui characterized the results of neuropsychological testing administered by Dr. Wood in 2023 as demonstrating a "progressive decline" from the time tests were administered in January 2021, with 2023 reflecting a decline in his full-scale IQ from 108 to 98 and a working memory decline from the 93rd percentile to the 87th percentile.  Dr. Chui was left with the impression that Defendant suffers from "dementia due to a progressive, irreversible neurodegenerative disorder."  After Alzheimer's disease was ruled out, Dr. Chui identified two other possible underlying disorders:  frontal temporal lobar degeneration ("FTLD") or Limbic-Predominant Age-Related TDP43 Encephalopathy ("LATE"), the latter of which she identified as more likely.  She testified that patients with LATE typically do not respond well to cueing.

Responding to the defense question of the severity of dementia, as of the date of her report, Dr. Chui identified Defendant as suffering from "moderate dementia," which reflects severe memory loss, with only highly learned material being retained, and new

material being rapidly lost.  As to the expected progression and prognosis, Dr. Chui believed that Defendant's dementia preceded the 2017 MVA, and that a resulting "concussion produced a step-wise cognitive decline, but had remained in slowly progressive decline between 2021 and the present.  And there being no treatment for LATE, Dr. Chui opined that Defendant's cognitive functioning is expected to deteriorate further, but that such decline is expected to be "overall slowly progressive."

### b.    Dr. Stacey Wood, Ph.D

Dr. Wood, a neuropsychologist, was retained by the defense to "conduct a comprehensive neuropsychological evaluation" of Defendant.  Dr. Wood is board certified in the field of geropsychology.  She teaches college classes regarding neuropsychology, aging, and memory disorders.  Dr. Wood evaluated Defendant over the course of five days in mid-to-late May 2023 at Sunrise Senior Living in Seal Beach, where Defendant now resides.

Overall, Dr. Wood formed the opinion, to "a reasonable degree of neuropsychological certainty," that Defendant suffers from "cognitive impairment" that is "consistent with a diagnosis of Major Neurocognitive Disorder, Unspecified" that is not explainable based solely on his age.  Dr. Wood noted Defendant as having poor insight as to the extent of his memory impairment.

Interpreting the tests she administered in May 2023, Dr. Wood noted the absence of any "evidence of poor effort" as measured through either stand-alone or embedded performance validity tests ("PVTs").  She also noted that the pattern of the test results was similar to those conducted in January 2021.

Dr. Wood noted that Defendant's "[l]anguage abilities were roughly average overall" except for "category fluency" (e.g., the ability to recall and name as many animals as possible within sixty seconds), which was noted to be "borderline," in the 9th percentile. Dr. Wood further observed:  "Attention was broadly average and processing speed was low average overall.  Working memory . . . was a relative strength, brought up by an

exceptional strength in arithmetic (Superior)."  "Executive function was broadly within normal limits," based on Defendant's "scoring in the average ranges," but with a noted difficulty with "two complex tasks that required keeping in mind two rules while completing" them.

Regarding "the domain of memory," Dr. Wood observed:

> The most marked cognitive impairment was in the domain of memory. Mr. Girardi's immediate memory (ability to repeat a brief story) was low average.  However, he demonstrated mild to severe impairment across tasks assessing story memory, list learning, orientation, and visual memory, with little to no recall after longer delays of about 20 minutes. Mr. Girardi also made significant memory errors, confusing foils for familiar words. During the interview, there were significant confabulations[18] and perseverations related to his beliefs about the current situation that persisted despite feedback.
>
> These findings indicate that he may be able to follow a conversation but will have difficulty recalling it if distracted or after a short delay. Mr. Girardi had poor insight into the extent of his memory impairment . . . .

(Wood Rpt. at 34) (footnote added).

On clinical interview, Dr. Wood observed Defendant experience "mild word-finding difficulties" and as having "significant, persistent confabulations."  These confabulations involved Defendant's expressed belief that he was still practicing law, that he was at Sunrise to meet with clients, and that Girardi Keese was still operating.  Additionally, twice during the clinical interview, Defendant identified George Bush as the current president.

As to Defendant's competency to stand trial, Dr. Wood conducted "a semi-structured clinical interview that assesses key aspects of competency to stand trial, including the

---

[18]  "Confabulation" is a false memory of a memory-impaired person generated without the intention of deceit.

ability to understand the nature of the proceedings, understand the possible consequences, and communicate with counsel," as standardized by the "Fitness Interview Test-Revised" ("FIT-R"). Overall, Dr. Wood expressed that "[w]hile [Defendant] retains a good factual understanding of court proceedings, he lacks the sufficient ability to consult with his attorney with a reasonable degree of rational understanding." The former is true based on his "lengthy career as an attorney," whereby his "general knowledge remains intact . . . as 'crystallized knowledge.'" "[C]rystallized factual knowledge is more resistant to the impact of aging and dementia than new learning and fluid reasoning." But as to more recent events, Defendant "did not freely recall the allegations [of] the indictment." He was able to recall some information after 24 hours, but not after one week. As to the likely outcomes of the case against him, Defendant answered that it is 100 percent likely that he would be found "not guilty," which Dr. Wood believed demonstrates a lack of appreciation of the risk of an adverse outcome, which raises the potential for inadequate participation in his own defense.

Nevertheless, Defendant was able to converse intelligently with Dr. Wood about potential defenses when presented with hypothetical charges, including those charged in the indictment.

But Dr. Wood opined that, given the inability to recall the facts of his current situation (most notably his disbarment, his firm's involuntary bankruptcy, that his brother was appointed to be his conservator, the existence or details of the pending charges in this case, and that he was represented by the Federal Public Defenders Office rather than his friend, inactive attorney Richard Marmaro), Defendant "does not have a realistic appraisal of his current situation, risks, and options and cannot retain that information when provided." Overall, Dr. Wood opined that "limitations in Mr. Girardi's ability to assist counsel were primarily related to his inability to recall and retain case specific information and the specifics of his current situation."

### c.   Dr. R. Ryan W. Schroeder, Neuropsychologist

Dr. Schroeder authored a report dated August 15, 2023, based on his file review, including the reports of Dr. Budding (from 2021), and Drs. Goldstein and Wood (from 2023) both of which are discussed herein.  Dr. Schroeder opined that validity tests and cutoffs must be recalibrated for examinees who have (or are suspected of having) dementia. As to Dr. Budding's testing, Dr. Schroeder observed that she gave only two validity tests, which is fewer than normally administered, neither of which is well-suited for use with dementia patients.  As to Dr. Wood's testing, he opined that, if one presupposes that Defendant has at least mild dementia, Defendant in fact "passed all validity tests."  As to Dr. Goldstein, Dr. Schroeder opined that the validity tests were ill-suited to dementia patients and/or, if one presupposes dementia, Defendant passed them.  Dr. Schroeder found significant that Defendant passed the "symptom validity scales" within the MMPI-2, suggesting no exaggeration of symptoms.

As to all three reports, Dr. Schroeder rejected the notion that Defendant's test performances showed evidence of exaggeration or malingering, stating as to each that he does "not see clear psychometric evidence of an exaggeration of cognitive dysfunction or malingering."

### 2.   Government Experts

### a.   Dr. Diana Goldstein, Ph.D.

Dr. Diana S. Goldstein, a psychologist retained by the Government, "conducted a psychological and neurocognitive evaluation of" Defendant on three consecutive days in late April 2023 and authored a report dated June 2, 2023.[19]  Dr. Goldstein believed

---

[19] (*See* Doc. 64 (Goldstein Rpt. (sealed redacted version).)  An unredacted, *in camera* version of the Goldstein Report was also reviewed by the Court.  There are a number of other details that relate to Defendant's understanding of the charges and ability to assist defense counsel found in the redacted portions of the Goldstein Report, generally at pages 28 through 36.  The Court does not discuss those portions in detail here and instead merely notes these portions of the Goldstein Report (available to the

Defendant was not "fully oriented," but she also observed that he recognized both her and the technician involved in his testing from the day before, and Defendant accurately recalled his room was on the third floor (despite another statement in his interview that he continued to live in his house in Pasadena).  Defendant recognized an investigator from the FPD's office (despite being unable to recall that he was represented by the FPD's office).  When asked by Dr. Goldstein to name his grandchildren, Defendant could not recall grandchildren with whom he had had years-long relationships.  He understood and expressed humor appropriately.  Dr. Goldstein noted that Defendant's conversation with her "built upon itself," with Defendant at one point reminding Dr. Goldstein that, "as [he] had] said 15 times," he was not a criminal lawyer, and for that reason he didn't know the answer to her specific questions.

After Defendant disclaimed any knowledge of the charges filed against him, he demonstrated no interest in reviewing the indictments after he was provided with paper copies of the indictment from this case and from the criminal case related to the *Lion Air* matter.

Dr. Goldstein observed that Defendant's "confabulation [was] solely on the topics of his legal, financial, and vocational status, all of which are related."  In contrast to these confabulations, Defendant revealed accurate recall of events, caused by the COVID-19 pandemic, that adversely affected law firms that focused on litigation.  Specifically, Defendant recalled that the COVID-19 pandemic resulted in courts shutting down for months, which caused delays in reaching settlements (due to lack of trials and other court dates), and which, in turn, also lead to reduction of support staff (or of support staff hours) in law firms).

---

defense but not the Government), further support the Court's conclusion that Defendant is competent to stand trial.

During the interviews, Defendant refused to silence his cell phone, and took calls from his wife.  Specifically, after having said earlier he did not remember having a third wife, he answered a phone call from the woman who had in fact been his third wife for twenty years, accurately remembering she was leaving for Spain on that day to film a television show and accurately identifying her as an "ex."

As he did with Dr. Darby (discussed below), Defendant gave incorrect answers to questions regarding current events and certain facts such as Los Angeles sports teams, civil rights leaders, and the assassinations of JFK and RFK.

Specific to a defendant's ability to assist defense counsel, Defendant discussed how a "document case" focuses more on the relevant documents than on testimony.  So as a defendant, he would help his counsel "find things," he would call the firm accountants, and he would make sure that counsel had access to all documents that might assist in the defense.  He also understood many key issues regarding the sentencing of a convicted defendant.

Defendant stated, *inter alia*, that a criminal defendant would be incompetent to stand trial "if he can't remember what he did."  When asked what a defendant should do if he was confused about something occurring in trial, he answered that the defendant should take notes and consult with his lawyer, noting particularly that he could use a break in the proceedings to do so.  He answered similarly when asked what a defendant should do if he knew a prosecution witness was not telling the truth:  Tell counsel so counsel can cross-examine the witness and/or re-call another witness (or call a new witness) to refute the lie.

But when asked about his own situation, Defendant denied knowledge that Girardi Keese had been closed, denied knowledge the firm was in bankruptcy proceedings, denied having a conservator, and denied living at Sunrise, saying he was there to meet with clients, that he merely stayed overnight, and that he was to return to his house in Pasadena "tomorrow."  He denied being disciplined by the California State Bar, denied having been disbarred, and denied having his assets frozen by order of the Northern District of Illinois.

In the context of cognitive testing administered by Dr. Goldstein, she noted that Defendant "failed or was unable to fully pass all aspects/trials of the majority of measures administered throughout testing, obtaining scores significantly below recommended clinical cutoff scores." She concluded that this was the result of "variable effort" on the part of the Defendant that "could underestimate his true/optimal capabilities significantly." This yielded "cognitive test data [that was] invalid for interpretation." Nevertheless, Dr. Goldstein explained that certain "*unimpaired* performances can reasonably be interpreted as *the least of* [Defendant's] capabilities in that respective cognitive domain." She then went on to summarize those "unimpaired performances," noting that they were presented "*for qualitative purposes only*" using "[a] conservative 'least as' approach." Using this method, Dr. Goldstein discussed her interpretations of the test results.

Defendant tested with a full-scale IQ in the low average range, and his General Ability Index indicated nearly the same score, differing only by one point. But the General Ability Index removes the working memory and processing speed (referred to as "fluid skills") to focus on crystallized verbal and nonverbal abilities. Dr. Goldstein interpreted the similarity in these two tests as demonstrating that the combination of working memory and processing speed do not adversely impact Defendant's performance. Viewing them separately, though, working memory was identified as a relative strength while processing speed was identified as a relative weakness.

Tests that focus on particular domains revealed unimpaired performance in the low average to average ranges across the following domains:

- general intellectual functioning (low average to high average);[20]

- attention (low average to average);

- learning and memory (low average to average);

---

[20] Defendant consistently scored in the high average range the arithmetic portion of neuropsychological tests, which was measured in the general intelligence portion of the testing administered by Dr. Goldstein and Dr. Wood.

- executive function other than attention-related (low average to average); and
- language functioning (low average to average).

Defendant's processing speed was found by both Dr. Goldstein and Dr. Wood at low average. Moreover, Dr. Goldstein noted that Defendant's tests involving "visual scanning" could be impaired by his diminished eyesight. Interpreting results related to learning and memory, Dr. Goldstein ruled out Defendant experiencing "rapid forgetting" in favor of a finding of that he has "relatively *intact (albeit reduced) initial encoding capacities.*" She opined that although he has difficulty with spontaneous retrieval, his recall improves with cueing.

Dr. Goldstein expressed the opinion that as of early 2021, Defendant "was not experiencing dementia." Instead, evidence she detailed "point[ed] to the less severe diagnosis of Mild Cognitive Impairment (MCI), also referred to as Mild Neurocognitive Disorder." Dr. Goldstein found significant the fact that Defendant's primary care record did not note any cognitive impairment before December 2020. She opined that Defendant's primary care record is instead "significant [as to] cognitive *stability*" after the 2017 MVA; the only pre-2021 neurological problems noted were related to balance and a hand tremor.

Also significant to Dr. Goldstein's opinions were the videotaped judgment-debtor examination of Defendant, the podcast featuring Defendant, and the continuing legal education session featuring a panel moderated by Defendant. Dr. Goldstein observed Defendant's responses from a clinical perspective. During a judgment-debtor examination, Dr. Goldstein observed Defendant as demonstrating naming/word retrieval difficulties (of a severity she could not accurately ascertain given the adversarial nature of the proceeding), but she also observed that Defendant "otherwise demonstrated normal cognitive functioning." Specifically, Defendant used and understood language correctly (with some difficulty noted due to Defendant's diminished hearing and failure to use hearing aids during the examination). Dr. Goldstein likewise observed the following: No confusion or

"loss of train of thought"; no repetition; repeated expressions of anger reflective of the rejection of an offer to settle the dispute; demonstrated knowledge of details of settlement; accurate statement of the then-current financial condition of Girardi Keese as having funds in an amount "just enough to make payroll"; appropriate invocation of the Fifth Amendment privilege against self-incrimination; recollection of a claim of a 25% ownership in the building that housed Girardi Keese; the tracking of events of that morning; the tracking of his own testimony (including multiple statements of as "I told you" and reference to his settlement offer); recollection of recent events; a correction of the questioner's proffered date regarding a fundraiser for then-presidential candidate Joe Biden (that it was in 2019 not 2020); Defendant's understanding of the purpose of the examination. As for the Defendant's participation in the podcast and as moderator of the Consumer Attorneys of California presentation, Dr. Goldstein noted: "Mild word-finding/retrieval difficulties [were] noted, but his tracking ability and ability to remain on point and respond relevantly and cogently were intact."

Dr. Goldstein opined that voicemails and letters left by or authored by Defendant in November and December 2020 demonstrated his understanding of his cases, the operation of the law firm in the midst of the pandemic, his understanding of the circumstances related to a former client who was represented by separate counsel in her attempt to get her settlement funds distributed, and his understanding that professional ethics required him to communicate with his former client's lawyer rather than the client herself. She also noted that by the end of December 2020 (and continuing for almost six months thereafter), Defendant began contacting former Girardi Keese lawyers to attempt to start another practice, reflecting his understanding that Girardi Keese was no longer operational.

Ultimately, Dr. Goldstein opined that Defendant is "partially malingering," meaning that he engages in the intentional exaggeration of his *bona fide* condition of minor cognitive impairment. Dr. Goldstein outlined a number of examples establishing that Defendant was able to track his conversations with her and has an intact memory for

current and recent events.  She also noted the complete absence of subjective reports of any cognitive impairments prior to January 2021.  According to Dr. Goldstein, this defies the normal course of progressive neurocognitive disease, which does not result in rapid decline in the absence of "other acute brain insult," which did not occur at the time.  On this issue of malingering, Dr. Goldstein stated:

> Currently, I find no compelling evidence that Mr. Girardi is suffering from a dementia syndrome.  To the contrary, there is compelling evidence he is not.  Mr. Girardi's clinical presentation is not one of severe amnesia, but in my opinion a deliberate attempt at deception, an intentional embellishment of mild cognitive impairment for secondary gain, in this particular matter, an adaptive attempt to avoid prosecution.  And the complex delusional system he claims—that his firm remains open and he continues to practice law, that he has never been disbarred, and that he is engaging in ongoing meetings with other practicing attorneys on open cases—may be wishful thinking (indeed Mr. Girardi appeared to be attempting to salvage his practice prior to being disbarred), but this is not psychosis; it is a clinical presentation that lacks credibility and sophistication.  So too do claims of having no knowledge or awareness of his legal and financial predicaments.  Malingering is simply the only reasonable explanation for Mr. Girardi's inconsistent and nonsensical presentation.

(Goldstein Rpt. at 69.)

Dr. Goldstein opined that Defendant meets both criteria of mental competency to stand trial.  First, she opined Defendant understands the nature and consequences of the charges against him.  Defendant's experience as a trial attorney gives him an in-depth understanding of the proceedings and the roles of the various participants in a trial, including the judge, the attorneys, the witnesses, and the jury.  And in terms of the consequences, so long as the issues are presented to him in the hypothetical rather than as

something that applies to him personally, Defendant demonstrates an appreciation for the possible consequences that could flow from the charges returned against him.

Second, Dr. Goldstein opined Defendant also has the ability to communicate with counsel and to assist in his own defense.  Improvements to Defendant's recall can be made with cueing and prompting, and his ability to follow the proceedings can be improved by note-taking and conferences with counsel.  When charges against him were framed in the hypothetical, Defendant identified a detailed, rational approach that could be taken in his defense, and he demonstrated knowledge of how available financial records could assist in his defense.

Dr. Goldstein concluded:

> Mr. Girardi clearly has a rational and factual understanding of the charges against him, the proceedings against him that may follow, and has the capacity to consult meaningfully with his attorneys toward a defense with a reasonable degree of rational understanding *if he so chooses*.  His insistence on being unaware of his legal or financial situation is willful and deliberate, and he can opt to be cooperative if he wishes to. . . .  Mr. Girardi's intellectual/cognitive capabilities are sufficiently intact, and his psychiatric status sufficiently stable, for him to follow, understand, interpret and participate meaningfully in upcoming proceedings, and to aid his attorneys meaningfully in a legal defense: he is competent to stand trial.

(Goldstein Rpt. at 71 (emphasis in the original, paragraph structure altered).)

### b.    Dr. R. Ryan Darby, Neurologist

Dr. Darby is "a neurologist with specialization in behavioral neurology and neuropsychiatry."  He reviewed a number of records related to Defendant's competency to stand trial, including the reports of Drs. Chui, Wood, and Goldstein, and issued a report dated July 17, 2023.  Dr. Darby interviewed Defendant over the course of three days.  As to the details of the present prosecution, Dr. Darby noted that Defendant stated that "he

doesn't have a clue about what he is charged with," but that he thereafter discussed issues directly relevant to those charges with clarity.  Defendant stated he would not take a client's money, and he attributed delays in distribution of settlement funds to medical liens and other liens that would have to be paid out of the settlement funds.  Without prompting, Defendant stated "that he knows that he did not steal any money but would accept that his clients may not have received what they were entitled to," and he would "find out 'who did it'" and make sure the client was paid.  Also without prompting, he identified concerns "about his accountant [and co-defendant] . . . having taken the money."

When asked by Dr. Darby whether he would follow advice of counsel, Defendant answered that he would follow it, but that he would also use his own experience to ascertain whether the "advice made sense for his specific situation."  Defendant understood that a "defense attorney would investigate the allegations" and that "he would provide his attorneys with the documents to support or refute the alleged claims."  He identified "[t]he defense attorney's job [as] mak[ing] sure the truth comes out if innocent, or if there is a crime committed to minimize the consequences."  As to the charges, Defendant made statements that showed he understood that wire fraud is related to theft, and that the penalty for this crime could vary but might include "jail, financial fees, and disbarment." Defendant correctly identified the roles of the prosecutor, the jury, and the judge, as well as plea bargains, courtroom proceedings, and witness testimony.  Defendant stated, erroneously, that he could be compelled to testify in his own criminal case.

When asked how the defense might demonstrate any lack of guilt, Defendant described a process of accounting for the settlement funds transferred to the firm's client trust account[21] and how one might go about determining whether the funds were properly allocated toward liens, costs, and satisfaction of the firm's contingency fee.  Defendant

---

[21] At times, client trust accounts are referred to by the acronym for "Interest on Lawyer Trust Accounts," or "IOLTA."

stated that "the documents would tell the whole story."   When asked specifically about a "strategy" for the defense, Defendant offered a rational defense theory: an accounting of the settlement funds for the cases and a focus on his co-defendant's actions in potentially stealing those funds.

As to Defendant's cognitive decline over time, Dr. Darby found it notable that there was "little evidence regarding any progression of cognitive problems between 2017 [through] 2020."  During this time, "any cognitive issues that were present did not impair his ability to function independently, including cognitively demanding work as a lawyer and business owner."  Dr. Darby observed that this was supported by "recordings of [Defendant] talking on a podcast and moderating a legal education video[, which] showed relatively normal cognitive functioning through 11/2020" and the statements of the lawyer who worked with him during his last eighteen months in practice.

Thus, for several reasons, Dr. Darby concluded that Defendant "is malingering or exaggerating the severity of his memory impairment."  First, the rapidity of the apparent decline is inconsistent with the normal progression of the diagnosed disorder.  Of this seemingly precipitous drop in Defendant's cognition from late 2020 to January 2021, Dr. Darby noted that such a change over a one-to-two-month period would be "highly atypical for a genuine neurodegenerative disorder, particularly [so for] LATE in the absence of Alzheimer's disease."  Dr. Darby opined that although a diagnosis of mild cognitive impairment could be supported in December 2020, such a diagnosis would not explain any rapid drop in cognitive functioning, noting it would be highly atypical for  "LATE or another disorder [to] cause[] such rapid progression in his memory that he would go from working to not being able to remember anything about very significant changes in his life's circumstances in only 1-2 months."

Second, Dr. Darby observed Defendant's inability to remember was selective, and to his benefit.  Dr. Darby noted that Defendant "is selective on which things he cannot remember, which he can remember, and which he answers incorrectly, in a pattern that is

beneficial to him."  Dr. Darby noted examples of Defendant not remembering the charges but then spontaneously offering that he did not steal anything from his clients, that his credit card was used solely for business expenses, and that he suspects his accountant and co-defendant of wrongdoing relating to client settlement funds.  And Dr. Darby noted that although there are reports that Defendant fails to recognize people he knows and sees frequently, Defendant did recognize Dr. Darby after meeting with him just once, showing surprise at seeing him.

Third, Dr. Darby found Defendant's patterns of confabulation to be atypical and non-credible.  Confabulations, as noted previously and as Dr. Darby explains, are beliefs of persons with "genuine memory impairment" that are used to "fill gaps in memory with explanations that are not accurate or true."  According to Dr. Darby, Defendant expresses many confabulations, including that "he still lives in his home, continues to work at Girardi Keese, and was not named in a civil case with criminal implications."  Other confabulations relate to statements regarding historical events such as the identity of presidents and details regarding major wars.  Dr. Darby explained these latter confabulations are atypical, because confabulations generally involve "personal memories" rather than "factual information."  Dr. Darby explains that Defendant claimed lack of memory about "overlearned, basic factual information about presidents and historical events, such as who was president during the Civil War and who fought in World War II," which are not generally the subject of confabulations "[i]n patients with genuine memory impairment."  Instead, Dr. Darby believes these latter statements are not confabulatory at all and that they are instead evidence of malingering.

Dr. Darby also noted a number of "near misses," such as where Defendant identified the American Civil War president was "not Lincoln," which indicated to Dr. Darby that Defendant likely did know that Lincoln was president during the Civil War.  Of the cognitive disorders identified as possible in Defendant's case, only end-stage dementia (which no one suggests Defendant has) would be likely to result in "an educated patient

[thinking] that George Bush was president during the Civil War or to be uncertain whether Europe was involved in World War II."

Finally, Defendant's decline in hygiene was noted to coincide with his forensic evaluations beginning in April 2023.  Most notably, Defendant "began wearing the same burgundy sweater to all evaluations (actively searching for the sweater in the dirty clothes if needed)."  This behavior was not noted previously, and Dr. Darby found particularly probative the fact that, according to the assisted living staff, Defendant would search out the same clothes day after day.  He explained that wearing the same clothes on successive days is found in "[p]atients with memory problems," but that is because they simply "forget to change" clothes.  Such patients typically "do not actively seek out dirty clothes to wear," which tends to show intact memory rather than memory problems:  "[H]e remembers he has a burgundy sweater and is trying to find it."

Dr. Darby opined that Defendant meets both portions of competency to stand trial. He has the ability to understand the nature and consequences of the proceedings against him.  Like Dr. Goldstein, Dr. Darby saw Defendant's background as a civil trial attorney as an aid to his understanding and that while Defendant continues to deny awareness of the charges against him, when those charges are framed in the hypothetical, "he can correctly understand what that charge is and the potential consequences."

Dr. Darby also opined that Defendant can properly assist his counsel in his defense. He has the general ability and was able to describe the types of evidence helpful to the defense.  And although Defendant subjectively reports a lack of awareness of the charges, Dr. Darby saw this as more likely the result of malingering than of actual memory loss, noting that Defendant demonstrated examples of the ability to "learn and retain information over time."  Defendant frequently noted to Dr. Darby that the accounting records were highly relevant to his defense, that he knows he did not steal from his clients, and that he suspected his accountant (who is his co-defendant) of engaging in the type of conduct of which he is accused.

Ultimately, Dr. Darby concluded that Defendant is competent to stand trial, summarizing as follows:

> Although it is possible that Mr. Girardi has LATE, memory problems from LATE, if present, would be expected to be mild and slowly progressive. It is therefore likely he is exaggerating the severity of any genuine memory problems. The time-course of severe memory loss over a few months in late 2020/early 2021 and the pattern of memory impairment on neuropsychological testing are both atypical for LATE. He has implausible memory loss for overlearned factual information like who was president during the civil war that are unlikely to be related to genuine memory impairment. More recent functional decline coincided with competency evaluations and include behaviors incongruent with genuine memory loss, such as searching through the dirty clothes for the same burgundy sweater to wear. Despite these reported memory problems, he demonstrated an intact understanding of the legal proceedings against him and demonstrated a general ability to assist his counsel in his defense. His memory loss regarding the specific details of the case against him, and inability to retain details of the case across sessions, is in my opinion more likely to be due to malingering than genuine memory impairment.
>
> Based on the information available at the time of this report, it is my opinion, to a reasonable degree of medical certainty, that Mr. Girardi IS COMPETENT to proceed to trial.

(Darby Rpt. at 30.)

## L.   Caregiver Accounts from 2023

Defendant's caregivers reported changes in Defendant's behavior in April of 2023. A supervisor from the assisted living facility where Defendant resides was interviewed by Dr. Goldstein. She reported changes in Defendant's behavior beginning approximately

April 2023.  Before, he had been independent in bathing, dressing, and grooming, but the supervisor had received reports that he had started wearing the same clothes, sometimes using towels in place of toilet paper, asking for his driver to come to pick him up but forgetting about his request after staff redirected his attention, and repeatedly asking to see a barber for a haircut after being told the barber would be in the next day.  She had not noticed any "word-finding problems," and said that Defendant doesn't get lost or confused and "always comes out when it's time for meals."  According to the supervisor, in approximately mid-May 2023, after Defendant's "lawyers started coming in to talk to him," Defendant began saying "I'm not a resident here, I'm here for business," and saying "I'm fighting for you," as if the supervisor were his client.  The supervisor reported that "He's always working at a desk or a table, by himself, outside or in the dining room[, and that h]e says he's working on cases.  He's on his cellphone a lot, but I don't know who he's talking to."

### M.   Defendant's Demeanor at the Competency Hearing

With one exception, discussed below, Defendant sat quietly at the defense table during the course of the three-day hearing.  Occasionally, Defendant seemed engaged in the proceedings, but often, he appeared to give them little attention.  One notable event occurred when the prosecutor asked Dr. Wood whether she would consider a particular fact relevant to an examinee's competency.  Specifically, the prosecutor asked Dr. Wood if she would find significant that an examinee "was able to successfully keep secret the fact of multimillion-dollar fraud?"  At this moment, before Dr. Wood answered, the prosecutor asked the Court to note that Defendant had said to him, in a lowered voice, "f**k you," and he also noted that defense counsel (seated next to Defendant at counsel table) did not contradict the prosecutor's account.  Dr. Wood agreed that Defendant's statement was significant because it showed "an appreciation of what [the prosecutor was] saying and what he is being accused of."

## IV.   DEFENDANT IS COMPETENT TO STAND TRIAL

Weighing all the evidence before the Court, and considering the many arguments offered by counsel, the Court concludes that although Defendant suffers from a mild-to-moderate cognitive impairment, he is competent to stand trial under the relevant legal standard.  In short, having reviewed the evidence relating to Defendant's brain scans, his testing results, the anecdotal accounts of his abilities, his presentation at clinical interviews, and, importantly, the timeline of the progression of the asserted cognitive decline, the Court finds persuasive the government's experts' conclusions that Defendant is exaggerating his symptoms and partially malingering.  As a result, and as explained further below, the Court concludes that Defendant is able to understand the nature and consequences of the proceedings against him and to assist properly in his defense.

### A.   Defendant's Neuroimaging Is Not Conclusive

Beginning in 2021, in connection with the conservatorship proceedings and continuing into the present proceeding, neurologists and neuropsychiatrists relied on Defendant's 2017 and/or 2021 MRI in formulating diagnoses of dementia or cognitive impairment.  As relevant here, Dr. Chui relied on the MRI performed in early 2021, and specifically, the "moderate bilateral temporal, parietal and hippocampal atrophy" observed therein, to form the initial impression that Defendant suffered from mild to moderate dementia due to late-onset Alzheimer disease.

Drs. Chui and Darby, the experts who examined all three brain MRI scans, agree that the volume loss or atrophy remained relatively stable from Defendant's post-accident (July 31, 2017) MRI through April 2023, although they do both also note a decrease in hippocampal volume.[22]   Specifically, although Dr. Chui testified that a progression of

---

[22] Defendant argues that Dr. Darby conceded that Defendant's neuroimaging is consistent with his current presentation.  As far as this goes, Defendant is correct, but because there is strong evidence that Defendant presented with his cognition intact (or no more than mildly impaired) well after the neuroimages began to reveal a similar extent of the volume loss experienced by Defendant in mid-2017, this argument is unconvincing.

atrophy between 2017 to 2023 was likely, she also agreed that a comparison of the *2017 scan* with the *2021 scan* revealed that "[a] similar level of significant hippocampal atrophy was present throughout the period from 2017 to [January 2021]."

As for the period between the 2021 scan and the 2023 scan, Dr. Chui noted an unspecified progressive worsening of brain atrophy from February 2021 to April 2023 that was "consistent with a progressive neurodegenerative process" that had been underway since before mid-2017.  As to that same time period, Dr. Darby noted the hippocampi volume had decreased from the second percentile in 2021 to the first percentile in 2023. This evidence tends to support a finding that if Defendant's cognitive functioning declined during between 2017 to and 2023, it did so only at a slowly progressive rate.

Notably, however, although such atrophy is generally considered to be correlative to memory loss, cognitive impairment, and/or dementia, it is not a "one-to-one" correlation, and persons with brain atrophy can be cognitively unimpaired.  Dr. Chui acknowledged that neuroimaging alone cannot determine whether someone has dementia.  And Dr. Darby opined:

> The link between brain imaging findings and the severity of clinical symptoms is not one to one, meaning two patients with the same brain scan could have different levels of cognitive impairment, and two patients with the same degree of cognitive impairment could have two different degrees of brain imaging abnormalities. In other words, someone with Mr. Girardi's neuroimaging findings could have a diagnosis of dementia, mild cognitive impairment, or could be cognitively normal.

(Darby Rpt. at 25.)

No expert contradicted the opinion that there is not a one-to-one correlation. Dr. Chui, who conducted research in this area, found there to be a .7 correlation that, while certainly significant, does not preclude a determination that Defendant is cognitively unimpaired or that he suffers from, at most, a mild cognitive impairment.  And although

Dr. Chui testified that she had encountered no patient in her clinical practice with that degree of atrophy that was "clinically normal," she also conceded that her sample, which was small, consisting of only 20 to 30 cases, was from a population of patients who came to her specifically *because of* cognitive impairment; she did not conduct a random study. For that reason, her clinical experience is of little value in determining the relationship between neuroimaging and cognitive impairment.

Overall, the neuroimaging in this case is not dispositive as to the ultimate issue of whether Defendant is competent to stand trial. Indeed, the neuroimaging does not provide particularly helpful insight into the Defendant's present cognitive condition at all. Therefore, having found that there is no conclusion to be drawn from the neuroimaging results, the Court examines other evidence of record.

### B.    Defendant's Comprehensive Neuropsychological Test Results[23] Do Not Support Defendant's Experts' Opinions that Defendant's Short-Term Memory is Severely Impaired

The parties argue extensively regarding a variety of Defendant's test results, but their dispute centers on whether Defendant has the capacity to form short-term memories such that he will be able to assist counsel with his defense. Defendant contends (and the experts he relies upon conclude) that Defendant's ability to form short term memories is severely compromised. (*See, e.g.*, Lavid Rpt. at 1 (concluding Defendant had "almost no short-term memory"); Budding Rpt. at 19 (concluding Defendant was not capable of assisting his

---

[23] There are several accounts in the record of Defendant's scores on neurological screening tests such as the Montreal Cognitive Assessment ("MoCA"). In light of the multiple in-depth neurological assessments, although the Court considers the results as evidencing cognitive impairment and as relatively consistent over the 2021 to 2023 time period, the Court relies on the more comprehensive measures of cognition rather than on the results of screening tests. (*See* Aug. 23, 2023 Tr. at 80 (Dr. Goldstein's testimony that the MoCA "doesn't inform cognition severity or type of cognition problems"); *id.* at 167 (Dr. Goldstein testimony that MoCA is not "use[d] for diagnosis" although it may ultimately support a diagnosis); Sept. 12, 2023 Tr. at 41 (Dr. Chui's testimony that the MoCA is a "screening test[s] that give us just a checklist under the hood of whether things—how things are going in the major six cognitive domains"); *id.* at 286 (Dr. Darby's testimony referring to the MoCA as both a "screening test" and a "bedside test").

attorney due to "clearly impaired abilities to encode/absorb information" and "difficulty recalling information provided to him"); Chui Rpt. at 7-9 (identifying Defendant as suffering from "moderate dementia," reflecting severe memory loss, with only highly learned material being retained, and new material being rapidly lost); Wood Rpt. at 36 (opining that "limitations in Mr. Girardi's ability to assist counsel were primarily related to his inability to recall and retain case specific information and the specifics of his current situation"); Mot. at 25-26 (referring to the conclusions of Drs. Lavid, Budding & Wood); Reply at 30 ("The cognitive impairment attacks short-term and episodic memory first."); *id.* at 46-47 (arguing impairment to short-term memory is supported by two anecdotal accounts).)

The Government argues (and its experts conclude) that Defendant's purported short-term memory impairment is either feigned or is exaggerated.  (*See, e.g.*, Goldstein Rpt. at 69 (rejecting that Defendant's "clinical presentation" as reflective of "severe amnesia" and attributing it instead as "a deliberate attempt at deception"); Darby Rpt. at 28 (noting that Defendant's inability to remember was selective and to his benefit); Opp. at 25-27 (noting discrepancy between claim in March 2021 that Defendant had "almost no short-term memory" and an anecdotal account from the following month reporting how Defendant in April 2021 recounted in detail a break-in that occurred in January 2021); Gov. Post-Hr'g Br. at 4 (arguing that Defendant's reported forgetfulness of "historical facts" (which are not short-term memories) cast doubt on Defendant's claim of short-term memory loss).)

However, the comprehensive neuropsychological test results do not support a finding of severe impairment in any domain; instead, they show an overall baseline cognitive function in at least the low average range, including the domains of learning and memory. Dr. Goldstein, while concluding that Defendant gave inconsistent effort on the tests she

administered,[24] nonetheless determined that the results of the tests could be used for a qualitative assessment, which would show the least of Defendant's cognitive abilities overall and in specific domains.  Although Dr. Goldstein's testing methods were  criticized in some respects,[25] no expert criticized the premise that such a qualitative assessment can be made by looking at Defendant's unimpaired test results as the least of Defendant's cognitive functioning.  Therefore, the Court credits the conclusions drawn from those tests, generally placing Defendant in at least the low average range of cognitive functioning in multiple domains, and specifically addressing attention, learning and memory, processing speed, executive function, and language.  On this basis, Dr. Goldstein ruled out the "rapid forgetting" claimed by Defendant when discussing the present charges, disagreeing with both Dr. Budding and Dr. Wood on whether Defendant has the ability to encode new information.  Because Dr. Goldstein focuses on a qualitative measure of "the least of"

---

[24] For instance, Dr. Goldstein was accompanied by a technician, who had served as an intern in her office.  Defendant criticizes the decision to allow the technician to administer the test.  He challenges the technician's qualifications and test administration practices in a general manner.  That is, without citation to evidence, Defendant contends she "ignored concerns about Mr. Girardi's documented hearing and vision loss, and forced him to endure marathon testing sessions without any regard for fatigue."

[25] Specifically, Dr. Schroeder criticized the PVTs administered by both Dr. Wood and Dr. Goldstein, noting that either the PVTs were not well suited to dementia patients or that different cutoffs for establishing validity should be applied in light of what he identified as "the realistic likelihood for a dementia process."  At its essence, though, the matter before the Court requires it to determine whether Defendant's cognitive symptoms, and most significantly his short-term memory, is legitimate and honestly presented or whether it is feigned or exaggerated in a manner meant to support his claim that he is incompetent to stand trial.  As a practical matter, *using dementia cutoffs* to determine evidence of malingering (in the form of a cognitive impairment resembling dementia) could have the effect of masking the existence of or extent of such malingering.  On the other hand, *not using dementia cutoffs*, as a practical matter, could make it unfairly difficult to show the existence of an actual cognitive impairment due to dementia.

In the end, the Court looks to all the evidence of record to determine the question presented in this case.  In this sense, the Court's approach mirrors the "practical recommendation" set forth in an article offered by the defense.  (*See* Def. Ex. 47, Miller & Axelrod, *Performance Validity Assessment: Disentangling Dementia from the Disinterested and the Disingenuous*, Forensic Geropsychology: Practice Essentials at 25 (2018) ("Miller & Axelrod").)  This article counsels use of "a process approach including qualitative integration of clinical judgment, strong working knowledge of disease characteristics and comparisons with known clinical groups, behavioral observations and careful scrutiny of the contextual factors surrounding a particular case."

Defendant's abilities, the Court credits Dr. Goldstein's opinion that Defendant retains the ability to encode new information and to form new short-term memories.

### C.   Written and Recorded Evidence That is Contemporaneous with Defendant's First Claim of Incompetency Show No Significant Cognitive Impairment

The experts opining on the subject agree that neurodegenerative diseases relevant to Defendant are *slowly* progressive.  Thus, Defendant's reported dramatic decline from November 2020 to mid-December through January 2021 deviates from the normal trajectory of any likely neurodegenerative diseases from which Defendant may suffer.

Thus, given the slow progression of neurodegenerative diseases, and given that Defendant's very first claim of cognitive impairment occurred in a legal proceeding on December 14, 2020, writings and recordings in the months and weeks before this claim become relevant.  Several such written and recorded communications show Defendant communicating well, seemingly without any (or with very mild) cognitive impairment. Specifically, correspondence from mid-2020 attributed to Defendant appear to provide reasons to Defendant's clients as to why certain settlement funds had not yet been distributed to them.  These letters do not suggest cognitive impairment of their author.

Defendant's performance in the podcast on October 6, 2020, is inconsistent with a claim that he suffers from a mental impairment making him incompetent to stand trial. Defendant engages in a conversation with the host on the topic of jury selection and the importance of jurors.  Overall, his performance is cogent and intelligent.  Defendant's performance in moderating the four-lawyer panel in late November 2020 is similar. Defendant listened to all the presentations, made observations about similarities between them (e.g., the use of visual aids and the "massive preparation" of the trial attorneys).  Dr. Goldstein made similar observations regarding judgment-debtor examinations taking

place on September 23, 2020, and October 13, 2020.[26]  These recordings are strong evidence that Defendant suffered from, at most, a mildly limiting cognitive impairment as of September through November 2020.  Indeed, from the Court's non-expert perspective, these videos show no more than normal age-related decline.

Defendant left voicemails for his *Lion Air* co-counsel in December 2020 that demonstrate he understood that allegations of fraud had been made against him and/or Girardi Keese.  The first voicemail was left less than two weeks before the hearing in which his competency was first questioned.  The second, more detailed message, was left less than two weeks after the hearing.  These voicemails show, contrary to the claims of Girardi Keese's counsel and his own counsel, that Defendant understood the nature of the civil lawsuit filed by Edelson, PC, and understood the nature of the civil contempt hearing in the *Lion Air* case.

Defendant appeared on police officer body cameras in late January 2021.  On the late night of the break-in, Defendant interacted appropriately with the police.  In the follow-up conversation, Defendant demonstrated some trouble recalling specific names and details, but overall, Defendant appeared to be capable of providing the appropriate responses necessary for police to complete their reports and investigate the break-in.  Again, from the Court's non-expert perspective, the body cam videos show no more than normal age-related decline.

Finally, Defendant left a number of voicemail messages with former colleagues in the first half of 2021, often suggesting they start a new practice together.  This demonstrated that Defendant understood that Girardi Keese was no longer operating.

---

[26] Dr. Wood was provided with a link to the podcast and the continuing legal education panel presentation.  But other than to note that the continuing legal education presentation "froze" about one-third of the way through it, Dr. Wood does not comment on these videos.  She makes no substantive observations regarding them.

Overall, the evidence of Defendant's conduct and performance in 2020 and 2021 is highly inconsistent with the claims of cognitive impairment made in the mid-December *Lion Air* hearing and at the time of the initiation of the conservatorship proceeding. Indeed, considering at most, a slowly neurodegenerative process is at work, Defendant's demeanor and performance during the judgment debtor examination, the podcast, and the continuing legal education presentation is irreconcilable with the claims of counsel in mid-December that Defendant "had issues regarding his mental competence" and that Defendant was not able "to understand the nature of the proceedings or to provide [her] with useful information."

Thus, through and including at least early 2021, the written and recorded evidence, especially when considered in conjunction with the expert reports, establish that Defendant was not suffering from any significant cognitive impairment; at most, he may have been suffering from the mild cognitive impairment described by several experts.

### D. Post Hoc Anecdotal Evidence[27] is Mixed and Is of Limited Evidentiary Value

The anecdotal reports of Defendant's alleged cognitive decline are mixed. They were also all made after-the-fact; that is, they were made no earlier than when the conservatorship action was filed.[28] Contemporaneous accounts would have been particularly probative, because by early 2021, a motivation arose for Defendant to purposely exaggerate his symptoms (as discussed in Section IV.E, below). The post hoc anecdotal accounts of Defendant's purported decline are of limited evidentiary value. Many reports look back to the date of Defendant's 2017 MVA, in July 2017, as a point when Defendant began declining. But no one spoke up before January 2021. Defendant

---

[27] The Court considered the anecdotal evidence from witnesses who testified at the competency hearing as well as reports of witnesses relied upon by the experts.

[28] And this coincides with the first notation in Defendant's medical records, which was not made until February 2021.

continued managing Girardi Keese from mid-July 2017 through the COVID-19 pandemic in 2020.

Defendant's legal assistant said she noticed he forgot certain details about his day-to-day work, but there is no evidence the legal assistant was concerned enough about the Defendant's condition to raise the issue to anyone else in the firm.

The consultant who worked with Defendant for a number of years reported that he didn't have the same attention to detail after the 2017 MVA. She characterized his avoidance of recalling others' names as "cheating," but she also "didn't think he was any less sharp."

Defendant's housekeeper's examples of changes after his 2017 MVA are mild, and again they were not considered to be worth mentioning prior to early 2021.

Defendant's daughter was estranged from him until early 2021. By this time, a motivation to exaggerate his symptoms had already arisen.

The Court credits the account of Defendant's attorney friend, made in February 2021, of a specific example in March 2020, just before the COVID-19 pandemic shut down the court system, when Defendant's friend encountered him, confused, looking for a state court department in the federal courthouse. This is a specific example of an incident that calls into question Defendant's cognitive functioning. But a single episode of confusion cannot carry the weight Defendant gives to it.

And in contrast to that single episode is the account given by the attorney who worked with Defendant during the last seventeen months of his practice, which the Court credits. Although this attorney knew Defendant for a shorter period of time than other witnesses, she witnessed him before the motivation to exaggerate cognitive decline arose, and she worked with him at the law firm, a setting in which cognitive functioning is particularly scrutinized among colleagues. It appears this attorney had many day-to-day

communications with Defendant at a very relevant time,[29] and she communicated with him on a variety of issues, including discussing details of cases, strategies for mediation, and seeking his guidance as a mentor.[30]

In sum, because the anecdotal evidence surfaced after the events giving rise to this case, because it does not appear to be entirely without bias, and because it is not consistent, Court finds such anecdotal evidence to be of limited value in this case.[31]

### E.    The Timing of Defendant's Reported Symptoms and Multiple Clinical Observations by Experts Support a Finding of Partial Malingering

The timing of Defendant's reported symptoms is highly suspect.  On November 21, 2020, Defendant moderated a panel and commented appropriately on the detailed presentations of four other successful trial lawyers.  A mere three weeks later, on December 14, 2020, when Defendant was facing a civil contempt sanction and facing accusations that he unlawfully withheld settlement funds from his clients, the very first claim of ongoing mental impairment arose.  Notably, the medical records preceding this hearing reveal no mention of any *ongoing* mental impairment and no mention of any type of progressive cognitive decline.  As noted previously, Defendant's recorded presentations in October through November are irreconcilable with the claims of impairment made on behalf of Defendant in the December 14, 2020 hearing and in connection with the conservatorship

---

[29] To the extent that this attorney's observations may conflict with those of Defendant's legal assistant, the Court notes that the attorney's observations are more consistent with the recordings of Defendant in late 2020.  Moreover, the two accounts differ in their focus.  Defendant's legal assistant noted Defendant's inabilities to recall relatively unimportant details unaided, while the attorney noted that Defendant's recall improved significantly with reminders, termed by the experts as "cueing."  The experts have noted that Defendant's recall improves with cueing, and they have identified it as an aid that could be used by defense counsel to improve Defendant's participation in his defense.

[30] From 2011 to 2015, this attorney worked as a paralegal in the United States Attorney's Office.  The prosecutor represents that, other than submitting to an interview regarding this case, she has had no other interaction with agents or prosecutors on this matter.

[31] Dr. Darby commented on these anecdotal accounts in his report.  He stated that his "overall impression from this evidence is that [Defendant] had possible [mild cognitive impairment] in late 2020 that was not severe enough to impede his ability to continue working."

proceeding.  Defendant was clearly feigning cognitive impairment or, at the very least, exaggerating the symptoms of a mild cognitive impairment in mid-December 2020 and in early 2021.

Of course, the issue before the Court is *not* Defendant's competence to stand trial in 2021, the issue is whether he is *presently* able to stand trial.  However, the fact that Defendant was clearly feigning or exaggerating the extent of his impairment from mid-December 2020 and into 2021 is probative as to whether he is feigning now.  So, too, is the slowly progressive nature of any neurodegenerative diseases from which Defendant may suffer.

Dr. Goldstein's and Dr. Darby's clinical observations support the conclusion that Defendant continues to exaggerate his symptoms.  At the outset, the Court notes that these two experts have education, training, and experience in assessing their subjects' presentation and communications beyond the mere surface level of persons engaged in casual conversation.  Each spent multiple days interviewing Defendant.  Each concluded he was malingering.[32]

Specifically, they observed that Defendant's purported inability to remember was mostly focused on topics where such an inability would benefit him.  For instance, he had no recall of the charges against him but expressed that he knew that he did not engage in the type of wrongdoing with which he is charged.  Beyond this, the doctors also took note of Defendant's purported inability to remember historical facts and other events that are deemed to be "crystallized" knowledge, which is atypical as these are not short-term

---

[32] Defendant argues that Dr. Goldstein acknowledges but does not apply the four criteria for malingering discussed in an article offered by Defendant as Defense Exhibit 48.  (*See* Reply at 12 (citing Sherman, et al., *Multidimensional Malingering Criteria for Neuropsychological Assessment: A 20-Year Update of the Malingered Neuropsychological Dysfunction Criteria*, Archives of Clinical Neuropsychology, Vol. 35, Issue 6, at 735-64 *see also* Goldstein Rpt. at 69 (setting forth the four criteria).)  The criteria identify "malingered neurocognitive dysfunction," abbreviated "MND."  The Court concludes that Dr. Goldstein properly identified the criteria for malingering and her report sufficiently explains how each is met here.

memories.  Dr. Darby called this an "implausible memory loss for overlearned factual information" and took note of "near misses" such as Defendant's response of "not Lincoln" when asked to identify who the president during the American Civil War was.

The doctors found significant that Defendant had accurate recollections of more recent events, such as the COVID-19 pandemic and its effect on his law firm.  They analyzed the information that Defendant repeatedly searched in the laundry for the particular sweater that he favored wearing on all days of their interviews.  This tended to show that Defendant's short-term memory was intact because he recalled having that sweater, sought it out to wear on that day, and found it in the laundry.  Moreover, Defendant's denial of any memory of a third wife is undercut by the fact that, during a clinical interview, he answered a phone call from her, accurately remembering she was leaving to fly to Spain that day.  Defendant's confabulations tended to benefit him as well, focusing on the inter-related topics of his legal, financial, and vocational status.  To the extent they did not, they tended to be related to non-personal facts rather than personal details, which the doctors explain is atypical.  In the end, Dr. Goldstein concluded that "[m]alingering is simply the only reasonable explanation for Mr. Girardi's inconsistent and nonsensical presentation."  After examining an extensive record on the subject, including multiple expert reports, the Court concurs with this assessment.

The Court does not believe that Defendant's expert, Dr. Wood, properly considered the evidence relating to malingering.[33]  For example, although Dr. Wood testified to the need to be aware and alert when there is a motive for malingering, she was unaware of several relevant considerations when she issued her report.  (*See* Sept. 13, 2023 Tr. at 69-109.)  First, Dr. Wood understood from the counsel who represented Defendant during the December 14, 2020 *Lion Air* hearing that Defendant claimed no appreciation for the

---

[33] Another of Defendant's experts, Dr. Chui, acknowledged that she did not test for malingering or address it in her report. (Sept. 12, 2023 Tr. at 116.)

allegations made against him in that case.  But she did not know about the voicemails left by Defendant for Jay Edelson ten days before and thirteen days after the *Lion Air* contempt hearing, essentially seeking an informal resolution to the dispute raised in the matter.  After listening to the voicemails when they were played at the hearing, Dr. Wood agreed that they were inconsistent with the claim that Defendant had no appreciation for the allegations made against him in the *Lion Air* case.  Second, when answering a combination of factual and hypothetical questions, Dr. Wood conceded another significant fact of which she was not aware:  that Defendant sent alleged "lulling" letters to his clients.  Third, Dr. Wood conceded that the "work from home is not working" communication from Defendant to his employees in September 2020, about three months before his claimed incompetency, would be relevant and that she did not consider it.  Fourth, Dr. Wood found significant that Defendant said he didn't have a third wife but then spoke with her cogently on a telephone call during an interview; however, she did not factor this into her analysis.  And finally, although frequently repeating that her focus was on assessing Defendant's current competency, Dr. Wood ultimately conceded that it would be "potentially" relevant to her present assessment whether Defendant had been feigning symptoms in December 2020.

### F.    The Legal Standard for Competency to Stand Trial is Met

Having found, as a factual matter, *inter alia*, that Defendant is at least partially malingering in that despite his denials, Defendant retains the memory of and/or is able to recall the existence and nature of the charges made in this case, the Court concludes that Defendant meets the relevant legal standard of competency to be tried on the criminal charges set forth in the Indictment.  Defendant is both able "to understand the nature and consequences of the proceedings against him" and "to assist properly in his defense."  18 U.S.C. § 4241(d).

### 1.    Defendant is Able to Understand the Nature and Consequences of the Proceedings Against Him

Defendant clearly understands the nature of the charges against him.  His characterization of the charge of wire fraud as "theft" certainly captures its essence in all cases; based on the charges in this particular case, that characterization is particularly appropriate.  Defendant disclaims knowledge of the existence of the charges (and/or the ability to remember he has been charged), but he claims knowledge that he did not engage in any wrongdoing, including the knowledge that he did not steal any settlement funds intended for Girardi Keese clients.  In doing so, he allows for the possibility that certain funds were not properly distributed by Girardi Keese due to negligence, and on this point, he does not shy away from responsibility for any such negligence.

As discussed at length herein, Defendant's purported denial of knowledge of the charges made against him (and/or the purported failure to remember such charges once reminded of them) is wholly lacking in credibility.  Defendant's overall understanding of the current proceedings—including their nature and consequences —was demonstrated when the charges against him were framed in the hypothetical by Drs. Wood and Goldstein. Indeed, most likely drawing on decades of experience as a civil trial attorney, Defendant demonstrated an extensive understanding that far exceeds that of an average criminal defendant.  He showed a knowledge of the substance of the charges, the factual allegations underlying those charges, how those charges might relate to the operations of Girardi Keese, how to defend against those charges, how a trial proceeds, the role of the others involved in the trial (prosecutor, defense counsel, judge, jury), and the likely consequences if found guilty.

### 2.    Defendant is Able to Assist Properly in his Defense

Defense counsel argue that Defendant's cognitive limitations preclude him from following along with the proceedings, encoding new information into short-term memory,

and communicating effectively with counsel.  Indeed, the argument is that he can't even remember the charges.  As a factual matter, the Court has rejected these contentions.  On more than one occasion in clinical interviews with experts, when Defendant was presented with the charges *in the hypothetical*,[34] Defendant was able to identify legitimate, even insightful, strategies for defending against those charges.

Having found that Defendant is able to remember the charges against him and having found that he retains a sufficient ("albeit reduced") ability to form new short-term memories, Defendant's insight into these areas will aid him in assisting counsel with his defense.  Defendant himself correctly identified aids to improving his ability to follow along the proceedings and assist in his own defense, including frequent conferences with counsel.  He also demonstrated an understanding of the handling of settlement funds within Girardi Keese, whom to consult for relevant records, and the potential for shifting criminal culpability to his co-defendant.  Dr. Goldstein identified further aids, including note-taking and "cueing" that would further aid Defendant's ability to follow along and assist counsel.

Ninth Circuit case law is in accord with the Court's finding here.  In *Timbana*, the Ninth Circuit upheld a finding that the defendant was competent to stand trial where, due to head trauma from an auto collision, the defendant suffered from "significant brain damage," and from "a moderate degree of cognitive impairment."  222 F.3d at 690.  In affirming, the Ninth Circuit observed that "[t]he reports of both experts support the court's finding that, notwithstanding his  physical and mental impairments, [the defendant] was competent to stand trial."  *Id.* at 701.  The court so held notwithstanding the expert opinion that defendant's "neurocognitive deficits . . . will *clearly interfere with the quality of his ability to participate in his defense*."  *Id.* at 691 (emphasis added).

---

[34] The willingness of Defendant to freely (and insightfully) discuss the details of defending against the charges so long as they are presented in the hypothetical while simultaneously denying any actual memory of the charges against him dovetails with Defendant's professed belief, expressed to Dr. Goldstein, that a defendant may be incompetent "if he can't remember what he did."  (Goldstein Rpt. at 40.)

Here it is much the same.  At their zenith, Defendant's superior cognition and his abilities as a civil trial attorney would have been likely to result in an exceptional ability to participate in his own defense.  But any actual diminishment of these abilities or of his cognition is not as severe as Defendant presents it and, stripped of the feigning and/or exaggeration described by the experts and found by the Court herein, Defendant retains the ability "to assist properly in his defense."  18 U.S.C. § 4241(d).

Thus, as discussed extensively herein, Defendant meets both parts of the legal standard for competency to stand trial.

## V.     CONCLUSION

For the reasons set forth herein, the Court FINDS Defendant is competent to stand trial, and DENIES Defendant's Motion for a finding of incompetency.

The Court issues the present order provisionally under seal.  Within five court days of the entry of this order, the parties are to identify those portions of the Court's order that they believe should remain under seal.[35]  In doing so, the parties should consider the Court's previous Orders on this topic, and the fact that the transcripts in this matter are already part of the public docket.

**IT IS SO ORDERED.**

DATED:  January 2, 2024

HON. JOSEPHINE L. STATON
United States District Judge

---

[35] The parties are directed to provide highlighted PDF versions of the Order to the Clerk for review by the Court.