CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
CHARLES J. SNYDER (Bar No. 287246)
Email: Charles_Snyder@fd.org
SAMUEL CROSS (Bar No. 304718)
Email: Sam_Cross@fd.org
J. ALEJANDRO BARRIENTOS (Bar. No. 346676)
Email: Alejandro_Barrientos@fd.org
Deputy Federal Public Defenders
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-2854
Facsimile: (213) 894-0081

Attorneys for Defendant
THOMAS VINCENT GIRARDI

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:23-cr-47-JLS-1 |
| Plaintiff, | **REPLY ISO MOTION TO SUPPRESS DIRECT AND DERIVATIVE EVIDENCE OBTAINED THROUGH WARRANTLESS SEARCHES AND SEIZURES AND INTENTIONAL PRIVILEGE INVASIONS; MOTION FOR JUDICIAL INQUIRY INTO POTENTIAL VIOLATIONS OF FED. R. CRIM. P. 6(E); REQUEST FOR EVIDENTIARY HEARING** |
| v. | |
| THOMAS VINCENT GIRARDI, | |
| Defendant. | |
| | Date:      July 26, 2024<br>Time:      8:30 a.m.<br>Ctrm:     8A<br>Estimate: 2-4 Hours (Argument (2 Hours), Evidence (2 Hours)) |

# TABLE OF CONTENTS

PAGE

REPLY ............................................................................................................ 1

A.   The Opposition confirms that GK was a sole proprietorship in
December 2020.......................................................................................... 1

B.   The Opposition fails to carry the government's heavy burden of
showing that the warrantless searches and seizures were reasonable,
and does not dispute that suppression is the appropriate remedy for a
violation. .................................................................................................... 4

    1.   There is no bankruptcy-trustee exception to the Fourth or its
warrant requirement; and even if there were, it would not
apply in this case. ............................................................................ 4

    2.   Girardi has standing to challenge the warrantless searches
and seizures. .................................................................................... 7

        a.   Girardi has both privacy- and property-focused standing. ............... 7

        b.   The government's standing arguments are wrong.......................... 11

    3.   The government has not carried its burden of establishing
actual or apparent consent. ............................................................ 14

C.   The government and trustee intentionally violated privilege, but the
scope of the invasion and remedy are unclear; the Court should
therefore order an evidentiary hearing. ................................................. 16

D.   The Court should also order an evidentiary hearing in light of the
government's failure to submit any evidence denying or explaining
apparent grand-jury-secrecy violations. ................................................ 18

# TABLE OF AUTHORITIES

PAGE(S)

**Federal Cases**

Barr v. American Association of Political Consultants, Inc.,
    591 U.S. 610 (2020)...............................................................................12

Bisno v. United States,
    299 F.2d 711 (9th Cir. 1961) ...........................................................7, 11

Byars v. United States,
    273 U.S. 28 (1927).................................................................................6

Byrd v. United States,
    584 U.S. 395 (2018).................................................................................7

Commodity Futures Trading Comm'n v. Weintraub,
    471 U.S. 343 (1985).................................................................................4

Corngold v. United States,
    367 F.2d 1 (9th Cir. 1966) ...............................................................5, 14

Grimm v. City of Portland,
    971 F.3d 1060 (9th Cir. 2020) .............................................................13

Hart v. Massanari,
    266 F.3d 1155 (9th Cir. 2001) .......................................................12, 13

In re Barman,
    252 B.R. 403 (Bankr. E.D. Mich. 2000)...............................................8

In re CA Fin. Sols.,
    2019 WL 2869566 (Bankr. D. Haw. July 1, 2019) ..............................4

In re El Toro Materials Co., Inc.,
    504 F.3d 978 (9th Cir. 2007) ...............................................................11

In re FitzSimmons,
    725 F.2d 1208 (9th Cir. 1984) .............................................................13

In re Ginzburg,
    517 B.R. 175 (Bankr. C.D. Cal. 2014) .................................................4

In re John Doe Grand Jury Proceedings,
    537 F. Supp. 1038 (D.R.I. 1982) ........................................................19

ii

TABLE OF AUTHORITIES

PAGE(S)

In re Kenney,
   97 F. 554 (S.D.N.Y. 1899) ...................................................................... 3

In re KRSM Properties, LLC,
   318 B.R. 712 (B.A.P. 9th Cir. 2004) .................................................... 4, 6

In re Lewis,
   94 B.R. 789 (Bankr. D. Mass. 1988) ..................................................... 3

In re Malsch,
   417 B.R. 458 (Bankr. N.D. Ohio 2009) .................................................. 8

In re Se. Banking Corp. Sec. & Loan Loss Rsrvs. Litig.,
   212 B.R. 386 (S.D. Fla. 1997) ............................................................. 17

In re Stockbridge Funding Corp,
   153 B.R. 654 (S.D.N.Y. Bankr. 1993) .................................................. 7

In re Szanto,
   2022 WL 4391803 (Bankr. S.D. Cal. July 22, 2022) ........................... 6

In re T.W. Koeger Trucking Co.,
   105 B.R. 512 (Bankr. E.D. Mo. 1989) .................................................. 6

Jones v. United States,
   36 F.4th 974 (9th Cir. 2022) ............................................................... 12

Moreno v. Baca,
   431 F.3d 633 (9th Cir. 2005) ................................................................. 4

SEC v. Dresser Indus., Inc.,
   628 F.2d 1368 (D.C. Cir. 1980) .......................................................... 19

Smith v. Arizona,
   602 U.S. ___ (June 21, 2024) ................................................................ 9

Spacone v. Burke(In re Truck-A-Way),
   300 B.R. 31 (E.D. Cal. 2003) ................................................................ 5

Stoner v. California,
   376 U.S. 483 (1964) ............................................................................ 14

# TABLE OF AUTHORITIES

PAGE(S)

Trump v. United States,
  2024 WL 3237603 (U.S. July 1, 2024) ................................................. 6

United States v. Antonelli Fireworks Co.,
  155 F.2d 631 (2d Cir. 1946) (Frank, J., dissenting) ........................... 18

United States v. Arreguin,
  735 F.3d 1168 (9th Cir. 2013) ............................................................ 15

United States v. Baker,
  58 F.4th 1109 (9th Cir. 2023) .............................................................. 7

United States v. Boyer,
  275 Fed.Appx. 655 (9th Cir. 2008) ............................................... 12, 13

United States v. Bundy,
  968 F.3d 1019 (9th Cir. 2020) ............................................................ 17

United States v. Canada,
  527 F.2d 1374 (9th Cir. 1975) .............................................................. 5

United States v. Cano,
  934 F.3d 1002 (9th Cir. 2019) ............................................................ 16

United States v. Cervantes,
  703 F.3d 1135 (9th Cir. 2012) ............................................................ 15

United States v. Davis,
  482 F.2d 893 (9th Cir. 1973) ................................................................ 5

United States v. Dearing,
  9 F.3d 1428 (9th Cir.1993) ................................................................. 15

United States v. Diaz,
  236 F.R.D. 470 (N.D. Cal. 2006) ....................................................... 19

United States v. Doe,
  701 F.2d 819 (9th Cir. 1983) ................................................................ 4

United States v. Enas,
  255 F.3d 662 (9th Cir. 2001) ................................................................ 5

iv

TABLE OF AUTHORITIES

PAGE(S)

United States v. Feng Juan Lu,
   248 F.App'x 806 (9th Cir. 2007) ................................................................ 4

United States v. Garcia,
   974 F.3d 1071 (9th Cir. 2020) .................................................................. 15

United States v. Garcia,
   2024 WL 32727 (9th Cir. Jan. 3, 2024) ..................................................... 3

United States v. Kojayan,
   8 F.3d 1315 (9th Cir. 1993) ..................................................................... 17

United States v. L.A. Tucker Truck Lines, Inc.,
   344 U.S. 33 (1952) ................................................................................... 12

United States v. Marshank,
   777 F.Supp. 1507 (N.D. Cal. 1991) .......................................................... 17

United States v. Ogden,
   485 F.2d 536 (9th Cir. 1973) ..................................................................... 5

United States v. Ruiz,
   428 F.3d 877 (9th Cir. 2005) ................................................................... 15

United States v. SDI Future Health, Inc.,
   464 F.Supp.2d 1027 (D. Nev. 2006) ......................................................... 17

United States v. Setser,
   568 F.3d 482 (5th Cir. 2009) ............................................................. 13, 14

United States v. Sineneng-Smith,
   590 U.S. 371 (2020) ................................................................................... 3

United States v. Ziegler,
   474 F.3d 1184 (9th Cir. 2007) ................................................................... 5

Virginia v. Moore,
   553 U.S. 164 (2008) ................................................................................... 5

Webster v. Fall,
   266 U.S. 507 (1925) ................................................................................. 12

TABLE OF AUTHORITIES

PAGE(S)

**State Cases**

Ball v. Steadfast-BLK,
   196 Cal.App.4th 694 (2011) ...................................................................... 16

Corrales v. Corrales,
   198 Cal.App.4th 221 (2011) ........................................................................ 2

**Federal Constitution, Statutes and Rules**

11 U.S.C. § 303(a) ........................................................................................... 8

11 U.S.C. § 303 (g) .......................................................................................... 8

11 U.S.C. § 521(a)(1) ...................................................................................... 9

11 U.S.C. § 522 ................................................................................................ 8

11 U.S.C. § 524(a)(4) ...................................................................................... 8

11 U.S.C. § 554(a) ........................................................................................... 8

11 U.S.C. § 554(b) ........................................................................................... 8

11 U.S.C. § 554(c) ........................................................................................... 8

11 U.S.C. § 704(a)(1) ...................................................................................... 9

18 U.S.C. § 3057 ............................................................................................. 5

Fed. R. of Crim. Pro., Rule 41 ....................................................................... 5

Fed. R. Evid., Rule 6(e) ...................................................................... 18, 19, 20

9th Cir. R. 36-3(a) .......................................................................................... 12

U.S. Const. amend. V ...................................................................................... 4

U.S. Const. amend. XIV ......................................................................... passim

**State Statutes**

Cal. Corp. Code § 16101 ................................................................................. 2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

TABLE OF AUTHORITIES

PAGE(S)

**Miscellaneous**

IRS Publ. 334, <u>Tax Guide for Small Businesses</u> (2024),
    https://www.irs.gov/pub/irs-pdf/p334.pdf .................................................................... 2

## REPLY

**A. The Opposition confirms that GK was a sole proprietorship in December 2020.**

While disclaiming any factual disputes in an effort to avoid an evidentiary hearing, Opp'n at 2:18-19, the Opposition expends substantial energy contesting the central factual issue in the motion – whether GK was a sole proprietorship – before declaring the question irrelevant, id. at 6:14-9:8, 9:10-11, 11:24-25. That the government would spend 1/6 of its response on an "irrelevant" factual dispute, which is also the sole focus of its evidentiary submissions, before attempting to write it off as unimportant, should pique the Court's interest. And for good reason. The issue is not irrelevant, but fundamental. It changes this case from one involving the limited and transferrable property rights of an inanimate entity to one involving the expansive Constitutional rights and privileges of an individual. It also undermines many of the actions taken during the investigation, as well as the authority upon which the government now seeks to rely. And it is an issue, like many others, on which the government fails entirely to carry its burden in a case involving warrantless Fourth-Amendment activity.

Indeed, all of the evidence submitted by both sides now shows that, when GK was taken involuntarily into bankruptcy in December 2020: (1) it was not a formalized collective entity with a separate identity from its legal owner(s), like a limited-liability partnership or professional corporation; (2) Girardi was the 100% equity owner; (3) there was no sharing of profits or losses or any other indicia of a general partnership. Even setting aside the numerous sworn statements by percipient witnesses with firsthand knowledge describing GK as a sole proprietorship in December 2020, and even setting aside the ACTS Agreement (the piece of documentary evidence closest in time to the bankruptcy, which describes GK as a sole proprietorship), these facts map directly onto the definition of a sole proprietorship. At the same time, they foreclose the existence of a California general partnership, which is defined as "an association of two or more persons to carry on as coowners a business for profit." Cal. Corp. Code §

1

16101 (emph. added).

The government tellingly does not even attempt to answer the obvious question raised by its general-partnership contention: if GK was actually a general partnership in December 2020, who was the other person carrying on as the coowner of the business for profit?  The reason for its silence is obvious: there was no other partner.  Indeed, the only plausible candidate based on the government's evidence was Robert Keese.  But even the K-1s submitted by the government, including the K-1s prepared by the trustee for the 2020 tax year, indicate that Keese was a 0% owner who shared neither profits nor losses.  Gov't Ex. 1 at 616.[1]  And, of course, since it is undisputed that Keese had left the firm many years before 2020, J. Girardi Decl. ¶ 3.d., any theoretical general partnership that might have existed between Girardi and Keese (but did not actually exist), would have automatically dissolved by operation of law.  Corrales v. Corrales, 198 Cal.App.4th 221, 223-24 (2011) ("Having carefully studied the idea of a one-partner partnership in light of the Revised Uniform Partnership Act, we conclude that no such animal exists."); id. at 227 ("When Richard withdrew from RCE, the partnership dissolved by operation of law; by definition, a partnership must consist of at least two persons").

Erroneously calling GK a partnership in some subset of documents (but not others) did not transform it into a new legal entity any more than a sovereign citizen's claim to be incorporated under the natural law.[2]  GK was either a general partnership in

---

[1] Though legally irrelevant for purposes of this motion, Girardi notes that general partnerships and sole proprietorships are largely similar for tax purposes.  Both can take business deductions and both are flow-through entities taxed at the individual level through Schedule C.  See IRS Publ. 334, Tax Guide for Small Businesses at 7, 30 (2024), https://www.irs.gov/pub/irs-pdf/p334.pdf.

[2] While loathe to do the government's legal research, Girardi notes that the government's argument – essentially, that because GK was wrongly described as a general partnership in some documents, it is therefore bound by that description – vaguely gestures at estoppel doctrines developed in certain contract and tort settings.

2

December 2020 or it wasn't.  And the evidence from both sides makes clear that it was not a partnership, but a sole proprietorship.  That point is thus not only undisputed, by application of undisputed law to undisputed fact, it is indisputable.[3]

While the foregoing effectively ends the issue, there are also other problems with the government's general-partnership arguments.  For one thing, the salient question is not whether GK was a general partnership at some time, but whether it was a general partnership in December 2020.  The government submits no contemporaneous evidence from late 2020, let alone evidence sufficient to overcome the ACTS Agreement dated November 16, 2020, Jack Girardi's declaration, and the many other sworn statements that GK was a sole proprietorship in December 2020.  The Opposition also offers nothing to suggest that, at the time it engaged in the warrantless Fourth Amendment activity, the government was relying on the evidence submitted with the Opposition (which, in any event, only reinforces that GK was a sole proprietorship).  But

---

But that vague gesture cannot help the government for multiple reasons.  First, especially in the context of warrantless Fourth Amendment activity, it is the government's burden, not the Court's, to develop the relevant legal and factual arguments.  United States v. Sineneng-Smith, 590 U.S. 371, 375-76 (2020).  Second, the estoppel doctrines do not actually create a legal entity, but estop the denial of an entity or agency as to one party for a limited purpose under limited circumstances.  Third – but most importantly – these doctrines have no relevance in the bankruptcy setting.  Indeed, if they did, it would lead to the perverse outcome that a person who wrongly claims to be doing business in entity form could thereby evade his personal creditors, whose recourse would be limited to the (non)entity rather than personal assets.  "[A]n involuntary petition [thus] cannot be filed on the basis of a partnership by estoppel."  In re Lewis, 94 B.R. 789, 791 (Bankr. D. Mass. 1988) (citations omitted); In re Kenney, 97 F. 554, 559 (S.D.N.Y. 1899) (cited with approval in H.R. REP. 95-595, 197, 1978 U.S.C.C.A.N. 5963, 6157 ("A partnership by estoppel would continue to be excluded from being a debtor under Title 11")).

[3] Because the government agrees that no evidentiary hearing is necessary on this issue, it also accepts that the Court must adopt Girardi's version of the facts.  United States v. Garcia, No. 22-50106, 2024 WL 32727, at *1 (9th Cir. Jan. 3, 2024) (where court accepted government's version of disputed facts but failed to hold a hearing, reversing denial of suppression motion).

3

1  warrantless Fourth Amendment activity cannot be retroactively justified by information

2  obtained after the fact.  United States v. Doe, 701 F.2d 819, 821 (9th Cir. 1983);

3  Moreno v. Baca, 431 F.3d 633, 640-41 (9th Cir. 2005).

4       There are, of course, serious downsides to operating as a sole proprietorship,

5  including the prospect of unlimited personal liability.  But there is also an important

6  upside: the undiluted protection of the proprietor's personal rights.  It is for this reason

7  that the law distinguishes between sole proprietorships and collective entities in many

8  Constitutional and statutory settings, including the Fifth Amendment, United States v.

9  Feng Juan Lu, 248 F.App'x 806, 808 (9th Cir. 2007), privilege law, Commodity

10  Futures Trading Comm'n v. Weintraub, 471 U.S. 343, 358 (1985) (privilege passes to

11  trustee in corporate bankruptcy); In re Ginzburg, 517 B.R. 175, 181-82 (Bankr. C.D.

12  Cal. 2014) (privilege remains with individual in personal bankruptcy), and the

13  Bankruptcy Code, In re KRSM Properties, LLC, 318 B.R. 712, 717 (B.A.P. 9th Cir.

14  2004) (sole proprietorship ineligible to be a standalone debtor in bankruptcy); In re CA

15  Fin. Sols., No. 19-00676 (RJF), 2019 WL 2869566, at *6 (Bankr. D. Haw. July 1,

16  2019) (same).  These legal distinctions cannot be ignored simply because doing so is

17  expedient or, now, necessary for law enforcement.

18  **B. The Opposition fails to carry the government's heavy burden of showing that**
19  **the warrantless searches and seizures were reasonable, and does not dispute**
    **that suppression is the appropriate remedy for a violation.**

20       **1.  There is no bankruptcy-trustee exception to the Fourth or its warrant**
         **requirement; and even if there were, it would not apply in this case.**

21

22       While the Opposition never acknowledges the implications of the government's

23  Fourth Amendment position, the Court does not have that luxury.  If the Court endorses

24  the government's arguments in this case, it will be carving out for the first time a

25  bankruptcy-trustee-shaped hole in one of the bedrock Constitutional protections.  That

26  hole would have been unimaginable to the Framers, who sought specifically to guard

27  against General Warrants and Colonial-era Writs of Assistance, the latter of which are

28  substantively indistinguishable from the bankruptcy trustee's relationship to the

4

government through 18 U.S.C. § 3057 and the Trustee Manual.

The Supreme Court has consistently made clear that the scope of Fourth Amendment is the same today as it was at the founding, and that no later laws can limit or curtail it.  Virginia v. Moore, 553 U.S. 164, 169 (2008); United States v. Enas, 255 F.3d 662, 675 (9th Cir. 2001).  It is for that reason that, in the few instances where courts have had to confront the issue, they have consistently held that "[t]he Fourth Amendment accords no exemption to the bankruptcy court or its trustee, nor shortcuts around probable cause, due process, jurisdiction, or Rule 41 of the Federal Rules of Criminal Procedure."  Spacone v. Burke(In re Truck-A-Way), 300 B.R. 31, 37 (E.D. Cal. 2003).

Yet other than gesturing generally at the Bankruptcy Code – a non-Constitutional body of law – the Opposition offers no substantive response to the many cases cited from many different contexts in the moving papers.  It does not – because it cannot – meaningfully explain why the trustee's obligatory role as a mini-FBI agent does not bring this case within United States v. Canada, 527 F.2d 1374 (9th Cir. 1975), and United States v. Davis, 482 F.2d 893, 897 (9th Cir. 1973), which invalidated warrantless searches conducted by private actors in accordance with federal cooperation requirements.   It does not – because it cannot – meaningfully explain why the government's extensive involvement in the warrantless searches does not bring this case within Corngold v. United States, 367 F.2d 1, 5 (9th Cir. 1966), United States v. Ziegler, 474 F.3d 1184, 1190 (9th Cir. 2007), or the joint-endeavor doctrine articulated in cases like United States v. Ogden, 485 F.2d 536, 539 (9th Cir. 1973).

The most that the Opposition has to offer is an invented Bankruptcy-based rule – that the possession in those cases was only temporary, rather than the "full property rights" properly vested with the GK trustee (Opp'n at 12:6-19) – which was not the stated basis for decision, is not grounded in Fourth Amendment logic, and is not even correct as a matter of the Bankruptcy Code.  If nothing else, the fundamental point of

5

the cases cited in the moving papers is that "[t]he Constitution deals with substance, not shadows," <u>Trump v. United States</u>, No. 23-939, 2024 WL 3237603, at *19 (U.S. July 1, 2024), and that the Fourth Amendment cannot be sidestepped through artifice, <u>Byars v. United States</u>, 273 U.S. 28, 33-34 (1927) ("The Fourth Amendment . . . is not to be impaired by judicial sanction of equivocal methods, which, regarded superficially, may seem to escape the challenge of illegality but which, in reality, strike at the substance of the constitutional right.").

But even setting all of that aside, and even assuming that there might be a bankruptcy-trustee exception to the Fourth Amendment in some case, this cannot be the case to establish it. As discussed above, GK was a sole proprietorship, and was thus legally ineligible to maintain a bankruptcy case separate from Girardi. <u>In re KRSM Properties</u>, 318 B.R. at 717. That ineligibility exists for good reason. If a sole proprietorship could file bankruptcy as an entity, the sole proprietor would receive entity-like protection, exempt from personal liability at the expense of creditors. <u>In re T.W. Koeger Trucking Co.</u>, 105 B.R. 512, 515 (Bankr. E.D. Mo. 1989). To avoid that unfair result, the only proper bankruptcy for a sole proprietorship is a personal one. <u>In re Szanto</u>, No. BR 22-01558-CL11, 2022 WL 4391803, at *7 (Bankr. S.D. Cal. July 22, 2022), <u>aff'd sub nom.</u> <u>Szanto v. Chase Bank</u>, No. 22CV1142-JO-BGS, 2023 WL 4629564 (S.D. Cal. June 15, 2023). <u>And, here, Girardi already had a separate personal bankruptcy case with a separate trustee</u>. Thus, to the extent that the government relies on the GK's trustee's Bankruptcy-derived authority to act on behalf of GK, that authority did not exist. Instead, if anyone held the authority, it was the trustee in Girardi's personal case. But that was not the person who was dispensing the GK evidence to the government.

And that is not the only thing that makes this case an ill-fitting vehicle for carving a new hole into the Fourth Amendment. As discussed in the moving papers, not only was the GK bankruptcy in this case improvident, not only was it involuntary,

6

not only did it involve Girardi's personal property, not only was Girardi incompetent to participate, not only was his representative barred from participating on an inaccurate premise, but the person who made all of the decisions regarding the disposition of his property was "a part of law enforcement as much as an [AUSA] or an F.B.I. agent." Stockbridge Funding Corp, 153 B.R. 654, 656 (S.D.N.Y. Bankr. 1993). It cannot possibly be that all of this is perfectly acceptable without any regulation under the Fourth Amendment simply because the government says "bankruptcy." It cannot possibly be that the Fourth Amendment vanishes upon the filing of an involuntary bankruptcy petition. To the contrary, bankruptcy or not, the government's inexplicable failure to do the most basic thing – get a warrant – requires the remedy of suppression.

## 2.  Girardi has standing to challenge the warrantless searches and seizures.

### a.  Girardi has both privacy- and property-focused standing.

Unable to cogently dispute all of this, the government hangs its hat entirely on the issue of standing, relying on three sentences from Bisno v. United States, 299 F.2d 711 (9th Cir. 1961), a 1961 opinion that is factually different, appears to have been argued differently, and cites no authority. The government's standing argument is wrong.

The Supreme Court has explained that "standing" is not "distinct from the merits," so it is "subsumed under substantive Fourth Amendment doctrine." Byrd v. United States, 584 U.S. 395, 410 (2018) (cleaned up). At most, "the concept of standing" is "shorthand for capturing the idea that a person must have a cognizable Fourth Amendment interest in the place [or thing] searched before seeking relief for an unconstitutional search[.]" Id. (cleaned up). This only requires either the defendant's "reasonable expectation of privacy" or "meaningful interference with [his] possessory interest in property seized." United States v. Baker, 58 F.4th 1109, 1116 (9th Cir. 2023).

The government does not contend that Girardi lacked a reasonable expectation of

7

privacy in GK's offices and a possessory interest in its records <u>before</u> the bankruptcy case began.[4]  But <u>after</u> that, it claims, he supposedly "has no expectation of privacy in [GK's] records because – upon filing of the bankruptcy petition – ownership of all the company's records vests in the trustee."  Opp'n. at 9:25-28; <u>id.</u> at 1:12-15; <u>id.</u> at 11:24-12:1.  That simplistic claim cannot be reconciled with the demands of the Fourth Amendment.

The filing of an involuntary bankruptcy case by someone other than the debtor allows a UST-approved panel trustee to "<u>take</u> possession of the property of the estate" against the debtor's will.  11 U.S.C. §§ 303(a), (g) (emph. added) & 701(a)(1).  Contrary to what the government assumes, that initial taking does not eliminate all interests the involuntary debtor has in his property even under the Bankruptcy Code; it merely <u>begins</u> the bankruptcy process.  A debtor may still claim that certain property is exempt from the property of the estate.  11 U.S.C. § 522.  And "the trustee may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate."  11 U.S.C. § 554(a).  The debtor may also ask the bankruptcy court to order the trustee to abandon such property.  11 U.S.C. § 554(b).  And generally, property "not otherwise administered at the time of the closing of a case is abandoned to the debtor[.]"  11 U.S.C. § 554(c).  In addition, the debtor may object to actions taken by a trustee in various settings, including to raise Constitutional, <u>e.g.</u>, <u>In re Barman</u>, 252 B.R. 403 (Bankr. E.D. Mich. 2000), and non-Constitutional, <u>In re Malsch</u>, 417 B.R. 458, 461 (Bankr. N.D. Ohio 2009), arguments.  And to the extent that the trustee takes possession of books and records, it is not every shred of paper or intangible information, but only those materials "relating to property

---

[4] The government claims that it "did not seek access or authority to seize personal property of defendant, held either at the business premises of Girardi Keese or elsewhere."  Opp'n. at 12-13 & n.6.  But that argument presupposes that the "GK property" was not Girardi's personal property.  Again, that is wrong as a matter of law because GK was a sole proprietorship.

of the estate." 11 U.S.C. § 524(a)(4).  Thus, until a bankruptcy case is actually resolved, and sometimes after, a debtor retains an interest in estate property and various rights that travel with it.

He also retains a reasonable expectation of privacy.  To be sure, a debtor must publicly file some information, like lists of his creditors, assets, and liabilities.  11 U.S.C. § 521(a)(1).  But the content of nonfinancial private information in his papers and records remains shielded from public view.  And even if the trustee can examine some private papers, the trustee's primary duty is to "collect and reduce to money the property of the estate" and "close such estate as expeditiously as is compatible with the best interests of parties in interest."  11 U.S.C. § 704(a)(1).  A trustee could not, for example, share a debtor's salacious diary with a friend, claiming that (as the government suggests) the trustee owns all the property in the estate and can do with it whatever she wants.  And, for the same reason, a trustee should not <u>vel</u> <u>non</u> be allowed to share the contents of a debtor's papers and effects for other reasons unrelated to administering the estate.  A debtor can thus reasonably expect that the trustee will maintain the privacy of his papers, use them only for purposes of administering the estate, and not disclose them to others for improper reasons.

But this should all be beside the point because "federal constitutional rights are not typically defined – expanded or contracted – by reference to non-constitutional bodies of law[.]"  <u>Smith v. Arizona</u>, 602 U.S. __, 2024 WL 3074423, *8 (June 21, 2024).  Even if bankruptcy statutes did purportedly eliminate all of Girardi's interests in GK and its property as soon as the involuntary petition was filed, modern statutes cannot narrow the fixed scope of the Fourth Amendment.

When evaluating <u>the Constitutional</u> question, the Court must look not to the Bankruptcy Code, but to fundamental Fourth Amendment principles, which Girardi discussed at length in his motion: (1) the Fourth Amendment rigorously protects persons, houses, papers, and effects against unreasonable searches and seizures; (2) the

9

1    warrant requirement is not merely an inconvenience to be weighed against the claims of

2    police efficiency; (3) a search is not private in nature if it has been ordered or requested

3    by a government official;[5] (4) warrantless searches and seizures are per se

4    unreasonable, subject to only a handful of narrow exceptions; (5) the government bears

5    a heavy burden to justify each individual warrantless search or seizure; and (6)

6    substantive Fourth Amendment rights cannot be circumvented by technical subterfuge.

7    The government ignores, but does not dispute, these principles.

8         The government also does not meaningfully dispute that: (1) the GK bankruptcy

9    was initiated by way of an involuntary petition; (2) the bankruptcy case against GK as a

10   separate entity was wrongly initiated to the extent it was Girardi's sole proprietorship;

11   (3) Girardi did not personally participate in the bankruptcy process due to

12   incompetency; (4) Girardi's conservator was prevented from appearing in the

13   bankruptcy case to protect his interests; (5) the bankruptcy trustee answered directly to

14   DOJ and had a statutory duty to cooperate with federal law enforcement;[6] (6) the

15   particular cooperation relationship between the GK trustee and the government in this

16

17   _____

18        [5] The government string-cites some of the authority cited by Girardi on this point
     but claims that it "pertain[s] to situations where a private actor was given temporary
19   possession of or access to property" rather than "full property rights." Opp'n. at 12.
     This factual distinction is irrelevant to the legal rule – cooperation between the
20   government and a private individual can reach a point where the government is
     responsible for the private person's actions for Fourth Amendment purposes. And, in
21   any event, the trustee was not truly a private actor. Mot'n at 19:20-21:19.

22        [6] Among other authority, Girardi pointed to cases that have recognized that
     there's no Fourth Amendment exception for bankruptcy courts and their trustees. Mot.
23   at 19-20. The government brushes them off, claiming that they involved whether a
     bankruptcy trustee can search a debtor's residence or other property. Opp'n. at 12. But
24   it does not, and cannot, dispute the general principle that the Fourth Amendment
     applies to the conduct of bankruptcy trustees. Thus, even if the cited cases did not
25   involve the particular scenario presented here, they establish that this Court must decide
     whether the conduct of the trustee, individually and in concert with the government,
26   violated the Constitution.
27
28

10

1    case was extensive;[7] and (7) the government could have obtained a warrant for the GK
2    evidence but did not.

3        Applying this undisputed Fourth Amendment law to the unique facts presented
4    here compels the conclusions that both the primary and secondary searches of the GK
5    evidence are subject to the Fourth Amendment and its warrant requirement.

6                    **b. The government's standing arguments are wrong.**

7        Ignoring everything above, the government cites <u>Bisno</u>, which it describes as
8    "well settled" and "governing," to support its claim that the bankruptcy eliminated any
9    cognizable Fourth Amendment interest Girardi had in GK and its records.  Opp. at 1, 9-
10   10.  In so doing, the government quotes the only three sentences in the opinion which
11   even touch upon that issue:

12           It is clear that no rights of Bisno no [sic] under the Fourth or the Sixth
             Amendment were violated.  The records involved were not recovered from
13           Bisno by a search or seizure of any kind but vested in the trustee in
             bankruptcy by operation of law as of the date of the filing of the petition in
14           bankruptcy.  Hence rights under the Fourth Amendment are not involved.

15   <u>Bisno</u>, 299 F.2d at 717.

16       That is the entirety of the discussion in <u>Bisno</u>.  <u>Bisno</u> did not cite the law on
17   standing as it existed in 1961, let alone apply the modern concept of standing as
18   discussed above.  <u>Bisno</u> did not consider the extent to which the defendant had a
19   reasonable expectation of privacy or proprietary interest in the records given the
20   bankruptcy laws in effect at that time, which have been overhauled since then.  <u>In re El</u>
21   <u>Toro Materials Co., Inc.</u>, 504 F.3d 978, 980 (9th Cir. 2007) ("Congress dramatically
22   overhauled bankruptcy law when it passed the Bankruptcy Reform Act of 1978.").

23

24           [7] The Opposition cites a handful of unpublished trial-court orders holding that the
25   panel trustees in those cases were not part of the prosecution team for discovery
26   purposes.  Opp'n at 4:13-5:12.  Nothing about Girardi's Fourth-Amendment arguments
     turns on whether the trustee is part of the prosecution-team for discovery purposes.  If it
27   becomes worthwhile to address the discovery point in some future setting, Girardi will
28   do so then.

                                                11

Bisno did not consider the statutory cooperation arguments and unique facts at issue in this case.  And how could it in three sentences?

Bisno is thus barely relevant to whether Girardi has a cognizable Fourth Amendment interest in GK and its records given modern bankruptcy law, modern standing caselaw, and the facts and arguments in this case.  And it certainly is not precedent on the matter.

Nearly a century ago, the Supreme Court recognized that "questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been decided as to constitute precedents."  Webster v. Fall, 266 U.S. 507, 511 (1925) (cleaned up).  Thus, when an issue is not "raised in briefs or argument nor discussed in the opinion of the Court," the "case is not a binding precedent on th[e] point."  United States v. L.A. Tucker Truck Lines, Inc., 344 U.S. 33, 38 (1952) (cleaned up).  And even when an opinion actually includes a statement about a certain legal principle, it is not precedent if the comment was "made casually and without analysis, uttered in passing without due consideration of the alternatives, or done as a prelude to another legal issue that commands the panel's full attention."  Jones v. United States, 36 F.4th 974, 981 n.5 (9th Cir. 2022) (cleaned up).

This precedent about precedent is itself binding authority that the Court is duty-bound to follow.  See Barr v. American Association of Political Consultants, Inc., 591 U.S. 610, 621 n.5 (2020).  The Court must therefore reject the government's erroneous call to treat Bisno as binding precedent that precludes Girardi from having a cognizable Fourth Amendment interest in the challenged evidence.

Bisno aside, the government points to no other precedent supporting its claim.  It claims that the Ninth Circuit "reiterated" its Bisno holding in United States v. Boyer, 275 Fed.Appx. 655 (9th Cir. 2008).  Opp. at 10-11.  But "unpublished dispositions and orders of" the Ninth Circuit "are not precedent, except when relevant under the doctrine of law of the case or rules of claim preclusion or issue preclusion."  See 9th Cir. Cir. R.

36-3(a) (cleaned up).  And the Ninth Circuit has repeatedly warned against mistaking unpublished memoranda – which are, "more or less, a letter from the court to parties familiar with the facts, announcing the result and the essential rationale of the court's decision," Hart v. Massanari, 266 F.3d 1155, 1177-78 (9th Cir. 2001) – with carefully-drafted published opinions, id. at 1176-78; Grimm v. City of Portland, 971 F.3d 1060, 1067 (9th Cir. 2020) (cleaned up); 9th Cir. Gen. Ord. 4.3.a.

In fact, Boyer is a prime example of why unpublished cases should not be used to decide future cases.  Contrary to what the government suggests, Boyer did not cite Bisno or, except for a case establishing the standard of appellate review, any other authority at all in the single paragraph addressing the defendants' suppression motion. 275 Fed.Appx. at 655-56.  The memorandum decision also doesn't include the words "standing," "privacy," or "property intertest."  Id.  If anything, the fact that Boyer does not cite Bisno underscores that the three sentences in Bisno are neither "governing" nor "well-settled."

In a footnote, the government claims that "other circuits have taken the same approach" as Bisno and Boyer, citing two cases without discussion, or even parentheticals.  Opp'n. at 10 n.4.  Neither of those nonprecedential opinions from more than 50 years ago contains any meaningful discussion relevant to whether Girardi has a cognizable Fourth Amendment interest in GK and its records given modern bankruptcy law, modern standing caselaw, or the facts and arguments of this case.[8]

The government also cites two out-of-circuit cases (one unpublished) involving court-appointed receivers.  Opp'n. at 11.  As discussed above, however, the present case involves the circumstances of particular bankruptcy proceedings.  Receivership is something else.  Indeed, while bankruptcy is decidedly not about culpability, as noted

---

[8] The government cites another Ninth Circuit case for the general proposition that the scope of a bankruptcy case is "broad," Opp'n at 12; that case has nothing to do with the Fourth Amendment issues presented here.  See In re FitzSimmons, 725 F.2d 1208, 1210-12 (9th Cir. 1984).

13

in one of the government-cited cases, "a receiver is to be appointed only after a <u>prima facie</u> showing of fraud and mismanagement." <u>See</u> <u>United States v. Setser</u>, 568 F.3d 482 (5th Cir. 2009).  Because "a receiver takes over property only after a court has agreed with the arguments and evidence that such a takeover is necessary," there is at least some argument that any "requirement of a constitutionally adequate substitute for a warrant" would not "add anything new to the prior rules for receivers." <u>Id.</u> at 487 (cleaned up).  In any event, even if receivers were somewhat analogous to trustees for Fourth Amendment purposes, the government-cited cases do not address the arguments Girardi makes here, so they are not helpful on the matter.

In sum, given the unique circumstances here, Girardi maintained a cognizable Fourth Amendment interest in GK and its records after the bankruptcy case was filed. The government therefore bears the heavy burden to prove that the conduct of the trustee and itself fell within an exception to the warrant requirement.

### 3. The government has not carried its burden of establishing actual or apparent consent.

In its limited effort to carry its heavy burden of establishing a warrant exception, the government invokes only one possibility: consent.  Opp'n. at 2, 9, 13.  Its claim that the trustee had actual authority to consent to the disclosures of GK's records to law enforcement rests entirely on its premise that the trustee was properly installed and could do whatever she wanted with the GK estate property because she took full "control" and "ownership" of that property as soon as the bankruptcy case was filed. Opp'n. at 1, 9, 11.  That premise has been refuted above many times over.  To add to those points, controlling Fourth Amendment authorities also refute the notion that a <u>de facto</u> FBI agent could be involuntary installed into a business or home, thereby gaining access to a person's papers and effects, and thereafter validly consent to the waiver of Constitutional rights for purposes of law-enforcement investigation.  <u>See</u> <u>Corngold</u>, 367 F.2d at 6-8; <u>Stoner v. California</u>, 376 U.S. 483, 489 (1964).  The trustee therefore didn't have actual authority to consent.

14

As a fallback, the government asserts that the trustee at least had "apparent authority." Opp'n. at 13. But it offers no support for that claim other than citing a case for the general proposition that a "'third party's consent to the search of another's belongings is valid if the consenting party has either actual or apparent authority to give consent.'" Opp'n. at 13 (quoting United States v. Ruiz, 428 F.3d 877, 880 (9th Cir. 2005)). Implicitly, this driveby citation appears to acknowledge that controlling law on apparent authority is not in the government's favor.

Indeed, the Ninth Circuit law for apparent authority has consistently established that the doctrine applies only to reasonable mistakes of fact, not mistakes of law, Ruiz, 428 F.3d at 881; and that, where there is some reason to doubt the consent-giver's authority based on the circumstances, the government cannot "proceed on the theory that ignorance is bliss" but has a duty to reasonably investigate, United States v. Arreguin, 735 F.3d 1168, 1177 (9th Cir. 2013); United States v. Dearing, 9 F.3d 1428, 1430 (9th Cir.1993). In light of these principles, it is not hard to imagine why the government doesn't say more.

But the Court need not seriously explore the issue, because the government has made no effort to meet its Constitutional burden. Its bare assertion of apparent authority is not enough. United States v. Cervantes, 703 F.3d 1135, 1142 & n.1 (9th Cir. 2012) (rejecting government's conclusory assertions about why a warrant exception applied: "It is not our role to engineer a path for the Government to meet that burden") (cleaned up); United States v. Garcia, 974 F.3d 1071, 1079 (9th Cir. 2020) (where government offered "nothing more than its say-so" to excuse its failure to obtain a warrant, holding that it was "not enough to avoid suppression") (cleaned up). Indeed, "[t]o rule in the government's favor on this [issue] would [require the Court] to bend over backwards, doing the government's work for it. Federal prosecutors should not need that kind of help from the courts, nor should they expect to receive it." Id.

Like the Court, it also isn't Girardi's "role to engineer a path for the Government

15

1   to meet [its] burden." Cervantes, 703 F.3d at 1142 n.1 (cleaned up). Therefore, Girardi

2   need not show that the government cannot satisfy the Ninth Circuit's apparent-authority

3   test. It's enough to point out that it hasn't even tried. And because the government

4   does not dispute that suppression would be required if a violation is established, that is

5   the only appropriate remedy in this case. See Mot'n at 22:2-19.

6   **C. The government and trustee intentionally violated privilege, but the scope of
    the invasion and remedy are unclear; the Court should therefore order an
7   evidentiary hearing.**

8        The Opposition's privilege arguments are equally unavailing for several reasons.

9        First, the Opposition wrongly seeks to subdivide what throughout the

10  investigation was a unified and cohesive unit: federal law enforcement in Chicago,

11  federal law enforcement in L.A., and a trustee who enthusiastically fulfilled her

12  statutory duty to cooperate with the government. See id. at 15:15-17 (suggesting that a

13  document possessed by the Chicago arm of the prosecution team is not in possession of

14  "the government in this matter"). The L.A. and Chicago cases, both of which pertain to

15  Girardi's alleged theft of client funds, involve the same federal agencies jointly

16  investigating overlapping conduct. See, e.g., Ex. 13-1 ("Special Agent Margaret

17  Malloy [in Chicago] told me that she spoke with you to let you know I would be

18  reaching out to you"); Mot'n at 7:19-25. The government is thus responsible for the

19  conduct engaged in by the entire prosecution team and cannot play inter-District shell

20  games. United States v. Cano, 934 F.3d 1002, 1023 (9th Cir. 2019) (explaining that the

21  government is presumed to have access to and knowledge of everything done by an

22  "agency [that] participates in the investigation of the defendant").

23       Second, the government's privilege argument depends entirely on GK being a

24  legal entity separate from Girardi, which it was not. Indeed, the Opposition itself

25  contends that the waiver was executed for the purposes of allowing the government to

26  review "GK's" privileged materials. But because GK was a sole proprietorship, and

27  because a sole proprietorship has no legal existence separate from the proprietor

28

16

himself, <u>Ball v. Steadfast-BLK</u>, 196 Cal.App.4th 694, 701 (2011), the purportedly-waived privileges necessarily belonged to Girardi's personally.  Indeed, no lawyer could have possibly advised GK separately from Girardi because the two were one in the same, with coextensive rights, interests, and liabilities.  By the government's own admission, therefore, it intentionally invaded a privilege that the trustee had no right to waive.  Opp'n at 13:23-24 ("The government does not dispute that the Trustee cannot waive defendant's personal privilege").

     <u>Third</u>, the government argues that, even if it did invade privilege, the remedy is document-specific suppression, and L.A.-based prosecutors do not intend to use privilege materials at trial.  Opp'n at 15:17-24.  But while that may be true for unintentional privilege invasions, it is not for intentional ones that violate Due Process. <u>United States v. Marshank</u>, 777 F.Supp. 1507, 1523-24 (N.D. Cal. 1991); <u>cf. United States v. SDI Future Health, Inc.</u>, 464 F.Supp.2d 1027, 1053 (D. Nev. 2006).  And even where invasions do not rise to the level of a Due-Process violation, the Court can fashion remedies under its supervisory authority.  <u>See</u> <u>United States v. Bundy</u>, 968 F.3d 1019, 1030 (9th Cir. 2020).  "The court's exercise of its supervisory powers protects the integrity of the federal courts and prevents the courts from making themselves accomplices in willful disobedience of law."  <u>Id.</u>

     Here, not only did the government intentionally invade Girardi's privilege, it did so in ways that call out for judicial action.  In L.A., while seemingly aware that they were on dubious ground (Mot'n at 13:6-11), the government and trustee colluded on a carefully-worded stipulation designed to keep the bankruptcy judge in the dark about their concerns.  In Chicago, there is no evidence of <u>any</u> privilege precautions whatsoever.

     If a civil litigant intentionally invaded its adversary's privilege then used the privileged materials to formulate strategy and pleadings, it is hard to imagine many courts staying mum because the actual privileged materials were not presented at trial.

Instead, the remedies would sound in the register of disqualification, dismissal, and remedial sanction.  E.g., In re Se. Banking Corp. Sec. & Loan Loss Rsrvs. Litig., 212 B.R. 386, 397 (S.D. Fla. 1997) (where bankruptcy trustee and his counsel used inadvertently-produced privileged material to draft complaint, forbidding the use of privileged materials "directly, or indirectly, for any purpose whatsoever," rescinding counsel's pro hac vice status, and imposing monetary sanctions).  It cannot possibly be that the government is held to a lesser standard.  United States v. Kojayan, 8 F.3d 1315, 1323 (9th Cir. 1993) ("Prosecutors are subject to constraints and responsibilities that don't apply to other lawyers"); United States v. Antonelli Fireworks Co., 155 F.2d 631, 658 (2d Cir. 1946) (Frank, J., dissenting) ("Surely if [a] rule is to be invoked to protect the pocketbook of an insurance company, it should be invoked in the instant case to protect natural persons from being sent to jail unjustly").

Maybe most tellingly of all, however, the Opposition makes no effort to explain why the government  undertook substantial post-Indictment efforts – after spending months reviewing the GK email database – to obtain a belated privilege waiver from the trustee.  But, of course, it must have been for some reason.  And that reason was almost certainly informed by things it had already seen during its review.  Was it to read emails with insolvency counsel?  With civil counsel relating to the alleged theft of client funds, as exemplified by Exhibit 15?  With tax counsel?  With criminal counsel, who was communicating with Girardi's other counsel?  Because the government doesn't say, the only thing known for sure is that some privilege invasion occurred in L.A.  As for Chicago, where the L.A. investigation started, the disregard for privilege appears to have been even more widespread and cavalier.  What effect this had on the overall investigation is likewise impossible to know without evidence.

It would have been easy federal agents or prosecutors in L.A. and Chicago to submit declarations explaining what they did, why they sought (or didn't seek) privileged material, how they used it, and why doing so was appropriate.  Yet no

1    explanations have been provided.  At a minimum, the Court should order a hearing to

2    determine the scope of the privilege violation and any remedy.

3    **D. The Court should also order an evidentiary hearing in light of the government's failure to submit any evidence denying or explaining apparent grand-jury-secrecy violations.**

4

5          The Court should also require a hearing to ascertain the scope of the

6    government's Rule 6(e) violations.  Indeed, it is fairly remarkable that, in the face of

7    substantial indicia of Rule 6(e) violations, the government submitted no declarations or

8    other evidence, including declarations denying a secrecy violation under oath.

9          In lieu of evidence, the government instead argues that, despite its extensive and

10   ongoing interactions with the trustee throughout multiple grand-jury investigations, and

11   despite working hand-in-hand with the trustee after Chris Kamon was arrested and as

12   his and Girardi's cases were steaming toward indictment on behalf of the "victims" (see

13   Mot'n at 24:26-25:8), there was no discussion at all of "the identities of witnesses . . .

14   the substance of testimony, the strategy or direction of the investigation," SEC v.

15   Dresser Indus., Inc., 628 F.2d 1368, 1382 (D.C. Cir. 1980), the identities of the targets,

16   or what is likely to occur as a result of the grand jury investigation. In re John Doe

17   Grand Jury Proceedings, 537 F. Supp. 1038, 1044-45 (D.R.I. 1982); United States v.

18   Diaz, 236 F.R.D. 470, 478 (N.D. Cal. 2006).  The government further contends that the

19   first entry in the trustee's billing records, which indicates that the government disclosed

20   the identity of a grand-jury witness and  funneled documents out of the grand jury to

21   the trustee during the course of an ongoing investigation, is perfectly fine under Rule

22   6(e).  See Opp'n at 17:15-18:2.

23         To take the last contention first, the government's claim that disclosing the

24   identity of a grand-jury witness does not violate Rule 6(e) is not only inconsistent with

25   well-established law, it is inconsistent with the position of this USAO in other cases.

26   Indeed, when the government seeks to withhold information from the defense, it

27   frequently claims that disclosing the existence and recipient of a grand-jury subpoena

28

                                                19

would violate Rule 6(e).  See Ex. 16.  Because Rule 6(e) does not expand and contract based on the government's needs at any particular moment, the government cannot now deny that its very first contact with the trustee violated 6(e).

The suggestion that, after violating Rule 6(e) upon first contact, then going on to work hand-in-hand with the trustee continuously over the next year during multiple open grand-jury investigations, the government never again crossed the line requires a level of credulity bordering on naivete.  The prospect of grand-jury activity in this case was not abstract – at a minimum – once Kamon was arrested on a Criminal Complaint in November 2022.  Indeed, from that point forward, the only place to go was to the grand jury for an indictment.  Between November 2022 and February 2023, the prospect of charges, the type of charges, the targets of an indictment, and even the specific "victims" appear to have been discussed repeatedly with the trustee.  That was the same time period when the government and trustee were working together on the response to Kamon's bond filings, and when the government was imploring the trustee to get the servers up and running because it had "just obtained an a/c waiver from a critical victim and need[ed] to download discrete emails related to this former client asap."  Ex. 13-1803.  It is simply not believable that additional grand-jury material was not shared.

The government may argue that any violation of Rule 6(e) was less culpable in this case than, for example, selectively leaking grand-jury information in order to taint a target in the press.  But not only does Rule 6(e) not turn on motive, the motive to disregard Rule 6(e) because it expedites an investigation is not particularly laudable.  In any event, the question today is whether violations occurred.  The government says categorically that they did not, but despite substantial indications to the contrary, it has submitted no evidence.  Because there is more than enough smoke to investigate a possible fire, the Court should order the government to offer sworn evidence detailing the prosecution team's interactions with the trustee and, thereafter, hold a hearing to

20

determine the existence, extent, and remedy for any violations.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED:  July 12, 2024          By  */s/ Charles J. Snyder*

CHARLES J. SNYDER
Attorney for Thomas Girardi

21

1

## **CERTIFICATE OF COMPLIANCE**

2
3
4

I, the undersigned, counsel of record for Defendant Thomas Girardi, certify that this brief contains approximately 7,139 words.  In making this certification, I have relied on the computer program used to prepare this brief (Microsoft Word).

5
6

Respectfully submitted,

7

CUAUHTEMOC ORTEGA
Federal Public Defender

8
9

DATED:  July 12, 2024          By  */s/ Charles J. Snyder*

10

CHARLES J. SNYDER
Attorney for Thomas Girardi

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28