CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
CHARLES J. SNYDER (Bar No. 287246)
Email: Charles_Snyder@fd.org
SAMUEL CROSS (Bar No. 304718)
Email: Sam_Cross@fd.org
J. ALEJANDRO BARRIENTOS (Bar. No. 346676)
Email: Alejandro_Barrientos@fd.org
Deputy Federal Public Defenders
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-2854
Facsimile: (213) 894-0081

Attorneys for Defendant
THOMAS VINCENT GIRARDI

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>THOMAS VINCENT GIRARDI,<br><br>Defendant. | Case No. 2:23-cr-47-JLS-1<br><br>**EX PARTE APPLICATION TO CONTINUE TRIAL DATE FROM AUGUST 6, 2024 TO OCTOBER 8 OR 15, 20204** |

Tom Girardi, through counsel, applies <u>ex parte</u> to continue the trial date in this case from August 6 to October 8 or 15, 2024. Girardi bases this application on the attached declaration, the files and records in this case, and any other argument or evidence that the Court may consider. This application is joined by Christopher Kamon but opposed by the government, which intends to file a written opposition.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: July 13, 2024        By */s/ Charles J. Snyder*

CHARLES J. SNYDER
Attorney for Thomas Girardi

**DECLARATION OF CHARLES J. SNYDER**

I, Charles J. Snyder, declare as follows:

1. I am a California-licensed DFPD appointed to represent Tom Girardi in this matter. Unless otherwise stated, I make this declaration based on personal knowledge and, if called as a witness, would attest to its contents under oath.

2. I am seeking to continue the trial date in this matter by two months, to October 8 or 15, 2024.[1] Despite my efforts as lead counsel to bring this matter to trial as quickly as possible, I believe that a continuance is appropriate and necessary in this case for a number of reasons.[2]

3. Before getting to the reasons, I want to briefly remind the Court of some context. In December 2020, Girardi was referred for federal criminal prosecution. In January 2023, after investigating for more than two years, the government obtained a five-count Indictment charging Girardi and Christopher Kamon with a decade-long wire-fraud scheme. On February 6, 2023, Girardi made his initial appearance, at which time Craig Harbaugh was appointed to represent him. Between February 2023 and January 10, 2024, Harbaugh acted as Girardi's lead counsel, while J. Alejandro Barrientos acted as co-counsel. During that period, the litigation focused almost exclusively on Girardi's competency, an issue on which Girardi's defense team expended substantial time (including a full year of attorney time) and resources. See Docket No. 154 ¶ 16.

4. On January 2, 2024, the Court issued an order finding Girardi competent

---

[1] Were it an option, as part of a continued effort to bring this case to trial as soon as possible, I would seek a shorter continuance, to late-September. Because it appears that the Court is dark during that time, I am proposing an October date. If the proposed dates do not work for the Court or the government, we would request the next available date on the Court's trial calendar.

[2] When agreeing to the last continuance, Girardi's defense team indicated that it would not seek a further continuance "absent good cause and the existence of new information not known as of the date of this stipulation." Docket No. 184 ¶ 7.d. For the reasons below, I believe that those conditions are amply satisfied.

1

to stand trial.  Shortly after, the Court scheduled a trial-setting conference for Girardi, which, due to the outstanding issue of competency, had yet to occur.

5. On January 9, the parties filed status reports proposing competing trial dates.  Girardi sought a trial date in early 2025, Docket No. 154; the government sought one almost immediately, in March or April 2024, Docket No. 155.  In support of its request, the government made a number of representations regarding the status of the case and its trial presentation, including (1) that it had already produced "substantially all discovery" as of April 2023, Docket No. 155 at 3:3-6; (2) that it would voluntarily limit its trial presentation to four client matters and five executions of the wire-fraud scheme, id. at 3:22-25; and (3) that it would take additional steps to help Girardi's mostly-new defense team prepare, id. at 4:7-11.

6. On January 10, the parties appeared for a trial-setting conference.  During that conference, the government repeated and expanded on its earlier representations in support of its proposed trial date.  Among other things, it stated that it would streamline the case by voluntarily limiting its trial presentation to four client matters, promising that it would not "stray beyond that," 1/10/24 Tr. at 6:3-21, claimed that all of the "relevant" discovery had already been produced, id. at 15:17-18:17; and promised that it would "help the defense in whatever way possible to ensure that this date does not get kicked beyond May," id. at 7:1-3.  Based in significant part on those representations, id. at 17:4-8, the Court set a May 2024 trial date.

7. As described at ¶¶ 7-21 of my declaration supporting Girardi's request for a subpoena to the Girard Keese bankruptcy trustee (Docket No. 169), I spent the weeks after that trial-setting conference attempting to track down basic documents, including voluminous information related to Kamon as well as accounting, email, and litigation documents from the Girardi Keese bankruptcy trustee.  Despite other pressing matters in other cases – since I, like the rest of Girardi's defense team, am a DFPD assigned to many cases in many courts across the District – I filed a detailed subpoena application

sketching out Girardi's potential defense by the second week of February 2024.

8. On February 27, 2024, in response to that subpoena, the trustee produced a Girardi Keese general ledger containing over 300,000 individual entries, a Girardi Keese trust ledger containing approximately 78,000 individual entries, and a detailed inventory of items found in the Girardi Keese offices that spanned 124 pages with approximately 60 lines per page. In addition, and maybe most importantly for present purposes, the trustee provided access to Girardi Keese's email server for the first time through a hosting platform called Mimecast, which has been essential to our ability to investigate and formulate a defense.

9. Unfortunately, Mimecast came with several limitations. First, despite our requests, the trustee provided us with only a single user profile. As a result, only one member of the defense team could review emails at a given time.[3] Second, unlike Relativity or similar programs, Mimecast is not a platform designed for discovery review, on which it is possible to tag and easily export documents. To the contrary, and as explained in the note below, reviewing documents on Mimecast has been extraordinarily difficult, disorganized, duplicative, and time-consuming.[4]

---

[3] We later received a deconstructed email server from the government on a hard drive. After our IT department spent roughly a week reconstructing the server, we determined that it was unreliable and essentially useless.

[4] To give the Court some brief insight into the cumbersome nature of using Mimecast: in order to review documents relating to a specific topic or custodian on Mimecast, I would have to first create a separate archive related to that topic and custodian because a general search did not allow for date sorting. Creating that archive usually took some number of hours, such that every time I wanted to create a new topic or custodian archive I had to begin the process then, while the archive was compiling, work on something else. Once an archive was created, I would manually review the documents, each of which often took a few seconds to load. When closely reviewing the emails of key witnesses, it would often take a day or more to get through a single month of messages. During this review, I would tag items as either relevant, privileged, or irrelevant. I used those tags not because the documents were relevant, privileged, or irrelevant, but because, in lieu of other tags, they were the only available

10. In late April and early May 2024, the trustee also voluntarily produced to the defense bank records for some (but not all) of Girardi Keese's approximately 175 bank accounts. These records, which are voluminous and underlie the voluminous ledgers produced in February, include important pieces of raw evidence that the defense is likely to use at trial

11. Meanwhile, after the trial-setting conference at which it represented that all of the relevant discovery had been produced, the government continued to produce voluminous discovery long in its possession. To provide a few examples, some of which are also discussed in Docket No. 258 at 4-5, the government produced for the first time Kamon's five proffers, all of the discovery from Kamon's separate case, and at least five of Kamon's digital devices. While the government suggested at the time that it did not see how the evidence was relevant to Girardi, recent events, including the government's own 404(b) notice, suggest that the relevance of a massive secret fraud being conducted by the head of accounting is fairly self-evident. I say this not necessarily to fault the government on this point – things happen over the course of a legal proceeding – but the fact remains that none of this evidence, nor any of the evidence discussed above from the trustee, was produced until after the trial-setting conference. Most of it was not produced until at least March 2024.

12. Since the Court set the initial trial date, I have done everything in my power as lead counsel to ensure that this case gets to trial on the schedule set by the

---

options for <u>de facto</u> coding system. From there, in order to get emails off Mimecast, I had to export each set of tagged documents to a .pst file. That export process also took time, and if a particular export contained more than 500 emails, it had to be broken into multiple exports. Once the export was ready, I then had to reopen the .pst files in Outlook, <u>go back through them again</u>, and attempt to sort them into folders for actual use. Because this case involves law firm, I estimate that, since March, I have initially reviewed several hundred thousand emails using the above-described system, and have exported and rereviewed another approximately 5,000-10,000. Needless to say, all of this took an extraordinary amount of time and came at the expense of other work that could have been done on this case.

1  Court.  To that end, over the last six months – and, largely, the last four since we got
2  email access from the trustee – Girardi's defense team has reviewed hundreds of
3  thousands of emails (if not more), over a million pages of document discovery (nearly
4  800,000 pages from L.A. prosecutors and a subset of the 6.6 million pages received
5  from the Chicago case), and portions of multiple digital devices.  We have also
6  provided timely notices and completed all of the pretrial briefing on schedule, including
7  12 substantive filings between mid-May and today.  Docket Nos. 186, 198, 202, 207,
8  215, 220, 222, 255, 256, 269, 271, 273.  Every day, we are working as quickly as we
9  can to prepare for a high-publicity, document-heavy trial with 15-30 witnesses
10 involving a decade-long scheme and arcane details related to the trust and operating
11 accounting processes at Girardi Keese.  We have also had to figure out all of this on our
12 own because our client is unable to help us in our defense.  And we are doing this while
13 maintaining full caseloads as active trial DFPDs.

14        13.    Despite these efforts, a number of things have led me to conclude that a
15 continuance is necessary and appropriate.

16             a.  First, in recent weeks, the government has indicated that its "four corners"
17 representation is not as steadfast as it appeared on January 10.  In a June 21 filing, for
18 example, the government sought permission to introduce evidence related to thousands
19 of uncharged transactions involving Erika Jane's company, EJ Global.  Then, in the
20 July 12 Reply to that filing, the government suggested that it has no intention of
21 limiting itself to the EJ Global evidence: "Defendant must accept that the natural
22 consequence of his position" – "his position" meaning his defense against the elements
23 of the crime charged – "is for the government to counter it with <u>all available admissible
24 evidence</u>, including evidence that defendant used tens of millions of dollars from
25 Girardi Keese accounts to pay for his personal expenses, including the expenses of his
26 former wife's entertainment company."  Docket No. 267 at 1:11-16 (emph. added).
27 Regardless of whether this evidence ultimately comes in, we have now been forced to
28

divert our limited time and attention to addressing these new issues – and the possibility of defending against <u>all</u> evidence that the government now deems germane – which eats into our already heavily-compressed schedule.  The point of the government's earlier representations, as I understood them, was to tell us what was categorically off limits and on what we did not need to focus.  Since those representations have eroded, our ability to exclude items from consideration has eroded as well.  Intentionally or not (<u>see</u> Note 5, <u>infra</u>), we have been affirmatively misled about the matters on which we were supposed to focus our limited time.[5]  Further, as it has become clear that Girardi and Kamon intend to present starkly antagonistic defenses, that, too, has required us to spend time and attention on matters beyond the "four corners" and charged client

---

[5] At this point, I feel compelled to note that one of the prosecutors in this case has demonstrated a habit of tactically-shifting representations at different stages of litigation.  In <u>United States v. Sadigh</u>; CR-15-465-TJH, for example, in a familiar effort to obtain an accelerated trial date over the defendant's objection, the prosecutor promised to provide early disclosures and streamline the case.  After securing the desired trial date, he went back on those representations. Ex. 1.  In <u>United States v. Terren Peizer</u>; CR-23-89-DSF, the same prosecutor avoided a sanctions motion for contacting a represented witness, in part, by claiming that the witness was not represented in the same matter and was questioned about topics (the termination of a contract with Aetna) that were not relevant to the government's trial presentation. <u>Peizer</u>, Docket No. 337 at 19:11-20:3.  At trial, the Aetna termination took center stage in the government's case, which resulted in a conviction.  <u>See</u> Ex. 2.  This is now a third case in quick succession where the same prosecutor has made clear and formal representations at one stage of litigation in order to secure a desired result or advantage over a defendant, but then abandoned those representations at a later stage, once the hoped-for result was obtained, because it was no longer advantageous to stand by them.  If once is by chance and twice is a coincidence, this has now moved into the territory of pattern.  And this pattern calls into question whether the representations originally made in January were ever genuine, or whether the government always intended to blow through them the moment Girardi sought to defend against the elements of the charged conduct, rather than simply submit.  The speed with which the government filed the EJ Global motion on June 21, the day after the June 20 afternoon hearing that it says supposedly triggered the need for the motion, further suggests that the government has always intended to put on certain non-four-corners evidence and has simply been waiting for safe time and pretense to do so.

matters. Indeed, unless or until Kamon is severed, we are effectively defending against two cases. And unlike the government, Kamon has no freestanding obligation to provide Girardi notice of anything about his case, so the evidence he intends to present at trial is particularly hard to prepare for. Even if the cases are ultimately severed, we will not know that until shortly before the current trial date and, in the meantime, have had to try to prepare for two defenses – one against the government, which has shown a desire to evade its earlier claims of a limited and well-defined case, and one against Kamon, whose evidentiary case is entirely unknown to Girardi's defense team.

   b. Second, there are at least six outstanding motions that are not scheduled to be decided until less than two weeks before trial. See Docket Nos. 214, 215, 218, 219, 220, 222, 225. Several of these motions involve complicated issues of fact and law, at least one requests an evidentiary hearing, and the outcome of the motions may radically change the complexion of the case. For example, from Girardi's perspective, whether he is participating in a joint trial or a severed trial impacts everything from jury selection, to opening, to the presentation of evidence and which witnesses will be called, to closing. From Kamon's perspective, whether his proffer statements come in, and what might trigger their admission, not only impacts everything about his trial presentation, but whether his decision to go to trial is fully advised. His counsel has also stated that the admission of the evidence about his "side fraud," which was only recently determined and which he has asked the Court to reconsider, will substantially impact his trial preparation and presentation. For both Girardi and Kamon, the former of whom is at a facility in Orange County and requires extraordinary time for even elementary discussions, and the latter of whom is in custody at MDC, defense counsel will also need time to discuss the outcome of these motions and their impact on the case, which is not accounted for in the current schedule. While, to some degree, trial practice always involves a somewhat shifting target, for the reasons discussed above, that indeterminacy is particularly difficult to deal with under the circumstances of this

1 case and on the current schedule.

2     c. Third, at 6:18 p.m. on Friday, July 12, 2024, after complaining about the
3 timing of Girardi's timely March 11, 2024 expert notice and May 2024 supplement to
4 that timely notice, and after helping itself to two rounds of briefing on the topic, Docket
5 Nos. 188, 225, the government for the first time provided a defective notice of a
6 mental-health expert. In so doing, the government sought to blame Girardi's "belated
7 disclosure" of expert testimony – which, again, was made on the March deadline – for
8 its failure to provide expert notice on a central topic in the case until July 12, after the
9 motions deadline and less than a month before trial. Ex. 3. When it came to seeking to
10 exclude the defense expert, of course, the government believed it was important "to tee
11 this issue up for the Court [in May] to give the parties enough time to incorporate her
12 ruling into their case presentations." Ex. 4. The government also demanded rolling
13 productions of materials provided to the defense expert, a demand with which the
14 defense voluntarily complied. Yet the timing of the government's expert disclosure has
15 effectively prevented meaningful litigation on its expert on a noticed motion schedule,
16 further compressed Girardi's already limited time to prepare, and seeks to shift the
17 burden from the government to comply with deadlines onto Girardi and the Court to
18 accommodate its failures. Perhaps more than any other evidentiary topic, expert issues,
19 can, should, and must be decided thoughtfully pretrial. Doing that is now impossible.
20 While Girardi has only been in possession of the government's expert disclosure for
21 less than 24 hours, he expects that he will file a motion challenging the expert on at
22 least the following grounds

23         i. The government incorporates by reference Dr. Darby's report from
24             competency proceedings, which includes his opinion on
25             malingering. The malingering opinion is irrelevant, inadmissible
26             under F.R.E. 403, and improper rebuttal since Dr. Chui is not
27             offering opinions on that matter.

28

ii. Dr. Darby is also unqualified to offer an opinion on malingering for the reasons stated during competency proceedings and the additional reason that Dr. Darby testified that his qualifications to offer a malingering opinion were unspecified "work[] with forensic psychiatrists," including his brother.

iii. Additionally, the malingering opinion should be excluded under F.R.E. 702 and Daubert because, among other things, it is based on insufficient data. As more fully explained in Girardi's recent opposition to the government's motion to exclude post-scheme evidence (ECF No. 256 at 16-18), Dr. Darby's malingering opinion was largely based on his assessment of the timing of the emergence and progression of Girardi's symptoms, but did not account for the contemporaneous Girardi Keese emails and other evidence documenting Girardi's impairment before 2021 that the government did not produce to the defense until after the competency proceedings.

iv. Even if Dr. Darby does not testify about malingering explicitly, to the extent he would testify about the timing and progression of Girardi's symptoms, his testimony would also suffer from the same failure to consider the contemporaneous records showing Girardi's impairment prior to 2021.

v. Other aspects of Dr. Darby's competency report are irrelevant, inadmissible under F.R.E. 403, and improper rebuttal, including the discussion of Girardi's statements about how he would defend a criminal case and Girardi's communications with his counsel.

vi. In addition, the late notice includes new opinions not previously offered during competency proceedings. For example, the notice

9

       suggests that Dr. Darby will testify about "defendant's ability to distinguish right from wrong." This particular is wildly irrelevant, inadmissible under F.R.E. 403, and improper rebuttal since Dr. Chui is not offering opinions on that matter, nor could she.

    vii. The notice is additionally deficient on this issue because it does not explain the bases and reasons for this opinion or Dr. Darby's qualifications to offer such an opinion.

    viii. And, of course, the notice is inexcusably late, and fails to comply with the demands of Rule 16(a)(1)(G)(iii).

  d. Fourth, despite discussing evidentiary stipulations in mid-June, and despite my proposal of certain evidentiary stipulations on July 1, as of July 12, and despite the government's statements about circulating stipulations "soon," we have not received any stipulations from the government. Among the topics covered by the proposed stipulations are the admissibility of email evidence and accounting ledgers, which are critical items of evidence in this case. Despite our efforts, we therefore do not know less than a month before the current trial date what the agreed-upon body of evidence will be, which substantially changes how we prepare for trial, and who we may have to call as witnesses. Somewhat relatedly, on July 4, 2024, in order to ensure that we had all of the relevant bank-account records in this case at the time of trial, I submitted an application for 20 subpoenas directed to various banks, often for multiple accounts. The subpoenas have yet to issue and, even if they do, getting the responsive documents trial-ready by August 6 is looking increasingly unlikely.

  e. Fifth, as Girardi's defense team has recently begun attempting to contact trial witnesses, it has been told by more than one that the government asked to be present for any conversations with the defense. This request – which is at best on the line of propriety – is of course chilling to witnesses who do not want to get crosswise with federal law enforcement. Indeed, when federal prosecutors and agents suggest

that they would rather not have a witness speak to the defense outside of their presence, the message is clear and easily understood. Rather than "help[ing] the defense [prepare] in whatever way possible," as promised in January, the government has attempted to slow down and interfere with the defense preparation in this sharp-elbowed way as well.[6]

      f. Sixth, there are a number of other substantive and non-substantive issues that, as trial approaches, will almost certainly emerge as time-consuming detractions from trial preparation. To offer just one example, because this is a document case, both sides will have to prepare voluminous exhibits, some number of which may contain third-party financial information or other inflammatory, irrelevant, or invasive material.

---

[6] Girardi is still evaluating what further response, if any, is warranted in light of these statements. At this point, even if the government were to clarify without a knowing wink that it is perfectly fine to speak with the defense without the prosecutors present – because witnesses belong to neither side – it seems hard to imagine that the bell could be unrung. United States v. Cook, 608 F.2d 1175, 1180 (9th Cir. 1979) ("As a general rule, a witness belongs neither to the government nor to the defense. Both sides have the right to interview witnesses before trial."); United States v. Goldfarb, No. CR07-260PHXDGC, 2008 WL 4531694, at *2 (D. Ariz. Oct. 9, 2008), on reconsideration, No. CR-07-260-PHX-DGC, 2009 WL 856326 (D. Ariz. Mar. 27, 2009) (""At least two other courts have also held that a prosecutor engages in misconduct when he advises witnesses they are free to speak with defense counsel, but then requests that he be present if such interviews occur. See United States v. Rodgers, 624 F.2d 1303, 1311 (5th Cir.1980); State v. Hofstetter, 75 Wash.App. 390, 878 P.2d 474, 478-79 (Wash.Ct.App.1994). The Ninth Circuit has not directly addressed this situation, but it has cited Gregory favorably. In United States v. Cook, 608 F.2d 1175 (9th Cir.1979), the Ninth Circuit cited Gregory and confirmed that 'a witness belongs neither to the government nor to the defense. Both sides have the right to interview witnesses before trial.'" Id. at 1180 . . . . The Ninth Circuit also discussed Gregory in United States v. Black, 767 F.2d 1334 (9th Cir.1985), again recognizing that "both sides have the right to interview witnesses before trial." Id. at 1337. The court distinguished Gregory because the prosecutor in Black 'did not insist on being present at the defense interviews; rather, he merely advised the witnesses of their right to decline the defendant's request for an interview.' Id. at 1338."); United States v. Leung, 351 F.Supp.2d 992, 996 (C.D. Cal. 2005) (dismissing Indictment where government sought to prevent witness from speaking with defense).

There has been no real discussion at this point of how those exhibits or other sensitive information will be presented, whether and which redactions may be required, and so on. This will make it even more difficult to have an organized, trial-ready presentation that respects the jury's time on the current schedule. Further, because this case involves a jury questionnaire, some substantial amount of time between the pretrial conference and trial will be devoted to processing, reviewing, and conferring about the responses, further cutting into any remaining preparation time.

        g. Seventh, it has recently come to the attention of Girardi's defense team that several of the government's trial witnesses are producing or participating in a podcast, the release of which was timed to coincide with the current trial date. While that alone would not be a basis to continue the trial – presumably, the same witnesses will be engaged in the same activities at any trial date – we intend to seek audio and other records related to that podcast, as well as discovery and transcripts related to a separate civil lawsuit bearing directly on one of the charged matters in this case involving those same witnesses.[7] In addition, it is my understanding that the government has been meeting with witnesses in recent months and, for at least some of those meetings, we do not have reports or memoranda.

14. In making this application, I am cognizant that the Court has already

---

[7] Unbeknownst to the defense until recently, the government intervened in that state-court case in order to seek a stay of discovery. The defense believes that, at a minimum, key government trial witnesses have engaged in document discovery, and at least some trial witnesses may have been deposed in that matter. Nothing from that case has been produced in discovery, nor has the government mentioned it to the defense at any time. I'd note that, while it is not unusual for the government to seek to stay a parallel civil case involving a <u>defendant</u>, on the theory that without a stay he or she would be able to circumvent the more limited discovery rights in criminal cases, this stay is unusual in that neither of the defendants is involved. The government appears to have reached out into a civil case involving nonparties for the sole purpose of ensuring that witnesses it intends to call in its case do not make sworn statements about the subject matter.

sought a time-qualified jury and that, as with any continuance, moving the dates in this case will require schedules to be rearranged. As an officer of the Court, I can represent that I would not be seeking this continuance unless I genuinely believed it was necessary. Girardi's defense team understands that this case will try and is trying to make that happen as quickly as possible and to the best of its ability. At the same time, given not only the public interest in this case, but the importance of any federal criminal trial at which life and liberty are at stake, I am ethically obligated to seek additional time. Girardi's defense team is simply not trial-ready, and it will struggle to present an organized and cogent defense – a defense that not only Girardi, but the public and legal system deserve – if the trial proceeds as scheduled. In light of the important decisions still to be made, we will also be unable to adequately attempt to advise our client about proceeding to trial. Conversely, we will be in a much better place if the Court and the parties resolve all of the pretrial motions in late July and we are able to spend another eight weeks communicating with our client and preparing for trial from there.

15. If granted, the requested continuance would only be the second one in this case, which is far fewer than the number granted in most document-heavy trials. For Girardi's current defense team, it would result in a total of 9 months from first appearance to trial, which is roughly 25% of the time that the government has had to work on the case since the initial criminal referral.

16. I believe that a breakdown of those nine months further underscores the reasonableness and necessity of this request: between January and March, Girardi's defense team spent substantial time gathering the key evidence in the case, which had not yet been produced; between March and July, the defense team reviewed millions of pages of documents (including emails), learned the entire case to the best of its ability, and completed all pretrial notices and briefing; now, by this application, Girardi's defense team now asks for <u>two months</u> – between August and early October – to focus

on preparing to present this document-heavy case involving an alleged ten-year scheme with shifting claims and evidence to a jury.  That is a breakneck pace for any defense team, but especially for DFPDs who represent, collectively, dozens of clients in cases pending in other courtrooms across the District, many of whom are in custody.  Without this continuance, I do not believe that we can provide competent or adequate representation at trial.  I would also respectfully suggest that, as has become clear in recent hearings and filings, this case is not close to as simple from an evidentiary, discovery, legal, or trial-presentation and -management perspective as the government originally indicated, and as may have appeared, at the initial trial-setting conference.

17. Finally, to address another potential consideration, I want to emphasize that we are not seeking this continuance for the purpose of reopening competency proceedings.  Barring some significant and unforeseen material change in Girardi's condition, we have every expectation and intention of proceeding to trial in this matter, as reflected by our diligence to date.  Before and during trial, we intend to ask the Court to make ongoing inquiries and findings to assure itself that Girardi remains capable of proceeding.  But we do not intend to reinstitute formal proceedings in advance of trial and are not seeking delay for that purpose.

18. I communicated with counsel for Kamon about this application, and he agrees to the requested continuance.  As additional support for his position, he states that he is a sole practitioner who is handling this case on his own and needs additional time for many of the same reasons as those articulated above.  He also adds that his wife is scheduled for surgery this week, which will largely render him unavailable for one of the remaining three weeks before trial.  He further states that, without a continuance, he cannot provide competent or adequate representation at trial.

19. I also communicated with the government about this application and sent an email containing the substantive bases for the requested continuance.  The government opposes and indicated that it intends to file a written response by July 19,

2024. I asked the government why it needs six days to respond when this filing was prepared and filed within a day of its July 12, 2024 filings and expert notice. The government indicated that "if we are able to get it on file sooner we will do so as it is in everyone's interest to have this issue resolved asap," but asked that I nonetheless "include [its] request for Friday."

20. Rather than waiting six days to hear from the government, I would respectfully request that the Court set a status conference at the earliest available date so that these issues can be addressed. Doing so will also alleviate the government of the burden of filing a response that takes six days to prepare. As the government indicated, and as we agree, it is in everyone's interests to have this issue resolved as soon as possible.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief. Executed on July 13, 2024 at Los Angeles, California.

                                */s/ Charles J. Snyder*
                                  Charles J. Snyder