UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>    Plaintiff,<br>            v.<br>THOMAS VINCENT GIRARDI,<br>    Defendant. | Case No. 2:23-CR00047-JLS<br><br>**ORDER DENYING MOTION FOR JUDGMENT OF ACQUITTAL (Doc. 397)**<br><br>**ORDER DENYING MOTION FOR NEW TRIAL (Doc. 401)** |

This matter is before the Court on Defendant's Motion for Judgment of Acquittal and Motion for a New Trial. The Court VACATES the December 6, 2024 hearing in this matter. As set forth herein, the Court DENIES both Motions. Sentencing remains on calendar for December 20, 2024 at 1:30 p.m.

**I.    MOTION FOR JUDGMENT OF ACQUITTAL**

Defendant moves for entry of judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. (*See* Doc. 397 (Mot.), 410 (Opp.) & 413 (Reply).) He was convicted of four counts of wire fraud.

Rule 29 permits a court to "set aside the verdict and enter an acquittal" after the jury has returned a guilty verdict. Fed. R. Crim. P. 29(c)(2). In considering a Rule 29 motion, the relevant question is whether "after viewing the evidence in the light most favorable to

the prosecution, . . . any rational trier of fact [could have found] the essential elements of the crime[s] beyond a reasonable doubt." *United States v. Nevils*, 598 F.3d 1158, 1164 (9th Cir. 2010) (cleaned up).  The court "must bear in mind that it is the exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts." *United States v. Rojas*, 554 F.2d 938, 943 (9th Cir. 1977) (quotation marks omitted).  Where evidence is capable of supporting two or more "'conflicting inferences,' a reviewing court 'must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *United States v. Del Toro-Barboza*, 673 F.3d 1136, 1143 (9th Cir. 2012) (quoting *Jackson v. Virginia*, 443 U.S. 307, 326 (1979)).

>  The elements of wire fraud are as follows:
>
>  First, the defendant knowingly participated in or devised a scheme or plan to defraud for the purpose of obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or omitted facts. Deceitful statements of half-truths may constitute false or fraudulent representations;
>  Second, the statements made or facts omitted as part of the scheme were material; that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or property, and they directly or indirectly deceived the person about the nature of the bargain at issue;
>  Third, the defendant acted with the intent to defraud, that is, the intent to deceive and cheat; and
>  Fourth, the defendant used, or caused to be used, an interstate wire communication to carry out or attempt to carry out an essential part of the scheme.
>  . . .
>  To convict the defendant of wire fraud based on omissions of material facts, you must find that the defendant had a duty to disclose the omitted facts arising out of a relationship of trust.

(Doc. 393 at 28-29, Jury Instr. 21.)[1]

There is sufficient evidence as to each element. As to the first element, both testimony and documentary evidence support an inference that, in the manner described in the Indictment, Defendant devised and/or participated in a plan to defraud clients to whom he provided legal representation by making misrepresentations or material omissions to them regarding the amount of and/or the availability of their settlement funds. (*See* Opp. 3-8.) Joseph Ruigomez testified as to how Defendant misrepresented the amount of his settlement funds. Other clients testified to Defendant's misleading statements regarding the unavailability of their funds or his false representations to them that their settlements were subject to taxation, and that he was working to resolve that. Documents in evidence corroborated such testimony.

As to the second element, evidence that Defendant misrepresented the amount of the client's legal settlement and whether settlement funds were ready to be transferred to the clients support the inference that the statements were material. Evidence at trial further supports a finding that Defendant failed to carry out his legal duty inform his clients of amounts due to them and/or that Defendant affirmatively misrepresented the true amount of their settlement funds or that the full amount of those funds could not be paid to them for one or more untrue reasons. There was evidence that Defendant misrepresented the amount of funds due to them and that he falsely told them: (1) that judicial oversight prevented him from disbursing the funds to them, (2) that funds were temporarily "locked up" for a number of months, (3) that funds were in interest-bearing accounts, (4) that tax-free settlements were subject to taxation, and (5) that settlements were structured to be paid monthly.

There is likewise sufficient evidence as to the third element, the intent to defraud. (*See* Opp., Doc. 67 at 13-16.) There was evidence that Defendant used diverted client

---

[1] The Court's pinpoint citations to the record are to the CM/ECF page numbers.

3

funds to support his celebrity-wife's entertainment career and that he used these funds to pay for luxuries such as private jets, country club memberships, jewelry, and luxury vehicles.  There is also evidence that Defendant's story to one particular client shifted multiple times on the issue of why the client had not been paid settlement funds.  There is evidence that Defendant refused to provide settlement documentation to clients and that he refused to allow an auditor to examine Girardi Keese records.  All this evidence, and the evidence regarding the misrepresentations made to clients, support the inference that Defendant had the requisite intent to defraud, that is, the intent to "deceive and cheat" his clients.

The fourth element requires that wire communications were used to carry out or attempt to carry out an essential part of the scheme.  The defense argues that the wires themselves were not part of the scheme.  They argue that any fraud occurred only **after** a particular wire communication (here, electronic transfers of funds) were made.[2]  The Government counters that the deposits were an integral part of the overall scheme to defraud.  (Opp., Doc. 410 at 16-20.)  It points out that depositing checks in an attorney-client trust account creates the illusion of legitimacy that he was complying fully with his professional obligations.  Similarly, these accounts were used to make "lulling payments" to clients to attempt to quiet them, as least temporarily, and/or to convince them that their funds were not being mishandled.  Thus, as the Government contends, wire transfers into the attorney-client trust accounts of settlement funds renders those uses of the wires "'incident to an essential part of the scheme'" in a manner that satisfies the fourth element. *See Schmuck v. United States*, 489 U.S. 705, 712 (1989).  The Court agrees.

---

[2] The Court rejects this argument as a matter of law, but its underlying factual premise is not entirely accurate either.  (*See* Opp., Doc. 410 at 8-9 & 16-17 (describing how Defendant's misrepresentations to Joseph Ruigomez occurred before his settlement funds were transferred into the attorney-client trust account).)

The Court rejects Defendant's contention that the wires in this case fall into the exception discussed in *Schmuck* that is based on *Parr v. United States*, 363 U.S. 370 (1960). In *Schmuck*, the Supreme Court carved out an exception for use of the mails (or wires) where that use occurred as a result of a "duty imposed by state law" that would have occurred even in the absence of the fraudulent scheme. *Schmuck*, 489 U.S. at 713 n.7 (relying on *Parr*). As Defendant's argument goes, pursuant to the settlement agreements that were negotiated by Defendant and entered into between Defendant's clients and the civil defendants they sued, the civil-defendant transferor was obligated to use the wires to transfer the funds into Defendant's attorney-client trust account and therefore, under the *Parr* exception, the transfers of settlement funds do not satisfy the "use of the wires" element of wire fraud. However, the Ninth Circuit has interpreted *Parr*'s "duty imposed by state law" as excluding duties imposed by "private contracts." *United States v. Bernhardt*, 840 F.2d 1441, 1446 (9th Cir. 1988). *Barnhardt*, therefore, establishes that the relevant wire transfers here, made pursuant to a duty imposed by a private contract (that is, a settlement agreement) are not subject to the *Parr* exception to *Schmuck*.

Thus, under the relevant legal standard, there is evidence sufficient to establish all elements of the offenses of conviction. The Court therefore DENIES the Motion for Judgment of Acquittal.

## II.   MOTION FOR NEW TRIAL

Defendant also moves for a new trial, focusing on his competency to stand trial. (*See* Doc. 401 (Mot.), 402 (*in camera* Def. Ex. A), 403 (*in camera* Def. Ex. B), 409 (Opp.) & 414 (Reply).)

### A.   Legal Standard

Under Federal Rule of Criminal Procedure 33, a conviction may be vacated and new trial may be granted when the "interest of justice so requires." Fed. R. Crim. P. 33(a). For example, a new trial is warranted where the evidence weighs heavily against the verdict. *See United States v. Alston*, 974 F.2d 1206, 1211-12 (9th Cir. 1992). The decision whether

to grant a motion for a new trial lies within the sound discretion of the trial court. *See United States v. Krasny*, 607 F.2d 840, 845 (9th Cir. 1979). Thus, the Court's power to grant a new trial is broader than its power to grant a motion for acquittal because the Court "is not obliged to view the evidence in the light most favorable to the verdict, and it is free to weigh the evidence and evaluate for itself the credibility of the witnesses." *United States v. Kellington*, 217 F.3d 1084, 1097 (9th Cir. 2000). However, the Court's discretion is not unconstrained, and the Court may grant a new trial only if it finds that "the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred." *Id.* (internal quotation marks omitted).

### B. Defendant's Competency to Stand Trial

Defense counsel continue to contend that Defendant was incompetent to stand trial. They argue, correctly, that the mental competency of the accused must persist at all stages of criminal proceedings. *See United States v. Dreyer*, 705 F.3d 951, 961 (9th Cir. 2013) ("'The obligation to determine competency to stand trial is continuing, and persists throughout a proceeding including through the sentencing phase.'"). Nevertheless, as set forth below, the Court rejects the notion that Defendant was incompetent during his trial.

#### 1. Legal Standard

A mentally incompetent defendant may not be tried. *See Cooper v. Oklahoma*, 517 U.S. 348, 354-56 (1996) (discussing due process considerations); 18 U.S.C. § 4241(d) (defining a mentally incompetent defendant as one who is "presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense").

Competence "requires the mental acuity to see, hear and digest the evidence, and the ability to communicate with counsel in helping prepare an effective defense." *Odle v. Woodford*, 238 F.3d 1084, 1089 (9th Cir. 2001). The "test [is] whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational

understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402 (1960) (quotation marks omitted).

The finding that a defendant is competent to stand trial is a question of fact. *United States v. Hoskie*, 950 F.2d 1388, 1392 (9th Cir. 1991). The Government bears the burden of proving this fact by a preponderance of the evidence. *United States v. Hoskie*, 950 F.2d 1388, 1392 (9th Cir. 1991). The court should consider representations of defense counsel regarding his client's competence, *Drope v. Missouri*, 420 U.S. 162, 177 n.13 (1975), but the court is free to weigh all the evidence and accord greater credibility to certain evidence, including expert reports and testimony, *see Hoskie*, 950 F.2d at 1394.

### 2. Pretrial Competency Proceedings

Prior to trial, the Court considered the issue of Defendant's competency. The Court reviewed hundreds of pages of briefs, exhibits, and expert opinions. The Court conducted a three-day evidentiary hearing and issued a 52-page opinion discussing Defendant's competency to stand trial. (Doc. 150 ("Competency Order").) As the Court previously concluded, "Defendant suffers from a mild-to-moderate cognitive impairment" that is "*slowly* progressive," but that "Defendant is exaggerating his symptoms and partially malingering," and "Defendant is able to understand the nature and consequences of the proceedings against him and to assist properly in his defense." (*Id.* at 37 & 42.)

### 3. Analysis

That Defendant suffers from some cognitive issue is not disputed, and the experts who treated and/or examined Defendant agree generally that this assessment had support. And the reports of defense counsel about Defendant's behavior and statements during trial are consistent with a cognitive disorder.

But in their under seal filings, defense counsel report behavior and statements that suggest a much more severe cognitive disorder. These reports highlight the fundamental issue from the pretrial adversarial competency: Was (and is) Defendant exaggerating his

symptoms for secondary gain? That is, is Defendant making statements and/or acting in a manner that he understands will support his claim of mental incompetency to stand trial?

The Court concludes now, as it did in the Competency Order, that Defendant is exaggerating symptoms of a mild cognitive impairment in order to support his counsel's claim that he is incompetent to stand trial. The Court does not reach this conclusion lightly.

Defendant's first claim of cognitive impairment arose in December 2020, as Girardi Keese lost financial liquidity due to the pandemic and as Defendant's co-counsel in the *Lion Air* case sought a contempt order from the Northern District of Illinois. The Court discussed how numerous contemporaneous recordings (including video recordings) and writings (some discussing legal matters) from late 2020 to early 2021 showed Defendant had baseline cognitive functioning at this time, suggesting both that the claim of mental incompetence began as a ruse to avoid consequences for mishandling the *Lion Air* settlement funds,[3] and casting doubt on reports of Defendant's poor cognitive function in early 2021. (*Id.* at 42-44 & 46-49.)

And the Government expert assessments reported atypical patterns of claimed memory loss, behavior, and confabulations that led the experts to conclude unequivocally that Defendant was at least partially malingering. (*See id.* at 46-49.) For instance, Defendant was unable to remember topics where such inability would benefit him, such as his memory of the nature of the charges against him. In contrast, Defendant discussed the charges in an insightful manner when those were presented to him as hypotheticals. The experts noted atypical patterns of memory loss that included retention of memories of then-recent events (the early months of the COVID-19 pandemic) but also included the loss of memory of historical events, which are generally considered "crystallized knowledge" that

---

[3] The handling of the *Lion Air* settlement funds is the subject of separate civil and criminal proceedings in another district. This Court's comments are meant to have no implications beyond the matters pending here.

are not as vulnerable to forgetting. He also showed an atypical pattern of confabulations, and these tended to benefit him as well.

Additionally, Defendant's behavior suggested to one expert that he retained the ability to form new memories, as demonstrated by Defendant's retrieving from the dirty laundry a particular sweater he favored for visits with experts. And in an example that played out before one of the experts in real time, Defendant first claimed to not remember his wife of twenty years, but when he answered a telephone call from her, he clearly remembered not only her but also accurately recalled details of her schedule and travel. In the end, one expert concluded that "[m]alingering is simply the only reasonable explanation" for Defendant's clinical presentation and test results.

In contrast to this evidence stands the under seal evidence offered by defense counsel with the present briefing.[4] (*See generally* Doc. 402, Barrientos Decl. (under seal); Doc. 403 (declaration of Defendant's caretaker/trial assistant).) But given the sophistication of Defendant's malingering when meeting with experts, it is not difficult to believe that Defendant tailored his behavior and statements in a manner designed to cast doubt on his competency. And in light of the slowly progressive nature of Defendant's disorder, the Court finds it highly unlikely that Defendant's cognition genuinely declined from its April 2024 functioning (as described by Dr. Goldstein in her report) to the cognition described by counsel and his assistant in their declarations. The Court finds it far more likely that Defendant was simply feigning a complete memory loss to support his continuing claim of mental incompetency.

Defendant's mental competency to stand trial was also established by his own testimony. (*See* Doc. 373, Aug. 22, 2024 Trial Tr. at 2516-46.) Defendant told the

---

[4] Defense counsel attempted to file this declaration *in camera* during the trial. For the reasons stated in the Court's order (Doc. 353), the Court did not permit the document to be filed *in camera*, i.e., without the government having the opportunity to review and address Defense Counsel's incompetency arguments.

prosecutor that he recalled hearing testimony from two witnesses. (*Id.* at 2530-31.) Defendant demonstrated the ability to track his own testimony. As a possible explanation as to why all funds may not have been paid out to a particular client, he stated several times that there was a danger in providing the young client with a large sum of money all at once, especially in light of that client's purported drug problem. (*See, e.g., id.* at 2533, 2537 & 2539.) Several times, when wanting to emphasize a point, Defendant would address the prosecutor directly and remind the prosecutor that he had made a particular point before. (*See, e.g., id.* at 2543 ("As I told you before, I don't take a salary.").)

  Defendant demonstrated an awareness of the nature of the proceedings as he testified. Near the end of the prosecutor's cross-examination, Defendant had the following exchange with the prosecutor:

  Q  Sir, you spent your career persuading people; right?

  A  I don't know. We will find out.

  Q  What do you mean by that?

  A  I was looking to the jury.

  Q  Right. Because you're hoping to persuade them to believe you; right?

  A  I don't want to persuade them to believe me. I want them to believe me.

(*Id.* at 2542-43.) This exchange shows Defendant was able to frame an answer to the prosecutor's question that was designed to highlight his own sincerity rather than his skill as a trial lawyer.

  Moreover, the Court observed Defendant taking copious notes during trial. Specifically addressing the issue of competence, the Court offered to examine those notes but, despite multiple other *in camera* proffers regarding Defendant's competency, his notes were not submitted for examination. (*See* Aug. 22, 2024 Tr. at 2512-13 (The Court: "[H]e was quite extensive in his note-taking. Those would be the kind of things that I would want to see.")

10

Defendant demonstrated the ability to assist in his own defense.  Overall, Defendant testified in a manner that was wholly consistent with the defense case.  He testified that any fraud was committed by his co-Defendant, and he commented upon the co-Defendant's ability to control and divert Girardi Keese funds due to his work in accounting for those funds.  Defendant testified, more than once, that if he had any incidental involvement in a failure to pay clients, it was the result of mere negligence or oversight, not as the result of an intent to deceive and cheat.  Defendant deflected, more than once, the significance of communications he had with clients regarding their settlement funds, giving seemingly plausible explanations for delay in payment or non-payment of those funds.

For all of these reasons, the Court finds that Defendant remained mentally competent to stand trial throughout the duration of his trial.  Defendant's Motion for a New Trial is therefore DENIED.

**IT IS SO ORDERED.**

DATED:  December 2, 2024

_____
HON. JOSEPHINE L. STATON
United States District Judge