E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
SCOTT PAETTY (Cal. Bar No. 274719)
Assistant United States Attorney
Deputy Chief, Major Frauds Section
     1100 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-6527
     Facsimile: (213) 894-6269
     E-mail:    scott.paetty@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 23-00047-JLS-1 |
|---|---|
| Plaintiff, | GOVERNMENT'S SENTENCING POSITION; DECLARATION OF SCOTT PAETTY; EXHIBITS |
| v. | |
| THOMAS VINCENT GIRARDI, | Hearing Date: December 20, 2024<br>Hearing Time: 1:30 p.m. |
| Defendant. | Location:    Courtroom of the<br>Hon. Josephine L.<br>Staton |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorney Scott Paetty, hereby files its sentencing position in the above referenced case.

This position is based upon the attached memorandum of points and authorities, the testimony and exhibits introduced during the competency proceedings and the 13-day trial, the declaration of

//

Scott Paetty and accompanying exhibits, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: December 6, 2024          Respectfully submitted,

                                 E. MARTIN ESTRADA
                                 United States Attorney

                                 MACK E. JENKINS
                                 Assistant United States Attorney
                                 Chief, Criminal Division


                                 _____/s/_____
                                 SCOTT PAETTY
                                 Assistant United States Attorney

                                 Attorneys for Plaintiff
                                 UNITED STATES OF AMERICA

## **TABLE OF CONTENTS**

DESCRIPTION                                                          PAGE

TABLE OF AUTHORITIES.................................................ii

MEMORANDUM OF POINTS AND AUTHORITIES.................................1

I.    INTRODUCTION..................................................1

II.   DEFENDANT'S OFFENSE CONDUCT AND CRIMINAL CONVICTIONS..........2

      A.    Defendant's Fraud Scheme at Girardi Keese.............2

      B.    The Charged Victims...................................4

            1.    Victim Client 1 (J.R.).........................4

            2.    Victim Client 2 (J.S.).........................5

            3.    Victim Client 3 (J.H.).........................6

            4.    Victim Clients 4 and 5 (E.S and A.M.)..........7

III.  RESPONSE TO THE PSR..........................................7

IV.   SECTION 3553(a) FACTORS......................................8

            1.    Nature and Circumstances of the Offense (18
                  U.S.C. § 3553(a)(1))...........................9

            2.    History and Characteristics of the Defendant (18
                  U.S.C. § 3553(a)(1))..........................12

            3.    Seriousness of the Offense, Respect for the Law,
                  Just Punishment, and Deterrence (18 U.S.C. §
                  3553(a)(2)...................................14

            4.    The Kinds of Sentences Available, the Sentencing
                  Range Established by the Sentencing Guidelines,
                  and the Need to Provide Defendant Necessary
                  Medical Care and Avoid Unwarranted Sentence
                  Disparities (18 U.S.C. §§ 3553(a)(2), (3), (4),
                  and (6))......................................16

V.    Restitution and Forfeiture..................................17

VI.   CONCLUSION..................................................18

i

# **TABLE OF AUTHORITIES**

**<u>Cases</u>**

<u>Gall v. United States</u>,
   552 U.S. 38 (2007) ........................................... 9, 16

<u>Molina-Martinez v. United States</u>,
   136 S. Ct. 1338 (2016) ........................................ 9

<u>United States v. Arena</u>,
   2020 WL 4505806, (S.D.N.Y. Aug. 3, 2020) ..................... 14

<u>United States v. Bresnahan</u>,
   400 F. Supp. 3d 793(D. Minn. 2019) ........................... 15

<u>United States v. Butler</u>,
   264 F.R.D. 37 (E.D.N.Y. 2010) ................................ 14

<u>United States v. Carty</u>,
   520 F.3d 984 (9th Cir.2008) ................................... 9

<u>United States v. King</u>,
   604 F.3d 125(3d Cir. 2010) ................................... 15

<u>United States v. Rita</u>,
   551 U.S. 338 (2007) ........................................... 9

<u>United States v. Rittall</u>,
   688 F. App'x 22 (1st Cir. 2017) .............................. 15

**<u>Statutes</u>**

18 U.S.C. § 3553........................................... passim

**<u>Sentencing Guidelines</u>**

U.S.S.G. § 2B1.1............................................. 7, 8

U.S.S.G. § 3A1.1............................................... 8

U.S.S.G. § 3B1.3............................................... 8

U.S.S.G. § 4C1.1............................................... 8

1          **MEMORANDUM OF POINTS AND AUTHORITIES**

2  **I.   INTRODUCTION**

3          Former attorney Thomas Vincent Girardi ("defendant") devised and

4  perpetrated a cunning fraud scheme against the injured clients he had

5  a sworn duty to protect.  His years-long theft of client funds from

6  his law firm's trust accounts and the myriad lies he told to cover up

7  his theft represent a calculated and devasting betrayal of the very

8  people that turned to him for help in their darkest hour.  As proved

9  at trial, defendant stole millions of dollars in client settlement

10 funds and failed to pay his clients the money that was due them.  In

11 carrying out this scheme, defendant provided a litany of false

12 excuses for failing to pay clients and, with the assistance of co-

13 defendant Christopher Kamon ("Kamon"), used his law firm's accounts

14 like a personal piggy bank.  Defendant also operated the law firm he

15 founded, Girardi Keese, like a Ponzi scheme by using new victim

16 client settlement money to pay previously defrauded clients, while he

17 and Kamon also used the embezzled client funds to pay law firm

18 expenses and to enrich themselves.

19         Although complaints of misappropriated client funds had swirled

20 around defendant for decades, his massive fraud was finally brought

21 to light at the end of 2020 when Girardi Keese descended into

22 bankruptcy and closed and defendant was referred to the Department of

23 Justice for criminal prosecution.  Defendant has now been convicted

24 by a jury of felonies related to the theft of client funds in the

25 four cases the government presented at trial.  Defendant also faces

26 criminal charges in Chicago for similar conduct in that jurisdiction.

27 Although defendant is in his mid-80s and has some cognitive

28 impairment, the gravity of defendant's wrongdoing and the serious

and, in many cases, irreparable damage he has done to his clients and the legal profession in general warrant a significant custodial sentence.

Therefore, for his role in devising, carrying out, and concealing his fraud scheme, and for the following reasons, the government submits that a sentence that includes 168 months imprisonment, a restitution order in the amount of $3,786,985.34, three years of supervised release, and a special assessment of $400 is justified and appropriate.

## II.    DEFENDANT'S OFFENSE CONDUCT AND CRIMINAL CONVICTIONS

The following summary of defendant's offense conduct is based on facts stated in the PSR ¶¶ 8-121.[1]

### A.    Defendant's Fraud Scheme at Girardi Keese

As the Court is well aware from the extensive pre-trial litigation and the 13-day trial in this matter, defendant orchestrated and carried out his fraud scheme from his position as the sole owner and managing partner of Girardi Keese, the plaintiff's law firm he founded decades ago in Los Angeles. Defendant exerted control over the Girardi Keese client trust accounts and determined which clients would be paid, how much they would be paid, when they would be paid, and signed outgoing checks to clients. These client trust accounts were strictly regulated and intended to function as a short-term place to deposit client funds, such as the settlement funds at issue here, which funds would then be promptly sent to the client once attorney fees and costs of the litigation were deducted.

---

[1] Facts taken from sources other than the PSR are noted in separate parenthetical citations.

2

Defendant's fraud scheme, in essence, was not complicated but it was no less devasting because of its simplicity.  Defendant and other Girardi Keese attorneys who worked for defendant would negotiate a settlement on behalf of a client that would require payment of money to the client.  Girardi would then misappropriate those settlement funds in a variety of ways.  Defendant would cause the settlement funds to be deposited into Girardi Keese client trust accounts while making various misrepresentations and/or material omissions to the clients, such as misrepresenting and omitting the true value of the settlement, lying about reasons for delaying payment, and then using the money for other purposes.  For example, as part of the scheme and to conceal the embezzlements and misappropriations defendant sent lulling communications to the clients falsely asserting, among other things, that the settlement proceeds had not been paid or that he could not pay the settlement funds to clients until certain fabricated events took place, such as clearing non-existent tax obligations, "settling" already-settled bankruptcy claims, or obtaining authorizations for payment from judges or other court officials, when no such further authorization was needed.  Another part of the scheme involved sending partial, lulling payments to clients, labelling them "advances" on purportedly yet-to-be-received settlement funds (which had already been deposited into the trust accounts and misappropriated) or fabricated "interest" payments on funds that were held in a non-existent separate high-yield interest bearing account.

To pull off such a scheme, defendant could not do it alone.  He enlisted the assistance of his long time head of accounting, co-

3

defendant Kamon.[2]  Kamon had access to the Girardi Keese bank account balances, including the trust accounts, and, at defendant's request, would regularly give defendant the account balances and then, at defendant's direction, would transfer money from the trust accounts to the firm's operating accounts where defendant and Kamon would thereafter misappropriate and embezzle settlement proceeds for improper purposes.  These improper purposes included, among other things, paying: (1) other Girardi Keese clients whose own settlement funds had previously been misappropriated, (2) law firm expenses (like payroll), (3) American Express card bills encompassing charges for defendant's (and Kamon's) personal expenses, (4) for two private jets, and notably (5) $25 million to fund defendant's former wife's entertainment career.

**B.   The Charged Victims**

At trial, the government presented testimony and evidence related to four victims who suffered severe consequences due to defendant's fraud scheme.  The jury convicted defendant of four felonies related to these four cases.[3]  These victims and their cases are discussed in detail in the PSR.  (See PSR ¶¶ 33-120.)  A summary of certain key facts is below.

1.   Victim Client 1 (J.R.)

As stated in PSR ¶¶ 32-54, Client 1 sustained life threatening injuries in a gas explosion that caused severe burns all over his body, killed his girlfriend, and destroyed his family's home. Defendant negotiated a settlement of the family's claims without

---

[2] Kamon pleaded guilty in this case and in related case number 23-24-JLS and is scheduled to be sentenced on January 31, 2025.

[3] The final count in the indictment (count five) was dismissed as to defendant Girardi before trial.  (Dkt. 314.)

4

obtaining prior approval from Client 1 or his family members, in violation of the retainer agreement they signed with Girardi Keese. Moreover, defendant lied to them about the true value of their $53 million settlement, instead telling them that the case settled for only $7.25 million.  Defendant then told Client 1 and his family a series of lies designed to conceal his misappropriation of their settlement money.

For example, defendant lied about tax liability on the settlement, lied about the settlement funds having been placed in a separate 6.5% interest bearing account, lied about the settlement judge's continuing involvement in the case, withheld the settlement agreement from Client 1 and his family despite repeated requests for additional information about their settlement, sent them incremental and irregular, partial lulling payments, and lied about the safety of their settlement funds despite having immediately misappropriated them.

### 2.  Victim Client 2 (J.S.)

As stated in PSR ¶¶ 56-83, Client 2 retained Girardi Keese to represent her in connection with a wrongful death claim based on a boating accident that caused her husband's death.  Defendant negotiated a $504,400 settlement for Client 2 and then proceeded to misappropriate the funds and give Client 2 numerous false excuses for not paying the money owed her.

For example, prior to the settlement money being deposited into the Girardi Keese trust account, while knowing that the funds were sourced from settlement funds belonging to other clients, defendant took out attorney's fees and costs related to the case in violation of the rules governing trust accounts.  Defendant used a portion of

5

those funds to pay Girardi Keese payroll and to transfer to his
personal bank account to make payments to two exclusive golf country
clubs.  In the days following the deposit of Client 2's settlement
funds, defendant also took out more in attorney's fees (approximately
$510,000) from the trust account than the entire amount of the
settlement.  (See Trial Exhibit 245.)  Despite the efforts of a
junior Girardi Keese attorney to get defendant to pay Client 2 the
money he owed her, defendant repeatedly lied to Client 2 and the
lawyer she hired to pursue defendant (whom Client 2 called the
"attorney for the attorney") by claiming that he was waiting on a
signature from a judge (he was not), that he was providing an
"advance" when no advance was necessary because Girardi Keese already
had the settlement funds in its trust account, and that the
settlement was held up for tax reasons (it was not).

### 3.    Victim Client 3 (J.H.)

As stated in PSR ¶¶ 84-98, victim Client 3 retained Girardi
Keese to represent her in a product liability case related to a
defective medical device.  Defendant misappropriated Client 3's
$128,250 settlement and used the money to pay for, among other
things, leases on luxury cars.

As another junior Girardi Keese attorney tried to assist Client
3 in receiving her settlement funds from defendant, defendant told
lie after lie to Client 3 to lull her and conceal his
misappropriation.  For example, defendant falsely told Client 3 that
he was waiting on an apportionment to the bankruptcy trustee.  That
was a lie because, as defendant well knew, the amount due to the
trustee had already been determined.  Defendant also falsely stated
in voicemail messages to Client 3 that additional court orders were

needed (they were not) and that "we [Girardi Keese]" would "like our

money just like you'd like yours", despite the fact that Girardi

Keese had received the full amount of Client 3's settlement months

earlier.  Client 3 never received any of her settlement money from

Girardi Keese.

### 4.    Victim Clients 4 and 5 (E.S and A.M.)

As stated in PSR ¶¶ 100-120, victim Clients 4 and 5 retained

Girardi Keese in connection with a lawsuit related to injuries they

and their minor son sustained in a car accident.  The minor son

subsequently died from his injuries.  Defendant misappropriated these

settlement funds and used them, among other things, to pay money

still owed to Client 1 and to pay Girardi Keese operating expenses.

Defendant's lulling lies told to Clients 4 and 5 mirror those told to

other victim clients.  Namely, that delays in payments were due to

court proceedings related to the minor child (when payments to

Clients 4 and 5 were not dependent on any such payment), or removal

of purported tax liability (when the settlements were not taxable),

or clearing of medical liens (when all medical expenses had been

paid).  Client 4 repeatedly sent emails and had follow up telephone

conversations with defendant that discussed the severe hardship the

delays in payment were causing her family and memorialized the litany

of lies that defendant told them regarding payment of their

settlement funds.

## III. RESPONSE TO THE PSR

In the PSR, the United States Probation & Pretrial Services

Office ("Probation") calculated defendant's total offense level at 33

based on the following factors:  base offense level of 7 under

U.S.S.G. § 2B1.1(a)(1), plus an 20-level increase for a gain of more

than $9,500,000 but less than $25,000,000 pursuant to § 2B1.1(b)(1)(K), a two-level enhancement for substantial financial hardship under § 2B1.1(b)(2)(A), a two-level enhancement for vulnerable victim under § 3A1.1(b)(1), and a two-level enhancement for abuse of a position of trust under § 3B1.3.  Probation determined that defendant should not receive any additional reduction as a "Zero-Point Offender" under § 4C1.1 because defendant caused substantial financial hardship to at least one victim.  (PSR ¶¶ 135-141.)  Probation also determined that restitution in the amount of $2,525,000 is appropriate.  (PSR ¶¶ 122-23, 211, 213.)

Based on a total offense level of 33 and a criminal history category of I, Probation calculated defendant's guidelines range as 135 to 168 months.  (PSR ¶ 198.)  In its disclosed recommendation letter, Probation recommended a custodial sentence of 135 months to be followed by three years of supervised release, and a restitution order in the amount of $2,525,000.  (Dkt. 407.)

The government concurs with Probation in its Guidelines analysis, however, as discussed below, the government believes that a restitution order of $3,786,985.34 is appropriate and recommends a high-end guidelines sentence of 168 months custody.[4]

**IV.  SECTION 3553(a) FACTORS**

The Court should impose a sentence sufficient, but not greater than necessary, to reflect the purposes of sentencing identified in 18 U.S.C. § 3553(a).  United States v. Carty, 520 F.3d 984, 991 (9th

---

[4] Probation also recommended a $35,000 fine in this case.  (See Dkt. 407 at 2.)  Because the government has no insight into defendant's current financial circumstances, the government takes no position on the applicability of a fine in this case.  The government will seek forfeiture, as alleged in the indictment, by separate filing.

Cir. 2008).  The advisory Guidelines range provides the "starting point and . . . initial benchmark" for this Court's consideration of an appropriate sentence.  <u>Molina-Martinez v. United States</u>, 136 S. Ct. 1338, 1345 (2016) (quoting <u>Gall v. United States</u>, 552 U.S. 38, 49 (2007).  Although the Guidelines are not binding, they "reflect a rough approximation of sentences that might achieve section 3553(a)'s objectives."  <u>United States v. Rita</u>, 551 U.S. 338, 350 (2007).

Under 18 U.S.C. § 3553(a), in arriving at the appropriate sentence, the Court should consider, among other factors, the nature and circumstances of the offense and the history and characteristics of the defendant, § 3553(a)(1); the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, § 3553(a)(2)(A); the need for the sentence imposed to afford adequate deterrence to criminal conduct, § 3553(a)(2)(B); the need for the sentence imposed to protect the public from further crimes of the defendant, § 3553(a)(2)(C); the kinds of sentences available, § 3553(a)(3); and the need to avoid unwarranted sentence disparities, § 3553(a)(6).

In light of the relevant § 3553(a) factors, a 168-month custodial sentence is sufficient, but not greater than necessary, to achieve the goals of sentencing here.

     1.   <u>Nature and Circumstances of the Offense (18 U.S.C. § 3553(a)(1))</u>

Defendant's criminal conduct in this matter is egregious. Defendant stole more than money from his victims.  Already suffering from life-altering injuries, defendant compounded his victims' stress and anxiety by forcing them to focus on attempting to claw their money from defendant when they should have been focusing on their

1  recovery.  Defendant betrayed the trust of his clients, caused them

2  extreme emotional, physical, and financial distress, and in so doing,

3  undermined the integrity upon which our legal system relies.  His

4  crimes thus eroded his victim's and the public's trust in the legal

5  process.

6      Defendant's theft of client funds was all the more reprehensible

7  in light of the fact that his victim clients had turned to defendant

8  in their darkest hours, expecting to find an advocate and protector;

9  instead, they were at the mercy of a thief who cared only about

10  himself.  While defendant was spending extravagantly from the Girardi

11  Keese accounts on private jets, luxury cars, jewelry and country

12  clubs, his wife's entertainment career, and direct transfers to

13  himself, he was spinning cold-hearted lies to his vulnerable clients

14  who desperately needed their settlement funds for basic necessities

15  like housing and transportation.

16      In addition to providing trial testimony, the four victims

17  mentioned above also submitted impact statements for the Court's

18  consideration.  These statements and additional statements from other

19  Girardi Keese clients alleging harms caused by defendant that have

20  been received by the government are attached as Exhibit 1 to the

21  Paetty Declaration.[5]  These statements are a stark reminder of the

22  immense pain and suffering these victims incurred as a result of

23  defendant's fraud.  For example,

---

25      [5] All impact statements that the government has received prior
26  to sentencing have been included in Exhibit 1.  The government has
not been able to confirm that all of these individuals are victims.
27  (See Ex. 1 at 60-61, bates 786605-06 (Declaration of Nicholas Troszak
describing the impracticality of providing a fully complete and
accurate accounting of all Girardi Keese client matters.)  However,
28  these statements provide information that the Court may be inclined
to consider as part of the 3553(a) analysis.

- Trial witness and victim J.R. recounted that in addition to the physical scars from the traumatic explosion that killed his girlfriend and left him in a coma, "the emotional scars" from defendant's fraud "run deep". (Ex. 1 at 1, bates 786587). He further stated, "The theft of our settlement has resulted in overwhelming stress, enormous legal costs, and the fear of a never-ending cycle of lawsuits, just to receive what rightfully belonged to us all along." (Id.)

- Trial witness and victim J.S. stated that in addition to the financial struggles resulting from defendant's lies about her settlement, she contracted "a case of the shingles, an irregular heart beat and the need of a medical service dog to assist with the anxiety." (Ex. 1 at 6, bates 786572.)

- Trial witness and victim J.H. voiced similar consequences. "Beyond the financial toll, the emotional ramifications have been equally damaging." She suffered "anxiety and depression as result of [defendant's] betrayal" and "find[s] it difficult to trust others in similar positions." (Ex. 1 at 70-71, bates 786615-616.)

- Victim V.A. who suffered "horrific" injuries in a head on collision described still being owed over a million dollars by defendant and has "refrained from seeking further medical treatment because . . . [she] ha[s] first-hand knowledge on how quickly medical bills pile up." (Ex. 1 at 10-14, bates USAO_GK_00786576-00786580.)

This is a mere sample of the immense hardship that defendant's

11

conduct caused his victims.  In sum, the scope and breadth of
defendant's criminal conduct was devastating and had tragic
consequences for the victim-clients he betrayed.  The severity and
lingering effects of that impact warrant a significant custodial
sentence.

        2.   <u>History and Characteristics of the Defendant (18
U.S.C. § 3553(a)(1))</u>

Defendant's history and characteristics present further
aggravating factors that justify a significant custodial sentence.
Defendant was a revered and legendary member of the plaintiff's bar.
He was well-educated and possessed credentials that exceeded those of
most lawyers.  He enjoyed the rare air at the top of his profession.
But instead of using his privileged position and significant talent
as a trial attorney to help his clients, he used it to steal from
them.

Defendant's fraud also sacrificed his own employees' reputations
and future job prospects.  Indeed, his crimes had severe consequences
for the people who worked for him.  Junior attorneys at his firm,
like trial witness A.G. whose attempts to get defendant to pay Client
2 the money he owed her, were rebuffed by defendant.  A.G. was
ultimately sued by Client 2 and forced to defend herself in civil
actions and State Bar proceedings that caused anxiety, emotional and
financial stress, and put her livelihood in jeopardy.  As the Court
and jury saw, defendant wrote misleading emails to throw clients and
his own staff off the scent that something was wrong, telling
attorneys like A.G. that he would "handle it", when defendant did no
such thing.  (<u>See</u> Dkt. 365 at 29:10-16.)

Defendant did not meet with Probation prior to the PSR being issued. However, the Court has the portrait of defendant that was presented during the competency proceedings and at trial. Both of these proceedings illuminated the vast damage that defendant's fraud wreaked on his victim clients, and while trial and competency evidence showed defendant's cognitive decline, it also proved his ability to manipulate his environment to suit his own ends. Defendant showed that he was able to feign and exaggerate symptoms of cognitive impairment when he deemed it beneficial to do so. Although defendant is in his mid-80s and suffers from cognitive impairment, defendant also showed that he was competent to stand trial in this case and knew what he was doing when he carried out the fraud scheme at Girardi Keese with Christopher Kamon.

Moreover, not only did the government prove beyond a reasonable doubt that defendant defrauded his victim clients in the four charged cases here, but the jury (and the Court) heard evidence of defendant's similar lies and misappropriation of client funds over the years and in the criminal case in the Northern District of Illinois that was premised on defendant's theft of client funds related to the Lion Air plane crash.[6] Exhibits from the competency proceedings showed that at the same time defendant's counsel was arguing in mid-December 2020 that defendant did not understand the potential criminal and civil exposure he faced in Chicago, defendant

---

[6] Defendant is charged with wire fraud and contempt in the Northern District of Illinois in United States v. Girardi et al., case number 23-CR-54 (the "Chicago case"). The Chicago case alleges that defendant engaged in a similar pattern of conduct (misappropriation of client settlement funds and lies to conceal the theft) resulting in approximately $3 million in loss to victim clients of the Lion Air crash. That case is still pending.

1    was leaving voicemail messages in which he recited facts particular

2    to the Chicago proceedings and even proposed settlement as a way to

3    end the civil case against him.  (See Competency Exs. 7-8, voicemails

4    to counsel in Chicago.)  Furthermore, evidence at trial in this

5    matter, including emails from a senior attorney at Girardi Keese to

6    Kamon, showed that defendant was lying to his clients even as the

7    Lion Air settlement money was being wired into the Girardi Keese

8    accounts.  (See Trial Ex. 813 (email chain between David Lira, who is

9    also a defendant in the Chicago case, and Kamon stating that things

10   were "Worse then [sic] bad.  Tom is lying to clients.").

11       Ultimately, the motivating factor behind defendant's crimes was

12   not his declining mental faculties but rather simple greed coupled

13   with the desire to maintain his lifestyle and his reputation as a

14   successful attorney.  This kind of betrayal and greed calls for a

15   significant term of imprisonment within the sentencing Guidelines

16   range.  See United States v. Arena, 2020 WL 4505806, (S.D.N.Y. Aug.

17   3, 2020) (denying compassionate release and reviewing application of

18   § 3553(a) factors to 42-month sentence for tax preparer who "abused

19   the trust that had been placed in him by his clients); United States

20   v. Butler, 264 F.R.D. 37, 39-40 (E.D.N.Y. 2010) (five-year term of

21   imprisonment for defendant who "disregarded his responsibility to the

22   financial well-being of his clients for the sake of his own short-

23   term financial gain").

24            3.   Seriousness of the Offense, Respect for the Law, Just
                  Punishment, and Deterrence (18 U.S.C. § 3553(a)(2)

25
26       The seriousness of defendant's criminal conduct, the need for

27   general deterrence, to promote respect for the law, and to provide

28   just punishment further justify a high-end sentence of 168 months.

It is notable that defendant's fraud was not an impulsive one-off; it continued across years and numerous cases, despite the efforts of those around him (including junior attorneys at Girardi Keese) to get him to do the right thing and pay his clients. Defendant's response to these efforts was to double down on his lies and blame others, most notably co-defendant Kamon, for his crimes. To be sure, Kamon stole millions of dollars from Girardi Keese, unbeknownst to defendant. However, Kamon's side fraud scheme is not a mitigating factor for defendant's conduct. Kamon did not lie to clients. Defendant did. Kamon's fraud scheme does not exculpate defendant. Far from it. Kamon's fraud merely sped up the timeline of Girardi Keese's demise because the firm was built upon a foundation of lies. Defendant's lies. These considerations underscore the seriousness of defendant's offense. As many sentencing and appellate courts have emphasized, denial of responsibility, blaming others, and continuing one's conduct after confrontation are all aggravating factors under section 3553(a). United States v. Rittall, 688 F. App'x 22, 26 (1st Cir. 2017); United States v. King, 604 F.3d 125, 141 (3d Cir. 2010); United States v. Bresnahan, 400 F. Supp. 3d 793, 797–805 (D. Minn. 2019).

Defendant engaged in a long running, cynical scheme to enrich himself by preying on the vulnerable. Given defendant age and mental decline, there is no need for specific deterrence and a negligible risk of recidivism. However, the need to deter others from committing similar crimes is great. As the Court is aware from the significant press coverage surrounding this case (indeed, the Court ordered a questionnaire to be provided to prospective jurors to address issues related to pretrial publicity, see Dkt. 313), there is

15

substantial public interest in this matter.  Defendant's sentence will receive similar attention from the press and the public. Therefore, a meaningful sentence will reinforce the notion that defendant's theft of client funds, and by extension the theft of client funds by any attorney, is a serious matter that erodes the public's confidence in the legal system and represents a threat to civil society.

In sum, a sentence within the Guidelines range——specifically, a sentence of 168 months——is necessary to reflect the seriousness of the offense, promote respect for the law, afford adequate deterrence, and provide just punishment for defendant's crimes.

> 4.  <u>The Kinds of Sentences Available, the Sentencing Range Established by the Sentencing Guidelines, and the Need to Provide Defendant Necessary Medical Care and Avoid Unwarranted Sentence Disparities (18 U.S.C. §§ 3553(a)(2), (3), (4), and (6))</u>

Because the government's recommended sentence is within the Guidelines range, it will not cause unwarranted sentencing disparities with other defendants in similar circumstances.  <u>See Gall v. United States</u>, 552 U.S. 38, 54 (2007) ("[A]voidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges.").  Moreover, a high-end, 168-month sentence is consistent with recent sentences in other similar cases in this district involving attorneys who stole client funds.  In <u>United States v. Layfield</u>, 18-CR-124-MWF, the defendant received a 144-month custodial sentence for stealing over $7.5 million from clients and litigation lenders.  (<u>See</u> Dkt. 439 at 8,[7] 368.)  In <u>United States v. Avenatti</u>, 19-CR-61-JVS, the defendant

_____

[7] Pagination refers to the CM/ECF header, not the page numbers in the brief.

1  received a 168-month sentence for stealing approximately $12.4

2  million in client settlement funds.  (See Dkt. 1023 at 2, 1053.)

3        Furthermore, defendant's mental condition is not an impediment

4  to incarceration.  The Bureau of Prisons ("BOP") has policies and

5  procedures in place to accommodate defendant's mental condition and

6  provide necessary care and support.  To that end, the BOP has issued

7  guidance and information regarding the resources available for care

8  and treatment of individuals with cognitive impairment, even for

9  those defendants who have been diagnosed with major neurocognitive

10 disorders (such as dementia or LATE).  See "Treatment and Care of

11 Inmates with Mental Illness," Federal Bureau of Prisons, Program

12 Statement 5310.16 (May 1, 2014) (available at

13 https://www.bop.gov/policy/progstat/5310_16.pdf); "Secure Mental

14 Health Units," Federal Bureau of Prisons, Program Statement 5335.01

15 (January 23, 2023) (available at

16 https://www.bop.gov/policy/progstat/5335.01.pdf).

17 **V.   Restitution and Forfeiture**

18       Under the Mandatory Victims Restitution Act, restitution is

19 mandatory in this case.  (PSR ¶ 211, 213.)  As stated above,

20 Probation calculated restitution as $2,525,000.  (See also PSR

21 ¶ 211.)  Based on the submission of victim client V.A., the

22 government believes the proper amount of restitution in the case

23 should be $3,786,985.34.  (See Ex. 1 at 10-14, bates USAO_GK_00786576

24 - USAO_GK_00786580; see also Exhibit 2 (the consent to settle and

25 accounting memorandum for V.A.).)  As referenced above, the United

26 States will seek forfeiture, as alleged in the indictment, by

27 separate filing.

28

## VI.   CONCLUSION

For the foregoing reasons, the government respectfully requests that this Court sentence defendant to 168 months imprisonment, a restitution order in the amount of $3,786,985.34, three years of supervised release, and a special assessment of $400.