CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
CHARLES J. SNYDER (Bar No. 287246)
Email: Charles_Snyder@fd.org
J. ALEJANDRO BARRIENTOS (Bar No. 346676)
Email: Alejandro_Barrientos@fd.org
Deputy Federal Public Defenders
321 East 2nd Street
Los Angeles, California  90012
Tel: 213-894-2854
Fax: 213-894-0081

Attorneys for Defendant
Thomas Vincent Girardi

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.  CR-23-47-JLS-1 |
| Plaintiff, | **THOMAS GIRARDI'S SENTENCING POSITION** |
| v. | |
| THOMAS VINCENT GIRARDI, | |
| Defendant. | |

Tom Girardi, through counsel, hereby submits his sentencing position.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED:  December 6, 2024      By */s/ Samuel Cross*
_____

CHARLES J. SNYDER
SAMUEL CROSS
Attorneys for Thomas Girardi

*There is a worthy tradition that death in prison is not to be ordered lightly, and the probability that a convict will not live out his sentence should certainly give pause to a sentencing court.*

United States v. Lee, 725 F.3d 1159, 1169 (9th Cir. 2013)

# I. __INTRODUCTION__

Tom Girardi once ranked among the most successful and prominent lawyers in the country. That Tom Girardi no longer exists. Today, Tom Girardi is a broke, half-blind, incontinent, 85-year-old man with dementia. He has lost everything, from his possessions, to his reputation, to his mind. He spends his days in a lockdown memory-care facility where he occupies a shared room and requires round-the-clock assistance for basic tasks. He has to be tricked into taking a shower on the pretense of going to court, and spends his time writing pages of notes about imaginary legal cases and clients that do not exist. He does not recall the trial or the verdict in this matter. He often does not recall close family or his few remaining friends. Multiple doctors have diagnosed him with serious cognitive impairments, and his court-ordered conservator was recently granted major-neurocognitive-disorder powers. If Mr. Girardi receives a custodial term of any length, it will not only result in a hastened, costly, and lonely death in a BOP medical ward, but will result in a distinctly-punitive death-in-prison sentence that he will not meaningfully understand.

Because criminal sentencing is where law meets morality, it "is often said the most difficult task a federal trial judge must perform is deciding upon and then imposing a sentence in a criminal case." United States v. Rothwell, 847 F.Supp.2d 1048, 1050 (E.D. Tenn. 2012). While that is no doubt true here as well, the "difficult task" is in some ways unusually straightforward. Section 3553(a)'s bedrock command is that any punishment imposed must be sufficient, but not greater than necessary, to achieve the purposes of federal sentencing. The inquiry in this case thus reduces to the following formulation: do the multifaceted commands of federal sentencing make it __necessary__ to transport Mr. Girardi across the country to die in a BOP medical facility, without adequate care and at significant taxpayer expense, as part of a punishment that

1

he will not durably understand, or would it be <u>sufficient</u> to leave Mr. Girardi in his current lockdown medical facility, paid for by untainted family funds, where he will never again experience freedom but can receive minimally-humane treatment at the end of his life?

Focusing on this question gets at the heart of what this sentencing proceeding is really about. With one exception, every traditional punishment consideration counsels against a custodial sentence. A custodial sentence is not necessary to achieve specific deterrence or incapacitation because Mr. Girardi is an octogenarian first-time offender convicted of nonviolent crimes who poses no ongoing or future threat to society. A custodial sentence is also not necessary to achieve general deterrence because the litigation spawned by GK's collapse has left Girardi a penniless pariah, and the associated media, State Bar response, and criminal prosecutions have already made him <u>the</u> cautionary tale for lawyers nationwide. A custodial sentence is not necessary to achieve a punitive sanction because Mr. Girardi's personal, professional, financial, and reputational ruin have punished him as thoroughly as any prison term ever could. And a custodial sentence would not only contravene lofty principles of mercy and compassion, but terrestrial ones of pragmatism, rehabilitation, and common sense. Indeed, because BOP is not equipped to deal with an inmate like Mr. Girardi, any custodial sentence would immediately make him one of the nation's most-compelling candidates for medical release.

The one exception in this purposes-of-punishment analysis – and the strongest argument for requiring Mr. Girardi to die in jail – is the principle of just deserts. But while retribution is a valid sentencing consideration, its persuasive value is limited in this case. It is undisputed that Mr. Girardi is 85 years old and suffers from mental impairments that hinder his ability to create and retain new memories. Because a person's inability to durably understand his punishment drains "its retributive purpose," <u>cf.</u> <u>Madison v. Alabama</u>, 586 U.S. 265, 277-79 (2019), incarceration loses its legitimate value in settings like this, <u>United States v. Lochmiller</u>, 473 F.Supp.3d 1245, 1249 (D.

2

Colo. 2020) (granting compassionate release to 72-year-old Ponzi schemer originally sentenced to 405 months based on dementia).  That is not to say that, under different circumstances, a punitive prison sentence might not be warranted.  Nor is it to suggest that the clients in this case are not rightly angry.  But the Court is not sentencing the memory of Tom Girardi or a guidelines abstraction.  It is sentencing an 85-year-old dementia patient, consistent with § 3553(a), as he "stands before the court on the day of sentencing."  United States v. Bryson, 229 F.3d 425, 426 (2d Cir. 2000) (quoted with approval in Pepper v. United States, 562 U.S. 476, 491 (2011)).

Rarely does the parsimony principle play a more urgent role than it does in this case.  Given the "worthy tradition that death in prison is not to be ordered lightly," Lee, 725 F.3d at 1169, and given the many sentencing considerations and guideline provisions counseling against a death-in-custody sentence, a sentence of lifetime confinement to a medical facility would be sufficient, but not greater than necessary, to achieve all the purposes of federal sentencing.  More than that, it would befit a system of justice capable of pragmatism, nuance, and basic humanity, which ultimately promotes respect for the law more than unmitigated harshness or an overreliance on guidelines arithmetic.

## II. ARGUMENT

As this Court knows well:

> Imposing a sentence on a fellow human being is a formidable responsibility. It requires a court to consider, with great care and sensitivity, a large complex of facts and factors. The notion that this complicated analysis, and moral responsibility, can be reduced to the mechanical adding-up of a small set of numbers artificially assigned to a few arbitrarily-selected variables wars with common sense. Whereas apples and oranges may have but a few salient qualities, human beings in their interactions with society are too complicated to be treated like commodities, and the attempt to do so can only lead to bizarre results.

United States v. Gupta, 904 F.Supp.2d 349, 350 (S.D.N.Y. 2012), aff'd, 747 F.3d 111 (2d Cir. 2014).  Indeed, while the advisory guidelines introduce a machine-like element, sentencing is a fundamentally human exercise in judgment and common sense.  The end goal of that exercise is not to tabulate numbers, but to measure a man,

3

in all his complexity, and arrive at a result "sufficient, but not greater than necessary" to achieve all the goals of federal sentencing.  18 U.S.C. § 3553(a).

Here, the Court can achieve that objective by imposing a sentence of lifetime confinement to a medical facility, which would punish Mr. Girardi for his transgression and provide substantial oversight, while also acknowledging that a BOP sentence is neither necessary nor practical given Mr. Girardi's age and mental condition.

**A. Lifetime confinement to a medical facility would be sufficient in light of Mr. Girardi's age and health.**

**1. BOP is not equipped to deal with an 85-year-old dementia patient like Mr. Girardi.**

Mr. Girardi presently lives twenty-four hours a day, seven days a week, in a locked memory-care facility.[1]  He is 85 years old, with significant vision problems.  PSR 2, ¶ 183.  He suffers from moderate dementia resultant from a progressive, irreversible neurocognitive disorder, which has shrunken portions of his brain almost to nonexistence, and whose symptoms include a "severe impairment of episodic memory."  Chui Report 7, ECF No. 60.  Even though his law firm has been shuttered for years, Mr. Girardi thinks it is still open and that he still works there, and purports to do "law work and cases" from the confines of the memory care ward.  Def.'s Mot. Competency 14, ECF No. 106; see Trial Tr. Day 11, ECF No. 373, 2546:15–16 ("Q:  Is your law firm still open, Tom?  A:  Yes."); Ltr. of R. Girardi ("His day-to-day activities include sitting alone at a table writing hundreds of pages of unintelligible notes and being taken for 3 meals a day by the facility staff").  Because he does not understand where he lives or, broadly, who he is, he requires constant reminders from medical and supervisory staff at the memory care facility to complete the tasks of daily living.  Def.'s Mot. Competency 15.

To understate the case, Mr. Girardi will do poorly in prison during this diminished, terminal phase of his life.  As explained in the attached declaration of

---

[1] Mr. Girardi has lived on the third floor of a locked memory ward in Orange County since June 2022.  Def.'s Mot. Competency 14, ECF No. 106.

Nicole English, BOP is simply not equipped to treat people like Mr. Girardi well, or even humanely.  See generally English Decl., Ex. 1.[2]  The Court must attend to Mr. Girardi's medical condition and "the need for the sentence imposed [] to provide the defendant with needed . . . medical care . . . in the most effective manner."  18 U.S.C. § 3553(a)(2)(D); United States v. Edwards, 595 F.3d 1004, 1011 (9th Cir. 2010) (affirming probationary sentence for repeat-offending 63 year-old defendant despite 27-33 month Guideline range because, while "Bureau of Prisons was capable of providing for [his]" diabetes-related medical care, a "sentence of probation would satisfy the requirement of providing needed care in the most effective manner").[3]  Whatever the Court may determine or recommend about Mr. Girardi's health and treatment needs at sentencing, however, BOP will make all the actual decisions about how Mr. Girardi will be treated, where he will go, and what will happen to him next.  United States v. Grant, 664 F.3d 276, 281 (9th Cir. 2011) ("A sentencing court can only recommend, and not require, that a prisoner be placed in a particular facility or program."); see also Tapia v. United States, 564 U.S. 319, 331 (2011) ("The sentencing court may have had plans for Tapia's rehabilitation, but it lacked the power to implement them.").

BOP would likely place a nonviolent first-time offender like Mr. Girardi, were he healthy, in a "camp" facility, with dormitory-style living.  English Decl. ¶¶ 16, 35.  Because Mr. Girardi is old and demented, however, he would likely instead be

_____

[2] Ms. English is familiar with the Bureau and its incapacities, having worked there for over 31 years in several roles including Assistant Director over the Health Services Division.  English Decl. ¶ 2.

[3] See also, e.g., United States v. White, 506 F.3d 635, 644 (8th Cir. 2007) (rejecting government argument in child-pornography case that sentencing court wrongly varied downward based on the defendant's age, 51, and medical condition); United States v. Heldeman, 402 F.3d 220, 224 (1st Cir. 2005) (remanding for resentencing where trial court failed to account for defendant's age, 72, and "unstable" medical condition); United States v. Marsh, 820 F.Supp.2d 320, 387-88 (S.D.N.Y. 2011) (exercising discretion under § 3553  in  fraud case and imposing 12 month sentence  on  52-year-old  defendant with heart disease and related conditions notwithstanding 108-135 month Guideline range because, among other things, the "defendant's many health problems . . . make it harder for him to serve a prison term").

5

designated to Federal Medical Center, or FMC.  Id. ¶ 37.  Because there are few such facilities, Mr. Girardi would inevitably be placed far from his family and home in California.[4]  Even an FMC, however, would be poorly equipped to handle a prisoner like Mr. Girardi, who cannot remember where he is, to say nothing of the daily requirements of prison life.  See id. ¶ 28 ("Prisons are places where awareness of time and place is essential to daily functions.  Appointments are posted without individual reminders, and disciplinary sanctions can be issued if an appointment is missed.").  He would be unable to participate in programming, or to earn credits to reduce his sentence under the First Step Act.  See id.; see generally First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194.  Mr. Girardi would struggle even to take basic medications or seek required care, and could have necessary medications discontinued simply because he had forgotten to request them.  English Decl. ¶ 42.  Medical care would be limited to what was available on-site, where service availability is severely constrained by BOP staffing shortages.  Id. ¶¶ 22–26.  Mr. Girardi's memory problems, along with the intermittent, unreliable abilities of BOP to transport prisoners off-site for needed medical treatment, would likely make it difficult or impossible for him to access any medical treatment that was available off-site.  Id. ¶¶ 25, 43.  Simply put, Mr. Girardi's health and BOP's limitations, even at an FMC, will shorten a life that is already almost over, and make it bewilderingly worse for a man who does not even understand where he is or why.  See id. ¶ 44 ("It is very possible that even a short sentence could be a life sentence for Mr. Girardi."); see also Human Rights Watch, Old Behind Bars (2012), https://www.hrw.org/report/2012/01/28/old-behind-bars/aging-prison-population-united-states (describing immense and inhumane challenges faced by older inmates).

Although BOP has one small unit at the FMC in Devens, Massachusetts, to house people with memory impairments, there is no guarantee Mr. Girardi will be placed there timely, or at all.[5]  BOP would need to conduct its own, independent

---

[4] There are no FMCs in the entire Western region of BOP.  English Decl. ¶ 39.
[5] The facility remains unaccredited.  English Decl. ¶¶ 29–30.

6

assessment of Mr. Girardi's mental and physical health, and determine whether he qualifies for placement at a medical facility and if so which one.  Id. ¶ 37.  Because BOP would deem his current health condition non-emergent, and because BOP contracts with outside medical staff to conduct such evaluations, often subject to long periods of delay, this evaluation period could take months or years.  Id. ¶¶ 37, 22–26.  During this time, Mr. Girardi would simply be housed wherever BOP had space, subject the designation procedure discussed above.  Moreover, there are more people with memory care needs in BOP than the Devens unit can accommodate.  Id. ¶ 30.

The mere existence of the Devens unit demonstrates BOP's recognition that people like Mr. Girardi cannot fairly or humanely be incarcerated elsewhere in BOP.  See Scientific American, Dementia in Prison is Turning into an Epidemic: The U.S. Penal System is Badly Underprepared (Sept. 27, 2022), https://www.scientificamerican. com/article/dementia-in-prison-is-turning-into-an-epidemic-the-u-s-penal-system-is-badly-unprepared/ ("[B]uilding dementia wards in prisons shines a spotlight on a larger issue: prisons are not properly equipped to house these patients because this was never their purpose in the first place").[6]  The Court cannot have any confidence Mr. Girardi will be placed there, or receive appropriate care at the end of his life within BOP.  The Court cannot sentence Mr. Girardi to BOP humanely.  These simple facts warrant a non-custodial sentence.  See 18 U.S.C. § 3553(a)(2)(D).

### 2. The guidelines support a noncustodial sentence based on Mr. Girardi's age and health.

Multiple sections in Chapter Five, which specifies allowable grounds for departures, also counsel in favor of a non-custodial sentence.  For example, § 5H1.1

---

[6] The Court, having sentenced individuals during the COVID-19 pandemic, is familiar with the reality that a facility's inability to care for individuals under then-existing material circumstances can warrant dramatic deviations from ordinary, run-of-the-mill sentencing practice.  Courts across the country recognized as much during those years.  See, e.g., United States v. Barkman, 446 F. Supp. 3d 705, 709 (D. Nev. 2020) (suspending probation condition requiring intermittent confinement because, inter alia, it was unclear how the jail in question could protect "particularly vulnerable populations, such as the elderly, or immunocompromised[.]").

provides:

> Age may be a reason to depart downward in a case in which the defendant is elderly and infirm and where a form of punishment such as home confinement might be equally efficient as and less costly than incarceration.

USSG § 5H1.1.  Mr. Girardi is 85.  Any multi-year sentence will result in an imprisonment that approaches the tenth decade of his life.  He is infirm.  He is already confined to the third floor of a locked memory ward.  Incarcerating him within BOP will be massively inefficient and expensive.  See ACLU, At America's Expense: The Mass Incarceration of the Elderly 27 (2012) ("[T]axpayers pay more than twice as much per year to incarcerate an aging prisoner than they pay to incarcerate a younger one"), https://www.aclu.org/publications/americas-expense-mass-incarceration-elderly.  As described above, there is likely nowhere he can be humanely housed within BOP, and the prison bureaucracy will expend significant resources evaluating him, moving him, attempting to house him, trying to care for him, and, in all probability, shipping his corpse back to California before the end of his imposed term of months.  If left in Orange County, he can end his days under the care of his conservatorship, without freedom but with relative decency.

The guidelines also specifically address mental health considerations:

> Mental and emotional conditions may be relevant in determining whether a departure is warranted, if such conditions, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines.

USSG § 5H1.3  Mr. Girardi's mental health conditions – his inability to remember where he is, what he does, or what he is convicted of having done – are present to an "unusual degree" relative to other offenders, and distinguish his case from "the typical cases covered by the guidelines."  See generally ECF No. 402.  Indeed, according to recent statistics, Mr. Girardi will be among the oldest and sickest defendants – if not the combined oldest and sickest – to be sentenced in the entire federal system this year.  See U.S. Sent'g Comm'n, Older Offenders in the Federal System at 3 & Fig. 2 (2022) (showing that, in the most recent year for which granular data is available, defendants

8

over 70 made up 0.7% of all offenders in the federal system).

Finally, § 5H1.4 provides:

> Physical condition or appearance, including physique, may be relevant in determining whether a departure is warranted, if the condition or appearance, individually or in combination with other offender characteristics, is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines. An extraordinary physical impairment may be a reason to depart downward; e.g., in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment.

USSG § 5H1.4.  As discussed above with respect to Section 5H1.1, Girardi is old and seriously infirm.  Although the primary concern regards his mental state rather than his physical condition, Girardi is old and getting older.  His physical condition cannot be expected to improve, and instead will likely decline because he will be unable to care for himself, or take the steps necessary to make sure that others provide him with the appropriate care.  See English Decl. ¶ 42.

To the extent that the guidelines contemplate an offender like Mr. Girardi at all, it is not in the one-size-fits-all arithmetic of Chapter Two, but in Chapters Five and One (discussed below), which recommend noncustodial sentences for the unusually elderly and infirm.  U.S.S.G. 5H1.1, 5H1.4, 1B1.13.[7]

### 3. If Mr. Girardi were already incarcerated, he would be a good candidate for compassionate release.

Ironically, were Mr. Girardi sentenced today to a long custodial sentence, he would tomorrow have a good claim for compassionate release from custody due to his age and his physical and mental health.  The guidelines and statute provide that elderly and infirm prisoners should be released early, or placed in less burdensome conditions

---

[7] For this reason, a custodial sentence is also not necessary to avoid unwarranted disparities.  As the Ninth Circuit has explained, "[w]hile it is important to avoid unwarranted sentence disparities among [similarly-situated] defendants," it is equally important "to avoid 'unwarranted similarities among [those] who were not similarly situated.'" United States v. Amezcua-Vasquez, 567 F.3d 1050, 1058 (9th Cir. 2009) (quoting Gall v. United States, 552 U.S. 38, 55 (2007)).  The government will not be able to identify an unwarranted disparity because no similarly-situated comparator exists.

of confinement, either by BOP or, at last resort, by the district courts.  Such conditions,

termed "extraordinary and compelling reasons" for release, exist when:

> (A)     The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end-of-life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>
> (B)     The defendant is—
> > (i)      suffering from a serious physical or medical condition,
> > (ii)     suffering from a serious functional or cognitive impairment, or
> > (iii)    experiencing deteriorating physical or mental health because of the aging process,
>
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.
>
> (C)     The defendant is suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death.

USSG § 1B1.13(b)(1); accord 18 U.S.C. § 3582(c)(1)(A).

Mr. Girardi checks all of these boxes, or will check them soon.  As of May

2023, he suffered from moderate dementia, and progressive cognitive and functional

decline.  See Chui Ltr., Ex. 2-4.  Dr. Chui, who examined him carefully, testified at

trial, and writes in his support at sentencing, opines that he is "no longer capable of

committing the sort of offenses for which he was judged guilty," and recommends, "for

his care and safety," and "based on his medical needs," that the Court consider keeping

him where he is, "in the Memory Care wing of a locked assisted living facility."  Id.

Nicole English, who worked for decades at the highest levels of BOP's health care

administration, explains that Mr. Girardi's condition "substantially diminishes," USSG

§ 1B1.13(b)(1)(B), his ability to care for himself or allow others to care for him.

English Decl. ¶ 42.  And, as discussed above, Mr. Girardi requires long-term,

specialized medical care that he will very likely not receive in BOP custody.

There is little purpose in the Court waiting to see exactly how BOP is unable to

care for Mr. Girardi.  There is little purpose in requiring Mr. Girardi – or, of course, and

burdensomely, friends and family on his behalf – to urgently petition the Court, once he

is in custody and his condition declines further, to alleviate these inhumane conditions

10

of confinement by releasing him back to his memory care facility to serve out his few
remaining days.  The Court can and should simply decline to incarcerate Mr. Girardi
now, and avoid placing him in conditions from which he would be entitled to
immediate, compassionate release.

**B. A custodial sentence is not necessary to prevent recidivism, protect the community, or achieve specific deterrence because Mr. Girardi's is an elderly, nonviolent, first-time offender who lives in a lockdown memory ward.**

A non-BOP sentence of lifetime confinement to a medical facility is also
appropriate because neither the need to protect the public nor the need to prevent
recidivism support a custodial term.  See 18 U.S.C. § 3553(a)(2)(B)-(C) (requiring
courts to consider the need for a sentence to prevent a defendant from engaging in
future criminal conduct or endangering society).

Indeed, the empirical facts show that Mr. Girardi poses no threat of recidivism or
endangering society through future criminal conduct.  As an 85-year-old college
graduate with no criminal history points, Mr. Girardi is among the offenders least likely
to recidivate in the entire criminal justice system.  See U.S. Sent'g Comm'n, Measuring
Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines at
7, 12-13 (2004); U.S.S.G., Supp. App. C, Amdt. 821 (explaining in the context of new
zero-point offender departure that "[r]ecidivism data analyzed by the Commission
shows, however, that offenders with zero criminal history points have considerably
lower recidivism rates than other offenders, including offenders with one criminal
history point") (citing U.S. Sent'g Comm'n, Recidivism of Federal Offenders Released
in 2010 (2021)); United States v. Ruiz, No. 04-CR-1146-03-RWS, 2006 WL 1311982,
at *4 (S.D.N.Y. May 10, 2006) (collecting cases "declin[ing] to impose Guidelines
sentences on defendants . . . over the age of forty at the time of sentencing on the
grounds that such defendants exhibit markedly lower rates of recidivism in comparison
to younger defendants"); U.S.S.G. § 5H1.1 ("The age-crime curve, one of the most
consistent findings in criminology, demonstrates that criminal behavior tends to
decrease with age").  And this is even truer given the nature of his conviction.

11

Measuring Recidivism, supra, at Ex. 11 (first-time fraud offenders least likely to recidivate).

But the Court does not need empirical data to know that Mr. Girardi poses no ongoing threat to society. Now 85 and afflicted with dementia, he lives in a lockdown memory ward, has no connection to criminal activity other than through a role that he will never again hold, and has done nothing to suggest any future danger in the four years since the law firm collapsed. Presumably for these reasons, the Court has already recognized that "[t]here is clear and convincing evidence that [Mr. Girardi] is not a danger to the public." 2024-8-27 Tr., Docket No. 375 at 13-17.

In considering the types of sentences available, Congress has stated that "prison resources are, first and foremost, [meant to be] reserved for those violent and serious criminal offenders who pose the most dangerous threat to society." Pub. L. No. 98-473, § 239, 98 Stat. 1987, 2039 (1984) (note to 18 U.S.C. § 3551). Here, not only is a custodial sentence not <u>necessary</u> to protect the public or achieve specific deterrence, "a form of punishment other than imprisonment [would] be sufficient to meet the purposes of sentencing," U.S.S.G. § 5H1.1, and confinement to a medical facility would be both "as efficient, and less costly," id. § 5H1.4.

**C. A custodial sentence is not necessary to promote general deterrence because any conceivable deterrent effect has already been accomplished by Mr. Girardi's public ruin.**

The government will likely argue that a custodial sentence is necessary to send a deterrent message to potential future offenders. But, other than as a rhetorical device, the government will not be able to coherently explain why, given the facts of <u>this</u> case, requiring Mr. Girardi to die in prison is necessary to achieve general deterrence.

Initially, empirical research has consistently found that, for economic crimes, it is the fact of detection and conviction, rather than the length of the sentence, that functions as the deterrent. <u>See</u> <u>United States v. Yeaman</u>, 248 F.3d 223, 238 (3d Cir. 2001) (Nygaard, J., dissenting in part) ("It is widely recognized that the <u>duration</u> of incarceration provides little or no general deterrence for white collar crimes. For

individuals committing these types of crimes, the probability of being apprehended and
incarcerated is a powerful deterrent in of itself[.]") (citing A. Mitchell Polinsky &
Steven Shavell, On the Disutility and Discounting of Imprisonment and the Theory of
Deterrence, 28 J. Legal Stud. 1 (Jan.1999)).  For example, in a 2002 book entitled
Corporate Crime, Law, and Social Control, Sally Simpson, Chair of the University of
Maryland's Department of Criminology and Criminal Justice, reviewed decades of
research and concluded that, for deterrence purposes, the severity of the sanction was
far less important than the certainty of punishment.  Accord David Weisburd, et al.,
Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes, 33
Criminology 587 (1995) (finding no difference in the deterrent effect of prison and
probation for white-collar offenders); Zvi D. Gabbay, Exploring the Limits of the
Restorative Justice Paradigm: Restorative Justice and White Collar Crime, 8 Cardozo J.
Conflict Resol. 421, 448-49 (2007) (finding "no decisive evidence" supporting
"conclusion that harsh sentences actually have a general and specific deterrent effect on
potential white-collar offenders"); Symposium, U.S. Sent'g Comm'n, Federal
Sentencing Policy for Economic Crimes and New Technology Offenses, Plenary
Session I, "What Social Science can Contribute to Sentencing Policy for Economic
Crimes" at 23 (Oct. 12, 2000) ("[T]he general deterrent effect of sanctions stems not so
much from the length of the sentence but from fear of the social stigma and ostracism
that attends to their imposition").

Consistent with this finding, numerous authorities have recognized that there is
"considerable evidence that even relatively short sentences can have a strong deterrent
effect on prospective 'white collar' offenders." United States v. Adelson, 441
F.Supp.2d 506, 514 (S.D.N.Y. 2006), aff'd, 301 F. App'x 93 (2d Cir. 2008) (citing R.
Frase, Punishment Purposes, 58 Stanford L. Rev. 67, 80 (2005), and E. Szockyj,
Imprisoning White Collar Criminals?, 23 S. Ill. U. L.J. 485, 492 (1998)).  And the
sentencing commission itself has "concluded that the definite prospect of prison, even
though the term may be short, will serve as a significant deterrent" to serious economic

crimes.  U.S.S.G. Ch. 1, Pt. A § 4(d) (2018).  Even were the general-deterrence
conversation limited exclusively to confining Mr. Girardi in a medical facility, the
government can thus offer no persuasive explanation why lifetime confinement for a
first-time offender would not send an appropriate deterrent message.

But the deterrent effect of this prosecution does not derive solely – or perhaps
even mostly – from a criminal sentence.  This case began in earnest in December 2020
when a federal judge in Chicago held Mr. Girardi in civil contempt.  Since then, Mr.
Girardi has experienced a personal, financial, professional, and reputational ruin so
complete and catastrophic as to be almost without parallel.  In the process, he became
the literal cautionary tale – the subject of multiple State Bar reports and reforms – of
what can happen to lawyers who are accused of taking client funds.

Not only has Mr. Girardi's ruin been comprehensive, it has played out in the
most public way imaginable.  Between civil and criminal litigation, the State Bar
response, and various media, nearly every negative thing that Mr. Girardi has ever done
has been paraded before the public, and many things that he did not do were attributed
to him as well.  As a retrospective pall was cast over every aspect of his life and career,
he became a convenient receptacle for every real and rumored malady.  Despite once
being the Dean of the California plaintiffs' bar, he has lost not only his reputation, but
many of his friends, his possessions, his profession, his business, and his mind.

At 85, he awaits sentencing after being federally prosecuted, pilloried in the
press, and losing everything important in the world.  The notion that any prospective
offender would look at this and say to himself or herself 'well, Girardi was bankrupted,
destroyed, deserted, and dragged through the public square as an octogenarian, but
because he avoided prison based on medically-documented dementia and the fact that
he was not prosecuted until he was in his 80s, I'll go ahead and commit a crime that I
wouldn't otherwise had he gotten custody,' has no connection to how rational people
think in the real world.  See Lochmiller, 473 F.Supp.3d at 1248-49 ("It is hard to
imagine someone who is aware of this order creating a Ponzi scheme based on the

assumption he or she will get out of prison early based on medically documented dementia").  If a prospective offender aware of Mr. Girardi's cases is not deterred at this point, a brief custodial term is not going to tip the balance.  Prison is thus not necessary – the operative word – to achieve general deterrence.  See Adelson, 441 F.Supp.2d at 514-15 ("[T]he Government at no time here presented any evidence or cited to any studies indicating that a sentence of more than three-and-a-half years [against guidelines of life in prison] was necessary to achieve the retributive and general deterrence objectives applicable to a case like this one.  And 'necessary' is the operative word, for section 3553(a) expressly dictates that '[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection' (emphasis supplied).").

**D. Lifetime confinement to a medical facility would promote respect for the law and honor the parsimony principle given the unique combination of facts in this case.**

Section 3553 requires courts to consider whether the sentencing imposed will "promote respect for the law" and "just punishment for the offense."  18 U.S.C. § 3553(a)(2)(A).  While the government often treats this factor as unidirectional, serving only to enhance a sentence, promoting respect for the law is rightly understood as a two-way street.  United States v. Stern, 590 F.Supp.2d 945, 956 (N.D. Ohio 2008) ("Respect for the law is promoted by punishments that are fair . . . not those that simply punish for punishment's sake") (emph. in orig.).  A criminal-justice system seen as blindly layering punishment upon punishment without regard for mitigation or basic humanity does more to deride the law than to promote respect.  Gall, 552 U.S. at 54 ("[A] sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing").  Likewise, given that the government and State Bar repeatedly declined to pursue Mr. Girardi when he was cogent and influential, belatedly throwing the book at him as a demented octogenarian may be just as likely to promote cynicism as anything else.

The bottom line is that Mr. Girardi is a man "in the closing stages of his life reduced to getting through the day only with significant assistance of others." Letter of J. Girardi at 3. And due to progressive dementia, he will not durably understand any punishment imposed. In this setting, courts have concluded that "just punishment" does not require death-in-prison, even in serious cases, because the defendant "does not [durably] know that he is being punished or why." <u>Lochmiller</u>, 473 F.Supp.3d at 1249; Anderson, J., & Baird, A., <u>Sentencing and placement of offenders with dementia: a significant contemporary challenge for the criminal justice system</u>, Psychiatry, Psychology and Law (Sept. 9, 2024), https://doi.org/10.1080/132 18719.2024.2377583 ("In summary, applying the retributive sentencing purposes of adequate punishment or desert, accountability and denunciation in a criminal law framework grounded in individual rational thought and action raises manifest difficulties in the context of the irreversible cognitive decline associated with offenders with dementia."); Am. Bar Ass'n, <u>Persons Living with Dementia in the Criminal Legal System</u> 27 (2022), https://www.americanbar.org/ content/dam/aba/administrative/law_aging/2022-dementia-crim-just-rpt.pdf ("The punitive and rehabilitative goals of criminal justice are unattainable in the case of people with dementia").

That is not to say that the clients in this case haven't been harmed or that, under different circumstances, a prison sentence wouldn't be warranted. But "[d]eath is by universal consensus a uniquely traumatic experience, and prison often deprives defendants of the ability to be with their families or to otherwise control the circumstances of death." <u>United States v. Wurzinger</u>, 467 F.3d 649, 652 (7th Cir. 2006). Also, "[t]here can be no worse punishment than the irretrievable loss of one's cognition." Letter of J. Merikangas. Even people who have done wrong are entitled to a measure of human dignity at the end of their lives.

In all cases, but especially where death is on the table, the parsimony principle, which has roots in moral and religious philosophy, instructs courts to exercise temperance, and if necessary, to err on the side of leniency. A sentence that balances

justice with mercy, punishment with rehabilitation, and legal doctrine with compassion and common sense would do more to promote respect for the law at this point than one driven by retribution.  Given the unique circumstances of this case, lifetime confinement to a medical facility would be sufficient, but not greater than necessary, to achieve <u>all</u> the goals of federal sentencing.

### III. <u>OBJECTIONS</u>

*Page 3 and paragraphs 214-215.*  For the reasons discussed above, Mr. Girardi objects to the PSR's guidelines calculation and ¶¶ 214 and 215 to the extent that they do not account for his age and health, the combination of which support a noncustodial sentence of lifetime confinement to a private medical facility.

*Page 3 and paragraph 134 (loss amount).*  The PSR applies a 20-point loss enhancement based on an "intended loss estimate" of "approximately $16.4 million," which "does not give [Mr. Girardi] credit" for payments "made to the charged victims" before his conviction.  PSR ¶ 134.  Mr. Girardi objects to the loss enhancement because it relies on an <u>ex post</u> version of the manual and/or Application Notes relating to the definition of loss and credits against loss that improperly exceed § 2B1.1's plain text.

During the offense period in this case (2010-2020), the fraud guideline spoke only of "loss," assigning graduated offense-level enhancements based on amounts of victim loss over $6,500.  <u>See</u> U.S.S.G. § 2B1.1(b) (2018).[8]  Though Application Note 3(A) purported to define "loss" as "the greater of actual loss or intended loss," the guideline itself was plainly limited to actual loss, so the note's enlargement of the term

---

[8] Between at least January 1, 2010 and November 1, 2024, § 2B1.1(b) referred only to "loss," which Application Note 3A further defined as "the greater of actual loss or intended loss."  In November 2024, in response to "case law concerning the validity and enforceability of guideline commentary," U.S.S.G., Amdt. 827, the Commission amended the text of § 2B1.1 so, for the first time, it defined loss to include, among other things, "intended loss."  Since this amendment would result in a harsher punishment than the operative guideline at the time of the offense, the Court must use the more-lenient version of the guideline in effect when Mr. Girardi allegedly committed the offense, which in this case is the 2018 version of § 2B1.1  U.S.S.G. § 1B1.11 (a), (b); <u>Peugh v. United States</u>, 569 U.S. 530, 544 (2013).

is an invalid expansion of the guideline. Application Note 3(E) similarly exceeded the guideline by including in the calculation of "loss" amounts returned to the victim prior to conviction.

The Ninth Circuit has explained that "Application Notes are not formally part of the Guidelines, but serve to 'interpret[ ]' and 'explain[ ]' the Guidelines for district courts." United States v. Kirilyuk, 29 F.4th 1128, 1136 (9th Cir. 2022) (quotation omitted). As a result, they cannot expand the Guidelines' scope. Id. at 1136-37; see also United States v. Rising Sun, 522 F.3d 989, 996 (9th Cir. 2008).

Four recent cases support the conclusion that, under the version of § 2B1.1 in effect at the time of the offense (in the 2018 Manual), "intended loss" should not be included in calculating guideline loss, and Mr. Girardi should receive credit for amounts returned to the alleged victims prior to conviction.

In Kirilyuk, the Ninth Circuit struck down an analogous portion of the fraud guidelines commentary, which automatically assigned each counterfeit or unauthorized access device a loss valued at $500, rather than a fact-specific amount. Id. Application Notes 3(A) and 3(E) similarly, and impermissibly, expand on § 2B1.1's use of the word "loss." Since the operative guideline itself does not define the term loss, under Kirilyuk, the Court must interpret the guideline according to its plain meaning. Id. at 1137.

The "ordinary meaning of 'loss' in the context of [the 2018 version] of § 2B1.1 is 'actual loss.'" United States v. Banks, 55 F.4th 246, 257 (3d Cir. 2022). In Banks, the Third Circuit squarely held that Application Note 3(A)'s "intended loss" definition contradicts the plain meaning of "loss" in Guideline § 2B1.1, and is therefore invalid. See id. The court initially noted that the Guideline's text "does not mention 'actual' versus 'intended' loss," and that "that distinction appears only in the commentary." Id. That fact alone, the Third Circuit held, "indicates that the Guideline does not include intended loss." Id. It further held that the "ordinary" meaning of "loss" is "actual loss," including as shown by dictionary definitions, "[n]one of which suggest[s] an

ordinary understanding that 'loss' means 'intended loss.'" Id. at 258.  Having

concluded that "the commentary expands the definition of 'loss' by explaining that

generally 'loss is the greater of actual loss or intended loss,'" the Third Circuit

"accord[ed] the commentary no weight" and directed that the defendant be resentenced

without the intended-loss enhancement.  Id.

The Supreme Court's decision in Kisor v. Wilke, too, confirmed that

commentary like that found in Application Notes 3(A) and 3(E) should be afforded no

deference.  139 S.Ct. 2400 (2019).  In Kisor, the Court sharply limited "Auer

deference" – the deference courts give to agencies' interpretations of their own rules –

including the Sentencing Commission's commentary interpreting the guidelines.  Id.

Before a court can defer to Guidelines commentary, it must first determine, among

other things, that the guideline is genuinely ambiguous, in light of its "text, structure,

history, and purpose."  Banks, 55 F.4th at 256 (quoting Kisor, 139 S.Ct. at 2415).

§ 2B1.1's term "loss" is not genuinely ambiguous because "loss" plainly means

actual loss.  Id. at 258.  But even assuming "loss" is ambiguous, Application Notes 3(A)

and 3(E) are still not entitled to deference because they are not reasonable

interpretations of that term. "Loss" means "actual loss" and "[i]t is only when we turn

to the commentary that [an] ambiguity . . . is injected."  Id. at 258 & n.56. "Inserting

the word 'intended' before the word 'loss' changes the meaning of 'loss' in a way that

departs from its plain meaning."  United States v. McKinney, 2022 WL 17547467 at *8

(E.D. Mich., Dec. 9, 2022).  Similarly, treating money returned to alleged victims

before a conviction – that is, money sitting in their bank accounts – as money "lost"

only makes sense through the distorted lens of Application Note 3(E).

Finally, a recent Ninth Circuit decision that considered Kisor and Kirilyuk

together concluded that Guidelines commentary adding inchoate offenses to a list of

controlled substance offenses under Guideline § 4B1.2(b) improperly added to and

contradicted the Guideline's unambiguous text.  United States v. Castillo, 69 F.4th 648,

658 (9th Cir. 2023).  Similarly, here, the absence of the word "intended" from § 2B1.1

shows "the Guideline does not include intended loss" and the commentary "impermissibly expands the word 'loss'" so as to be entitled to no weight.  <u>Banks</u>, 55 F.4th at 250, 257-58.  Likewise, there is no reasonable (or unreasonable) definition of actual loss that includes money in a victim's hand.

This Court should (and must) follow these recent cases, rather than commentary that impermissibly exceeds the fraud guideline, and calculate loss based only on actual money lost and not returned to the charged clients before Mr. Girardi's conviction.  In this case, that would drop the loss amount to less than $1.5 million (possibly far less), and the related enhancement from 20 to no more than 14 levels.[9]  Mr. Girardi's resulting offense level would be 27 and his corrected advisory guidelines range would be 70-87 months.

***Paragraphs 7-120.***  Mr. Girardi objects to the PSR's description of the offense because he contested his guilt at trial and intends to appeal his conviction.

***Paragraph 211.***  Mr. Girardi objects to the restitution amounts because he believes that most or all of the stated amounts in ¶ 211 have already been repaid.  For example, after receiving $11 million from Mr. Girardi in 2019 and 2020, Mr. Girardi believes that J.R. received over $10 million from "GK" bankruptcy estate,[10] for a combined total millions of dollars in excess of his actual settlement and interest.  Mr. Girardi believes that J.S. and J.H. have likewise received repayment of their outstanding settlement balances.  Mr. Girardi does not know the status of E.S. and A.M.'s outstanding settlement balance, if any.  Amounts previously returned to a victim

---

[9] The PSR contends that the actual losses in this case include $1.25 million to J.R. (PSR ¶ 39), $184,000 to J.S. (PSR ¶ 67), $91,000 to J.H. (PSR ¶ 90), and $1 million to E.S. and A.M. (PSR ¶ 109).  To Mr. Girardi's knowledge, J.R. has already been paid well in excess of the claimed $1.25 million through the bankruptcy estate.  Mr. Girardi believes that J.S. and J.H. have also recovered their settlement balances.  Mr. Girardi does not have any information about whether E.S. and A.M. have received the outstanding $1 million.

[10] As discussed at length in prior filings, GK was a sole proprietorship 100% owned by Mr. Girardi.

must generally be offset from restitution, 18 U.S.C. § 3663(b)(1)(B)(ii),
3663A(b)(1)(B)(ii), and it is the government's burden to establish that a legal victim is
presently entitled to a specific restitution amount, <u>United States v. Waknine</u>, 543 F.3d
546, 556 (9th Cir. 2008).  Before ordering restitution, the Court should require proof
that the victims identified in the PSR haven't already recovered the amounts claimed as
restitution.  If the Court does order restitution, it must be ordered jointly and severally
with Christopher Kamon.

*__The Constitutionality of the United States Sentencing Guidelines or, at a
minimum, § 2B1.1.__*  Mr. Girardi objects to using the guidelines in this case because
they are the unconstitutional product of an unconstitutional delegation to an
unconstitutional body, the United States Sentencing Commission.

While the individual rights sections of the Constitution often garner the most
public attention, its true genius lies in the structural provisions, which divide power
vertically between the states and federal government; horizontally among the federal
executive, legislative, and judicial branches; and vertically again between House and
Senate.  As to the horizontal separation of powers among the federal branches, Article
I, § 1, provides that "[a]ll legislative Powers herein granted shall be vested in a
Congress of the United States, which shall consist of a Senate and House of
Representatives."  Article II, § 1, cl. 1, provides that "[t]he executive Power shall be
vested in a President of the United States of America."  And Article III, § 1, provides
that "[t]he judicial Power of the United States, shall be vested in one supreme Court,
and in such inferior Courts as the Congress may from time to time ordain and
establish."

"The Framers recognized that, in the long term, [these] structural protections
against abuse of power were critical to preserving liberty."  <u>Bowsher v. Synar</u>, 478 U.S.
714, 730 (1986).  A pronounced separation among the branches has thus long been
understood to be an essential component of effective government and individual
freedom.  For that reason, each branch was afforded powers and incentives to guard

"against a gradual concentration of the several powers in the same department[.]" Federalist No. 51 at 321-22 (Madison).

The Sentencing Commission, by contrast, represents not a separation, but a platypus-like combination of the competing branches. Created by Congress in 1984, the Commission (1) purports to be an "independent agency," (2) housed in the judicial branch, (3) comprised of (a) sitting Article III judges and other (b) executive- and (c) judicial-branch officials, (4) appointed by the President, (5) but subject to for-cause removal protections, for the purpose of (6) creating substantive sentencing policy (7) subject to partial notice-and-comment rulemaking, which (8) has the force of law at sentencing in every federal case in the nation. See U.S. Sent'g Comm'n, About, https://www.ussc.gov/about-page; 28 U.S.C. § 991(a).

In Mistretta v. United States, 488 U.S. 361 (1989), the Supreme Court rejected a separation-of-powers and nondelegation challenge to the Commission over a stinging dissent by Justice Scalia, relying on cases like Morrison v. Olson, 487 U.S. 654 (1988), in the process. Mr. Girardi does not believe that Morrison remains good law, or that the Commission's structure and design – either an "independent agency" within the Judicial Branch, id. at 423-26 (Scalia, J., dissenting), or "a new Branch altogether, a sort of junior-varsity Congress," id. at 427 (Scalia, J., dissenting) – are consistent with current delegation or separation-of-powers jurisprudence. To the contrary, the amalgamation represented by the sentencing Commission provides neither checks, nor balances, nor accountability, nor safeguards to individual liberty.

//
//
//
//
//
//
//

22

1    The Court should therefore find that this structure violates the Constitutional

2  separation of powers and nondelegation principles and, as a result, decline to apply the

3  guidelines.

4                                         Respectfully submitted,

5                                         CUAUHTEMOC ORTEGA
                                          Federal Public Defender
6

7  DATED:  December 6, 2024        By */s/ Samuel Cross*

8                                         CHARLES J. SNYDER
                                          SAMUEL CROSS
9                                         Attorneys for Thomas Girardi