# EXHIBIT 1

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> THOMAS GIRARDI, ) <br> ) <br> Defendant. ) <br> _____ ) | Case Number: 2:23-cr-00047-JLS <br><br> The Honorable Josephine L. Staton <br> United States District Judge |

**DECLARATION OF NICOLE ENGLISH**

I, Nicole English, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

**PROFESSIONAL BACKGROUND**

1. I currently work as a corrections consultant, specializing in federal corrections. I provide consulting services on all aspects of the federal prison system for private attorneys, Federal Defenders' Offices, individuals, and family members of those facing a possible federal prison sentence, or for those who have already been sentenced/incarcerated.

2. I worked for the Federal Bureau of Prisons (BOP) for over 31 years in various capacities, with my final position as Regional Director in the Northeast Region managing 20 institutions and respective wardens. Over the course of my career, I have held the title of Assistant Director over the Health Services Division responsible for medical, dental, and mental health (psychiatric) services provided to adults in custody including healthcare delivery, infectious disease management, and medical designations. The Division also coordinates the agency's Occupational Safety and Health program which ensures a safe, healthy environment for employees and adults in custody. The Division manages the comprehensive Food Services Program in all facilities. I was Warden at FCI Waseca, FCI Marianna and USP Leavenworth as well as Associate Warden at USP Marion and FCC Victorville.

3. I hold a master's degree in public administration. A copy of my resume which includes my relevant work experience is attached to this report as Exhibit A.

## SCOPE OF DECLARATION

4. I was contacted by Samuel Cross from the Office of the Federal Public Defender for the Central District of California. Mr. Cross represents Defendant Thomas Girardi in this case. Mr. Cross requested this document in support of Mr. Girardi's forthcoming sentencing hearing.

5. I was asked to provide an overview and offer my expert opinion about how a term of incarceration, if imposed, could impact Mr. Girardi given the serious medical condition with which he has been diagnosed.

6. In preparing this statement, I reviewed the following documents:
   - Presentence Investigation Report ("PSR") filed on November 1, 2024.
   - Medical Records Summary Spreadsheet, provided by Mr. Cross.
   - Documents and medical records relating to competency proceedings, provided by Mr. Cross.

## EXECUTIVE SUMMARY

7. Mr. Girardi is 85 years old and suffers from medical conditions including dementia, which currently requires him to reside in an assisted living facility.

8. In this declaration, I describe current processes utilized by the BOP, such as how individuals are designated. I also delineate current challenges in the agency, such as critical staffing shortages[1], poorly managed infectious disease contagion[2], and concerning oversight of medical contracts for specialty providers[3]. I will explain the potential impact of these issues on Mr. Girardi. I recommend several actions that could assist in determinations about the care and custody of Mr. Girardi.

## MR. GIRARDI'S MEDICAL CONDITIONS

9. Records reveal Mr. Girardi is 85 years old, making him older than the vast majority of people in BOP custody. He is blind in one eye.

10. Several years ago, he was diagnosed with dementia and now resides in an assisted living facility. Despite his diagnosis, he was found competent to proceed.

---

[1] DOJ-OIG, "Review of the Federal Bureau of Prisons' Medical Staffing Challenges." March 2016.
[2] DOJ-OIG, "Capstone Review of the Federal Bureau of Prisons' Response to the Coronavirus Disease 2019 Pandemic." March 2023.
[3] DOJ-OIG "Notification of Concerns Resulting from Multiple Office of the Inspector General Reviews Related to the Federal Bureau of Prisons Strategy for its Medical Services Contract" Office of the Inspector General, (September 2022).

## BUREAU OF PRISONS CLASSIFICATION AND DESIGNATION

11. The BOP operates 122 prison facilities across the United States. Facilities are classified into four security-level categories which are Minimum Federal Prison Camp (Camp or FPC), Low Federal Correctional Institution (FCI), Medium FCI and High United States Penitentiary (USP). There are also administrative facilities such as Detention Centers, referred to as Metropolitan Correctional Centers (MCC), Metropolitan Detention Centers (MDC) or Federal Detention Centers (FDC), and Federal Medical Centers (FMC), each of which house all security levels.

12. BOP staff assign individuals an initial security classification, which allows them to determine the appropriate security level for housing during a term of incarceration. Some of the factors used in this classification are age, history of violence, previous escapes, criminal history, history of violence and severity of the instant offense.[4] For most sentenced individuals, BOP attempts to designate within 500 miles of the legal residence or family.

13. However, per its policy, BOP may supersede its focus on placement near home for programmatic, treatment, or security reasons. In addition to security level, every facility has a medical and mental health Care Level. Inmates themselves are also assigned a Care Level based on the level of physical and mental health services they require. Care Levels are One through Four, with Care Levels One and Two reserved for more healthy inmates, whose care can be managed within a standard BOP facility. Care Levels Three and Four are assigned to inmates with more serious physical or mental health concerns, requiring more intensive care beyond that available at a mainstream BOP facility. FMCs are Care Level Four facilities.

14. There are six FMCs available to male inmates, and each care for a wide group of inmates' illnesses with certain specialties at each location. The FMCs are located in Butner, North Carolina, Devens, Massachusetts, Fort Worth, Texas; Lexington, Kentucky, Springfield, Missouri, and Rochester, Minnesota. Individuals with significant medical concerns are sent to FMCs if bedspace is available. If it is not, individuals are sent to a general population facility until they decline sufficiently to

---

[4] DOJ-BOP "Program Statement 5100.08, *Inmate Security Designation and Custody Classification.*" September 12, 2006.

3

15. Individuals sent to FMCs may be from any security level. In other words, persons with no criminal history may be housed together with those who have significant propensities for violence or organized criminal activities.

16. Non-FMCs operate as general population institutions, although there are differences by security level. For example, minimum security facilities ordinarily are arranged barracks-style with beds grouped in a communal area versus double-bunked cells at higher security facilities. Minimum security facilities also tend to house healthier individuals, as staff is minimal at those locations and 24-hour medical care is not offered. There are no fences at minimum security facilities. Memory care services are not provided at general population institutions.

## COMMUNITY CORRECTIONS

17. BOP operates 122 prisons, or secure facilities. Additionally, BOP contracts with providers to operate facilities in the community commonly referred to as halfway houses. BOP refers to these facilities as Residential Reentry Centers (RRCs).

18. Most individuals transition to an RRC toward the end of their sentence. Some of those persons reside inside the RRC facility, and others participate in programs offered through and are monitored by the RRC but reside at their residence on home confinement.

## BUREAU OF PRISONS STAFFING

19. As noted, staffing shortages are a rampant problem across BOP. This can mean staff morale is poor and problems go unnoticed or fester until they become a crisis. For the last two years, BOP was ranked the worst place to work in the Federal government based on a survey of its employees and BOP staff themselves. [5] [6]

20. Staffing shortages are evident across every job type, from medical providers to correctional officers.

21. When facilities are not adequately staffed, the institution must rely on either augmentation or overtime to ensure facility posts are covered. Augmentation is the

---

[5] Partnership for Public Service. "2023 best Places to Work in the Federal Government." : https://bestplacestowork.org/rankings/detail/?c=DJ03.
[6] Moore-White, Brandy. "The Federal Prison System is in crisis. Here are the top 3 reasons why." The Hill. February 9, 2024.

practice of filling vacant officer posts with secretaries, teachers, and other institution employees. While all BOP staff receive basic correctional training, these staff have other duties to perform and may be unfamiliar with particular units or inmates when they are augmented. Augmentation was originally intended for short-term post coverage, such as when an officer was attending mandatory training. Due to the BOP's overall staffing shortages, augmentation has become a regular and over-used practice. Overtime, on the other hand, allows staff to work additional shifts for 150% pay (known as "time and a half"). The Office of the Inspector General has noted the former practice negatively impacts other needs and services at the prison, while the latter can cause inattentiveness and safety concerns.[7]

## BUREAU OF PRISONS MEDICAL CARE AND LACK OF SPECIALTY PROVIDERS

22. At general population facilities, healthcare is provided only on an outpatient basis and is rarely available around the clock. FMCs, on the other hand, have a higher concentration of medical staff. Regardless, only the most acutely ill inmates will have intensive medical monitoring, particularly overnight.

23. Because BOP has few specialists on staff, specialty community medical appointments are common. Medical contracts have not been well-managed by the agency and the Office of the Inspector General has advised the agency to develop standards for assessing quality of medical outcomes, among other concerns[8].

24. The staff shortages the BOP is currently facing, which have been widely publicized[9] [10]and openly discussed by Congress over the last year or more, significantly impacts the care available in-house, which in turn affects these necessary community appointments.

25. After the medical department schedules a medical appointment in the community the other departments, primarily correctional services, must plan for the escorted transport of the inmate. These medical appointments require correctional officers to provide

---

[7] DOJ-OIG. "Inspection of the Federal Bureau of Prisons' Federal Correctional Institution Waseca." May 2023.
[8] DOJ-OIG "Notification of Concerns Resulting from Multiple Office of the Inspector General Reviews Related to the Federal Bureau of Prisons Strategy for its Medical Services Contract." September 2022.
[9] DOJ-OIG, "Top Management and Performance Challenges Facing the Department of Justice – 2021." October 2021.
[10] US Senate Judiciary Committee: https://www.judiciary.senate.gov/meetings/09/22/2022/oversight-of-the-federal-bureau-of-prisons.

escort. Often, these scheduled appointments are canceled on the day of the appointment due to staffing issues, which is harmful to the inmate. In the event of a vacant post, the officers who were scheduled for the escorted trip will often be utilized for coverage. The inmate's medical appointment will be canceled, and the inmate may wait for extended periods before the medical specialist appointment is rescheduled[11].

26. BOP's medical staff operate as independent practitioners. They are often not experts in the conditions they are required to manage. In some cases, they have been found indifferent to the needs of those in their care, at times resulting in death.[12]

## BUREAU OF PRISONS INFECTION MANAGEMENT

27. Inmates live in a dense population setting where spread of infectious disease has always been a concern, even prior to COVID-19. Because prison uses communal housing, particularly at lower security levels, it can be difficult for any individual to avoid communicable illnesses. There are "high touch" areas where contagion of disease is a concern; toilets, showers, dining areas, telephones (shared by multiple inmates each day) and computer terminals. These areas perpetuate the spread of germs and infection and can be especially dangerous to older individuals.

## BUREAU OF PRISONS DEMENTIA CARE

28. Prisons are places where awareness of time and place is essential to daily functioning. Appointments are posted without individual reminders, and disciplinary sanctions can be issued if an appointment is missed. Moves across the compound occur at scheduled times. Prisoners are expected to work or attend self-improvement programs.

29. The BOP does not have an evidence-based accredited program for individuals in need of memory care. Various proposals have been considered by leadership on this topic, and attempts have been made at the local level to create units for individuals with dementia, but no policy exists to govern care of people with dementia.

30. FMC Devens, a BOP facility in Massachusetts, created a small unit to house people with memory impairments. There are more people with memory care needs in BOP than this unit can accommodate.

---

[11] DOJ-OIG, "Audit of the Federal Bureau of Prisons Comprehensive Medical Services Contracts Awarded to the University of Massachusetts Medical School = 22-052 (March 2022).

[12] DOJ-OPA, "Two Federal Bureau of Prisons Employees Charged with Violating Civil Rights of Inmate Resulting in His Death." June 7, 2023.

## BUREAU OF PRISONS CONTINUITY OF CARE

31. After an individual is assigned Medical and Mental Health Care Levels in BOP, he is evaluated by BOP staff at the time of arrival at the designated facility. While records are reviewed, BOP staff assign diagnoses based on their own clinical assessment. Individuals are treated by BOP physicians, who may not be specialists, and even their long-time community providers are not consulted in their care.

32. BOP uses a centralized formulary for medications. All incoming inmates have their prescriptions reviewed, and if they are not on BOP's list, they are often replaced with a generic or changed entirely.

## BUREAU OF PRISONS PROGRAMS

33. BOP offers a large menu of programs to meet the needs of the inmate population. Under the First Step Act, prisoners may earn credit for time off the sentence or extra community placement time for the completion of recommended programs.

34. Individuals who are outside the prison for medical care are not able to earn credit. Similarly, those not able to participate in recommended programs for mental and physical health reasons also may not earn credit.

## IMPACT OF CURRENT BOP POLICIES AND CONDITIONS ON MR. GIRARDI

35. My calculation of Mr. Girardi's Security Classification score indicates he would be Minimum Security (Exhibit B). The BOP will determine following a sentence of imprisonment, an appropriate designation for Mr. Girardi based on his security classification.

36. If Mr. Girardi went to a camp facility, his potential for violating rules by becoming confused is high. He would also not have the level of supervision that he has in an assisted living facility.

37. Because he is an older adult with dementia, it is unlikely the agency will designate Mr. Girardi to a minimum-security facility. Instead, he is likely to be assigned to high Medical and Mental Health Care Levels and be designated to either a Care 3 facility or an FMC. When an inmate is at a Care 3 facility and their medical condition deteriorates, as professionals believe will happen to Mr. Girardi, they must be transferred to an FMC. The process of transfer can take up to a year as medical

evaluations are done and reviews by management for approvals to transfer must take place. Mr. Girardi will remain at his initial facility until a space is opened at an FMC.

38. If he goes to an FMC, Mr. Girardi will be housed with people from higher security levels. This could place him in danger from being taken advantage of or even physically harmed.

39. Given his need for assistance and medical care, Mr. Girardi is unlikely to be designated close to home. There are no FMCs in California, where he lives, or in the entire Western region of BOP. Although his health is the priority, separation from familiar places and loved ones negatively impacts prisoners generally and can be especially harmful to those suffering from dementia.

40. Whether or not Mr. Girardi is placed at an FMC or even in BOP's dementia housing unit, he will require services from community-based specialists, and BOP has recently struggled to ensure sick individuals like Mr. Girardi receive timely services from experts outside the facility.

41. In my opinion, the staffing shortages that are now critical at the BOP could have a detrimental and compromising impact on Mr. Girardi's ongoing medical care needs.

42. I also have concerns about BOP's ability to maintain the continuity of Mr. Girardi's medical treatment. He resides in assisted living where he has help with activities of daily living and reminders to take his medication. Alone in prison he may struggle to care for himself and decline as a result. BOP can even discontinue medications if he forgets to take them, considering memory lapses akin to refusal.

43. If Mr. Girardi is sentenced to a term of incarceration, his current care will be disrupted and re-determined by the BOP based on available resources. The BOP's resources are limited to the medical care providers who are on-site at the prison facility, where there is a critical shortage as discussed above, or available in the immediate community, regardless of the level of experience or degree of expertise those medical care providers may have regarding Mr. Girardi's dementia.

44. Dementia has varying courses for each individual, but life expectancy is shortened after a diagnosis, and significantly so for older adults like Mr. Girardi.[13] It is very possible than even a short sentence could be a life sentence for Mr. Girardi.

## CONCLUSION

45. BOP has the responsibility of treating inmates with all sorts of health issues and conditions although its failures have been documented in a multitude of government oversight reports and investigated at various congressional hearings over the years.

46. BOP has not proven it can skillfully treat dementia patients commensurate with community standards. Placement outside the BOP such as home detention may provide the best care and surroundings to potentially slow Mr. Girardi's cognitive decline.

47. Should Mr. Girardi be sentenced to imprisonment in a BOP facility, he would benefit from being near family, but he should be placed in a facility that can treat his dementia and keep him safe, even if that is an FMC. That facility must have proper medical staffing and access to memory care specialists.

48. Mr. Girardi's medical treatment will require appointments to community medical providers to receive care not provided inside a BOP facility, which could be delayed, cancelled, or missed due to critical BOP staffing shortages.

49. Mr. Girardi's needs would be easier to meet in the community, and even if he spends time in prison, I do suggest the Court consider ways to maximize the amount of time Mr. Girardi resides in an RRC or limit the amount of time he serves in prison, so he does not die there.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 6th day of December 2024.

Nicole English          *Nicole English*
                        Nicole English (Dec 6, 2024 16:36 EST)

---

[13] Rizzuto, D., Bellocco, R., Kivipelto, M., Clericia, F., & Fratiglioni, L. Dementia after age 75: Survival in different severity stages and years of life lost. Current Alzheimer's Research September 2012 (7), 795-800. doi: 10.2174/156720512802455421 different severity stages and years of life lost. Current Alzheimer's Research September 2012 (7), 795-800. doi: 10.2174/156720512802455421

9

# EXHIBIT A

Nicole C. English
Info@Prisonology.com

Nicole English has over 31 years in corrections experience. Among her many accomplishments, she was responsible for 122 institutions as the Assistant Director for the Bureau of Prisons under the Health Services Division. She was the Regional Director in the Northeast Region managing 20 institutions and wardens. Her expertise is related to, among other areas, the standards of medical care in the agency and implementation of national health care initiatives. She has worked in all security and custody levels, as well as managed several specialized missions: communications management unit, female offenders, special administrative measures cases, sex offenders, protective custody units, gang management, medical complexes, and mental health units.

**PROFESSIONAL EXPERIENCE**

*Prisonology, LLC, Expert     June 2024-Present*

*Comprehensive Corrections Consultant, LLC, Corrections Consultant*
*McDonough, GA                May 2022-Present*

*Federal Bureau of Prisons, Regional Director, Northeast Region-Senior Executive Service*
*Philadelphia, PA              August 2020-December 2021*

Oversaw the operations of 20 Bureau of Prisons facilities, including a medical center, three detention centers, and two high security penitentiaries and the largest prison in the agency. I was responsible for the oversight and management of more than 5,900 employees, and the custody and care of approximately 22,500 inmates.

*Federal Bureau of Prisons, Assistant Director, Health Services Division*
*Central Office, Washington D.C.       August 2019-August 2020*

Directed three national program areas: Medical Services, Environmental and Safety Compliance/Occupational Health and Food Services with a budget of over $1.5 billion. Oversaw dental care, psychiatric care, health care staffing, and recruitment, health care delivery, infectious disease management, medical designations, occupational safety, environmental compliance, fire protection, occupational health, worker's compensation, and the provision of nutritional and specialty meals. Held the Health Care Authority for the agency which oversaw the Medical, Safety, and Food Services operations of 122 Bureau of Prisons facilities, six regional offices, two staff training centers, 12 contract facilities, and 22 residential re-entry management offices with oversight and management of approximately 36,000 staff and approximately 175,000 inmates.

*Warden-Senior Executive Service*
*Multiple Locations*             *March 2010- August 2019*

Served as the Chief Executive Officer (CEO), of Federal Correctional Institutions (FCI) in Waseca, Minnesota, Marianna, Florida, and the United States Penitentiary (USP), Leavenworth, Kansas. Managed $60 million operating budgets, providing leadership for over 400 employees, and supervising and mentoring over 2400 inmates.

*Associate Warden*                *May 2006-March 2010*

Reported directly to the CEO, supervising first line supervisors which encompassed a wide range of duties which include planning, organizing, reviewing work, administering personnel matters, and dealing effectively with employees and union representatives regarding employee management concerns. Duty stations include USP Marion and FCC Victorville.

**SPECIALIZED TRAINING**

Investigator: Inmate Discipline, Employee Discipline, Equal Employment Opportunity
Public Information Officer
Special Operations Response Team-Tactical Operator/Trainer
Crisis Management Trainer-Emergency Response
Federal Emergency Management Agency (FEMA)-Incident Commander
Case Management and Classification
Inmate Discipline Hearing Officer
Prison Rape Elimination Act (PREA) Compliance Manager
Critical Incident Reviewer in Charge

**EDUCATION**

Master's Degree, Public Administration, Portland State University, Portland, OR
Bachelor's Degree, Criminal Justice, Boise State University, Boise, ID

# EXHIBIT B

**Prisonology**

(617) 858-5008
info@prisonology.com
11231 US Highway 1 #310, North Palm Beach, FL 33408

## INMATE LOAD DATA

| # | Field | Value | # | Field | Value | # | Field | Value |
|---|---|---|---|---|---|---|---|---|
| 1. | REGISTER NUMBER | 43156-510 | | | | | | |
| 2. | LAST NAME | GIRARDI | 3. FIRST NAME | THOMAS | 4. MIDDLE | VINCENT | 5. SUFFIX | |
| 6. | RACE | W | 7. SEX | M | 8. ETHNIC | O | 9. DATE OF BIRTH | 06-03-1939 |
| 10. | OFFENSE/SENTENCE | | | | | | | |
| 11. | FBI NUMBER | HVHTVXPAF | | | | 12. SSN NUMBER | | |
| 13. | STATE OF BIRTH | CO | 14. OR COUNTRY OF BIRTH | US | | | 15. CITIZENSHIP | US |
| 16. | ADDRESS STREET | | | | | | | |
| 17. | CITY | SEAL BEACH | 18. STATE | CA | 19. ZIP | 90740 | 20. OR FOREIGN COUNTRY | |
| 21. | HEIGHT | 5,10 | 22. WEIGHT | 195 | 23. HAIR COLOR | GY | 24. EYE COLOR | BL |
| 25. | ARS ASSIGNMENT | | | | | | | |

## SECURITY DESIGNATION DATA

| # | Field | Details | Score |
|---|---|---|---|
| 1. | JUDGE JOSEPHINE L. STATON | 2. REC FACILITY   3. REC PROGRAM   4. USM OFFICE | |
| 5. | VOLUNTARY SURRENDER STATUS | 0 = NO     (-3) = YES  IF YES, MUST INDICATE: 5A. V/S DATE: ____ 5B. V/S LOCATION: | -3 |
| 6. | MONTHS TO RELEASE ___ | | |
| 7. | SEVERITY OF CURRENT OFFENSE | 0 = LOWEST   1 = LOW MODERATE   3 = MODERATE   5 = HIGH   7 = GREATEST | 3 |
| 8. | CRIMINAL HISTORY POINTS: __0__ | 0 = 0-1  2 = 2-3  4 = 4-6  6 = 7-9  8 = 10-12  10 = 13+ | 0 |
|   | 8A. SOURCE DOCUMENT DATE: ____  8A. SOURCE OF DOCUMENTED ___ - PSR OR ___ - NCIC | | |
| 9. | HISTORY OF VIOLENCE | MINOR: NONE 0, >15 YEARS 1, 10-15 YEARS 1, 5-10 YEARS 3, <5 YEARS 5   SERIOUS: NONE 0, >15 YEARS 2, 10-15 YEARS 4, 5-10 YEARS 6, <5 YEARS 7 | 0 |
| 10. | HISTORY OF ESCAPE OR ATTEMPTS | MINOR: NONE 0, >15 YEARS 1, >10 YEARS 1, 5-10 YEARS 2, <5 YEARS 3   SERIOUS: NONE 0, >15 YEARS 3(S), >10 YEARS 3(S), 5-10 YEARS 3(S), <5 YEARS 3(S) | 0 |
| 11. | TYPE OF DETAINER | 0 = NONE   1 = LOWEST/LOW MODERATE   3 = MODERATE   5 = HIGH   7 = GREATEST | 3 |
| 12. | AGE | 0 = 55 AND OVER   2 = 36 THRU 54   4 = 25 THRU 35   8 = 24 OR LESS | 0 |
| 13. | EDUCATIONAL LEVEL | 0 = VERIFIED HIGH SCHOOL DEGREE OR GED  1 = ENROLLED IN AND MAKING SATISFACTORY PROGRESS IN GED PROGRAM  2 = NO VERIFIED HIGH SCHOOL DEGREE/GED AND NOT PARTICIPATING IN GED PROGRAM   13A. HIGHEST GRADE COMPLETED ___ | 0 |
| 14. | DRUG/ALCOHOL ABUSE | 0 = NEVER/>5 YEARS   1 = <5 YEARS   U = UNKNOWN | 0 |
| 15. | TOTAL | | 3 |
| 16. | PUBLIC SAFETY FACTORS | A-NONE   B-DISRUPTIVE GROUP (MALES ONLY)   C-GREATEST SEVERITY OFFENSE (MALES ONLY)   F-SEX OFFENDER   G-THREAT TO GOVERNMENT OFFICIALS   H-DEPORTABLE ALIEN   I-SENTENCE LENGTH (MALES ONLY)   K-VIOLENT BEHAVIOR (FEMALES ONLY)   L-SERIOUS ESCAPE   M-PRISON DISTURBANCE   N-JUVENILE VIOLENCE   O-SERIOUS TELEPHONE ABUSE | A |
| 17. | REMARKS | SEVERITY OF CURRENT OFFENSE: OBSTRUCTION OF JUSTICE  TYPE OF DETAINER: CONTEMPT OF COURT IN 1 ITEM OF PENDING CHARGES SECTION | |
| 18. | OMDT REFERRAL: (YES/NO) SCRN LEVEL: MD= MH=____ SENT TO OMDT ON: CONSIDER RDAP? Y OR N/ | | |

18. OMDT Referral