# EXHIBIT 2

## <u>TABLE OF SENTENCING LETTERS</u>

| | |
|---|---|
| Exhibit 2-1 | Robert Girardi |
| Exhibit 2-2 | Ken Girardi |
| Exhibit 2-3 | John Girardi |
| Exhibit 2-4 | Helena Chui |
| Exhibit 2-5 | James Merikangas |
| Exhibit 2-6 | Rick Kraemer |
| Exhibit 2-7 | Michael Abrams |
| Exhibit 2-8 | Robert Sonne |
| Exhibit 2-9 | Wayne Boehle |
| Exhibit 2-10 | Kim Cory |
| Exhibit 2-11 | Samuel Keesal |
| Exhibit 2-12 | Gary Drummond |
| Exhibit 2-13 | Dennis Fitzpatrick |

# EXHIBIT 2-1

Honorable Judge,

My name is Robert Girardi, and I am writing this letter to provide insight into the character and circumstances of my older brother, Tom Girardi. I believe that to determine an informed and appropriate sentence, it is crucial to consider the entirety of Tom's entire life, including his numerous and significant contributions to the field of law, his widely recognized skill and aid to thousands of past clients, and the gravity of his diminished mental state and current medical condition.

Professional Accomplishments

Tom's legal career spans over 50 years, during which he made substantial and vital contributions to both the legal profession and society. He is widely recognized as a pioneer in "toxic tort" litigation, taking on formidable opponents to protect the rights of individuals harmed by environmental and health-related issues.

His most widely recognized achievement was his involvement in the landmark case that inspired the film "Erin Brockovich." As an essential part of the legal team, Tom played a crucial role in securing a $333 million settlement for the residents of Hinkley, California, against Pacific Gas and Electric Company (PG&E) in 1993. This case brought justice to hundreds of affected individuals and set a precedent in environmental law and toxic tort litigation.

Throughout his career, Tom consistently championed the cause of the "little guy," taking on numerous David vs. Goliath cases, including:

- More than 30 verdicts of $1 million or more

- Over 100 settlements of $1 million or more

- Senior Counsel on a $4.85 billion settlement against Merck for personal injuries related to the drug Vioxx

- A $45.5 million verdict against Ford Motor Company in a defective seat belt case

Recognition and Philanthropy

Tom Girardi's contributions to the legal field have been widely recognized by the public, the legal profession, and his peers. He was inducted into the Trial Lawyer Hall of Fame and consistently ranked among the top lawyers in California. In 2015, he was voted the best lawyer in a poll of 38,000 California lawyers.

Tom personally paid for the construction of a multi-story building at Loyola Law School, which he named in honor of our Father. Tom taught a class at the Law School every semester for over 40 years.

During Covid, when the Civil Courts were closed and the firm was not generating any income, Tom voluntarily sold all of his Las Vegas assets for approximately 80 million dollars, which he used primarily as payroll to take care of those he employed to keep the law firm in business.

Beyond his professional achievements, Tom Girardi has been involved in numerous philanthropic efforts, supporting organizations dealing with public justice and inner-city law centers.

Severity of His Current Medical Condition

When determining an appropriate sentence, it is crucial to consider Tom's current health status. At 85 years old, he is suffering from severe cognitive decline and serious physical limitations:

- He has been diagnosed with dementia and resides in a locked-down Alzheimer's memory care facility, which I have personally paid for. To date, his medically required care, including his supervised institution, has totaled almost $750,000

- His short-term memory has been tested and determined to be at the one-percentile level

- Tom has barely controlled glaucoma and he is going blind. He has had multiple surgical events at the Jules Stein Eye Institute at UCLA to insert tubes into his eyeball to reduce the intraocular pressure. He is blind in one eye and losing vision in the other. He requires medication for this, which is administered by a registered nurse twice daily that the opthalmologist says he must not miss to preserve his limited vision.

- His day-to-day activities include sitting alone at a table writing hundreds of pages of unintelligible notes and being taken for 3 meals a day by the facility staff. He needs assistance bathing and changing his clothes. ████████████████████████████████████████████████ I've never seen him interact with any of the residents on the floor. Most of the people on the floor don't know where they are.

- Tom is still very socially savvy. He carries a conversation well and is very agreeable, but to the astute observer, one will notice that he never uses people's names and instead refers to people generically. For example, he calls me "my friend" and I don't believe he knows my name. He does not know the name of his kids, or maybe that he even has kids. Tom's savvy includes redirecting conversations to the person in front of him. He asks questions to deflect his lack of memory on a topic. Then he will ask the same question more than a dozen times in 30 minutes. If Tom is asked about himself, he thinks he is still practicing as a lawyer, though he couldn't name a case or a client or any colleagues. I've called him to tell him I'm going to visit for lunch, and when I get there, he has no recollection of the conversation saying I would visit him in an hour.

Three years ago, the severity of his Alzheimer's caused him to wander off after a medical appointment, leaving him lost and wandering in Pasadena for three hours before being found and rescued. Notably, he was unaware of the fact that he was lost, highlighting the severity of his condition. I believe that if Tom still had his facilities intact, none of the alleged acts of wrongdoing would have occurred.

Conclusion

While the alleged offenses are serious, as Tom's brother and his court-appointed conservator, I respectfully ask the court to consider Tom Girardi's lifelong dedication to justice, his numerous contributions to the legal profession, and his current severely diminished mental and physical state. A compassionate sentence that takes into account his medical needs and inability to pose any future threat to society would be most appropriate.

Tom Girardi's legacy as a champion for the underdog and his groundbreaking work in environmental and personal injury law has left an indelible mark on the legal landscape. His condition renders him unable to engage in any further legal practice or pose a risk to others.

I believe that an appropriately compassionate sentence would include his court-directed confinement in a suitable medical facility to serve justice while also addressing his urgent daily medical needs. I want the court to know that I am willing to pay for the advanced daily care he requires.  Such a sentence would reflect both the gravity of the offenses and the unique circumstances of this case, embodying the principles of wisdom, justice, mercy, and common sense that our legal system strives to uphold.

Thank you for considering the totality of these factors in determining a legally appropriate yet compassionate sentence for my brother.


Respectfully submitted,


Dr. Robert Girardi

# EXHIBIT 2-2

Kenneth Girardi
7447 Henefer Ave.
Los Angeles, CA 90045
(310)670-4063


November 15, 2024


Hon. Josephine L. Staton,

My name is Kenneth Girardi and Thomas Girardi is my uncle. I admit I am biased and want to see the best possible outcome for him as I believe he is a good person. I pray and hope you consider his sentence would be to put him on house arrest and monitored at the nursing home.

Growing up Tom was always busy, but kind and inclusive. Ninety-Nine percent of the people I meet that ask me if I was related to him always had kind words about how he has positively impacted their lives. People behaved different after they found out we were related, and they were even nicer to me. I still live in the area where he and my father grew up and I continue to run into people that went to elementary school with him that pass on fond memories and experiences. Before any of this legal stuff has happened, I would say he had more friends than almost anyone I knew.

I know he loves the legal profession and talking to him about career advice, he said if he did not have this law career, he didn't know where he would end up. Other lawyers have told me adding his name to a case automatically increased the value of the case for the client. He has helped countless victims with their legal matters.

After I graduated from undergrad, Tom encouraged me to continue my education and get a graduate degree. I remember having ethics conversations with him while I was getting my MBA and what was appropriate and what was not. Who was allowed to bill on contingencies and why it was illegal for others. We talked business, and losing money on early career attorneys, because they could not bill enough hours to cover their salaries and expenses. He explained to me the why it was important to take that loss on early career attorneys and help them grow professionally and advance the field of law. Eventually if they stayed long enough and continued to grow, they would pass the break-even point and begin to generate revenue.

I do not believe he had bad intentions for the alleged acts for which he was charged. I know Tom felt financially responsible for all the people that worked at the law firm; and the stress that came with making payroll and operating the law firm weighed on him.

I have seen the deterioration in his mental capacity over the past several years. His natural charm and personality do a really good job of masking how bad it really is and how easy it would be for someone to question it. Most men he referred to as 'pal' and most women he referred to as 'chick', these were both terms of endearment for Tom and he continues to use them today. It is a very

convenient way of hiding not remembering or recognizing an individual. He says it so graciously, it comes out endearing. I also think his natural ability to read the room, allows him to pick up items and converse like knows what is going on, similar to a psychic who uses cold reading techniques. The couple of years before COVID, he was on the LMU Board with my wife's cousin. She would always tell us after the board meeting how nice he was and how they got along, but when I would talk to Tom, he would have difficulty remembering those board meetings.

Tom's symptoms now remind me of my grandfather near the end of his life, but seem to be much worse at a younger age. When I visited Tom at the beginning of COVID, he was slightly more aware of what was going on in the world and would not repeat himself as much. He knew there was a pandemic, but did not know about the firm closing. But I had heard from those around him that he shouldn't be alone since the car accident. Now when I talk to him, I do not know if he truly recognizes me and is just being gracious or if it comes and goes where he recognizes me and forgets who I am. I think he is just happy to have a little attention. He only calls me 'pal', I don't think he has said my name in probably 4 years, and it was always after someone else said it first.

I have experienced 7 deaths in the last 10 years for family members, mostly from cancer, but other ailments as well and have been by the side of 3 of them when they have taken their last breath. It has changed my definition of dignity. I have witnessed both extremes, where one admitted she was scared and did not want to die at 65, to my aunt who was very accepting of her choices and died from lung cancer. She used her illness as a teaching moment for my daughter to never smoke. Being able to pass away at home on one's own terms is something everyone should be afforded. Both my aunt and my sister-in-law did not want to die in a hospital, and we were able to get them home for a few days at the end.    Although Tom no longer has a 'home', the memory care facility is the next closest thing. It pains me to think that he could die in jail.

Tom will not have any opportunity to commit these type offenses in the future. I understand he lost his license to practice and the law firm closed. Both of which he does not acknowledge happened. He does not have access to money. I pay for a cell phone for him, it is only a flip phone on a prepaid plan. My dad tried to give him an apple phone at the beginning of COVID so he could use the assistant on the phone but he lost it within a week and does not remember ever having it. He lives in a memory care facility on a locked floor, not many people visit him and he gets excited for visitors. He always has a legal pad with him and is writing down notes for cases that are over or do not exist. I have not read them for fear of offending him, but in his mind he is always 'working'.

Two years ago, I did not think Tom would have been alive today with his physical and mental health. He needs help getting out of bed, and using the restroom and basic hygiene. His glaucoma is so bad he is can't see out of 1 eye and requires surgery.    His life right now is really sad, and I can't imagine being in that situation without all the legal issues going on around him. Most of the people in his life have abandoned him or are keeping their distance. When I visit him, I only stick to safe topics. I always ask about are his parents, or the area he grew up in. But he will repeat his answers several times the rest of the visit, not remembering he already answered it. He always asks several times in the same visit what is going on with me and how is work, but keeps the question vague, because he doesn't remember who I am or what I do.    I fear with all the help he needs in daily life that any prison sentence will greatly accelerate his deterioration. It will also take away any remaining human dignity a memory care nursing facility may afford him.    His current situation is like a prison, because most of his friends and family

have distanced themselves. Keeping him there for his remaining years might offer him a little more
dignity in an already sad situation.   I believe Tom waking up in prison everyday would confuse him
more than he is now, and he would not fully understand what was going on or why he is there.

Not that it should matter, but the financial interest Tom's firm had in the Porter Ranch Gas Leak
Lawsuit settlement should be enough to make everyone financially whole. I hope his sentencing hearing
is not preventing the court appointed trustee from distributing the funds to keep the number of victims
higher for when he is sentenced.

Thank you for your time and consideration in this matter.

Sincerely,

Kenneth Girardi

# EXHIBIT 2-3

LAW OFFICES OF

# JOHN GIRARDI

November 22, 2024

***Via Email Only to:***
Charles_Snyder@fd.org; Sam_Cross@fd.org;
Natalie_Degrati@fd.org

Honorable Josephine L. Staton, District Judge
First Street US Courthouse
350 West 1st St.
Los Angeles, CA 90012
Courtroom 8A, 8th Floor

### Re:  U.S. v Thomas V. Girardi
### CR 23-47-JLS

Dear Judge Staton:

There is an iconic figure of Southern California whose base of operation is not too far distant from the United States Courthouse. That individual is Father Gregory Boyle, SJ, who, of course, has worked with gang intervention and rehabilitation. One of his gifts is his ability to recognize the whole person and not just distinct moments in that person's life. It was Father Boyle who has frequently uttered "None of us should be defined by the worst things we've done."

The misdeeds of Thomas Girardi leading to conviction have been well chronicled (though frequently inaccurately and speculatively in the overwrought press coverage). There is far more to the character of Thomas Girardi than that which has played out over the four years and over several years before that. In this regard, I have been in a fairly good place to observe: I am his youngest brother (by eight years) and worked as a lawyer at his firm from December of 1972 until the bankruptcy closed the firm in December of 2020.

Others writing on Tom's behalf have undoubtedly spoken of his litany of success in verdicts and settlements. Dollars are the dollars, but those results do not reveal the character Tom from his early days as a lawyer up to the time where his cognition became impaired. Thomas Girardi's enthusiasm for the advocacy of being a trial lawyer was well known and well received. It was not just the technical ability in the courtroom but the fully formed sense of advocacy -- doing what it takes to give the clients their best chance --  the tireless effort of early morning and late nights, the sacrifice of personal time, the ability to find courage confronted with a formidable, well financed opposing parties as well as their counsel. Even more so, he taught all law clerks and

U.S. v Thomas V. Girardi, CR 23-47-JLS
Judge Staton
November 22, 2024
Page 2

young lawyers and they learned to take responsibility in the Court, with the client, and with each other. If there were a mistake or a problem, own it and try to solve it. This was a constant.

He demonstrated all of this and it was catching. When the law firm was very small up until the late 2010's when there were over 20 lawyers, law clerks were used extensively. I would fairly estimate that from the mid 1960's when he first became a lawyer to the early 2000's, there was somewhere in the range of 200 to 250 young people who clerked at the firm. Many of those went on to have careers as trial lawyers themselves but, even more, many of those indicated they were so inspired by Tom Girardi's approach to being a lawyer that they chose such a path. Clearly, it was not everyone but over the years as I have randomly encountered many of those lawyers in the hallways of courthouses in all the Southern California counties, many have commented about their time at the law firm and many of them have also volunteered that their clerking time there was the best job they have ever had.

During these decades, Thomas Girardi also enjoyed a relationship with many, if not most, defense lawyers that was unlike the all too typical contentious relationship. No case deserved scorched earth approach and even with a successful resolution it was important that opposing counsel would never be embarrassed in front of their client and was able to walk away from a trial or a settlement with their dignity intact. It is a skill that, I fear, most lawyers do not genuinely appreciate. For reasons such as these, over the years as I have encountered those opposing lawyers they have reported to me episodes of Thomas Girardi's behavior in the past which they characterized as decent, respectful and exceptionally professional yet noting they know that Thomas served his clients well too.

Thomas was an entertaining and fairly popular legal seminar speaker. He seemed to frequently find a way to include such an approach to opposing counsel to his seminar audience.

These are not typical accounts of what one trial lawyer would say about another.

Notably, it was not this generosity of spirit that Tom just demonstrated to those in the same profession. I do not think there is a valet, a clubhouse attendant, a member of wait staff, a janitorial service person or anyone involved in a service industry who would speak of unkindness on Thomas Girardi's part. It was not just that he was generous with a tip (though he notably was), it was his ability to engage, to joke and to have a meaningful conversation about what was going on. It would be impossible to count the number of letters written or cases filed over what otherwise might be inconsequential matters where Tom Girardi advocated for that valet or waitress (for no fee whatsoever) just as if they were a client with a million-dollar case. These gestures were not advertised and do not show up on any professional lawyer accolade but his relationship with other lawyers, especially the clerks at the firm and service people are at the end of the day an even more accurate reflection of a man.

U.S. v Thomas V. Girardi, CR 23-47-JLS
Judge Staton
November 22, 2024
Page 3

Clearly, over the last two or so years of the existence of the firm, Thomas manifested cognitive impairment. That has only deteriorated since the firm closed. In retrospect, however, there were episodes of language or behavior that now appear to be the incipient sign of the progression of the debilitating disease from which he suffers. It is my best sense that that occasional lapse started appearing six, or seven or eight years before, the close of the firm, that is, sometime in the middle of 2010's. As he was then in his '70's anyone who became aware of these episodes certainly thinks such was one of the natural progressions of aging – like losing the car keys or misplacing the reading glasses or recounting a story with details different than those which he actually experienced. They were not alarming at the time. Especially up to the last four years that the firm existed those lapses became more apparent and more worrisome It grew to a situation where there were episodes where he did not recognize lawyers who had been at the firm for 15 or 20 years, did not know what lawyer sat in what office, or did not recognize the floor when he got off the elevator (and the building had only three levels). Along with the lapses, there was a change in his character and his loss of friends and those with whom he would have spent time years earlier was even more manifested.

When people have asked me how my brother now is doing I report to them my observation that I believe he is on a downward arc and has been for a number of years. He cannot care for himself, he has people preparing meals ████████████████████████████████████
████████████████████████████████████████████████████████

There exists no potential for Thomas Girardi committing any type of offense again. Consistent with dementia, in his own mind he still thinks he is running a law firm and still thinks he is a lawyer with fine advocacy skills -- though he has not been for nearly four years now. He is a man in the closing stages of his life reduced to getting through the day only with significant assistance of others.

I hope that the Court recognizes the behavior of Thomas Girardi over those last few years of his practice is entirely inconsistent with decades long career which proceeded.

Very truly yours,

JOHN A. GIRARDI

JAG/ma

# EXHIBIT 2-4

                                    Keck Medical Center of USC

November 19, 2024

Honorable Josephine L. Staton
United States Federal Court
Los Angeles, CA

Re:   U.S. v Thomas V. Girardi CR 23-47-JLS

Your Honor:

I write on behalf of my patient, Mr. Thomas Girardi, to provide information to be considered at the time of his sentencing.  Mr. Girardi was referred to me for a neurological consultation, which took place on April 8, 2021.  I saw the patient in follow-up clinic visits on 11/12/2021 and 4/13/2023.  Over approximately this interval of time, he underwent serial mental status exams, assessment of activities of daily living, neuropsychological testing, and imaging studies which substantiated a slowly progressive cognitive and functional decline.

My professional opinion (stated in a letter dated May 31, 2023) is that Mr. Girardi suffers from a slowly progressive and untreatable dementia known as LATE (Limbic-predominant, Age-related, TDP-43, Encephalopathy).  Family and colleagues noted changes in his mental status and behavior beginning with a car accident in 2017.  From the presence of severe hippocampal and temporal lobe atrophy evidenced on an MRI dated 7/31/2017, I infer that a neurodegenerative process had started prior to 2017.

By May 2023, I graded the severity of Mr. Girardi's dementia to be moderate in severity.  Across specific cognitive and functional domains, he evinced: 1) severe impairment in memory, 2) moderate disorientation to time and place, (3) significant impairment in problem solving and judgment, 4) inability to conduct outside activities, and 5) need for assistance in dressing and hygiene.

Because of the severity of his cognitive impairment, he is no longer capable of committing the sort of offenses for which he was judged guilty.  Since June 2022, he has been living in a secure, skilled nursing facility.  For his care and safety, I recommended in December 2023 and February 2024 that the Court appoint a conservator and remand placement to a locked or secure skilled nursing facility.  Based on his medical needs, I respectfully ask that you consider keeping him in the Memory Care wing of a locked assisted living facility.

Sincerely yours,

Helena Chang Chui, MD
McCarron Professor and Chair of Neurology
Medical License:  G45721

cc:    Charles_Snyder@fd.org, Sam_Cross@fd.org, Natalie_Degrati@fd.org

# EXHIBIT 2-5

Hon. Josephine L. Staton                    November 18, 2024
Re: Thomas Girardi

Your honor,

I have known Mr. Girardi since 1996 when I was an expert witness in the lawsuit brought by the residents of Hinckley, CA against PG&E for the contamination of groundwater with hexavalent chromium. This case, made famous by the movie Erin Brockovich, settled for $333 million, the largest class action lawsuit in the US at the time. That began my long association with the firm of Girardi & Keese testifying as an expert in occupational toxic exposures (Lockheed Aircraft), as well as in personal injury cases of neurological and psychiatric damages. In addition to the professional time spent preparing for depositions and trials, I spent many dinners and other social events with Mr. Girardi and his family and staff. I considered him a good friend and went on vacation trips with him and met with him when he came to Washington, DC on business (I live in suburban Maryland).

Mr. Girardi was generous and thoughtful. On one occasion while I was there, he paid the college tuition for a clerk in his office, pretending it was a regular scholarship that had been established for workers in the firm. The results he won for his clients were exceptional by any standard, because in my opinion, he really cared for their welfare.

As the years went on this brilliant lawyer and entertaining raconteur began to show signs of mental impairment, including meeting me at the wrong restaurant in New York City, having mistaken one Italian place for another. He often retold the same anecdote many times as if it were new. During one trial he went to play golf and left my testimony and cross examination to a junior associate, who had never before presented a case to a jury. Years before these events I had spoken to his Internist about getting an MRI of the brain to evaluate causes of dementia. He finally had an evaluation by Helena Chui, MD, Chair and Professor of Neurology at USC, who confirmed his diagnosis of dementia. He now resides in a facility for the senile elderly.

I cannot judge the events for which he has been convicted, but it would not surprise me if he had not been taken advantage of by those around him who managed the finances in this firm.

He now spends his time in care, no longer able to participate in the life he used to live. There can be no worse punishment than the irretrievable loss of one's cognition.

Respectfully yours,
signed
James R. Merikangas, M.D.
Clinical Professor of Psychiatry and Behavioral Science, George Washington University
Co-Founder, American Neuropsychiatric Association
Former President, American Academy of Clinical Psychiatrists
Distinguished Life Fellow, American Psychiatric Association

# EXHIBIT 2-6

**Rick Kraemer**
**889 South Victoria Avenue**
**Los Angeles, California 90005**

November 15, 2024

Honorable Josephine L. Staton
United States Federal Court
350 West First Street
Courtroom 8A
Los Angeles, California 90012

RE: Thomas V. Girardi

Please accept this letter in consideration of Mr. Girardi's upcoming sentencing on December 6, 2024. Tom's life and career is much like a painting in a museum, if one looks at it up closely, it is hard to see the entire picture. When one steps back and looks at Tom's career, the picture differs from what has been under the microscope in the recent trial and the public's opinion.

For background, I own Executive Presentations which has served the legal community in Southern California since 1986. My company has been involved in over 15,000 legal matters, having prepared trial presentations and in-trial technical support to top tier firms and prominent litigators. I hold a Bachelor's Degree in Marketing from the University of Wisconsin, and a Master's Degree in Economics/Finance from Houston Christian University.

I first met Tom in the mid-1990s. I volunteered to take pictures at an American Board of Trial Advocates event in 1996 where he was being honored as CAL-ABOTA's Trial Lawyer of the Year. Subsequently, Tom would call me when he needed a photographer to cover an event.

In 1998 Tom became the CAL-ABOTA president and had me photograph events for him. In 1999 Tom became the national president of ABOTA and personally funded my travel with him to photograph the ABOTA events he presided over. Subsequently, ABOTA adopted me as their national photographer, which position I still hold to this day. This sequence of events also cemented my company, Executive Presentations, in the Southern California Legal community as a "go to vendor" for legal presentations. Tom coined the phrase "Its Legal Malpractice not to use Executive Presentations" which brought more clients to my small company. In 2005 Tom became President of the International Academy of Trial Lawyers, and I subsequently became their national photographer generating additional visibility for my company.

Tom's support and generosity were a "game changer" in my career. Over the years I had the pleasure of interacting closely with Tom "in the trenches" on high stakes/profile cases and observed his diligence, and his civility when collaborating with the Court, his adversaries, and his clients. I witnessed Tom's peers, staff, and vendors all holding him in high regard as to his warm demeanor and yeoman work ethic.

My Godfather once told me there is good in everyone. I am asking you to consider the good that Tom Girardi has done, and that it not be overshadowed by his misdeeds. Last week I was at the Jonathan Club and the parking attendant told me of Tom's generosity with himself and the JC staff. Tom respected and made working class people feel important. It is said that sad news always overshadows good news, although I still am regularly reminded of the many honorable deeds related to Tom.

After Tom's car accident in 2017 he began to decline. People at the firm testified in his trial that Tom was losing it, and trial testimony from the G&K firm emails amongst his lawyers was that he cannot remember anything (politely saying it).

When Girardi & Keese closed its doors in December of 2020 during the pandemic, Tom's brothers Jack and Bob asked me to assist in looking after Tom who was no longer "the guy" I knew 25 years ago. His mental health had deteriorated, and he was experiencing physical health issues including blindness. His vibrancy and zest were gone. I would show him pictures of friends and he could not recognize or remember them. While Tom was still living at home, I would take him meals and administer his eye drops. Tom was not capable of remembering to take his medications, administer his eye drops which were imperative for his vision and care for himself. He also was prone to do things that were unsafe like turning on the oven for heat because the heating system in his home was not functioning. We ended up turning off the gas to the stove to prevent him from being in danger. Most everyone had deserted him as his generosity was no longer able to be taken advantage of. Tom's daughter Jenny and I would trade off assisting him and keeping him company.

One day Isabell, a caretaker who his brother Bob Girardi was paying for 8 hours a day, took Tom to an eye doctor's appointment in Pasadena and waited for him out front. Tom, not remembering she was there, went out another door and started walking home. Another time an emergency arose, and I was called at 6 am to take Tom to UCLA Stein Eye Institute as the shunt in his eye was protruding out of his eyeball. Tom became restless and wanted to leave the facility before they could tend to him. He did not understand the gravity of his medical condition and eventually he lost sight in his eye. Yet another time I took him to a doctor's appointment, and he started to shuffle through credit cards to pay. The credit cards had been shut off over a year ago. With no driver's license, or ability to call Uber (as he had lost the I-Phone the day after his brother Bob gave it to him and only uses a flip phone), Tom was immobile and relied on the care of the few that were left to help.

One day while sitting on his porch I "lit" into Tom about his
fabrication of the firm being open and new cases coming in. I told
him it was not so, and his retort was "do not scold me!" It was
strange to be admonishing a man I once looked up to. That said,
when I am asked why I am still kind to Tom I respond that I am not
the law or his maker, I am a friend who cares about his well-being.

Since leaving his home in Pasadena (now sold) I visit Tom regularly
in the nursing home and he does not remember what I tell him and
asks me the same questions repeatedly. Our conversations are not
deep as he cannot connect with his thoughts. I testified in Mr.
Girardi's competency hearing that Tom was/is significantly
compromised mentally and physically failing. I stand by my
testimony and Tom's mental cogency has further declined since
then. When individuals say he is "faking it" I ask how would you
know, have you been to see him?

Tom needs 24-hour lockdown care in a dementia wing of a nursing
home and shares a room with another dementia patient. The
attendants at the nursing home tell me he is in his own world
(whacked), a world far from the world he once knew. Last month
when I was at the nursing home, we called an old friend Browne
Greene (I did the talking) to wish him a happy 88th birthday. When
we got off the phone Tom asked me what firm Browne was with,
and then asked me his (Browne's) name. Tom had no recollection
of Browne, who he has known for over 40 years.

My conversations with Tom on the telephone usually last less than
a minute with no substance. Typically, after getting off the phone,
he often calls me back asking if I had called. When I ask him what
he has been doing he says he is with lawyers and will be back at
home (Pasadena) tomorrow. He still thinks he owns his home. This
past summer lunch was set up by a lawyer who did not understand
Tom's mental status. Tom told the lawyer that his driver would take
him to Hillstone's in Santa Monica. The lawyer phoned me the
morning of the scheduled lunch and I told him "there is no driver,"

therefore no lunch.

Tom repeatedly tells me he speaks with and sends work daily to
Shirleen Fujimoto, his former assistant. Shirleen has not spoken to
Tom since the firm dissolved in 2020. If one were to call Tom today
and ask him what Rick Kraemer's first name is, he would say
"Kraems". As well he does not remember my wife's name and refers
to her as "the chic."

When considering Tom's sentence, I urge you to find a way to look
at the "entire picture" and consider the good Tom has done for so
many along the way. Tom is not capable of any further harm or for
that matter bestowing any generosity for which he was once
known. Individuals, including members of the judiciary, colleagues,
and former employees, care deeply as it relates to Tom's well-being
and seeing that he is in proper hands with good medical attention.

Please consider my heartfelt thoughts above and feel free to
contact me if you have any questions.  My cell phone number is
213-500-2321.

Sincerely,

*Rick*

# EXHIBIT 2-7

To the honorable Josephine L. Staton,

I am writing this letter on behalf of Thomas Girardi. I have known Tom since about 1972. I was admitted to practice law in California in 1969. I started practicing at the California Attorney General's office. In 1972, I was in private practice.

I was representing a client In a P.I. case. He was seriously permanently injured. I did not feel experienced enough to complete the case. Therefore, I brought in co-counsel Tom Girardi. He already had an excellent reputation in P.I. cases. He settled the case just before trial, and he got an excellent result.

Thereafter, Tom frequently referred family law cases to me as I did more of the same as time went on. Family law became the primary area of my practice.

About 25 years ago, Tom retained me to represent him in his dissolution of marriage case from his second wife. After over two years of litigation, the case was settled on the second day scheduled for trial. The fees were very substantial, and Tom owed my firm about 160,000 dollars. I volunteered to reduce the final bill, but Tom would not accept any reduction. He said I did an excellent job and that he would pay me in full, which he did.

On or about 2009 (Great Recession) the Alliance Bank was seized by the F.D.I.C. along with about 500 other small to medium size banks. I was a founder of the bank and a director. The directors hired Tom to represent them against the E+O insurance carrier. After about two years of litigation, Tom was able to get the carrier to increase its offer to settle from 250,000 to 5 million dollars. The case was then settled. Tom did a remarkable job, and he refused to accept any fees or even costs. That was incredibly generous.

A few years ago, Tom retained me to represent him in his divorce from his current wife. I represented Tom until I retired about three years ago.

What was very apparent when Tom called and asked for my help was that he did not sound at all like the confident, dynamic Tom I knew. Instead, he seemed timid and overly thankful. He was like a different person.

I spoke to Tom a couple times thereafter and he always sounded very different from the person I knew for over 40 years.

A few months before I retired (November 2021) Bob Girardi asked if I would come to Tom's house in Pasadena and talk to him. I had never been to his home. Soon thereafter, I went to visit Tom. Bob was also there. I was shocked to see Tom. He looked like he had lost too much weight, and he was dressed in a rather unkempt manner, far away from the well-dressed and sharp person I knew.

I was at the house for about two hours. I tried to have a pleasant conversation with him about the times I represented him and his representation of Alliance Bank. I was uncertain if he knew what I

was talking about. He did not respond in any meaningful manner. He carried a yellow legal pad around but did nothing with it. It was very sad.

For all the years I knew Tom until the recent time I was retained (no fee ever collected), Tom was a dynamic, brilliant attorney. I never heard a negative comment from anyone about him.

I hope the court in sentencing Tom will consider his total decline mentally and physically and his long history of excellent work and generosity.

Michael Abrams          *[signature]* 11/12/24

# EXHIBIT 2-8

# Robert Sonne

67 S Higley Rd Ste 103-412
Gilbert, Az 85296
Bob 480.276.9178 Pianogy@aol.com

November 17, 2024

Hon. Joephine L. Stanton:

I met Tom Girardi in 1972 through his brother, Robert
Girardi, who was and still is my best friend.  Through
the years, I have attended many social functions that
included Tom, where Tom was always the one to "light up
the room."  Any event was that much more enjoyable with
Tom present, as he had the gift that drew everyone to
him.  His kindness and attentiveness, his sharp wit and
intellect made him a special member of any group.

As the years went by, Robert would keep me up to date
of Tom's many successes and accomplishments, both in
his law practice and in his personal life, always about
Tom's generosities with others.

In the past decades, as a building contractor, I have
had a few legal issues that Tom was always happy to
assist me and would often resolve the issue with a
phone call or a letter. He would never send me a bill..

In the early 1990's, I was facing some monetary
hardships when I was sued by a former client.  Tom took
the case for no charge as he realized my dire financial
position.  Through his kindness and generosity, I was
able to settle the issue and retain my California
contractors' license and move ahead re-building my

business.  I was then, and am now, indebted to Tom and
his kind generosity.

I talk to Robert weekly and have been following the
legal problems of his brother, Tom the past few years.
The constant negative news and reports, the episode of
American Greed, and the series of articles in the LA
Times have left me perplexed as this isn't the Tom
Girardi I've known.  These stories were about someone
else.  And, as I have discovered, these stories were.

Last Tuesday, November 12, 2024, I had the oportunity
to go to dinner with Robert and Tom.  Tom is a shell of
a man I used to know.  He had the same "light up the
room presence, was personable, attentive, entertaining
and happy, with a few wonderful stories and jokes---for
about five minutes.  Then, for a second time, Tom asked
me where I lived and what I did.  And then a third and
forth time.  Tom would tell a story and then repeat a
story he told ten minutes earlier.  He then, again,
would ask where I lived and what I did.

I asked how he was being treated where he lived.

"Oh, I don't live here, I'm just here for a week for
some meetings," he replied.  "I live in Pasadena
overlooking the Rose Bowl in a house designed by the
guy who designed the Rose Bowl.  I'm about fifteen
minutes from my office.  All the attorneys working for
me live on the West side and must drive an hour."

This is not the Tom Girardi I knew for all these years.
My experience with Tom the other night showed that he
isn't right.  That he has suffered an affliction
through no fault of his own that renders him incapable
of caring for himself, let alone running a multi-
million dollar law firm as he did for most of his life.

Tom Girardi is incarcerated at the present time and has
been for the last few years.  He is in a facility being
paid for by his brother, Robert, where he can't leave
or freely move around.  His everyday activities are
completely monitored.

His final years should not be spent as a prisoner of
the State, but under the care and guidance of his
family and the personnel of his current living
facility.  He is a threat to absolutely no one except
to himself as he requires constant care.

I hope the court can make the decision to let Tom
Girardi live his remaining years where he is now.

With kind regards,

Robert Sonne

# EXHIBIT 2-9

| From: | Wayne Boehle |
|---|---|
| To: | Charles Snyder; Sam Cross; Natalie Degrati |
| Subject: | Tom Girardi letter |
| Date: | Saturday, November 30, 2024 9:55:19 AM |

EXTERNAL SENDER

Judge Staton

My name is Wayne Boehle and my bar number is 49286. I was admitted in California in 1971. I have known Tom Girardi since 1963. Both of us attended Loyola University. Tom was 2-3 years ahead of me.

After law school I started working for the firm of Waters McCluskey and Cochran. I became partner in 1974 and ran the firm the last 30 years of my practice. After retiring, I became a mediator and work for ADR Services Inc. I have been mediating cases for approximately 9-10 years.

During my tenure as a defense attorney handling civil matters I probably had 30-40 cases with Girardi Keese. Tom handled most of them when they would arrive at the settlement stage of the proceedings. With the exception of the last case I handled with Tom, I never had any problems with Tom or his firm in the handling or settlement of the cases. It's clear to me now that the problem I had, was a result of his failing mental health. I actually walked into his office at a deposition and told him that I thought we were friends , but friends wouldn't leave the voicemail he left me then walked out. 6-7 months later the case settled and he left me a voicemail thanking me for helping to get the case settled. I believe he was having problems at this time which was around 2012.

I want to say that when Tom was in his prime as a trial lawyer, there were few lawyers that could match his skills. He could pick up a file knowing little about it and try the case in an expert manner. His people skills were amazing. His IQ was off the charts. That's why it was horrifying for me to learn of the problems that he caused and perpetrated at the end of his career. I know he needs to make restitution and be punished. I only hope that the 90% of his career is taken into consideration when his sentence is handed down. He truly was respected as one of the best civil trial lawyers in the country. What happened to the deteriorating conduct that has come out will never be understood by this writer. Hopefully Tom will not pass away in prison. Sincerely, Wayne J Boehle

# EXHIBIT 2-10

November 13, 2024

Honorable Josphine L. Staton

**Re: U.S. v Thomas V. Girardi CR 23-47-JLS**

Dear Your Honor:

I have worked with Mr. Girardi for 34 years and was one of his legal assistants.

Tom has always been a kind, understanding, and empathetic person. He was always a role model for the team, and someone many of us coworkers looked up to.  During my time working with Tom for 34 years, we experienced a lot of what life has to offer together. I was there through his challenges as well as his wins, as he was for me.  During my 3rd pregnancy, I was diagnosed with cervical cancer. This life-shattering news devastated my family and left me in fear of the unknown.  Tom provided me with the strength and support needed to get through the trying time.  He ensured I seek the top doctors and that my family remains taken care of while I focus on healing and surviving. There was also a time in my life when my aunt was suffering from breast cancer, that had ultimately spread to her brain. She was nearing death and only had a few weeks left to live. She needed to be placed in hospice care, which cost around $5,000.  When I told him about my aunt's situation, he immediately was willing to assist financially. A final example I would like to share does not involve myself or my family, but rather the thousands of clients he had and took care of. There were many times where clients needed advancements, to help pay their bills, or to provide food on their tables, and Tom ensured they received the help they needed to support themselves during the tough legal battles they were in.

Tom has always spoken about how he likes to help people who don't have a voice.  He would rather help than to harm or to take anything from anyone.  I strongly believe that Tom had no ill intention of financially harming any of his clientele.  The only thing he is at fault for is for being too kind and allowing individuals to take advantage of him.  In the 34 years I have worked for him, I have never seen him waver from the kind, optimistic, helpful person that he still is. I know Tom to be very smart and thoughtful.  The thing that I have learned from him is to have patience and to think before reacting. I now apply that to my everyday life.

During the last few years of the law firm still being active, I noticed that Tom began to slow down. He would seem distracted and confused and would often repeat the same stories or commands. I believe this was the start of his mental deterioration.

I believe Tom would not commit any sort of offense based on the type of person he is.  He
only means well and has only the purest intentions.  Additionally, he has a deteriorated
mental state that would prohibit him from trying to carry out any situation as such.

Tom needs medical assistance mentally and physically.  He is getting older and, as stated
prior, his mental state is deteriorating. He would benefit from a home that cares for older
individuals suffering from mental inabilities as well as the harsh realities old age has on our
bodies. I know that prison would only deteriorate him further and not allow him to receive
the proper medical help he needs.  He has already lost his firm, his family, friends, and
many of the people that were in his close circle. He deserves to live out the remaining years
of his life with some type of peace.

Thank you for reading my statement and taking it into consideration.

With best intention,

Kim Cory
(626) 991-2891

# EXHIBIT 2-11

LAW OFFICES
# KEESAL, YOUNG & LOGAN
A PROFESSIONAL CORPORATION
THE WATERFRONT AT
CATALINA LANDING
310 GOLDEN SHORE, SUITE 400
LONG BEACH, CA 90802
(562) 436-2000
FACSIMILE:
(562) 436-7416
www.kyl.com

SAMUEL A. KEESAL, JR.
STEPHEN YOUNG
MICHAEL M. GLESS
PETER R. BOUTIN
JOHN D. GIFFIN
BEN SUTER
MICHELE R. UNDERWOOD
ELIZABETH P. BEAZLEY

JODI S. COHEN
STACEY MYERS GARRETT
ELIZABETH H. LINDH
SANDOR X. MAYUGA
CHRISTOPHER A. STECHER‡
IGOR V. STADNIK‡
SIMON M. LEVY
BRYCE CULLINANE

AILAN LIU
ASHLEY E. IMPELLITTERI
CHRISTOPHER J. CAMMISO
MICHELLE L. ABDOLHOSSEINI
JULIANNE M. AVERYK
SARAH MALIK
LUCAS E. GARCIA

GABRIEL LEE-SANCHEZ
BAILEY MAHER
VALERIE QUIRARTE
AMANDA M. OUTCALT
AMANDA L. BOTELHO
JOEL H. FELDMAN
REBEKAH M. ZUFELT

* ADMITTED IN ALASKA
† ADMITTED IN WASHINGTON
‡ ADMITTED IN WASHINGTON & CALIFORNIA
§ ADMITTED IN ALASKA & CALIFORNIA
+ ADMITTED IN DISTRICT OF COLUMBIA & FLORIDA
£ ADMITTED IN DISTRICT OF COLUMBIA, OREGON, WASHINGTON
  & CALIFORNIA
º REGISTERED FOREIGN LAWYER WITH THE LAW SOCIETY
  OF HONG KONG 1982-2022 & ADMITTED IN NEW YORK
^ REGISTERED FOREIGN LAWYER WITH THE LAW SOCIETY
  OF HONG KONG

ALL OTHERS ADMITTED IN CALIFORNIA

OF COUNSEL
ROBERT H. LOGAN       WILLIAM McC. MONTGOMERY
TERRY ROSS            JON W. ZINKE*
RICHARD A. APPELBAUM+ ROY DELBYCK^
REAR ADMIRAL, U.S.C.G. (RET.)

November 22, 2024

The Honorable Josephine L. Staton
United States District Court
Central District of California
350 West 1st Street, 8th Floor
Los Angeles, CA 90012

Dear Judge Staton:

      I am writing regarding Tom Girardi.  I have known Tom for some 30 years, have had dozens of cases against him and have referred cases or worked on cases where we were co-counsel.  I am amazed he finds himself in this position.  It is out of character for the Tom I knew.  Tom was always a fine lawyer and a fine gentleman who stood by his word on literally dozens if not hundreds of occasions.  He always was willing to take the high road.  Two examples of his doing so are as follows:

      We represented the owner of the Queen Mary.  I was called in route from the Indy 500 by the owner advising that he had been sued by Dick Clark from American Bandstand regarding my client's failure to make approximately $9M in payments due pursuant to his agreement to rent Dick Clark's artifacts for display in the Spruce Goose Dome adjacent to the Queen Mary.  My client acknowledged the fact that he owed Mr. Clark approximately that amount, could not pay it because he simply did not have the money, but was concerned there was a $30M punitive damage claim which, if it was not withdrawn, would result in the failed bond offering currently pending.  I called Tom from Cincinnati Airport and described these circumstances.  Tom said he was not certain that he could maintain a punitive damage claim and said he would withdraw the claim subject to reinstating it on what we both agreed was 90 days before trial.  When I got back to the office, I found that he had dismissed the case with prejudice.  I in turn reminded Tom that the agreement was that it should be without prejudice so that if evidence materialized that supported the claim, he could reinstate it up to 90 days before trial.  The case thereafter settled but his willingness to withdraw the claim I thought reflected well on Tom.

      On another occasion, we were lead counsel for Unocal regarding the oil spill disaster at Avila Beach.  An associated counsel had suggested a settlement amount which we had disclosed to Unocal.  Unfortunately, at the mediation chaired by Judge Daniel Weinstein, that

SAN FRANCISCO OFFICE
578 JACKSON STREET
SAN FRANCISCO, CA 94133
(415) 398-6000
FACSIMILE:
(415) 981-0136 • (415) 981-7729

ANCHORAGE OFFICE
SUITE 7A
101 E. 9TH AVENUE
ANCHORAGE, AK 99501-3651
(907) 279-9696
FACSIMILE: (562) 436-7416

SEATTLE OFFICE
SUITE 3100
1301 FIFTH AVENUE
SEATTLE, WA 98101
(206) 622-3790
FACSIMILE: (206) 343-9529

HONG KONG OFFICE
ROOM 929 STAR HOUSE
3 SALISBURY ROAD
TSIMSHATSUI, KOWLOON, HONG KONG
(852) 2810-5777
FACSIMILE: (852) 2810-5288

The Honorable Josephine L. Staton
November 22, 2024
Page 2

counsel refused to stand by this acceptable amount.  Tom was upset that that attorney had done so and dealt with the issue in a straightforward manner even though it was not in his best financial interest to do so.

       As to Tom's mental state, I do have some insights.  I arbitrated a case downtown with the AAA at a time when Tom owed monies to the person for whom I was arbitrating the case.  We had several lunches together during which Tom spoke of that person and the circumstances surrounding his claims against Tom.  His description of the circumstances was inaccurate and inconsistent time after time.  My partner, Michael Gless (who has likewise known Tom for many years) and I discussed his lack of continuity of thought and our concern regarding his cognitive abilities.  I have not spoken to Tom since his problems surfaced and put forward these thoughts so the court might see a Tom Girardi that I knew and liked so that you can in turn determine what sentence Tom should receive.

       I must remind the court that I was involved in the Pacific Hospital case and asked for a sentencing which the court did not feel was appropriate.  I know very little about this case and am not urging a particular sentence for Tom but wanted you to have a feel for Tom which others may be reluctant to express in all the circumstances.

       Thank you for your consideration of any or all of these comments.

       Best regards,

       Samuel A. Keesal, Jr.
       *skip.keesal@kyl.com*

SAK:kdg

KYL4867-5443-3789.1

# EXHIBIT 2-12

| | |
|---|---|
| **From:** | Gary T Drummond |
| **To:** | SCharles_Snyder@fd.org; Sam Cross; Natalie Degrati |
| **Subject:** | THOMAS GIRARDI, SENTENCING LETTER (CR 23-47-JLS) |
| **Date:** | Wednesday, November 20, 2024 11:37:44 AM |

**EXTERNAL SENDER**

Hon. Josephine L. Stanton

Your Honor:

Tom Girardi and I have been long distance friends—friendly adversaries, actually—and I was distressed to hear of his manifold troubles of late.  First was the State Bar investigation, simultaneous with the onset of dementia, then, after he had lost everything important to him, the stunning news of his conviction.  I would not, of course, presume to comment on the recent verdict against him, but I have to say that the actions portrayed are utterly, completely out of the character of the man I know.

Tom was the spirit of quiet generosity, in attitude and deed, and he unfailingly displayed a genuine humanity.  It showed in small ways: doing some *pro bono* work for a tenant of one of my clients, helping a friend of my daughter's with local introductions, making sure the court reporters, the bailiff and the court clerk were acknowledged at a Thanksgiving luncheon during one of our trials, along with many other grace notes.  These things may be individually trivial, but, over the years, they revealed a kindness and graciousness that I found admirable.

In over forty years of practice, Tom is the most authentic, guileless person I've ever met, which is, I think we can agree, saying a lot about a trial lawyer.

Sincerely,

Gary T. Drummond

# EXHIBIT 2-13

**Dennis M. Fitzpatrick**

Hon. Josephine L. Staton:

I am writing this letter on behalf of Thomas V. Girardi.

I have known Mr. Girardi for over 50 years as a client of his law firm, business partner and friend. I was formerly the President and CEO pf Beverly Hills Savings, a public company and later, PacTen Partners, LLC, a real estate development company. I am 86 years old and retired. I lived most of my life in the Los Angeles area and now reside in San Diego. I have an engineering degree from the University of California (Berkeley) and two master degrees from USC.

I first got to know Tom as a client of his law firm. He defended Beverly Hills Savings when the federal government chose to "shut down" the entire industry in the late 1970's. Tom did an excellent job and kept the company and me out of any further legal entanglements. I found him and his entire law firm to be outstanding counselors. Indeed, I had occasion during that period to discuss him with an acquaintance who happened to be the head of one of Los Angeles' leading law firms and he called Tom Girardi an "excellent lawyer."

Since that time, we have become friends and Tom represented me and/or my company on occasion, he became an investor in some of our projects and, occasionally, I acted as an expert witness for his firm. I always found him to be a superior human being and friend.

I am surprised and shocked at the result of his recent trial. That seems completely at odds with the Tom Girardi I know,

I am aware of many "good works" by Tom. He has always looked after people on the lower rungs of the economic ladder. Some examples:

(1) When Wilshire Country Club remodeled their course, Tom became aware that they planned to lay-off many of the workers during the remodel. Tom went to the board and intervened on the workers behalf. He did the same thing during Bel Air Country Club's remodel.
(2) Tom had a radio program that informed the public about the law and its operation.
(3) He was a big supporter of his alma mater, Loyola University.
(4) Tom sat on multiple committees including those for lawyer organizations as well as the Library of Congress. On many of them he was either the chair or the President.

About five or six years ago, I became aware that Tom had suffered a serious automobile accident near his Pasadena home and suffered a head injury. I did notice some impact to his mental acuity after that incident.

In closing, I would like to urge leniency in any sentencing. He is old, not well and in need of help that I'm sure his family will provide.

Sincerely,

Dennis M. Fitzpatrick

**17630 Plaza Arica, San Diego, CA 92128**
**(310) 993-9117  dfitz@pactenpartners.com**