UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>THOMAS VINCENT GIRARDI,<br><br>    Defendant. | Case No. 2:23-CR00047-JLS<br><br>**ORDER AFTER HEARING PURSUANT TO 18 U.S.C. § 4247(d)** |

      On June 2, 2025, this matter came before the Court for a hearing pursuant to 18 U.S.C. § 4247(d).  The Court set the hearing after arguments raised by the defense suggested to the Court that it should order an assessment of whether Defendant "may presently be suffering from a mental disease or defect" that would necessitate "care or treatment in a suitable facility."  18 U.S.C. § 4244(a).  In December, 2024, the Court ordered a psychiatric or psychological examination of Defendant, which resulted in the issuance of a report. *See* 18 U.S.C. § 4244(b) & § 4247(b)-(c).  The report was distributed to the parties and has been made part of the record, and the defense was given the opportunity to consult with defense experts, and their reports have also been made part of the record.  (*See* Doc. 500 (combining three under-seal reports); Doc. 142-1 (expert declaration filed with Defendant's sentencing memorandum).)  At the hearing, the Court

received into evidence the Government's Exhibit 1.  The Court has reviewed the record, the parties' filings, the expert reports, and considered the testimony and arguments of counsel presented at the hearing.

At the conclusion of the hearing, the Court announced its ruling and that a written order would follow.  Now, as set forth herein, and pursuant to 18 U.S.C. § 4244(a), the Court FINDS by a preponderance of the evidence that although Defendant is "suffering from a mental disease or defect," it is NOT one "of which he is in need of custody for care or treatment in a suitable facility."  Accordingly, the Court CONCLUDES that Defendant may be housed at an appropriate facility within the federal Bureau of Prisons.

I.  **OFFENSES OF CONVICTION**

On January 31, 2023, former attorney Thomas Vincent Girardi ("Defendant") was indicted on five counts of wire fraud in violation of 18 U.S.C. § 1343.  Defendant was charged with defrauding five clients "by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts" that Defendant "had a duty to disclose." (Indictment ¶ 2; Doc. 1 at 4.)  Defendant was convicted of unlawfully failing to pay to his clients the full amount of settlement funds received by Defendant's (now defunct) law firm, Girardi Keese.  Defendant made misrepresentations and/or offered fictitious excuses as to why the settlement funds could not be distributed to his clients sooner.  After a twelve-day trial, Defendant was convicted on four counts[1] of wire fraud.

II.  **LEGAL STANDARD**

When a district court is "of the opinion that there is reasonable cause to believe that [a convicted] defendant [is] suffering from a mental disease or defect" that would require "custody for care or treatment in a suitable facility," it must *sua sponte* order a hearing before the sentencing of that defendant.  18 U.S.C. § 4244(a).[2]  Prior to the hearing, "the

---

[1] Just before trial, the Court dismissed the fifth count pursuant to the Government's unopposed Motion to Dismiss.  (*See* Doc. 312 & 314.)
[2] Section 4244(a) also authorizes the Government to move for such an order, but it did not do so here.

court may order that a psychiatric or psychological examination of the defendant be conducted, and that a psychiatric or psychological report be filed with the court, pursuant to the provisions of section 4247(b) and (c)." 18 U.S.C. § 4244(b).

The incorporation of § 4247(b) authorizes the court to commit such a defendant to the custody of the Attorney General for up to 30 days (plus one 15-day extension) to permit "[a] psychiatric or psychological examination" of the defendant. 18 U.S.C. § 4247(b). Subsection (c) of § 4247 requires that the examiner prepare "[a] psychiatric or psychological report," and sets forth a list of subjects that the report must address. These include:

> (1) the person's history and present symptoms; (2) a description of the psychiatric, psychological, and medical tests that were employed and their results; (3) the examiner's findings; and (4) the examiner's opinions as to diagnosis, prognosis, and . . . (E) if the examination is ordered under section 4244 . . . , whether the person is suffering from a mental disease or defect as a result of which he is in need of custody for care or treatment in a suitable facility . . . .

18 U.S.C. § 4247(c)(1)-(4) (paragraph structure altered).

Hearings pursuant to § 4244 are subject to the procedural requirements of § 4247(d). These requirements include representation by counsel, the right to present evidence, to subpoena and call witnesses, to cross-examine witnesses, and the right to testify. The statute describes the determination to be made at the hearing as follows:

> If, after the hearing, the court finds by a preponderance of the evidence that the defendant is presently suffering from a mental disease or defect *and* that he should, in lieu of being sentenced to imprisonment, be committed to a suitable facility for care or treatment, the court shall commit the defendant to the custody of the Attorney General. The Attorney General shall hospitalize the defendant for care or treatment in a suitable facility.

18 U.S.C. § 4244(d) (emphasis added).

### III. PROCEDURAL BACKGROUND

On the day the jury returned its verdict, the Court set a sentencing hearing on December 6, 2024, a date that was later continued to December 20, 2024. (*See* Docs. 361 & 412.) A Presentence Report ("PSR") was filed on November 1, 2024. (Doc. 408 (later superseded by a Revised PSR (Doc. 433)).) The parties filed sentencing position statements and exhibits. (*See* Docs. 419, 421, 425-426 & 430.) After reviewing these, the Court issued an Order (Doc. 431) requiring further briefing from the parties, noting that Defendant's argument in favor of "lifetime confinement to a medical facility" implicated the procedures set forth in 18 U.S.C. § 4244 and § 4247 (which is described *supra* section II).

Thereafter, the parties filed responses to the Court's Order (Docs. 435-436) and, after review, the Court vacated the December 20, 2024 sentencing hearing, and instead held a status conference. (Docs. 437-438.) The same day, the Court entered an order temporarily committing Defendant to the custody of the Attorney General (for 30 days) for an evaluation pursuant to § 4244 and § 4247, set a January 7, 2025 self-surrender date, and set forth specifics regarding Defendant's transport to a Bureau of Prisons ("BOP") Federal Medical Center ("FMC") in Butner, North Carolina. (Doc. 439.) Defendant self-surrendered, was transported, and evaluated by BOP Forensic Psychologist Dr. Brianna Grover and BOP Neuropsychologist Dr. Tracy O'Connor Pennuto. After receiving an inquiry on February 4, 2025 from the FMC, the Court set a status conference for February 6, 2025. (Doc. 446; *see* also Doc. 447 (defense filing in advance of status conference).) In addition to counsel, Dr. Grover and Dr. Pennuto appeared by telephone. After the status conference, the Court granted a 15-day extension for the evaluation of Defendant. (Doc. 448.)

On March 11, 2025, a comprehensive report was received from the Bureau of Prisons, authored by Drs. Grover and Pennuto. After review of the report, and pursuant to 18 U.S.C. § 4244 and § 4247, the Court set the present hearing for April 11, 2025 (*see*

Docs. 450-451), which was continued to May 8, 2025 (Docs. 467 & 472). In response, the defense disclosed its own experts. First is physician Dr. Laura Mosqueda, and second is a corrections consultant, Nicole English.³

Defendant's medical emergency delayed the proceedings. On the afternoon of the day before the scheduled hearing, on May 7, 2025, the Court was advised that Defendant was being evaluated in the Emergency Department of a local hospital. (*See* Docs. 505-506.) Because of Defendant's waivers of appearance, the Court directed defense counsel to inquire of Defendant whether he wished to waive his appearance at the hearing. (Doc. 507.) When defense counsel filed his declaration that Defendant did not waive his appearance, the Court vacated the hearing and set a status conference for the same date and time. (Doc. 509.) At the status conference, the Court continued the § 4247(d) hearing to June 2, 2025, at 8:00 a.m., and the sentencing hearing to June 3, 2025. (*See* Doc. 516.)

After being evaluated in the Emergency Department, Defendant was hospitalized. On May 12, 2025, the defense filed its investigator's declaration, which indicated that the medical evaluation of Defendant was ongoing as of that date. (*See* Degrati Decl., Doc. 514 (sealed).) On May 14, the Court ordered the defense to update the Court within five days (or earlier if Defendant was discharged from the hospital before the five-day deadline). Five days later, a second declaration updated the Court on Defendant's status. (*See* Degrati Decl., Doc. 517 (sealed).) Because that declaration indicated, based on hearsay information, that Defendant would remain hospitalized for approximately eight weeks, the Court ordered defense counsel to obtain Defendant's medical records and to submit those records for under seal filing no later than May 28, 2025. (Doc. 518.)

Defense counsel filed a declaration on May 28, 2025 stating that 762 pages of medical records were received by the defense that morning. (*See* Cross Decl., Doc. 527 (sealed).) Of those, defense counsel filed under seal 13 pages (all related to Defendant's

---

³ The Court permitted all the experts to testify via videoconference based on a stipulation of the parties.

May 14, 2025 admission to an Orange County hospital). (Doc. 528 (sealed).) Of note, Defendant underwent surgical procedures on or about May 15 and 19, 2025, and was released from the hospital within a few days thereafter. (*Id.*)

On May 29, 2025, the Court advised the parties that the June 2, 2025 hearing and the June 3, 2025 hearing would proceed as previously ordered.

## IV.    BASES FOR THE COURT'S FINDINGS

The standard of proof relevant to the Court's present determination is preponderance of the evidence. 18 U.S.C. § 4244(d). The finding the Court must make has two distinct parts: First, the Court must find whether "the defendant is presently suffering from a mental disease or defect," and second whether, as a result of the mental disease or defect, the defendant should, "in lieu of being sentenced to imprisonment, be committed to a suitable facility for care or treatment." *Id.*

### A.    Mental Disease or Defect

Drs. Grover and Pennuto prepared the BOP report after employing a thorough evaluation procedure, which included an extensive file review, multiple clinical interviews, behavioral observation in a custodial setting, physical health history and examination, brain MRI, and neuropsychological testing. (*See* BOP Rep., Doc. 500 at 3-5.) Specifically, over the course of approximately six weeks, Defendant was housed in a mental health care unit at the FMC, which allowed mental health care professionals and staff to observe Defendant's behavior, his habits, and his interactions with others over an extended period of time. These observations are summarized in eight single-spaced pages of the report. (BOP Rep., Doc. 500 at 8-16; *see also id.* at 20-21.) Dr. Pennuto administered a battery of neuropsychological tests, including at least eleven separate tests. (*Id.* at 3 & 21-24.) Defendant's physical health was assessed based upon his medical history, a physical exam, a chest x-ray, and an MRI brain scan. (*Id.* at 3.) Preparation of the BOP report included an extensive review of past reports related to Defendant's mental status, including reports from Dr. Budding (2021), Dr. Lavid (2021), Dr. Chang (2023), Dr. Wood (2023), Dr.

6

Goldstein (2023), Dr. Darby (2023), and Dr. Schroeder (2023).  (*Id.* at 3-4.)  Extensive review of Defendant's medical records was also undertaken, and included Defendant's records from his treating physicians, hospital records, and records from two senior living facilities.  (*Id.*)  Finally, there was a review of significant portions of the Court records in this case.  (*Id.*)

Comparing Defendant's performance on neuropsychological testing to earlier tests, Drs. Grover and Pennuto confirmed he demonstrated a continuing slow cognitive decline.  (*Id.* at 24.)  The BOP report explains Drs. Grover and Pennuto's diagnostic impressions at length:

> Mr. Girardi's cognitive compromises are best characterized as a Major Neurocognitive Disorder, due to multiple etiologies, mild, without accompanying behavioral or psychological disturbance.  The core characteristic of this disorder is evidence of significant cognitive decline from a previous level of performance in one or more cognitive domains.  The specifier "due to multiple etiologies" indicates the cognitive compromises are the result of multiple factors as indicated [in the preceding paragraph].  In general, the severity of cognitive deficits in a major neurocognitive disorder interferes with capacity for independence in everyday activities (*e.g.*, managing finances, transportation, [and] medications).  However, given Mr. Girardi's high premorbid level of functioning, and his resulting high level of cognitive reserve, he can compensate well for some of his cognitive deficits.  As such, the "mild" severity specifier was provided to address the extent to which his cognitive deficits impact his functional independence.  In Mr. Girardi's case, he is independent in ADLs, but needs assistance with IADLs.[4]  Lastly, the specifier "without behavioral or psychological disturbance" reflects that Mr. Girardi's cognitive deficits are not accompanied by clinically

---

[4] According to the Cleveland Clinic, activities of daily living, or "'ADLs' include things like eating, bathing and using the bathroom." *See* https://my.clevelandclinic.org/health/articles/activities-of-daily-living-adls (last accessed June 2, 2025).  Instrumental activities of daily living, or "IADLs" include more complex activities, and include such activities as managing one's money, healthcare, household, and transportation.  *Id.*  These also include activities like shopping, preparing meals, and communicating with others using phones or computers.  *Id.*  Although the statute does not specifically refer to ADLs or IADLs, the Court finds that they provide a helpful framework in this context.  The extent to which an individual retains (or loses) the ability to engage regularly and independently in ADLs or IADLs is a helpful in defining what assistance (if any) a defendant might require on a day-to-day basis.

significant behavioral or psychological disturbances.

(*Id.* at 25 (footnote added).) The BOP report acknowledges that Defendant's "prognosis is deemed poor due to the degenerative nature of his illness." (*Id.* at 26.)

Defense expert physician Dr. Mosqueda agrees with the BOP diagnosis of major neurocognitive disorder,[5] and she echoes the concern that the disorder "will continue to get worse," describing a "gradual[] los[s] of the ability to provide any care for himself." (Mosqueda Rpt., Doc. 500 at 38.)

On this record, the Court FINDS that Defendant "is presently suffering from a mental disease or defect," within the meaning of 18 U.S.C. § 4244(d). Specifically, Defendant suffers from Major Neurocognitive Disorder (referred to colloquially as "dementia"), which is slowly progressive, but which is currently mild and without accompanying behavioral or psychological disturbance.

### B. Appropriate Placement

The second factual issue is whether Defendant "should, in lieu of being sentenced to imprisonment, be committed to a suitable facility for care or treatment." 18 U.S.C. § 4244(d).

The BOP doctors opine that, notwithstanding their diagnostic impressions of Defendant and his "poor prognosis," he can be successfully housed within facilities operated by the BOP. (BOP Rep., Doc. 500 at 26-29.) The BOP report notes that the BOP manages and accommodates "a variety of mental disabilities," including "cognitive disorders." (*Id.* at 26.) The report points to Defendant's demonstrated abilities to perform ADLs: to dress himself, to use the bathroom himself, to walk, to feed himself, and to maintain appropriate grooming. (*Id.*) The BOP report suggests that Defendant would

---

[5] The review undertaken by Dr. Mosqueda was much less in-depth than that undertaken by the BOP. (*See* Mosqueda Rpt., Doc. 500 at 36-39.) She did not observe, test, interview, or examine Defendant, and her document review was limited to the BOP report, a letter from Dr. Chui (2023), and the original English declaration. Dr. Mosqueda echoes the opinion of other experts that Defendant suffers from cognitive decline. (*See id.* at 38-39.)

benefit from having an inmate companion assigned and from having his medication maintained on the "pill line" rather than having Defendant track his own medication. (*Id.* at 26-27.) According to Drs. Grover and Pennuto, a sufficient deterioration in Defendant's condition would likely result in transfer to a BOP specialty program or medical facility. (*Id.* at 27.) The BOP report also noted the potential for transfer to an FMC with a specialty program specifically for inmates with dementia. (*Id.*)

Defense expert, corrections consultant Nicole English, is an individual who has significant past work experience within BOP administration related to health care, and who now works on behalf of those individuals who are facing a possible federal prison sentence. (*See generally* Doc. 421-1 (English Decl.).) Ms. English opines that many factors counsel against placement of Defendant in BOP facilities.[6] For instance, she believes that Defendant would be assessed as requiring only a minimum-security placement, but that the relative lack of structure and minimum availability of medical services at these minimum-security facilities would counsel in favor of another placement for Defendant. (*Id.* at 8.) Instead, Defendant would be likely to be placed initially in a Care level 3 facility[7] (for less healthy inmates) or an FMC which, at Care level 4, is for the least healthy inmates. (*Id.* at 8-9.) Transfers from level 3 facilities to FMCs can take up to a year, and FMCs mix inmates from across the spectrum of security classifications, meaning that in an FMC Defendant could be housed with high-security inmates. (*Id.*) No FMCs are close to Defendant's home in southern California. (*Id.* at 9.) Ms. English also discusses staffing shortages, problems with medical contracts with specialty providers, poorly managed

---

[6] Ms. English focuses more on BOP operations generally than upon Defendant's care specifically. Her review included (non-specific) medical records provided by defense counsel, the Presentence Investigation Report prepared in this case (dated November 1, 2024), and the BOP Report. (*See* Doc. 142-1 at 3; Doc. 500 at 30.)
[7] Part of the BOP's management of inmate health care involves a health assessment and assignment of a level of care to each inmate. A Care level 1 inmate is relatively healthy and generally in need of only routine care; in contrast, a Care level 4 classification is assigned to the least healthy inmates.

infectious disease contagions, and documented failures regarding the medical treatment of inmates as adding support for her opinion that the "BOP has not proven it can skillfully treat dementia patients" and that "[p]lacement outside the BOP such as home detention may provide the best care" for Defendant. (*Id.* at 5-7 & 10.)

Dr. Mosequeda reviewed Ms. English's report, and her forward-looking opinions regarding how Defendant might fare in a prison setting are largely dependent upon the accuracy of Ms. English's opinions. (*See* Doc. 500 at 36-39.) For instance, when she discusses the need for others to interact with Defendant in a manner unlikely to disturb him, she notes that sharing space with inmates with mental health problems and/or violent histories increase the chances that Defendant will become agitated. (*Id.* at 38.) Dr. Mosequeda also sets forth a long list of Defendant's chronic medical conditions and his need for consistent monitoring by physicians and his need for access to specialist physicians. (*Id.*) She describes Defendant's vulnerability to the risk of abuse and neglect in a prison setting. (*Id.* at 39.) All of these concerns relate to conditions within BOP facilities as posited by Ms. English. Dr. Mosequeda does not discuss the BOP report, which was based on observations of how Defendant actually fared in a prison setting. Nor does she acknowledge the penultimate paragraph of the BOP report, which explains the process in the event the Court sentences Defendant to a term of imprisonment, and which includes designation of a facility based upon his security level, but also taking into account his mental health care level and needs. (*Id.* at 29.)

In her supplemental declaration (Doc. 500 at 30-35), Ms. English reiterates some of her earlier points and addresses the BOP Report. She states that, in her experience, the BOP always indicates that an inmate's health needs can be met, but that in practice that is not the case. (*Id.* at 30-31.) She opines that the scrutiny over Defendant's evaluation placed additional attention on him, creating an artificially favorable environment for him that would not continue over time when he was not as closely monitored. (*Id.* at 31.) According to Ms. English, Defendant's documented irritability with staff could present a

problem for him outside of this artificially favorable environment.  (*Id.* at 32-33.)  Ms. English also focuses on shortcomings in the provision of healthcare at FMC Devens, which the BOP report favored for its Memory Care Unit.[8]  (*Id.* at 34-35.)

Both Ms. English and Dr. Mosqueda opine that Defendant's illness renders him especially vulnerable to abuse by other inmates and that, due to his advanced age and cognitive condition, Defendant would be less equipped than average to negotiate the complex social interactions that arise in prison life.  (English Supp. Decl., Doc. 500 at 33-34; Mosqueda Rep., Doc. 500 at 37-39.)

Considering all this evidence, the Court FINDS that Defendant can be appropriately housed and managed within a facility of the BOP; thus, the Court concludes that Defendant should NOT, "in lieu of being sentenced to imprisonment, be committed to a suitable facility for care or treatment."  18 U.S.C. § 4244(d).

In so finding, the Court has considered the cautionary points made by Ms. English regarding the shortcomings in BOP operations, including those affecting inmates' quality of and continuity of medical care.  But to the extent that such shortcomings are in fact present, any resulting burdens are visited upon all inmates requiring a higher level of medical care.  The Court has also considered the vulnerabilities identified by Defendant's experts, including the possibility that Defendant may be housed with high security inmates if transferred to an FMC, and that, based upon his age and declining cognition, other inmates in any facility may identify him as a target for abuse or exploitation.  But again, this general concern would present for any somewhat vulnerable inmate for myriad reasons, and it is insufficient to show that Defendant cannot be housed in a BOP facility.

In the end, the Court places more weight on the conclusions of the BOP experts

---

[8] Specifically, Ms. English references a 2024 Report by the DOJ Office of the Inspector General citing staffing shortages, issues with healthcare practices, waiting lists for First Step Act program participation, and infrastructure and repair issues.  However, the Report, admitted at the hearing as Exhibit 1, also reflects that the BOP responded to the identified shortcomings and has taken steps to resolve them.  (*See* Appendices 4 and 5 to Exhibit 1.)

following their 45-day observation of Defendant's abilities, both cognitive and physical, in a prison environment. The evidence shows that, although at times demonstrating confusion, Defendant currently possesses a baseline ability to function on a day-to-day basis and that he currently retains independence as to his ADLs. The Court has had many opportunities over the past two years to observe Defendant, and notes that its observations are consistent with the determination of the BOP experts; Defendant generally behaves in a socially acceptable manner, is generally receptive to being redirected by his counsel and caregivers, and generally responds appropriately to his surroundings. For example, Defendant's testimony at the June 2, 2025 hearing reflected both the memory loss he has experienced as well as this baseline ability to function.[9] And although Defendant's cognition is expected to continue to decline, that decline is expected to be only slowly progressive.

As for Defendant's current inability to manage his own IADLs, most of those are not required in an institutional setting (e.g., food preparation and household management). As for the one instrumental activity of daily living (health maintenance) that carries over into a custodial setting, procedures within each BOP facility to dispense medicine to inmates each day (on a "pill line"), along with other accommodations, such as a companion inmate, will adequately compensate for Defendant's likely inability to manage this independently.

Thus, the Court determines that Defendant's "mental disease or defect" does not require that he be placed in an alternate, "suitable facility for care or treatment." 18 U.S.C. § 4244(d).

---

[9] And the Court's observation of Defendant's capacity at the hearing appears consistent with the BOP's use of the "mild" severity specifier to modify the diagnosis of "Major Cognitive Disorder." (*See id.* at 25.) The severity specifier is meant "to address the extent to which his cognitive deficits impact his functional independence." (*Id.*)

## V. CONCLUSION

Having so concluded, as indicated at the conclusion of the hearing on this matter, the Court proceeded to sentencing as scheduled.

**IT IS SO ORDERED.**

DATED: June 3, 2025

                                                                    HON. JOSEPHINE L. STATON
                                                                    United States District Judge