# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

    Plaintiff,

        v.

THOMAS VINCENT GIRARDI,

    Defendant.

Case No. 2:23-CR00047-JLS

**ORDER DENYING MOTION FOR BOND PENDING APPEAL (Doc. 554)**

This matter is before the Court on Defendant's Motion for Bail Pending Appeal. (Doc. 554.)  It is fully briefed.  (*See* Docs. 566-567.)  The matter was heard on September 11, 2025, at which time the Court took the matter under submission.  Defendant raises four issues he contends are sufficient to meet the standard for granting bond pending appeal. (*See* Mot., Doc. 554 at 10-26.)  These issues may be described as (1) the Court's denial of Defendant's motion to suppress Girardi Keese business records; (2) the Court's decision to give Instruction 20 regarding a lawyer's ethical duties and attorney-client trust accounts; (3) the Court's rejection of Defendant's Rule 29 Motion for Judgment of Acquittal as to wire-fraud counts ("*Parr* argument"); and (4) the Court's rejections of Defendant's argument, raised at more than one point in the proceedings, that he was incompetent to stand trial and to assist in his own defense. (*See* Competency Order, Doc. 150; Order

Rejecting *In Camera* Submission, Doc. 353; Rule 33 Order, Doc. 353 Order Denying Mot. for New Trial.)  As set forth herein, the Court DENIES Defendant's Motion.

## I.    BACKGROUND

On January 31, 2023, former attorney Thomas Vincent Girardi ("Defendant") was indicted on five counts of wire fraud in violation of 18 U.S.C. § 1343.  After lengthy competency proceedings, the Court found Defendant competent to stand trial.  (*See* Competency Order, Doc. 150.)

Before trial, Defendant sought suppression of evidence in the form of records of the now-defunct Girardi Keese ("GK"), which was forced into Chapter 7 Bankruptcy by its creditors on December 18, 2020.  Defendant maintained that the bankruptcy trustee provided to the Government certain records, described as "material taken from GK's offices, computers, and databases."  (Mot. to Suppress, Doc. 222 at 9.)  The Government conceded that no search warrants were sought or obtained in procuring these records from the bankruptcy trustee.  (Opp., Doc. 247 at 7.)  For the reasons set forth in its Order, the Court denied the Motion to Suppress.  (Doc. 299.)

In August 2024, Defendant was tried and convicted on four counts of wire fraud.  (*See* Doc. 387 (Verdict).)  Specifically, Defendant was convicted on charges that he defrauded five clients by failing to pay them the full amounts of settlement proceeds the clients were owed and doing so "by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts" that Defendant "had a duty to disclose."  (Indictment ¶ 2; Doc. 1 at 4.)

Before deliberations, the Court instructed the jury, *inter alia*, on the law that imposed certain ethical duties on attorneys and on certain provisions related to attorney-client trust accounts.  (*See* Jury Instr., Doc. 393 at 21-25 ("Instr. 20").)

After a twelve-day trial, Defendant was convicted on four counts; a fifth count was dismissed on the Government's unopposed motion shortly before trial.  (*See* Docs. 312 & 314.)  Defendant filed a post-trial Motion for Judgment of Acquittal ("Rule 29 Motion,"

Doc. 397) and Motion for New Trial ("Rule 33 Motion," Doc. 401).  The Order Denying Defendant's Rule 29 Motion rejected Defendant's argument that three of the four specified wire transfers could not serve as the bases for the wire-fraud charges because the transactions were made pursuant to a duty imposed by state law ("*Parr* argument").  (Doc. 416 at 5.)  The Order Denying Defendant's Rule 33 Motion again rejected his claim of incompetency.  (Doc. 416 at 5-11.)

Defendant's December 6, 2024 sentencing hearing date was continued to permit an evaluation of Defendant by the BOP in January and February as permitted by 18 U.S.C. § 4244.  After that evaluation, a BOP Forensic Psychologist and a BOP Neuropsychologist prepared a report pursuant to 18 U.S.C. § 4247(c) ("BOP Report," Doc. 500 at 1-29).  In response, the defense disclosed expert witnesses.  After Defendant's intervening medical emergency and hospitalization, the Court held a hearing pursuant to 18 U.S.C. § 4247(d).  In its written ruling (Doc. 531), the Court determined that although Defendant suffers from a "mental disease or defect," that "mental disease or defect" does not require that he be placed in an alternate, "suitable facility for care or treatment."  18 U.S.C. § 4244(d).  Defendant was sentenced the next day to a term of imprisonment of 87 months, and the Court set his self-surrender date for July 17, 2025.  (*See* Doc. 532.)

## II.    LEGAL STANDARD

For a defendant to obtain release on bond pending appeal, the Court must find:

(A) by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released[1] . . . and

(B) that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in—

(i) reversal,

---

[1] Here, the Government does not contend that Defendant presents a flight risk or that he poses a danger to the safety of any other person or to the community if released.  (*See* Opp., Doc. 566 at 7 n.2.)  Therefore, the Court assumes that Defendant has met the requirements of § 3143(b)(1)(A).

(ii) an order for a new trial,

(iii) a sentence that does not include a term of imprisonment, or

(iv) a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process.

18 U.S.C. § 3143(b)(1) (footnote added). This statute creates a presumption against post-conviction release and places the burden of meeting the criteria for release pending appeal on the defendant. *United States v. Wheeler*, 795 F.2d 839, 840 (9th Cir. 1986); *see also* S. Rep. No. 225, 98th Cong., 2d Sess. 26-27, *reprinted in* 1984 U.S. Code Cong. & Admin. News 3182, 3209-10 (noting that the intent in amending § 3143 was to allocate the burden of proof to the defendant).

Examining the language of the statute shortly after its passage, the Ninth Circuit explained that "'substantial' defines the *level of merit* required in the question raised on appeal." *United States v. Handy*, 761 F.2d 1279, 1280 (9th Cir. 1985).[2] To be "substantial," the question must be "fairly debatable," or "fairly doubtful," two terms that the Ninth Circuit found to be synonymous. *Id.* at 1282. A "substantial question" may be "new and novel," it may be "one that poses issues debatable among jurists of reason" or it may be one that "present[s] unique facts not plainly covered by the controlling precedents." *Id.* at 1281-82 (quotation marks omitted). The "substantial question" standard places a higher burden on a defendant than did the "not frivolous" standard.[3] *Id* at 1282-83. But a

---

[2] The Ninth Circuit adopted the standard of the Third Circuit, expressed in *United States v. Miller*, 753 F.2d 19, 23 (3d Cir. 1985).

[3] *United States v. Garcia*, 340 F.3d 1013, 1021 n.5 (9th Cir. 2003), does not suggest otherwise. Certain language in footnote 5, read out of context, suggests that a "substantial question" is merely a "non-frivolous" issue. *Id.* ("The defendant, in other words, need not, under *Handy*, present an appeal that will likely be successful, only a non-frivolous issue that, if decided in the defendant's favor, would likely result in reversal or could satisfy one of the other conditions."). But *Handy* held that the former "non-frivolous issue" standard was "abandoned" with the passage of the 1984 Bail Reform Act. *Handy*, 761 F.2d at 1282-83. Despite some ambiguous language, footnote 5 of *Garcia* discusses *Handy* with approval, and the Court does not read *Garcia* as weakening *Handy* in any way. *Accord*, *United States v. Heine*, 2018 WL 3745813, at *2 (D. Or. Aug. 7, 2018) (noting the internal inconsistency found in footnote 5 but concluding that the *Garcia* court did not intend to modify the *Handy* standard).

defendant need not prove that it is more likely than not that the district court would be reversed. *See id.* at 1280-81.

Whether resolution of a substantial question is "'likely to result in reversal' defines the type of question that must be presented." *Id.* at 1281. That is, whether a question is "likely to result in reversal" considers what will happen if the appellant does prevail on the "substantial question" presented. If the remedy to be granted by the appellate court in such an instance would reduce the term of incarceration in a meaningful way (as described by subsections (iii) and (iv) of § 3143(b)(1)(B)), or if the likely remedy would be a reversal of the conviction or an order for a new trial, then the second part is met. *See Miller*, 753 at 23 ("A court may find that reversal or a new trial is 'likely' only if it concludes that the question is so integral to the merits of the conviction on which defendant is to be imprisoned that a contrary appellate holding is likely to require reversal of the conviction or a new trial.") (cited with approval in *Handy*, 761 F.2d at 1280)).

## III.    ANALYSIS

### A.    Denial of Defendant's Motion to Suppress

In his Motion to Suppress, Defendant challenged a broad category of evidence, referred to as "GK evidence," and described as "material taken from GK's offices, computers, and databases." (*See* Order Denying Motion to Suppress, Doc. 299 at 2.) In opposing the Motion to Suppress, the Government conceded it did not obtain a search warrant for these records and instead obtained them from the bankruptcy trustee in the *In re Girardi Keese* bankruptcy case. (Opp. to Mot. to Suppress, Doc. 247 at 7 ("The Girardi Keese bankruptcy trustee consented to the government's request for access to Girardi Keese books and records without a search warrant.").)

#### 1.    *Bisno v. United States* Controls

The Court denied Defendant's Motion to Suppress based upon *Bisno v. United States*, 299 F.2d 711 (1961), which it considers to be dispositive. In *Bisno*, the Ninth Circuit rejected the criminal defendant's Fourth Amendment challenge because the records

to be suppressed were in the possession of the bankruptcy trustee.  *Id.* at 717.  Ownership of those records had become "vested" in the trustee of the bankruptcy estate and therefore, according to the Ninth Circuit, "rights under the Fourth Amendment [were] not involved." *Id.*  Although Defendant argued in the Motion to Suppress that bankruptcy law had changed significantly in the years since *Bisno* was decided in 1961, the Court noted that the relevant provisions of bankruptcy law had not.  (*See* Order Denying Motion to Suppress, Doc. 299 at 10.)  Specifically, then, as now, a debtor's property becomes property of the estate upon either the filing of a bankruptcy petition or upon the appointment of a trustee, and it becomes controllable by the bankruptcy trustee upon his or her appointment to that role.  (*Id.*)  Here, the records sought to be suppressed also became property of the bankruptcy estate upon the filing of an involuntary bankruptcy petition by Girardi Keese creditors.  Thereafter, the bankruptcy court authorized the trustee "to immediately enter onto the premises of [Girardi Keese] and take possession of the books and records, accounts, and all aspects of the debtor."  *In re Girardi Keese*, 2:20-BK-21022-BR (C.D. Cal. Bankr., Jan. 5, 2021) (Doc. 45).  Thus, *Bisno* was (and is) controlling Ninth Circuit precedent.

Of note, *Bisno* involved business records that "vested" in the bankruptcy trustee in an involuntary bankruptcy case filed by creditors against Bisno.  *Id.* at 713-14 & 717.  In this manner, Bisno's situation was nearly identical to Defendant's.  Both faced involuntary petitions for bankruptcy, and both involved a criminal defendant's assertion of a Fourth Amendment right as to business records.

### 2.    No Substantial Question of Law or Fact

With the present Motion, Defendant challenges the Court's reliance on *Bisno* as creating a substantial question of law or fact likely to result in reversal or an order for a new trial.  As to the first point, Defendant argues that *Bisno* is old law, having been decided sixty-five years ago.  But as explained *supra* and in the Order Denying Motion to Suppress, *Bisno* is directly on point, has not been overruled, and is based on a foundation that has not

been weakened by subsequent changes in bankruptcy law. Its holding regarding the Fourth Amendment has not been modified or undermined in any discernable way since that time.

Indeed, the Fifth Circuit followed *Bisno* and found that a criminal defendant had no reasonable expectation of privacy in business records that had, by operation of bankruptcy law, transferred to the bankruptcy trustee. *Kroll v. United States*, 433 F.2d 1282, 1288-89 (5th Cir. 1970) (observing that as to the records of bankrupt entities, "[r]easonable expectations are that government officials will be examining the books").

And in fact, several more recent cases are in accord with *Bisno*'s holding, including two (unpublished) appellate cases. For instance, within the Ninth Circuit, a district court denied a motion to suppress in relevant part on the basis that a bankruptcy trustee, who "was the custodian of the records," had "validly exercised his authority to consent to the production of documents pursuant to grand jury subpoenas." *See United States v. Hronopoulos*, Case No. 01-CR-2218 (S.D. Cal., Sept. 4, 2003) (Order Partially Denying Motion to Suppress Evidence at 4, Doc. 309 at 5). The Ninth Circuit affirmed this ruling *sub nomine*, rejecting the defendant's Fourth Amendment challenge and expressly noting that the bankruptcy trustee "maintained control and custody over all the documents in the office." *United States v. Boyer*, 275 Fed. App'x 655 at *1 (9th Cir. 2008) (quotation marks omitted). The Third Circuit, also in an unpublished opinion, reached a similar conclusion when it found that a criminal defendant had failed to establish a reasonable expectation of privacy in documents related to his bankrupt medical practice, expressly noting that, a result of his position, the bankruptcy trustee was the "legal titleholder of the corporate documents." *United States v. Andujar*, 209 Fed. App'x. 162, 165 (3rd Cir. 2006). Other district courts are in accord as well. *See, e.g., United States v. Scott*, 12 F. Supp. 3d 298, 305 (D. Mass. 2014) (noting that when the defendant "filed a petition for voluntary bankruptcy and turned over the required records of the estate to the Trustee, . . . he surrendered any reasonable expectation he might have had in their contents"); *United States v. Patrick*, 916 F.Supp. 567, 570-71 (N.D . W.Va. 1996) (finding no Fourth Amendment

violation based upon bankruptcy trustee's actions in permitting law enforcement agents to take custody of the corporate books and records of the bankrupt entity and noting that "the trustee may cooperate with a criminal investigation of the debtor corporation and may consent to a search of corporate books and records"); *United States v. Pavlock*, 2010 WL 4702372 at *3-5 (N.D.W.V. 2010) (relying on *Kroll* and *Patrick* to deny a motion to suppress and stating that "[o]nly the bankruptcy trustee could object that a search [of records of a bankrupt business] exceeded [the scope of the search] that . . . she authorized"). Against this backdrop, Defendant has not cited a single case that questions the holding in *Bisno* or arrives at a contrary conclusion.

Therefore, the Court's denial of Defendant's Motion to Suppress does not raise a substantial question of law or fact. The underlying circumstances and the evidence challenged by Defendant here are indistinguishable in any meaningful way from that challenged in *Bisno*, and the rationale for finding no Fourth Amendment violation in *Bisno*—because the bankruptcy trustee had lawful possession of the documents as part of the estate—is equally applicable here. Therefore, the Court's conclusion that *Bisno* controls is not fairly doubtful or fairly debatable.

### 3. No Likelihood Resolution of These Questions Would Result in Reversal or an Order for a New Trial

Defendant contends that, should these questions be resolved in his favor, the likely remedy would be a reversal of Defendant's conviction and/or an order for a new trial. The Court disagrees. *Bisno* was binding precedent at the time the government obtained the documents in this case. Should the Ninth Circuit overrule *Bisno*, the good faith exception would nonetheless apply.

The exclusionary rule is a "prudential doctrine" to which exceptions apply, and suppression of evidence is not always appropriate. *See United States v. Cano*, 934 F.3d 1002, 1021 (9th Cir. 2019). Specifically, the exclusionary rule is to be applied where its invocation will deter future Fourth Amendment violations." *Id.* (relying on *Davis v. United*

*States*, 564 U.S. 229, 236-37 (2011)).  The exclusionary rule does not deter future violations where it relates to evidence that is obtained based upon "objectively reasonable reliance on binding judicial precedent."  *Davis*, 564 U.S. at 239.

Here, a principled reading of *Bisno* reveals that the law in the Ninth Circuit at the relevant time provided that where business records become part of a bankruptcy estate, the trustee of that bankruptcy estate has the authority to provide records to law enforcement investigators.  It is also clear that in this situation, the bankrupt party has no reasonable expectation of privacy in such records.  Therefore, because the prosecutors' and bankruptcy trustee's actions were authorized by *Bisno*, the exclusionary rule would not apply.  Indeed, apart from the bare assertion that "the Ninth Circuit may hold that the government failed to carry its burden to establish an exception to the exclusionary rule" (Mot., Doc. 554 at 15), Defendant offers no reason as to why the evidence would be excluded.  So even if Defendant were to prevail, it would be unlikely that his conviction would be reversed or that a new trial would be ordered.

In sum, as to the identified issues resolved in the Court's Order Denying Motion to Suppress, Defendant has failed to "raise[] a substantial issue of law or fact," that, if resolved in his favor, would be "likely to result . . . a reversal [or] an order for a new trial."

### B.    Ethics Instruction (Instruction 20)

Defendant contends that the Court's ethics instruction (Instruction 20) raises substantial questions of law or fact for two reasons: first, the instruction varied from the allegations set forth in the Indictment; and second, the instruction invaded the fact-finding province of the jury.

### 1.    Background

Despite Defendant's representation to the contrary (Mot., Doc. 554 at 16), the Indictment in this case alleges that Defendant engaged in multiple attorney ethical violations in carrying out the charged scheme to defraud.  Paragraph 1(e) of the Indictment charged:

e.    Defendant GIRARDI became a member of the State Bar of California in 1965 and was obligated to comply with the California Rules of Professional Conduct. Defendant GIRARDI knew that the California Rules of Professional Conduct required him to, among other things, ***promptly notify a client of the receipt of any funds the client was entitled to receive, and promptly pay or deliver to the client or such payees as designated by the client any such funds that defendant GIRARDI and Girardi Keese held in trust for the client upon the client's request***.

(*Id.* (emphasis added); *cf.* Mot., Doc. 554 at 16 (stating "the ***only particular alleged duty was*** to 'promptly notify the client of the receipt of any funds the client was entitled to receive'") (emphasis added).)    The ethical provision most relevant to the present case is the ethical duty of an attorney ***to pay*** one's client the money due to that client.  (*See also* Indictment ¶ 2 (the charged scheme to defraud included "the concealment of material facts, including material facts that defendant GIRARDI had a duty to disclose"), ¶ 9 (noting that transferring money from another's client's settlement funds to GK's operating funds and falsely labeling it "fees" occurred "in violation of the California Rules of Professional Conduct governing the management of attorney-client trust accounts"), & ¶ 16 (allegations regarding the handling of the settlement funds of Client 4 and 5 that violated the California Rules of Professional Conduct governing the management of attorney-client trust accounts).

Instruction 20 outlined certain ethical duties owed by attorneys to their clients, and it also outlined some specific provisions related to the use of attorney-client trust accounts. Specifically, Instruction 20 outlined these four categories of basic ethical duties of an attorney: (1) an attorney's fiduciary duty and duty of loyalty; (2) the duty of an attorney to act in the interest of one's clients and refrain from engaging in self-dealing; (3) the duty of honesty and fair dealing and the duty to keep clients informed regarding their cases; and

(4) a duty to enter into written contracts regarding the scope of representation and the fee arrangement. (Doc. 393 at 23-27.) Instruction 20 also set forth detailed provisions regarding use of an attorney-client trust account; in essence, these provisions give precise instructions on how an attorney must handle a client's funds.

Imbedded within Instruction 20 is the reminder, given several times, regarding the limited nature of evidence the jurors had heard regarding attorney ethical violations. Specifically, the Court instructed that the jury could consider an attorney's ethical duties when

> evaluating whether the government ha[d] proven the elements of the offense,
> including whether the defendant engaged in a scheme to defraud, whether the
> statements made or facts omitted as part of the scheme were material, whether
> the defendant acted with the intent to defraud, and whether the defendant had a
> duty to disclose an omitted fact arising out of a relationship of trust.

(Doc. 393 at 23:16-22.) In various ways, the Court instructed the jury that they were being asked to determine if Defendant committed the charged offenses, not whether he committed an ethical violation. (*See* Doc. 393 at 23:8-14, 24:16-19, 24:24-25:1-2, 26:27-27:5.)

### 2.    No Substantial Question of Law or Fact

Defendant argues that Instruction 20 raises a substantial question of law or fact in that it creates a constructive amendment to the Indictment or a fatal variance therefrom. Defendant also argues that Instruction 20 invaded the fact-finding province of the jury and that an attorney's ethical obligations should have been determined as a matter of fact, by the jury, based on expert evidence.

As for the former, Defendant's argument depends upon an unfair characterization of the scope of the Indictment as narrowly identifying a single ethical duty Defendant was alleged to have violated. Here, the basic attorney ethical duties set forth in Instruction 20 were all directly relevant background to the charged offenses and the evidence admitted at

trial.  The same is true of the duties regarding the client trust accounts.  Therefore,
Defendant has not raised a substantial question of law or fact on this basis.

As to the latter, Instruction 20 was properly given by the Court pursuant to its
fundamental duty to instruct the jury on the law.  Provisions of law need not by "proven"
through evidence.  *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1016
(9th Cir. 2004) ("[I]nstructing the jury as to the applicable law is the distinct and exclusive
province of the court." (quotation marks omitted)); *Nationwide Transp. Fin. v. Cass Info.
Sys., Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008) (same).  Thus, the Court's discharge of its
duty to instruct the jury as to the law did not invade the fact-finding province of the jury,
and Defendant has not raised a substantial question of law or fact on this basis.

### 3.    No Likelihood Resolution of These Questions Would Result in Reversal or an Order for a New Trial

Defendant does not develop his argument regarding whether resolution of these
issues in his favor would be "likely to result in reversal or a new trial."  (*See* Mot., Doc.
554 at 15.)  The failure to develop an argument on this point is a failure of the burden of
proof, which is on Defendant, as the statute creates a presumption against post-conviction
release.  *Wheeler*, 795 F.2d at 840.

Therefore, as discussed, as to Instruction 20, Defendant has failed to "raise[] a
substantial issue of law or fact."   He has also failed to establish that if the issues he
identifies were to be resolved in his favor, that ruling would be "likely to result . . . a
reversal [or] an order for a new trial."

### C.    *Parr* Argument

Premised on *Parr v. United States*, 363 U.S. 370 (1960), Defendant argues that wire
fraud may not be premised upon a use of the wires that occurs pursuant to a duty imposed
by state law.  (*See* Mot., Doc. 554 at 19-22.)  In rejecting this argument, the Court noted
that the Ninth Circuit has interpreted *Parr*'s "duty imposed by state law" as excluding
duties imposed by "private contracts."  (*See* Rule 29 Order, Doc. 416 at 4-5 (relying on

*United States v. Bernhardt*, 840 F.2d 1441 (9th Cir. 1988)).)  Defendant contends that the Court's ruling raises a substantial question of law or fact.

### 1.    *Parr v. United States* and *United States v. Bernhardt*

In *Parr*, the Supreme Court considered whether certain mailings could support a mail-fraud conviction.  It concluded that the charged mailings were not "a part of the execution of the fraud" and were not "incident to an essential part of the scheme." 363 U.S. at 389-391.  In doing so, the Supreme Court focused on the "unique" facts presented there, where the relevant mailings were sent by officials tasked with assessing and collecting taxes in compliance with their "legally compelled" actions.  *Id.* at 391.  Thus, the Supreme Court concluded, the mailings were not "unlawful steps in a plot, . . . part of the execution of the fraud, . . . incident to an essential part of the scheme, . . . or . . . made for the purpose of executing the scheme" to defraud.  *Id.* (cleaned up).

In *Bernhardt*, the Ninth Circuit distinguished *Parr* and reversed the dismissal of mail-fraud counts, noting that "[t]o charge a violation of [mail fraud or wire fraud], an indictment must allege facts demonstrating (1) the formation of a scheme to defraud, and (2) a knowing use of the mails in furtherance of the scheme."  *Bernhardt*, 840 F.2d at 1455. The court in *Bernhardt* noted that in the case before it, the relevant mailings were not made pursuant to a legal obligation, but pursuant to a private agreement:

> The issue here is whether mailings required by a private agreement, wherein one of the parties to the agreement is seeking to defraud the other, can be said to have been sent in furtherance of the underlying scheme to defraud. Neither *Parr* nor *Mitchell* dealt with such a circumstance.

*Bernhardt*, 840 F.2d at 1447.  Ultimately, because the mailings in *Bernhardt* were made for the parties' "private convenience rather than from an independent and unrelated obligation," the Ninth Circuit distinguished *Parr* and reversed the district court's dismissal of the mail-fraud charges.  *Id.*

More recently, and more pointedly, relying on *Bernhardt*, the Ninth Circuit recently rejected a *Parr* challenge on nearly identical facts to those raised in the present case:

> To make a long story short, Layfield was a crooked plaintiff's lawyer and certified public accountant with operations in Los Angeles and elsewhere. He routinely (and illegally) used client settlements to cover his personal expenses as well as his firm's operating expenses to the tune of millions of dollars commingled and stolen, and eventually moved to Costa Rica—at which point his client trust account was down to $134.

*United States v. Layfield*, 96 F.4th 1095, 1096 (9th Cir.), *cert. denied*, 145 S. Ct. 302 (2024). In the unpublished portion of the opinion, the Ninth Circuit affirmed Layfield's conviction, despite the *Parr* argument that his deposits of client settlement funds in the firm's attorney-client trust account were required by California law. *United States v. Layfield*, 2024 WL 982437 at *1 (Mar. 7, 2024).

### 2.     No Substantial Question of Law or Fact

Comparing the present case to the precedential decision of *Bernhardt*, the settlement agreements at issue in this case were not executed as part of an "obligation" that was "independent and unrelated" from the "private convenience" they advanced. *Bernhardt*, 840 F.2d at 1447. Instead, the wire transfers were "required by private agreement[s]"— settlement agreements that were used by Defendant to further the underlying scheme to defraud. *Id.* As a result, the Court's rejection of Defendant's *Parr* argument resulted from a straightforward application of *Bernhardt*. And the Ninth Circuit's unpublished ruling in *Layfield*, although not binding as precedent, reinforces the correctness of the application of *Bernhardt* here. Therefore, Defendant has failed to raise to substantial issue of law or fact based upon the Court's rejection of his *Parr* argument.

### 3.    No Likelihood Resolution of These Questions Would Result in a Reduced Sentence

Defendant argues that, should he prevail on his *Parr* argument, he would be entitled to a judgment of acquittal as to three of the four counts of conviction.  (Mot., Doc. 554 at 21.)  According to Defendant, this would, in turn, require resentencing in light of newly enacted United States Sentencing Guideline § 1B1.3(c).  (Mot., Doc. 554 at 21.)  Effective November 1, 2024, subsection (c) was added to provide that "acquitted conduct" should not be considered in the relevant offense conduct for sentencing purposes.  *See* Amendment 826, eff. Nov. 1, 2024, adding new subsection (c) to §1B1.3 ("(c) Acquitted Conduct.— Relevant conduct does not include conduct for which the defendant was criminally charged and acquitted in federal court, unless such conduct also establishes, in whole or in part, the instant offense of conviction.").

Should Defendant prevail on his *Parr* argument, then it is likely that the appellate court would vacate Defendant's conviction as to three of his four offenses.  In light of the newly enacted subsection (c), it also seems likely that the factors related to Defendant's sentencing would be altered.  But Defendant falls short of establishing a likelihood that any resentencing would result in "a sentence that does not include a term of imprisonment, or . . . a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process."  18 U.S.C. § 3143(b)(1)(B)(iii)-(iv).[4]

---

[4] To the extent Defendant relies on a combination of sentencing-related appellate issues and the *Parr* appellate issue to reach the reduction-in-sentence threshold set forth in 18 U.S.C. § 3143(b)(1)(B)(iii)-(iv), it is still insufficient to meet the relevant standard.  (*See* Mot., Doc. 554 at 21-22 & n.9.)  Although Defendant suggests this combination of issues (if prevailed upon) is sufficient, he only briefly discusses appellate issues regarding his sentence (*see id.* n.9); therefore, he has not raised a substantial question of law or fact as to any of these sentencing-related appellate issues.

Therefore, as to the rejection of Defendant's *Parr* argument, Defendant has failed to "raise[] a substantial issue of law or fact" that, if resolved in his favor, be "likely to result . . . a reversal [or] an order for a new trial."

### D.    Defendant's Competency

In its final argument, the defense contends that "[i]t is fairly debatable that the Court erred when denying Girardi's multiple requests to determine he was incompetent to stand trial and [to] otherwise participate in his own defense."  (Mot., Doc. 554 at 22.)

#### 1.    The Role of Appellate Standard of Review in Determining Whether a Defendant has Raised a Substantial Question of Law or Fact

In determining whether a defendant has raised a substantial question of law or fact, the district court must consider the relevant standard of review.[5]  As another district court has aptly noted:

> Because a defendant must demonstrate that the appeal (and not the initial issue before the district court) raises a substantial question of law or fact, the district court must look to the applicable appellate standard of review when assessing [whether the defendant raised a substantial question].

*United States v. Douglas*, 2024 WL 195256, at *3 (D.N.J. Jan. 17, 2024);[6] *see also United States v. Shields*, No. CR12-00410, 2015 WL 900694, at *3-4 (N.D. Cal. Feb. 24, 2015) ("[g]iven the standard of review, the court does not believe that [defendant] has a 'fairly debatable issue' of insufficiency of the evidence to support his conviction on Count 12") *United States v. Yagman*, No. CR 06-227(A) SVW, 2008 WL 11446469, at *5 (C.D. Cal. Jan. 2, 2008) ("[g]iven the deferential standard of review, and the nature of the facts in this case, the issue is not a 'fairly debatable' one on appeal.")  With the relevant appellate

---

[5] *Handy* is silent on this point because it engaged in a *de novo* review of the lower court's statutory interpretation of § 3143(b)(1)(B).

[6] New Jersey is located within the Third Circuit, which decided *Miller*.  The approach followed by *Miller* was adopted by the Ninth Circuit in *Handy*.

standard of review as backdrop, the Court considers whether the defense has presented a substantial question of law or fact by factoring into the analysis.

Here, the Court's initial competency finding will be subjected to appellate review for clear error. *See United States v. Gastelum-Almeida*, 298 F.3d 1167, 1171 (9th Cir. 2002). "The clear error standard is significantly deferential, and clear error is not to be found unless the reviewing court is left with the definite and firm conviction that a mistake has been committed." *Gov't of Guam v. Guerrero*, 11 F.4th 1052, 1059 (9th Cir. 2021) (cleaned up). "Such a definite and firm conviction requires us to find that the district court's determination was wrong because it was: (1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record." *Id.* (cleaned up). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 574 (1985).

Subsequent rulings are subject to abuse-of-discretion standard of review. Specifically, after finding a defendant competent to stand trial after hearing, a court's failure to hold a subsequent competency hearing is subject to an abuse-of-discretion standard of review. *United States v. White*, 670 F.3d 1077, 1082 (9th Cir. 2012). The same standard applies to a district court's ruling on a motion for a new trial. *United States v. Moses*, 496 F.3d 984, 987 (9th Cir. 2007). "A district court abuses its discretion when it fails to apply the correct legal standard or bases its decision on unreasonable findings of fact." *Briseño v. Henderson*, 998 F.3d 1014, 1022 (9th Cir. 2021) (cleaned up).

## 2.    The Court's Rulings Regarding Defendant's Competency

Defendant's contention that he has raised a substantial question of law or fact as to the Court's rulings regarding Defendant's competency to stand trial relate to three Orders of the Court: The Competency Order (Doc. 150), a mid-trial Order rejecting *in camera* filing (Doc. 353), and the Order Denying Motion for New Trial (Doc. 416). (*See* Mot., Doc. 554 at 22.)

In the Competency Order, the Court recounted the extensive evidence before the Court, which included written filings and a three-day hearing.  (*See* Doc. 150 at 7-36.)  As discussed throughout, the timing of Defendant's first claim of incompetency was suspect from its inception.  Specifically, there is an absence of evidence that Defendant's competency was ever questioned before December 2, 2020, when Defendant's co-counsel from the *Lion Air* case sued Defendant in a separate lawsuit in the Northern District of Illinois, thereby publicly accusing Defendant of misappropriating client settlement funds.  (*Id.* at 10.)  The same day, co-counsel filed a motion in the *Lion Air* case for an order of contempt against Defendant.  (*See id.*)  Twelve days later, in a hearing on the contempt motion, counsel for Girardi Keese first raised the issue of Defendant's "mental competence" and "memory issues."[7]  (*Id.* at 10-11.)  The *Lion Air* judge held Defendant in contempt and froze Girardi Keese assets.  (*Id.* at 11.)  Creditors filed involuntary bankruptcy petitions against both Girardi Keese and Defendant four days later.  (*Id.* at 12.)

Because of this incentive to fabricate or exaggerate symptoms of cognitive decline that began on December 2, 2020, the Court discounted anecdotal evidence of Defendant's family, assistants, and housekeeper that were offered after this time period.  (*Id.* at 44-46).  On the other hand, because of their inherent reliability, the Court credited video-recorded and written evidence showing Defendant competently interacting and communicating in a professional capacity with others shortly before December 2, 2020 and continuing another six months into the year 2021.  (*Id.* at 42-44.)

The Court also credited testimony of two attorneys as to their observations before December 2020.  Specifically, the Court credited the testimony of Defendant's attorney-friend who encountered Defendant in March 2020, seeming somewhat confused, looking for a court hearing in what Defendant would have been expected to know was the wrong

---

[7] A defense expert and a Government expert who reviewed Defendant's medical records concurred that none of Defendant's medical records showed any mental decline or memory issues.  (*See id.* at 11 n.8.)

courthouse.  (*Id.* at 45.)  The Court also credited Defendant's associate attorney who interacted with him and communicated about cases with him frequently during the last seventeen months of Defendant's law practice, just before any incentive to exaggerate his cognitive symptoms arose.  (*Id.* at 45-46; *see also id.* at 46 n.29 (comparing the associate's account to that of Defendant's legal assistant).)

The Court discussed the reports from five experts at length: Three experts (Drs. Chui, Wood, and Schroeder) were retained by the defense and two experts (Drs. Goldstein and Darby) were retained by the Government.  (*Id.* at 17-36.)  The Court analyzed the various expert opinions against the backdrop of the timing of his purported cognitive decline.  (*Id.* at 46-49.)  The Court compared and weighed the experts' opinions on various issues relevant to Defendant's cognition (and therefore, relevant to Defendant's competency to stand trial).

For instance, although Defendant's brain scans showed a pronounced atrophy of his hippocampi, two experts agreed that there was a relative stability of the degree of atrophy between 2017 and 2021, which led the Court to conclude that the opinion regarding Defendant's hippocampi atrophy did "not provide particularly helpful insight" into Defendant's competence, particularly in light of Defendant's demonstrated ability (established by videos and documentary evidence) to function in late 2020 and early 2021.  (*See id.* at 37-39 & 42-44.)

On the specific issue of whether Defendant retained the ability to form short-term memories such that he would be able to assist counsel in his defense, the Court gave greater value to the opinions of experts who relied on "comprehensive neuropsychological test results" than to the opinions of experts who relied on other bases, and the Court rejected conclusions drawn by experts to the extent those opinions were premised on "screening" tests rather than "more comprehensive measures of cognition."  (*Id.* at 39-42 & n.23.)

On the issue of whether Defendant was "malingering" (which in this context is synonymous with a feigning or exaggerating symptoms suggesting cognitive limitations),

the Court credited the opinions of the Government's two experts (Drs. Goldstein and Darby).  (*Id.* at 47-48.)  The Court did so based on Dr. Goldstein's and Dr. Darby's clinical observations, which were made after each spent multiple days interviewing Defendant, that Defendant was exaggerating symptoms of cognitive decline.  (*Id.*)

The Court gave little weight to the opinion of Defendant's expert Dr. Wood as to this issue.  (*Id.* at 49)  The Court did so after hearing her testimony on cross-examination at Defendant's competency hearing.  (*Id.*)  Dr. Wood was aware that Defendant claimed to have no appreciation for the December 2020 allegations made against him by co-counsel in the *Lion Air* case, but when she drew her conclusions, she had not heard voicemails left by Defendant for co-counsel that sought informal settlement of the dispute both before and after the contempt hearing—voicemails demonstrating he did understand the allegations.  (*Id.*)  Moreover, at the time she formed her opinion, Dr. Wood was unaware of a number of communications from Defendant that tended to demonstrate his mental competency.  (*Id.*)

After sifting through the evidence, the Court considered whether Defendant was, at the relevant time, able "to understand the nature and consequences of the proceedings against him" and "to assist properly in his defense." 18 U.S.C. § 4241(d).

As to the former, although Defendant repeatedly disavowed any knowledge of the substance of the charges made against him, the Court found him lacking credibility on this point.  (Competency Order, Doc. 150 at 50.)  The Court did so based upon Defendant's ability to discuss at length his understanding of those charges once they were framed in the hypothetical by Drs. Wood and Goldstein.  (*Id.*)  So framed, although Defendant disclaimed any knowing diversion of settlement funds due to clients, he allowed for the possibility that there was a negligent failure to disburse client funds properly.  (*Id.*)  He also demonstrated knowledge of how a trial proceeds, how to defend against the offenses charged in this case (when framed in the hypothetical), the role of the participants in a trial, and the likely consequences of a verdict of guilty.  (*Id.*)

As to his ability to assist in his own defense, the Court noted again that it did not believe Defendant's professed inability to retain knowledge of the charges against him. (*Id.* at 51.)  When discussing the charges in the hypothetical, Defendant identified an insightful defense strategy.  (*Id.*)  The Court also detailed other specific abilities that would enable Defendant to assist in his own defense.  (*Id.*)  The Court ultimately concluded that Defendant met the standard for competency to stand trial.

Mid-trial, the Court rejected defense counsel's *in camera* filing, noting that the submission by defense counsel was in substance "a request for an abbreviated, incomplete and *ex parte* second competency hearing," something the Court deemed "neither necessary nor appropriate."  (*See* Doc. 353.)

And in denying Defendant's Motion for a New Trial, the Court observed that Defendant's performance at trial did not suggest to the Court that he had been unable to understand the nature and consequences of the proceedings or unable to assist in his own defense.  Indeed, the Court observed that "Defendant's mental competency to stand trial was . . . established by his own testimony," before discussing that testimony at length. (Order Denying Motion for New Trial, Doc. 416 at 9-11.)

### 3.    No Substantial Question of Law or Fact

In order to raise a substantial question of law or fact, Defendant must identify an issue that is "fairly doubtful" or "fairly debatable" given the relevant standards of review, which would consider whether the Court's factual findings are plausible, logical, reasonable, and supported by evidence of record.[8]

At the outset, it must be noted that the Court's ruling in the Competency Order relied heavily upon analyses and comparison of the expert evidence of record.  In determining a defendant's competency to stand trial, district courts are given great discretion to weigh

---

[8] The abuse-of-discretion standard of review includes consideration of whether the district court applied the wrong legal standard, which defense counsel do not argue here.

expert testimony and to credit one expert opinion over another.  *See Gastelum-Almeida*,
298 F.3d at 1172 (affirming the district court and observing that "[i]n performing its fact-
finding and credibility functions, a district court is free to assign greater weight to the
findings of experts produced by the Government than to the opposing opinions of the
medical witnesses produced by the defendant"); *accord United States v. Frank*, 956 F.2d
872, 875 (9th Cir. 1992) (as amended on denial of reh'g); *United States v. Lindley*, 774
F.2d 993, 993 (9th Cir. 1985).  With that in mind, the Court considers the arguments of
defense counsel.

With the present Motion, defense counsel contend the Court's repeated rulings "are
at least fairly debatably erroneous, particularly because, as trial was conducted and post-
trial proceedings occurred, evidence mounted that Girardi was neither competent nor
feigning incompetence."  (Mot., Doc. 554 at 22.)

During trial and afterwards, defense counsel informed the Court that Defendant's
interactions with them did not meet the "minimum level sufficient to prepare and execute a
defense."  (*Id.* at 24-25 & n.7.)  On this point, the Court did not lightly dismiss defense
counsel's concern regarding their clients' mental state, and did not disbelieve counsel's
reports of Defendant's behavior.  Instead, the Court found that, given Defendant's
malingering when meeting with the experts, and because Defendant's disorder was (as the
experts agreed) merely slowly progressive in nature, it was "far more likely that Defendant
was . . . feigning a complete memory loss" than it was that Defendant's cognition genuinely
declined to the level demonstrated to defense counsel during trial.  (*See* Doc. 416 at 9.)
And as discussed *supra*, and as set forth more fully in the Court's Order Denying Motion
for New Trial, Defendant's testimony, which was given on the last day of trial, is itself
strong evidence of Defendant's mental competency throughout the trial.  (*Id.* at 9-11.)

As for substantial questions of law or fact during the time after trial but before sentencing,[9] Defendant argues that the BOP examiners did not report that Defendant was malingering or exaggerating his cognitive decline.  (*See* Mot., Doc. 554 at 26 (citing BOP Report, Doc. 500 at 10).)  On this point, the BOP evaluators reported as to objective measures of Defendant's effort on neuropsychological tests, which they found to be acceptable (*id.* at 21-22 & 24), but the BOP evaluators did not discuss whether they believed that Defendant was feigning or exaggerating his symptoms in his interactions with them or others within the facility.  Notably, BOP evaluators were simply not focused on the same issue as was the Court; instead, the purpose of their report was different, so their focus was on whether Defendant demonstrated sufficient functionality such that the BOP could place him in a BOP facility or whether he would require more supervision.  (*See* BOP Report, Doc. 500 at 2-3.)  Thus, the BOP evaluators' lack of any conclusion as to whether Defendant was malingering does not assist defense counsel in raising a substantial question of law or fact in this case.  To the contrary, the overall impression noted by the evaluators in their "neuropsychological summary" does more to support the Court's competency finding than to detract from it:

> Overall, Mr. Girardi presents as alert and partially oriented, and he has some insight regarding his abilities and deficits.  He demonstrates appropriate social interaction and adequate recollection of his history, despite having difficulty with his more recent timeline.  He can read and write, and his language skills remain a strength for him.  Further, he demonstrated intact attention and executive skills, though with some slowing.

(*See* BOP Report, Doc. 500 at 24.)

---

[9] Defendant also points out, and rightly so, that "[t]he requirement of competency extends . . . all the way through sentencing."  (*See id.* at 23); 18 U.S.C. § 4241 ("At any time after the commencement of a prosecution for an offense **and prior to the sentencing of the defendant**," either party "may file a motion for a hearing to determine the mental competency of the defendant.") (emphasis added).

To raise a substantial question of law or fact in this context, defense counsel would be required to establish that it is "fairly debatable" that the Court clearly erred or abused its discretion as to its finding that Defendant was mentally competent.  Here, defense counsel fails to show that it is "fairly debatable" whether the Court rulings were illogical, implausible, unreasonable, or lacking in evidentiary support.  As such, no substantial issue of law or fact has been raised.

### 4. Likelihood of Reversal or Order for a New Trial

The requirement that a criminal defendant meet the standard for mental competency to stand trial is so fundamental that, should Defendant prevail on this issue, the appellate court would likely reverse his conviction to protect Defendant's right to Due Process.

## IV. CONCLUSION

As set forth herein, Defendant has failed to raise any "substantial question of law or fact" on appeal.  Moreover, as to three of the four bases for Defendant's Motion, he has failed to establish that if the identified issue were to be resolved in his favor, that resolution would be likely to result in any of the remedies set forth in 18 U.S.C. § 3143(b)(1)(B)(i)-(iv).  Accordingly, the Court DENIES Defendant's Motion for Bond Pending Appeal.

**IT IS SO ORDERED.**

DATED:  September 19, 2025

HON. JOSEPHINE L. STATON
United States District Judge